# EXHIBIT B

6/3/2024 9:33 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 88351753
By: Cynthia Clausell-McGowan
Filed: 6/3/2024 8:42 AM

CASE NO. _____

| | | |
|---|---|---|
| COAST TO COAST TITLE, LLC, SOL CITY TITLE, LLC, MAGNOLIA TITLE ARKANSAS, LTD., MAGNOLIA TITLE FLORIDA, LLC, THE PEABODY BULLDOG, LLC, AND JOHN MAGNESS | § § § § § § | IN THE DISTRICT COURT OF |
| **PLAINTIFFS,** | § § § | |
| V. | § § | HARRIS COUNTY, TEXAS |
| TYRELL L. GARTH, PHILLIP H. CLAYTON, DEBBIE MERRITT A/K/A DEBORAH MERRITT, MATTHEW D. HILL, CHARLES BURNS, P. GARRETT CLAYTON, SCOTT M. REEVES, ARIANE E. YOUNG, TINGLEMERRITT, LLP, STARREX TITLE FLORIDA, LLC, LAURIE COOPER, MARKETSTREET CAPITAL PARTNERS, LLC, MARKETSTREET CAPITAL PARTNERS AR, LLC, AND BRIAN A. BREWER | § § § § § § § § § § § § § § § | _____ JUDICIAL DISTRICT |
| **DEFENDANTS.** | | |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Arkansas, Ltd., and Magnolia Title Florida, LLC (collectively the **"Magnolias,"** the **"Magnolia Companies"**, or **"Magnolia Entities"**), The Peabody Bulldog, LLC (**"TPB"**), and John Magness (**"Magness"**), and collectively with the Magnolia Entities and TPB, **"Plaintiffs"**) and collectively file this, their Original Petition, against Tyrell L. Garth, Phillip H. Clayton, Debbie Merritt a/k/a Deborah Merritt, Matthew D. Hill, Scott M. Reeves, Ariane E. Young, TingleMerritt, LLP, Starrex Title Florida, LLC, Laurie Cooper, MarketStreet Capital Partners, LLC, MarketStreet Capital Partners AR, LLC, and Brian A. Brewer, and would respectfully show the following:

## I.
## DISCOVERY CONTROL PLAN

1.    Plaintiffs request that discovery be conducted under Level 2 pursuant to Rule 190.3 of the Texas Rules of Civil Procedure ("TRCP").

Copy from re:SearchTX

## II.
## TRCP 47 STATEMENT

2.      Plaintiffs seek monetary relief over $1,000,000.00 and may seek injunctive relief as well.

## III.
## PARTIES

3.      Plaintiff **Coast to Coast Title, LLC** (sometimes **"Coast to Coast"**) is a Texas limited liability company with its principal place of business in Harris County, Texas.

4.      Plaintiff **Sol City Title, LLC** (sometimes **"Sol City"**) is a Texas limited liability company with its principal place of business in Harris County, Texas.

5.      Plaintiff **Magnolia Title Arkansas, Ltd.** (sometimes **"Magnolia Arkansas"** or **Magnolia Title Arkansas"**) is an Arkansas limited liability company with its principal place of business in Harris County, Texas.

6.      Plaintiff **Magnolia Title Florida, LLC** (sometimes **"Magnolia Florida"** or **"Magnolia Title Florida"**, and with Coast to Coast, Sol City, and Magnolia Title Arkansas, collectively, **"the Magnolias"**, **"the Magnolia Companies"**, **"the Magnolia Entities"**) is a Florida limited liability company with its principal place of business in Harris County, Texas.

7.      Plaintiff **The Peabody Bulldog, LLC ("TPB")** is a Texas limited liability company with its principal place of business in Harris County, Texas.  TPB is also a shareholder of Starrex International, Ltd. (250,000 common shares). Prior to this lawsuit, TPB sent a pre-suit notice letter to the Board of Directors of Starrex International, Ltd. and its counsel in a related lawsuit providing notice that it intends to file a derivative shareholder action under Canadian (Alberta) law and Texas law against Directors and Officers Charles Burns, Garrett Clayton, Scott Reeves, Matthew Hill, and Debbie Merritt for various breaches of fiduciary duty to Starrex International, Ltd.  TPB has asked the Board of Directors of Starrex International, Ltd. to investigate and take legal action against these persons for their malfeasance.  TPB presumes that its demand is futile but understands that it must make this demand and notice as a condition precedent to the filing of a derivative action against the aforementioned directors and officers.  Accordingly, TPB will await its day to bring a derivative shareholder action against such persons.

8.      Plaintiff **John Magness ("Magness")** is an individual living in Harris County, Texas.

Copy from re:SearchTX

9.    Defendant **Tyrrell L. Garth** (**"Garth"**) is an individual living in or about Jefferson County, Texas.  He materially participated in relevant actions as detailed herein, including drafting and participating in the forgery and scheme performed or performable in Harris County, Texas.  He may be served as his usual place of business:

> Tyrrell L. Garth
> Cheyenne Capital
> 7350 Phelan Blvd.
> Beaumont, TX 77706-5821

> OR WHEREVER HE MAY BE FOUND

> **CITATION IS REQUESTED TO ISSUE.**

10.   Defendant **Phillip H. Clayton** (**"Clayton"**) is a three-time convicted felon and individual living in or about Harris County, Texas.  He materially participated in relevant actions as detailed herein.  He may be served at his residence:

> Phillip H. Clayton
> 15015 Jones Rd.
> Houston, TX 77070

> OR WHEREVER HE MAY BE FOUND

> **CITATION IS REQUESTED TO ISSUE.**

11.   Defendant **Debbie Merritt a/k/a Deborah Merritt** (**"Merritt"**) is an individual living in Harris County, Texas.  She is the Chief Financial Officer of Starrex International, Ltd. and Starrex Insurance Holdings, Inc. and the Title Authorized Person of Starrex Title Florida, LLC.  She may be served as her usual place of business at:

> Debbie Merritt
> Starrex International, Ltd.
> 14701 Saint Marys Ln.
> Ste. 150
> Houston, TX 77079

> OR WHEREVER SHE MAY BE FOUND

> **CITATION IS REQUESTED TO ISSUE.**

Copy from re:SearchTX

12. Defendant **Matthew D. Hill** (**"Hill"**) is the former President and CEO of Starrex International, Ltd. (resigned February 6, 2024) and Starrex Insurance Holdings, Inc. and believe to maintain his positions with Starrex International, Ltd. as the current Chairman of the Board, Director on the Board, and Audit Committee Member.  He is also Phillip H. Clayton's son-in-law. He may be served at the following addresses:

> Matthew D. Hill
> Dart Land Services LLC (Managing Member)
> Property Interlink, LLC (CEO)
> MFI Credit Solutions LLC (President)
> 14701 Saint Marys Ln. #150
> Houston, TX 77079-2927
>
> Matthew D. Hill (Managing Member)
> Junction Hill Cattle Company, LLC
> 15015 Jones Rd.
> Houston, TX 77070
>
> Matthew D. Hill (Manager/Member)
> FreyHill Enterprises, LLC
> 11806 Rue St. Honroe Ct.,
> Tomball, TX 77377


> OR WHEREVER HE MAY BE FOUND
>
> **CITATION IS REQUESTED TO ISSUE.**


13. Defendant **Charles Burns** (**"Burns"**) is the current President and CEO of Starrex International, Ltd. since February 6, 2024, when he replaced Hill.  Burns has also served as the Chair of the Starrex Audit Committee since 2014, a member of the Starrex Audit Committee since 2004, and has been a Director on the Board of Starrex since 2004.  He may be served at the following addresses:

> Charles Burns
> Starrex International Ltd.
> 14701 Saint Marys Lane, Suite 150
> Houston, TX 77079
> (Business)

Copy from re:SearchTX

Charles Burns
199 Bay Street, Suite 2200
Toronto, Ontario M5L 1G4
cburns@bayshore.ca
(Business)

OR WHEREVER HE MAY BE FOUND

**CITATION IS REQUESTED TO ISSUE.**

14. Defendant **P. Garrett Clayton ("P.G. Clayton")** has been a Director on the Board of Starrex International, Ltd. since December 9, 2013, a member of the Starrex Audit Committee Member from 2013 and 2016 as well as the Chairman of the Board, President, and CEO from December 9, 2013 to November 1, 2016. He is also the son of Phillip H. Clayton. He is a significant direct and indirect shareholder of Starrex and continues to serve as a Director. He may be served at the following address, his usual places of business or residence:

P. Garrett Clayton
Starrex International Ltd.
14701 Saint Marys Lane, Suite 150
Houston, TX 77079
(Business)

P. Garrett Clayton
Seventh Floor Investments LLC
9999 Bellaire Blvd. # 7B
Houston, TX 77036-3588
(Business)

P. Garrett Clayton
6 Galloway Gates Ct.
Tomball, TX 77377
(Harris County Residence)

OR WHEREEVER HE MAY BE FOUND

**CITATION IS REQUESTED TO ISSUE.**

15. Defendant **Scott M. Reeves ("Reeves")** is a Director, the Corporate Secretary, Audit Committee Member, and General Counsel of Starrex International, Ltd., a contractual signing

Copy from re:SearchTX

authority of the company, and a certifying Audit Committee Member who signed numerous Starrex International, Ltd. filings filed with SEDAR containing material misrepresentations and omissions of fact.  He also participated in the fraudulent, forged Magnolia promissory notes scheme and cover up.  He is the husband and/or partner of Ariane Young and a Partner with the Canadian law firm of Tingle Merrett LLP.  He is a resident of Calgary, Alberta.  He may be served at his usual place of business, as follows:

> Scott M. Reeves
> Tingle Merrett LLP
> Suite 1250 Standard Life Building, 639 – 5th Avenue S.W.
> Calgary, Alberta T2P 0M9 Canada

> Scott M. Reeves
> Starrex International, Ltd.
> 14701 Saint Marys Ln. #150
> Houston, TX 77079-2927

> OR WHEREVER HE MAY BE FOUND

> **CITATION IS REQUESTED TO ISSUE.**

16.  Defendant **Ariane E. Young** (**"Young"**) participated in the fraudulent, forged Magnolia promissory notes scheme involving the cover up.  She is the wife and/or partner of Scott Reeves and a Partner with the Canadian law firm of Tingle Merrett LLP.  She is a resident of Calgary, Alberta, Canada.  She may be served at his usual place of business, as follows:

> Ariane E. Young
> Tingle Merrett LLP
> Suite 1250 Standard Life Building, 639 – 5th Avenue S.W.
> Calgary, Alberta T2P 0M9 Canada

> OR WHEREVER SHE MAY BE FOUND

> **CITATION IS REQUESTED TO ISSUE.**

17. Defendant **TingleMerrett LLP a/k/a Tingle Merrett LLP** (**"TingleMerrett"**) is a Canadian law firm and professional limited partnership with its principal place of business in Calgary, Alberta, Canada.  The knowledge of its partners, Scott M. Reeves and Ariane E. Young,

Copy from re:SearchTX

is imputed to the firm. "Texas law imputes one attorney's knowledge to all attorneys in a firm." *Tesco American, Inc. v. Strong Indus., Inc.*, 221 S.W.3d 550, 553 (Tex. 2006) (reversing appellate decision because one judge had conflict stemming from prior firm's representation of party while she was lawyer with the firm, although she was unaware of it); *Unauthorized Practice of Law Comm. v. Am. Home Assurance Co., Inc.,* 261 S.W.3d 24, 40 (Tex. 2008) ("Texas law imputes knowledge of confidential information to counsel's lawyer-associates so that in a private law firm, all of the lawyers are irrebuttably presumed to have knowledge of the confidential information."); *Nat'l Medical Enters., Inc. v. Godbey,* 924 S.W.2d 123, 131 (Tex. 1996) ("The attorney's knowledge is imputed by law to every other attorney in the firm."). It may be served through its registered agent, or any president or vice president, as follows:

> Attention: Registered Agent, President, or Vice President
> TingleMerrett LLP
> Suite 1250, 639-5th Ave. S.W.
> Calgary, Alberta T2P 0M9

**CITATION IS REQUESTED TO ISSUE.**

18. Defendant **Starrex Title Florida, LLC ("Starrex Title Florida")** is a Florida limited liability company solely managed by Title Manager Starrex Insurance Holdings, Inc., which has already appeared herein. Its principal place of business is in Sarasota, Florida, in the premises of Magnolia Title Florida, LLC's Sarasota office (2075 Fruitville Road, Suite 100, Sarasota, FL 34237), which it wrongfully took over along with Magnolia Title Florida, LLC's property, proprietary property, and intellectual property. Its Title Authorized Person is Debbie Merritt. Its registered agent and title agent in charge is Laurie Cooper. It may be served through service on its sole manager, Starrex Insurance Holdings, Inc., or by service on its registered agent who also offices at Starrex Title Florida, LLC's office:

> Laurie Cooper, Registered Agent
> 2075 Fruitville Road
> Suite 100
> Sarasota, FL 34237

OR WHEREEVER SHE MAY BE FOUND

**CITATION IS REQUESTED TO ISSUE.**

Copy from re:SearchTX

19.  Defendant **Laurie Cooper** (**"Cooper"**) is the former President of Magnolia Title Florida, LLC and Magnolia Title Arkansas, Ltd., and a resident of Florida who may be served at her usual place of business:

> Laurie Cooper
> "Magnolia Title Company," an assumed name of
> MarketStreet Capital Partners, LLC
> Starrex Title Florida, LLC
> 2075 Fruitville Road
> Suite 100
> Sarasota, FL 34237

> OR WHEREEVER SHE MAY BE FOUND

> **CITATION IS REQUESTED TO ISSUE.**

20.  Defendant **MarketStreet Capital Partners, LLC** d/b/a Magnolia Title Company (FL; 2/2/24 - Present) (**"MarketStreet Capital Partners"**) is a Texas limited liability company with its principal place of business in Harris County, Texas.  It may be served through its registered agent, as follows:

> Brian A. Brewer (Registered Agent)
> 25700 Interstate 45
> Suite 100
> Spring, TX 77386-1357

> OR WHEREEVER HE MAY BE FOUND

> **CITATION IS REQUESTED TO ISSUE.**

21.  Defendant **MarketStreet Capital Partners AR, LLC** d/b/a Magnolia Title Company (AR; 1/30/24 - Present) (**"MarketStreet AR"** and with MarketStreet Capital Partners, collectively **"MarketStreet"**) is an Arkansas limited liability company with its principal place of business in Pulaski County, Arkansas, at Magnolia Title Arkansas, Ltd.'s office location, which it wrongfully took over along with Magnolia Title Arkansas, Ltd.'s property, proprietary property, and intellectual property.  It may be served through its registered agent, as follows:

> Brian A. Brewer (Registered Agent)
> "Magnolia Title Company," an assumed name of
> MarketStreet Capital Partners AR, LLC

Copy from re:SearchTX

10310 W. Markham St.
(Suite 220)
Little Rock, AR 72205

OR WHEREEVER HE MAY BE FOUND

**CITATION IS REQUESTED TO ISSUE.**

22. Defendant **Brian A. Brewer** d/b/a Magnolia Title Company (FL; 1/24/24 – 2/2/24) (**"Brewer"**) is a Texas resident with his domicile in or about Harris County, Texas. He may be served at his usual place of business, as follows:

Brian A. Brewer
MarketStreet Capital Partners, LLC
25700 Interstate 45
Suite 100
Spring, TX 77386-1357

Brian A. Brewer
Momentum Title, LLC
Mailing:
25700 Interstate 45
Suite 100
Spring, TX 77386-1357
Office:
1400 Woodloch Forest Drive
Suite 575
The Woodlands, TX 77380

OR WHEREEVER HE MAY BE FOUND

**CITATION IS REQUESTED TO ISSUE.**

23. Starrex International Ltd. (**"Starrex"** or **"Starrex International"**) is not currently a party to this lawsuit but is referenced herein and is a party to companion litigation with Cause No. 2023-85306; styled *Starrex International Ltd., et al. v. Coast to Coast Title, LLC, et al.*; Pending in the 11th Judicial District Court of Harris County, Texas (the **"Starrex Lawsuit"**). It is a Canadian company with its principal place of business in Harris County, Texas.

24. Starrex Insurance Holdings, Inc. (**"SIH"**) is not currently a party to this lawsuit but may be referenced herein and is a party to the Starrex Lawsuit. It is a Nevada Corporation with its principal place of business in Harris County, Texas.

Copy from re:SearchTX

25.  Starrex Holdings, Inc. is not currently a party to this lawsuit but may be and is a party to the Starrex Lawsuit. It is a Wyoming Corporation with its principal place of business in Harris County, Texas.

26.  Starrex Insurance Services, Inc. (**"SIS"** and with SIH, collectively, **"Starrex Insurance"**) is not currently a party to this lawsuit but may be referenced herein and is a party to the Starrex Lawsuit. It is a Nevada DBA/assumed name of Starrex Insurance Holdings, Inc. with its principal place of business in Harris County, Texas and has appeared herein.

27.  Starrex Technical Services, LLC is not a party but may be referenced herein and is a party to the Starrex Lawsuit. It is a Nevada limited liability company with its principal place of business in Harris County, Texas and has appeared herein.

## IV.
### JURISDICTION

28.  The Court possesses jurisdiction over this matter because the amount in controversy exceeds the minimum jurisdictional limit of the Court.  TEX. R. CIV. P. 47(b).

29.  Venue is proper in Harris County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE §§ 15.002(a)(1) and (2).

30.  Venue is also proper pursuant to TEX. CIV. PRAC. & REM. CODE § 15.005.

31.  This Court has personal jurisdiction over defendants Laurie Cooper, MarketStreet Capital Partners AR, LLC, and Starrex Title Florida, LLC pursuant to the Texas long-arm statute because they purposefully availed themselves of the privileges and benefits of conducting business in Texas. Tex. Civ. Prac. & Rem. Code § 17.042.

32.  Specifically, Cooper, while still employed by and owing fiduciary duties to plaintiffs Magnolia Title Arkansas, Ltd. and Magnolia Title Florida, LLC, misappropriated their trade secrets, intellectual property, customer data, and other proprietary information that was hosted on computer systems in Texas and belonged to Texas entities.

33.  MarketStreet Capital Partners AR, LLC then conspired with and aided and abetted Cooper in misappropriating and misusing those misappropriated Texas trade secrets, customer data and other proprietary information to facilitate its competing title business operations improperly usurped from the Magnolia entities.  It knew or should have known that its conduct would have effects in the forum state of Texas.  *See Gen. Elec. Co. v. Brown Ross Int'l Distribs., Inc.*, 804

Copy from re:SearchTX

S.W.2d 527, 533 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (citing to *McFee v. Chevron Int'l Oil Co.*, 753 S.W.2d 469, 473 (Tex. App.—Houston [1st Dist.] 1988, no writ)).

34.   Starrex Title Florida, LLC is a Florida limited liability company solely managed by Starrex Insurance Holdings, Inc., which has already appeared in this litigation. By misappropriating the Magnolia entities' Texas trade secrets and business assets through its connections with Cooper and MarketStreet, Starrex Title Florida purposefully availed itself of jurisdictional contacts in Texas.

35.   All defendants' contacts with Texas arise from the same nucleus of operative facts giving rise to this litigation regarding misappropriation of trade secrets and corporate opportunities belonging to Texas entities. Thus, specific personal jurisdiction exists that comports with due process. *See Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (specific jurisdiction requirements met where suit arises from or relates to defendant's contacts with Texas).

36.   Personal jurisdiction over these defendants is further proper under the Texas long-arm statute because they recruited Texas residents like Cooper for employment and conspired to misappropriate trade secrets from Texas companies in furtherance of their tortious activities. *See* Tex. Civ. Prac. & Rem. Code § 17.042. The quality and nature of their purposeful contacts related to this litigation, combined with their targeting of Texas companies and residents for harm, make the exercise of jurisdiction proper and comport with traditional notions of fair play and substantial justice.

37.   "Even if all of a corporate representative's actions are performed in his corporate capacity, the officer or member may also be subjected to personal jurisdiction and held liable in his individual capacity for those actions if they were tortious." *City of White Settlement v. Emmons*, No. 02-17-00358-CV, *40 (Tex. App.—Fort Worth Sept. 27, 2018, pet. denied) (mem. op.) (citing *OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *9 (Tex. App.—Fort Worth Mar. 29, 2018, no pet.) (mem. op.); *Deaton v. Moreno,* No. 02-16-00188-CV, 2017 WL 4683940, at *5 (Tex. App.—Fort Worth Oct. 19, 2017, pet. denied) (mem. op.); *Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 581 (Tex. App.—Austin 2006, no pet.). A corporate officer who had "direct, personal participation in the wrongdoing" so that he was the " 'guiding spirit behind the wrongful conduct' or the 'central figure' in the challenged corporate activity" may not escape liability. *City of White Settlement*, No. 02-17-00358-CV, at *40 (citing *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.) (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985))).

Copy from re:SearchTX

38.  Out-of-state Defendants have routinely and purposefully reached into the state of Texas to conduct business, acquire trade secrets, solicit employment, and/or attend business-related meetings.  *Broussard v. IPSCO Tubulars, Inc.*, 641 S.W.3d 805, 811-12 (Tex. App.—Eastland 2022) (citing *BMC Software Belgium v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).  Out-of-state Defendants have misappropriated or committed unauthorized disclosure of confidential information stored in Texas, belonging to businesses with their principal place of business in Texas.  All tortious acts plead herein occurred in Texas.

39.  In sum, by committing tortious acts and/or knowingly misappropriating trade secrets and intellectual property from Texas entities, using misappropriated assets to facilitate operations directly competing against Texas companies, and conspiring with Texas residents like Cooper toward these unlawful ends, the defendants purposefully established minimum contacts within Texas and could reasonably anticipate being haled into Texas courts. Their actions satisfy Texas's long-arm statute and due process requirements for personal jurisdiction.

## V.
### Conditions Precedent

40.  Plaintiffs plead pursuant to Rule 54 of the TRCP that all conditions precedent to recovery have been performed or have occurred.

## VI.
### Facts

41.  The Declaration of John Magness is attached hereto as **Exhibit A** and incorporated by reference for all purposes herein.

### A.  Leadership of Starrex

42.  At the time that Starrex filed this lawsuit, Starrex International's leadership consisted of (a) Matthew D. Hill, President, Chairman & CEO, and a Member of the Audit Committee, (b) Debbie Merritt, CFA, PhD, Chief Financial Officer, (c) P. Garrett Clayton, Director, a son of Phillip H. Clayton, (d) Scott M. Reeves, Director, Corporate Secretary, and Member of the Audit Committee as well as de facto General Counsel, (e) and Charles Burns, Director and the Chair of the Audit

Copy from re:SearchTX

Committee.  On February 6, 2024, Matthew D. Hill suddenly resigned as President and CEO and was replaced by Charles Burns as President and CEO, who continued to serve as Chair of the Audit Committee.  Tyrrell L. Garth ("Garth") owns at least 19.77% of Starrex as of October 4, 2022. Phillip H. Clayton's ("Clayton") The Clayton Legacy Foundation owns at least 19.86% of Starrex as of October 4, 2022.  Garth and Clayton have ownership in each Magnolia entity and together, they own about 2/3 of the Magnolia Title Arkansas and Magnolia Title Florida entities, as stated multiple times in capitalization tables provided by Merritt detailing ownership of the Magnolias.

43.   Starrex International wholly owns and controls Starrex Insurance.

44.   As a publicly traded Canadian company (although with its corporate offices and principal place of business and operations in Texas), Starrex must have at least three audit committee members.  According to Section 1.4 of Canada National Instrument 52-110, Audit committee members of the Company must be independent directors with some limited, temporary exceptions. To be independent a director must have no direct or indirect material relationship with the Company. A material relationship is generally a relationship which could, in the view of the board of directors, be reasonably expected to interfere with the exercise of the director's independent judgment.  On information and belief, it appears that the requirement of independence (or any applicable exemption) is no longer being met and that following the nonattainment of this requirement (or any applicable exemption), the most substantial financial and reporting malfeasance in the Company's recent history began to occur.  Specifically, each of the current directors is as follows:

- **Charles Burns**
  - Chair of the Audit Committee from 2014 to Present.
  - Member of the Audit Committee from 2004 to Present.
  - Director from 2004 to Present.
  - President and CEO from February 6, 2024 to Present.
  - Not an independent director while serving as President and CEO.  *See* NI 52-110, Section 1.4.
  - Not an independent member of the Audit Committee while serving as President and CEO.

- **Matthew D. Hill**
  - Member of the Audit Committee from November 1, 2016 to Present.
  - Member of the Compensation Committee as of November 3, 2022.
  - Chairman of the Board from November 1, 2016 to Present.
  - Director from July 12, 2016 to Present.

Copy from re:SearchTX

- o President and CEO from November 1, 2016 to February 6, 2024.
- o Senior Vice President from January 1, 2015 to November 1, 2016.
- o Not an independent director while serving as President and CEO. *See* NI 52-110, Section 1.4.
- o Not an independent member of the Audit Committee while serving as President and CEO.

- **Scott Reeves**
  - o Member of the Audit Committee from March 1, 2022 to Present.
  - o Director from December 4, 2019 to Present.
  - o Member of the Compensation Committee as of November 3, 2022.
  - o Corporate Secretary from at least June 12, 2020 to Present. (Ronald Mann resigned as Corporate Secretary effective December 4, 2019.)
  - o General Counsel of, and corporate legal counsel to, the Company.
  - o Not an independent director while receiving certain compensation from the Company or serving as Corporate Secretary or General Counsel. *See* NI 52-110, Sections 1.4-1.5.
  - o Not an independent member of the Audit Committee.

- **P. Garrett Clayton**
  - o Member of the Audit Committee from 2013 to 2016.
  - o Significant direct and indirect shareholder of Starrex
  - o Director from December 9, 2013 to Present.
  - o Chairman of the Board from December 9, 2013 to November 1, 2016.
  - o President and CEO from December 9, 2013 to November 1, 2016.
  - o Not an independent director as he is a related party to the Company. *See* NI 52-110, Section 1.4.
  - o Not an independent member of the Audit Committee while serving as President and CEO.

## B. Tyrrell L. Garth Partners with Three-Time Convicted Felony, Clayton, and they Make Material Misrepresentations to Induce Magness to Forego Lucrative Job Offers and Incude a Third-Party to Invest $1MM and Move his Title Business into the Magnolias

45. Tyrrell L. Garth ("Garth") was intimately involved in the operations, managerial decisions, and negotiations for and on behalf of both the Magnolias and Starrex. He consistently played both sides and believes he can insulate himself from his conduct simply because he had no official officer position with any of the parties. His de facto and demonstrated control of the Magnolias and Starrex, as evidenced by numerous communications and documents, including his direct and indirect ownership in each company indicate a person deeply involved in and directing the ongoing affairs of the Magnolias and Starrex.

Copy from re:SearchTX

46. Phillip H. Clayton ("Clayton") participated alongside Garth, as the men had known each other and partnered together for well over 30 years, including when Clayton was charged by the SEC in 2003 after having already been convicted of three felony offenses.

47. On April 8, 2021, Garth, Clayton, Garrett Clayton, and others met with John Magness ("Magness"), a seasoned title insurance executive with a successful track record, in order to introduce him to the idea of managing the Magnolia Title insurance companies. Clayton followed up with an email on April 13, 2021 at 11:51 AM in which he thanked Magness and told him that he could join partners "with the highest of moral character" and to "not overlook the Canadian Pubco (Starrex) that has a dual listing in the U.S. We could easily have a $10.00 share by the summer and could control our destiny . . . ." (Magness was not aware of Clayton's criminal history or charges and convictions for stock price manipulation.) Garth similarly told Magness: "Breath on it (the Starrex stock) and it goes to $5.00 (a share)." Starrex International's stock price currently sits around $0.12/share Canadian on the Canadian National Stock Exchange (CSE: STX), as of this time of the filing on generally a low or zero volume.

48. With thrice-convicted felon, Clayton, he attended in person meetings with ANTIC (now Essent Ventures) to get the ANTIC Line of Credit in place. He made representations to the CEO of ANTIC, David Townshend, its General Counsel, Robe Noce, and its COO, Todd Mendolia, that Starrex would sign the Line of Credit because Starrex's acquisition of the Magnolias was imminent.

49. At all relevant times, Garth acted as though he was an authorized representative of Starrex. For instance, see the below email and legal document signed by Garth as "Authorized Corporate Representative of Starrex International, Ltd.:

Copy from re:SearchTX

From: <TGarth@cheyenneinvest.com>

Date: Tue, May 31, 2022 at 1:11 PM

Subject: RE: Mediation - June 1, 2022 - The Peadbody Bulldog, LLC, et al. v. Blackburn, et al. - 6 cases

To: Charles Sturm <csturm@sturmlegal.com>, Britt naponic <brittnaponic@gmail.com>, John Magness <johnmagness1020@gmail.com>

I am attaching my menu and Page 4 of the mediation package which I have signed in all capacities. Please forward this information to the mediator on my behalf.

Tyrrell L. Garth

Cheyenne Capital Corp.

7350 Phelan Blvd.

Beaumont, Tx 77706

(409) 866-5444

(409) 866-3666 / Fax

tgarth@cheyenneinvest.com

Copy from re:SearchTX

| Authorized Corporate Representative | CSP Texas Joint Venture, LLC |
| | |
| Charles A. Sturm (SBN 24003020) | Peabody Bulldog, LLC and John Magness |
| | |
| John Magness | |
| | |
| Authorized Corporate Representative | Peabody Bulldog, LLC |
| | |
| Glen W. Morgan (SBN 14438900) | Terry Garth, 405 Manhattan Investments, LLC, Alphabet Investments, LLC and Starrex International, Ltd. |
| Terry Garth | |
| Authorized Corporate Representative | 405 Manhattan Investments, LLC |
| Authorized Corporate Representative | Alphabet Investments, LLC |
| Authorized Corporate Representative | Starrex International, Ltd. |

DATED the _____ day of _____ 2022.

- 4 -

Copy from re:SearchTX

50.  Garth told the CEO of the Manager of HMH Title Investments, LLC ("HMHTI"), B. Nelson Mitchell, Jr. ("Mitchell"), that John Magness would run Starrex and acquisitions would be performed nationwide along with recruitment-driven growth.  He also represented to History Maker Homes ("HMH") that the Magnolias would be acquired by Starrex.  Additionally, he represented to Mr. Mitchell that the cash investment in the Magnolias would be used as working capital and to grow the business and not to pay back any debts, expenses, or reimbursements. These were all material inducements for History Maker Homes' title business to on board with Starrex (which Garth valued at $5 million as a stand-alone company according to a Jan. 24, 2023 11:07AM email) and for Mr. Mitchell to invest $1 million across the four Magnolias.

51.  None of these things happened nor did Garth intend for them to happen at the time of his representations.  Additionally, on information and belief, once the $1 million investment entered the coffers, Garth and Clayton directed approximately $750,000 - $850,000 of it to be used to reimburse them for expenses they incurred, in a blatant manner of self-dealing.

52.  HMHTI invested $1,000,000 in the Magnolias based on Garth's representations.  It remitted the investment amount on September 9, 2022.  HMHTI could not know that just five weeks later, Starrex International and Starrex Insurance Services, Starrex, Garth, Hill, and Merritt would create promissory notes that they allege were entered into by the Magnolias on or effective October 17, 2022, in complete circumvention of HMHTI's rights and the very Side Letters agreements drafted by Garth nine months prior.[1]

53.  Further, Garth misrepresented to John Magness that he would receive millions of shares of Starrex stock as compensation and that Kevin Gartland and Mr. Magness would run Starrex after it merged with the Magnolias.  He represented that he had access to at least $50 million from friends and family investors and a $50 million credit facility for investment in the Magnolias and combined Magnolias-Starrex entity and intended for the executives and investors of the Magnolias to rely upon this.  In reality, Garth never raised one dime.

---

[1] HMHTI also could not know that Starrex, Garth, Hill, and Merritt would intentionally keep HMHTI blind to these alleged promissory notes then forge signatures on such notes.  After that, based on the fake notes, Starrex, Garth, Hill and Merritt would file groundless UCC-1 financing statements covering all of the assets of the Magnolias.  They would then sue the Magnolias based on the fake notes and attempt to strong arm the Magnolias into accepting a terrible deal through these tactics and by completely cutting off all IT services in the very manner that Garth had warned less than two years earlier would "destroy the Magnolias" when a different management company threatened the same drastic action, which included cutting off the Magnolias' access to the mission-critical digital platform Qualia.  We will likely discover more evidence this very idea was planted in the heads of Garth, Hill, and Merritt by those events less than two years earlier.

Copy from re:SearchTX

54. Garth represented to Kevin Gartland, CEO and owner of All American Title Co.("All American") that both All American and the Magnolias would certainly be owned by Starrex, Mr. Gartland and Mr. Magness would run the resulting, combined entity, and synergies would be created across the platform through additional acquisitions and organic growth. Since Starrex owned no title business at the time of the All American acquisition (on or about March 17, 2023), Garth told Gartland that Starrex would acquire the Magnolias within 30 days thereafter. Mitchell, Gartland, and Magness all asked Garth for assurances that this would occur. Garth said it would. On information and belief, Gartland would have never sold All American to Starrex if he had known that Starrex had no intention of acquiring the Magnolias because without the acquisition of the Magnolias, there was little business benefit for the profitable All American.

