IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COAST TO COAST TITLE, LLC, SOL CITY TITLE, LLC, MAGNOLIA TITLE ARKANSAS, LTD., MAGNOLIA TITLE FLORIDA, LLC, THE PEABODY BULLDOG LLC, AND JOHN MAGNESS<br>*Plaintiffs* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| V. | §<br>§ | CIVIL ACTION NO.:4:24-cv-27679 |
| TYRELL L. GARTH, PHILLIP H. CLAYTON, DEBBIE MERRITT A/K/A DEBORAH MERRITT, MATTHEW D. HILL, CHARLES BURNS, P. GARRETT CLAYTON, SCOTT M. REEVES, ARIANE E. YOUNG, TINGLEMERRITT, LLP, STARREX TITLE FLORIDA, LLC, LAURIE COOPER, MARKETSTREET CAPITAL PARTNERS AR, LLC AND BRIAN A. BREWER<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

## DECLARATION OF BRITT NAPONIC

I, Britt Naponic, declare as follows:

1. I am over 18 years of age, of sound mind, and competent to make this declaration. I have personal knowledge of the facts stated herein, and they are all true and correct.

2. I am the General Counsel for Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Florida, LLC, and Magnolia Title Arkansas, Ltd. (collectively, "Magnolia Entities"). I have held this position since January 2022. Prior to this, I served as general counsel of BSpoke Title Holdings since October 2020, when the Magnolia Entities were created as follows: Sol City Title,

LLC (formed prior but transitioned to a full service title agency), Coast to Coast Title, LLC (December 9, 2020), Magnolia Title Florida, LLC (September 27, 2021), and Magnolia Title Arkansas, Ltd. (October 20, 2021).

3.   In my role, I am intimately familiar with the Magnolia Entities' business operations, data storage practices, confidential information, and trade secrets. The Magnolia Entities are title insurance agencies primarily involved in closing real estate transactions for the purpose of issuing title insurance policies.

4.   The Magnolia Entities utilize software developed and hosted by Qualia Labs, Inc., named "Qualia Core," a digital real estate closing platform, to manage their essential business operations and store proprietary information. At all relevant times, Qualia Labs, Inc.'s Texas office has been located in Austin, Texas, physically hosting the Magnolia Entities' data in Texas. Further, the particular deployment of Qualia Core containing the Magnolia Entities' data was originated and located in Texas.

5.   Defendant Laurie Cooper joined the Magnolia Entities, including Magnolia Title Florida, LLC and Magnolia Title Arkansas, Ltd. ("Magnolias Florida and Arkansas") at the time of their inception. John Magness is the Manager of the Magnolia Entities.  Cooper had previously worked for John Magness at Stewart Title and brought some employees in Arkansas and Florida with her, forming a core group from Stewart Title.

6.   During her employment with Magnolias Florida and Arkansas, Cooper, as President of these entities, had access to the Magnolia Entities' proprietary business information, trade secrets, and confidential data stored on the Qualia servers in Austin, Texas. This proprietary information includes, but is not limited to, customer lists, financial data, transaction histories, transactions in progress, banking information, business performance and accounting data, and closing procedures.

7.   In the title insurance industry, customer lists are considered highly valued, proprietary information. These lists, which include contact information, transaction histories, and other critical business data, are equivalent to a highly valuable, proprietary Rolodex of contacts and customers. This information is one of the most sought-after assets in our industry.

8.   Similarly, examination information compiled and kept in the company's records, cloud drives, and Qualia system is also highly valued, proprietary trade secret information. This examination information is not publicly available and contains proprietary, professional work product and opinions. Title insurance agencies, usually pay substantial sums to digital platforms for subscriptions to access this type of proprietary examination information data.  To recreate anything like it would require many hours of work and specialized knowledge and involve such tasks as locating the sources of the base-level information, traveling to physical locations, such as clerk's offices, to gather relevant information, then the time and skills to analyze the information, compile it, professionally assess the connections between the information, and generate opinions and accurate compilations.  The Magnolia Entities' proprietary examination information is not publicly available and portions were obtained under an exclusive, paid-for license that required Magnolia Entities to safeguard and take concerted action to protect such information.   Likewise, the Magnolia Entities had a duty to protect non-public, private information in accordance with ALTA's best practices and CFPB regulations, yet on information and belief, Cooper and MarketStreet—using Cooper's special access as President—took all of this information away from the Magnolia Entities without authorization.

