

## Management Services Agreement

This Management Services Agreement (**"Agreement"**) effective as of January 1, 2022 (the **"Effective Date"**), is entered into by and between Starrex International, Ltd., a company organized under the laws of Canada (**"Starrex"**) and Magnolia Title Arkansas, LLC, Magnolia Title Florida, LLC, Coast to Coast Title, LLC and Sol City Title, LLC ("Magnolia Title").

The above parties shall be individually referred to as a **"Party"** and collectively as the **"Parties"**.

**WHEREAS**, MAGNOLIA TITLE desires that STARREX provide to MAGNOLIA TITLE certain Services (as defined below), as more fully set forth herein in consideration of the fees set forth herein; and

**WHEREAS**, the Parties are interested in determining their rights and obligations with respect to the Services to be rendered by the Parties;

**NOW, THEREFORE**, in consideration of the mutual covenants, conditions and premises set forth herein, the Parties agree as follows:

1. **Definitions**

    1.1. **"Affiliate"** means any corporation, firm, partnership, limited liability company or other entity, whether de jure or de facto, that directly or indirectly owns, is owned by, or is under common ownership with a Party to the extent of at least fifty percent (50%) of the equity having the power to vote on or direct the affairs of the entity and any person, firm, partnership, corporation, limited liability company or other entity actually controlled by, controlling, or under common control with a Party; provided, however, that the term "Affiliate" shall not include either Party.

    1.2. **"Confidential Information"** has the meaning ascribed to in that certain Non-Disclosure Agreement of even date herewith (the "NDA") between the Parties, substantially in the form attached hereto as **Exhibit B.**

    1.3. **"Costs"** means STARREX's ordinary and necessary costs, calculated in accordance with IFRS excluding costs related to stock-based compensation, incurred by STARREX in the performance of Services (as defined below) under this Agreement including, without limitation: (1) costs of personnel providing Services including, but not limited to, employee salaries, travel expenses, professional fees and other costs; (2) allocation for general and administrative (G&A) costs; and (3) one-time restructuring charges; but, with respect to (1) and (2) excluding interest, penalties, income taxes, goodwill, and other non-operating expenses.

    1.4. **"Payment Date"** means the due date for payment of the payments and any other amounts payable hereunder on the first of each calendar month.



1



**<u>Management Services Agreement</u>**

1.5. "**Payments**" shall have the meaning set forth in Section 5.4 of this Agreement.

1.6. "**Services**" means the services described in **<u>Exhibit A</u>** to this Agreement, as amended from time to time.

1.7. "**Third Party**" or "**Third Parties**" means any person(s) or entity(ies) other than a Party or an Affiliate.

1.8. "**IFRS**" means International Financial Reporting Standards.

## 2. <u>Services</u>

STARREX shall render to MAGNOLIA TITLE such services as detailed in **<u>Exhibit A</u>** attached hereto, which may be updated and amended from time to time by the mutual consent of the Parties (collectively, the "**Services**").

## 3. <u>Obligations of STARREX</u>

3.1. **Appointment.** MAGNOLIA TITLE hereby appoints STARREX as an exclusive provider of Services, and STARREX hereby accepts such appointment on the terms and conditions of this Agreement and within the parameters of the global marketing policies and general guidelines of MAGNOLIA TITLE and its affiliates.

3.2. **Facilities and Personnel.** STARREX hereby represents that it has adequate facilities and personnel to perform its obligations under this Agreement.

3.3. **Best Interest of MAGNOLIA TITLE.** STARREX agrees to act in the best interests of MAGNOLIA TITLE and at no time to do, cause or permit to be done any act, or publish or bring in to the public domain any information that is or may be detrimental to the best interests or business reputation of MAGNOLIA TITLE.

3.4. **Use of Affiliates and Third Parties.** Nothing herein shall be deemed to restrict STARREX from utilizing Affiliates or Third Parties to assist STARREX in performing the Services, provided, however, that such Affiliates or Third Parties shall be subject to the same restrictions as are imposed on STARREX hereunder, and provided further that MAGNOLIA TITLE shall retain the right to monitor the activities of such Affiliates or Third Parties to the extent necessary to protect its reputation and to monitor and control the use and quality of its products and services.

