Iɴ ᴛʜᴇ Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Dɪsᴛʀɪᴄᴛ Cᴏᴜʀᴛ Fᴏʀ
ᴛʜᴇ Sᴏᴜᴛʜᴇʀɴ Dɪsᴛʀɪᴄᴛ ᴏғ Tᴇxᴀs Hᴏᴜsᴛᴏɴ
Dɪᴠɪsɪᴏɴ

| | | |
|---|---|---|
| COAST TO COAST TITLE, LLC, SOL CITY TITLE, LLC, MAGNOLIA TITLE ARKANSAS, LTD., MAGNOLIA TITLE FLORIDA, LLC, THE PEABODY BULLDOG LLC, AND JOHN MAGNESS<br>*Plaintiffs* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| V. | § | CIVIL ACTION NO.:4:24-cv-2767 |
| | § | |
| TYRELL L. GARTH, PHILLIP H. CLAYTON, DEBBIE MERRITT A/K/A DEBORAH MERRITT, MATTHEW D. HILL, CHARLES BURNS, P. GARRETT CLAYTON, SCOTT M. REEVES, ARIANE E. YOUNG, TINGLEMERRITT, LLP, STARREX TITLE FLORIDA, LLC, LAURIE COOPER, MARKETSTREET CAPITAL PARTNERS AR, LLC MARKETSTREET CAPITAL PARTNERS, LLC, AND BRIAN A. BREWER<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br><br><br><br>§ | |

---

**PLAINTIFFS' OBJECTIONS AND RESPONSE TO DEFENDANTS
TYRRELL L. GARTH AND PHILLIP H. CLAYTON'S MOTION TO DISMISS PURSUANT
TO RULES 12(B)(6) AND 9(B)**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF REFERENCES ............................................................................................................ ii

NATURE AND STAGE OF PROCEEDINGS ............................................................................... 1

STATEMENT OF ISSUES AND STANDARD OF REVIEW ...................................................... 1

OBJECTIONS TO DEFENDANTS' MOTION AND EVIDENCE .............................................. 2

ARGUMENT AND AUTHORITIES ............................................................................................. 4

    I.    Fraud Based on Forgery ...................................................................................................... 4

    II.    Plaintiffs have Sufficiently Pled their claim for Tortious Interference Against Garth and Clayton 4

    III.    Plaintiffs have Sufficiently Pled Their Claim for Conspiracy ....................................... 6

    IV.    Plaintiffs have Sufficiently Pled Their Claim for Fraudulent Inducement – Cause of Action No. 16    8

        A.    Starrex's Acquisition of the Magnolias ................................................................. 8

        B.    The Starrex Promissory Notes ("for-the-auditor-only" notes) ............................... 10

        C.    The TBP Note .......................................................................................................... 11

        D.    The BSpoke Settlement Agreement ........................................................................ 13

    V.    Plaintiffs have Sufficiently Pled their claim for Violations of the DTPA .................... 14

    VI.    Plaintiffs have Sufficiently Pled their claim for Common Law Fraud ......................... 15

    VII.    Plaintiffs have Sufficiently Pled their claim for Unjust Enrichment ........................... 18

    VIII.    Plaintiffs have Sufficiently Pled Their Claim for Fraudulent Inducement into the MSA ........ 19

REQUEST FOR LEAVE TO AMEND ........................................................................................ 21

CONCLUSION ............................................................................................................................. 21

# **TABLE OF REFERENCES**

## Cases

*ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). ..................................... 5

*Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996)............................................... 15

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) ............................................................ 1

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ............................................................................ 4

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). ........................................................... 1, 2

*Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) ......................... 2

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) ........................ 3

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)................ 17

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) . 21

*Italian Cowboys Partner, Ltd. v. Prudential Ins. Co. of America*, 341 S.W.3d 323 (Tex. 2011). ........... 13

*LHC Nashua Partnership, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450 (5th Cir. 2011). .... 13

*Lyn-Lea Travel Corp., v. Am. Airlines*, 283 F.3d 282 (5th Cir. 2002)..................................... 22

*M-I LLC v. Stelly*, 733 F.Supp.2d 759, 775 (S.D. Tex. 2010). .................................................. 5

*Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 553 (Tex. 1998)............................................................................................................................................. 7

*Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) ............................................... 3

*Schulmberger Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997) ............................ 13

*Smith v. EMC Corp.*, 393 F.3d 590 (5th Cir. 2004).................................................................. 22

*Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 570 (5th Cir. 2005) ........................... 2

*Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)........................................................................ 7

*United States ex rel Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).................. 2

*Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997)....................................... 2

## Rules

Fed. R. Civ. P. 12(b)(6)............................................................................................................ 1, 15

Fed. R. Civ. P. 15(a)(2) ............................................................................................................... 21

Fed. R. Civ. P. 9(b). ............................................................................................................ 1, 4, 6, 15

Fed. R. Evid. 901 ........................................................................................................................... 3

Rule 56.............................................................................................................................................. 4

Rule 8 ........................................................................................................................... 21

Rule 9(b) ...................................................................................................................... 21

NOW COME Plaintiffs Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Florida, LLC, Magnolia Title Arkansas, Ltd., The Peabody Bulldog, LLC, and John Magness (collectively, "Plaintiffs"), and file this Response in Opposition to Defendant Tyrrell L. Garth and Phillip H. Clayton's Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and Rule 9(b), and would respectfully show the Court as follows:

## NATURE AND STAGE OF PROCEEDINGS

1.      Plaintiffs bring this action against Defendants, including Tyrrell L. Garth and Phillip H. Clayton, asserting claims for tortious interference, civil conspiracy, fraudulent inducement, common law fraud, unjust enrichment, and violations of the Texas Deceptive Trade Practices Act (DTPA). These claims stem from Defendants' alleged misconduct, including fraudulent representations, breaches of contractual and fiduciary obligations, interference with Plaintiffs' business relationships, and the misappropriation of Plaintiffs' trade secrets and proprietary information. Plaintiffs also allege that Defendants engaged in deceptive trade practices and unlawful activities under federal and state law, causing significant harm to Plaintiffs. Defendants Garth and Clayton have moved to dismiss under Rules 12(b)(6) and 9(b), arguing that Plaintiffs have failed to state claims upon which relief can be granted and have failed to meet the heightened pleading standards for fraud. Plaintiffs now respond, demonstrating that the First Amended Complaint contains detailed factual allegations that sufficiently support each of their claims under the Federal Rules of Civil Procedure.