55. Between May 2022 to September 2022, Garth negotiated on behalf of the Magnolias with HMH while also representing Starrex's intentions and that he effectively controlled Starrex. Garth drafted and negotiated the contribution agreements that HMHTI eventually signed as well as the Side Letters that HMHTI and the Magnolias would eventually sign, controlling the corporate governance. Clayton was at every meeting as well, making representations to HMHTI. HMHTI was willing to invest $1 million in cash into the Magnolias based on certain conditions known to Garth and which Garth represented existed or which he would soon make occur. Garth also promised HMHTI that his investment would not be used to repay investors or pay off debts, but rather to fund the growth of the company. (Yet, on information and belief, up to $850,000 of HMHTI's investment was used to reimburse Garth and Clayton's expenses.)

56. While negotiating with HMHTI, Garth drafted and produced term sheets on May 24, 2022 at 12:10 PM, that detailed the the combination of the Magnolias and Starrex set forth elaborate and comprehensive action plans for the combination of the companies and the operations of all the companies going forward. The term sheets he drafted were signed by John Magness as manager of the Magnolias, Matt Hill as CEO of Starrex International and Starrex Insurance Services, and Nelson Mitchell as CEO of HMHTI. The term sheets called for a closing date of Starrex's acquisitions of the Magnolias of August 1, 2022.

57. As Garth represented Starrex's acquisition of the Magnolias was imminent, Garth drafted and revised four Side Letters and four Contribution Agreements with HMH that were designed to effectively alter the way the four Magnolias were governed without renegotiating all four of the Limited Liability Company Agreements with all the shareholders of the Magnolias. The Side

Copy from re:SearchTX

Letters were executed by HMHTI and the Magnolias and were intended to bridge the Magnolias between HMH's investment and the Starrex acquisition of Magnolias. Because Starrex did not acquire the Magnolias, the Side Letters effectively controlled the governance of each Magnolia. Also, because Starrex owners representing 51% or more of the company signed the Side Letters, there is no possibility that people representing the majority of Starrex shares were not fully aware of the existence, content and terms of the Side Letters. (Garth, along with his co-conspirators, would later circumvent the very Side Letters he had drafted and negotiated.)

58. In particular, section 5.5 of each of the Limited Liability Company Agreement for each of the four Magnolia entities states that the Manager does not have the authority to do any act in contradiction of the Company Agreement without the consent of the Supermajority Vote. The Side Letters contain a list of items that are deemed to be in contradiction of the Company Agreements—in particular, within section 6 of each Side Letter affected each Magnolia entity (each defined as the "Company" in its respective Side Letter) the following items require a Supermajority vote and HMH's consent:

> (iii) to sell, transfer, convey, assign, lease, license or otherwise dispose of substantially all of the Company's assets or properties; . . . (vii) to enter into any reorganization, recapitalization or similar transaction effecting [sic] the Company or its assets or properties; (viii) to authorize any transaction, agreement, or action on behalf of the Company that is unrelated to its purpose as set forth in the Company Agreement or the Certificate or that contravenes the Company Agreement or the Term Sheet.

59. Yet, as explained below, Garth, Merritt, and Starrex conspired to create and forge false promissory notes that are now central to Starrex's claims and that purport to obligate all the Magnolias to Starrex. This was done <u>despite Garth having a hand in drafting, revising, and approving the very Side Letters that would prevent any such sort of Note or other Agreement from effectively binding the Magnolias without a Supermajority Vote of the shareholders and HMH's consent.</u>

60. Additionally, at all relevant times, Garth, Merritt, and Starrex were fully aware of the existence and content of the Side Letters and involved in the negotiations and consummation of the Side Letters. See, for example, the following email, dated September 12, 2022, sending Merritt and Starrex (as well as Garth, of course) <u>fully executed copies of all the Side Letters</u>:

Copy from re:SearchTX



61.　Additinoally, Hill and Starrex were at all times aware of the Side Letters and terms as each of the four Side Letters attached as Exhibit "A" thereto and "incorporated herein by reference for all purposes ("Term Sheet" )", a Statement of Preliminary Terms of Proposed Transactions drafted by Garth and signed in part by Hill as "CEO OF STARREX INTERNATIONAL, LTD. AND STARREX INSURANCE SERVICES, INC." See excerpts below:

Copy from re:SearchTX

September 9, 2022

HMH Title Investments, LLC
1038 Texan Trail
Grapevine, Texas 76051

                Re:    First Amended and Restated Company Agreement of Magnolia Title
                      Florida, LLC

Mr. Mitchell:

       This letter agreement is between HMH Title Investments, LLC ("HMH"), Magnolia Title
Florida, LLC, a Florida limited liability company (the "Company"), 405 Manhattan Investments,
LLC, ("405"), Alphabet Investments, LLC, ("Alphabet") and Peabody Bulldog, LLC ("PB" and
405, Alphabet, and PB are each an "Existing Class A Member" and collectively the "Existing
Class A Members") and is being entered into in connection with and is in further consideration of
the investment by HMH in the Company, pursuant to the Contribution Agreement dated of even
date herewith ("Contribution Agreement"), Statement of Preliminary Terms of Proposed
Transactions attached hereto as Exhibit "A" and incorporated herein by reference for all purposes
("Term Sheet"), and the First Amended and Restated Company Agreement of the Company, dated
as of December 1, 2021 (as amended, restated, waived or otherwise modified from time to time,
the "Company Agreement"). Capitalized terms used herein and not otherwise defined shall have
the meanings given to them in the Company Agreement.

       1.     Classification of Units (Section 3.5). Notwithstanding the terms of the Company

---

## Exhibit "A"

### Statement of Preliminary Terms of Proposed Transactions

Parties:        HMH Lifestyles, L.P. (HMH) and/or its affiliates.[1]

                Sol City Title, LLC d/b/a Magnolia Title – Houston

                Coast to Coast Title, LLC d/b/a Magnolia – North Texas

                Magnolia Title Florida, LLC

                Magnolia Title Arkansas, LLC

                Starrex International, Ltd. and Starrex Insurance Services, Inc., a Nevada Corporation (a
                subsidiary of Starrex International, Ltd.) (collectively, "STX")

Transaction No. 1:    A designated affiliate of HMH will acquire the following assets

---

Copy from re:SearchTX



62. Clayton made a variety of representations in tandem with Garth and Starrex; thus, either Garth and Clayton intentionally circumvented the governance protections for which HMH bargained in connection with HMH's investment in the Magnolias or the representations in the contracts HMH signed were false. Not only are the Promissory Notes forged and false, but they never could have been entered into because to do so would have been in breach of HMH's and Magnolias' agreements (the Side Letters).

### C. Garth and His Thrice-Convicted Felon Partner, Clayton, Fraudulently Induce The Peabody Bulldog and John Magness to Their Detriment

63. Defendants Tyrrell Garth and Phillip H. Clayton perpetrated a systematic campaign of fraudulent misrepresentations and willful omissions of material facts. They did so with the specific intent to induce plaintiffs The Peabody Bulldog (TPB), John Magness, and the Magnolia Entities into taking actions divesting them of valuable assets, equity stakes, and business interests for Garth's and Clayton's personal enrichment.

64. To effectuate a scheme transferring most of TPB's full equity ownership in BSpoke Title Holdings (recently valued in April/May 2022 at $2.2 - $2.4 million) to entities under Garth's and Clayton's control, on or about June 2022, Garth blatantly misinformed TPB that doing so would allow TBD's contributions to remain intact by being rolled into Starrex stock. As always, he represented that he had the power to issue—or direct the issuance of—grants of Starrex stock. Further and specifically, Garth (along with Clayton's participation) affirmatively represented that TPB would receive 3,000,000 shares of Starrex International Ltd. in exchange for consolidating the BSpoke Title Holdings assets under the Magnolia Entities. Additionally, TPB could have received monthly distributions from the BSpoke Title Holdings but traded this right away in

Copy from re:SearchTX

reliance on Garth's representations. Despite representing himself at all relevant times as a corporate representative of Starrex, Garth did not issue the 3,000,000 shares of Starrex to TPB.

65. Garth also falsely assured TPB and Magness that a promissory note it had made in relation to the BSpoke entities "would be forgiven and retired" to facilitate this purported equity recapitalization into Starrex. These representations were complete fabrications known to Garth to be false when made, as Garth harbored no intentions to convey 3,000,000 Starrex shares or forgive TPB's promissory note holdings.

66. Garth further represented to Magness and TPB that a promissory note made by Magness and TPB for $100,000 to the order of Garth's wholly owned company, Superior Am Cap Investments, LLC, in connection only with $100,000 in consulting fees paid (rather than a direct payment) was made only for tax efficiency purposes and meant to be forgiven. As an attorney, Garth further represented that Magness and TPB could pay taxes when, in fact, the note was forgiven and that Garth would absolutely direct his wholly owned company, Superior Am Cap Investments, LLC, to forgive and retire the note. This turned out to be a lie.

67. TPB would not have relinquished control or ownership of highly profitable BSpoke assets absent such deception regarding the promises of 3,000,000 shares of Starrex stock. Garth's and Clayton's true motive was simply to wrest those assets away for his own benefit as he would own more valuable assets in the form of the enhanced Magnolia Companies while giving up nothing himself and making false promises to TPB of future compensation in the form of Starrex shares.

68. In a separate strand of Garth's overarching deception (with participation of Clayton), he made an array of misrepresentations over many months aimed at fraudulently inducing Magness to forego valuable employment opportunities and work without compensation and also, with the Magnolia Entities, pursue a sham "acquisition" by Starrex that Garth never seriously intended. These included, but were not limited to:

- Affirmatively misstating that Starrex would "raise $50 million in cash and a $50 million credit facility" to robustly capitalize and fund the combined Magnolia/Starrex operations post-merger. No such cash raises or financing were pursued or even contemplated.

- Falsely promising Magness "would be appointed CEO and awarded a Board seat at Starrex after the merger, with no involvement from Starrex's existing leadership" despite knowing this directly contradicted Starrex management's plans and intentions to remain.

- Misrepresenting Garth's illusory ability to legitimately inflate Starrex's stock price to $5 per share by summer 2023, and affirmatively representing to Magness that he could

Copy from re:SearchTX

therefore forego significant cash compensation since his newfound equity stake in Starrex would single-handedly "make him extremely wealthy."

- Deceiving Magness that "Starrex planned to use the merged Magnolia operations as a platform to aggressively acquire title companies nationwide," necessitating Magness/Magnolias signing oppressive NDAs with various target companies to facilitate this claimed growth strategy Garth never intended.

69. At no point did Garth and Clayton intend for Magness to actually integrate with Starrex's leadership or convey him any equity stake. Nor did Garth (with Clayton) or Starrex ever pursue the financing, cash raises, nationwide acquisition strategy or legitimate business plan he misrepresented to induce the Magnolias' compliance and asset transfer.

70. Each of these misrepresentations was intentionally fraudulent and contradicted by Garth's ulterior motives—not to pursue any legitimate merger, but simply to create a pretense for improperly diverting the Magnolia assets and business opportunities away to benefit Garth and his associates, such as Clayton.

71. The pattern of deception continued throughout in-person meetings with Garth and Clayton. In November 2022, at the Magnolia Title corporate office on St. James Place in Houston, a meeting took place amongst Garth, Clayton, Magness, and Britt Naponic, General Counsel for the Magnolias. Starrex had just obtained the ANTIC line of credit. At that meeting, Garth and Clayton stated that Merritt was to be terminated as Starrex CFO because she was running off employees and incompetent at her job. Hill was to soon resign as Starrex CEO to go coach eighth grade football. Garth and Clayton stated that Starrex would become a 100% title business, told Magness that he would replace P. Garrett Clayton (Clayton's son) as a director on the board of Starrex and be appointed CEO of Starrex, and Kevin Gartland (owner of All American Title) would be appointed COO of Starrex. In hindsight, all of these statements were fraudulent misrepresentations but it still came as a shock when Clayton's felonious history was revealed during the Bspoke Title unwinding process.

Copy from re:SearchTX

**D.** **January 1, 2022: The Magnolias and Starrex (along with its Affiliates and Third Parties, including Officers) Enter into the Management Services Agreement**

72.   Effective January 1, 2022, the Magnolias and Starrex entered into a Management Services Agreement ("MSA"), whereby Starrex was to perform certain services for the Magnolias in exchange for reimbursement of its costs.   These Defendants are collectively referred to as Magnolia Title in the MSA.   Deborah Merritt, the Chief Financial Officer of Starrex, executed the MSA on behalf of Starrex.   The MSA binds Starrex and all of its Affiliates and Third Parties, including officers of Starrex.

73.   The MSA also contains the following provisions:

> 1.1. **"Affiliate"** means any corporation, firm, partnership, limited liability company or other entity, whether de jure or de facto, that directly or indirectly owns, is owned by, or is under common ownership with a Party to the extent of at least fifty percent (50%) of the equity having the power to vote on or direct the affairs of the entity and any person, firm, partnership, corporation, limited liability company or other entity actually controlled by, controlling, or under common control with a Party; provided, however, that the term "Affiliate" shall not include either Party.

> 1.2. **"Confidential Information"** has the meaning ascribed to in that certain Non-Disclosure Agreement of even date herewith (the "NDA") between the Parties, substantially in the form attached hereto as **Exhibit B.**

> 1.7. **"Third Party"** or **"Third Parties"** means any person(s) or entity(ies) other than a Party or an Affiliate.

> 3.3.  **Best Interest of MAGNOLIA TITLE.**  STARREX agrees to act in the best interests of MAGNOLIA TITLE and at no time to do, cause or permit to be done any act, or publish or bring in to the public domain any information that is or may be detrimental to the best interests or business reputation of MAGNOLIA TITLE.

> 3.4.  **Use of Affiliates and Third Parties.**  Nothing herein shall be deemed to restrict STARREX from utilizing Affiliates or Third Parties to assist STARREX in performing the Services, provided, however, that such Affiliates or Third Parties shall be subject to the same restrictions as are imposed on STARREX hereunder, and provided further that MAGNOLIA TITLE shall retain the right to monitor the activities of such Affiliates or Third Parties to the extent necessary to protect its reputation and to monitor and control the use and quality of its products and services.

Copy from re:SearchTX

9. **Confidential Information**

The exchange of Confidential Information between the Parties and the treatment of such Confidential Information shall be governed by the terms of the NDA.

EXHIBIT B

NON-DISCLOSURE AGREEMENT

1. (a) For the purposes of this Agreement, "Confidential Information" shall mean (i) all information in any and all medium that has been disclosed or will be disclosed by or made available by one Party ("Disclosing Party") to the other Party ("Receiving Party") or otherwise acquired by the Receiving Party as a result of or in connection with this Agreement or the Parties' discussions (whether prior to the execution hereof or thereafter), including, without limitation, data, data structure, data format, technology, source code, know-how, inventions, discoveries, designs, processes, techniques, methods, performance characteristics, testing strategies, formulations, models, equipment, algorithms, software programs, documents, plans, specifications, information concerning research and development work, or trade and business secrets. Confidential Information will also include information disclosed by Disclosing Party, which relates to current, planned or proposed products, licensing or sales activities, policies, practices, finances, revenue, pricing, cost or profits, marketing and business plans, forecasts, projections and analyses, financial information, customer information and third party confidential information and (ii) any and all techniques, processes, programs, schematics, unreleased products, technical data, product plans, product designs, marketing plans, research and development activities, customer preferences and data, business opportunities, financial data, and particularly the source code and related unpublished documentation of proprietary computer programs, integrated circuit topography designs, industrial designs and documentation. Disclosing Party shall determine in its sole discretion what information and materials it shall disclose to Receiving Party. (b) For the purposes of this Agreement, Confidential Information shall not include any information which, Receiving Party can document: (i) is already known to the Receiving Party can document at the time of disclosure, (ii) is publicly available at the time of disclosure; (iii) becomes public domain after disclosure through no act of the Receiving Party or any of the its Related Persons (as defined below) in breach of this Agreement; (iv) is disclosed to the Receiving Party by a third party who is not, to the best knowledge of the Receiving Party, in breach ofan obligation of confidentiality; or (v) was or is independently developed by the personnel of the Receiving Party without access to or use of the Confidential Information.

2. Except as otherwise expressly agreed in writing by the Disclosing Party, the Receiving Party shall not (a) use, copy or reproduce the Confidential Information, except for the Purpose; (b) disclose or otherwise provide any Confidential

Copy from re:SearchTX

Information to any third party without the prior written consent of Disclosing Party (but in all events any such consented to disclosure shall be made only with a written and signed confidentiality agreement, substantially similar to this Agreement, from the recipient,); ( c) alter, reverse engineer, decompile, disassemble or otherwise modify the Confidential Information. Notwithstanding the foregoing, the Receiving Party may disclose such Confidential Information to the extent required or requested by any court of competent jurisdiction or by any government or government agency having jurisdiction over the Receiving Party, but only after giving written notice to Disclosing Party of such request and requirement sufficiently in advance to allow Disclosing Party to determine whether to contest or limit such disclosure and, if so, to take steps to prevent or limit such disclosure.

7. . . .   The Receiving Party's obligations with respect to Disclosing Party's Confidential Information shall survive any expiration or termination of this Agreement.

These provisions impose upon Starrex and its Affiliates, as well as all Third Parties it utilizes, contractual obligations and a fiduciary duty to the Magnolias.  Nonetheless, upon information and belief, Starrex and its Affiliates, as well as its Third Parties (including its officers) breached the MSA in multiple ways, and likewise, breached their fiduciary duty to the Magnolias.  These ways include, but are not limited to, breach of Section 3.3 (Best Interest of MAGNOLIA TITLE), Section 3.4 (Use of Affiliates and Third Parties), and Section 1.2, 9, and Exhibit B, Non-Disclosure Agreement, regarding the use, theft, failure to return, and dissemination of the Magnolias' confidential information.

**E.**   **Starrex Obtains ANTIC Credit Line and Starrex and Merritt Exert Complete Control over the Alleged "Magnolia Line of Credit" to Enrich Themselves**

74.  Throughout August to October 2022, Starrex completed the due diligence process with Agents National Title Insurance Company (ANTIC) in order to receive a $5 million line of credit.

75.  On October 17, 2022, Starrex Insurance Holdings, Inc. and Starrex International Ltd. entered into a Loan and Security Agreement with ANTIC dated October 17, 2022 with an interest rate equal to the Prime Rate minus 0.50% (with a floor of 0%), a $5,000,000 Convertible Promissory Note dated October 17, 2022, executed by Starrex Insurance Holdings, Inc. and Starrex International Ltd., and the Guaranty dated October 17, 2022, executed by Starrex International, Ltd.

Copy from re:SearchTX

76.  Somehow, Starrex claims that the Magnolias are responsible for various unrelated expenses and legal bills not related to the Magnolias' business amounting to hundreds of thousands of dollars.

77.  Starrex also claims that it obtained the ANTIC line of credit to finance the Magnolias—this is not true.  Starrex admitted in its Management Discussion & Analysis for the six months ended June 30, 2023, that the ANTIC line of credit financed the acquisition of All American Title Co.

78.  The Magnolias never agreed to any debt.  In contrast, as discussed below, Starrex created fraudulent notes and back-dated them to create the false appearance of having had a valid security interest in the Magnolias' assets on which it filed four groundless UCC-1 financing statements in Texas, Florida, and Arkansas.

79.  The penalty for filing a groundless financing statement is liability to the owner of the property covered by the financing statement for the greater of $5,000 or actual damages, court costs and attorney's fees.  Tex. Bus. & Com. Code § 9.5185(a).  Section 9.5185(d) also authorized the owner of the property covered by the groundless financing statement to seek specific relief by filing suit.

80.  The Texas Penal Code provides that a person who knowingly files a forged financing statement commits a felony in the third degree and that a person who knowingly files a materially false or groundless financing statement commits a Class A misdemeanor.  Tex. Penal Code § 37.101(b).  If the person commits the offense with the intent to defraud or harm another, the offense is a state jail felony.  *Id.*

81.  In addition, it is clear that Starrex and Merritt had good reason to play their cards close to their chest and refuse to open the books—they were misappropriating monies, mischaracterizing transfers, and assigning expenses and management fees to an account and non-existent entity variously known as Magnolia Corporate and—as represented to auditors—an entity called "Magnolia Title Group."  The shoddy and/or fraudulent accounting and misappropriation by Merritt and Starrex International resulted in calculations by Starrex CFO Merritt that as of approximately mid-July 2023, a non-existent fifth entity named "Title Corp" or "Magnolia Title Group" allegedly owed $1,576,424.

82.  For instance, according to records Merritt provided in July 2023, large payments were made and received with almost no transparency whatsoever into transfers worth tens of thousands of dollars, including various round payments of $130,000 or $150,000 to Starrex are described as

Copy from re:SearchTX

"capital contributions" but then described in a notes column as "Repayment", likely to avoid recognizing the payments as taxable income.

83. Additionally, Merritt and Starrex charged the following to the Magnolias for the period of time from potentially March 2022 to July 2023:

    a. Transfers billed to the Magnolias in large, completely round numbers of exactly $75,000, $65,000, $50,000, $13,000, $10,000, and other similar amounts described as "Transfer to Magnolia Dallas", "Transfers to Magnolia," "Wire to …," "Transfer to Magnolia's," "Transfer to Magnolia"  or "MTC Wires" and always described in the last notes column as "To pay Bills" or "To Pay bills" and sometimes "To pay bills and Rent";

    b. Every month, the Magnolias are charged for "Office 365", "Adobe Pro", "Bill – Ring Central" and pay for Qualia by ACH, but when Starrex decided it was time to strong arm the Magnolias by shutting off all paid-for IT and destroying the business, it was irrelevant that the Magnolias had paid for all of these software licenses;

    c. Starrex Technical Services is additionally paid thousands of dollars each month, eventually rising to over/around $7,000-$10,000 a month or more;

    d. Magnolia is charged tens of thousands of dollars for work performed by Starrex's Canadian law firm of TingleMerrett LLP, and specifically, at one point, a running total of $36,369.05 to Starrex's Canadian counsel TingleMerrett, including Scott Reeves and Ariane Young;

    e. Random entries of $20,000 entitled "Move to correct Agency" for "Management Fees";

    f. Merritt and Starrex dole out "Finders Fees" on new hires of $18,000;

    g. Merrit and Starrex charge interest on the ANTIC LOC to Magnolia even though there are no signed promissory notes with any interest rate (only forged, fake ones), Starrex uses the line of credit for its own purposes, Magnolia has no transparency over how monies are used nor control over the use of monies, and Starrex has admitted that it used the line to finance All American Title Co;

    h. Intentionally repeated charges for the same software, charged to each Magnolia entity, including over $40,000 in subscription fees for "Office 365 and Adobe Pro" from March 2022 to June 2023;

    i. At least $200,000 to Starrex Technical Services from March 2022 to June 2023;

    j. $248,599.68 in "STX Consulting Oncome from Magnolia's" from January 2023 to June 2023;

Copy from re:SearchTX

k.  At least $71,200 to Sturm Law Firm;

l.  At least $28,623 or more for Garth's personal attorney Bill at York & Hinds, P.C.;

m.  Charging 70% of Starrex's IT and Accounting salaries to Magnolia;[2]

n.  Charging $120,000 of the salary for the CEO of All American Title to Magnolia instead of Starrex, which wholly owns All American Title;[3]

o.  Thousands of dollars to the law firm of Locket and Horwitz, who filed the four groundless UCC-1 Financing Statements against the Magnolias;

p.  At least $37,302.50 to the law firm of Manatt, Phelps & Phillips, LLP simply called "Manatt Invoice", dated 6/8/2023;

q.  Various large transfers of up to $218,000 at a time called "Move AR Balances" or "Move AR balance" to "Clean up AR/AP balances between the Magnolia";

r.  Interest allegedly due on "LOC from Magnolia's" although the Magnolias had never signed any promissory notes and the ones upon which Starrex relies are fake and forged;

s.  Legal bills for McGinnis Lochridge;

t.  Hundreds of thousands in entries entitled "Transfer to Magnolia" and described only as "To pay Bills", always in completely round numbers such as $50,000;

u.  At least $651,306.49 in allegedly BSpoke-related expenses;

v.  Over $50,000 in interest on the Agents National Title Insurance Company (ANTIC) Line of Credit; and

w.  Other misappropriations.

84.  Additionally, sometime in December 2023, Starrex and Merritt took $98,000.00 from the Magnolias' revenue and deposited it into its own operating account.  Their withdrawals have drained the Magnolias' escrow account that was earmarked to pay title insurance premiums.  At no point did Starrex ever provide an explanation or documentation that justified this transfer.  To

---

[2] On September 6, 2023, at 12:14 PM, Justin Ray, Starrex Comptroller, writes that for IT and Accounting salaries, Magnolia is charged 70% of Starrex's salaries.
[3] On November 28, 2023, at 2:30PM, Merrit references Kevin Gartland's inexplicable salary split between All American Title and Magnolia Title, $120,000 of which Starrex is attempting to charge to the Magnolias from March – September 2023.  She refuses to credit the Magnolias this amount.

Copy from re:SearchTX

the extent the Magnolias have been able to obtain financial documents from Starrex, such documentation shows wildly fluctuating corporate allocations, exorbitant management fees, salaries paid to Starrex employees, and duplicative IT costs, all of which are contrary to the best interests of the Magnolias.

85.  Clearly, Starrex and Merritt spent as they pleased while refusing to disclose the expenditures on a substantially detailed basis or provide general ledger supports, all the while attempting to pin the bill on the Magnolias.

### F.  <u>The Conspiracy to Forge Promissory Notes and Cover Up the Scheme, and the Aftermath</u>

86.  In summary, Starrex and/or its Affiliates, which includes Starrex Insurance Holdings, Inc., Starrex Holdings, Inc., and Starrex Insurance Services, Inc., either forged or caused to be forged the Revolving Promissory Notes attached to Plaintiff's Original Petition as Exhibits Nos. 1 through 4.  They performed this conspiracy in conjunction with Merritt, Garth, and Hill.

87.  In October 2022, Starrex negotiated a line of credit with ANTIC/Essent.  Starrex claims that it intended to make expenditures for the benefit of the Magnolias and many others and that it intended to complete an acquisition of the Magnolias; however, under no circumstances did the Magnolias ever agree to execute promissory notes as they were not part of the negotiations or agreement.  These promissory notes were made without the Magnolias' knowledge and permission and were made contrary to the procedures set forth in the applicable shareholder agreement(s) and Side Letters thereto.  Additionally, the Magnolias never received an accounting despite numerous requests to Starrex CFO Deborah Merritt.  the Magnolias never had control of any expenditures and records and information about expenditures, allocations, and the rationale for large, sudden draws were concealed and not disclosed to them.  Starrex, its CFO Merritt, and its other executives, such as CEO Hill, exerted full control over the expenditures, allocations, draws, and information relating to the foregoing.   Further, upon information and belief, Starrex and/or Merritt, Hill and other Starrex executives unjustly enriched themselves by using the money improperly gained from the forged promissory notes to defray their own operating expenses and to compensate executives. Thus, in hindsight, it is perhaps no surprise that a substantial amount of funds are unaccounted for.

Copy from re:SearchTX

88.  In early April 2023, in preparation for the acquisition ruse between Starrex and Magnolia, Starrex's auditors, McGovern Hurley, were asking for amounts that the Magnolias allegedly owed Starrex.  Merritt and her controller, Justin Ray, told the auditors that five entities owed Starrex monies: the Maganolias and an entity called "Magnolia Title Group."  In reality, Magnolia Title Group never existed and represented a slush fund that Merritt and Starrex could direct to their choosing while alleging that the Magnolias owed the money spent.  This "entity" and the debts assigned to it were never disclosed in the public markets nor was it disclosed to the auditors that this was not a real entity.  Merritt and Ray then filled in the numbers in these sheets, representing a variety of amounts that had little relation to reality, including $573,918 allegedly due from the non-existent "Magnolia Title Group" to Starrex International, Ltd. as of December 31, 2022.  The letters were returned to McGovern Hurley on April 11, 2023.

89.  When the auditors received this information, they were skeptical—where are the promissory notes that Starrex had referenced in its public filings that related to these debts?  Debbie Merritt as CFO, and Matthew Hill, as CEO, both of Starrex International and Starrex Insurance Holdings, had made various binding certifications and representations to the Canadian National Stock Exchange, the Alberta Securities Commission and Canadian Securities Administrators, the Canadian public and by way of the international dual-listing exemption, the U.S. public and the Securities and Exchange Commission, that these promissory notes between the Magnolias and Starrex existed and that the ANTIC credit line existed to finance these expenses.  All such representations were completely false.

90.  They were in a difficult position.  Debbie Merritt reached out to Garth and they discussed how to handle this for Starrex as they frequently did.  We do not currently have access to all the communications between Merritt and Garth but fortunately, Garth decided to copy Magness on this exchange.  Magness never executed the false promissory notes nor would he.  But, Garth, Starrex, and Merritt desperately needed signed promissory notes to close the loop.

91.  On April 17, 2023 at 9:28AM, Merritt writes to Garth, copying Magness:

> I wanted to wait until the end of Q1 to provide you with numbers for each of the Magnolia Entities.  ***The auditors are pushing now for the signed promissory notes.*** Please see below:"

> [Table]

> (bold and italicized emphasis added).

Copy from re:SearchTX

92.  In response to Merritt's email of April 17, 2023, at 9:28 AM, Magness responds at 9:30 AM to Merritt only, asking, "What is that for?"

93.  Responding only to Magness, at 9:32 AM, Merritt responds:

> "The notes we need to support the amounts due to Starrex on the line. ***We were going to draft them in December, but I knew we'd need additional funding. The auditors need some type of paper to support the "line" Starrex provided to each of the Magnolias.*** Terry said he'd draft them for me."

> (bold and italicized emphasis added, admitting that she didn't want to reveal to shareholders, investors and funders that Starrex was allegedly advancing money)

94.  Thus, Merritt makes several incriminating admissions. She admits that she did not want these promissory notes to exist while soliciting additional funding because it might turn off potential investors, shareholders, and funders. She also admits that she simply wants to create a paper trail for optics-only reasons. Finally, she admits that the line of credit at the heart of Starrex's instant claims is just a quote-unquote "line" in the loosest sense of the word.

95.  In response to Merritt's email of April 17, 2023, at 9:28 AM, Garth responds at 10:59 AM (copying Magness), and writes:

> "***What date should the promissory notes be executed? I suggest a date prior to the first draw and probably a date that is reasonably close to the date that the line of credit was executed.*** Also, the notes need a maturity date. I suggest June 30, 2023, which should give sufficient time to determine how and when the Magnolias will be merged. Let me know."

> (bold and italicized emphasis added, admitting that he wants to back date the notes and choose a maturity date out of thin air)

96.  Merritt replies on April 17, 2023, at 11:04 AM:

> "I agree. The effective date of the line was October 17, 2022 with the first draw initiated on October 26, 2022. ***June 30, 2023 maturity date works – we have classified all as short term on the balance sheet.***"

> (bold and italicized emphasis added, admitting that she has already disclosed and classified non-existent promissory notes)

97.  Garth replies on April 17, 2023, at 2:26 PM:

Copy from re:SearchTX

> **"Do you want the interest rate in the notes to be a fixed rate or a floating rate** that would correspond to the same interest rate payable under the ANTIC LOC? If so, please send a copy of the ANTIC note."

> (bold and italicized emphasis added, admitting that no interest rate ever existed)

98. Debbie replies on April 17, 2023, at 2:28 PM, referring either to an "MH" meaning either Matthew Hill or auditor McGovern Hurley:

> **MH would prefer to see a fixed rate.** Are you agreeable to a 6% rate?

> (bold and italicized emphasis added, admitting that they are creating false documents for MH)

99. Garth replies on April 17, 2023, at 3:14 PM, "Okay."

100. On April 17, 2023, at 4:18 PM, one hour later, Matt Wiggins, CFO of Magnolias investor, HMH, emails Merritt, asking for the March/1Q financials. Merritt does not mention that she and Garth are drawing up false promissory notes of any sort.

101. During this time, Merritt us under pressure from the auditors about failing to implement proper financial security measures related to the acquisition of All American Title Co. (which failures are being criticized by auditors) and starts pushing false facts on Kevin Gartland, the CEO of All American.

102. On April 18, 2023, at 10:42 AM, Garth sends Merritt the four draft notes, copying Magness. Each lists the Payee as only "Starrex Insurance Services, Inc., a Nevada corporation (the "Payee"), at 14701 Saint Mary's Lane, Suite 150, Houston, Texas 77079." Garth specifies the mandatory venue as Harris County, Texas for three of the notes and for the draft note with Magnolia Title Florida, specifies Jefferson County, Texas as the mandatory venue.[4] Neither Garth nor Merritt send this email to anyone else, including HMH or any other shareholder of Magnolia. Garth writes, "Attached are the drafts of the four notes for your review and comment. If no further changes are needed, please obtain John's signature when available."

---

[4] Accordingly, while all four alleged promissory notes are certainly fraudulent and forged, Starrex has sued Magnolia Title Florida, LLC in the improper venue under the terms Garth drafted, to which the Magnolias never agreed. Presumably Garth included Jefferson County, Texas as a mandatory venue because that is where he lives.

Copy from re:SearchTX

103. According to the metadata in the PDF of each promissory note drafted by Garth and attached to the foregoing email, he created them on April 18, 2023 and turned them into PDFs together as the creation date of each one is spaced 3-10 seconds apart.

104. Magness responds to Garth's email on April 18, 2023, at 10:41 AM, writing, "I am out of town, will forward for review before I sign." He then forwards his email to Magnolia's general counsel, Britt Naponic at 10:52 AM. Magness follows advice of counsel and did not sign any of the notes.

105. Merritt responds to Garth's email on April 18, 2023, at 12:21 PM, writing, "I have no issues with the docs. Thanks!"