9.   Cooper had continuous connections with Qualia and management people in Texas. All management personnel, including myself, John Magness, and other executives and top-level employees of the Magnolia Entities, were based in Texas. Conference calls happened with great

frequency, especially when working on Qualia reports and the Draycott analysis. She also had constant contact and communication with the Magnolia Entities' corporate management and executives, including me, John Magness, and the Presidents of Magnolias in Texas as well as other executives.

10. Throughout her employment with Magnolias Florida and Arkansas, Cooper regularly accessed and utilized the proprietary information stored on the Texas-based Qualia servers to perform her job duties. As President of these entities, Cooper was required to use the Qualia platform continuously throughout each working day, as it is essential software for managing real estate closings and related operations.

11. Cooper's access to the Texas-based servers was continuous and systematic, occurring on a daily basis from the start of her employment until her resignation on or about February 2, 2024. The nature of her role as President necessitated constant interaction with the Qualia platform to oversee and manage the operations of Magnolia Title Florida, LLC and Magnolia Title Arkansas, Ltd.

12. Cooper was in frequent communication with Texas-based personnel. She constantly talked and worked with Anelle Sena, Controller in Texas, and prior to Anelle, Janna Nutt, Controller in Texas. Cooper was always on phone calls with the Presidents of the Texas Magnolia entities, constantly, and spoke with John Magness several times a day. She frequently worked with Patricia Rissanen, the President of Texas Operations, to find opportunities to work together and allocate business expenses amongst the Magnolia Entities.

13. I worked closely with Cooper all the time. She was very protective of her information and would only allow very few people, including me, to access certain data. I spoke with her frequently, and she was in constant communication with John Magness.

14. Cooper participated in numerous conference calls and virtual meetings with Texas-based employees and representatives of the Magnolia Entities. These meetings often involved discussions of confidential business strategies and proprietary information stored on the Texas-based Qualia servers.

15. During these calls and meetings, Cooper frequently referenced her access to, and use of, the Texas-based Qualia platform and the proprietary information stored therein, highlighting the importance of this Texas-based resource to her daily operations as President of Magnolias Florida and Arkansas. Additionally, through her numerous and constant interactions with the Texas-based Magnolia Entities' executives, learned proprietary and confidential strategic information generated in Texas, which she then took to her new employer, MarketStreet Capital Partners, LP, a Texas-based company.

16. Cooper made decisions to hire employees and send out offers she signed as Division President of Magnolia Title. Significantly, these offer letters bore a Houston, Texas address on the letterhead, further demonstrating the Texas-centric nature of the Magnolia Entities' operations. Attached as **Exhibit A** is a true and correct copy of an "Offer of At-Will Employment" letter dated June 24, 2022, for a position with Magnolia Title Florida, LLC. This offer letter, which Cooper signed as Division President, prominently displays "Magnolia Title, 14701 Saint Mary's Lane Ste 150, Houston, Texas 77079" at the top.

17. Attached as **Exhibit B** is a true and correct copy of an email dated June 24, 2022, from Laurie Cooper to Debbie Merritt and John Magness. In this email, Cooper states, "I will be extending this offer to this escrow officer. She will bring approx. $55,000 monthly gross revenue." The attached offer letter is the same as the one in Exhibit A. This email and attachment demonstrate that although Cooper was President of Magnolia Title Florida, LLC and Magnolia

Title Arkansas, Ltd., she was sending out employment contracts for Magnolia Title with a Houston, TX address on the letterhead, further evidencing the Texas connections of her role.

18. By accepting her own offer of employment, starting in the position, accepting a salary, and performing the role, Cooper acknowledged the existence of proprietary information and agreed to protect it. A true and correct copy of the employment offer letter made to Cooper is attached as **Exhibit C**. This offer letter, which Cooper received and accepted by starting her position as President, includes language regarding the confidentiality of Magnolia Title's information and Cooper's duty to protect it. Cooper had an obligation to maintain the confidentiality of Magnolia Title's proprietary information and on information and belief, was put on notice that she would receive access to confidential and proprietary information and trade secrets, which includes the valuable customer lists and examination information discussed earlier.