## 4. <u>Obligations of MAGNOLIA TITLE</u>

4.1. **Additional Support.** As deemed appropriate by the Parties, MAGNOLIA TITLE will provide additional support to STARREX to facilitate STARREX's performance under this Agreement.



<u>**Management Services Agreement**</u>

5. <u>**Payments**</u>

    5.1. **Reimbursement Amount.** Except as otherwise agreed by the parties, in exchange for performing the Services and all other obligations under the terms of this Agreement, STARREX shall be reimbursed by MAGNOLIA TITLE for the Costs STARREX incurs in performing the Services (collectively all such Costs are referred to as the "**Reimbursed Amount**"). Notwithstanding the foregoing, if STARREX subcontracts with Affiliates or Third Parties to perform Services, the Costs so incurred by STARREX will be billed to MAGNOLIA TITLE at the same rate charged to STARREX by such Affiliate or Third Parties, without additional mark-up, unless otherwise agreed to by MAGNOLIA TITLE.  Current set costs per month are $12,500.

    5.2. **Payments.** The Reimbursement Amount is referred to herein collectively as the "**Payments**".

6. <u>**Payment Terms**</u>

    6.1. **Records and Statements.** Upon the request of MAGNOLIA TITLE, STARREX shall provide MAGNOLIA TITLE with a statement detailing the Payments, as specified in such request, within thirty (30) days of receipt thereof, unless otherwise agreed by the Parties. Such statements shall include invoices or other similar reports. STARREX shall keep accurate and detailed books, accounts and records with respect to the provisions of Services and the Costs incurred in connection with providing the Services, and shall provide MAGNOLIA TITLE or its designee, within a reasonable time, all such information as MAGNOLIA TITLE or its designee may request for verifying the completeness or accuracy of the calculations or references contained in such statements. During normal business hours, MAGNOLIA TITLE or its designee shall have the right, at MAGNOLIA TITLE's expense, to inspect and audit STARREX's books, accounts and records relating to the Services and the computation of Payments. Prompt adjustment shall be made by the proper Party to compensate for any errors or omissions disclosed by such inspection or audit.

    6.2. **Payment Terms.** Payments and any other amounts payable hereunder shall be calculated monthly and shall be paid to STARREX no later than the Payment Date.

    6.3. **Currency and Interest.** Payments and any other amounts payable hereunder shall be made in the currency of MAGNOLIA TITLE or such other currency as may be agreed by the Parties.

    6.4. **Taxes.** In the event that the Payments are subject to income tax withholding, such amounts may be withheld from the Payments payable to STARREX in accordance with any applicable laws. MAGNOLIA TITLE or its designee shall remit such withheld sums to the applicable taxing authority and upon request shall provide STARREX with official receipts issued by the appropriate taxing authority (or such other evidence as is reasonably requested by STARREX) to establish that any such withholding taxes have been paid. For the avoidance of doubt, the Reimbursement Amount shall not include any income taxes or any taxes, however



**Management Services Agreement**

designated. Any applicable taxes must appear instead as separate items, without markup, on the statement from STARREX and will be paid to STARREX by MAGNOLIA TITLE, subject to STARREX's right to require a tax invoice complying with any legislation under which the applicable taxes are imposed. STARREX will cooperate with and provide reasonable assistance to MAGNOLIA TITLE with respect to recovery, if possible, of any applicable taxes.

7. **Quality Control**

The Services provided by STARREX shall be of high professional quality and workmanship. MAGNOLIA TITLE, with prior advance notice, may inspect STARREX's facilities, materials and operations, directly related to the provision of Services hereunder, to ensure compliance with the established quality standards and usage policies. If MAGNOLIA TITLE notifies STARREX that any of the Services provided hereunder fall(s) below the established quality standards, or fails to comply with the established usage policies, or that an activity of STARREX has harmed or appears likely to harm the strength and reputation of MAGNOLIA TITLE, STARREX shall, at its expense and as soon as practicable but in any event within 30 days, take such corrective action as is necessary to restore its quality and usage to the required standard of policy to protect the strength and reputation of MAGNOLIA TITLE.

8. **Warranty**

**No STARREX Warranty on Behalf of MAGNOLIA TITLE.** STARREX SHALL NOT MAKE ANY REPRESENTATION, WARRANTY OR COMMITMENT, WHETHER WRITTEN OR ORAL, ON BEHALF OF MAGNOLIA TITLE OR ANY OF ITS OTHER AFFILIATES.