## STATEMENT OF ISSUES AND STANDARD OF REVIEW

2.      The Court must determine whether Plaintiffs' First Amended Complaint states a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6)  and whether the fraud-based claims meet the heightened pleading standard of Rule 9(b) .

3.      In reviewing a motion to dismiss under Rule 12(b)(6) , the Court must accept all well-pleaded facts as true and view them in the light most favorable to the Plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) . In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2) .

4.      For claims sounding in fraud, Rule 9(b)  requires a party to state with particularity the circumstances constituting fraud or mistake. This heightened pleading standard requires the Plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the

statements were made, and explain why the statements were fraudulent. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997). The Plaintiff must "plead enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

5.      Importantly, the court should not evaluate the merits of the allegations but must satisfy itself only that the plaintiff has adequately pled a legally cognizable claim. *United States ex rel Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir. 2004). Motions to dismiss are viewed with disfavor and are rarely granted. *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 570 (5th Cir. 2005).

## OBJECTIONS TO DEFENDANTS' MOTION AND EVIDENCE

6.      Plaintiffs object to Defendants' Motion to Dismiss to the extent it relies on matters outside the pleadings and seeks to introduce evidence improperly at the Rule 12(b)(6) stage. Specifically, Plaintiffs object to the following:

### 1. Improper Consideration of Matters Outside the Pleadings:

7.      Defendants' motion goes beyond the four corners of the First Amended Complaint by relying on arguments and evidence related to a purported disclaimer of reliance in the BSpoke Settlement Agreement. This specific agreement is not attached to or integral to the First Amended Complaint. Consideration of this extrinsic document at the motion to dismiss stage is improper. *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) ("A court may consider documents attached to a motion to dismiss only if they are referred to in the complaint and are central to the plaintiff's claim.")(emphasis added); *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (same); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (same).

8.      Defendants' attempt to introduce the BSpoke Settlement Agreement to support their disclaimer argument is premature and procedurally improper. Whether the agreement contains a valid disclaimer and whether such a disclaimer would bar Plaintiffs' claims are fact-intensive inquiries that cannot be resolved at the motion to dismiss stage. These issues require a full evaluation of the context of the agreement, the parties' understanding, and the circumstances surrounding its execution, which cannot be properly considered without discovery.

9.      If the Court chooses to consider the BSpoke Settlement Agreement, it must treat Defendants' motion as one for summary judgment under Rule 56 and afford Plaintiffs the opportunity to

present all pertinent material. Fed. R. Civ. P. 12(d). Conversion to summary judgment is premature at this juncture, as no discovery has been conducted. Plaintiffs are entitled to conduct discovery to develop evidence regarding the circumstances surrounding the execution of the BSpoke Settlement Agreement, the intent of the parties, and the validity and enforceability of the alleged disclaimer.

### 2. Unauthenticated Exhibits:

10.     Plaintiffs object to Exhibits A through L attached to Defendants' Motion to Dismiss. While Defendants have submitted certifications from the Harris County District Clerk regarding the authenticity of the documents as true and correct copies of those filed in a related state court case, these certifications do not satisfy the requirements for authentication under the Federal Rules of Evidence.

11.     To be considered by the Court, documentary evidence must be properly authenticated. Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Authenticity is a condition precedent to admissibility. Fed. R. Evid. 901.

12.     Here, Defendants have not provided any evidence to establish that Exhibits A through L are what they purport to be. The certifications from the Harris County District Clerk merely attest that the documents are true and correct copies of those filed in another case. They do not establish that the documents themselves are genuine, that they were actually executed by the individuals whose signatures appear on them, or that the contents of the documents are accurate. There are no affidavits or declarations from individuals with personal knowledge of the creation or execution of the documents.

13.     Because Defendants have failed to properly authenticate Exhibits A through L, these documents should not be considered by the Court in ruling on the Motion to Dismiss.

### 3. Improper Argument on the Merits:

14.     Defendants' Motion to Dismiss prematurely argues the merits of Plaintiffs' claims by asserting defenses and offering interpretations of the facts that are disputed. At the motion to dismiss stage, the Court must accept all well-pleaded factual allegations in the First Amended Complaint as true and view them in the light most favorable to Plaintiffs. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Defendants' arguments regarding the intent behind the promissory notes, the purpose of the BSpoke Settlement Agreement, and the interpretation of contractual provisions go beyond the scope of a Rule 12(b)(6) motion and are more appropriately addressed at summary judgment or trial.

### 4. Conclusion

15.     For the foregoing reasons, Plaintiffs object to the Court's consideration of materials and arguments beyond the pleadings and to the form of such other evidence. Plaintiffs respectfully request that

the Court disregard those portions of Defendants' Motion to Dismiss that rely on such matters, deny the motion to dismiss on the arguments presented therein, and allow the case to proceed to discovery. If the Court were to consider such arguments or evidence, the Court should convert this to a Motion for Summary Judgment under Rule 56 and allow Plaintiffs to provide appropriate evidence in response.

## ARGUMENT AND AUTHORITIES

### I. Fraud Based on Forgery

16.    Plaintiffs do not assert forgery as a separate cause of action. Rather, the allegations of forgery are factual predicates supporting the fraud claims. Defendants' alleged use of forged signatures on checks and the creation of the "for-the-auditor-only" promissory notes are integral to the broader scheme to defraud Plaintiffs. These actions demonstrate a pattern of deceitful conduct that is central to the fraud claims. The forgery allegations provide specific instances of fraudulent misrepresentation and are pleaded with sufficient particularity to satisfy Rule 9(b) .

### II. Plaintiffs have Sufficiently Pled their claim for Tortious Interference Against Garth and Clayton

17.    Plaintiffs have sufficiently pleaded a claim for tortious interference with contract against Garth and Clayton. To establish this claim, Plaintiffs must show: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) that such act was a proximate cause of damage; and (4) actual damage or loss. *See ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). *M-I LLC v. Stelly*, 733 F.Supp.2d 759, 775 (S.D. Tex. 2010) (Ellison, J.).

18.    Defendants argue that Plaintiffs' pleadings fail to identify the contracts interfered with, the manner in which Gath and Clayton interfered, and the amount of damages caused. However, Plaintiffs' amended complaint sufficiently identifies each of these elements and sufficiently pleads the claim.  (FAC ¶¶ 420-431).