106. These draft promissory notes are never authentically signed but they are later forged by Garth, Merritt, and Starrex using a photo of the signature of John Magness simply inserted into the draft PDFs created by Garth. No copy is ever sent to Magness or anyone else associated with the Magnolias. No draft is ever sent for review to any other shareholder of Magnolia, especially HMH—Merritt intentionally avoids mentioning the draft promissory notes to the CFO of HMH, even though he emails Merritt one hour after Garth and Merritt have finished their discussion. No copy of the forged promissory notes exists in Magness' email—either in the sent box or inbox.

107. Mr. Magness swears that he did not execute the Promissory Notes nor would he have had authority to enter into the Promissory Notes without a supermajority of shareholders and HMH's consent. Of course, this is well known to Garth and Merritt.

108. On April 24, 2023 at 7:54:21 AM, Merritt suddenly announces to Magness and Matthew D. Hill, that:

> "Good Morning.
>
> I am asking Justin to prepare a draw request today for $1,000,000. The Magnolia group currently owes Starrex $2,916,867. The good news is that consolidated EBITDA for March was ($66,249), a significant reduction over the loss from February.
>
> The following table provides you with the information requested with respect to Capital accounts in the **Magnolia entities**.
>
> [Capitalization Table for Magnolias]

Copy from re:SearchTX

With respect to the **All American** transaction, Starrex has paid $1,800,000 in cash as a down payment, and has provided $1,000,000 in operating capital, for a total of $2,800,000.

Let me know if you need anything further."

(bold emphasis in original)

109. On April 24, 2023 at 8:02AM, John Magness asks, "What is the million for?"

110. On April 24, 2023, at 8:18 AM, Merritt replies, "We currently owe $1,950,000.  To make Starrex whole we need another $1mm.  We've only drawn down on the line twice."

111. On April 24, 2023, at 8:19 AM and 8:20 AM, Magness replies "Got it . . . . So Starrex owes Antic 3 million and they have nothing to convert it in too [sic]…"

112. Merritt does not respond.  She also does not mention promissory notes or anything of the sort.

113. According to the metadata from a "sample" of the four notes sent by Ariane Young, counsel to Starrex and a live in partner of Scott Reeves, counsel for Starrex as well as Director, Corporate Secretary, and Audit Committee Member, the Coast to Coast note was last modified on May 2, 2023 at 12:44:18 PM; therefore, the promissory notes were forged at that time or before.

114. On April 24, 2023, at 12:31 PM, Merritt writes an email to Agents National Title Insurance Company (ANTIC) requesting a $1,000,000 draw and providing no general ledger specific backup. She attaches a letter dated April 24, 2023, which simply requests the $1,000,000 draw, provides no reason for the draw, contains boilerplate legal language, and is signed by Merritt for Starrex Insurance Holdings, Inc. and Hill for Starrex International Ltd.  Once received, this $1,000,000 is used by Merritt, Hill, and Starrex however they please.

115. On April 27, 2023 at 10:12 PM, Merritt circulates a variety of documents, including the proposed acquisition structure for the Magnolias and the Binding Letter of Intent, which had been drafted by the law firm of Tingle Merritt (the law firm of Scott Reeves and Ariane Young).

116. On April 29, 2023, in anticipation of the full execution of the Letter of Intent between the Magnolias and Starrex, Merritt and Hill sent the "final docs ready for execution" as conveyed by an email from Merritt dated Saturday, April 29, 2023 at 2:09 PM and then Hill at 4:34 PM, attaching four "Promissory Note Security Agreements", each of which is a security agreement for one of the Magnolias.  Magness replies at 4:36 PM, "What about impairment?"  Hill responds at

Copy from re:SearchTX

5:03 PM that he is headed to a game but Merritt is not worried about it and has a handle on it. He offers to discuss the next day.

117. On or about April 29, 2023 to April 30, 2023, Garth tells Magness that he has to sign these security agreements or the LOI cannot be executed. Garth assures Magness that it is merely a formality that will become completely irrelevant when Starrex consummates the acquisition of the Magnolias. Accordingly, based on Garth's representations, Magness signs the security agreements with wet ink, as he would have done with any important document. However, Garth is fully aware that the security agreements cannot be effective without a supermajority of shareholders and HMH's consent; this is because Garth is a major shareholder of the Magnolias and drafted all the Side Letters.

118. When Magness immediately thereafter discusses the security agreements with Mitchell, he is informed that the security agreements cannot be effective because Mitchell will not provide his consent on behalf of HMH. Since no shareholder vote took place and based on Garth's representations (and full knowledge that the security agreements are not effective), it is completely understood that the security agreements are of no effect.

119. On April 30, 2023, the Letter Agreement Regarding Proposed Acquisition of Magnolia Entities ("LOI"), effective May 1, 2023, is executed between Starrex International Ltd. and the Magnolias. Starrex and other parties will later breach several sections of this LOI, which survive its termination, including but not limited to section 5 (disclosure and non-solicitation), which contains provisions respecting confidentiality information and non-solicitation. Starrex International issues a press release announcing the LOI.

120. Unbeknownst to the Magnolias, Starrex is falsely representing to the market that it is current on its ANTIC obligation in order to manipulate its stock price (CSE: STX | OTCQB: STXMF).[5] This is vitally important as the LOI contemplates the Magnolias being acquired by a Newco owned by Starrex, which would Newco issue stock that could be exchanged into Starrex common stock.

121. As stated by the auditors in internal PDF comments to the filed version of the Starrex International Condensed Interim Consolidated Financial Statements Three Months Ended March 31, 2023 and 2022 (as of May 30, 2023):

---

[5] *See* Starrex International Ltd., Consolidated Financial Statements for Dec. 31, 2022 and 2021 *compared with* Condensed Interim Consolidated Financial Statements Three Months Ended March 31, 2023 and 2022.

Copy from re:SearchTX

- **Regarding March 31, 2023, Income taxes payable of $1,542,838:**

> Number: 1          Author: Chris Milios Date: 5/29/2023 10:50:00 PM
> All income tax was paid off by March 31?

- **Regarding March 31, 2023, Current Liability – Current Portion of notes payable (Note 14): $4,500,000 (referring to ANTIC note liability):**

> Number: 2          Author: Nimesh Ratnarajah    Date: 5/29/2023 9:15:00 PM
> Why isn't the ANTIC loan current? It was presented as current on the YE FS

Starrex International represented in its Consolidated Financial Statements December 31, 2022 and 2021 (prepared May 1, 2023) that the ANTIC note had no current liability portion due; that is, that the ANTIC Note was current and the balance was only $850,000. Yet, suddenly, three months later, it is <u>not</u> current and the balance due is $4,500,000.

- The auditors are very critical of multiple miscalculations and mischaracterizations in the Statement of Cash Flows.

- In the Notes to the Financial Statements, Starrex claims to have ongoing control of Property Interlink, LLC and Reliable Valuation Services, LLC, but auditor Ratnarajah says, "Company no longer has control of [Property Interlink] and [Reliable Valuation Services, LLC]." Merritt disagrees with him in her responding comment, stating that the "The Company does have control over PI and RVS. The assets were purchased and absorbed into another company." Yet, Note 17 classifies Property Interlink and Reliable Valuation Services as "discontinued operations", the buyers have paid a purchase price, and prior year results have been reclassified to discontinued operations.

- Note 18 mentions the LOI as effective May 1, 2023.

122. Apparently, between April 18, 2023 and May 2, 2023, without notice or discussion, Garth Merritt and Starrex, then proceeded to forge the false promissory notes and finalized them, in anticipation of making fraudulent securities filings against each of the four Magnolia entities the very next day. (This also created a fake paper trail that would support the false representations made to the market through its financial statements and press release of May 1, 2023). On information and belief, Merritt has admitted that she used the photo of Magness' signature to "sign" the promissory notes but claims that she was somehow given authority to do so.

Copy from re:SearchTX

123.    Starrex needed these fake, forged promissory notes to present to its auditors, McGovern and Hurley.  McGovern and Hurley should have exercised more discretion in accepting the clearly forged notes with identical photos of a signature and other irregularities.  These forged notes also made is possible for McGovern and Hurley to sign off on Starrex's financials during the month of May 2023.  For instance, in the Condensed Interim Consolidated Financial Statements Three Months Ended March 31, 2023 and 2022, the auditors' interlineated comment on the "Subsequent Events" section (p. 22) simply asks if there are any other events to report and accepts the materially false description of the fake, forged Magnolia promissory notes.

124.    Magness denies ever providing any such authority, nor would he have authority from the Magnolias to enter into the notes (or pledge liens on assets) without following the terms of the Side Letters.  Also, it is patently absurd to believe that almost $5 million in alleged promissory notes would be signed by a photo of the same signature four times.

125.    In fact, more than 51% of Starrex's shareholders and its highest-ranking officer, directly or indirectly, signed the very Side Letters that determine the authority of Magness to bind the Magnolias, and Garth negotiated and drafted/revised the Side Letters, so Starrex cannot pretend that it did not know the Side Letters existed.

126.    On May 3, 2023, Starrex directs Lockett and Horwitz, A Professional Law Corporation, to file a UCC-1 Financial Statement against each of the Magnolia entities—two in Texas (at the Secretary of State level), one in Florida, and one in Arkansas, all listing the secured party as Starrex Insurance Services Inc. at 14701 Saint Mary's Lane Ste 150, Houston, TX 77079.  The description in each filing is identical:

> "COLLATERAL: This financing statement covers the following collateral:
> Right, title, and interest in the following assets: (i) all of the Debtor's
> inventory, accounts, equipment, fixtures, investment property, deposit
> accounts, claims, letter of credit rights, supporting obligations, money and
> other personal property and (ii) all products and proceed of the foregoing"

127.    This is never discussed or revealed to anyone with the Magnolias nor shared with the Shareholders.  Starrex needed "signed" promissory notes to support these filings, so it just created them out of thin air using forged signatures.

Copy from re:SearchTX

128.    Starrex does not proceed with the acquisition as contemplated by the Letter Agreement (also referenced as the "LOI" or "Letter of Intent"). The LOI automatically expires on June 30, 2023.

129.    Throughout this time and thereafter, the parties have discussions with ANTIC and then EssentVentures, and all parties commence discussions about an investment or acquisition involving ANTIC/Essent Ventures with the assistance of certain advisors like Draycott SCR handling the valuation of the Magnolias and other aspects. This becomes especially important after Starrex pulls out of the LOI.

130.    In July 2023, in the course of due diligence, EssentVentures and Draycott SCR request line items of corporate allocations for the last 12 months and the ANTIC line of credit. Starrex is unwilling to share this information for three weeks and creates a serious of unexplainable delays. Merritt, Hill, and Starrex provide little information until Merritt suddenly reveals a cash shortfall at the last minute.

131.    On August 11, 2023, in an email sent on 10:46 AM, Magness writes to Merritt, in part,

> "Debbie; I am confused as to why we only found out 2 1/2 hours before funding requirements that we are 256k short on cash. We have no way to know if these amounts are accurate. . . . I will add that we are close to receiving an offer from Essent that would benefit all parties involved. To draw on the line would be a huge mistake at this point. . . . ."

132.    It was becoming increasingly clear that Starrex and Merritt were appropriating funds in a way that indicated malfeasance. The forged promissory notes were about to become much more of an issue for Starrex and their co-conspirators.

133.    In August 2023, Ariane E. Young and Scott M. Reeves[6] set out to obtain ratification and replacement of the forged, fake promissory notes with "Amended and Restated Notes". She (and presumably others) intentionally termed these new notes "Amended" and "Restated" in order to make it appear as though signing these new notes were simply for the reason of making an immaterial, minor update to previous, genuine promissory notes between each Magnolia company and Starrex Insurance Services, Inc.

---

[6] Scott Reeves is the General Counsel, Corporate Secretary, Director, and Audit Committee Member for Starrex. He is also a partner with the Canadian law firm of TingleMerrett LLP. Ariane Young is his partner or wife and she is in turn, also a partner with the same Canadian law firm.

Copy from re:SearchTX

134.    This was a ruse.  No previous, original promissory notes between each Magnolia company and Starrex Insurance Services, Inc. exist.  In fact, no promissory notes between any Starrex entity and any Magnolia company were ever executed.

135.    Because the Side Letters essentially controlled the corporate governance of the Magnolias, Young and Reeves set out to get HMH to sign these instruments and contacted HMH's attorney, Adam Fulkerson.  Young represented that signing the "Amended and Restated" notes was for the purpose of making a simple change to update the amount and maturity date, when in reality there were no notes in existence to amend or restate.  The "Amended and Restated" notes contained recitals that were factually untrue—for instance, they claimed that the Magnolia companies had entered into promissory notes dated October 17, 2022 with Starrex Holdings, Inc., Starrex Insurance Holdings, Inc. and Starrex International Ltd.  However, she hoped that Fulkerson and HMH would not learn these facts.  Because Magness would not sign these "Amended and Restated" notes for the Magnolias (because no original notes existed), she hoped to trick HMH and/or their attorneys into consenting to sign.

136.    Young sends out emails and makes phone calls, noting that "time is of the essence on the amended and restated notes" (email of Aug. 22, 2023 at 1:13PM).

137.    Finally, on August 23, 2023 at 11:38 AM, Young, an attorney and partner of the Canadian law firm of Tingle Merritt, sends an email containing the original forged promissory note to Adam Fulkerson (an attorney for HMH), copying Scott Reeves.  Because Young knew that all four notes were forged (as her law partner and romantic partner, Scott Reeves, was aware), she does not send Mr. Fulkerson all four notes, although allegedly, they represent $5 million in debt and there is no good reason not to send all four.  Instead, she sends him a "sample of one of the 4 that were signed," attaching *only* the forged Coast to Coast promissory note.  Presumably she does not want him to see that all four notes have suspicious metadata and/or signatures.

138.    In that same email, Ariane E. Young also falsely claims, "What Starrex sent to the Magnolias to sign last week was an ***amended and restated note to replace the October 17, 2022 one*** . . . ." and "***The original promissory notes are in default as of June 23, 2023***, and so this was intended to waive that default under the expectation the Magnolias would enter into a deal with Essent and repay the Notes by August 31, 2023." (bold and italicized emphasis added)

139.    The metadata of the forged Coast to Coast note is as follows:

Copy from re:SearchTX

Created: 4/18/2023 with the same time as the time presented in Garth's draft note

Modified: 5/2/2023 at 12:44:18 PM

140.   On August 24, 2024 at 4:23 PM, Ms. Young states that "our client is super anxious to get this resolved", meaning that Starrex, including Scott Reeves (who is copied on every email), desperately needed the forged promissory notes to be replaced and superseded.  They would not want to make a demand using forged notes and/or be forced to rely on them for recourse if they could help it at all.

141.   The ruse was transparent because the "amended and restated" notes would not resolve anything and would only extend the alleged maturity date until September 1, 2024.

142.   In response to resistance to sign meaningless notes, Young writes on August 25, 2023 at 4:10 PM, "We were simply trying to paper the agreement that was reached and do not understand your client's reluctance at this point. . . . If your client is now not willing to enter into the amended and restated notes and agreements, please let us know."

143.   In response, Fulkerson proposes on August 28, 2023 at 9:11 AM for Young to simply "propose a form amendment (not a restatement) that modifies the face amount of the notes (and only the face amount of the notes.)"  Fulkerson is not yet aware that the notes are fake have been forged.  Young, Reeves and Starrex refuse such a proposal because they need "restated" notes in order to supersede the forged notes.  Fulkerson's proposal would do them no good.

144.   On August 30, 2023, Magness and Starrex CEO Hill exchange texts.  Hill fervently asks, "So are you saying that you aren't going to sign?"  Magness responds, "Not yet, still talking with counsel and waiting on Draycott to brief us on Essent presentation …"  Magness decides not to sign.

145.   On August 31, 2023 around 11:15 AM, Fulkerson and Young had a call.  Young called the Magnolias a "hostile debtor" and ranted and raved.  She, Starrex, and Reeves were obviously desperate to achieve ratify and supersede the forged promissory notes, especially as Starrex was to undergo increased scrutiny by securities regulators and the public given the impending default of the ESSENT/ANTIC line of credit, ESSENT/ANTIC would want to see Starrex's books, and her husband and partner, Scott Reeves, was conflicted and liable considering his membership on the Audit Committee of Starrex.  The call ended and there was no resolution.

Copy from re:SearchTX

146.    Fulkerson and others begin to realize that this was a lame attempt at ratification of forged notes as well as Starrex's and Merritt's profligate and self-dealing use of funds.

147.    This realization took some time because none of them knew that the forged promissory notes existed.  It became clear that once Starrex either decided not to follow through with the acquisition or revealed that it never intended to acquire the Magnolias as represented numerous times, it had no recourse for the monies it had used as it chose.  (Additionally, Garth and Clayton seemingly never had any intent to acquire the Magnolias as of March and/or April 2023 despite their and Starrex's serious material representations to the contrary.)  As a publicly traded company with shareholders that held its management accountable, this was a major problem.  Starrex originally forged the notes to convince the auditors that its alleged loans to the Magnolias were documented and also used said notes as a paper trail to back up their (groundless) UCC financing statement filings.  However, the LOI expired, it decided it had to create a paper trail to show its shareholders that it had sound business judgment and documented recourse for the monies it spent and lent.  It did not want to have to rely on the forged promissory notes which likely were only there for its own internal and audit "compliance" purposes so it hoped to superseded the forged notes with the "amended and restated" notes.

148.    It seems that Young's unusual behavior on the call might have been related to the deadline for Starrex to file its MD&A and financial statements on August 31, 2023, for the six months ended June 30, 2023.  Starrex likely did not want to make further misstatements and omissions of material fact and obtaining the "amended and restated" notes that day or soon thereafter would ensure that Starrex had a legitimate sort of paper trail that papered over its fraud and forgery.

149.    Indeed, on August 31, 2023, Starrex International filed its Management Discussion and Analysis prepared as of August 31, 2023, for the six months ended June 30, 2023.  Under Canadian securities law, it was certified by Merritt as CFO and Hill as CEO to be true and accurate like countless other filings.  Yet, it contained blatant lies.  For instance, on page 4, it stated, describing the forged promissory notes:

> The Company entered into four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies.  The promissory notes carry a 6% per annum interest rate with a maturity date of June 23, 2023.  At the option of the Company, the note will become immediate [sic] due and payable.  As at June 30, 2023, the Company recorded interest income of $62,469 (June 30, 2022 - $Nil).

Copy from re:SearchTX

150.    This is completely false.  When Merritt and Hill certified this as true on August 31, 2023 through their respective executed FORMS 52-109FV2, including the representation that "the interim filings [which include the MD&A] do not contain any untrue statement of a material fact", they lied.  Plain and simple.

151.    In addition to these many misrepresentations to the public, shareholders, Alberta Securities Commission and Canadian Securities Administrators, Canadian National Stock Exchange, the U.S. Securities and Exchange Commission, and the U.S. public and shareholders, Starrex and its executives also misrepresented that the forged promissory notes were collectable, which materially misrepresented Starrex International's financial condition.

152.    On September 8, 2023, at 9:19 PM through Carolyn J. Reed, Eric Wade of Porter Hedges LLP sends a demand email attaching four demand letters in which each forged promissory note has been combined with the PDF, eliminating the individual metadata for each note.  However, the forged Magness signature is identical on each note and seems to consist of a little photo placed on the signature line of each note.  In response, at 9:27 PM, Magness forwards the email to Nelson Mitchell, Terry Garth, and Phil Clayton, writing, "Please see below, these notes are not enforceable, we need to discuss our response."  At the time, Magness did not realize that Garth (and likely, Clayton, behind the scenes) had been instrumental in the forged notes scheme.

153.    Upon receiving the demand, HMH's attorney, Adam Fulkerson called Eric Wade, asking him, "Do you even realize the notes were never signed?"  Mr. Wade demurred.

154.    The reaction from the Magnolias is one of disbelief and protest.  Magness never signed the notes, as he swears.

155.    On September 11, 2023, at 3:00 PM Scott Reeves sent an Amending Letter Agreement to Magness.  Magness refused to sign.  On October 12, 2023 at 10:46 AM, Scott Reeves cancelled the envelope.

156.    On September 14, 2023, ANTIC, Starrex International and Starrex Insurance Holdings signed a letter agreement assigning the ANTIC Loan Agreement dated October 17, 2022 to EssentVentures, LLC, a Delaware limited liability company.

157.    On September 27, 2023, EssentVentures, LLC (purchaser) and ANTIC (seller) executed an Asset Purchase Agreement which specifically assigned the ANTIC Loan Agreement to EssentVentures, LLC.

Copy from re:SearchTX

158.   On September 27, 2023, EssentVentures, LLC, Starrex International and Starrex Insurance Holdings signed a letter agreement restating the facility termination date for the ANTIC Loan Agreement and acknowledging the assignment.

159.   Also on September 27, 2023, Hill, as CEO of Starrex International, sends to Nelson Mitchell a letter likely ghost-written by Garth (as usual), proposing a settlement that would require the removal of John Magness from the Magnolias.   Mr. Mitchell finds the settlement offensive and highly distasteful.  It is rejected.

160.   On October 11, 2023 at 12:39 PM, Bill Higgins of EssentVentures wrote to Hill and Merritt thanking them to meeting with him the day before but stating that he was disappointed that he wasn't provided with a more definitive plan outlining how Starrex would repay the $4.85 million it owed EssentVentures.  He told them to expect EssentVentures to issue a demand notice by end of day October 12, 2023, demanding full repayment by October 17, 2023.

161.   On October 12, 2023, at 5:17 PM, Merrit wrote to Bill Higgins of EssentVentures, copying Hill.  Through the acquisition of ANTIC, EssentVentures had become the main underwriter to the Magnolias.  Merritt knew this.  In her email, Merritt disparaged the Magnolias, claiming that they owed Starrex past due sums since July—a blatant lie as that relied on the fake promissory notes she knew she had forged.  She also told EssentVentures that Starrex had securities interest in the Magnolia entities that Starrex could surrender to EssentVentures, but this was based on the lie that promissory notes existed and securities agreements with authority had been executed.  She also stated that as a result, Starrex could not take the position that the Magnolias are separate from the ANTIC note.

162.   As promised, on October 12, 2023, EssentVentures, LLC served a formal demand notice for repayment of the Loan and Security Agreement dated as of October 17, 2022 by and among Starrex Insurance Holdings, Starrex International, and EssentVentures, LLC.  The notice also indicated that it would not delay the facility termination date and stated that the facility would terminate on October 17, 2023.

163.   On October 18, 2023, Starrex International issued a press release acknowledging the money was owed.  The press release was at once specific and oddly vague in several important respects.  It identified some details but would not identify when the facility originated (that is, the date of October 17, 2022 is completely omitted), the identity of the current lender, the fact that it had been assigned to EssentVentures, or even the original lender, instead calling the lender a

Copy from re:SearchTX

"Missouri-based institutional lender."   In keeping with Starrex's general operational practices, this was calculated to obscure the details while appearing to meet disclosure requirements. Additionally, it claimed that Starrex entered into the facility in connection with the proposed acquisition of the title agency business ("Target").   It is unknown whether Target referred to All American, the Magnolias, some other title companies, or a combination of all of them.

164.   On October 20, 2023, EssentVentures, LLC sued Starrex Insurance Holdings, Inc. and Starrex International Ltd. in New York County Supreme Court, Index No. 655209/2023 seeking repayment of $4,850,000.  It stated that it was based on the Loan and Security Agreement dated October 17, 2022, by and among ANTIC and the Starrex entities, the Convertible Promissory Notes dated October 17, 2022, executed by the Starrex entities, and the Guaranty dated October 17, 2022, executed by Starrex International.

165.   Also on October 20, 2023, EssentVentures, LLC served a Notice of Acceleration and Demand on Starrex Insurance Holdings and Starrex International.

166.   On October 25, 2023, EssentVentures, LLC served Starrex International and Starrex Insurance Holdings with the lawsuit.

167.   On November 3, 2023, Starrex International vaguely disclosed the demand from an unidentified "Lender" (but not the lawsuit, despite already being served) in its Form 7 Monthly Progress Report ending October 31, 2023, filed with the Canadian National Stock Exchange.  As always, this progress report was certified by Merritt as CFO of Starrex International.

168.   On November 17, 2023, EssentVentures, Starrex International and Starrex Insurance Holdings agree to an extension of certain deadlines in the EssentVentures lawsuit.

169.   As of November 21, 2023, Starrex International filed its Management's Discussion and Analysis for the nine months ended September 30, 2023 and 2022.   It contains additional misrepresentations in line with previous deceptions.  Specifically, on page 3, it states:

> "The Company entered into four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies. The promissory notes carry a 6% per annum interest rate with a maturity date of June 23, 2023. At the option of the Company, the note will become immediate due and payable. For the nine-month period ended September 30, 2023, the Company recorded interest income of $118,346 (September 30, 2022 - $Nil)."

Copy from re:SearchTX

170.    Once again, Starrex International, Merritt and Hill, falsely claim that Magnolia entered into promissory notes with Starrex effective October 17, 2022.  Yet, not only did this not occur and the fake notes were forged but the entity stated on the fake promissory notes is <u>not</u> the "Company" (Starrex International, Ltd., a Canadian company), but rather "Starrex Insurance Services, Inc.", a "Nevada DBA of Starrex Insurance Holdings, Inc." as Starrex judicially admits in its Original Petition.  Additionally, the "Company" claims $118,346 in interest income on fake promissory notes and makes it appear as though they are current and collectible!

171.    Equally "odd," Starrex International does not mention the September 8, 2023 demand it made on the Magnolias, the fact that the (fake) notes are due upon demand or that they are allegedly delinquent.  Starrex's attitude can be fairly characterized as follows: If you're going to lie to regulators and the market to manipulate your stock price, you might as well go all in!

172.    On page 4, the Company acknowledges that the (fake) notes have been in default as of June 23, 2023, but quickly and fraudulent assures the market: "the notes are secured with the underlying assets of the entities which are valued at approximately $3,800,000 as at September 30, 2023."  This is yet another lie because the notes do not exist and thus cannot be secured by any underlying assets of some unidentified entities (presumably, the Magnolias).

173.    On page 5, the Company states that $1,800,000 was used as a cash down payment associated with the acquisition of All American Title Co., Inc., and that cash used in investing activities through loans advanced is directly associated with the proceeds in the amount of $4,000,000 borrowed from the credit facility with ANTIC, an admission that some of the ANTIC Loan Agreement was used as such.  The Company then lies once against by stating that "[l]oans in the amount of $3,051,239 were also advanced associated with the promissory notes in support of a potential acquisition, which expired on June 23, 2023."

174.    Dated as of November 22, 2023, the Starrex International, Ltd. Condensed Interim Consolidated Financial Statements Three and Nine Months Ended September 30, 2023 and 2022, are signed by Merrit as CFO, Hill as Chairman and Scott M. Reeves as Director (and for the Audit Committee).  (No wonder they wanted those "amended and restated" notes signed!)  Similarly, it contains material misrepresentations regarding the fake promissory notes.  Specifically, on page 16, it represents:

> "The Company entered into four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies. The promissory notes carry a 6% per annum interest rate with a maturity date of June 23, 2023.

Copy from re:SearchTX

> At the option of the Company, the note will become immediately due and payable. As at September 30, 2023, the Company recorded interest income of $118,346 (September 30, 2022 - $Nil)."

175.    Once again, these are material misrepresentations for the reasons stated above.  The "Company" never entered into any notes because the notes are fake and signatures forged, the face of the note contains an entity that is <u>not</u> the Company by any stretch of the imagination, false interest income is reported by way of a fake interest rate and the notes are reported as immediately due and payable at the option of the Company, all of which is untrue.

176.    How could an entity not even listed as Payee on the fake notes make a demand for payment?  Why would Starrex International represent to the market and regulators that these notes exist, they have generated substantial interest income, and that it can collect on them, when this is all completely untrue?  Why would Merrit, Hill, and Reeves sign off on this?  the Magnolias look forward to finding out the answers to these questions.

177.    There are other omissions and misrepresentations therein.  On page 22, in the Section entitled "19. Subsequent Events," the Company mentions the demand by the "successor Lender" but fails to mention the initiation of a lawsuit at all, despite this document being prepared on November 22, 2023, almost a month after Starrex was served with the EssentVentures lawsuit. Within the same section, Starrex states the following, which is false if it refers to the Magnolias: "Starrex holds security over the assets of the Target and is currently undertaking discussions with the Lender to try and negotiate an extension to the demand and to work out repayment terms." Strangely, the "Target" is not identified or defined anywhere in the filing.  It is obvious that the Company and its leadership are very concerned about their fraudulent misrepresentations being discovered.

178.    On November 29, 2023, Merritt as CFO and Hill as CEO file their FORMS 52-109FV2 with the Canadian National Stock Exchange, certifying that despite the number of material misrepresentations and a some notable material omissions made in the interim financial report and interim MD&A of Starrex International Ltd. for the interim period ended September 30, 2023, these documents somehow "do not contain any untrue statement of material fact or omit to state a material fact required to be stated."

Copy from re:SearchTX

179.    On December 3, 2023, in the EssentVentures lawsuit, the parties agree once against to an extension of deadlines, with the Starrex entities' response to EssentVentures' summary judgment in lieu of a petition due on December 11, 2023.

180.    On December 5, 2023, at 1:24 PM, Magness for the Magnolias requests an extension of the Management Services Agreement (MSA) through February 1, 2024.  Merritt responds on December 6, 2023, at 4:04 PM that "Starrex is willing to extend the MSA through December 31, 2023, as we work through potential solutions."  Magness quickly responds at 4:16PM, writing "This is fine, I am not sure it will allow for enough time for an IT transition… Maybe we can discuss a separate IT solution…"  Thus, Starrex Technical Services and the Magnolias agrees to an extension through December 31, 2023 and relied upon Merritt's promises of this extension.

181.    On December 7, 2023, Starrex International files its Form 7 Monthly Progress Report as of December 7, 2023 for the month ended November 2023.  Once again, Starrex fails to disclose the active lawsuit with EssentVentures, instead simply describing the demand for repayment from the "US based company . . . successor Lender" that purchased the "original Lender" and omitting any mention of court or legal action whatsoever.  It is signed and certified by Merritt as CFO to be true and that there is no material information concerning the Issuer which has not been publicly disclosed—but of course that is untrue for the reasons stated.

182.    In the last quarter of 2023 through February 2024, and at other times, Merritt, either acting in the course and scope of her role as Starrex CFO or alternatively, outside the course and scope and of her own volition, repeatedly contacted the Magnolia's employees, customers, and underwriters and made misrepresentations, disparaging and defamatory statements about the Magnolioas.  Merritt actively encouraged the Magnolia's employees to quit their positions with the Magnolias and/or recruit them to Starrex.  She further disclosed the Magnolias' confidential information.  These actions are violations of the MSA and also amount to tortious interference.

183.    On December 8, 2023 at 3:30PM, as is becoming true to form, Merritt writes a strange email to *every single employee of Magnolia Texas* by using the email group "Magnolia TX ALL." She writes:

> "Good afternoon.
>
> I wanted to clarify misunderstandings that have surfaced over the past several weeks.  Starrex provides support services only to the Magnolia entities.

Copy from re:SearchTX

> We do not own the Magnolia entities and have no authority over bill payments or decisions made in finance, payroll or Information Technology. Both Justin Ray and Mike Reinertsen execute decisions made by John Magness, the sole manager of the Magnolia entities, and his management team.
>
> If you have questions or would like to discuss this or our role, I am available any time and welcome the opportunity to assist in any way possible.
>
> Debbie Merritt, PhD, CFA
> Chief Financial Officer
> o: 281-406-8621
> c: 214-537-2320"

184.    Magnolias' operational leadership, including the President of Magnolia's operations in Texas, react with incredulity and confusion at this bizarre, factually untrue CYA email. Too little and way too late. Also, until December 8, 2023 and beyond—as dramatically demonstrated thereafter—Merritt, Starrex Technical Services, Justin Ray, and Mike Reinersten certainly had the requisite authority to execute these functions without Magness' involvement and frequently executed Merritt's directives whether to the benefit or detriment of the Magnolias. In fact, they, along with other conspirators, individually and by and through Starrex, would soon thereafter shut down and interfere with Information Technology and other services in a manner calculated to destroy the Magnolias.

185.    It is no coincidence when on December 11, 2023, Starrex *finally* makes a press release about the lawsuit filed by EssentVentures seeking **$4,850,000**, only **47 days** after it was served on October 25, 2023. After multiple extensions, Starrex's response to EssentVentures' summary judgment in lieu of petition was due that very day—December 11, 2023. The announcement reads: "Starrex International Faces Summary Judgement [sic] Application on Demand for Repayment of Credit Facility." Starrex had not announced the commencement of the lawsuit prior to that time, only the demand for repayment on October 18, 2023. Clearly, Starrex wanted to delay announcing this highly material change as long as possible, even withholding this information across multiple disclosure filings. In true Starrex style, the lawsuit is described in unusually vague terms: it is identified as a summary judgment in the State of New York filed by "another US based company" that purchased the original Lender, a "Missouri-based institutional lender". Once again, Starrex

Copy from re:SearchTX

materially misrepresents its financial position by claiming that "Starrex holds security over the assets of the Target . . . . " The "Target" is not identified.

186.    Later, the Starrex entities were granted a reprieve once against when the parties agreed to yet another extension that same day and the parties planned to attend mediation.

187.    On December 12, 2023 at 4:53 PM, Merritt advises that Starrex will be terminating and cutting off everything and mentions the importance of Qualia to the Magnolias' daily operations.

188.    Three hours later, the Starrex entities file this instant lawsuit against the Magnolias with the fake, forged promissory notes supporting their central claims.