19. In February 2024, I became aware that Cooper had facilitated the unauthorized transfer of the Magnolia Entities' proprietary data from the Texas-based Qualia servers to systems or a deployment belonging to MarketStreet Capital Partners, LP and MarketStreet Capital Partners AR, LP (collectively, "MarketStreet"). MarketStreet Capital Partners, LP has generally appeared in this lawsuit without challenging jurisdiction and is a Texas limited partnership. Therefore, Cooper provided the Magnolia Entities' proprietary data to a Texas-based company. Additionally, it was then confirmed to me in February 2024 that Cooper was employed by the Texas-based MarketStreet Capital Partners, LP, which obtained an assumed name of "Magnolia Title Company" in Florida and has operated as though it is Magnolia Title Florida, LLC.

20. Through my investigation, I discovered that Cooper continued to access the Qualia platform immediately after her resignation on February 2, 2024. Upon facilitating the mass resignation of numerous Magnolia employees, she caused them to achieve uninterrupted access to

the Qualia platform containing our confidential and proprietary data for her benefit and the benefit of her employer, MarketStreet.

21. On information and belief, Cooper, along with MarketStreet, appear to be accessing the same deployment or a mirror image of our deployment of Qualia containing Magnolia Entities' proprietary information.

22. The Magnolia Entities last paid for their Qualia subscription on December 21, 2023, in the amount of $33,374.75, which covered usage through March 2024. This substantial payment demonstrates the critical importance of the Qualia platform to our operations and Cooper's daily activities. Attached as **<u>Exhibit D</u>** is a true and correct copy of an email dated December 20, 2023, in which Cooper arranged for this payment from Magnolia Florida to Qualia for the benefit of all Magnolia Entities by ACH from the Magnolia Florida operating account.

23. Attached as **<u>Exhibit E</u>** is a true and correct copy of an email dated December 21, 2023, in which Cooper again raised the issue of the quarterly payment of $33,374.75 to cover the first quarter of 2024. In this email, Cooper acknowledged the necessary monetary transfers between the Texas, Florida, and Arkansas-based Magnolia Entities relating to the Qualia payment.

24. Less than 45 days after arranging this payment, Cooper resigned and immediately joined competitor MarketStreet. On information and belief, MarketStreet used the Qualia deployment for which the Magnolia Entities had already paid $33,374.75 in December 2023, which would cover usage through March 2024.

25. After Cooper's resignation, I discovered evidence that Cooper had directed the unauthorized transfer of a large amount of proprietary information from the Texas-based Qualia servers to a Qualia deployment used by MarketStreet. This included confidential business and client information, including the highly valuable customer lists and examination information

previously described.  We do not even know the full extent of everything she has taken to MarketStreet and our investigation is ongoing.

26. After her resignation on February 2, 2024, we discovered that Cooper continued to use Magnolia Entities' misappropriated trade secrets and confidential information to compete directly with the Magnolia Entities. Specifically, MarketStreet offered competitive services using our proprietary procedures and targeted our clients using our confidential information.  In fact, on information and belief, MarketStreet and Cooper represented to the public, customers, and others that they were Magnolia Title Florida, LLC and likewise continued the transactions in progress hosted on Qualia as though nothing at all had changed.  Additionally, on information and belief, Cooper and MarketStreet took other valuable property from the Magnolias Entities, including but not limited to their social media accounts, web presence, good will, phone numbers, and logos.

27. The misappropriation of our trade secrets and confidential information has caused significant harm to the Magnolia Entities. In conjunction with other actions taken against the Magnolias by other parties, the businesses were irreparably harmed and forced to wind down in accordance with insurance regulations and state law.

28. Cooper committed at least some of these acts while employed by MarketStreet Capital Partners, LP, a Texas-based limited partnership. The Texas-based company of MarketStreet Capital Partners, LP has confirmed that it employed Cooper immediately after she resigned as President of Magnolias Florida and Arkansas. Cooper is still an employee of MarketStreet and has been since her resignation as President in February 2024.