9. **Confidential Information**

The exchange of Confidential Information between the Parties and the treatment of such Confidential Information shall be governed by the terms of the NDA.

10. **Term and Termination**

10.1. Unless earlier terminated, this Agreement shall continue and remain in effect for a period of 24 months from the Effective Date and shall be automatically renewed thereafter for successive additional 12 month periods, unless either Party shall give the other Party notice of non-renewal not less than 90 days prior to the end of the original term or of any such renewal period.

10.2. **Termination Upon Notice.** Notwithstanding any provision of this Agreement to the contrary, to the extent not prohibited by applicable law, either Party may, in its sole discretion, which may be exercised for any reason or for no reason whatsoever, terminate this Agreement or any one or more provisions thereof effective as of a date specified by such terminating Party in a written notice given to the non-terminating Party at least 30 days prior to such specified termination date. Notwithstanding the foregoing, such specified termination date shall not be before the date which is one year from the Effective Date.



**Management Services Agreement**

10.3. **Immediate Termination.** To the extent not prohibited by applicable law, either Party may immediately terminate this Agreement at any time in the event that:

10.3.1. A receiver is appointed to the non-terminating Party or its property;

10.3.2. The non-terminating Party becomes insolvent or unable to pay its debts as they mature or ceases to pay its debts as they mature in the ordinary course of business or makes an assignment for the benefit of its creditors;

10.3.3. Any voluntary proceedings are commenced by or for non-terminating Party under any bankruptcy, insolvency or debtor's relief law;

10.3.4. Any proceedings are commenced against non-terminating Party under any bankruptcy, insolvency or debtor's relief law and such proceedings are not vacated or set aside within sixty (60) days from the date of commencement thereof;

10.4. **Governmental Action.** Notwithstanding the final provisions of Section 11.2 above, in the event that any governmental agency imposes currency restrictions, monetary or exchange controls, export or import regulations, customs levies or other duties or levies, or subjects either Party to income or other taxes, or through legislation, ordinance, regulation, decree or treaty imposes conditions or restrictions that, in the in the Parties judgment no longer make it commercially feasible to continue under this Agreement, the Party on which such government action is imposed shall have the right, without further liability, to terminate this Agreement upon thirty (30) days written notice to the other Party, unless the other Party agrees to supply additional compensation to offset any and all lost revenue resulting from such government action.

10.5. **No Damages or indemnification for Termination.** IN THE EVENT OF TERMINATION OF THIS AGREEMENT FOR ANY REASON, TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY AGREES THAT IT SHALL HAVE NO RIGHTS TO DAMAGES OR INDEMNIFICATION OF ANY NATURE, SPECIFICALLY INCLUDING COMMERCIAL SEVERANCE PAY, WHETHER BY WAY OF LOSS OF FUTURE PROFITS, EXPENDITURES FOR PROMOTION OF PRODUCTS OR OTHER COMMITMENTS IN CONNECTION WITH ITS BUSINESS AND GOODWILL. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES AND RENOUNCES ANY CLAIM TO COMPENSATION OR INDEMNITIES FOR ANY TERMINATION OF A BUSINESS RELATIONSHIP WHICH MAY EXIST UNDER THE LAWS OF ANY STATE OF THE UNITED STATES, THE STATE OF ISRAEL OR OTHERWISE. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, EACH OF THE PARTIES SHALL BE DEEMED TO HAVE BEEN COMPENSATED FOR ALL ACTIVITIES AND RISKS UNDERTAKEN HEREUNDER BY THE PAYMENTS PAID OR PAYABLE BY THE OTHER PARTY PURSUANT TO THE PROVISIONS OF SECTIONS 5 AND 6 OF THIS AGREEMENT.