#### A. Existence of Contracts

19.    Plaintiffs' First Amended Complaint ("FAC") identifies multiple contracts with which Garth and Clayton interfered, including:

    a. Lease contracts for each office location of Magnolia Florida and Magnolia Arkansas. (FAC ¶ 422).
    b. The Qualia deployment contract. (FAC ¶ 422).
    c. Agency Agreements between Sol City and each of Agents National Title Insurance Company (ANTIC), Old Republic, Fidelity, and First American. (FAC ¶ 422).

    d.   Agency Agreements between Coast to Coast and each of ANTIC, Fidelity, Old Republic, and ANTIC. (FAC ¶ 422).

    e.   Agency Agreements between Magnolia Florida and ANTIC. (FAC ¶ 422).

    f.   Agency Agreements between Magnolia Arkansas and ANTIC. (FAC ¶ 422).

    g.   Employment contracts between the Magnolia entities and their employees. (FAC ¶ 422).

    h.   Earnest money contracts and escrow agreements involving customers purchasing properties and requiring title insurance, with the Magnolia entities acting as title agents. (FAC ¶ 422).

Identified above, Plaintiffs identify numerous specific contracts which defendants interfered with. (FAC ¶422). Plaintiffs further allege that both Garth and Clayton interfered with listed contracts as part of their scheme to take control of Magnolia Arkansas and Magnolia Florida. (FAC ¶426).

**B.  Willful and Intentional Interference**

20.    Defendants incorrectly claim that "the factual section of the First Amended Complaint addressing the wind-up process of Magnolia Arkansas and Magnolia Florida does not mention Garth or Clayton at all." However, the FAC makes it very clear that the wind-up process was executed at the direction of Garth and Clayton, whose ultimate goal was control of Magnolia Arkansas and Magnolia Florida. (FAC ¶¶ 239, 241).

21.    Plaintiffs allege that Garth and Clayton, as part of their scheme to take control of the Magnolia entities, willfully and intentionally interfered with these contracts. (FAC ¶ 426). Specific acts of interference include:

    a.   Directing the termination of the Magnolia entities' access to the Qualia platform, which was essential to their operations and contractual obligations. (FAC ¶ 226).

    b.   Making misrepresentations to underwriters, leading to the termination of agency agreements. (FAC ¶ 186).

    c.   Soliciting Magnolia employees to resign and join competing entities, thereby interfering with their employment contracts. (FAC ¶ 206).

    d.   Causing the termination of lease agreements for Magnolia's office locations. (FAC ¶ 232).

22.    These actions demonstrate a conscious desire to disrupt the Magnolia entities' business relationships and contractual obligations.

**C.  Proximate Cause and Damages**

Garth and Clayton's actions proximately caused the Magnolia Plaintiffs' damages. The interference with contracts led to:

    a.   Loss of business opportunities and contracts.

    b.   Financial losses due to operational disruptions.

    c.   Damage to business reputation and goodwill.

    d.   Costs associated with winding down the Magnolia entities.

23.    **Conclusion.** Plaintiffs have sufficiently pleaded a claim for tortious interference against Garth and Clayton. The First Amended Complaint identifies the contracts at issue, the specific acts of interference, and the resulting damages. Therefore, the motion to dismiss this claim should be denied.

## III.     <u>Plaintiffs have Sufficiently Pled Their Claim for Conspiracy</u>

24.    Plaintiffs have sufficiently pleaded a claim for civil conspiracy against Garth and Clayton, including meeting the heightened Rule 9(b) pleading standard. *See* FAC, ¶¶ 481-486. A civil conspiracy under Texas law is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 553 (Tex. 1998). To state a claim for conspiracy, a plaintiff must plead facts showing: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556-57 (Tex. 2005).

25.    Plaintiffs' First Amended Complaint satisfies these elements:

1.    **Two or More Persons**. Plaintiffs allege that Defendants, including Garth and Clayton, conspired to harm the Magnolia Plaintiffs. (FAC ¶¶ 481-486). Each of these individuals played a distinct role in the conspiracy, as detailed in the FAC.

2.    **Object to Be Accomplished.** The object of the conspiracy was to defraud the Magnolia Plaintiffs, misappropriate their assets, and ultimately take over their business operations for the benefit of Defendants. (FAC ¶ 484). This unlawful purpose is evident from the coordinated actions taken by Defendants to deceive, manipulate, and harm the Magnolia Plaintiffs.

3.    **Meeting of the Minds**. The FAC alleges that Defendants had a "meeting of the minds" to achieve their unlawful objectives. (FAC ¶ 486). This is supported by specific factual allegations, including:

a. **Coordinated Actions:** Defendants worked together to fabricate and use the "for-the-auditor-only" promissory notes to create a false impression of debt owed by the Magnolia Plaintiffs. (FAC ¶¶ 122-123).

b. **Communications and Meetings:** Defendants held meetings and communicated regularly to plan and execute their scheme. For instance, in January 2024, Merritt, Hill, and others, including counsel, discussed a plan to take over the assets of Magnolia Arkansas and Magnolia Florida. (FAC ¶ 486).

c. **Role of Garth and Clayton:** Garth and Clayton were central to the conspiracy. They made misrepresentations, directed the actions of other Defendants, and participated in the scheme to defraud the Magnolia Plaintiffs. (FAC ¶¶ 72-75, 82-83, 126, 484, 486).

4. **Unlawful, Overt Acts.** Defendants committed numerous unlawful acts in furtherance of the conspiracy, including:

a. **Forgery:** Using an image of Magness' signature on numerous checks without authorization. (FAC ¶ 486).

b. **Misappropriation of Funds:** Making unauthorized withdrawals from the Magnolia Plaintiffs' bank accounts. (FAC ¶¶ 536-539).

c. **Fraudulent Misrepresentations:** Making false statements to the Magnolia Plaintiffs, underwriters, and other third parties about the financial condition and obligations of the Magnolia entities. (FAC ¶¶ 48, 50, 52, 59, 85, 122-123, 186, 488-496).

d. **Tortious Interference:** Interfering with the Magnolia Plaintiffs' contracts and business relationships. (FAC ¶¶ 422, 484).

e. **Misappropriation of Trade Secrets:** Unlawfully acquiring, using, and disclosing the Magnolia Plaintiffs' confidential information and trade secrets. (FAC ¶¶ 446, 554-557).

5. **Damages.** As a proximate result of the conspiracy, the Magnolia Plaintiffs suffered substantial damages, including financial losses, loss of business opportunities, damage to reputation, and the eventual destruction of their businesses. (FAC ¶¶ 371, 431, 498, 558).