189.    Once the lawsuit is filed, Starrex refuses to abide by any of its obligations to the Magnolias, apparently believing that its lawyers will protect it from ongoing tortious acts and breaches of contract.

190.    Magness writes on December 13, 2023 at 4:30 PM to Merritt:

> So you have all of the money for payroll and we don't have admin rights in Gusto or Frost Bank. So not sure how we process payroll, but we are all in agreement that what we are doing is within our legal rights, and supports our employees, the affected consumers and is compliant with our wind down plan. Per your email from yesterday:
>
>> We do not own the Magnolia entities and have no authority over bill payments or decisions made in finance, payroll or Information Technology. Both Justin Ray and Mike Reinertsen execute decisions made by John Magness, the sole manager of the Magnolia entities, and his management team.
>> If you have questions
>
> Please advise on next steps…

191.    the Magnolias attempt to initiate payroll but are challenged by a lack of access, given that up until that point, Starrex would use its system access to initiate payroll.

192.    On December 15, 2023, EssentVentures, Starrex International and Starrex Insurance Holdings settle the lawsuit confidentiality and move to have the lawsuit dismissed.  Strangely,

Copy from re:SearchTX

Starrex does <u>not wait 47 days like it did before</u>, to announce the development of legal action; instead, it issues a press release announcing settlement that very afternoon.[7]

193.   On December 21, 2023, the Magnolias pay $33,374.75 to Qualia—Magnolia's mission critical digital real estate closing platform—to keep it active through March 31, 2024:

| 12/21/2023 | MT Florida Operating | ███████58 | Debit | qualia qualia ST-Z6K6P6A9S6F0 BANKUNITED FL OPERATIN | 33,374.75 |
|---|---|---|---|---|---|

194.   But that doesn't stop Merritt, Starrex and the others from cutting off the Magnolias' access to a software platform it already paid for that was critically necessary for its business operations. By cutting off the Magnolias' access, Starrex, Merritt, and other co-conspirators could seize the Magnolias' valuable, in progress contracts, customers and proprietary data and use the data and software to operate their own title insurance services while later impersonating the Magnolias in Florida and Arkansas completely.

195.   Prior to the wholesale theft and impersonation of Magnolia Florida and Magnolia Arkansas, by CEO Hill's email (ghost-written by Garth) sent on December 29, 2023, at 11:42 AM to "Magnolia Shareholders", Starrex proposed a settlement whereby it would completely acquire "Magnolia Title Florida LLC and possibly Magnolia Title Arkansas, Ltd." in exchange for forgiveness of the alleged debts and the release of certain assets to HMH free of encumbrances.

196.   This made perfect sense.   Garth and Clayton already owned around 2/3 of Magnolia Florida.

197.   On December 31, 2023, at 5:45 PM, Hill (via Garth's ghost-written email) clarified that "this is an offer to settle with only Magnolia Florida and Magnolia Arkansas.   This is not an offer to settle with Coast to Coast or Sol City."   He further wrote that "the offer is withdrawn if the parties have not signed a definitive written settlement agreement by January 5, 2024."

198.   Why January 5, 2024?   Because now that Starrex had control of the software, including the Qualia digital real estate closing platform, all paid for by the Magnolias, Starrex had plans to simply steal and take over Magnolia Florida starting that day.   In doing so, Starrex and its co-conspirators would not only illegally and shamelessly convert and take all business and intellectual

---

[7] One imagines the Herculean efforts Starrex must have expended to shorten its 47-day litigation reporting cycle to a same day press release!   Starrex proves wrong the adage about the relative speeds of good news and bad news: when it comes to Starrex's material disclosures, good news travels at the speed of light; bad news travels like molasses.

Copy from re:SearchTX

and physical property of Magnolia Florida (and thereafter, Magnolia Arkansas), but they would severely and materially diminish, hamper, affect, and curtail Magnolia's ability to repay the alleged debts—which Magnolia disputes.

199.    On February 6, 2024, as announced in a Starrex International press release, Hill suddenly resigned as President and CEO of Starrex International, Ltd. and was replaced by previously independent Chair of the Audit Committee, Charles Burns as interim CEO.  Starrex International's "board also confirmed its commitment to pursue further expansion in the United States Title industry and have identified several exciting opportunities."  Curiously omitted from the press release was the information that the several exciting title industry opportunities were complete, blatant thefts and takeovers of Magnolia Title Florida and Magnolia Title Arkansas in the most arrogant and illegal manner imaginable.

## G. Starrex and Merritt Destroy the Rest of the Magnolias' Business by Intentionally Causing a Digital Death

200.    Merritt, working in partnership with Starrex Technical Services, caused irreparable, devastating damage to Coast to Coast Title's and Sol City Title's operations by halting the migration of Outlook data, which shutdown their email systems and access to escrow software. Additionally, Merritt and Starrex Technical Services also cut off their phone systems and shut off the log-in feature for their laptops, which prevented employees of these the Magnolias from working.  Without email, access to escrow software (including Qualia), phone systems, and the ability to log into their own laptops, Starrex and its affiliates essentially shutdown Coast to Coast Title's and Sol City Title's operations.  Starrex also took business opportunities in breach of the MSA.  Defendants' actions are a breach of the MSA and a breach of their fiduciary duty to the Magnolias, constitute tortious intereference, and have significantly damaged Coast to Coast Title and Sol City Title.

201.    Defendants' unilateral decision to restrict the Magnolias' employees' access to critical IT infrastructure, including emails and Microsoft Authenticator accounts necessary for their operations, effectively crippled the companies ability to conduct business. Coupled with disparaging remarks about the Magnolias to its employees and external parties, Defendants' actions catalyzed a loss of confidence, employee exodus, and significant business disruption for Magnolia Companies.

Copy from re:SearchTX

202.    Moreover, Defendants' unilateral decisions to impede the Magnolias' access to essential IT infrastructure, including email and data storage, under the pretext of pending acquisition, directly sabotaged the Magnolias' ability to fulfill its contractual duties and maintain business continuity.

203.    As Terrell Garth had observed by email on March 11, 2022 at 10:10 AM when negotiating with BSpoke Title regarding IT services:

> The management support services which are essential to the daily operations of the agencies are described in Article II . . . . and as of today the only services that are continuing to be provided intermittently are title examination and title production (which would include keeping the QUALIA operating system open to the Magnolias until the transition to a new system can be completed within two to three weeks).  **Keeping this system in place for the Magnolias during this transition period is critical to their ongoing operations and if terminated would, in all probability, destroy the businesses.**

(bold emphasis added)

204.    A little over one year and nine months later, Starrex did just this to the Magnolias. Starrex and the Magnolia corporate office shared office space without division.

205.    Although Starrex Technical Services and Merritt had promised and agreed to extend and complete the migration and services through December 31, 2023—and the Magnolias had relied on this promise—they abruptly ceased a few days before the start of 2024.  Merritt claimed that all emails, software and the mission-critical Qualia Core and Qualia Connect deployment belonged to Starrex, despite the fact that only Magnolia used them—especially Qualia, and had already paid $33,374.75 for Qualia through Q1 2024, ending March 31, 2024.  Starrex was seemingly placing the Magnolias in an impossible position so they would have no choice but to accept the offer Starrex shoved down their throat:  give us Magnolia Florida and Magnolia Arkansas or lose everything.

206.    Starrex and Starrex Technical Services not only cut off access to Qualia and all Microsoft Office applications, which included customer contact details, access to sending/receiving/retrieving email, access to creating/retrieving files, but it also changed the credentials of the linked magnoliatitleteam.com domain and Microsoft Authenticator that gatekept access to each Magnolia laptop and Microsoft Office applications.  This meant that many Magnolia

Copy from re:SearchTX

employees, which the exception of Magnolia Florida and Magnolia Arkansas to some extent (because Magnolia wanted to take them over), were denied all access to their emails, files, closing transactions in progress, customer contact information, and everything needed to do their jobs. The employees of the Magnolias understandably panicked and began to resign en masse. Many of them joined Starrex's takeover of Magnolia Florida and Magnolia Arkansas, and in particular, Laurie Cooper, former President of Magnolia Florida and Magnolia Arkansas, lead the way, seeding the new ventures with proprietary customer data and stolen intellectual and other property.

207.    To be clear, despite Starrex's claims that somehow it did not have control over Microsoft Authenticator, a two-factor security feature required to log into each Magnolia laptop at the initial Microsoft Windows login screen, this is what the Texas-based Magnolia employees would still face in February 2024:



February 2024: A screen capture from a Magnolia Texas employee's smartphone demonstrating the persistent control of Starrex International and Starrex Technical Services over their laptops and IT

Copy from re:SearchTX

208.    The Qualia digital closing platform that the Magnolias used and which contained the Magnolias' proprietary transaction, customer, and closing data, including for transctions-in-progress, was a business essential tool that the Magnolias' employees had to use on a daily basis to manage and operating the closings on their transactions.  John Magness for Magnolia had originally executed the Qualia for Enterprise Order Form on or about March 14, 2023 with the name of "Starrex Technical Services" as the customer.  As Magness had no power to sign on behalf of Starrex Technical Services and the Magnolias *paid for* the Qualia service and it contained the Magnolias' proprietary data and transactions in progress, the Magnolias had every right to continue to use their paid-for service.

209.    However, obtaining control of the Qualia deployment was especially important to Starrex to further its title insurance services ambitions and for the use of MarketStreet and Starrex Title Florida, LLC.  Once the Magnolias rejected Starrex's offers to sell Magnolia Florida and Magnolia Arkansas to Starrex for the price of the forged, fraudulent promissory notes, Starrex needed to obtain complete control over the Qualia platform.  It did not matter to Starrex that the Magnolias had already paid for it through March 31, 2024:

| 12/21/2023 | MT Florida Operating | ███88 | Debit | qualia qualia ST-Z6K6P6A9S6F0 BANKUNITED FL OPERATIN | 33,374.75 |
|---|---|---|---|---|---|

Starrex needed the platform to seed and run its new operations, to be housed inside Magnolia Florida and Magnolia Arkansas.  The cherry on top was that all of the Magnolias' employees' data and transactions were already in Qualia and they knew how to use it.  They could then be induced to quit Magnolia and rejoin the new Starrex title venture at the same location, using the same platform, same email, and same everything.

210.    To back up Merritt's claims that Starrex Technical Services was entitled to control the Qualia deployment and apparently, also take ownership and control of all of Magnolias' proprietary data therein (which was a breach of fiduciary duties and the MSA) although the

Copy from re:SearchTX

Magnolias had paid for it, Scott Reeves wrote the following letter to Qualia (a copy of which was not provided to the Magnolias):



**TingleMerrett** LLP
*Barristers & Solicitors*

January 6, 2024

**BY E-MAIL**

QUALIA
201 Mission St, Suite 1800, San Francisco, CA
5700 South Mopac, Building D-410, Austin, TX

**Attention:    Natalie Sanchex, Sr. Customer Success Manager - Strategic Accounts**

Dear Ms. Sanchez:

**Re:    Starrex International Ltd.  -  Authorized Signing Authorities**
**File No.  8187.001 SMR**

I am corporate secretary and general counsel to Starrex International Ltd. ("**Starrex**").  This reply is to your inquiry email to Debbie Merritt, CFO of Starrex dated January 5, 2024 regarding Mr. John Magness purporting to have the authority to sign contracts on behalf of Starrex.

I confirm that Mr. Magness is NOT a director or officer of Starrex and, as such, he has no authority to bind Starrex in any contractual capacity.  I further confirm that the directors and officers of Starrex and, as such, the <u>only</u> contractual signing authorities of the company are as follows:

Matt Hill          President, CEO and a Director
Debbie Merritt    CFO
Scott Reeves      Corporate Secretary and Director
Garrett Clayton   Director
Charles Burns     Director

I trust that the foregoing is satisfactory.  Please contact me if you have any further questions or concerns.

Yours truly,
**TINGLE MERRETT LLP**

Scott M. Reeves
Assistant: Cathy Beglinger-Rivoire (403) 571-8007

SMR/cbr
cc.    Deb Merritt

{00722791 v1}

*#1250 Standard Life Building, 639 – 5th Avenue S.W.*
*Calgary, Alberta  T2P 0M9  Canada  T. 403-571-8000 F. 403-571-8008*
*Scott M. Reeves Direct Line 403-571-8015 Email sreeves@tinglemerrett.com*

Copy from re:SearchTX

211.    Starrex, Merritt, Brewer, MarketStreet, Cooper, and Starrex Title Florida then proceeded to use the platform to seed the Magnolia Florida and Magnolia Arkansas locations it completely took over with the participation of MarketStreet, Brian Brewer, Laurie Cooper, Debbie Merritt, Starrex Insurance Holdings, Inc., and Starrex Title Florida, LLC (managed by Starrex Insurance Holdings, Inc.).  Today, it runs those locations as a new (but undisclosed to the public, customers, and others) "Magnolia Title" in Sarasota, FL and Little Rock, AR, with all of Magnolias' former employees, including the former President of Arkansas and Florida, and stolen physical and intellectual property.

212.    Qualia sided with Starrex and Starrex Technical Services.  But determined was in error—the deployment was paid for by the Magnolias, no one on behalf of Starrex had ever signed the Qualia contract, the deployment contained all of the Magnolias' proprietary data and Starrex had no claim to such proprietary data.  Once that occurred, rather than provide the Magnolias access to their data for exporting, migration, or other purposes, Starrex took it and used it in its new title operations, using Magnolia Florida and Magnolia Arkansas' employees, property, business phone numbers (through Ring Central), [8] equipment, office space, names, logos, proprietary customer data, among other things, and transactions in progress.  Thus, anyone calling, emailing, or visiting the physical locations (or even attempting to close on their house) gets MarketStreet and Starrex operating in the name of Magnolia Title Company.

### H. The Big Steal: Starrex/Merritt Makes Magnolias an Offer Based on Forged Notes, and When it is Rejected, Steals Remaining Magnolia Property, IP, Locations, Phone Numbers, Logos, and Proprietary Data with the Help of Starrex, MarketStreet, Brian Brewer, Laurie Cooper, Debbie Merritt, and Starrex Title Florida

213.    Magnolia Title Florida, LLC[9] has held and used its fictitious name of "MAGNOLIA TITLE" since October 5, 2021[10] and began operating as a title insurance agency.

---

[8] On January 30, 2024, at 11:52 AM, Justin Ray of Starrex acknowledges that Starrex is using Magnolias' Ring Central accounts attached to all the Magnolia business phone numbers.  Records show that the Magnolias paid many tens of thousands of dollars to Ring Central for these accounts, reflecting extensive usage of these phone numbers for their businesses prior to the time they were taken by Starrex, Starrex Title Florida and MarketStreet.
[9] Formed in Florida on September 27, 2021 via filing # L21000424747.
[10] On October 5, 2021, Magnolia Title Florida, LLC filed with the Florida Secretary of State its Application for Registration of Fictitious Name, Registration # G21000133874, for the fictitious name of "MAGNOLIA TITLE" (Florida Document Number: L2100042447; FEI Number: 87-2916282).

Copy from re:SearchTX

It operated out of 2075 Fruitville Road, Suite 100, Sarasota, FL 34237. (Its business phone has always been (941) 867-8864). Accordingly, it is known in its area of operation and the surrounding area as Magnolia Title. On May 12, 2022, Magnolia Title Florida, LLC changed its Authorized Person to Debbie Merritt and confirmed its registered office address as 2075 Fruitville Road, Suite 100, Sarasota, FL 34237.[11]

214.    Magnolia Title Arkansas, Ltd.[12] has held and used its registered, assumed name of "MAGNOLIA TITLE" with the State of Arkansas since October 29, 2021 and began operating as a title agency (NPN/License # 20121168). Its business address is 10310 W Markham Street, Suite 220, Little Rock, AR 72205. (Its business phone has always been (501) 255-2941). Accordingly, it is known in its area of operation and the surrounding area as Magnolia Title.

215.    Yet, as of January and February 2024, after Plaintiffs filed this lawsuit, MarketStreet Capital Partners and MarketStreet AR, in collaboration with Starrex Title Florida, LLC (for Florida), Cooper (for both Florida and Arkansas), Merritt (same), and Brewer (same), simply claim these addresses, names and phone numbers as their own. Magnolia Title Florida and Arkansas' operations, intellectual property, and proprietary and trade secret data have been blatantly stolen by these Defendants. Cooper and Starrex provided and delivered the proprietary and trade secret data that seeded the businesses of MarketStreet and Starrex Title Florida. According to the states of Arkansas and Florida and Cooper's representations, Cooper is still working for Magnolia Title Arkansas and Florida, despite resigning on February 2nd and Brewer confirming that Cooper works for his MarketStreet companies. The Designated Responsible Licensed Producer for Magnolia Title Arkansas is also the same as that of MarketStreet AR: Wanda Borecky, (License/NPN # 16812370) and so are the other associated title agents: Laurie Cooper, Josefat Rivera (License/NPN # 18946472), and Dustin Parson (License/NPN# 21005130)

216.    On December 29, 2023, and then on New Years' Eve, Dec. 31, 2023, Starrex makes "an offer to settle with only Magnolia Florida and Magnolia Arkansas". This is all Starrex wants and both Garth and Clayton together directly and indirectly own 2/3 of Magnolia Florida and

---

[11] On May 12, 2022, Magnolia Title Florida, LLC filed filing # L21000424747, changing the Authorized Person to Debbie Merritt, Magnolia Title Florida, LLC, 14701 Saint Marys Lane Suite 150, Houston, Texas 77079 with email: dmerritt@starrexintl.com and phone (281)406-8621. The filing also confirmed the mailing address to be 14701 Saint Marys Lane Suite 150, Houston, Texas 77079, and the principal office address to be 2075 Fruitville Road, Suite 100, Sarasota, FL 34237.

[12] On October 20, 2021, Magnolia Title Arkansas, Ltd. was formed by John Magness, Manager, and Britt Naponic, Incorporator/Organizer via filing # 811335623 with the Arkansas Secretary of State.

Copy from re:SearchTX

Magnolia Arkansas. They are behind this. The offer is as follows: allow us to "buy" Magnolia Florida and Magnolia Arkansas with the fake, forged promissory notes—we take it all and in exchange, we forgive just the forged promissory notes for Florida and Arkansas.

217.    To apply additional pressure, although Merritt and Starrex agreed to continue migration of all Magnolia data through December 31, 2023 and knows that the Magnolias are relying upon these representations, they suddenly cease migration before the agreed-upon extended deadline is reached.

218.    On January 2, 2024, Merritt essentially admits in communications that Starrex Technical Services suddenly ceased the migration of Magnolia data and shut off access a few days prior in order to strong arm a deal on Arkansas and Florida—the offer that was sent on December 29th and New Years' Eve by the Starrex group. She offers to "assist" *only* if the Magnolias are willing to discuss the transfer of Arkansas and Florida. Of course, she also states that Garth and Clayton have already agreed to this. She offers to have Garth and Clayton make contact from the Starrex side to discuss a deal on Arkansas and Florida. This offer is rejected.

---

**From:** Debbie Merritt CFA, PhD <dmerritt@starrexintl.com>
**Date:** Tuesday, January 16, 2024 at 1:51 PM
**To:** Nelson Mitchell <Nelson.Mitchell@historymaker.com>, John Magness <John.Magness@magnoliatitleteam.com>
**Subject:** Florida & Arkansas

> **CAUTION:** This email originated from outside HistoryMaker Homes. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Nelson/John,

As you are aware, both Florida and Arkansas are now without an underwriter. It is my understanding they are unable to open new files and are searching for a home. Setting aside whatever personal issues exist on both sides of the table, would you be willing to work something out that preserves your ability to file whatever claims you have against Starrex so that those 28 employees may continue their employment? I am not asking you to relinquish either entity to Starrex, but merely to assign the leases and assets, which are nominal in those two entities, in exchange for a write off of the debt? This, at a minimum, allows these individuals to keep their jobs.

Whatever issues exists between Magnolia and Starrex can be settled in whatever manner is required to assuage the claims and move on.

---

Copy from re:SearchTX



Copy from re:SearchTX

219.　　There was no response to Merritt's January 16, 2024 email sent at 1:51 PM to Mitchell and John Magness (Magness no longer had access to his email) and her January 16, 2024 text message to Mitchell that quickly followed at 1:58 PM. Cooper wrote to Magness by text on January 17, 2024. With their take it or else deal rejected, they decided to take what they wanted without consent or authorization and deal with the consequences later. Merritt, Hill, Cooper, Brewer, MarketStreet, and other co-conspirators, potentially including other professionals and advisors, agreed to proceed with the theft and conversion of Magnolia Title Florida and Magnolia Title Arkansas. This meeting of the minds and agreement on a common objective(s) is evident in their conferences and phone calls discussing the plot on or about early to mid-January 2024, which may have included professionals other than the participants. In these defendants' minds, a Magnolia employee could simply go home today and return to the office tomorrow, now instead working for a third party d/b/a "Magnolia Title Company."

220.　　They solicit Cooper in breach of the non-solicitation provision of the Letter Agreement between Starrex and the Magnolias and partner with her. They find a willing co-conspirator in Brian Brewer and MarketStreet, who is running a struggling title business—this is an opportunity for rapid expansion—and with his co-conspirators, all they have to do is steal and use all of Magnolia Arkansas and Magnolia Florida's property and proprietary data and tortious and illegally take over their locations, addresses, phone numbers, and impersonate them in every way possible. No one will know the difference nor be able to stop them—so they think.

221.　　Indeed, Starrex or its leadership were determined to take Magnolia Title Florida and Magnolia Title Arkansas by any means necessary, whether that meant Starrex would take it for its own purposes or third parties would use these assets for Starrex's potential later benefit. After the Magnolias rejected Starrex's offer to essentially buy those entity with the fake, forged promissory notes, Starrex spang into action and registered Starrex Title Florida, LLC on January 5, 2024, with the help of Laurie Cooper. Thus, it seems that Cooper had begun actively participating in the conspiracy at least as early as January 5, 2024, while still employed as the President of Magnolia Florida and Magnolia Arkansas, but likely began participating far earlier. She would not formally resign as President until about a month later—February 2, 2024. Notably, Starrex had shut off and blocked all IT services for the two Texas locations but kept these two operating.

Copy from re:SearchTX

222.    Although Starrex had previously claimed in public filings that it had security interest in up to $3.8 MM of the Magnolia Companies' assets and represented to the public that alleged loans to the Magnolia Companies were accordingly secured, today, a substantial amount of Magnolia assets on which it claimed security interests (which the Magnolia Companies vigorously deny), on information and belief, appear to be used and operated by a collection of third-parties, with the help of Merritt, Hill, Cooper, Brewer, MarketStreet and other co-conspirators, with apparently some participation in Florida by Starrex Title Florida.

223.    **On Jan. 5, 2024, Starrex Title Florida LLC is formed with Starrex Insurance Holdings Inc. as sole Manager, Debbie Merrit as Authorized Person, Laurie Cooper as Registered Agent, and principal business location as Magnolia Title Florida's Offices.** On January 5, 2024, Starrex Title Florida LLC was formed with the filing of its Electronic Articles of Organization for Florida Limited Liability Company via filing L24000014887 using the same mailing address as all the other Starrex entities: 14701 Saint Marys Ln., Suite 150, Houston, TX 34237.  The Electronic Articles are signed by Laurie Cooper. The Authorized Person is Debbie Merritt, listing her Starrex 14701 Saint Marys Lane address and the sole Manager is Starrex Insurance Holdings, Inc.,[13] a current party to this case, listing the same address.  The "street address of the principal office of the Limited Liability Company" is 2075 Fruitville Road, Suite 100, Sarasota, FL 34237", which is Magnolia Title Florida, LLC's office address in Sarasota.   The Florida registered agent is Laurie Cooper at 2075 Fruitville Road, Suite 100, Sarasota, Florida 34237.  Just like MarketStreet Capital Partners, LLC, which makes a foreign filing just 25 days later, Laurie Cooper's listed address is Magnolia Title Florida, LLC's office address in Sarasota. Magnolia Title Florida LLC did not consent to any of this.

224.    At the time, Laurie Cooper was still the President of Magnolia Title Florida and Magnolia Title Arkansas.  However, as of January 5, 2024, as the designated Agent in Charge of Starrex Title Florida LLC, she began formally working for and on behalf of Starrex Title Florida, LLC, solely managed by Starrex Insurance Holdings, Inc. and with its Authorized Person designated as Defendant Debbie Merritt.

---

[13] Starrex Insurance Holdings, Inc. is the Starrex group's title insurance subsidiary, as it was the acquisition vehicle for American Title Company, LLC.  Accordingly, it follows Starrex's overall plan to expand in the title insurance field by forming Starrex Title Florida, LLC and completely (and wrongfully) taking over Magnolia Title Florida, LLC's operations and all intellectual property, equipment, software, etc. without consent.

Copy from re:SearchTX

225.    On January 16, 2024, Merritt asks for Magnolia Florida and Magnolia Arkansas to consent for another entity to assume the leasing and release all the assets.  This is rejected.

226.    On January 17, 2024, after Merritt put her up to it, Laurie Cooper poses the same question by text to Magness.  Magness does not accept but states that if anyone wants to take over the leases, they will have to make a formal offer for consideration.[14]

227.     Starrex and its co-conspirators decide that there is no reason to ask for permission any longer.  They are doing things the way they want, on their on terms.  No one needs to be informed.  There is no voice of reason.

228.    **On January 18, 2024, Starrex Title Florida LLC, is approved as a Title Insurance Agency** (NPN # 21049327; License # G084848) by the Florida Department of Financial Services, listing both its business address and mailing address as <u>Magnolia Title Florida, LLC's office address in Sarasota</u> (2075 Fruitville Road, Suite 100, Sarasota, FL 34237) with the primary county as Sarasota.  The Agent in Charge is Laurie Cooper (P029160), the email is Laurie.Cooper @magnoliatitleteam.com, and the phone number is <u>Magnolia Title Florida's phone number</u> (941-961-4764).

229.    **On Jan. 25, 2024, Brian Brewer registers "MAGNOLIA TITLE COMPANY" and likely commits a Third Degree Felony.**  On January 25, 2024, via an Application for Registration of Fictious Name, Registration Number #G24000014524, for the name "MAGNOLIA TITLE COMPANY", Brian Brewer swore for the first time under oath to the Florida Secretary of State that he owned the assumed name "Magnolia Title Company" and had advertised it at least once in a newspaper as defined in Chapter 50, Florida Statues (specifying a genuine advertisement in a newspaper of general circulate and other requirements), including Florida Statutes Section 865.09—a violation of which is **Third Degree Felony** pursuant to Florida Statutes Section 817.155.  Magnolia Title Florida LLC did <u>not</u> consent to any of this.

230.    **On Jan. 30, 2024, MarketStreet makes foreign filing in Florida listing Magnolia Title Florida's offices as its place of business and Laurie Cooper as Florida Registered Agent.**  On January 30, 2024, MarketStreet Capital Partners, LLC (FEI Number 84-2634436), a Texas limited liability company, filed a foreign filing with the Division of

---

[14] On January 17, 2024 at 8:57 AM, Laurie Cooper wrote to Magness by text, asking for Magnolia Title Florida and Magnolia Title Arkansas to please release the leases.  Obviously, Merritt put her up to it and Starrex was soliciting her for a new job.  Magness asked to whom they would be released.  There was no further response.  Magness stated that if anyone wants to take over the leases, they will have to make a formal offer for consideration.

Copy from re:SearchTX

Corporations of the Florida Secretary of State, registering the company to do business in Florida via filing M24000001170.  The formation and contact person is Brian A. Brewer, at 25700 I-45 North, Suite 100, Spring, TX 77386, bbrewer@momentumtitletx.com; 713-254-3374.  Under oath and in accordance with Florida Statutes section 605.0203(1)(b) and aware that any false information submitted in a document to the Department of State constitutes a third degree felony under Florida Statutes section 817.155, Brian A. Brewer swore that he was the <u>only</u> member of this entity.  (Yet, the Texas regulators show this not to be true.)  The Florida registered agent is Laurie Cooper at 2075 Fruitville Road, Suite 100, Sarasota, Florida 34237.  Just like Starrex Title Florida LLC (formed less than a month ago), Laurie Cooper's listed address is <u>Magnolia Title Florida, LLC's office address in Sarasota</u>.  Magnolia Title Florida LLC did <u>not</u> consent to any of this.

231.  **On Jan. 30, 2024, MarketStreet AR is formed by Brian Brewer, listing Magnolia Title Arkansas's business address as its own.**  On January 30, 2024, MarketStreet Capital Partners AR, LLC was formed by Brian A. Brewer, Incorporator/Organizer/Registered Agent and Leah Lopez, Manager via filing # 811477302 with the Arkansas Secretary of State.  It falsely claimed the fictitious name of "MAGNOLIA TITLE COMPANY". It also falsely claimed Magnolia Title AR, LLC's de facto business address as its own: 10310 W Markham Street, Little Rock, AR 72205.  Magnolia Title Arkansas, Ltd. did <u>not</u> consent to any of this.

232.  **On Feb. 2, 2024, Brian Brewer transfers the assumed name of "MAGNOLIA TITLE COMPANY" to Marketstreet and likely commits a *second* Third Degree Felony.**  On February 2, 2024, Brian Brewer had an Application for Registration of Fictious Name, Registration Number #G24000018305, for the name "MAGNOLIA TITLE COMPANY" filed with the Florida Secretary of State.  For the application, on February 1, 2024, Brian Brewer (with email: BBrewer@momentumtitletx.com), who swore *once again* under oath to the Florida Secretary of State that he owned the assumed name "Magnolia Title Company" and had advertised it at least once in a newspaper as defined in Chapter 50, Florida Statues, including Florida Statutes Section 865.09—a violation of which is **Third Degree Felony** pursuant to Florida Statutes Section 817.155—cancelled and abandoned the name so that MarketStreet Capital Partners, LLC, a Texas limited liability company liability company located at 25700 I-45N, Suite 100, Spring, TX 77368, could then register the assumed name of "Magnolia Title Company" in Florida and assume

Copy from re:SearchTX

operations with Starrex Title Florida, LLC at Magnolia Title Florida, LLC's office in Sarasota, FL.  Magnolia Title Arkansas, Ltd. did not consent to any of this.

233.    On February 7, 2024, Debbie Merrit files for Starrex Title Florida, LLC with the Florida Division of Corporations.

234.    **On Feb. 9, 2024, Laurie Cooper registers the fictitious name of "MAGNOLIA TITLE COMPANY" with MarketStreet and likely commits a Third Degree Felony.**  On February 9, 2024, Laurie Cooper, filed an Application for Registration of Fictious Name, Registration # G24000022404, for the ficitious name "MAGNOLIA TITLE COMPANY", swore under oath to the Florida Secretary of State that MarketStreet Capital Partners, LLC, a Texas limited liability company located at 25700 I-45N, Suite 100, Spring, TX 77368 (Florida Document Number: M24000001170; FEI Number 84-2634436),[15] owned the assumed name "Magnolia Title Company" and had advertised it at least once in a newspaper as defined in Chapter 50, Florida Statues, including Florida Statutes Section 865.09—a violation of which is **Third Degree Felony** pursuant to Florida Statutes Section 817.155.  As she listed the "Florida County Principal Place of Business" as "Sarasota", the advertisement was to be made in that county.  CITE TO FLORIDA STATUTES   The "Mailing Address of the Business" was listed as 2075 Fruitville Road, Sarasota, FL 34237, which is Magnolia Title Florida, LLC d/b/a Magnolia Title's office address.
Magnolia Title Florida LLC did not consent to any of this.

235.    Thus, Brian Brewer likely committed *two* Third Degree Felony Offenses and Laurie Cooper committed one such offense.  The maximum prison sentence for a third-degree felony is five years in a state penitentiary or prison camp.  Florida Statutes Section 775.082 (2023).

236.    **Also on Feb. 9, 2024, MarketStreet AR registers as a Title Agents in Arkansas with the assumed name of "MAGNOLIA TITLE COMPANY" and the material participation of Cooper and other former Magnolia employees.**  On February 9, 2024, MarketStreet Capital Partners AR, LLC, with the assistance of four former Magnolia Title Arkansas, Ltd. employees (including Laurie Cooper, Wanda Borecky (NPN/License # 16812370), Dustin Parson (NPN/License # 21005130), Josefat Rivera (NPN/License #18946472)), and Connie

---

[15] Not coincidentally, Brian Brewer's other title business, Momentum Title, LLC, also has its mailing address and principal place of business at the same address as MarketStreet Capital Partners, LLC—25700 I-45N, Suite 100, Spring, TX 77386-1357.  Brian Brewer is currently listed as a Member/Manager.  Momentum Title and Brian Brewer were introduced to Starrex around two years ago by executives of the Magnolias as a potential acquisition target of Starrex.  Just two years later, its Manager (Brian Brewer), a related entity (MarketStreet), Starrex and Laurie Cooper are co-conspirators who have completely taken over Magnolias' Florida and Arkansas offices.

Copy from re:SearchTX

Freeman (NPN/License # 20995778) registered as a Title Agency with the State of Arkansas, license # 3002946122 with the assumed name of "MAGNOLIA TITLE COMPANY." Its address is that of Magnolia Title Arkansas, Ltd.: 10310 W Markham Street, Little Rock, AR 72205 and its "Business Primary Phone" is the same as Magnolia Title Arkansas' long-time business phone provided by Ring Central (which was wrongfully controlled by Starrex): (501) 255-2941. Its business email is Laurie.Cooper@magnoliatitleteam.com. Brian Brewer is listed as its sole manager and 100% owner. Magnolia Title Arkansas, Ltd. did <u>not</u> consent to any of this.