29. Given Cooper's use of Texas-based letterhead for official company business, her frequent communications with Texas-based management, her access to and use of Texas-based servers containing proprietary information, and her subsequent employment with a Texas-based

competitor, it is clear that Cooper's actions were substantially connected to the state of Texas and caused harm to Texas-based business interests.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ____Sep 20, 2024_____ in Houston, Texas.

Britt Naponic (Sep 20, 2024 18:21 CDT)

Britt Naponic

# EXHIBIT A



Magnolia Title
14701 Saint Mary's Lane Ste 150
Houston, Texas 77079

**Offer of At-Will Employment**

June 24, 2022

Heather Parker
Musiclady8963@yahoo.com
941.773.7082

Dear Heather:

I am pleased to extend you ("you" or "Employee") a formal offer to join "Magnolia Title Florida DBA Magnolia Title" (the "Company") as an "at-will" employee beginning July 2022. As an "at will" employee of the Company, your employment will be subject to immediate termination by either party with or without notice or cause. Your employment also will be subject to the employment policies of the Company as adopted from time to time by Management. Such policies shall control in the event of a conflict between such policies and the terms of this offer. You will report to the Bradenton Branch Manager, Sarah Duff.

1.   <u>Compensation and Benefits</u>. During the term of your employment as Escrow Officer by the Company ("Employment"), you will be provided a compensation package as detailed below:

(a)   <u>Base Compensation</u>. During your Employment, the Company will compensate you at an annual rate of $65,000 (the "Base Compensation") payable in accordance with the Company's customary payroll policies, which amounts shall be subject to applicable withholding deductions required by law and other deductions authorized by you. You will also receive three percent commission. Commission will be paid on closed orders generated by you. The commission is calculated on the net title premium (premium less underwriting remittance) plus escrow fees.

Commissions will be paid in the month following the closed transaction.

In addition, you will receive a $500 per month allowance for car and cell phone, payable in accordance with standard payroll practices.

(b)   <u>Policies and Benefits</u>. Your Employment will be subject to all of the policies applicable to the other employees of Company generally as adopted from time to time by the Company. Employee benefits will include health insurance for you and your immediate family under the insurance plan made available to the Company's employees generally and the receipt of such other benefits available to employees of the Company generally.

(c)   <u>Reimbursements</u>. You will be eligible for reimbursement of all approved business expenses in accordance with Company policies as adopted from time to time by the Company.

(d)   <u>Paid Time Off</u>. You are eligible for 80 hours of paid time off for 2022 and 160 hours per year beginning 2023.

Page 1

STARREX036580

(e)       Company Issued Equipment.  The Company may, at its discretion, issue equipment for use at a remote location.  You are responsible for the proper care and maintenance of any Company issued equipment as set forth in the Company's Telecommuting Policy.  Where permissible by law, the Company reserves the right to deduct the cost of all non-returned Company equipment upon termination.

2.       Confidentiality and Non-Disclosure Agreement.   Employee agrees that effective immediately and during and following Employee's employment with the Company, Employee shall hold in strictest confidence and shall not make use of or disclose, directly or indirectly, to any person, firm, corporation, partnership, agency, commission, institution, or other entity, any Trade Secret or other Confidential Information relating to any business, product or service of the Company.  Concurrent with the execution of this Agreement, the Company has provided Confidential Information to Employee in exchange for Employee's Agreement to keep such Confidential Information, and any Confidential Information to which Employee has already become privy or is hereafter disclosed to Employee by the Company in strict confidence as provided in this Agreement.

(a)       As used in this Agreement, "Confidential Information" means information, whether written or oral, known or received by Employee that relates to the Company and is not generally available to the public, or which would reasonably be considered confidential and/or proprietary, including, without limitation, all agreements, drafts of agreements, budgets, blueprints, coding sheets, concepts, costs, customer lists and data, data, demonstrations, designs, developments, documents, drawings, email addresses and names, estimates, files, financial information and statements, financing structures, flowcharts, forecasts, formulae, hardware, ideas, improvements, information, inventions, know-how, layouts, letters, licenses, listings, marketing plans, marks, memoranda, methods, microcode, notes, object codes, plans, prices, price lists, pricing policies, procedures, processes, product plans and names, programs, proposals, prototypes, reports, research and development information, schematics, service marks, sketches, software, source codes, specifications, strategies, subroutines, suggestions, systems, tangible materials, techniques, trademarks and tradenames relating to the Company and any other materials that relate to the Company, all whether or not copyrightable or copyrighted, patentable or patented, registrable or registered or otherwise, and in each case including all documents or other media in which such Confidential Information resides or is embodied.