**Management Services Agreement**

## 11. <u>Limitation of Liability</u>

EACH OF THE PARTIES HEREBY AGREES THAT IN NO EVENT SHALL THE OTHER PARTY BE LIABLE UNDER OR IN RELATION TO THIS AGREEMENT OR ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES (AND WHETHER IN RELATION TO TORT, INCLUDING NEGLIGENCE), BREACH OF CONTRACT, STRICT LIABILITY OR OTHERWISE, OR ANY OTHER LIABILITY FOR ANY OF THE FOLLOWING: (I) LOSS OF PROFITS, REVENUES OR SALES; (II) LOSS OF BARGAIN; (III) LOSS OF OPPORTUNITY; (IV) LOSS OF USE OF ANY SERVICE OR ANY COMPUTER EQUIPMENT; (V) LOSS OF TIME ON THE PART OF MANAGEMENT OR OTHER STAFF; (VI) PROFESSIONAL FEES OR EXPENSES; (VII) BUSINESS INTERRUPTION, RELATED TO THIS AGREEMENT OR THE SERVICES PROVIDED HEREUNDER, (VIII) DAMAGE TO OR LOSS OF DATA;OR (VII) ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, EXTRAORDINARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND HOWSOEVER.

EACH PARTY UNDERSTANDS AND AGREES THAT, WITH RESPECT TO THE SERVICES: (A) NEITHER PARTY WILL BE LIABLE, WHETHER IN CONTRACT, TORT, OR STRICT LIABILITY, TO CUSTOMERS OR SUBSCRIBERS OF THE OTHER PARTY FOR ANY SERVICE NOT DELIVERED, REGARDLESS OF THE REASON FOR NON-DELIVERY; AND (B) NEITHER PARTY WILL BE LIABLE TO CUSTOMERS ORSUBSCRIBERS FOR ACTS OR OMISSIONS OR FOR INFORMATION PROVIDED THROUGH THE SERVICE, OR FOR CAUSES BEYOND THEIR REASONABLE CONTROL.

## 12. <u>Assignment</u>

Neither Party may assign or delegate its rights or obligations hereunder, in whole or in part, to any third party without the prior written consent of the other Party in each instance, which consent may not be unreasonably withheld or delayed.  Any unauthorized assignment or delegation shall be null and void.

## 13. <u>Notices</u>

Any notice required or permitted hereunder shall be given in writing (unless otherwise specified herein) and shall be deemed effectively given on the earliest of (a) the date delivered, if delivered by personal delivery as against written receipt therefor or by confirmed or acknowledged facsimile or e-mail transmission, (b) the tenth calendar day (provided such day is a business day in the country or state of the receiving party or, if it is not, the next such calendar day which is a business day there) after deposit, postage prepaid, in the postal service of the United States (for notices sent by MAGNOLIA TITLE) or of the State of Israel (for notices sent by STARREX) by registered or certified mail (or equivalent service) , or (c) the fifth calendar day (provided such day is a business day in the country or state of the receiving party or, if it is not, the next such calendar day which is a business day there) after mailing by domestic or international express courier, with delivery



**Management Services Agreement**

costs and fees prepaid, in each case addressed to the Chief Executive Officer of the recipient. Each of the Parties shall separately keep the other Party informed of the current mailing address and other contact information of such officer, which information may be changed from time to time by notice similarly given.

14. **Miscellaneous**

14.1. No failure, delay of forbearance of either party in exercising any power or right hereunder shall in any way restrict or diminish such party's rights and powers under this Agreement, or operate as a waiver of any breach or nonperformance by either party of any terms of conditions hereof.

14.2. In the event it shall be determined under any applicable law that a certain provision set forth in this Agreement is invalid or unenforceable, such determination shall not affect the remaining provisions of this Agreement.

14.3. The preamble and schedules to this Agreement constitute an integral and indivisible part hereof.

14.4. This Agreement constitutes the entire understanding and agreement between the Parties hereto with respect to, and supersedes any and all prior discussions, agreements and correspondence with regard to, the subject matter hereof, and may not be amended, modified or supplemented in any respect, except by a subsequent writing executed by both Parties hereto.

14.5. This Agreement shall inure to the benefit of and be binding upon each of the Parties and their respective successors and assigns.

14.6. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

14.7. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. A facsimile or other electronic transmission of this signed Agreement shall be legal and binding on all Parties hereto.

14.8. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.