26. **Conclusion** Plaintiffs have sufficiently pleaded a claim for civil conspiracy against Garth and Clayton. The FAC details the agreement among Defendants to achieve an unlawful purpose, the

specific overt acts taken in furtherance of the conspiracy, and the resulting damages. Therefore, Defendants' motion to dismiss this claim should be denied.

## IV. Plaintiffs have Sufficiently Pled Their Claim for Fraudulent Inducement – Cause of Action No. 16

27.    Plaintiffs Magness and The Peabody Bulldog have sufficiently pleaded claims for fraudulent inducement against Garth and Clayton. Fraudulent inducement is a particular species of fraud that arises when a party is induced to enter into a contract based on false representations. *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). To state a claim for fraudulent inducement, a plaintiff must show: (1) a material misrepresentation; (2) which was false; (3) and which was either known to be false when made or was made recklessly without any knowledge of its truth and as a positive assertion; (4) which the speaker intended to be acted upon by the other party; (5) which the other party acted in reliance on; and (6) which caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

28.    Plaintiffs' First Amended Complaint details numerous instances where Defendants Garth and Clayton made material misrepresentations and omissions of fact with the specific intent to fraudulently induce Plaintiffs into entering agreements and taking actions that they would not have otherwise taken.

### A. Starrex's Acquisition of the Magnolias

29.    Plaintiffs allege that Garth and Clayton fraudulently induced Magness into working for Starrex and pursuing the acquisition of the Magnolia entities by making false representations about the benefits of the acquisition and the roles Magness and the Magnolia entities would play in the new venture.

### 1. Material Misrepresentations:

- Garth and Clayton falsely promised Magness that he would be appointed CEO and awarded a Board seat at Starrex after the acquisition, with no ongoing involvement from Starrex's existing leadership. (FAC ¶ 489).

- They misrepresented their ability to inflate Starrex's stock price to over $5 per share by summer 2023 and stated that Magness would experience a "wealth event" based on the approximately 3 million shares of Starrex stock he would receive. (FAC ¶ 489).

- They deceptively claimed that Starrex planned to aggressively acquire title companies nationwide using the Magnolias as a platform. (FAC ¶ 489).

- They falsely represented that they could raise $50 million from friends and family and secure a $50 million credit facility. (FAC ¶ 491).

2.  **Falsity.** These representations were false when made. Garth and Clayton knew that Starrex did not intend to appoint Magness as CEO or award him a board seat, nor did they have the ability to inflate the stock price as claimed. (FAC ¶ 489). They also knew that the promised shares were not going to be delivered and that the financial backing they described did not exist.

3.  **Knowledge or Recklessness.** Garth and Clayton either knew these representations were false or made them recklessly without regard for their truth. As insiders with detailed knowledge of Starrex's plans and capabilities, they were aware that their statements were misleading.

4.  **Intent.** Garth and Clayton made these representations with the specific intent to induce Magness to join Starrex, contribute his expertise and business connections, and forego other lucrative opportunities. (FAC ¶ 489). They intended for Magness to rely on their false promises in making his decision.

5.  **Reliance.** Magness justifiably relied on these representations. He believed that joining Starrex would lead to substantial financial benefits and that the company had a viable plan for growth and expansion. (FAC ¶ 498). Based on these representations, Magness agreed to work for Starrex, invested his time and resources, and forewent other employment opportunities, including one that would have paid him $900,000 per year. (FAC ¶ 498).

6.  **Damages.** As a result of his reliance, Magness suffered significant damages, including lost income, wasted time and resources, and damage to his professional reputation. (FAC ¶ 498).

30.    Although Garth and Clayton were not parties to the Letter of Intent, they were at all relevant times control persons with Starrex, as detailed in the FAC. Garth and Clayton had *de facto* power to review and approve all documents related to every transaction—it was essential and required by both Starrex chief executives and the Starrex Board. (FAC, ¶ 119, 131 fn. 3) Additionally, Garth both represented Starrex as an authorized representative and had full power to approve important matters on its behalf. (FAC, ¶ 76). They negotiated on behalf of the Magnolias and Starrex. (FAC, ¶ 84). Garth drafted and produced terms sheets between the Magnolias (Plaintiffs) and Starrex. (FAC, ¶¶ 85-86). Garth drafted and communicated all the for-the-auditor-only promissory notes between the Mangolia Plaintiffs and Starrex (FAC, ¶¶ 119-135). Garth and Clayton even directed Merritt and Starrex to use Magnolias' $1,000,000 investment to pay their antecedent debt to Starrex for their personal benefit. (FAC, ¶¶ 81, 536-

538).  Garth and Clayton controlled who was hired and fired at the chief executive level at Starrex.  (FAC, ¶¶ 100).  Merritt represented to Plaintiffs that the transaction could not progress until Garth/Clayton had reviewed and approved everything. Additionally, Garth presided over every meeting in connection with Starrex's acquisition of the Magnolias. (FAC, ¶¶ 82-84, 97-100, 491).

31.    These misrepresentations at issue go far beyond general promotional statements or opinions. Instead, they address material and fundamental aspects of the Starrex's operations, organizational structure, and profitability—core factors that directly Magness's decision to pursue the proposed transactions. Such statements were not vague or subjective but were presented as factual assertions, designed to induce reliance and create a false sense of security about Starrex's financial health and prospects.

32.    Garth and Clayton repeatedly represented the for-the-auditor only notes to be a prepayment for the acquisition of the Magnolias or a "debt" that would be credited at the closing of the acquisition—thus, they were not real and would never be due. (FAC, ¶¶ 84-89, 145, 172, 489, 496).  Any "due date" on the notes would occur *after* the inevitable, sure-thing acquisition of the Magnolias by Starrex—as represented by Garth and Clayton, which meant the notes would never mature as they would be settled at closing.  Thus, the misrepresentations made by Garth and Clayton—control persons of Starrex (FAC, ¶¶ 72-81) in connection with Starrex's were not merely representations merely about some future event, they were made in connection with a transaction which Magness believed was underway.

33.    Therefore, these misrepresentations are actionable and cannot be dismissed as mere puffery.

### B.  The Starrex Promissory Notes ("for-the-auditor-only" notes)

34.    Plaintiffs allege that Garth and Clayton fraudulently induced Magness into signing the Starrex Promissory Notes by misrepresenting their purpose and enforceability.

1.    **Material Misrepresentations.** Garth and Clayton, along with other Defendants, represented to Magness that the promissory notes were "only for the audit" and would not be circulated or enforced. (FAC ¶ 495). They stated that the funds were classified as a prepayment for the acquisition of the Magnolia entities. (FAC ¶ 496).