237.     **Starrex Insurance Holdings, MarketStreet, MarketStreet AR, Cooper, and Merritt, completely took over, stole and tortiously interfered with, Magnolia Florida and Magnolia Arkansas and numerous contracts, including earnest money contracts in progress.** Starrex Insurance Holdings, MarketStreet Capital Partners, LLC, and MarketStreet Capital Partners AR, LLC, absconded with—and uses—the same office, same phone number, same name, logo, email, and intellectual property (as well as proprietary customer data) as Magnolia Title Florida, represents itself as "Magnolia Title", the same one that has always officed there and pulled a complete con job on all of Magnolia Title Arkansas' and Magnolia Title Florida's existing customers by seamlessly switching them over to a new entity using Magnolia Title Florida's proprietary customer data, some of which was procured by Laurie Cooper. Debbie Merritt also participated. The earnest money contracts in progress were all summarily switched over to the third parties and away from Magnolia Title Arkansas and Magnolia Title Florida. None of this was authorized by Magnolia Title Arkansas, Ltd. or Magnolia Title Florida, LLC and amounts to and results in, wholesale theft, tortious interference, conversion, misrepresentation, and for Starrex, breaches of contract.

238.     Additionally, despite the Magnolias consistently paying for their software licenses and in particular, paying $33,374.35 by ACH on December 21, 2023 to Qualia for the continued use of its digital closing platform through March 31, 2024, including the Qualia Core and Qualia Connect deployment, Defendants used it for their own purposes including accessing all of the Magnolias' proprietary data without the Magnolias' consent, while denying access to the Magnolias starting late December 2023.

239.     Cooper formally resigned by email sent on February 2, 2024 at 3:10:06 PM CST, stating that she was resigning from her position as Division President of Magnolia Title Arkansas and Magnolia Title Florida, effective immediately. Cooper also indicated in her email that all

Copy from re:SearchTX

Florida employees had resigned effective immediately. Thus, Cooper would now only act for herself individually and apparently, at times, on behalf of Starrex Title Florida, LLC and MarketStreet.

240. Cooper also took various proprietary information, customer lists, customer transactions in progress and other valuable intellectual property belonging to Magnolia Title Arkansas and Magnolia Title Florida over to her new employers, MarketStreet and Starrex, in order to seed the business and continue work on all the transactions in progress. Cooper admitted that she was "wrong" for downloading a customer list.

241. But despite her resignation, she would continue to represent herself as the President of Magnolia Title Florida and Arkansas and run the takeovers of the Magnolias, to this very day:



Laurie Cooper's LinkedIn Profile - Captured on March 19, 2024 at 10:56 AM CDT

Copy from re:SearchTX



Laurie Cooper's Repost – Captured on March 19, 2024 at 10:59 AM CDT.  Considering Cooper's fraud and fraudulent access to Magnolias' bank accounts, this is rich coming from her.

Copy from re:SearchTX

242.     Despite her formal resignation, Cooper acted as though she still worked for Magnolia.

243.     On February 6, 2024, without authorization, Cooper wrongfully accessed Magnolia's escrow account and its Florida recording account ending in 5041, and transferred $4,585.75 from the escrow account to the recording account.

244.     That same day, without authorization, Cooper wrongfully accessed Magnolia's Florida operating account ending in 1758 and Magnolia Title's Frost Bank operating account and sent an outgoing wire in the amount of $2,560.00 from the Florida operating account to the Forst Bank operating account.

245.     Cooper continued to use her same email address, same phone numbers, same title, same logo, same signature, and same letterhead as though she still worked for Magnolia—she certainly wanted everything to think so, and eventually, believe that it was the same Magnolia Title operating in Florida and Arkansas.  No one would know the difference.  For instance, here's her signature and information as of December 23, 2023, when she was still employed as the President of Magnolia Title Arkansas and Magnolia Title Florida:

---

**From:** Laurie Cooper <laurie.cooper@magnoliatitleteam.com>
**Sent:** Wednesday, December 13, 2023 4:45 PM
**To:** Nelson Mitchell <Nelson.Mitchell@historymaker.com>; Debbie Merritt CFA, PhD <dmerritt@starrexintl.com>
**Cc:** John Magness <John.Magness@magnoliatitleteam.com>; Wayne Norton <wayne.norton@magnoliatitleteam.com>; Matthew D. Hill <mhill@starrexintl.com>; Phil Clayton <pclayton@myamcap.com>; terrygarth@icloud.com; Justin Ray <jray@starrexintl.com>
**Subject:** RE: Payroll

I will take care of Arkansas and Florida



**LAURIE COOPER**
President | Arkansas and Florida Operations

941.867.8864 (O) | 941.867.8955 (F) | 941.961.4764 (M)

**WARNING! WIRE FRAUD ADVISORY – NEVER TRUST WIRING INSTRUCTIONS SENT VIA EMAIL** Wire fraud is on the rise! Please call your Magnolia Title Escrow Officer immediately to verify any wiring instructions received via email. Important: Do not call a phone number within the wire instructions email– only use a verified number for Magnolia Title such as the one on the sales contract, via an Internet search, etc. This email message is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

Copy from re:SearchTX

246.    Here it is on February 8, 2024, six days after she formally resigned:



Copy from re:SearchTX

247.    And on February 12, 2024, Cooper makes a particularly ironic statement while continuing to use Magnolia Title Florida LLC's property (highlighting added):



248.    On February 8, 2024, at 11:13 AM, Laurie Cooper writes to Anelle Sena the Magnolias as follows: "Please send me the form you need signed if buyers send funds to the old account." That is, Cooper has simply moved over all the transactions from the Magnolias and needs the buyers to know not to send the funds to the Magnolias' escrow accounts (according to the information they were previously provided) but instead to her new employers' escrow accounts.

Copy from re:SearchTX

249.    On the early morning of February 8, 2024, Laurie Cooper texts Anelle Sena, writing "The aggregate reports from 2/5 I ran and realized I shouldn't have." Thus, Cooper admits that she wrongfully accessed Magnolias' systems and ran reports on its proprietary data on February 5, 2024, the Monday right after she resigned.

250.    On Feb. 9, 2024, Laurie Cooper registers "MAGNOLIA TITLE COMPANY" with MarketStreet and commits a Third Degree Felony by making a misrepresentation under oath to the State of Florida.

251.    Also on Feb. 9, 2024, MarketStreet AR registers as a Title Agents in Arkansas with the assumed name of "MAGNOLIA TITLE COMPANY" and the material participation of Cooper and other former Magnolia employees. On February 9, 2024, MarketStreet Capital Partners AR, LLC, with the assistance of four former Magnolia Title Arkansas, Ltd. employees (including Laurie Cooper, Wanda Borecky (NPN/License # 16812370), Dustin Parson (NPN/License # 21005130), Josefat Rivera (NPN/License #18946472)), and Connie Freeman (NPN/License # 20995778) registered as a Title Agency with the State of Arkansas, license # 3002946122 with the assumed name of "MAGNOLIA TITLE COMPANY." Its address is that of Magnolia Title Arkansas, Ltd.: 10310 W Markham Street, Little Rock, AR 72205 and its "Business Primary Phone" is the same as Magnolia Title Arkansas' long-time business phone provided by Ring Central (which was wrongfully controlled by Starrex): (501) 255-2941. Its business email is Laurie.Cooper@magnoliatitleteam.com. Brian Brewer is listed as its sole manager and 100% owner.

252.    On February 16, 2024, at 11:24 AM, Brian A. Brewer writes to Anelle Sena, copying Laurie Cooper, and writes, "My name is Brian Brewer, I am the owner of Magnolia Title Company in Florida."

253.    On February 16, 2024, at 12:26 PM, Brian A. Brewer, sole owner of MarketStreet, confirms in an email to Anelle Sena, copying Laurie Cooper, that "Laurie Co[o]per" "works for MarketStreet" and "[m]y company is a long existing Texas LLC." He further threatens to "get the Florida Department of Insurance and the FBI involved immediately, we have contacts." (Yet, he is a thief.) He signs the email "Brian A. Brewer, President, MarketStreet Capital Partners d/b/a Magnolia Title Company. Cell 713-254-3374." It is the arrogant thief who cannot improve his situation.

Copy from re:SearchTX

254.    Anelle Sena responds to Brian A. Brewer at 12:49 PM CST, showing nearly identical Florida Title Insurance Licensee results (bold emphasis added):

Brian,

Please see both attachments. **Who does Laurie work for? Both licensees show Laurie as agent in charge and both reflect our Magnolia Title address. The MarketStreet licensee info also does not reflect a current underwriter.**

Our goal is also to protect the consumer and I will await the borrowers contact information.

Thank you,



Copy from re:SearchTX



255.    On February 16, 2024, despite the fact that apparently all Florida employees had resigned, Michelle Raymond at the Sarasota, FL office picked up the phone and stated that it was the same Magnolia Title that had already been there for multiple years.  This was not true and was indicative of the misrepresentations and unfair competition in which MarketStreet and Starrex Title Florida engaged.

256.    By February 19, 2024, Laurie Cooper had already notified Magnolia Title Arkansas and Magnolia Title Florida's insurance carrier, NewMark Insurance Services LLC, that the offices were "closing down".  This caused Tori Font with NewMark to write an email to Magness on February 19, 2024 at 11:05 AM stating that she had been informed of the shut down.

257.    The next day, on February 20, 2024, all employees of Magnolia Title Arkansas formally resigned by letter by signing the same form letter with the date, followed by "Please accept this letter as notice of my formal resignation effective immediately. Sincerely, *Signature* [Name]."  All were identical except the signature and name. (The metadata indicates that the PDF was last modified on February 20, 2024 at 11:48:35AM, which means these were finalized during working hours.) Then, having been solicited and induced to resign by Starrex and MarketStreet AR, they began work effective immediately at the same office location through MarketStreet AR in collaboration with Starrex and continued to use the same computer, logo, title, email, phone

Copy from re:SearchTX

number, digital platform, office equipment, desk, etc. and serve the same transactions-in-progress and the same customers.

258.     The customers, brokers and others would have no idea that Magnolia Title Arkansas, Ltd. was no longer their employer, but now MarketStreet Capital Partners AR, LLC with the collaboration of Starrex in providing services, support, and proprietary data and property that belonged to Magnolia Title Arkansas. They drove into Magnolia Title Arkansas, Ltd. d/b/a Magnolia Title that morning, all resigned, and when the day ended, they drove out of MarketStreet Capital Partners AR, LLC/Starrex d/b/a Magnolia Title Company.   For these 15 employees, it was surely the most convenient job switch in Arkansas history!

259.     For MarketStreet and Starrex, it was another successful, complete theft of everything that belonged to Magnolia Title.  MarketStreet and Starrex continue trespass on the premises of Magnolia Title Florida and Arkansas, engage in unfair competition, , and commit other various wrongful and illegal acts, including but not limited to wrongfully and illegally impersonating Magnolia and using its intellectual and proprietary property.

260.     Reports indicate that on February 20, 2024 and thereafter, Arkansas continued to operate as normal and make substantial profits but now they were made for MarketStreet Capital Partners AR, LLC/Starrex d/b/a Magnolia Title Company (AR) instead of Magnolia Title Arkansas, Ltd..  Reports also indicate that numerous open matters were simply continued so that MarketStreet Capital Partners AR, LLC/Starrex earned the profit instead.

261.     Reports also indicate that Florida continued to operate as normal and make substantial profits, but now they were made for MarketStreet Capital Partners, LLC d/b/a Magnolia Title Company (FL) and Starrex Title Florida, LLC, instead of Magnolia Title Florida, LLC.  As with Arkansas, numerous open matters were seamlessly continued with no customer, bank, or broker any the wiser.  In fact, by stealing Magnolia's property, MarketStreet and Starrex had a good February month in terms of revenue.

262.     On February 22, 2024, Cooper wrongfully accessed Magnolia's Florida underwriting account ending in 1766 and transferred from her new escrow account to this account $13,972.44.

Copy from re:SearchTX

263.     Also on February 22, 2024, without authorization, Cooper accessed Magnolia's Florida operating account ending in 1758 and **wrongfully withdrew $52,618.41**. This implicates Cooper, Starrex Title Florida, and MarketStreet.

264.     That same day, using her same signature block and logo as before and still claiming to be the President of the Arkansas and Florida Operations of Magnolia Title, Cooper writes to Anelle Sena, copying Brian Brewer, at 4:10 PM, stating that "[y]our accounts are still under the same platform of my account." This indicates that she continues to wrongfully access Magnolia's accounts and has easy access to them.

265.     Laurie Cooper, Brian Brewer, MarketStreet Capital Partners, LLC (TX) d/b/a Magnolia Title Company (FL), Starrex Title Florida, LLC (with Starrex Insurance Holdings, Inc. as sole manager and Debbie Merritt as authorized person), and MarketStreet Capital Partners AR, LLC (AR) d/b/a Magnolia Title Company (AR), operating out of the same location, with the same address, same phone number, same name, same logo, same equipment, same customers, same software licenses, using the same proprietary information and intellectual property belonging to the Magnolias, all the while representing to the public, customers, banks and brokers that they are the same Magnolia Titles that have always been there, continue to operate with seeming impunity. They have and continued to tortiously interfere with all of Magnolia's contracts.

266.     These tortious actions materially and severely affect the Magnolias' abilities to repay the $5 million in alleged, fake promissory notes, in the event they are forced to repay any alleged debts to Starrex.

### I.   Starrex, Merritt, Hill, and Reeves Make Numerous Misrepresentations and Omissions in Official Filings with Regulatory Authorities and to the Public

**Debbie Merritt Falsely Misrepresents Herself as CFO of Two Magnolia Entities**

267.     Debbie Merritt misrepresented herself to the Texas Comptroller under oath as the CFO of both Sol City Title, LLC and Coast to Coast Title, LLC on December 31, 2023. Specifically, she submitted Texas Franchise Tax Public Information Reports where she signed under oath (claiming dates of 4/18/23 for Coast to Coast and Sol City Title) and actually filed on December 31, 2023, representing to the Texas Comptroller that "the information in this document and any attachments is true and correct to he best of my knowledge and belief."

Copy from re:SearchTX

268.     On information and belief, Merritt also represented herself to the United States Internal Revenue Services to be the CFO of each of the Magnolia Entities on or about April 2023, when signing the 2022 tax returns of each Magnolia Entity.

269.     Given that Merritt represented herself to be the CFO of each Magnolia Entity and acted as such, she individually owed both of these entities a variety of fiduciary duties under common law (as well as through her status as a Third Party under the MSA), which she breached with vindictive and reckless abandon, destroying their businesses and actively choosing not to act in their best interest for her own benefit.

**Hill, Merritt, and Reeves Make, Sign and Certify Filings Containing Misstatements and Omissions of Material Fact in the Following Capacity: Hill as CEO and Chairman, Merritt as CFO, and Reeves as Director and Audit Committee Member.**

270.     Starrex, Merritt, Garth, Hill, Reeves, and Young claimed that the Magnolias had made the four promissory notes central to Plaintiffs' claims in this lawsuit in an aggregate principal amount,  that were executed or effective October 17, 2022.  Yet, Plaintiffs can show these notes are forged and fraudulent.  Additionally, if Plaintiffs' claims were true, then Starrex's financial filings would contain appropriate statements of fact regarding the execution, detail and performance of the notes.  A thorough analysis of all relevant filings by Starrex made with the Canadian National Stock Exchange and through the SEDAR system for the Canadian Securities Administrators and Alberta Securities Commission reveal numerous misstatements and omissions of material fact.  Additionally, all misrepresentations and misstatements disparaged the Magnolias and harmed their reputations and business operations.  Coupled with Starrex, Merritt, Hill, and Reeves signatures and certifications that represent the filings are true and accurate, one must ask the question: Were they lying then or are they lying now?

271.     The analysis begins with the first filing made for October 31, 2022, the date closest in time to the allegedly effective promissory note date of October 17, 2022.

272.     On November 2, 2022, Starrex International Ltd. files with the Canadian National Stock Exchange ("CSE") its Form 7, Monthly Progress Report for the month ending October 31, 2022 (made as of November 2, 2022).  The Report discloses only the $5,000,000 loan facilities issued by an "institutional lender".  It does not mention or discuss any promissory notes allegedly made by the Magnolias.  This Report is signed and certified by Merritt as CFO of Starrex.

Copy from re:SearchTX

273.    On November 30, 2022, Starrex files with the CSE its Form 5, Quarterly Listing Statement of Starrex International Ltd.—which is signed and certified by Merritt as CFO, and contains the following, which is also filed with SEDAR:

    a.    ***There is no mention whatsoever about promissory notes made or executed by the Magnolias.***

    b.    In the attached SCHEDULE A, Condensed Interim Consolidated Financial Statements for the period ended September 30, 2022 (prepared as of Nov. 30, 2022), on page 24, in the "18. Subsequent Events" section, Starrex International Ltd. discloses that Starrex has entered into a loan and security agreement for a revolving line of credit with an effective date of October 11, 2022 (presumably the "11" is a typo) with a maturity date of October 12, 2023, collateralized by the assets of Starrex International Ltd. and the interest rate.  The security interest in Starrex Insurance Holdings, Inc.'s assets is not mentioned and neither is the identity of the lender nor the total principal amount of the line.  Although other events dated November 3 and November 7, 2022, are detailed, there is absolutely no mention of any promissory notes or line of credit with the Magnolias.  As always, they are signed by Merritt as CFO, and also Hill as Chairman of the Board of Directors, and Scott M. Reeves as Director and Audit Committee member:

> *The accompanying notes are an integral part of these unaudited condensed interim consolidated financial statements.*
>
> Signed:  Matthew D. Hill         Signed:  Scott M. Reeves
> Chairman                           Director

    c.    In the attached SCHEDULE B, Management Discussion and Analysis For the nine months ended September 30, 2022, prepared as of November 29, 2022, at pages 12-13, in the "Subsequent Events" section, the same vague and deficient disclosure as that made in SCHEDULE A is repeated.  Once again, although other events through dated November 3 and November 7, 2022, are detailed, there is absolutely no mention of any promissory notes or line of credit with the Magnolias.

    d.    Through the filing of their FORMS 52-109FV2, CERTIFICATION OF INTERIM FILINGS VENTURE ISSUER BASIC CERTIFICATION, dated November 29, 2022, CFO Merritt and CEO Hill each certify that as to the "interim financial report and interim MD&A of Starrex International Ltd. for the interim period ended September 30, 2022" there were no misrepresentations, no untrue statement of material facts, no omission of any material fact, and that the filings fairly presented in all materials respects various characteristics of the company.

274.    On December 9, 2022, Starrex International then *refiles* with SEDAR its Condensed Interim Consolidated Financial Statements - Restated and Management Discussion and

Copy from re:SearchTX

Analysis (Restated) for the Three and Nine Months Ended September 30, 2022 and 2021. These are prepared as of December 9, 2022. ***There is no mention whatsoever about promissory notes made or executed by the Magnolias.***

    a.   Once again, in the Management Discussion and Analysis, at page 15, the "Subsequent Events" section, the identical disclosures are made: some information about a line of credit with an unidentified lender, at an unidentified amount, effective October 11, 2022, maturing October 12, 2023; one event dated November 3, 2022 and two events dated November 7, 2022; but no mention whatsoever of any promissory notes or line of credit with the Magnolias. As with prior filings, on page 21, Starrex represents that the Audit Committee has made appropriate and timely decisions regarding public disclosure and the CEO and CFO have certified Starrex's preparation and filings, as required by National Instrument 52-109.

    b.   Likewise, in the Condensed Interim Consolidated Financial Statements, on page 21, in the "18. Subsequent Events" section, the identical disclosures are made: some information about a line of credit with an unidentified lender, at an unidentified amount, effective October 11, 2022, maturing October 12, 2023; one event dated November 3, 2022 and two events dated November 7, 2022; but no mention whatsoever of any promissory notes or line of credit with the Magnolias. As always, they are signed by Merritt as CFO, and also Hill as Chairman of the Board of Directors, and Scott M. Reeves as Director and Audit Committee member (and also Corporate Secretary):

| | |
|---|---|
| *The accompanying notes are an integral part of these unaudited condensed interim consolidated financial statements.* | |
| Signed:  Matthew D. Hill | Signed:  Scott M. Reeves |
| Chairman | Director |

    c.   Also on December 9, 2022, through the filing of their FORMS 52-109FV2, CERTIFICATION OF INTERIM FILINGS VENTURE ISSUER BASIC CERTIFICATION, dated Dec. 9, 2022, CFO Merritt and CEO Hill certified that as to the "amended and restated interim financial report and amended and restated interim MD&A of the issuer for the interim period ended September 30, 2022" there were no misrepresentations, no untrue statement of material facts, no omission of any material fact, and that the filings fairly presented in all materials respects various characteristics of the company.

    275.   On March 3, 2023, Starrex files individual Form 7 filings with the CSE, one for the month ended December 2022, one for the month ended January 2023, and one for the month ended February 2023. None of these filings mention or disclose any about any line of credit, promissory notes or alleged indebtedness involving the Magnolias. Each filing is signed and certified by Merritt as CFO.

Copy from re:SearchTX

276.    On March 17, 2023, Starrex International sold 250,000 shares for $410,000.00 CN to a single, undisclosed accredited investor.

277.    On April 3, 2023, Starrex files a Form 7 filing with the CSE for the month ended March 2023.  Once again, nothing in the filing mentions or discloses any line of credit, promissory notes or alleged indebtedness involving the Magnolias.  This filing is signed and certified by Merritt as CFO.

278.    On May 1, 2023, Starrex International files its Consolidated Financial Statements December 31, 2022 and 2021 (Express in U.S. Dollars, which is audited, and Management's Discussion and Analysis For the Year Ended December 31, 2022, prepared as of May 1, 2023. The Starrex Board approves the Management's Discussion and Analysis ("MD&A") For the Year Ended December 31, 2022, prepared as of May 1, 2023.  Yet, the filings contain misstatements and omissions of material facts:

    a.    In particular, at pages 9-10 of the MD&A, in the "Subsequent Events" section and on page 36 of the Financial Statements, within the "21. Subsequent Events" section, Starrex makes the following misrepresentations: "The stock consideration [for the Letter of Intent between the Magnolias and Starrex] has been reduced by the **aggregate expected amount of promissory notes** that will be outstanding at the Closing (as defined herein) of the Proposed Transaction **in the aggregate amount of US$4 million, which notes were recently issued by the Magnolias to Starrex.**" (bold emphasis added).

        i.    ***This is untrue*** as explained above the Magnolias never made, authorized or executed promissory notes.  Because this a complete lie, it is no surprise that Starrex refrains from stating the specific principal amount, the effective date, the execution date, the interest rate, and the maturity date of these alleged promissory notes.  This is highly suspicious.

    b.    The Financial Statements are represented to be true and accurate as evidenced by Merritt as CFO, Hill as Chairman, and Scott Reeves as Director and Member of the Audit Committee.  *The **Financial Statements are false and Merritt, Hill, and Reeves have falsely represented them to be true and accurate.***

    c.    On May 1, 2023, through the filing of their FORMS 52-109FV1, Certification of Annual Filings – Venture Issuer Basic Certificate, dated May 1, 2023, CFO Merritt and CEO Hill certified that as to the "annual financial statements and annual MD&A including, for greater certainty, all documents and information that are incorporated by reference in the AIF" there were no misrepresentations, no untrue statement of material facts, no omission of any material fact, and that the filings fairly presented in all materials respects various characteristics of the company.

Copy from re:SearchTX

*There are misrepresentations, untrue statements of material facts, and omissions of material facts—Hill and Merritt make false certifications.*

279.    On May 30, 2023, Starrex International files its Condensed Interim Consolidated Financial Statements for the Three Months Ended March 31, 2023 and 2022 (prepared as of May 30, 2023) as well as the interim Management's Discussion and Analysis for the three months ended March 31, 2023 and 2022 (prepared as of May 30, 2023).

    a.   In particular in the Financial Statements, Starrex International makes the following misstatements of material fact:

- At page 18, in the section entitled "9. Note Receivable", Starrex states: "The Company entered into four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies.  The promissory notes carry a 6% per annum interest rate with a maturity date of June 23, 2023.  At the option of the Company, the note will become immediate [sic] due and payable.  As at March 31, 2023, the Company recorded interest income of $25,140 (March 31, 2022 - $Nil)."

- At page 22 of the Financial Statements, in the section entitled "18. Subsequent Events", Starrex repeats the same material misrepresentations that it stated in its filings of May 1, 2023: "The stock consideration has been reduced by the **aggregate expected amount of promissory notes** that will be outstanding at the Closing (as defined herein) of the Proposed Transaction **in the aggregate amount of US$4 million, which notes were recently issued by the Magnolias to Starrex.**" (bold emphasis added).  There were no promissory notes executed by the Magnolias and no notes "recently issued by the Magnolias to Starrex."

- ***These representations are false—both about the promissory notes and any interest income.***  the Magnolias did not enter into four promissory notes effective October 17, 2022 to provide operating capital through revolving promissory notes, nor agree to an interest rate, maturity date, due dates upon demand or to pay any interest to Starrex.  Starrex did not actually earn any interest income but misrepresents to all stakeholders that it did.

- ***The auditors are suspicious.*** The auditors' interlineated comment points out about the fraudulent interest income: "Where is this recorded in the P&L.  The other revenue is only $7,534." – Nimesh Ratnarajah, Date: 5/29/2023 5:14:00 PM.

- As usual, the Financial Statements are represented to be true and accurate as indicated by the signatures of Merritt as CFO, Hill as Chairman, and Scott

Copy from re:SearchTX

Reeves as Director and Member of the Audit Committee. ***But, as with the prior filings, Merritt, Hill, and Reeves falsely represent the Financial Statements to be true and accurate.***

    b.   The Management's Discussion and Analysis For the three months ended March 31, 2023 and 2022, contains similar material misstatements and omissions:

        ▪   On page 4, in the section entitled "LIQUIDITY & CAPITAL RESOURCES", Starrex falsely represents "The Company also reported a note receivable of $3,292,527 from Magnolia Title, with a maturity date of June 30, 2023 (*See Note 9 of the condensed interim consolidated financial statements*).

    c.   On May 30, 2023, through the filing of their FORMS 52-109FV2, CERTIFICATION OF INTERIM FILINGS VENTURE ISSUER BASIC CERTIFICATION, dated May 30, 2023, CFO Merritt and CEO Hill certified that as to the "interim financial report and interim MD&A" of Starrex International "for the interim period ended March 31, 2023" there were no misrepresentations, no untrue statement of material facts, no omission of any material fact, and that the filings fairly presented in all materials respects various characteristics of the company.

    280.   On June 1, 2023, Starrex International files its (Amended) Condensed Interim Consolidated Financial Statements for the Three Months Ended March 31, 2023 and 2022 (prepared as of May 30, 2023)—although it is <u>not</u> labeled as amended—as well as the interim (Amended) Management's Discussion and Analysis for the three months ended March 31, 2023 and 2022 (prepared as of May 30, 2023)—although it is likewise <u>not</u> labeled as amended. As usual, the Financial Statements are signed by Merritt as CFO, Hill as Chairman, and Scott Reeves as Director and Member of the Audit Committee. These filings repeat the identical material misrepresentations and omissions of the May 30, 2023 filings, except that on page 18 of the (Amended) Financial Statements, Starrex has changed the disclosure of the "maturity date" of the fake, forged Magnolia promissory notes from "June 23, 2023" to "June 30, 2023." Starrex shows impressive attention to the detail of its fraud. Although these filings have been amended, Hill and Merritt do not execute new FORM 52-109FV2.

    281.   On April 3, 2023, Starrex files individual Form 7 filings with the CSE for the month ended April 30, 2023 and month ended May 31, 2023. Once again, nothing in the filing mentions

Copy from re:SearchTX

or discloses any line of credit, promissory notes or alleged indebtedness involving the Magnolias. This filing is signed and certified by Merritt as CFO.

282.    On August 31, 2023, Starrex International files its Condensed Interim Consolidated Financial Statements for the Three and Six Months Ended June 30, 2023 and 2022 (Unaudited) (expressed in U.S. dollars) (prepared as of August 31, 2023) as well as the interim Management's Discussion and Analysis for the three months ended March 31, 2023 and 2022 (prepared as of August 31, 2023).

    a.   In particular, in the Management Discussion and Analysis, on page 4, Starrex International makes the following misstatements of material fact: "The Company entered into four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies. The promissory notes carry a 6% per annum interest rate with a maturity date of June 23, 2023. At the option of the Company, the note will become immediate due and payable. As at June 30, 2023, the Company recorded interest income of $62,469 (June 30, 2022 - $Nil)." ***Once again, this is false. There are no such agreements, notes, interest rate, maturity date, nor interest income. This is a series of complete misrepresentations.***

    b.   Within the Financial Statements, possibly as an acknowledgment of the fraud, Starrex elects not to disclose the alleged Magnolia notes in the Section entitled, "3. Financial Instruments and Financial Risk Management" at pages 10-11, despite claiming at other times that Starrex is owed millions by the Magnolias.

    c.   Within the Financial Statements, on page 15, at the section entitled "10. Loans Receiveable", Starrex misstates material facts once again but is even more vague that before: "The Company entered into four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies. The promissory notes carry a 6% per annum interest rate with a maturity date of June 23, 2023. At the option of the Company, the note will become immediate due and payable. As at June 30, 2023, the Company recorded interest income of $62,469 (June 30, 2022 - $Nil)." ***This is a series of misstatements and omissions of material fact.***

    d.   Notably, Starrex elected not to disclose or discuss the purported balance due on the forged Magnolia promissory notes, either in the MD&A or the Financial Statements. Starrex also elects not to mention the Magnolias at all, instead calling the companies "title insurance companies."

    **e.**   The Financial Statements are represented to be true and accurate as evidenced by Merritt as CFO, Hill as Chairman, and Scott Reeves as Director and Member of the Audit Committee. ***The Financial Statements are false and Merritt, Hill, and Reeves have falsely represented them to be true and accurate.***

Copy from re:SearchTX

     f.   Once again, through the filing of their FORMS 52-109FV2, CERTIFICATION OF INTERIM FILINGS VENTURE ISSUER BASIC CERTIFICATION, dated August 31, 2023, *CFO Merritt and CEO Hill make false certifications* as to the veracity, accuracy and completeness of the "interim financial report and interim MD&A" of Starrex International for the interim period ended June 30, 2023.

283.    On November 3, 2023, Starrex files individual Form 7 filings with the CSE, one each for the months ended July 2023, August 2023, and September 2023.  The filings for July 2023 and August 2023 do not mention or disclose any about any line of credit, promissory notes or alleged indebtedness involving the Magnolias.  The filing for September 2023, makes a reference to the forged Magnolia notes for the first time in a disclosure regarding a "demand for repayment by a debtor in association with certain secured promissory notes and other receivables in the aggregate amount of $5,002,426" that presumably references the Magnolias.  *As it knowingly refers to fake, forged promissory notes, this is a misstatement of material fact and further misrepresents that Starrex holds valid security interests against the Magnolias and could collect.*  This filing is signed and certified by Merritt as CFO.

284.    On November 3, 2023, Starrex files a Form 7 filing with the CSE for the month ended <u>October 2023</u>.  Starrex discloses the developing situation with an unidentified "U.S.-based lender" regarding a $5,000,000 line of credit and that $4,850,000 was "payable by the Borrower October 17, 2023."  Presumably this refers to EssentVentures' demand on Starrex.  There is no mention or disclosure about any line of credit, promissory notes or alleged indebtedness with the Magnolias.  This filing is signed and certified by Merritt as CFO.

285.    On November 29, 2023, Starrex International files its Condensed Interim Consolidated Financial Statements for the Three and Nine Months Ended September 30, 2023 and 2022 (Unaudited) (expressed in U.S. dollars) (prepared as of November 22, 2023) as well as the interim Management's Discussion and Analysis for the nine months ended September 30, 2023 and 2022 (prepared as of November 21, 2023).

     a.   In particular, in the Management Discussion and Analysis, on page 3, in the section entitled "Trade and Other Receivables," Starrex International makes the following misstatements of material fact: "The Company entered into four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies. The promissory notes carry a 6% per annum interest rate with a maturity date of June 23, 2023. At the option of the Company, the note will become immediate due and payable. For the nine-month

Copy from re:SearchTX

period ended September 30, 2023, the Company recorded interest income of $118,346 (September 30, 2022 - $Nil).” *As previously discussed, every single one of these statement are are completely false. Even worse, Starrex is now misrepresenting to stakeholders and the market that it has earned $118,346 in interest income on notes it knows are fake and forged.* It is also misrepresenting that these notes exist—which they certainly do not—and thus could be collectible.

b.  Additionally, on page 4, within the same section, Starrex states—presumably speaking about the Magnolias, “As at September 30, 2023, the loans receivable have been classified Stage 2 based on the default date of June 23, 2023. The notes are secured with the underlying assets of the entities which are valued at approximately $3,800,000 as at September 30, 2023.” These statements are false. *Given the statement about the alleged loan amount on page 5, Starrex is misrepresenting to stakeholders and the market that allegedly, a debt of $3,051,239 owed to Starrex is secured by assets of $3,800,000 through promissory notes that do not exist using groundless security interest. If anything is material, this is, yet none of this is true.*

c.  Additionally on page 5, in the section entitled “Cash used in Investing Activities,” Starrex states “Loans in the amount of $3,051,239 were also advanced associated with the promissory notes in support of a potential acquisition, which expired on June 23, 2023. A demand for repayment was issued on September 8, 2023. The Company is currently pursuing collection efforts.” *More misstatements.*

d.  Within the Financial Statements, on page 16 in the section entitled “10. Loans Receivable”, Starrex makes more misstatements: “The Company entered into four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies. The promissory notes carry a 6% per annum interest rate with a maturity date of June 23, 2023. At the option of the Company, the note will become immediately due and payable. As at September 30, 2023, the Company recorded interest income of $118,346 (September 30, 2022 - $Nil).” *Starrex misstates several material facts while falsely claiming interest income and collectible notes exist.*

e.  On page 17 in the same section: “As at September 30, 2023, the loans receivable have been classified Stage 2 based on the default date of June 23, 2023. The notes are secured with the underlying assets of the entities which are valued at approximately $3,800,000 as at September 30, 2023.” *Starrex misstates material facts by claiming that existence of notes and claiming they are secured.*

f.  On page 22, in the Section entitled “19. Subsequent Events”, Starrex states vaguely “Starrex holds security over the assets of the Target and is currently undertaking discussions with the Lender to try and negotiate an extension to the demand and work out payment terms.” *Starrex is misrepresenting that it has a valid security interest in the assets of the Magnolias when, in fact, it does not.*

Copy from re:SearchTX

g.  Starrex is intentionally vague about the fake promissory notes and never once mentions the name of any Magnolia entity, instead calling them "title companies".

h.  The Financial Statements are represented to be true and accurate as evidenced by Merritt as CFO, Hill as Chairman, and Scott Reeves as Director and Member of the Audit Committee.  *The Financial Statements are false and Merritt, Hill, and Reeves have falsely represented them to be true and accurate.*

i.  Through their associated FORMS 52-109FV2, CERTIFICATION OF INTERIM FILINGS VENTURE ISSUER BASIC CERTIFICATION, dated November 29, 2023, *CFO Merritt and CEO Hill make false certifications* as to the veracity, accuracy and completeness of the interim financial reports and MD&A.