(b)       As used in this Agreement, the term "Trade Secret" means information including a program, device, method, technique or process that: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(c)       Without express prior written authorization of the Company, Employee may disclose the Confidential Information and Trade Secrets protected by this Section 2 only to the extent that Employee is required to make such disclosure by law and is ordered by a court or administrative agency of competent jurisdiction to make such disclosure.

(d)       Information that is generally known to the Company's competitors or to the general public by means other than disclosure by Employee or any agent of Employee shall not be considered confidential for purposes of this paragraph.

(e)       Employee recognizes and agrees that he or she has no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without

Heather Parker
Page 2

STARREX036581

limitation, stored computer files, e-mail messages, voice messages or otherwise) and that Employee's activities and any files or messages on or using any of those systems may be monitored at any time without notice.

(f)      Immediately upon termination of Employee's employment with the Company, whether voluntary or involuntary, or at any other time designated or requested by the Company, Employee will immediately surrender to the Company without demand all items that contain or constitute Confidential Information or Trade Secrets as well as all originals and all copies of all manuals, memoranda, notes, records, files and other documents obtained by Employee during his or her employment with the Company which relate in any way to the Company, its businesses and operations, and its customers and suppliers. Employee acknowledges that such information is, and shall remain, property of the Company.

(g)      Employee acknowledges and agrees that the amount of actual damages suffered by the Company and its affiliates in the event of an actual or threatened breach of this Section 2 will be difficult or impossible to accurately calculate and there will not be an adequate remedy at law available to fully compensate such Person in the event of such an actual or threatened breach.  Consequently, Employee, agrees that in addition to any other remedy or relief to which it may be entitled, in the event of a breach or threatened breach of this Section 2, the Company and its affiliates shall be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security), and neither the breaching party nor any of their affiliates will oppose the granting of any such relief on the ground(s) that the Company and its affiliate has an adequate remedy at law, has not proven actual damages, and/or should be required to post a bond or other security.

(h)      If any provision contained in this Section 2 is, for any reason, held invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provisions of this Section 2, but this Section 2 will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

(i)      The terms and provisions of this Section 2 shall survive the termination of employment of Employee for any reason and/or the assignment of this offer letter by the Company to any successor in interest or other assignee and shall be governed by and construed and interpreted in accordance with the laws of the State of Texas, without reference to its conflict of laws rules.

We are delighted about having you join the Company.  We have confidence that your skills, energy and commitment will help to ensure our success and create opportunities for your professional growth.

This Offer Letter may be executed by the parties hereto in any number of counterparts, including counterparts delivered by facsimile or other electronic transmission, each of which shall be deemed an original, but all of which shall constitute one and the same Offer Letter.

*Signature page follows:*

Heather Parker
Page 3

STARREX036582

Your signature confirms your acceptance of this at-will offer of employment.   Please return one signed copy of this letter as soon as possible to the undersigned.

Very truly yours,

"COMPANY"

By:_____

      Laurie Cooper, Division President

ACCEPTANCE OF OFFER:

_____

Employee

Date: _____

Heather Parker
Page 4

STARREX036583

# EXHIBIT B

**From:** Laurie Cooper
**Sent:** Friday, June 24, 2022 7:06 AM
**To:** Debbie Merritt CFA, PhD;John Magness
**Subject:** new offer
**Attachments:** Magnolia Title Offer- Parker.docx


Good morning

I will be extending this offer to this escrow officer.   She will bring approx. $55,000 monthly gross revenue.

Happy Friday!