**Management Services Agreement**

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly authorized representatives effective as of the date first above written.

| **MAGNOLIA TITLE** | **STARREX INTERNATIONAL LTD** |
|---|---|
| By: _____ | By: _____ |
| Name: John Magness | Name: Debbie Merritt |
| Title: Sole Member | Title:  Chief Financial Officer |

EXHIBIT A

SERVICES

Within the framework of the Agreement to which this Exhibit is attached, STARREX shall provide MAGNOLIA TITLE with the following services:

1. Facilities;
2. Marketing services;
3. Administrative services
4. Information Technology services

EXHIBIT B

NON-DISCLOSURE AGREEMENT

This Agreement (the "**Agreement**") is entered into effective as of January 1, 2022, by and between **MAGNOLIA TITLE Ltd.**, a company incorporated under the laws of Canada, or any of its Affiliates other than the Company ("**MAGNOLIA TITLE**") and **Starrex International Ltd.**, a company incorporated under the laws of Canada ("**STARREX**") (each a "**Party**" and collectively, the "**Parties**").

**WHEREAS**, Each Party may have access to or receive Confidential Information (as defined below) of the other Party for the following purpose: services provided by STARREX to MAGNOLIA TITLE, all in accordance with that Management Services Agreement signed by and between the Parties (the "**Purpose**").

**NOW, THEREFORE**, in consideration of the foregoing, the Parties hereby mutually agree as follows:

8



**Management Services Agreement**

1.  (a) For the purposes of this Agreement, "**Confidential Information**" shall mean (i) all information in any and all medium that has been disclosed or will be disclosed by or made available by one Party ("**Disclosing Party**") to the other Party ("**Receiving Party**") or otherwise acquired by the Receiving Party as a result of or in connection with this Agreement or the Parties' discussions (whether prior to the execution hereof or thereafter), including, without limitation, data, data structure, data format, technology, source code, know-how, inventions, discoveries, designs, processes, techniques, methods, performance characteristics, testing strategies, formulations, models, equipment, algorithms, software programs, documents, plans, specifications, information concerning research and development work, or trade and business secrets. Confidential Information will also include information disclosed by Disclosing Party, which relates to current, planned or proposed products, licensing or sales activities, policies, practices, finances, revenue, pricing, cost or profits, marketing and business plans, forecasts, projections and analyses, financial information, customer information and third party confidential information and (ii) any and all techniques, processes, programs, schematics, unreleased products, technical data, product plans, product designs, marketing plans, research and development activities, customer preferences and data, business opportunities, financial data, and particularly the source code and related unpublished documentation of proprietary computer programs, integrated circuit topography designs, industrial designs and documentation.  Disclosing Party shall determine in its sole discretion what information and materials it shall disclose to Receiving Party.

    (b) For the purposes of this Agreement, Confidential Information shall not include any information which, Receiving Party can document: (i) is already known to the Receiving Party can document at the time of disclosure, (ii) is publicly available at the time of disclosure; (iii) becomes public domain after disclosure through no act of the Receiving Party or any of the its Related Persons (as defined below) in breach of this Agreement; (iv) is disclosed to the Receiving Party by a third party who is not, to the best knowledge of the Receiving Party, in breach of an obligation of confidentiality; or (v) was or is independently developed by the personnel of the Receiving Party without access to or use of the Confidential Information.

    (c) All Confidential Information of Disclosing Party shall remain the sole property of the Disclosing Party, and that no patent, copyright, trademark or other proprietary or other right or license is granted by this Agreement.

1.  During the term of this Agreement through the tenth anniversary of the termination date of that certain Management Services Agreement of even date to which MAGNOLIA TITLE and the STARREX are parties (the "**ISA**"), each Party shall hold all Confidential Information in strict confidence and take all steps to safeguard the Confidential Information with reasonable care, including, without limitation, those steps it takes to protect its own confidential information, if any, of a similar nature or which a reasonable party would take to protect its own confidential information of a similar nature.



**Management Services Agreement**

2.  Except as otherwise expressly agreed in writing by the Disclosing Party, the Receiving Party shall not (a) use, copy or reproduce the Confidential Information, except for the Purpose; (b) disclose or otherwise provide any Confidential Information to any third party without the prior written consent of Disclosing Party (but in all events any such consented to disclosure shall be made only with a written and signed confidentiality agreement, substantially similar to this Agreement, from the recipient,); (c) alter, reverse engineer, decompile, disassemble or otherwise modify the Confidential Information. Notwithstanding the foregoing, the Receiving Party may disclose such Confidential Information to the extent required or requested by any court of competent jurisdiction or by any government or government agency having jurisdiction over the Receiving Party, but only after giving written notice to Disclosing Party of such request and requirement sufficiently in advance to allow Disclosing Party to determine whether to contest or limit such disclosure and, if so, to take steps to prevent or limit such disclosure.