2.    **Falsity.** These representations were false. The notes were not merely for audit purposes, as evidenced by Defendants' later attempts to enforce them and use them as leverage against the Magnolia Plaintiffs. (FAC ¶¶ 122-123, 186).

3. **Knowledge or Recklessness.** Garth and Clayton knew these representations were false or made them recklessly without regard for their truth. They were aware that the notes were intended to create a binding financial obligation.

4. **Intent.** Garth and Clayton made these representations with the intent to induce Magness to sign the notes, knowing that he would not have done so if he had been aware of their true nature. (FAC ¶ 495).

5. **Reliance.** Magness justifiably relied on these representations and signed the notes, believing they were a mere formality and would not be enforced. (FAC ¶ 145).

6. **Damages.** As a result of his reliance, Magness and the Magnolia entities became liable for a substantial debt that Defendants later attempted to collect, causing financial harm and contributing to the destruction of the Magnolia businesses. (FAC ¶ 371).

35.    Garth and Clayton attempt to avoid liability for fraudulently including Magness into signing the for-the-auditor-only notes by claiming that the express terms of the notes directly contradicts the oral representations made by Garth and Clayton that the notes were for audit purposes only. This misconstrues Plaintiffs' argument. As previously stated in paragraphs 30-32, *supra*, the misrepresentations made by Garth and Clayton were that Starrex and the Magnolias would be merged by that date—that is, the notes were only for the auditors because they would never come due.  (The maturity date of the notes was well after the merger was to close—the inevitable, sure-thing merger.)  The notes were irrelevant because they would be credited at closing and were booked as prepayment for the acquisition.  Plaintiffs were induced to sign the promissory notes, not by a contradictory representation, but rather by a representation that was *supplemental* to the express terms of the notes. No express terms contradict the representations to Plaintiffs that the notes would never come due.

**C.  The TBP Note**

36.    Plaintiffs allege that Garth fraudulently induced Magness and The Peabody Bulldog, LLC ("TBP") to enter into the TBP Note by misrepresenting that the note was only for tax efficiency purposes and would be forgiven.

1. **Material Misrepresentations.** Garth represented to Magness and TPB that the $100,000 promissory note to Superior Am Cap Investments, LLC was made only for tax efficiency purposes in connection with $100,000 in consulting fees paid and was meant to be forgiven. (FAC ¶ 504). Garth further represented that he would direct his wholly-owned company, Superior Am Cap Investments, LLC, to forgive and retire the note. (FAC ¶ 504).

11

2. **Falsity.** These representations were false. The note was not forgiven, and Garth had no intention of forgiving it.

3. **Knowledge or Recklessness.** Garth knew these representations were false or made them recklessly without regard for their truth. As an attorney, Garth was aware of the legal implications of the note and the consequences of his misrepresentations.

4. **Intent.** Garth made these representations with the intent to induce Magness and TPB to enter into the note, knowing that they would not have done so if they had been aware of the true nature of the obligation.

5. **Reliance.** Magness and TPB justifiably relied on these representations and entered into the note, believing it would be forgiven.

6. **Damages.** As a result of their reliance, Magness and TPB became liable for the $100,000 note, causing them financial harm.

37.    While Defendants correctly point out that a clear, unequivocal expression of intent to disclaim reliance on the specific matters in dispute can preclude a claim of fraudulent inducement, the merger clause contained in the TBP note <u>does not contain a clear, unequivocal disclaimer of reliance to preclude claims based in fraud</u>, as required by Texas law. *See Schulmberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997).  The merger clause at issue merely contains boilerplate language that does not expressly disclaim reliance.

38.    Defendants rely on a memorandum opinion from the Southern District of Texas which holds general merger clauses can satisfy this standard by stating that earlier extrinsic statements are superseded by the written contract. However, the 5th Circuit and Texas Supreme Court are clear that, where a merger clause <u>does not expressly disclaim reliance on prior representations</u>, a claim for fraudulent misrepresentation is <u>not</u> precluded. *Italian Cowboys Partner, Ltd. v. Prudential Ins. Co. of America*, 341 S.W.3d 323, 336 (Tex. 2011) ("This elevated requirement of precise language helps ensure that parties to a contract—even sophisticated parties represented by able attorneys—understand that the contract's terms disclaim reliance such that the contract may be binding even if it was induced by fraud. Here, the contract language was not clear or unequivocal about disclaiming reliance.); *LHC Nashua Partnership, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 460 (5th Cir. 2011) ("[the] merger clause states that the agreement supersedes previous 'agreements' and 'understandings' and constitutes the 'entire agreement.' But the clause makes no mention of 'representations' and does not expressly disclaim reliance on any representations nor expressly waive fraud claims.")

39.    **Conclusion.** Texas law requires a clear, unequivocal disclaimer of reliance to preclude a claim for fraudulent inducement, but this is not present in the TBP Note.

### D. The BSpoke Settlement Agreement

40.    Plaintiffs allege that Garth fraudulently induced TPB to enter into the BSpoke Settlement Agreement by misrepresenting that TPB would receive 3,000,000 shares of Starrex stock in exchange for relinquishing its equity in BSpoke Title. (FAC ¶ 503).

1.    **Material Misrepresentations.** Garth represented to TPB that it would receive 3,000,000 shares of Starrex stock in exchange for giving up equity ownership in BSpoke Title Holdings, which all parties agreed was worth around $2.2 million. (FAC ¶ 503). He also stated that the promissory note related to BSpoke entities would be forgiven and retired to facilitate the equity recapitalization into Starrex. (FAC ¶ 504).

2.    **Falsity.** These representations were false. TPB never received the promised Starrex shares, and the promissory note was not forgiven. (FAC ¶¶ 503-505).

3.    **Knowledge or Recklessness.** Garth knew these representations were false or made them recklessly without regard for their truth. He was aware that Starrex had no intention of conveying the promised shares or forgiving the note.

4.    **Intent.** Garth made these representations with the intent to induce TPB to surrender control of the BSpoke assets and consolidate them under the Magnolia entities, which were controlled by Garth. (FAC ¶ 505).

5.    **Reliance.** TPB justifiably relied on these representations and entered into the BSpoke Settlement Agreement, relinquishing its valuable equity interests. (FAC ¶ 507).

6.    **Damages.** As a result of its reliance, TPB suffered substantial economic losses, including the loss of equity, income streams, and appreciation. (FAC ¶ 507).