286.    On December 7, 2023, Starrex files with the CSE a Form 7 filing for the month ended November 2023, in which it discloses in "Note 6" the developing situation with an unidentified U.S.-based lender regarding a $5,000,000 line of credit and that $4,850,000 was "payable by the Borrower October 17, 2023." Starrex also states that management continued to negotiate with the "Creditor to settle demand for payment issued in October (see Note 6)."  There is no mention or disclosure about any line of credit, promissory notes or alleged indebtedness with the Magnolias.  This filing is signed and certified by Merritt as CFO.

287.    On January 10, 2024, Starrex files its Form 7 filing for the month ended December 2023. Starrex discloses the situation with an unidentified U.S.-based lender regarding a $5,000,000 line of credit and that $4,850,000 was "payable by the Borrower October 17, 2023" and noted that "Management reached a settlement with Creditor for demand for payment issued in October (see Note 6).  Management also filed petitions for default judgments associated with the demand for payment issued in September."  There is no mention or disclosure about any line of credit, promissory notes or alleged indebtedness with the Magnolias.  This filing is signed and certified by Merritt as CFO.

288.    On April 4, 2024, Starrex files three months of Form 7 progress reports in the CSE system.  Starrex reveals in the Form 7 report for the month ending February 28, 2024 (dated April 1, 2024) that it has "divested MFI Credit Solutions, LLC, effective March 21, 2024, in consideration for US$5 million cash."  At best, this turned out to be an April Fools' Joke, and at worst, intentional or grossly negligent financial and accounting malfeasance, when Starrex later revealed on April 30, 2024 in its Consolidated Financial Statements for December 31, 2023 and

Copy from re:SearchTX

2022 that it actually sold MFI Credit Solutions, LLC for *one-tenth of that amount*—not for "$5 million cash" but for "consideration of $500,000 cash."[16]

289.    Starrex's previous financial statements revealed no debt associated with MFI Credit Solutions, LLC that could possibly account for this shocking discrepancy.  Meanwhile, the originally represented cash consideration of $5 million was about *2.5 times* Starrex's entire average market cap of ~$2 million.    How can a publicly traded company make such a blatant misrepresentation for and get away with it?

### J.    Individual Liability of the Audit Committee Members and Board of Directors for Breach of Fiduciary Duty to Starrex

290.    TPB is a shareholder of 250,000 common shares of stock in Starrex (OTCQB:  STXMF | CSE: STX).

291.    Pursuant to Canada National Instrument ("NI") 52-110 ("NI 52-110"), Starrex maintains an Audit Committee composed of directors on its Board of Directors.    Through the relevant years, the following directors have served on Starrex's Audit Committee:

- **Charles Burns**
  - Chair of the Audit Committee from 2014 to Present.
  - Member of the Audit Committee from 2004 to Present.
  - Director from 2004 to Present.
  - President and CEO from February 6, 2024 to Present.
  - Not an independent director while serving as President and CEO.  *See* NI 52-110, Section 1.4.
  - Not an independent member of the Audit Committee while serving as President and CEO.

- **Matthew D. Hill**
  - Member of the Audit Committee from November 1, 2016 to Present.
  - Member of the Compensation Committee as of November 3, 2022.
  - Chairman of the Board from November 1, 2016 to Present.
  - Director from July 12, 2016 to Present.
  - President and CEO from November 1, 2016 to February 6, 2024.
  - Senior Vice President from January 1, 2015 to November 1, 2016.
  - Not an independent director while serving as President and CEO. *See* NI 52-110, Section 1.4.
  - Not an independent member of the Audit Committee while serving as President and CEO.

---

[16] Available at https://sedar-filings-backup.thecse.com/00002604/2404301127350866.pdf.

Copy from re:SearchTX

- **Scott Reeves**
  - Member of the Audit Committee from March 1, 2022 to Present.
  - Director from December 4, 2019 to Present.
  - Member of the Compensation Committee as of November 3, 2022.
  - Corporate Secretary from at least June 12, 2020 to Present. (Ronald Mann resigned as Corporate Secretary effective December 4, 2019.)
  - General Counsel of, and corporate legal counsel to, the Company.
  - Not an independent director while receiving certain compensation from the Company or serving as Corporate Secretary or General Counsel. *See* NI 52-110, Sections 1.4-1.5.
  - Not an independent member of the Audit Committee.

- **P. Garrett Clayton**
  - Member of the Audit Committee from 2013 to 2016.
  - Significant direct and indirect shareholder of Starrex
  - Director from December 9, 2013 to Present.
  - Chairman of the Board from December 9, 2013 to November 1, 2016.
  - President and CEO from December 9, 2013 to November 1, 2016.
  - Not an independent director as he is a related party to the Company. *See* NI 52-110, Section 1.4.
  - Not an independent member of the Audit Committee while serving as President and CEO.

292.    Broadly speaking, under NI 52-110, the Audit Committee is a committee of the company's board of directors, consisting of no less than three, who:

    a.  provides recommendations to the board of directors relating to the selection and remuneration of auditors;

    b.  review the corporation's financial statements and recommends whether the statements should receive board approval;

    c.  review certain disclosure documents (financial statements, Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A), and earnings statements) prior to their public release; and

    d.  formulate and enforce financial controls, generally by creating and reviewing policies and responding to complaints received from the corporation's ethic's (whistleblower) hotline.

293.    The Audit Committee must generally be composed of a majority of independent directors who are not officers or employees or the corporation or any affiliate nor have a relationship that would compromise their independence.

Copy from re:SearchTX

294.    As a public Canadian company, Starrex is also required to set out the committee's mandate and duties in a written committee charter.  It has done so by publicly posting the "Starrex International Ltd. (the "Corporation") Charter of the Audit Committee of the Board of Directors", *available at* https://starrexintl.com/wp-content/uploads/2015/09/Starrex-Audit-Committee-Charter.pdf.

295.    Despite the many duties set forth in detail in Starrex's Audit Committee Charter, the Audit Committee has failed to faithfully and competently discharge its duties.

296.    Further, in the notice of the Nov. 3, 2022 Annual Meeting, Starrex disclosed that "As of March 1, 2022, a majority of members of the Audit Committee were not independent." Notice of Annual and Special Meeting of Shareholders and Management Information Circular and Proxy Statement of Starrex International Ltd. (dated Oct. 4, 2022), at p. 4 (p. 7 of PDF), *available at* https://sedar-filings-backup.thecse.com/00002604/2210131029295473.pdf. Starrex noted that it had previously relied upon an exemption pursuant to section 6.1 of NI 52-110.[17]  *See id.* at pp. 5-6 (pp. 8-9 of PDF).

297.    Garfield Last, former director and Audit Committee member, died on or about February 28, 2022.  Accordingly, any exception to the requirement that a majority of the Audit Committee be composed of independent members available under Section 6.1 of NI 52-110 would have expired by the later of the next annual meeting or six months from the date on which the circumstance arose.  Of course, the next annual meeting occurred on November 3, 2022.

298.    The financial and reporting malfeasance of special concern began <u>after</u> any exemption under Section 6.1 could possibly apply meaning that the primary negligence and malfeasance began after the Audit Committee was no longer complying with the critical requirement (or any exemption thereto) that it be composed of a majority of independent directors. The Board of Starrex is responsible for ensuring that Starrex complies with Canadian laws and regulations, including but not limited to, the composition of its Audit Committee.

299.    Further, although several directors have long served at Starrex, they have failed to detect, prevent, investigate, mitigate, and/or correct the serious negligence and misconduct as

---

[17] "For the year ended December 31, 2021, the Audit Committee was composed of Charles Burns, Garfield J. Last (until February 28, 2022), Matthew D. Hill and Scott Reeves (from March 1, 2022). A majority of the Audit Committee were independent up until March 1, 2022, and an exemption pursuant to section 6.1 of NI 52-110 was relied on regarding independence."  Notice of Annual and Special Meeting of Shareholders and Management Information Circular and Proxy Statement of Starrex International Ltd. (dated Oct. 4, 2022), at pp. 5-6 (pp. 8-9 of PDF), *available at* https://sedar-filings-backup.thecse.com/00002604/2210131029295473.pdf.

Copy from re:SearchTX

detailed above committed by officers and directors of Starrex and have exposed Starrex and themselves to significant liability and the possibility of fines and sanctions. *See* Section 211.03 of the Alberta Securities Act ("ASA") (secondary market liability); *see also* ASA Section 194 (providing for fines of up to $5 million each and/or imprisonment of up to five years less a day for each officer and director that makes misrepresentations in disclosure documents or contravenes securities law requirements). In addition to fines of up to $5 million and imprisonment of up to five years less a day provided by the ASA, the Alberta Securities Commission may assess sanctions and penalties against companies for or directors and officers who have not complied with securities law such as $1 million (each) of administrative penalties or requirements to change corporate practices.

## V.
### CERTAIN RELEVANT APPLICABLE LAW

### **BACKGROUND ON APPLICABLE CANADIAN SECURITIES LAWS**

300.    Canadian securities regulation is established to ensure market transparency and fairness, safeguarding investors' ability to make informed decisions. Central to this regulatory regime is the concept of continuous disclosure, mandated by the Alberta Securities Commission and Canadian Securities Administrators and governed under various National Instruments (NIs) and Policies developed by the Canadian Securities Administrators (CSA).

**Continuous Disclosure Requirements:**

301.    At the core of Canada's securities regulations is the requirement for periodic and timely disclosure. Reporting issuers are obligated to regularly file detailed documents such as financial statements and management's discussion and analysis (MD&A). Furthermore, any material changes that could influence the issuer's market value or investor decisions must be disclosed immediately via press releases and material change reports. This framework ensures that all market participants have equitable access to essential information, fostering an environment of transparency and trust.

Copy from re:SearchTX

**Key Regulatory Instruments:**

302.    National Instrument 51-102 (NI 51-102) harmonizes continuous disclosure obligations across Canada, delineating requirements for financial reporting, MD&A, and the immediate reporting of material changes. This Instrument also emphasizes the disclosure of forward-looking information, ensuring that investors receive a comprehensive view of an issuer's future prospects. National Policy 51-201 (NP 51-201) further refines these requirements, promoting clarity and balance in the disclosure of material information.

303.    For example, the board of each reporting issuer is required to approve both annual financial statements and interim reports and interim and annual MD&A prior to their release. The MD&A must include discussions of off-balance-sheet transactions, more detailed disclosure of critical accounting estimates and additional guidance for resource issuers. Meanwhile, an AIF must include such things as disclosure regarding social and environmental policies of the reporting issuer if they are fundamental to its operations and a reporting issuer must file on SEDAR a copy of any material contract entered into except those entered into "in the ordinary course of business", subject to certain limited exceptions. NI 51-102 also requires issuers to publicly disclose copies of constating documents and other documents or agreements that affect the rights of securityholders as well as results of voting for securityholder meetings. National Instrument 81-106 Investment Fund Continuous Disclosure imposes a similar disclosure regime for investment funds.
NI 51-102 also contains requirements regarding disclosure of forward-looking information.

304.    NI 51-102 requires reporting issuers to issue and file with the relevant securities authority: (i) a press release directed to the investing public (to be issued "forthwith") and (ii) a Material Change Report (to be filed within ten days of the date on which the change occurs). In general, a "material change" is defined to mean, in relation to a reporting issuer, a change in the business, operations, or capital of the issuer that would reasonably be expected to have a significant effect on the market price or value of any of the securities of the reporting issuer or a decision made by the board (or by senior management who believe that confirmation of the board is probable) to implement such a change.

305.    National Policy 51-201 Disclosure Standards (NP 51-201) supplements the material change disclosure requirement and provides the marketplace with the view of the CSA on a number of disclosure matters. In particular, NP 51-201 provides that any announcement of material information should be factual and balanced; neither over-emphasizing favourable news

Copy from re:SearchTX

nor under-emphasizing unfavourable news. In short, announcements must be clear, accurate and objective. As well, it suggests a number of best practices to assist reporting issuers in complying with continuous disclosure rules, and preventing insider trading and selective disclosure, including that reporting issuers establish a corporate disclosure policy.

**Governance and Accountability:**

306. The framework is supported by stringent governance practices and accountability measures. National Instrument 52-110 (NI 52-110), for example, mandates CEO and CFO certification of disclosures and specifies the composition and responsibilities of audit committees. This governance structure is designed to prevent misrepresentation and ensure the accuracy of financial reporting, providing a solid foundation for investor confidence.

**Statutory Liability for Secondary Market Disclosure**

307. Securities laws also impose civil liability for secondary market disclosure. Causes of action for secondary market disclosure pertain to misrepresentations made by, or on behalf of, a responsible issuer in its disclosure documents or in public oral statements, and failures to make timely disclosure of a material change. In addition to the issuer itself, its directors and officers and major shareholders, among others, could be subject to such a cause of action. In contrast to the common law cause of action for negligent misrepresentation, which requires each plaintiff to prove that it relied to its detriment on the alleged misrepresentation, a plaintiff has a statutory right of action without regard to whether the purchaser or seller of securities relied on the alleged misrepresentation.

**Corporate Governance and Audit Committees:**

308. Canada's response to Sarbanes-Oxley legislation in the U.S. can be found in National Instrument 52-110 Audit Committees, National Instrument 52-109 Certification of Disclosure in Issuers' Annual and Interim Filings and National Instrument 52-108 Auditor Oversight. These instruments are comprehensive in scope, but in brief require CEO and CFO certification of disclosure in public companies' annual and interim filings, regulate the role and composition of audit committees, prescribe disclosure in respect of audit committees and support

Copy from re:SearchTX

the work of the Canadian Public Accountability Board in its oversight of auditors of public companies.

309.    NI 52-110 Audit Committees governs the function, powers and composition of the audit committee, and requires issuers to provide certain prescribed disclosure regarding its composition and functions. The audit committee rule requires all issuers to which it applies to have an audit committee composed of a minimum of three directors. Generally, all three directors are required to be independent (NI 52-110 sets out a definition for independence) and financially literate. The audit committee rule clarifies the role of the external auditor vis-à-vis the audit committee, board and securityholders of an issuer by requiring that the external auditor report directly to the audit committee. The responsibilities that the audit committee must fulfill are also prescribed and include responsibility to establish procedures for receiving and addressing complaints about auditing and accounting matters (whistleblowing).

310.    Governance disclosure is prescribed by National Instrument 58-101 Disclosure of Corporate Governance Practices, whereas governance "best practices" are prescribed by the associated National Policy 58-201 Corporate Governance Guidelines. The instrument and policy generally apply to all reporting issuers other than investment funds.

311.    Broadly speaking, NI 58-101 requires issuers to disclose their corporate governance practices in their information circulars or AIFs, and to file on SEDAR a copy of any code of ethics adopted, as well as any amendments to it. Failure by an issuer to provide adequate disclosure constitutes a breach of securities laws and exposes the issuer and others to enforcement proceedings and sanctions.  In particular, NP 58- 201 recommends that the board of an issuer be comprised of a majority of independent directors and that the issuer have a compensation committee and a nomination committee, each comprised entirely of independent directors.

312.    National Instrument 52-109 Certification of Disclosure in Issuers' Annual and Interim Filings (NI 52-109) requires reporting issuers to file interim and annual certificates, certified by the CEO and CFO (or equivalent) of the issuer. The certificates include certifications regarding fair presentation of financial condition, financial performance and cash flow and confirmation that the interim and annual filings do not contain any misrepresentations. The certificates must also include certifications regarding the establishment, maintenance and effectiveness of disclosure controls and procedures (DCP) and internal control over financial reporting (ICFR). In addition, certified corresponding disclosure is required in the issuer's MD&A

Copy from re:SearchTX

regarding the effectiveness of DCP and ICFR and any changes in ICFR during the relevant period that have materially affected, or are reasonably likely to materially affect, the issuer's ICFR.

313.    The Canada-U.S. Multi-Jurisdictional Disclosure System (MJDS) facilitates cross-border securities offerings.  Eligible Canadian issuers are also able to use MJDS forms to offer securities publicly in the United States by means of a Canadian prospectus, which is subject to review only by Canadian regulatory authorities.

314.    As Starrex is listed on the Canadian Securities Exchange (CSE), it must above by CSE requirements in addition to those impose on it under Canadian law including Policy 5 regarding timely and complete disclosures of material facts.

315.    Additionally, Starrex its directors, certain officers, and experts who provide an opinion in respect of certain disclosure bear potential liability for any misrepresentations in a disclosure document pursuant to the secondary market liability provisions of section 211.03 of the Alberta Securities Act ("ASA").  A misrepresentation is (a) an untrue statement of material fact, or (b) an omission to state a material fact that is required to be stated or that is necessary to make a statement not misleading in the light of the circumstances in which it was made.

316.    Under Section 194 of the ASA, the Company and its officers and directors may be fined up to $5 million (each) or subject to imprisonment of not more than five years less a day, or both, if:

- A disclosure document contains a misrepresentation (a statement that is materially misleading or untrue or does not state a fact that is required to be stated or is necessary to make the statement not misleading at the time and in light of the circumstances under which the statement is made).

- The Company otherwise contravenes securities law requirements.

317.    The Alberta Securities Commission also has broad powers to make orders in the public interest, including sanctions and penalties against companies or directors and officers who have not complied with securities law such as $1 million (each) of administrative penalties or requirements to change corporate practices. As further discussed below, the directors and officers of the Company allegedly made various material misrepresentations and allegedly knowingly certified public filings they knew to be untrue.

318.    According to the Supreme Court of Canada and under corporate law, directors and officers owe a fiduciary duty and a duty of care to the Company to *inter alia*, act honestly and in

Copy from re:SearchTX

good faith vis-à-vis the Company, not abuse their positions for personal benefit, manage the assets so as to realize the Company's objectives, avoid conflicts of interest, and serve the Company selflessly, honestly, and loyally. Allegedly, as detailed below, the directors and officers breached their fiduciary duties to the Company.

319. The Business Corporations Act (Alberta) ("ABCA") sets out a detailed conflict of interest regime covering material contacts or transactions (or proposed material contracts or transactions) in which a director or officer:

- Has an interest opposite to the Company.
- Is a director or officer of a party acting opposite to the Company.
- Has a material interest in a party acting opposite to the Company.

If an officer or director has a conflict or possible conflict, they must both:

- Disclose the conflicting interest to the board.
- Abstain from voting at the board level.

320. The transaction or contract must be approved by a majority vote of the directors entitled to vote on the matter or a special resolution of the shareholders. The contract or transaction (or proposed contract or transaction) must be reasonable and fair to the Company at the time of its approval. The ABCA also sets out a remedial provision giving the courts the express power to:

- Set aside an interested contract or transaction on any terms that it thinks fit.
- Require the director or officer to account to the Company for any profit or gain realized on it.
- Require an accounting for profits as a standard remedy for breach of fiduciary duty on the part of directors, officers or other fiduciaries.

321. In *Canadian Aero Service Ltd. v. O'Malley, 1973 CarswellOnt 236 (S.C.C.)*, the seminal case on the corporate opportunity doctrine in Canada, the Supreme Court of Canada held that a director or senior officer:

- Is precluded from obtaining for himself or herself, either secretly or without the approval of the corporation, any property or business advantage belonging to the corporation or for which it has been negotiating, especially where the director or officer participated in the negotiations on the corporation's behalf.
- May not usurp or divert to another corporation or person with which they are associated a maturing business opportunity that the corporation was actively pursuing.

These prohibitions apply even after their resignation if the resignation may have been prompted or influenced by a desire to acquire the opportunity.

Copy from re:SearchTX

322.    The court also made clear that the fiduciary duty is intensely fact specific and that it must be tested in each case by factors that cannot be exhaustively enumerated but that include:

- The position or office held.
- The nature of the corporate opportunity.
- The specificity and ripeness of the opportunity.
- The director's or officer's relation to the opportunity.
- The amount of knowledge they possess and the circumstances in which it was obtained.
- Whether their knowledge is special or common, private or public.

Clearly, however, as set forth below, the Company's officers and directors allegedly usurped the Company's corporate opportunities in violation of the corporate opportunity doctrine.

### Starrex's Dual-Listing Exemption Exposes it to Liability Under U.S. Securities Laws

323.    Starrex only achieves its exemption from registration that allows it to be dual-listed on the CSE and OTC (U.S.) if it meets the requirements of 17 CFR §240.12g3-2(b)(1), which incorporate the reporting and disclosure requirements of both the Alberta Securities Commission and Canadian Securities Administrators (including the National Instruments cited above) and the requirements of the CSE and impose its own detailed reporting requirements.  Starrex seems to have significantly failed in this regard.  The penalty for non-compliance is the loss of exemption if one of three independent events occurs: "(c) The exemption under paragraph (b) of this section shall remain in effect until: (1) the issuer no longer satisfies the electronic publication condition of paragraph (b)(2) of this section . . . ."  17 CFR §240.12g3-2(c)(1).  The information required to be published on Starrex's website must be done so promptly after the information has been made public, 17 CFR §240.12g3-2(b)(2)(ii), and under subsection (b)(2)(i), must be published since the first day of its most recently completed fiscal year, information that:

(A) Has made public or been required to make public pursuant to the laws of the country of its incorporation, organization or domicile;

(B) Has filed or been required to file with the principal stock exchange in its primary trading market on which its securities are traded and which has been made public by that exchange; and

(C) Has distributed or been required to distribute to its security holders.

17 CFR §240.12g3-2(b)(1)(iii).

Copy from re:SearchTX

324.    Accordingly, all requirements imposed on Starrex under Canadian law and the rules of the CSE must are incorporated therein.  Yet, Starrex has failed to comply.  Starrex's audit committee has not met Canadian requirements for independence and in fact, it seems to have failed in its duties and suffered from material conflicts of interest that have implicated all of its members. Starrex's board of directors has generally not followed the recommendations of the Alberta Securities Commission and Canadian Securities Administrators respecting independence.

325.    Most importantly, Starrex's material disclosures have been fraudulent as they have referred to forged promissory notes as thought they are genuine and both the CFO and CEO have certified these statements to be true, a false certification.  Additionally, Starrex's own auditors have issued highly critical comments about glaring inconsistencies (some might say, fraudulent accounting practices), lack of proper disclosures, and lack of quality or consistent accounting within its filed financial statements.  How do we know this?  Starrex has been so remiss in its duties with such poor attention to detail that it has actually filed the draft, annotated versions of multiple financial disclosures in the CSE or SEDAR system containing internal comments from their auditors and Starrex's CFO's response or lack thereof.

326.    Thus, Starrex is likely aware that it is in jeopardy of justifiably losing its exemption. The market has presumably taken notice of its irregularities, inconsistencies, sudden unexplained resignation on February 6, 2024 of its CEO who also served on its Audit Committee, and potentially fraudulent conduct, sending the stock price (OTCQB: STXMF | CSE: STX) to multi-year lows on extremely low volume.  This is a far cry from thrice-convicted Phillip H. Clayton's statement in April 2018 that he expected the stock to go to $10/share and "Canadian Pubco (Starrex) that has a dual listing in the U.S. . . . could easily have a $10.00 share by the summer and could control our destiny via strategic acquisition and strong organic growth."[18]

327.    Additionally, although Mr. Clayton's felonious history[19] and the scheme he would employ with his co-conspirators was not known to Plaintiffs at the time, facets of the wrongful scheme described herein possess an eerie resemblance to the one  the Securities and Exchange Commission (SEC) prosecuted against Clayton in 2003: Civil Action No. 3:03CV1763-L;

---

[18] Email from Cindy Jackson (cjackson@myamcap.com) writing a memo "FROM: Phil Clayton" to John Magness, dated April 13, 2021, 11:51AM.

[19] Mr. Clayton's colorful criminal history was only revealed years later, which prompted an emergency meeting of his close associates, including his children and Mr. Garth, designed to talk down Magnolias' serious misgiving upon learning this.

Copy from re:SearchTX

*Securities and Exchange Commission v. Unistar Financial Service Corp., Mark A. Sparks, F. Jeffrey Nelson, Phillip H. Clayton, Dino A. Romano, Cynthia Jackson, Intermark Investments, Inc., Turner Holdings, Inc. and Nicole Clayton Caver* (N.D. Tex.).

## BACKGROUND ON U.S. SECURITIES OFFERINGS

328.    Congress enacted the U.S. Securities Act nearly a century ago to regulate the offer and sale of securities. In contrast to the commercial principle of *caveat emptor*, Congress established a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient and accurate information to allow investors to make informed decisions before they invest.

329.    Sections 5(a) and 5(c) of the Securities Act require issuers of securities to register offers and sales of those securities with the SEC when they offer and sell securities to the public. Registration statements relating to an offering of securities provide investors with important information about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

330.    The Securities Act and Exchange Act also contain anti-fraud provisions to prevent fraudulent conduct in the offer, sale, and purchase of securities. Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, for example, seek to ensure honest behavior and fair dealing in securities transactions.

331.    Congress used a broad definition of "security" in the Securities Act and Exchange Act. A "security" encompasses a wide range of investments, including investment contracts. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.

Copy from re:SearchTX

### APPLICABLE LAW ON BRINGING A PRIVATE CAUSE OF ACTION FOR STATUTORY AND PENAL VIOLATIONS

#### A.  Rationale for Magnolia Companies' Right to Bring a Private Cause of Action

**Direct Harm to Magnolia Companies**

332.    The Magnolias' causes of action are predicated on the direct harm caused by Starrex's and its CFO, CEO, and Director's fraudulent conduct. The dissemination of forged documents as part of Starrex Internationals official filings not only misrepresented Magnolia Companies' financial obligations but also potentially devalued Magnolia Companies' standing in the eyes of investors and the marketplace, directly impacting Magnolia Companies' operational viability and financial stability. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) (elaborating on the requirement that the party responsible for the "making" of a false statement can be held liable under Rule 10b-5, emphasizing the significance of control over the content of the statement and its communication).

**Misrepresentation and Materiality**

333.    The forged documents presented, signed, and certified by the CEO, CFO and Director were designed to mislead, constituting a clear misrepresentation of material facts. The materiality of these documents is underscored by their potential to influence the decision-making process of investors and regulatory bodies regarding Magnolis.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) (underscoring that the materiality of a false or misleading statement hinges on a substantial likelihood that a reasonable investor would consider it important in making an investment decision).

**Scienter and Deceptive Practices**

334.    Scienter, or the intent to deceive, manipulate, or defraud, is a critical element in actions under Section 10(b) and Rule 10b-5. The deliberate actions of the CFO in forging and disseminating financial documents fulfill this requirement, highlighting the intentional nature of the fraud perpetrated against Magnolia Companies and its stakeholders. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) (providing guidance on the standard for pleading

Copy from re:SearchTX

scienter in securities fraud cases, emphasizing that the inference of scienter must be at least as compelling as any opposing inference one could draw from the facts alleged).

### B. Legal Authority for Claims Against the CFO and CEO of Starrex International, Ltd., Individually

335.    The legal authority to bring claims directly against the CFO and CEO individually, despite their corporate roles, can be derived from both the specific actions that constitute violations of the law (e.g., forgery, fraud, breach of fiduciary duty) and the direct harm those actions caused to the Magnolias, investors, and the regulatory integrity of the securities markets.

336.    For the conduct described, involving forgery of financial documents and their presentation to regulators and in filings with stock exchanges and through the dual-listing exemption described, with the intent that persons in the U.S. rely upon the representations (for instance, all financial references are intentionally presented in USD), the specific legal authorities and citations for securities fraud under U.S. law include:

   a.  Securities Fraud under the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 CFR § 240.10b-5) based on the fabrication and dissemination of false financial information in Starrex's filings, if done knowingly or recklessly by the CEO and CFO. This is permitted pursuant to Rule 10b-5, promulgated under the Securities Exchange Act of 1934, prohibits making any untrue statement of a material fact or omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. *See, e.g.*, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), which clarifies the need for scienter (intent to deceive, manipulate, or defraud) in actions brought under Rule 10b-5.

   b.  Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) makes it unlawful for any person, directly or indirectly, to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe. *See also SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968, cert. denied, 394 U.S. 976) (interpreting Section 10(b) and Rule 10b-5 to apply broadly to actions that defraud investors).

   c.  Sarbanes-Oxley Act Violations (Public Company Accounting Reform and Investor Protection Act, 18 U.S.C. §§ 1514A, 7241):

Copy from re:SearchTX

i.   CFO certification of financial reports that they know to be false could violate SOX provisions aimed at ensuring the accuracy of public company financial statements and disclosures.

ii.  Sections 302 and 906 of the Sarbanes-Oxley Act require CFOs and CEOs to personally certify the accuracy of financial reports and disclosures.  Hill and Merritt were also subject to Canada's counterpart to these laws.

iii. Section 302 requires senior corporate officers to certify the accuracy of financial reports filed with the SEC and establishes criminal penalties for certifying a report knowing it does not comply with all requirements.  *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745.

iv.  Section 906 provides criminal penalties for certifying a misleading or fraudulent financial report.  *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745.

d.   The Securities Act of 1933, **Section 17(a) (15 U.S.C. § 77q(a))** prohibits fraud, deceit, or material misstatements on the part of sellers in the offer or sale of securities.  *See also Aaron v. SEC*, 446 U.S. 680 (1980), clarified the elements of fraud under Section 17(a) of the Securities Act of 1933.

337.     Given the legal framework established by the Securities Exchange Act of 1934 and interpreted by the courts, the Magnolias, as the Magnolias and Third-Party Plaintiffs have a substantiated basis to assert a private cause of action against the CEO, CFO, Corporate Secretary/Director/Audit Committee representative member and Starrex International. The intentional misrepresentation of material facts, coupled with the direct harm inflicted upon Magnolia Companies, aligns with the prerequisites for securities fraud litigation. Pursuing this legal avenue provides a mechanism for Magnolia Companies to seek compensation for the damages incurred and to address the egregious violations of securities law committed by the CFO and Starrex International.

338.     The Magnolias, through these causes of action, seeks reparation for the significant harm inflicted by the Defendants conduct, including but not limited to compensatory and punitive damages, injunctive relief, and any other legal and equitable remedies deemed appropriate by the court. The extent of the Defendants actions not only violated specific statutory and common law provisions but also egregiously breached the inherent trust and fiduciary duties owed to Magnolia Companies, its employees, and its stakeholders.

Copy from re:SearchTX

## APPLICABLE LAW ON INDIVIDUAL LIABILITY OF INDIVIDUAL CORPORATE OFFICERS OF STARREX

339.    **Individual Liability of Corporate Officers.** The Texas Business Organizations Code (TBOC) provides the statutory framework under which corporate officers must operate, specifically detailing their fiduciary duties to the corporation. However, Texas law also recognizes that officers can be held personally liable for their actions if those actions are outside the scope of their employment or authority, especially if those actions are for personal benefit or harm to others. In *Miller v. Keyser*, 90 S.W.3d 712 (Tex. 2002), the Texas Supreme Court counsels that corporate officers can be held personally liable for actions beyond their corporate authority. The court held that officers could be personally liable if their tortious actions were not directed by the corporation or were outside the ordinary course of business. *Id.*; *see also Community Health Systems, Inc. v. Hansen*, 525 S.W.3d 671 (Tex. 2017) (generally examining whether actions taken by a corporate officer were within the scope of their employment, focusing on the benefit to the corporation versus personal motives); *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605 (Tex. 1999) (establishing that individual liability hinges on actions that are not authorized, are conducted with malice, or are aimed at personal gain); *Worsham v. Nix*, 269 S.W.3d 619 (Tex. App. — Houston [14th Dist.] 2008, no pet.) (generally explaining how corporate officers are exposed to personal liability when they take actions that are motivated by personal interests and are not for the corporation's benefit). This includes fraud and acts that amount to intentional torts.