LAURIE COOPER
President | Arkansas and Florida Operations

941.867.8864 (O) | 941.867.8955 (F) | 941.961.4764 (M)

WARNING! WIRE FRAUD ADVISORY – NEVER TRUST WIRING INSTRUCTIONS SENT VIA EMAIL Wire fraud is on the rise! Please call your Magnolia Title Escrow Officer immediately to verify any wiring instructions received via email. Important: Do not call a phone number within the wire instructions email– only use a verified number for Magnolia Title such as the one on the sales contract, via an Internet search, etc. This email message is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

STARREX036579

# EXHIBIT C



September 24, 2021

Laurie Cooper
*Via email : Lauriescooper@yahoo.com*

Dear Laurie,

Sol City Title, LLC, dba Magnolia Title (the "Company"), is pleased to offer you employment with the Company on the terms described below. This offer of employment is conditioned on your satisfactory completion of certain requirements, as more fully explained in this letter. Your employment is subject to the terms and conditions set forth in this letter.

• Position. You will start in a full-time position of Division President, Magnolia Title Florida. In this capacity, you will perform duties and responsibilities that are reasonable and consistent with such position as may be assigned to you from time to time. You agree to devote your full business time, attention, and best efforts to the performance of your duties and to the furtherance of the Company's interests. You will report Directly to Patricia Rissanen at BS Title Team, LLC bda Bspoke Title Holdings.

• Compensation and Employee Benefits. In consideration of your services, you will be paid $175,000.00 base with a guaranteed $75,000.00 bonus paid semiannually, ($37,500.00 paid twice a year) First payment to be made 6 months after start date in April 2022 and second payment in October 2022. In addition, you will be paid a car allowance of $500.00 and $150.00 cell phone allocation per month, payable in accordance with the standard payroll practices of the Company and subject to all withholdings and deductions as required by law. As a regular employee of the Company, you will be eligible to participate in a number of Company-sponsored benefits, which are explained in more detail in the document attached to this offer. You will be given 4 weeks of accrued PTO throughout the year in pay periods, along with 2 personal days and 1 day off on a designated day of your birthday month. These requests must be submitted through Gusto.

• Employment Relationship. Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. Although your job duties, title, compensation, and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company.

• Contingent Offer. The Company reserves the right to conduct background and/or reference checks on all prospective employees. Your job offer is contingent upon clearance of such background and/or reference check as applicable. This offer will be withdrawn if any of the above conditions are not satisfied.

• Company Policies and Additional Agreements. As an employee of the Company, you will be expected to abide by and adhere to the Company's rules and standards. As a condition of your employment, you



will be subject to all applicable employment and other policies of the Company. You will also agree to execute any additional agreements required by the Company at the start of your employment. You further agree that at all times during your employment (and afterwards as applicable), you will be bound by, and will fully comply with, these additional agreements.

• Continuing Obligations. By signing this letter, you confirm with the Company that you are under no contractual or other legal obligations that would prohibit you from performing your duties with the Company. You further confirm that you will not remove or take any documents or proprietary data or materials of any kind, electronic or otherwise, with you from your current or former employer to the Company without written authorization from your current or former employer, nor will you use or disclose any such confidential information during the course and scope of your employment with the Company.

• Entire Agreement. This letter and other accompanying documents supersede and replace any prior understandings or agreements, whether oral, written, or implied, between you and the Company regarding the matters described in this letter.

If you wish to accept this offer, please sign, and date below. As required, by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States. This offer, if not accepted, will expire at the close of business on September 26, 2021. We look forward to having you join us no later than September 27, 2021.

Very truly yours,

By:_____
(Signature)

Name: Sarah Blackburn Title:
Chief Executive Officer


ACCEPTED AND AGREED:

_____
(Signature)


_____

Date
Anticipated Start Date: September 27, 2021

# EXHIBIT D

| | |
|---|---|
| **From:** | Laurie Cooper |
| **Sent:** | Thursday, January 25, 2024 8:34 AM CST |
| **To:** | John Magness |
| **Subject:** | Qualia payment |

Please see below for the Qualia payment

I also sent it to Anelle on December 20th

**From:** Qualia <notifications@qualia.com>
**Sent:** Wednesday, December 20, 2023 6:43:02 PM
**To:** Laurie Cooper <laurie.cooper@magnoliatitleteam.com>
**Subject:** Receipt for Connect



**Thank you for your business**

| | |
|---|---|
| **Description** | Connect |
| **Charge Amount** | $33374.75 |
| **Charge date** | Dec 19, 2023 11:26 PM |
| **Status** | Charged to bank account ending in 1758 |

Your payment in the amount of $33374.75 has been processed.