3.  The Receiving Party agrees to limit its internal disclosure of Confidential Information only to those of its employees, officers, directors, consultants and advisors (collectively, "**Related Persons**") who need to know such information and who have signed a written agreement with the Receiving Party binding them to terms and conditions substantially similar to those of this Agreement. In any event the Receiving Party shall be fully responsible for any acts and omissions of its Related Persons in breach of this Agreement.

4.  Upon the expiration or termination of this Agreement or at the earlier written request of Disclosing Party, the Receiving Party shall return to Disclosing Party, retaining only one copy for its legal files in order to be able to identify at any time the Confidential Information protected by secrecy obligations (or, subject to Disclosing Party's written instructions, destroy and certify such destruction, all Confidential Information in tangible form in its possession, it being agreed, however that the Receiving Party shall not be required to destroy any computer files created during automatic system back up which are subsequently stored securely by the Receiving Party).

5.  The Confidential Information disclosed under this Agreement is delivered "as is" and Disclosing Party makes no representation of any kind with respect to the accuracy of such Confidential Information or its suitability for any particular use.

6.  The Receiving Party undertakes that all of the Receiving Party's employees and other Related Persons shall execute a non-disclosure agreement with assignment of inventions obligations which are same or similar to the provisions of this Agreement or the ISA, as may be relevant.

7.  This Agreement shall remain in effect from the date hereof until the fifth anniversary of the later of (a) the expiration or termination of the ISA or (b) the last date of disclosure of any Confidential Information. Upon expiration or termination of this Agreement, the Receiving Party shall act in accordance with Section 5 above. The Receiving Party's obligations with respect to Disclosing Party's Confidential Information shall survive any expiration or termination of this Agreement.

8.  Since unauthorized disclosure or use of Confidential Information will diminish the value of the proprietary interests that are the subject of this Agreement, if the Receiving Party breaches any of its obligations hereunder, Disclosing Party may be entitled to equitable



**Management Services Agreement**

relief to protect its interest therein, including but not limited to injunctive relief, as well as money damages.

9.  The relationship of the parties is that of independent contractors. This Agreement does not create an agency, partnership or similar relationship between the parties. Neither party hereby acquires any rights to use in advertising, publicity or other marketing activities any name, trade name, trademark or other designation of the other party. Any such rights may be provided in a separate agreement of the parties, each of which, if any, shall be subject to the provisions of this Agreement.

10. The notice provisions of the ISA are incorporated herein by reference as if set forth herein in full.

11. In the event of invalidity of any provision of this Agreement, the parties agree that such invalidity shall not affect the validity of the remaining portions of this Agreement, and further agree to substitute for such invalid provision a valid provision, which most closely approximates the intent and economic effect of the invalid provision.

12. Neither Party may assign this Agreement without the prior written consent of the other Party.

13. Any failure by either Party to enforce strict performance by the other Party of any provision herein shall not constitute a waiver of the right to subsequently enforce such provision or any other provision of this Agreement.

14. This Agreement shall inure to the benefit of and be binding upon each of the Parties and their respective successors and assigns, and, to the extent not included in the foregoing, all Related Persons who have been provided with Confidential Information.

15. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

16. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. A facsimile or other electronic transmission of this signed Agreement shall be legal and binding on all parties hereto.

17. Headings used in this Agreement are provided for convenience only and shall not be used to construe meaning or intent.

18. This Agreement is the complete and exclusive statement of the agreement between the Parties, and supersedes all prior written and oral communications and agreements relating to the subject matter hereof. This Agreement may only be modified by a written agreement signed by persons duly authorized to sign agreements on behalf of the Parties.



**Management Services Agreement**

    **IN WITNESS WHEREOF**, each party hereto has executed this Non-Disclosure Agreement by a representative duly authorized as of the date first above written.

**MAGNOLIA TITLE**

By: _____

Name: John Magness

Title:  Sole Member_____

**STARREX INTERNATIONAL LTD**

By: _____

Name: Debbie Merritt

Title: Chief Financial Officer_____

12