41.    Unlike the TPB Note, the BSpoke Settlement Agreement does purport to contain a disclaimer of reliance.  However, this disclaimer provision fails for lack of consideration as to Garth and Clayton. The purpose of the BSpoke Settlment Agreement was to release claims between various title company entities. Under the terms of this highly complex settlement, numerous parties either agreed to waive certain claims against another party or pay a sum of money to another party. Garth and Clayton did not individually own any portion of the Plaintiffs; rather, they owned them through entities they controlled, which are parties to the Settlement Agreement—it was entirely superfluous for Garth and Clayton to be individual parties to the Settlement Agreement.

42.     Garth and Clayton, as control persons of the entities released in the BSpoke Settlement Agreement, personally benefitted from their misrepresentations which caused TPB to enter into the BSpoke Settlement Agreement.  However, Garth and Clayton did not give or receive anything under the Settlement Agreement.  They had asserted no claims and were not parties to any litigation that was being settled through the Agreement. Further, in the underlying litigation that gave rise to the BSpoke Settlement Agreement, there were no claims asserted against Garth or Clayton in their individual capacity and they asserted no claims, yet they inserted themselves as signatories to the settlement agreement and now seek the protection of its provisions without having provided any consideration.

43.     Further, Plaintiffs have sufficiently pleaded claims for fraudulent inducement against Garth and Clayton. The FAC details specific misrepresentations made by Garth and Clayton, the context in which those misrepresentations were made, and the resulting harm to Plaintiffs. These allegations satisfy the heightened pleading standard for fraud under Rule 9(b) and establish a plausible claim for relief. Therefore, Defendants' motion to dismiss these claims should be denied.

## V.   Plaintiffs have Sufficiently Pled their claim for Violations of the DTPA

44.     Plaintiffs have sufficiently pleaded a claim for violations of the Texas Deceptive Trade Practices-Consumer Protection Act (DTPA), Tex. Bus. & Com. Code §§ 17.41 et seq., against Garth. The DTPA prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a). To state a claim under the DTPA, a plaintiff must show that: (1) the plaintiff is a consumer; (2) the defendant engaged in false, misleading, or deceptive acts; and (3) these acts constituted a producing cause of the plaintiff's damages. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996).  Plaintiffs have done so:

1.   **Consumer Status.** Plaintiffs qualify as consumers under the DTPA. A consumer is defined as "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code § 17.45(4). Here, Plaintiffs sought to acquire services from Starrex, including management services and the promised acquisition of the Magnolia entities. They also sought to acquire shares in Starrex as part of the proposed transaction. These activities fall within the scope of the DTPA's definition of a consumer. (FAC, ¶ 510)

2.   **False, Misleading, or Deceptive Acts.**  Plaintiffs allege that Garth engaged in several false, misleading, or deceptive acts, including:

14

     **a.** **Misrepresentations about Starrex Stock:** Garth misrepresented the value and potential appreciation of Starrex stock, promising Magness that he would receive millions of shares and experience a "wealth event." (FAC ¶ 489). These representations were false and misleading, as Garth knew that Starrex did not intend to fulfill these promises.

     **b.** **Misrepresentations about the Acquisition:** Garth falsely claimed that Starrex planned to aggressively acquire title companies nationwide using the Magnolias as a platform, inducing Magness to enter into non-disclosure agreements with various targets. (FAC ¶ 489). This representation was false, as Garth never intended to pursue this strategy.

     **c.** **Misrepresentations about the Promissory Notes:** Garth misrepresented that the promissory notes were "for-the-auditor-only" and would not be enforced, inducing Magness to sign them under false pretenses. (FAC ¶¶ 122-123).

These actions constitute false, misleading, or deceptive acts under the DTPA.

     **3.** **Producing Cause and Damages.** Garth's deceptive acts were a producing cause of Plaintiffs' damages. Plaintiffs relied on Garth's misrepresentations in entering into agreements, investing time and resources, and foregoing other business opportunities. As a result, Plaintiffs suffered financial losses, including lost profits, wasted resources, and damage to their business operations. (FAC ¶ 498).

    45.    **Conclusion.** Plaintiffs have sufficiently pleaded a claim for violations of the DTPA against Garth. The FAC details specific false, misleading, or deceptive acts committed by Garth, Plaintiffs' consumer status, and the resulting damages. Therefore, Defendants' motion to dismiss this claim should be denied.

    46.    Plaintiffs' Amended Complaint satisfies this burden under Rules 12(b)(6) and 9(b) by sufficiently pleading this claim. (FAC, ¶¶ 501-512). Accordingly, Defendants' motion to dismiss should be denied.

    47.    As for the BSpoke Settlement Agreement, based upon the same analysis in paragraphs 40-43, *supra*, the disclaimer of reliance provision contained therein is void as to Garth and Clayton in their individual capacities.

**VI.** **Plaintiffs have Sufficiently Pled their claim for Common Law Fraud**

15

48.     Plaintiffs have sufficiently pleaded a claim for common law fraud against Garth and Clayton. To state a claim for common law fraud under Texas law, a plaintiff must allege: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly without any knowledge of its truth; (3) the defendant intended the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and thereby suffered injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001).

49.     Plaintiffs' First Amended Complaint alleges that Garth and Clayton engaged in a pattern of fraudulent misrepresentations to induce Plaintiffs to enter into business relationships with Starrex and to invest time, resources, and effort into the venture. These misrepresentations include:

### 1. Misrepresentations about Starrex's Acquisition Plans and Financial Capabilities

a. **False Promises of Acquisition and Growth:** Garth and Clayton represented that Starrex planned to aggressively acquire title companies nationwide, using the Magnolia entities as a platform. (FAC ¶ 489). They also claimed they could raise substantial capital and obtain a significant credit facility to fund these acquisitions. (FAC ¶ 491). These representations were false, as Garth and Clayton knew that Starrex had no intention of pursuing this strategy.

b. **Misrepresentations about Stock Value and Wealth Event:** Garth and Clayton misrepresented the value and potential appreciation of Starrex stock, promising Magness that he would receive millions of shares and experience a "wealth event." (FAC ¶ 489). These representations were false and made with knowledge of their falsity or with reckless disregard for their truth.