Copy from re:SearchTX

# VII.
# CAUSES OF ACTION

### CAUSE OF ACTION NO. 1: BY MAGNOLIA COMPANIES:
### NEGLIGENCE OF STARREX OFFICERS
### (DEFENDANTS DEBBIE MERRITT, MATTHEW D. HILL, AND SCOTT REEVES)

340.    Plaintiffs Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Florida, Ltd., and Magnolia Title Arkansas, LLC incorporate the foregoing paragraphs as if fully set forth herein.

341.    The actions and omissions of defendants Hill, Merritt, and Reeves, officers of Starrex during the relevant time, constituted negligence causing injury to Plaintiffs.  Merritt represented herself to multiple third-parties, including but not limited to governmental authorities, as the Chief Financial Officer, or CFO, of the Magnolia Companies and in fact, acted in all respects as the CFO of the Magnolia Companies.  Hill was the CEO of Starrex until he was replaced by Charles Burns on February 6, 2024, and Reeves has been Corporate Secretary of Starrex since at least June 12, 2020.

342.    Under Texas law, the elements of a negligence claim are: 1) the existence of a legal duty, 2) a breach of that duty, and 3) damages proximately caused by the breach. *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998).

343.    As senior officers of Starrex International Ltd., Hill, Merritt, and Reeves owed duties to the Magnolia Companies under common law and by virtue of the management services agreement between Starrex and the Magnolia Companies in which they were utilized as Third Parties, binding them individually to the same obligations imposed on Starrex. This created obligations that include, but are not limited to, the following:

    a.  Exercise reasonable care in providing services to the Magnolia Companies;

    b.  Implement controls to safeguard the Magnolias' assets and proprietary information;

    c.  Maintain effective oversight regarding use of funds intended to benefit the Magnolias; and

    d.  Avoid self-dealing transactions diverting corporate opportunities from the Magnolias.

Copy from re:SearchTX

344.     These defendants breached their duties to the Magnolia Companies through acts and omissions including, but not limited to, the following:

  a.  Failing to implement controls over the Magnolias' funds, data, transactions and assets;

  b.  Permitting misappropriation of the ANTIC credit line and the monies allegedly lent to the Magnolias;

  c.  Diverting the Magnolias' proprietary information, opportunities and operations for their benefit

  d.  Engaging in transactions comprising corporate waste and self-dealing adverse to the Magnolias; and

  e.  Failing to exercise proper oversight permitting breaches of duties owed to the Magnolias.

345.     The defendants' negligent breaches of duties proximately caused substantial damages to the Magnolia Companies, including, but not limited to, the following:

  a.  Loss of control over funds, operations, data, transactions and other assets;

  b.  Impairment of business interests, revenue streams and growth opportunities;

  c.  Losses arising from diverted opportunities and misappropriation of proprietary information;

  d.  Exposure to liability from lack of oversight and safeguarding of operations/compliance; and

  e.  General institutional damages and reputational harm from negligent mismanagement.

346.     The negligent actions and omissions fell below the duty of care owed, enabling harms to befall the plaintiffs that make the defendants liable for damages. Accordingly, the Magnolia Companies are entitled to recover their full range of losses caused by this negligent misconduct under common law negligence principles.

Copy from re:SearchTX

**CAUSE OF ACTION NO. 2: BY MAGNOLIA COMPANIES:**
**NEGLIGENCE OF STARREX DIRECTORS**
**(DEFENDANTS MATTHEW D. HILL, P. GARRETT CLAYTON, CHARLES BURNS, SCOTT REEVES)**

347.    The Magnolia Companies incorporate the foregoing paragraphs as if fully set forth herein.

348.    Plaintiffs Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Florida, Ltd., and Magnolia Title Arkansas, LLC bring this cause of action for negligence against Starrex directors Matthew D. Hill, P. Garrett Clayton, Charles Burns, and Scott Reeves.  On information and belief, Matthew D. Hill has served as a director and Chairman of the Board since November 1, 2016, P. Garrett Clayton since December 9, 2013, Charles Burns since 2004, and Scott Reeves since December 4, 2019.  On information and belief, Burns has been the Chair of the Starrex Audit Committee since 2014 (and a members since 2004), Hill has been a member since November 1, 2016, and Reeves since March 1, 2022.  On information and belief, P. Garrett Clayton was a member from 2013 to 2016.

349.    Under Texas law, the elements of a negligence claim are: 1) the existence of a legal duty, 2) a breach of that duty, and 3) damages proximately caused by the breach.  *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998). Each element is satisfied by the Starrex directors' actions and omissions injuring the Magnolia Companies.

350.    As directors of Starrex, Hill, P.G. Clayton, Burns and Reeves owed duties to the Magnolia Companies arising from, but not limited to, the following:

   a.   The contracted management services relationship between Starrex and the Magnolia Companies, which created obligations to exercise reasonable care in providing oversight of services rendered, a duty imposed upon officers and directors.

   b.   Their constructive knowledge that Starrex's subsidiary operations provided critical services impacting the Magnolia Companies' businesses, necessitating duties to reasonably supervise avoidance of negligent mismanagement imperiling those operations.

   c.   Their fiduciary status as corporate directors of the parent company, imposing elementary duties not to act negligently regarding companies treated as subsidiaries in a manner exposing them to reasonably foreseeable harm.

Copy from re:SearchTX

351.    Thus, the defendants assumed duties extending beyond just Starrex itself - their oversight role regarding operations impacting subsidiaries like the Magnolia Companies created reasonableness and due care obligations. Hill, Reeves, and Burns, in particular, had heightened awareness of the management services relationship given their Audit Committee roles.

352.    The directors breached their duties to the Magnolia Companies through negligent acts and omissions including, but not limited to, the following:

    a.  Failing to implement internal controls or verify information regarding Starrex's handling of funds and services supposedly for the Magnolias' benefit, including the ANTIC credit line;

    b.  Disregarding red flags that funds and the Magnolias' proprietary data/information were being misused for interests conflicting with the Magnolia Companies;

    c.  Lack of oversight allowing misappropriation of the Magnolia Companies' operations, opportunities and assets to benefit other parties like MarketStreet;

    d.  Allowing misconduct enabling the Magnolia Companies' compliance obligations and business interests to be undermined;

    e.  Negligent retention of officers and lack of supervision over avoidance of conflicts of interest harming the Magnolias; and

    f.  Ratification or failure to remediate improper usurpation of the Magnolias' corporate opportunities and lines of business

353.    The Starrex directors' negligent breaches proximately caused devastating injuries to the Magnolia Companies, including, but not limited to, the following:

    a.  Loss of control over funds, operations, proprietary data and trade secrets intended for their benefit;

    b.  Impairment, diversion and usurpation of their business interests, opportunities and revenue streams;

    c.  Severe institutional damages from compliance deficiencies and mismanagement undermining their operations;

    d.  Exposure to liability from lack of oversight enabling misuse of their corporate assets and opportunities; and

Copy from re:SearchTX

    e.   Irreparable reputational harm caused by directors' negligent lack of control over personnel decisions.

354.    The Magnolia Companies have suffered substantial actual damages from the directors' negligent abdication of their oversight responsibilities. This negligence enabled foreseeable harm to befall the Magnolia Companies in the form of misappropriated assets, undermined business interests, liability risks from compliance failures, and widespread organizational impairment—all of which warrants holding the Starrex directors personally liable for damages.

### CAUSE OF ACTION NO. 3: BY MAGNOLIA COMPANIES: FRAUD BY NON-DISCLOSURE (DEFENDANTS MERRITT AND HILL)

355.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

356.    Fraud occurs when (a) a party fails to disclose a material fact within the knowledge of that party, (b) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (c) the party intends to induce the other party to take some action by failing to disclose the fact, and (d) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. PJC 105.4 is based on the elements of fraud by nondisclosure set forth in *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). *See also New Process Steel Corp. v. Steel Corp. of Texas*, 703 S.W.2d 209, 214 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (court's charge adequately instructed jury on fraud, including nondisclosure). As to the reliance element, *see Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181-82 (Tex. 1997); *Custom Leasing, Inc. v. Texas Bank & Cross-Plaintiff Haque Co.*, 516 S.W.2d 138, 143 (Tex. 1974); *see also, e.g., Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("[B]y failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting . . . .") (emphasis added); *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied) (same).

357.    Silence can constitute misrepresentation. "As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." *Bradford*, 48 S.W.3d at 755. "Whether such a duty exists is a question of law." *Bradford*, 48 S.W.3d at 755.

Copy from re:SearchTX

The supreme court has concluded that a duty to disclose arises when there is a confidential or fiduciary relationship. I*nsurance Co. of North America v. Morris*, 981 S.W.2d 667, 674-75 (Tex. 1998). The court has also held that a duty to disclose arises in other circumstances. *See Spolaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (specific representations about bonus plan gave rise to duty to disclose adoption of an alternate plan); *Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979) (seller of real estate has duty to disclose material facts not reasonably discoverable by purchaser).

358.    Likewise, courts of appeals have concluded that a duty to disclose may arise when (1) there is a special or fiduciary relationship, (2) a person voluntarily discloses partial information but fails to disclose the whole truth, (3) a person makes a representation but fails to disclose new information that makes the earlier representation misleading or untrue, or (4) a person makes a partial disclosure and conveys a false impression. *See, e.g., Columbia/HCA Healthcare Corp. v. Cottey*, 72 S.W.3d 735, 744-45 (Tex. App.- Waco 2002, no pet.); *Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 212-13 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *Lesikar v. Rappeport*, 33 S.W.3d 282, 299 (Tex. App.—Texarkana 2000, pet. denied); *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App.—Houston [14th Dist.] 1997, pet. denied).

359.    Further active concealment of material facts may also be as actionable as false statements. *Campbell v. Booth*, 526 S.W.2d 167, 172 (Tex. Civ. App.—Dallas 1975, writ ref'd n.r.e.); *see also GXG, Inc. v. Texacal Oil & Gas*, 977 S.W.2d 403, 409 (Tex. App.—Corpus Christi 1998, pet. denied).

360.    Defendants Merritt and Hill failed to disclose to the Magnolias the existence of the promissory notes attached to Plaintiff's Original Petition as Exhibit Nos. 1 through 4. The MSA established a fiduciary relationship requiring the disclosure of the promissory notes. Yet, Defendants never even sent any allegedly executed copies of the promissory notes to the Magnolias until many months after the alleged execution thereof, when on September 8, 2023, their current counsel made a demand for "repayment" of the promissory notes and for the first time, attached copies of the notes. the Magnolias were floored and protested—no one had ever sent them copies of these allegedly executed notes. Defendants Merritt and Hill deliberately remained silent when the MSA required them to disclose the existence of the promissory notes. As evidenced by the allegations in Plaintiff's Original Petition, the Magnolias are being harmed by Defendants Merritt's and Hill's forgery of the promissory notes. the Magnolias are entitled to

Copy from re:SearchTX

recover actual damages, exemplary damages, reasonable and necessary attorney's fees, and all other damages to which they are entitled.

### CAUSE OF ACTION NO. 4:  BY MAGNOLIA COMPANIES: BREACH OF CONTRACT (DEFENDANTS HILL, MERRITT, AND REEVES)

361.    The Magnolia Companies incorporate the foregoing paragraphs as if fully set forth herein.

362.    The MSA is a valid and enforceable contract between the Magnolias and Starrex International, Ltd.  Starrex, Merritt, Hill, and Reeves breached the MSA—specifically Sections 3.3, 3.4, 9, and the Non-Disclosure Agreement attached as Exhibit B thereto—by forging or causing to be forged the promissory notes attached to Plaintiff's Original Petition as Exhibit Nos. 1 through 4, transferring the $98,000 from the Magnolias to themselves, making substantial misappropriations, and by making misrepresentations and disparaging / defamatory statements about the Magnolias, releasing confidential information belonging to the Magnolias;, by taking the Magnolias' business opportunities using their confidential information and, using the Magnolias' confidential information to persuade the Magnolias' employees to either quit and/or work for a competitor to Starrex's benefit, and through an attempt to cover up the forged promissory notes. The actions of Starrex, Merritt, Hill, and Reeves damaged the Magnolias.  Merritt, Hill, and Reeves, as "Third Parties" under the MSA (Section 1.7), are bound to the contractual provisions of the MSA to the same extent as Starrex.

363.    The Letter Agreement Regarding Proposed Acquisition of Magnolia Entities, dated April 30, 2023 between Starrex International, Ltd. (including its wholly owned subsidiaries, Starrex Holdings, Inc. and Starrex Insurance Holdings, Inc.) and the Magnolias, dated April 30, 2023, contains paragraph 5, which prohibits Starrex International, Ltd., including Starrex Insurance Holdings, Inc., from disclosing or using the Confidential Information it received from the Magnolias.  Paragraph 5 also contains a non-solicitation provision that prohibits Starrex International, Ltd., including Starrex Insurance Holdings, Inc., from soliciting Magnolias employees for a period of 18 months following the termination of the Letter Agreement, which would end no earlier than December 30, 2024.   There is no time limit on the applicability of the

Copy from re:SearchTX

confidentiality provision. Starrex terminated the Letter Agreement on or about June 30, 2023.  The The Letter Agreement expressly provides in paragraph 7, that "paragraph 5 (disclosure and non-solicitation)" shall survive the termination of the Letter Agreement.

364.    Starrex, Hill, Merritt, and Reeves failed to promptly return to the Magnolia Entities or destroy, the Confidential Information or any work product produced from such Confidential Information in its possession of in the possession of any of its representatives.  Starrex also used and disclosed the Confidential Information for its own benefit and the benefit of its affiliated companies and partners.

365.    Defendant Starrex Title Florida LLC is solely managed and controlled by Starrex Insurance Holdings, Inc.  Starrex Title Florida is wholly owned by Starrex Insurance Holdings, Inc., which is wholly owned by Starrex.  Starrex, Starrex Insurance Holdings, and Starrex Title Florida LLC together used and disclosed confidential information along with Starrex Insurance Holdings, Inc. and Starrex International, Ltd. and also solicited Magnolias' employees, all of which is a breach of paragraph 5 of the Letter Agreement.  Alternatively, Starrex Insurance Holdings, Inc. and Starrex Title Florida, LLC aided and abetted Starrex in breaching the relevant provisions of the letter agreement.

366.    Accordingly, the Magnolia Entities are entitled to the damages sought herein.

367.    Plaintiffs are entitled to recover their reasonable and necessary attorney's fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.


**CAUSE OF ACTION NO. 5: BY MAGNOLIA COMPANIES:**
**BREACH OF FIDUCIARY DUTY**
**(DEFENDANTS HILL, MERRITT, AND REEVES)**

368.    The Magnolia Companies incorporate the foregoing paragraphs as if fully set forth herein.

369.    Paragraphs 3.3 and 3.4 of the MSA impose upon Starrex and its Affiliates and Third Parties, including Officers Hill, Merritt, and Reeves, a fiduciary duty to act in the best interests of the Magnolias and at no time to do, cause or permit to be done any act, or publish or bring in to the public domain any information that is or may be detrimental to the best interests or business

Copy from re:SearchTX

reputation of the Magnolias. The actions of Defendants described herein constitute a breach of their fiduciary duty to the Magnolias. As a result, the Magnolias have been damaged.

370. Additionally, Merritt claimed and represented that she was the CFO of multiple Magnolia Entities to both the Texas Comptroller (when signing and filing for Coast to Coast and Sol City) and on information and belief, the United States Internal Revenue Service (when signing under oath and filing the 2022 tax returns in April 2023 for each of the four Magnolia Entities as "its CFO"). Accordingly, she owes fiduciary duties to the Plaintiffs. She breached those fiduciary duties in the many ways listed above through misrepresentations, self-dealing, misappropriation, violations of securities laws, tortious interference with their contracts, theft, and fraud.

371. Accordingly, Plaintiffs are entitled to the damages sought herein.

### CAUSE OF ACTION NO. 6: BY MAGNOLIA COMPANIES: FRAUD BASED ON COMMON LAW FORGERY (DEFENDANTS MERRITT, HILL, GARTH, REEVES, YOUNG, AND TINGLEMERRETT)

372. The Magnolia Companies incorporate the foregoing paragraphs as if fully set forth herein.

373. Under Texas Penal Code § 32.21, the act of creating and utilizing forged documents, representing them as genuine and binding upon Magnolia Companies, constitutes common law forgery. The act of forging the alleged Promissory Notes that were referenced and presented as genuine and legitimate in numerous contexts, to the public and in regulatory filings, as well as instituting a legal action and presenting them as legitimate constitutes common law forgery, actionable under both Texas Penal Code and civil law for damages incurred. Texas Penal Code §§ 32.21 (Forgery) and 32.22 (Criminal Simulation).

374. Under Texas Penal Code § 32.21, forgery involves altering, making, completing, executing, or authenticating any writing so that it purports to: (a) Be the act of another who did not authorize that act, (b) have been executed at a time or place or in a numbered sequence other than was in fact the case, or (c) be a copy of an original when no such original existed.

375. The conduct in Texas Texas Penal Code § 32.21 rises to a third degree felony if the value of the property or service is $2,500 or more but less than $30,000 and a first degree felony when the value of the property or service is $300,000 or more. In the instant case, the value of the forged promissory notes combined exceeds $4 million.

Copy from re:SearchTX

376.    Under Texas Penal Code § 32.22, a person commits the offense of criminal simulation if: (a) A person commits an offense if, with intent to defraud or harm another: (1) he makes or alters an object, in whole or in part, so that it appears to have value because of age, antiquity, rarity, source, or authorship that it does not have; (2) he possesses an object so made or altered, with intent to sell, pass, or otherwise utter it; or (3) he authenticates or certifies an object so made or altered as genuine or as different from what it is.

377.    Forgery specifically gives rise to claims of fraud where the participants' actions in creating or presenting forged documents were intended to deceive Magnolia Companies, regulators, or investors.

378.    In Texas, civil fraud requires: (a) A material representation that was false, (b) the speaker's knowledge of its falsity or ignorance of its truth, (c) the speaker's intent that it should be acted upon by the party, (d) the party's reliance on the representation, and (e) the party's consequent and proximate injury. *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co.*, 51 S.W.3d 573 (Tex. 2001).

379.    These actions were done with the intent to defraud and cause harm to the Magnolias by Defendants Merritt, Hill, and Garth.

380.    Defendants Reeves, Young, and TingleMerrett worked with the other Defendants herein to cover up the fact of the forgery and attempt to obtain ratification of the forged promissory notes by attempting to have Plaintiffs execute "amended and restated" promissory notes.  These Defendants were fully aware that no original, genuine notes existed.  This was a fraudulent attempt to make it appear as though the original, forged promissory notes were actually genuine and legitimate.

381.    Accordingly, Plaintiffs seek the damages detailed herein and state that Defendants are also liable for any alleged damages or liability that Starrex seeks from Plaintiffs in the *Starrex Lawsuit*.

## CAUSE OF ACTION NO. 7: BY MAGNOLIA COMPANIES: TORTIOUS INTERFERENCE (DEFENDANTS STARREX TITLE FLORIDA, LLC, MERRITT, HILL, GARTH, CLAYTON, COOPER, MARKETSTREET AND BREWER)

382.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

Copy from re:SearchTX

383.    The four elements of intentional interference with a contract are (1) the existence of a contract subject to interference, (2) an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *Prudential Insurance Co. of America v. Financial Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909 (Tex. 2013) (stating elements and emphasizing the need for intentional and willful conduct causing interference); *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *Holloway v. Skinner*, 898 S.W.2d 793, 795-96 (Tex. 1995); *see also Powell Industries, Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998); *Southwestern Bell Telephone Co. v. John Carlo Texas, Inc.*, 843 S.W.2d 470, 472 (Tex. 1992).

384.    The contracts with which the Defendants interfered included software license agreements for which the Magnolias fully paid (including the Qualia), contracts with title insurance customers, earnest money contracts, contracts with brokers, contracts with underwriters, and contracts with landlords and vendors.

385.    Further, the acts, including but not limited to the unauthorized restriction of access to IT resources and the dissemination of false information regarding the forged, fake promissory notes to underwriters and others, were designed to and effectively did interfere with Magnolias' existing contractual obligations and relationships. These acts were executed with malice, beyond any legitimate business purpose, and directly resulted in damages to the Magnolias.

386.    Defendants had an intent to interfere, not just an intent to do the particular acts performed. *Southwestern Bell Telephone Co.*, 843 S.W.2d at 472.

387.    Defendants also engaged in conduct that prevented the performance of Plaintiffs' contracts and/or made the performance of their contracts impossible, more burdensome, more difficult, or of less or no value to the one entitled to performance. *AKB Hendrick, LP v. Musgrave Enterprises, Inc.*, 380 S.W.3d 221, 236 (Tex. App.—Dallas 2012, no pet.) (citing *Tippet v. Hart*, 497 S.W.2d 606, 610 (Tex. Civ. App.—Amarillo), writ ref'd n.r.e. per curiam, 501 S.W.2d 874 (Tex. 1973)). However, "[o]rdinarily, merely inducing a contract obligor to do what it has the right to do ... is not actionable interference." *See ACS Investors, Inc.*, 943 S.W.2d at 430.

388.    Defendants had no justification, including no legal right to interfere and no mistaken but good-faith claim to a colorable legal right, regardless of motivation. *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996); *see also Wal-Mart Stores, Inc. v. Sturges*,

Copy from re:SearchTX

52 S.W.3d 711, 725 (Tex. 2001). Additionally, they had no legitimate privilege or alternatively, exercised an otherwise legitimate privilege by resort to illegal or tortious means.

389.     Additionally or alternatively, the methods of interference employed by Defendants are tortious in themselves, thereby excluding any potential defense of privilege or justification. *Prudential Insurance Co. of America v. Financial Review Services, Inc.*, 29 S.W.3d 74, 81 (Tex. 2000); *see also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002).

390.     Accordingly, Plaintiffs seek the damages detailed herein and including but not limited to: (a) the amount of money necessary to put the Magnolias in the same economic position they would have been in had the contracts interfered with been actually performance, (b) lost profits from such contracts, and (c) the pecuniary loss of the contracts' benefit and consequential losses.

### CAUSE OF ACTION NO. 8: BY MAGNOLIA COMPANIES: CONVERSION (DEFENDANTS STARREX TITLE FLORIDA, LLC, MERRITT, AND COOPER)

391.     The Magnolia Companies incorporate the foregoing paragraphs as if fully set forth herein.

392.     The elements of conversion are: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused the plaintiff's demand for the return of the property. *Huffmeyer v. Mann*, 49 S.W.3d 554, 558 (Tex. App.—Corpus Christi 2001, no pet.).

393.     The Magnolia Companies owned, had legal possession of, and/or were entitled to possession of its valuable intellectual property and other assets.  These defendants assumed and exercised dominion and control over this property in an unlawful and unauthorized manner.  They knew it was unauthorized because Merritt had made specific requests for the Magnolia Companies to transfer these assets in exchange for an alleged mutual benefit.  They also knew that the Magnolia Companies had never authorized these defendants to exercise dominion and control over this property to the exclusion of and inconsistent with the Magnolia Companies' rights.

Copy from re:SearchTX

394.    A demand was made to Defendants directly and/or through counsel for the Plaintiffs to these defendants' counsel.   Defendants refused to return the property taken.

395.    Accordingly, Plaintiffs seek the damages specified herein.

### CAUSE OF ACTION NO. 9:  BY MAGNOLIA COMPANIES: VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT (DEFENDANTS STARREX TITLE FLORIDA, LLC, MERRITT, HILL, MARKETSTREET, BREWER, AND COOPER)

396.    The Magnolia Companies incorporate the foregoing paragraphs as if fully set forth herein.

397.    Section 134A.002(3) of the Texas Uniform Trade Secrets Act provides for six alternative improper methods of acquisition, use, or disclosure of trade secrets. *See Emerald City Management, LLC v. Kahn*, No. 4:14-cv-358, 2016 WL 98751, at *17-18, 29 (E.D. Tex. Jan. 8, 2016) (acknowledging improper disclosure can constitute misappropriation under the Act).

398.    Specifically applicable is the violation of duty imposed by confidential or contractual relationship.  Confidential relationships imposing duties relating to a trade secret can exist in various situations. See, e.g., Tex. Civ. Prac. & Rem. Code 134A.002(3) (describing circumstances in which duties concerning trade secrets arise under statute); H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc., 951 S.W.2d 33, 36 (Tex. App.—Corpus Christi 1997, writ denied) (finding negotiations during sale of business created confidential relationship); *American Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex. App.—Waco 1996, no writ) (finding that former employee is prohibited from using confidential information or trade secrets acquired during his employment); *Crutcher- Rolfs-Cummings, Inc. v. Ballard*, 540 S.W.2d 380, 387 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.) (finding confidential relationship because plaintiff and defendant were licensor and licensee and also joint adventurers).

399.    "Trade secret" means (information, such as, business, scientific, technical, economic, or engineering, and any formula, design, prototype, pattern, plan, compilation, program device, program, code, device, method, technique, process, procedure, financial data, or list of actual or potential customers or suppliers) that both: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b)

Copy from re:SearchTX

is the subject of reasonable measures by the owner under the circumstances to maintain its secrecy. Trade secrets may be tangible or intangible, no matter how the trade secret is "stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." Tex. Civ. Prac. & Rem. Code 134A.002(6).

400.    "Improper means" includes theft; bribery; misrepresentation; breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret; or espionage through electronic or other means. 134A.002(2) of the Act. *See Education Management Services, LLC v. Tracey*, 102 F. Supp. 3d 906, 914 (W.D. Tex. 2015) (applying the Act and listing improper means).

401.    "Use of the trade secret means commercial use by which the offending party seeks to profit from the use of the secret." *Atlantic Richfield Co. v. Misty Products, Inc.*, 820 S.W.2d 414, 422 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (citing *Metallurgical Industries Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1205 (5th Cir. 1986)); *see also Global Water Group, Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex. App.—Dallas 2008, pet. denied).

402.    Effective September 1, 2017, the Act provides that a trade-secret owner is a "person or entity in whom or in which rightful, legal, or equitable title to, or the right to enforce rights in, the trade secret is reposed." Tex. Civ. Prac. & Rem. Code 134A.002(3-a). Ownership of a trade secret has been construed to be an element of a misappropriation claim under the Act. *St. Jude Medical S.C., Inc. v. Janssen-Counotte*, No. A-14-CA-877-SS, 2014 WL 7237411, at *14 (W.D. Tex. Dec. 17, 2014) (applying pre-2017 version of the Act).

403.    "A former employee, however, may not use confidential or proprietary information acquired during the employment relationship in a manner adverse to his former employer." *Sharma v. Vinmar International, Ltd.*, 231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, pet. dism'd); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

404.    Defendants Hill and Merritt breached duties imposed on them by the Master Services Agreement and the Letter Agreement with the Magnolias.  Defendants Cooper, Merritt, and Hill, misappropriated and/or improperly disclosed trade secrets within a confidential relationship or under contract, including Non-Disclosure/Confidentiality Agreement, and along with Starrex Title Florida, LLC, conspired to work together to do so, as well as aid and abet the misappropriation and wrongful use of the trade secrets.  They also obtained the trade secrets by

Copy from re:SearchTX

improper means; for instance, Cooper resigned from her role as President of Magnolia Title Arkansas and Magnolia Title Florida, and thereafter proceeded to download proprietary customer and other valuable trade secret data from the Magnolias' systems to which she still could obtain access. MarketStreet and Brewer, with knowledge that the information constituted trade secrets, used the information to their advantage, obtaining profits thereby. Likewise, Cooper, Merritt, Hill, and Starrex Title Florida adid the same.

405.    As a matter of law, there was a contractual or confidential relationship giving rise to a duty to maintain the trade secret's secrecy or limit its use, an instruction to that effect may be necessary, as between the Magnolias, on the one hand, and on the other hand, Defendant Laurie Cooper (confidential relationship) and Defendant Starrex Title Florida LLC (contractual relationship and confidential relationship).

406.    These violations of the contributed to the total destruction of Plaintiffs' business. Accordingly, Plaintiffs seeks the damages set forth herein as well as: (1) lost profits caused by Defendants' misappropriation; (2) profits (unjust enrichment) that Defendants earned from the misappropriation; and (3) development costs that Defendants avoided by the misappropriation. Additionally, they may seek a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret. As with all other causes of action so permitting, Plaintiffs seek exemplary damages as well.

## CAUSE OF ACTION NO. 10: BY MAGNOLIA COMPANIES: UNJUST ENRICHMENT (DEFENDANTS MERRITT, STARREX TITLE FLORIDA, LLC, MARKETSTREET, COOPER, AND BREWER)

407.    The Magnolia Companies incorporate the foregoing paragraphs as if fully set forth herein. Plaintiffs plead the following cause of action in addition, or in the alternative, to other causes of action.

408.    Merritt, Starrex Title Florida, MarketStreet, Cooper, and Brewer have been unjustly enriched, as they have wrongfully secured a benefit or passively received benefits that would be unconscionable for them to retain.

409.    These Defendants were unjustly enriched by obtaining a benefit by at least the taking of an undue advantage. For instance, they had or were able to obtain access to the

Copy from re:SearchTX

Magnolia Companies' valuable assets and property, including intellectual property, and used these assets and property to enrich themselves.

410.    As a direct and proximate cause of these Defendants' unjust enrichment, the Magnolia Companies have been harmed in an amount to be proven at trial.

### CAUSE OF ACTION NO. 11: BY MAGNOLIA COMPANIES: COMMON LAW MISAPPROPRIATION AND VIOLATION OF TEX. CIV. PRAC. & REM. CODE CHAPTER 16 ( DEFENDANTS MERRITT, STARREX TITLE FLORIDA, LLC, MARKETSTREET, COOPER, AND BREWER)

411.    The Magnolias incorporate the foregoing paragraphs as if fully set forth herein.

412.    The Magnolias' trademarks are used in commerce and are distinctive.

413.    The Magnolias would show that (1) they create a product or service through their "extensive time, labor, skill, and money", (2) the Defendants are "free riding" off of the Magnolias' work by using the services to engage in direct competition, and (3) the Magnolias have incurred "commercial damage" as a result. *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco 1993, writ denied) ("Within the broad scope of unfair competition are the independent causes of action such as trade-secret law, 'palming off' or passing off, and misappropriation, to name only a few.")

414.    Additionally, the Magnolias would show that these Defendants are diluting the Magnolias' inherently distinctive mark and engaging in unfair competition in commerce, in violation of Section 16.103 of the Texas Civil Practices and Remedies Code.

415.    Accordingly, the Magnolias are due all damages specified herein, as well as lost profits, actual damages, consequential damages, statutory damages, costs, fees, and injunctive relief as they may specify.

### CAUSE OF ACTION NO. 12:  BY MAGNOLIA COMPANIES: VIOLATION OF THE LANHAM ACT, 15 U.S.C. §§ 1051 ET SEQ (DEFENDANTS MERRITT, STARREX TITLE FLORIDA, LLC, MARKETSTREET, COOPER, AND BREWER)

416.    The Magnolias incorporate the foregoing paragraphs as if fully set forth herein.

Copy from re:SearchTX

417.    The Lanham Act, 15 U.S.C. §§ 1051 et seq., was enacted by Congress in 1946. The Act provides for a national system of trademark registration and protects the owner of a federally registered mark against the use of similar marks if such use is likely to result in consumer confusion, or if the dilution of a famous mark is likely to occur.

418.    Magnolias' trademarks are used in commence (15 U.S.C. § 1127) and are distinctive:



419.    The Magnolias' trademarks were designed for the use of the Magnolias.  The Magnolias could register the above mark as a design mark in an international class that includes title insurance services.

420.    Defendants are wrongfully using the Magnolias' marks.

421.    The marks are arbitrary/fanciful or suggestive and thereby inherently distinctive. *See Zatarain's, Inc. v. Oak Grove Smoke House, Inc.*, 698 F.2d 786 (5th Cir. 1983).  Therefore, the Magnolias have exclusive rights to the mark as determined solely by priority of use.  The mark

Copy from re:SearchTX

should not be categorized as descriptive. The mark is not a personal name, generic class of products, or a geographic term.

422.    The Magnolias claim trademark infringement of an unregistered mark pursuant to 15 U.S.C. § 1125(a) and will demonstrate that (a) the Magnolias have a valid and legally protectable mark; (b) the Magnolias own the mark; and (c) Defendants' use of the mark to identify their title insurance services is causing a likelihood of confusion. *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3rd Cir. 2000).

423.    In fact, Defendants intend to confuse the public, customers and others with whom the Magnolias did business in order to induce them to falsely believe that Defendants ARE the same title companies—Magnolia Title Florida and Magnolia Title Arkansas. They are counting on this! Numerous emails and actions support the Defendants' blatant attempt to hoodwink the existing customers of the Magnolias and other clients, brokers, vendors, and stakeholders by pretending to be seamless continuations of the same companies when, in fact, they are not.

424.    Accordingly, the Magnolias are due at least the following damages: (1) disgorgement of the defendant's profits; (2) actual damages, (3) reasonable royalty, (4) attorneys' fees for this exceptionally malicious case, and (5) costs. *See* 15 U.S.C. § 1117(a).

### CAUSE OF ACTION NO. 13: BY MAGNOLIA COMPANIES: BUSINESS DISPARAGEMENT AND INJURIOUS FALSEHOOD (DEFENDANTS MERRITT AND HILL)

425.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

426.    A person disparages the business of another if he or she publishes a disparaging false statement about the business, and, when he publishes the statement, he or she either knows the falsity of the statement or acts with reckless disregard of whether the statement is false/acts with ill will or intends to interfere with the economic interest of the plaintiff, and his or her publication of the statement played a substantial part in inducing others not to do business with the plaintiff and resulted in a specific pecuniary loss to plaintiff. A statement is "published" if it is intentionally communicated to a person other than plaintiff who is capable of understanding its meaning.