The contents of this e-mail message and any attachments are confidential and may be legally privileged. If you are not the intended recipient, notify the sender by replying to this e-mail and deleting this message and its attachments, if any.

Qualia
50 Fremont St Suite 3600
San Francisco, CA 94105
support@qualia.com
(855) 713-0081
9am - 8pm ET, M-F

# EXHIBIT E

| | |
|---|---|
| **From:** | John Magness |
| **Sent:** | Thursday, December 21, 2023 10:18 AM CST |
| **To:** | Anelle Sena |
| **CC:** | Laurie Cooper; Wayne Norton |
| **Subject:** | Re: Qualia payment |
| **Attachments:** | image002.png, image003.png, image004.png, image005.png, image006.png, image007.png, image008.png, image009.png, image010.png, image011.png, image012.png, image013.png |

Yes, so we can transfer that, then assess?
Sent from my iPhone


On Dec 21, 2023, at 10:16 AM, Anelle Sena <anelle.sena@magnoliatitleteam.com> wrote:


So it looks like to cover, each agency owes FL: 8343.69


<image002.png>

        **ANELLE SENA**
        Director - Support Services
        Magnolia Title

<image003.png>

    <image004.png>    anelle.sena@magnoliatitleteam.com

    <image005.png>    214-432-3967

    <image006.png>    214-498-6539

    <image007.png>    2751 S. Stonebridge Drive, Suite 5
    McKinney, TX 75072

    <image008.png>    **magnoliatitletx.com**


<image009.png>    <image010.png>    <image011.png>    <image012.png>

WARNING! WIRE FRAUD ADVISORY – NEVER TRUST WIRING INSTRUCTIONS SENT VIA EMAIL Wire fraud is on the rise! Please call your Magnolia Title Escrow Officer immediately to verify any wiring instructions received via email. Important: Do not call a phone number within the wire instructions email– only use a verified number for Magnolia Title such as the one on the sales contract, via an Internet search, etc. This email message is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Laurie Cooper <laurie.cooper@magnoliatitleteam.com>
**Sent:** Thursday, December 21, 2023 10:14 AM
**To:** John Magness <John.Magness@magnoliatitleteam.com>; Wayne Norton

<wayne.norton@magnoliatitleteam.com>; Anelle Sena <anelle.sena@magnoliatitleteam.com>
**Subject:** Qualia payment

The $33,374.75 was the last quarterly charge for the year.  Justin had included it in the AP but did not pay it. This will come out again March 14th.

Technically, this would be split by the 4 entities

**LAURIE COOPER**
President | Arkansas and Florida Operations

941.867.8864 (O) | 941.867.8955 (F) | 941.961.4764 (M)

**WARNING! WIRE FRAUD ADVISORY – NEVER TRUST WIRING INSTRUCTIONS SENT VIA EMAIL** Wire fraud is on the rise! Please call your Magnolia Title Escrow Officer immediately to verify any wiring instructions received via email. Important: Do not call a phone number within the wire instructions email– only use a verified number for Magnolia Title such as the one on the sales contract, via an Internet search, etc. This email message is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# Britt Naponic Declaration with Exhibits (FINAL)

Final Audit Report                                                    2024-09-20

| | |
|---|---|
| Created: | 2024-09-20 |
| By: | Philip Racusin (pracusin@hchlawyers.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAqAETd9i2sSe014OxbYabxSvLTvBhF-Eh |

## "Britt Naponic Declaration with Exhibits (FINAL)" History

📄 Document created by Philip Racusin (pracusin@hchlawyers.com)
2024-09-20 - 11:14:57 PM GMT

✉ Document emailed to Britt Naponic (brittnaponic@gmail.com) for signature
2024-09-20 - 11:15:08 PM GMT

📄 Email viewed by Britt Naponic (brittnaponic@gmail.com)
2024-09-20 - 11:15:51 PM GMT

🖋 Document e-signed by Britt Naponic (brittnaponic@gmail.com)
Signature Date: 2024-09-20 - 11:21:46 PM GMT - Time Source: server

✅ Agreement completed.
2024-09-20 - 11:21:46 PM GMT