### 2. Misrepresentations about Merritt's Qualifications

a. **False Credentials:** Garth and Clayton repeatedly represented that Debbie Merritt possessed extensive academic credentials, including a bachelor's degree, an MBA, and a PhD, as well as a CFA charter. (FAC ¶ 516). They touted her as "wicked smart" and emphasized her purported expertise in U.S. and Canadian securities regulations. (FAC ¶ 516).

b. **Falsity:** These representations were false. Merritt did not possess the claimed credentials. (FAC ¶ 523).

c. **Knowledge and Intent:** Garth and Clayton either knew these representations were false or made them recklessly without verifying their accuracy. They intended for Magness to rely on these misrepresentations in deciding to work with Starrex and entrust the financial management of the Magnolia entities to Merritt. (FAC ¶ 527).

d. **Reliance and Damages:** Magness justifiably relied on these misrepresentations, believing that Merritt was highly qualified to manage the financial aspects of the

venture. (FAC ¶ 528). As a result of this reliance, Magness and the Magnolia entities suffered financial losses and damage to their business operations.

3. **Misrepresentations about the Promissory Notes.** Garth and Clayton misrepresented the purpose and nature of the promissory notes, claiming they were "for-the-auditor-only" and would not be enforced. (FAC ¶¶ 122-123). These representations were false and intended to induce Magness to sign the notes, which were later used to the detriment of the Magnolia entities.

4. **Reliance and Damages.** Plaintiffs justifiably relied on Defendants' misrepresentations in entering into agreements with Starrex, investing time and resources, and foregoing other business opportunities. (FAC ¶ 498). As a result of this reliance, Plaintiffs suffered substantial damages, including financial losses, loss of business opportunities, and damage to reputation.

50.    **Conclusion**.  Plaintiffs have sufficiently pleaded a claim for common law fraud against Garth and Clayton. The FAC details specific misrepresentations made by Garth and Clayton, their knowledge of the falsity of these representations, their intent to induce reliance, and the resulting damages suffered by Plaintiffs. These allegations satisfy the pleading standards for fraud under Texas law and are sufficient to survive a motion to dismiss.

51.    Plaintiffs' claim for common law fraud is centered on two groups of misrepresentations made by Garth and Clayton. The first group of misrepresentations relates to the false promises made to Magness in the court of including him to participate in the "business venture" orchestrated by Garth and Clayton. The second group of misrepresentations relates to the competency and qualifications of Merritt.

52.    As stated in paragraphs 30-35, *supra*, the for-the-auditor only notes were repeatedly represented to Magness as prepayment for the acquisition of the Magnolias. Thus, the misrepresentations made by Garth and Clayton in connection with Starrex were not merely representations merely about some future event, they were made in connection with a transaction that was represented to be inevitable and a sure-thing—Starrex was acquiring the Magnolias, which would benefit Plaintiffs, and be run by Magness. The for-the-auditor only notes were executed on April 19, 2023 and represented to be necessary for the LOI.  The LOI was signed just days later, on April 30, 2023. (FAC, ¶¶ 117-147).

53.    As for the second group of misrepresentations, Plaintiffs clearly allege that such misrepresentations were either made intentionally or were made recklessly, being that it was reckless for Garth and Clayton to represent that Merritt was key figure who would be invaluable in the operations of a massive title company conglomerate without conducting even the slightest due diligence as to her background. (FAC, ¶¶ 48-49, 516-532, 544-547). This is especially true where Merritt's qualifications and

17

credentials (or the lack thereof) were verifiable, especially by an employer. Plaintiffs' counsel was able to uncover the truth of Merritt's deception with some concerted research and various subpoenas and requests.

54.    Further, Plaintiffs' amended complaint shows reliance on these misrepresentations by claiming that the credentials were presented as crucial qualifications for Merritt, who would be overseeing the complex, transnational organization created by the MSA. (FAC, ¶ 545).

55.    Taken as true, these allegations sufficiently state a claim for fraudulent inducement. Accordingly, Defendants' motion should be denied.

## VII.    **Plaintiffs have Sufficiently Pled their claim for Unjust Enrichment**

56.    Plaintiffs have sufficiently pleaded a claim for unjust enrichment against Garth and Clayton. Unjust enrichment occurs when a party obtains a benefit from another by fraud, duress, or taking an undue advantage, and it would be unconscionable for that party to retain the benefit. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Plaintiffs' First Amended Complaint alleges that Garth and Clayton were unjustly enriched through their wrongful conduct, which conferred a benefit upon them that would be inequitable for them to retain:

1.    **Specific Instances of Unjust Enrichment:**

    a.    **Misappropriation of Funds:** Garth and Clayton orchestrated the misappropriation of approximately $1 million from the Magnolia Plaintiffs' Frost Bank accounts through unauthorized withdrawals and forged signatures. (FAC ¶¶ 536-539). These funds were used to satisfy personal debts owed by Garth and Clayton to Starrex,

    b.    **Usurpation of Business Opportunities:** Garth and Clayton, through their control of Starrex and their fraudulent misrepresentations, induced Magness to bring valuable business opportunities to Starrex instead of pursuing them independently. (FAC ¶ 490). This included directing existing and prospective title business to Starrex, which rightfully belonged to the Magnolia Plaintiffs. (FAC ¶ 83). By doing so, Garth and Clayton enriched themselves and Starrex at the expense of the Magnolia Plaintiffs, who were deprived of the profits and growth opportunities.

    c.    **Control and Benefits from the Magnolia Entities:** Garth and Clayton, through their positions of influence within Starrex and their misrepresentations, gained control over the Magnolia Entities and their assets. They used this control to benefit themselves, including directing the operations of the Magnolia Entities in a manner that favored their personal interests over those of the Magnolia Plaintiffs. (FAC ¶¶ 76, 84-87).

2. **Inequitable to Retain Benefits.** It would be inequitable and unconscionable for Garth and Clayton to retain the benefits they obtained through their wrongful conduct. They unjustly enriched themselves by:

- Using misappropriated funds to satisfy personal debts. (FAC ¶¶ 78-81, 537-538)

- Usurping business opportunities that rightfully belonged to the Magnolia Plaintiffs. (241, 484-486)

- Gaining control over the Magnolia Entities and their assets through fraud and misrepresentation. (FAC, ¶¶ 72-147)

57.    These actions directly harmed the Magnolia Plaintiffs, causing them significant financial losses and damaging their business operations.

58.    As discussed in paragraphs 30-35, *supra*, Garth and Clayton were at all times control persons and shareholders of Starrex and were required to approval all documents related to the transaction. Executives and the board of Starrex took their orders from Garth and Clayton. In fact, Starrex executives and board members would not act without Garth's approval and Clayton's participation. Additionally, Garth presided over every meeting in connection with Starrex's acquisition of the Magnolias.