427.    The action for injurious falsehood or business disparagement is to protect the economic interests of the injured party against pecuniary loss." *Hurlbut v. Gulf Atlantic Life*

Copy from re:SearchTX

*Insurance Co.*, 749 S.W.2d 762, 766 (Tex. 1987); *see also In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015); *In Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014); *see also Burbage v. Burbage*, 447 S.W.3d 249, 261 n.6 (Tex. 2014). The words at issue must be disparaging and false. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003); *Hurlbut v. Gulf Atlantic Life Insurance Co.*, 749 S.W.2d 762, 766 (Tex. 1987). Business disparagement requires proof of "publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages." *Prudential Insurance Co. of America v. Financial Review Services, Inc.*, 29 S.W.3d 74, 82 (Tex. 2000).

428.    Only absolute privilege is relevant, qualified privileges are irrelevant in a business disparagement case. *See Hurlbut*, 749 S.W.2d at 768; *Galveston County Fair & Rodeo, Inc. v. Glover*, 880 S.W.2d 112, 120 (Tex. App.—Texarkana 1994), writ denied per curiam, 940 S.W.2d 585 (Tex. 1996) (stating that absolute privilege is a legal question that the court will determine as a matter of law before the submission to the jury); *see also Arant v. Jaffe*, 436 S.W.2d 169, 178 (Tex. App.—Dallas 1968, no writ). Defendants had no privilege to state these words. Further, Plaintiffs can show special damages.

429.    Defendants Starrex CFO Debbie Merritt and Former CEO Matthew Hill issued an injurious falsehood and disparaged Plaintiffs' business when they told the public and underwriters such as Agents National Title Insurance Company (ANTIC) and its subsequent purchaser that the Magnolias were unable to pay Starrex what was owed pursuant to the (forged) promissory notes. The many regulatory filings and emails plainly prove the publication.[20] Not only was Starrex <u>not</u> a payee on the forged promissory notes (by its plain terms, the forged promissory notes listed "Starrex Insurance Services, Inc." as the payee), but they were forged by Starrex, Merritt and others and were never executed nor authorized by Plaintiffs. The words were both disparaging and false. Starrex and Merritt's disparagement and injurious falsehood caused underwriters to provide 30 days written notice of cancellation and cease doing business with the Magnolias, resulting in substantial pecuniary damages.

430.    Accordingly, Plaintiffs seek all damages to which they are entitled under Texas law.

---

[20] See the many official filings with SEDAR referenced herein. Also see, e.g., Merritt's email of October 12, 2023 to EssentVentures, a major underwriter for the Magnolias.

Copy from re:SearchTX

<u>CAUSE OF ACTION NO. 14: BY MAGNOLIA COMPANIES:</u>
<u>VIOLATIONS OF SECURITIES LAWS</u>
<u>(DEFENDANTS MERRITT, HILL, AND REEVES)</u>

431.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

432.    The conduct of Defendants Merritt, Hill, and Reeves as passed through exemptions present in SEC regulations, including 17 CFR § 240.12g3-2(b) (including subsection (1)(iii) thereof), which include the forgery of financial documents and their presentation in official filings, constitutes a violation of the Securities Exchange Act of 1934, particularly Section 10(b) and Rule 10b-5, as well as relevant provisions of the Sarbanes-Oxley Act of 2002. These actions were intended to, and did, mislead investors and regulatory bodies, damaging the integrity of the marketplace and most especially, the Magnolias standing in the marketplace where it makes use of public resources, underwriters, retail customers, and operated in a regulated environment.

433.    By falsifying financial documents and incorporating them into official filings, the Defendants violated federal securities laws designed to protect investors and ensure market integrity. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) (clarifying the scienter requirement under Rule 10b-5 of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)).

434.    As discussed hereinabove, the Magnolias possesses a legitimate basis to initiate a private cause of action against Starrex and its executives for violations of federal securities laws. This assertion is grounded in the deliberate misconduct involving the forgery of financial documents and their presentation in regulatory filings, which materially misled investors, regulators, and the public, affecting Magnolias' operational and financial integrity.

435.    The Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 CFR § 240.10b-5), particularly Section 10(b) and Rule 10b-5, prohibits fraudulent activities in connection with the purchase or sale of securities. It is unlawful to make any false statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in any filing with the SEC (or in this case, through a dual-listing exemption). 15 U.S.C. §§ 78j(b) and 78ff; SEC Rule 10b-5. Rule 10b-5 explicitly forbids making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the context in which they were made, not misleading. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) (clarifying that while Section 10(b) and Rule 10b-5 do not explicitly provide a

Copy from re:SearchTX

private cause of action, ***such an action has been implied by judicial precedent, allowing victims of securities fraud to seek redress***) (bold and italicized emphasis added). Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) makes it unlawful for any person, directly or indirectly, to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe. *See also SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968, cert. denied, 394 U.S. 976) (interpreting Section 10(b) and Rule 10b-5 to apply broadly to actions that defraud investors). The named Defendants violated Rules 10(b) and Rule 10b-5. The named Defendants violated these federal securities regulations. Likewise, Defendants may have violated Section 17(a) (15 U.S.C. § 77q(a)) of the Securities Act of 1933 by making fraudulent, deceitful, or material misstatements on the parts of sellers in the offer or sale of securities. *See also Aaron v. SEC*, 446 U.S. 680 (1980) (clarifying Section 17(a)).

436. Additionally, Defendants should be aware that they may have committed violations of the Sarbanes-Oxley Act Violations (Public Company Accounting Reform and Investor Protection Act, 18 U.S.C. §§ 1514A, 7241). The CEO and CFO certifications by Merritt and Hill as well as the certifications and signatures by Hill as Chairman and Reeves as Director of financial reports that they know to be false could violate SOX provisions aimed at ensuring the accuracy of public company financial statements and disclosures.[21] Section 302 establishes criminal penalties for falsely certifying a report knowing it does not comply with all requirements. *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745. Additionally, Section 906 provides

---

[21] Most recently, on April 29, 2024, Charles Burns as Chief Executive Officer signed and filed a Form 52-109FV1 (along with Merritt), certifying that the annual Management and the Audited Financial Statements of Starrex despite the fact that it contains material misrepresentations. For instance, at Note 10 on page 29 of the Starrex International Ltd. Consolidated Financial Statements for December 31, 2023 and 2022, it is stated "The Company entered four agreements effective October 17, 2022, to provide operating capital through a revolving promissory note to title insurance companies." Financial Statements *available at* https://sedar-filings-backup.thecse.com/00002604/2404301127350866.pdf. This is patently false. The promissory notes were forged and (falsely) purported to be made to the order of Starrex Insurance—not Starrex International, Ltd. Moreover, no Starrex entity "entered into" any promissory notes. It is patently clear that the Company did not enter into any such promissory notes (or have such notes made to its order), forged or no,t with the Plaintiffs. Second, in the next sentence the Financial Statements describe the fictional notes as carrying a 6% per annum interest rate with a maturity date of June 23, 2023—another falsehood. Third, the Financial Statements further declare "[a]s at December 31, 2023, the Company recorded interest income of 269,674 . . . ." in referring to the forged promissory notes at issue. The Company received no such interest income and had no right to receive any such alleged interest income. Finally, on page 30 of the Financial Statements, it is written that the "loans receivable have been classified Stage 3 based on the default date of June 23, 2023." This is yet another misrepresentation.

Copy from re:SearchTX

criminal penalties for certifying a misleading or fraudulent financial report.  See Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745.

### CAUSE OF ACTION NO. 15: BY MAGNOLIA COMPANIES: CONSPIRACY (ALL DEFENDANTS)

437.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

438.     A civil conspiracy under Texas law is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, resulting in damages. *Operation Rescue-National v. Planned Parenthood of Houston and Southeast Texas, Inc.*, 975 S.W.2d 546 (Tex. 1998).

439.     In coordination with co-conspirators, the Defendants engaged in a concerted action to commit the aforementioned wrongful acts against the Magnolias. This conspiracy was bound by a common purpose to defraud, resulting in substantial damages to the Magnolias.

440.     Defendants had a meeting of the minds and acted to defraud the Magnolias by forging the promissory notes that are attached to Plaintiff's Original Petition, falsely presenting them time and time again to the public and regulators to the detriment of Magnolia and attempting to cover up such forgery and prevent its discovery until they could make a legal demand upon Plaintiffs.  Similarly, Defendants conspired to shut down Coast to Coast Title's and Sol City Title's operations and to completely take over, steal and misappropriate all rights, property and intellectual property (also including customers, transactions in progress and trademarks) owned by Magnolia Title Arkansas and Magnolia Title Florida while completely impersonating their operations and engaging in unfair competition.  They also conspired to tortiously interfere with the Magnolias' valuable contracts with their customers, vendors, underwriters, software providers, and others. They also conspired to cut off all IT and technical services, all access to emails and files, access to their phone number (delivered through Ring Central), and the mission-critical digital closing platform, all of which was to the serious detriment of the Magnolias but to the benefit of the Plaintiffs.  Plaintiffs were severely damaged as a result and seek all damages set forth herein and to which they are entitled.

Copy from re:SearchTX

<u>CAUSE OF ACTION NO. 16: BY MAGNESS:</u>
<u>FRAUDULENT INDUCEMENT</u>
<u>(TERRELL GARTH AND PHILLIP H. CLAYTON)</u>

441.    Plaintiff John Magness incorporates the foregoing paragraphs as if fully set forth herein.

442.    Defendant Tyrrell Garth and Phillip H. Clayton made numerous material misrepresentations and omissions of fact with the specific intent to fraudulently induce Magness into foregoing other lucrative employment opportunities, working without compensation based on illusory promises of future equity, and causing Magness and the Magnolia Entities he managed to pursue a sham corporate "acquisition" that Garth never intended to consummate.

443.    These false representations included, but were not limited to, the following:

    a.   Affirmatively misstating that Starrex International Ltd. would "raise $50 million in cash and a $50 million credit facility" to robustly finance the combined Starrex/Magnolia operations post-merger. In reality, no such capital raises or financing were ever contemplated.

    b.   Falsely promising Magness would be appointed CEO and awarded a Board seat at Starrex after the acquisition, with no ongoing involvement from Starrex's existing leadership. Garth knew this contradicted the undisclosed intentions of Starrex management to remain in control.

    c.   Misrepresenting Garth's purported ability to inflate Starrex's stock price over $5/share by summer 2023. Based on this fraudulent misstatement, Garth deceived Magness into believing he could forgo substantial cash compensation since his future Starrex equity would make him extremely wealthy.

    d.   Deceptively claiming Starrex planned to aggressively acquire title companies nationwide using the Magnolias as a platform, necessitating oppressive non-disclosure agreements with targets to facilitate a growth strategy Garth never intended to pursue.

444.    Garth further represented to Magness that a promissory note made by Magness and TPB for $100,000 to the order of Garth's wholly owned company, Superior Am Cap Investments, LLC, in connection only with $100,000 in consulting fees paid (rather than a direct payment) was made only for tax efficiency purposes and meant to be forgiven.  As an attorney, Garth further represented that Magness and TPB could pay taxes when, in fact, the note was forgiven and that Garth would absolutely direct his wholly owned company, Superior Am Cap Investments, LLC, to forgive and retire the note.  This turned out to be a lie.

Copy from re:SearchTX

445.     Each of these representations was knowingly false when made. Garth and Clayton harbored no genuine intention for Starrex to raise acquisition funds, install Magness in a leadership role, allow him to realize equity upside, or use the Magnolias as a pipeline for nationwide expansion. His true motive was to simply misappropriate Magnolia assets for his own benefit.

446.     Magness justifiably relied on Garth's and Clayton's fraudulent misrepresentations to his detriment by foregoing other lucrative employment and expending resources to operate the Magnolias in accordance with the misrepresented acquisition strategy, including Garth's bad faith demands to execute NDAs with targets. Garth's deception thus proximately caused Magness substantial harm in the form of lost earnings, wasted time/resources, and other damages.

447.     Garth's and Clayton's conduct constitutes fraudulent inducement under Texas common law. *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 369 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). His material false representations and omissions, made with knowledge of their falsity and intent to induce reliance, create liability for fraud. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

448.     Based on the fraudulent and malicious nature of Garth's and Clayton's deceptive conduct, Magness further seeks exemplary damages. Tex. Civ. Prac. & Rem. Code 41.003(a).

### CAUSE OF ACTION NO. 17: BY TPB:
### FRAUDULENT INDUCEMENT/DTPA
### (TERRELL GARTH)

449.     Plaintiff The Peabody Bulldog, LLC (TPB) incorporates the foregoing paragraphs as if fully set forth herein.

450.     In order to effectuate his scheme of divesting TPB's ownership of its valuable BSpoke entities and transferring those assets under his own control, defendant Tyrrell Garth perpetrated fraudulent misrepresentations and omissions to induce TPB to relinquish its equity.

451.     In mid-2022, Garth affirmatively misstated that TPB consolidating the BSpoke entities under the Magnolia companies Garth controlled would allow TPB's equity contributions to remain intact by being rolled into Starrex International Ltd. stock. Garth represented TPB would receive 3,000,000 shares of Starrex in exchange for giving up equity ownership in Bspoke Title Holdings recently valued at $2.2 - $2.4 million. This occurred at or around the time of a mediation involving TPB on or about June 1, 2022. TPB never received the stock. Garth represented himself at all times as an authorized corporate representative of Starrex who had the ability to grant, or

Copy from re:SearchTX

direct the grant of, these shares of Starrex to TPB. At the time of his promise, Garth seemingly never had any intention of following through.

452. Garth further represented to Magness that a promissory note made by Magness and TPB for $100,000 to the order of Garth's wholly owned company, Superior Am Cap Investments, LLC, in connection only with $100,000 in consulting fees paid (rather than a direct payment) was made only for tax efficiency purposes and meant to be forgiven. As an attorney, Garth further represented that Magness and TPB could pay taxes when, in fact, the note was forgiven and that Garth would absolutely direct his wholly owned company, Superior Am Cap Investments, LLC, to forgive and retire the note. This turned out to be a lie.

453. These representations were intentional fabrications. Garth knew them to be false when made, as he never intended to actually convey any Starrex shares to TPB or forgive its promissory note. His sole aim was to fraudulently induce TPB to surrender control of the BSpoke assets so Garth could improperly seize them.

454. Garth's failure to disclose his lack of authority and intent to provide TPB with Starrex equity as promised were material omissions made to reinforce his affirmative deceptions. Garth had a duty to disclose these facts to correct the false impressions created by his partial disclosures and misrepresentations. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001).

455. TPB justifiably relied on Garth's fraudulent statements and omissions by transferring its lucrative BSpoke ownership interests. Absent the false promises of Starrex shares as consideration and note forgiveness, TPB would not have relinquished these valuable assets. As a proximate result of Garth's fraud, TPB has suffered substantial economic losses from deprivation of the income streams, equity appreciation, and going concern value comprising its prior BSpoke holdings.

456. Garth's pervasive fraud constitutes fraudulent inducement under Texas common law. His false representations and misleading omissions, made knowingly and deliberately to deceive, create liability. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

457. Moreover, Garth's deceptive practices violated the Texas Deceptive Trade Practices Act (DTPA). His misrepresentations and failures to disclose were false, misleading and unconscionable actions that induced TPB to enter the BSpoke transfer transaction it otherwise would have avoided, constituting statutory "laundry list" violations under DTPA 17.46(b) and 17.50(a)(1) and (3).

Copy from re:SearchTX

458.    Because Garth committed these DTPA violations knowingly and intentionally as part of an extended scheme to defraud TPB across multiple transactions, TPB is entitled to recover treble economic damages under DTPA 17.50(b)(1), as well as reasonable and necessary attorneys' fees under DTPA 17.50(d).

459.    Based on the egregious and malicious nature of Garth's deliberate, ongoing fraud, TPB also seeks exemplary damages. Tex. Civ. Prac. & Rem. Code 41.003(a).

## VIII.
### EXEMPLARY DAMAGES
### (ALL DEFENDANTS)

460.    Plaintiffs are entitled to exemplary damages.

461.    Fraud, as well as malice, is a ground for recovery of exemplary damages. Tex. Civ. Prac. & Rem. Code § 41.003(a)(1). As a predicate for recovery of exemplary damages, fraud is defined as "fraud other than constructive fraud." Tex. Civ. Prac. & Rem. Code 41.001(6).

462.    Section 41.008 of the Civil Practice and Remedies Code limits recovery of exemplary damages. However, these limitations will not apply in favor of a defendant found to have "knowingly" or "intentionally" committed conduct described as a felony in specified sections of the Texas Penal Code. See Tex. Civ. Prac. & Rem. Code 41.008(c), (d).

463.    Additionally and alternatively, Defendants acted with malice, permitting the recovery of exemplary damages. *See* Tex. Civ. Prac. & Rem. Code 41.003(a)(3).  Malice is the specific intent to cause substantial injury to the plaintiff or an act or omission by a defendant (a) which when viewed objectively from the standpoint of the defendant at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others or (b) of which the defendant has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

464.    Additionally and alternatively, the gross negligence or malice of a defendant employee should be imputed to the corporate employer.  A principal or master is liable for exemplary or punitive damages because of the acts of his agent, but only if: (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved

Copy from re:SearchTX

the act. *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex. 1967); *see also Bennett v. Reynolds*, 315 S.W.3d 867, 883-84 (Tex. 2010); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997).

465.    Pleading further, the limitation or cap on exemplary damages should be lifted because the Magnolias' damages are based on conduct "described as a felony" in Tex. Penal Code 32.21.  *See* Tex. Civ. Prac. & Rem. Code § 41.008(c).  Specifically, the value of property or service that is the subject of the violation actions is $2,500 or more.  Tex. Pen. Code § 32.21 (e-1)(4)-(7).

466.    Pleading further, the limitation or cap on exemplary damages should be lifted because the trade secrets were stolen from the Magnolias in violation of Texas Penal Code § 31.05. The theft of these trade secrets rises to the level of a felony because the value of the trade secrets is worth more than $30,000.  *See* Tex. Penal Code 31.03(e)(5) (defining general criterion for third-degree felony); Tex. Civ. Prac. & Rem. Code 41.008(c)(13) (lifting cap on exemplary damages when theft is at a level of a third-degree felony or higher).

## IX.
## RESERVATION OF RIGHT TO REQUEST SPOLIATION INSTRUCTION/ADVERSE INFERENCE

467.    Plaintiffs' investigation is ongoing.  As such, they reserve the right to move for an instruction for an adverse inference resulting from spolitation, including but not limited to the intentional spoliation, manipulation, deletion, erasure, or modification of electronic evidence.  *See, e.g., Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 23-26 (Tex. 2014).  Specifically, Plaintiffs may show that Defendants (a) had a duty to preserve the evidence at issue, (b) breached that duty, and (c) this has caused prejudice to Plaintiffs.  *Id.* at 20.  Plaintiffs may show that the evidence that has been spoliated is electronic in nature and may also consist of communications.  Further, Plaintiffs would show that the spoliated evidence was relevant to key issues in the case, the effect of the evidence on the spoliating party's case was harmful and/or would have been helpful to Plaintiffs' case, and the spoliated evidence was not cumulative.  *Id.*; *see also Petroleum Solutions, Inc. v. Head*, 454 S.W.3d 482 (Tex. 2014).

Copy from re:SearchTX

## X.
### DISCOVERY RULE

468.    To the extent Defendants assert that any applicable statute of limitations bars any of the Plaintiffs' causes of action, Plaintiffs plead the discovery rule to toll such statute of limitations.

469.    "The discovery rule is limited to those rare "circumstances where 'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.' " *Latouche v. Perry Homes, LLC*, 606 S.W. 3d 878, 883 (Tex. App.–Houston [14th Dist.] 2020, citing *Cosgrove v. Cade*, 468 S.W.3d 32, 36 (Tex. 2015) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996)).

470.    As one court put it, the discovery rule exception applies "where plaintiff possesses an inherently undiscoverable cause of action, which is not considered to accrue until plaintiff discovers or through the exercise of reasonable care and diligence should discover the nature of an injury." *Casarez v. NME Hosps*., Inc., 883 S.W.2d 360, 364 (Tex. App.—El Paso 1994, writ dism'd by agr.) (citing *Moreno*, 787 S.W.2d at 351; *Weaver*, 561 S.W.2d at 794). In this matter, both prongs are met.

471.    Inherently Undiscoverable. "An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence.'" *Via Net v TIG Ins. Co.,* 211 S.W. 3d 310, 313-14 (quoting *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734-35 (Tex. 2001)).  Homeowners could not have discovered the deficient and defective condition of the Property until they became clearly apparent to them.

472.    Objectively Verifiable. Defendants have been on notice regarding the date of accrual for Plaintiffs' claims because Defendants caused the accrual.


## XI.
### FRAUDULENT CONCEALMENT

473.    Pleading further and in the alternative, to the extent Defendants assert that any applicable statute of limitations bars any of Plaintiffs' causes of action, Plaintiff pleads fraudulent concealment to toll such statute of limitations.

Copy from re:SearchTX

474.    "The fraudulent concealment doctrine, unlike the discovery rule, resembles equitable estoppel." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex. 2001) (citing *Comput. Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex. 1996)).

475.    Because "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run," *S.V. v R.V.*, 933 S.W. 2d 1, 6 (Tex. 1996), a "defendant's fraudulent concealment of wrongdoing may toll the statute of limitations after the cause of action accrues." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011).

## XII.

### CONDITIONS PRECEDENT

476.    All conditions precedent have been performed or have occurred as required by RULE 54 of the TEXAS RULES OF CIVIL PROCEDURE.

## XIII.
### DESIGNATION OF EXPERTS

477.    Plaintiffs hereby designate their attorneys as their expert(s) to testify as to reasonable and necessary attorneys' fees and costs incurred by Plaintiffs in the preparation, discovery, and trial of this suit in furtherance of Plaintiffs claims.  Such attorneys may also provide rebuttal testimony as to any expert designated by any Defendant, if any, on the subject of attorney's fees and costs. The attorneys' resumes are available upon request and their biographies are available on linkedin and at www.hchlawyers.com.  Plaintiffs also designate any other counsel associated with the undersigned law firm who may be handling this suit at the time of trial as his expert on the issue of reasonable and necessary attorneys' fees incurred by Plaintiffs in this lawsuit.

## XIV.

### DEMAND FOR JURY TRIAL

478.    Plaintiffs demand a trial by jury and will tender the fee contemporaneous with the filing of this petition.

Copy from re:SearchTX

## XV.

### ATTORNEY'S FEES

479.    Plaintiffs were required to retain the services of the undersigned counsel to prosecute this lawsuit.

480.    Plaintiffs seek to recover their reasonable and necessary attorney's fees incurred in the prosecution of this lawsuit.

481.    Pursuant to contracts between the parties, as referenced above and Section 38.001 of TEX. CIV. PRAC. & REM. CODE, as well as the Texas Business and Commerce Code and the Texas Deceptive Trade Practices Act, Plaintiffs are entitled to seek reasonable and necessary attorney's fees and court costs.  Plaintiffs will also seek pre-judgment and post-judgment interests pursuant to Sections 302.002 and 304.003 of the Texas Finance Code.

## XVI.

### NOTICES

### A.  TRCP 193.7 Notice

482.    Plaintiffs hereby gives notice to all parties that they intend to use any and all documents that are produced by a party against that party in pretrial proceedings or at trial pursuant to Texas Rule of Civil Procedure 193.7.

### B.  TRE 902(10) Notice

483.    Pursuant to Subsection 10 of Section 902 of the Texas Rules of Evidence, Plaintiffs hereby give notice to all parties that they intend to file with the court an affidavit with business records of Plaintiffs that they intend to introduce at trial.  At the time of filing of said affidavit, the business records and affidavit will be produced to all counsel or made available for inspection and copying at the office of Plaintiffs' attorneys.   As provided by Rule 902(10), the expense for copying will be borne by the party seeking copies.

Copy from re:SearchTX

## C. <u>TRCP 203(b) Notice</u>

484.    Pursuant to Rule 203(b), Plaintiffs hereby give notice to all parties that they intend to offer the deposition testimony of all witnesses at trial as rebuttal evidence in anticipation of each witnesses' expected testimony. Plaintiffs reserve the right to introduce other documents as rebuttal evidence the anticipation for use of which <u>cannot be made at this time.</u>

## D. <u>TRE 609 Notice</u>

485.    <u>TRE 609</u>. Pursuant to TRE 609, request is hereby made for written notice of intent to use evidence of a conviction, if any, against any of the witnesses named by any party to this lawsuit, as persons with knowledge of relevant facts. Sufficient advance written notice of intent to use such evidence is requested to provide a fair opportunity to contest the use of such evidence. Said notice is requested not later than thirty (30) days before trial.

## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Arkansas, Ltd., Magnolia Title Florida, LLC, John Magness, and The Peabody Bulldog, LLC, pray for judgment against Defendants as requested herein, along with:

a.    Actual damages;

b.    Additional damages, including but not limited to treble damages, as allowed by Texas Business & Commerce Code § 17.50(b)(1) due to certain Defendants' knowing and/or intentional conduct pursuant to the Texas Deceptive Trade Practices Act;

c.    Exemplary damages due to certain Defendants' fraudulent conduct that is the subject of causes of action sounding in fraud;

d.    Reasonable and necessary attorneys' fees;

e.    Pre-judgment and post-judgment interest as provided by law;

f.    Costs of Court;

g.    Treble economic damages, as applicable;

h.    Treble mental anguish damages, as applicable; and

i.    All other relief to which Plaintiffs may be entitled.

Copy from re:SearchTX

Respectfully submitted,

**HENDERSHOT COWART P.C.**

By: */s/ Simon W. Hendershot, III*
    SIMON W. HENDERSHOT, III
    SBN: 09417200
    trey@hchlawyers.com
    Ian F. McNeil
    SBN: 24041459
    IMcNeil@hchlawyers.com
    Philip D. Racusin
    SBN: 24054267
    pracusin@hchlawyers.com
    1800 Bering Drive, Suite 600
    Houston, Texas 77057
    Telephone: (713) 783-3110
    Facsimile: (713) 783-2809

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served on all parties through counsel of record pursuant to Rule 21a of the Texas Rules of Civil Procedure on June 3, 2024.

               */s/ Philip D. Racusin*
               Philip D. Racusin

Copy from re:SearchTX

# EXHIBIT A

Copy from re:SearchTX

CASE NO. 2023-85306

| | | |
|---|---|---|
| STARREX INTERNATIONAL LTD., STARREX INSURANCE HOLDINGS, INC., STARREX HOLDINGS, INC., AND STARREX INSURANCE SERVICES, INC. | §<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| PLAINTIFFS, | §<br>§ | HARRIS COUNTY, TEXAS |
| V. | §<br>§ | |
| COAST TO COAST TITLE, LLC, SOL CITY TITLE, LLC, MAGNOLIA TITLE ARKANSAS, LTD., AND MAGNOLIA TITLE FLORIDA, LLC | §<br>§<br>§<br>§<br>§ | 11TH JUDICIAL DISTRICT |
| DEFENDANTS. | § | |

## <u>DECLARATION OF JOHN MAGNESS</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

The following unsworn declaration is made pursuant to Section 132.001 of the Texas Civil Practices & Remedies Code:

1.     "My name is John Magness.  I am over 21 years of age, of sound mind and competent to make this declaration. I have never been convicted of a crime and have personal knowledge of the facts stated below, which are true and correct. I declare under penalty of perjury that the statements below are true and correct.

2.     I am the Manager of Defendants Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Arkansas, Ltd., and Magnolia Title Florida, LLC.

3.     I deny the genuineness and authenticity of the signatures in the Revolving Promissory Note for Coast to Coast Title, LLC, the Revolving Promissory Note for Sol City Title, LLC, the Revolving Promissory Note for Magnolia Title Arkansas, Ltd., and the

Copy from re:SearchTX

Revolving Promissory Note for Magnolia Title Florida, LLC, which are attached as Exhibits 1, 2, 3 and 4 to Plaintiffs' Original Petition (collectively, the "Alleged Promissory Notes"). The purported signatures on these documents are not genuine, nor were they authorized in any capacity.

4.      Counsel for Plaintiffs Starrex International Ltd., Starrex Insurance Holdings, Inc. Starrex Holdings, Inc. and Starrex Insurance Servies, Inc. (collectively, "Plaintiffs") has sent a single screenshot image of what Plaintiffs purport to be a genuine, short text message exchange between Debbie Merritt and I in which Plaintiffs claim I authorize Ms. Merritt to place my signature on the Alleged Promissory Notes for Defendants and somehow bind all Defendants to these terms on April 19, 2023.   I knew that a Supermajority Vote and the consent of HMH Title Investments, LLC ("HMH") was necessary to approve the Alleged Promissory Notes, and on information and belief, so did Ms. Merritt.

5.      I have no reason to assume the screenshot sent by Plaintiff's counsel is genuine. It is a mere image.  It contains no proof of authenticity.  I do not recall sending any such text message and do not believe I would or could authorize someone to place my signature on the Alleged Promissory Notes, which are backdated to October 17, 2022, and which amount to a total of $4,000,000 in debt obligations.

6.      Further, I deny that I authorized Ms. Merritt to place my signature and bind Defendants to the Alleged Promissory Notes.  I deny that Defendants had granted authority to enter into the Alleged Promissory Notes pursuant to the Company Agreements of each Defendant and the Letter Agreements dated on or about September 9, 2022, modifying such Agreements then in place, known as the "Side Letters."

7.      On information and belief, Ms. Merritt is fully aware of the corporate governance

Copy from re:SearchTX

requirements of the Defendants, including the Side Letters that modify the Company Agreement of each Defendant, and knows she did not obtain authority or consent as required. On information and belief, Ms. Merritt knows that no shareholder vote was taken as required and she knows that a Supermajority Vote and HMH's consent was not obtained, which was required to authorize and bind the Defendants to the Alleged Promissory Notes. On information and belief, Ms. Merritt's involvement prior and her subsequent actions and communications demonstrate her knowledge of these corporate requirements.

8.    Ms. Merritt and Plaintiffs never sent any draft copies of the Alleged Promissory Notes for review by Defendants' shareholders despite having numerous communications with them around that time. Thereafter, Ms. Merritt and Plaintiffs never sent executed copies of the Alleged Promissory Notes to the shareholders until September 8, 2023. (I have seen an email sent from Ariane Young, counsel for Plaintiffs, on August 23, 2023, to attorney Adam Fulkerson, which attached a single copy of the Alleged Promissory Note for Coast to Coast Title, LLC, while she was attempting to convince the shareholders of Defendants to execute "amended and restated" promissory notes.)

9.    The first time I saw executed copies of the Alleged Promissory Notes was when Plaintiffs' counsel sent a demand to Defendants on September 8, 2023, by email, demanding that Defendants pay the Alleged Promissory Notes. My immediate response to that as well as that of the owner of Defendants' shareholder HMH, was that these Alleged Promissory Notes were not authorized and were unenforceable. This was communicated to the Plaintiffs' management, including Merritt, and they have been aware of Defendants' position for many months. Yet, only recently has Plaintiffs' counsel produced a single screenshot of the alleged aforementioned text message exchange.

Copy from re:SearchTX

10.     There are additional irregularities.  Although the total face value of the Alleged Promissory Notes is $4,000,000 and Plaintiffs claim they were executed on April 19, 2023, Plaintiffs did not thereafter provide Defendants with $4,000,000 or any amount substantially similar.  As of the making of this Declaration, Plaintiffs have not produced to Defendants "original" electronic copies of any of the Alleged Promissory Notes.  Further, upon review of the metadata of the Alleged Promissory Note for Coast to Coast Title, LLC (sent by Ariane Young on August 23, 2023 to Adam Fulkerson) and the drafts created by Terrell Garth as seen in the emails produced by Plaintiffs, the Alleged Promissory Notes appear to have all been created on April 18, 2023, and as to the Coast to Coast Title, LLC note sent by Ariane Young, modified on May 2, 2023.  Notably, three of the Alleged Promissory Notes specify mandatory venue as Harris County, but the Magnolia Title Florida, LLC note specifies Jefferson County as the mandatory venue.  Mr. Garth lives in Jefferson County.

"My name is John Ardry Magness.  My date of birth is May 4, 1959, and I have a business address at 2 Cardwell Ct., Houston, TX 77055.   I declare under penalty of perjury that the facts stated in this document are true and correct."

Executed in Harris County, Texas, on  Apr 4, 2024                              .


John Ardry Magness (Apr 4, 2024 17:59 CDT)

John Magness

Copy from re:SearchTX

# 2024-04-04 Declaration of John Magness 4893-4697-3108 FINAL

Final Audit Report                                          2024-04-04

| | |
|---|---|
| Created: | 2024-04-04 |
| By: | Philip Racusin (pracusin@hchlawyers.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAWCWCsyrnh4P-TqmNWqwPrzJDyB6X-wrj |

## "2024-04-04 Declaration of John Magness 4893-4697-3108 FINAL" History

Document created by Philip Racusin (pracusin@hchlawyers.com)
2024-04-04 - 10:32:02 PM GMT

Document emailed to John Ardry Magness (johnmagness1020@gmail.com) for signature
2024-04-04 - 10:32:06 PM GMT

Email viewed by John Ardry Magness (johnmagness1020@gmail.com)
2024-04-04 - 10:48:18 PM GMT

Document e-signed by John Ardry Magness (johnmagness1020@gmail.com)
Signature Date: 2024-04-04 - 10:59:28 PM GMT - Time Source: server

Agreement completed.
2024-04-04 - 10:59:28 PM GMT

Adobe Acrobat Sign

Copy from re:SearchTX