59.    **Conclusion.** Plaintiffs have sufficiently pleaded a claim for unjust enrichment against Garth and Clayton. The FAC details specific instances where Garth and Clayton obtained benefits through wrongful conduct, and it would be inequitable for them to retain those benefits. Therefore, Defendants' motion to dismiss this claim should be denied.

## VIII.    Plaintiffs have Sufficiently Pled Their Claim for Fraudulent Inducement into the MSA

60.    Plaintiffs have sufficiently pleaded a claim for fraudulent inducement into the Management Services Agreement (MSA) against Garth and Clayton. Notably, Plaintiffs' fraudulent inducement claim as to the MSA is substantially the same as its claim for common law fraud against Garth and Clayton.

61.    To establish fraudulent inducement, Plaintiffs must show that Defendants made material misrepresentations, that the misrepresentations were false and made with knowledge of their falsity or recklessly without knowledge of their truth, that Defendants intended for Plaintiffs to rely on these misrepresentations, that Plaintiffs actually and justifiably relied on the misrepresentations, and that Plaintiffs suffered damages as a result of such reliance. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). Plaintiffs' First Amended Complaint satisfies these elements:

1. **Material Misrepresentations Regarding Merritt's Qualifications.** Prior to the execution of the MSA, Garth and Clayton made material misrepresentations regarding Debbie Merritt's qualifications. Specifically, they represented that Merritt:

   i. Held a bachelor's degree in accounting and an MBA from the University of Memphis. (FAC ¶ 516).

   j. Held a PhD in Global Economics and Management from UCLA Anderson School of Management. (FAC ¶ 516).

   k. Was a Chartered Financial Analyst (CFA). (FAC ¶ 516).

   l. Had unique expertise in both U.S. and Canadian securities regulations. (FAC ¶ 516).

   These representations were false, as Merritt did not possess these qualifications. (FAC ¶ 523).

2. **Knowledge of Falsity or Recklessness.** Garth and Clayton either knew these representations were false or made them recklessly without verifying their accuracy. Given their positions of authority and their involvement in the recruitment of Magness, they had a duty to ensure the accuracy of their statements, particularly regarding key personnel like Merritt.

3. **Intent to Induce Reliance.** Garth and Clayton made these misrepresentations with the intent to induce the Magnolia Plaintiffs to enter into the MSA. They presented Merritt's purported qualifications as crucial to the successful operation of the business venture and the management of complex financial and regulatory matters. (FAC ¶ 516). They intended for the Magnolia Plaintiffs to rely on these representations in deciding to enter into the MSA and entrust their financial operations to Starrex.

4. **Justifiable Reliance.** The Magnolia Plaintiffs justifiably relied on these misrepresentations. They had no reason to doubt the veracity of Garth and Clayton's statements, given their positions and the detailed nature of the representations. Relying on these representations, the Magnolia Plaintiffs entered into the MSA, granting Starrex significant control over their financial operations and confidential information. (FAC ¶ 549).

5. **Damages.** As a direct and proximate result of their reliance on the misrepresentations, the Magnolia Plaintiffs suffered damages. The MSA, entered into based on false pretenses, facilitated the subsequent misappropriation of funds, mismanagement of operations, and ultimately, the destruction of the Magnolia Plaintiffs' businesses. (FAC ¶ 550).

62.    **Conclusion**.  Plaintiffs have sufficiently pleaded a claim for fraudulent inducement into the MSA against Garth and Clayton. The FAC details the specific misrepresentations made, Defendants' knowledge or recklessness regarding their falsity, the intent to induce reliance, justifiable reliance by

Plaintiffs, and the resulting damages. Therefore, Defendants' motion to dismiss this claim should be denied.

## REQUEST FOR LEAVE TO AMEND

63.    In the event that the Court determines that Plaintiffs' First Amended Complaint lacks the requisite specificity or fails to state a claim upon which relief can be granted, Plaintiffs respectfully request leave to amend their complaint. Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2); *Smith v. EMC Corp.,* 393 F.3d 590, 595 (5th Cir. 2004); *Lyn-Lea Travel Corp., v. Am. Airlines,* 283 F.3d 282, 286 (5th Cir. 2002).

64.    Here, any alleged deficiencies in the pleadings can be cured through amendment. Plaintiffs have diligently investigated the facts and circumstances surrounding Defendants' conduct and can provide additional details to further support their claims. Specifically, Plaintiffs can provide more specific factual allegations regarding the "who, what, when, where, and how" of the fraudulent misrepresentations, the specific contracts interfered with, the precise nature of the unjust enrichment, and the damages suffered. Granting leave to amend would not be futile, as it would allow Plaintiffs to fully articulate their claims and provide the Court with a more comprehensive factual basis for its decision.

## CONCLUSION

65.    Plaintiffs have sufficiently pleaded each of their claims against Garth and Clayton, providing detailed factual allegations that support the elements of each cause of action. The First Amended Complaint meets the pleading standards under both Rule 8 and Rule 9(b), and Plaintiffs have demonstrated that they have viable claims for relief. Defendants' Motion to Dismiss improperly relies on matters outside the pleadings and seeks to prematurely litigate factual disputes. Therefore, Plaintiffs respectfully request that this Court sustain Plaintiffs' objection and deny Defendants' Motion to Dismiss in its entirety. In the alternative, Plaintiffs request leave to amend their complaint to address any perceived deficiencies.

WHEREFORE PREMISES CONSIDERED, Plaintiffs respectfully request that this court deny Defendants' Motion to Dismiss, and for any other relief, both in equity and at law, to which Plaintiffs may show themselves justly entitled.

Dated:  December 23, 2024.

Respectfully submitted,

**HENDERSHOT COWART P.C.**

By:  */s/ Philip D. Racusin*
    SIMON W. HENDERSHOT, III
    SBN: 09417200
    trey@hchlawyers.com
    PHILIP D. RACUSIN
    SBN: 24054267
    pracusin@hchlawyers.com
    1800 Bering Drive, Suite 600
    Houston, Texas 77057
    Telephone:  (713) 783-3110
    Facsimile:   (713) 783-2809
    *ATTORNEYS FOR PLAINTIFFS COAST TO COAST TITLE,*
    *LLC, SOL CITY TITLE, LLC, MAGNOLIA TITLE*
    *ARKANSAS, LTD., MAGNOLIA TITLE FLORIDA, LLC,*
    *THE PEABODY BULLDOG LLC AND JOHN MAGNESS*

### CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, a copy of the foregoing document was served on all counsel of record via the Court's ECF system.

*/s/ Philip D. Racusin*
    Philip D. Racusin