IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COAST TO COAST TITLE, LLC, | § | |
| SOL CITY TITLE, LLC, MAGNOLIA TITLE | § | |
| ARKANSAS, LLC, MAGNOLIA TITLE | § | |
| FLORIDA, LLC, THE PEABODY BULLDOG | § | |
| LLC, AND JOHN MAGNESS | § | |
| *Plaintiffs* | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **V.** | § | CIVIL ACTION NO.:4:24-cv-2767 |
| | § | |
| TYRRELL L. GARTH, PHILLIP H. | § | |
| CLAYTON, STARREX TITLE FLORIDA, | § | |
| LLC, LAURIE COOPER, MARKETSTREET | § | |
| CAPITAL PARTNERS AR, LLC, | § | |
| MARKETSTREET CAPITAL PARTNERS, | § | |
| LLC, AND BRIAN A. BREWER | § | |
| *Defendants.* | § | |
| | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Arkansas, LLC, and Magnolia Title Florida, LLC (collectively the **"Magnolias",** the **"Magnolia Companies"**, or **"Magnolia Entities"**), The Peabody Bulldog, LLC (**"TPB"**), and John Magness (**"Magness"**), and collectively with the Magnolia Entities and TPB, **"Plaintiffs"**) and collectively file this, their Second Amended Complaint,[1] against Tyrell L. Garth, Phillip H. Clayton, Starrex Title Florida, LLC, Laurie Cooper, MarketStreet Capital Partners, LLC, MarketStreet Capital Partners AR, LLC, and Brian A. Brewer (collectively, "Defendants"), and would respectfully show the following:

---

[1] As authorized by Minute Entry dated Feb. 3, 2025 granting Plaintiffs leave to amend their complaint [Dkt. 57], Unopposed Motion for Extension of Time [Dkt. 61] and Order granting extension [Dkt. 64], and Second Unopposed Motion for Extension of Time [Dkt. 65] and Order granting extension [Dkt. 66].

# I.
# INTRODUCTION

1.    From April 2021 through February 2024, Defendants Garth and Clayton orchestrated a sophisticated fraud scheme to exploit Plaintiffs' assets, relationships, and expertise without providing the promised consideration. Their conduct was not a failed business venture but rather a calculated fraud involving specific misrepresentations about funding capabilities, acquisition plans, and corporate governance. Garth and Clayton, operating through entities they controlled while maintaining the appearance of limited involvement, induced Magness to forego lucrative opportunities, convinced The Peabody Bulldog to relinquish valuable equity positions, and secured a $1 million investment from HMHTI that was promptly misappropriated. Throughout this period, they conspired to create false debt obligations, misrepresented the credentials of key financial personnel, harmed Plaintiffs through numerous, false material representations, and leveraged their pervasive control over Starrex's operations while maintaining the appearance of operating at arm's length.

2.    When Plaintiffs declined Defendants' coercive settlement offer in December 2023, Defendants executed a coordinated takeover of Magnolia operations through a carefully sequenced series of actions in January and February 2024. Cooper, still serving as President of Magnolia Florida and Arkansas, worked with Defendants to transfer proprietary customer information, coordinate employee resignations, and establish competing entities using Magnolia's locations, identities, and assets. Defendants Brewer and MarketStreet, with material assistance from Cooper and Starrex Title Florida, then appropriated Magnolia's physical locations, staff, customer relationships, and even telephone numbers, creating shadow operations that continued to use the Magnolia name and branding. This calculated scheme resulted in over $10 million in damages to Plaintiffs, including lost operations, misappropriated funds, and destroyed business goodwill developed through years of effort and investment.

# II.
# PARTIES

3.    **Plaintiff Coast to Coast Title, LLC** (sometimes **"Coast to Coast"**) is a Texas limited liability company with its principal place of business in Houston, Harris County, Texas. Coast to Coast

Title provides title insurance services throughout Texas and has been damaged by Defendants' scheme through operational disruption and asset misappropriation.

4.    **Plaintiff SolCity Title, LLC** (sometimes **"Sol City"**) is a Texas limited liability company with its principal place of business in Houston, Harris County, Texas. SolCity operates in the title insurance industry and has similarly suffered damages from Defendants' concerted actions.

5.    **Plaintiff Magnolia Title Arkansas, LLC** (sometimes **"Magnolia Arkansas"** or **Magnolia Title Arkansas"**) is an Arkansas limited liability company with its principal place of business in Arkansas. Magnolia Title Arkansas operates in coordination with the Texas Plaintiffs in providing title insurance services and has suffered substantial damage from Defendants' asset misappropriation.

6.    **Plaintiff Magnolia Title Florida, LLC** (sometimes **"Magnolia Florida"** or **"Magnolia Title Florida"**, and with Coast to Coast, Sol City, and Magnolia Title Arkansas, collectively, **"the Magnolias"**, **"the Magnolia Companies"**, **"the Magnolia Entities"**) is a Florida limited liability company with its principal place of business in Florida. It forms part of the integrated Magnolia Companies' network and has been specifically targeted for asset theft by Defendants.

7.    **Plaintiff The Peabody Bulldog LLC ("TPB")** is a Texas limited liability company with its principal place of business in Houston, Harris County, Texas. TPB holds equity interests in the Magnolia Companies that have been wrongfully diminished by Defendants' fraudulent conduct.

8.    **Plaintiff John Magness ("Magness")** is an individual residing in Houston, Harris County, Texas. Mr. Magness is a seasoned title insurance executive with over 20 years of experience who was fraudulently induced by Defendants to build the Magnolia Companies, resulting in substantial personal and professional losses.

9.    **Defendant Tyrrell L. Garth ("Garth")** is an individual residing in Beaumont, Jefferson County, Texas. Garth was the architect of the fraudulent scheme, exercising pervasive control over Starrex and directing all Defendants' actions despite his purportedly limited formal authority.

10.    **Defendant Phillip H. Clayton ("Clayton")** is an individual residing in Chapel Hill, Texas. Clayton, a thrice-convicted felon, served as Garth's co-conspirator, actively participating in misrepresentations and asset misappropriation throughout the relevant time period.

11.    **Defendant Brian A. Brewer ("Brewer")** d/b/a Magnolia Title Company (FL; 1/24/24 – 2/2/24) (**"Brewer"**) is an individual residing in Texas who exploited Plaintiffs' misappropriated assets through the MarketStreet entities for his personal profit.  He has appeared in this case through counsel.

12.     Defendant **MarketStreet Capital Partners, LLC** d/b/a Magnolia Title Company (FL; 2/2/24 - Present) (**"MarketStreet Capital Partners"**) is a Texas limited liability company with its principal place of business in Houston, Harris County, Texas.  It operates out of Magnolia Title Florida's offices. It has served as a vehicle for Defendants' unjust enrichment through stolen Magnolia assets.  It has appeared in this case through counsel.

13.     Defendant **MarketStreet Capital Partners AR, LLC** d/b/a Magnolia Title Company (AR; 1/30/24 - Present) (**"MarketStreet AR"** and with MarketStreet Capital Partners, collectively **"MarketStreet"**) is an Arkansas limited liability company similarly used to misappropriate Plaintiffs' property under Garth's and Clayton's direction.  Its principal place of business in Pulaski County, Arkansas, at Magnolia Title Arkansas, LLC's office location.  It has appeared in this case through counsel

14.     **Defendant Laurie Cooper ("Cooper")** is an individual residing in Florida who served as the former President of Magnolia Title Arkansas and Magnolia Title Florida. Cooper abused her position to facilitate the transfer of Plaintiffs' assets to other Defendants, maintaining significant Texas contacts throughout her employment.  She has appeared in this case through counsel.

15.     **Defendant Starrex Title Florida, LLC** (**"Starrex Title Florida"**) is a Florida limited liability company specifically created by Defendants to siphon Magnolia Title Florida's assets, controlled by Brewer.  It has appeared in this case through counsel.

# III.
# SELECTED DEFINITIONS

16.     "Magnolia Companies" or "Magnolia Entities" or "the Magnolias" or "Magnolias" refers collectively to Coast to Coast Title, LLC, Sol City Title, LLC, Magnolia Title Arkansas, LLC, and Magnolia Title Florida, LLC.

17.     "TPB" refers to The Peabody Bulldog, LLC.

18.     "HMHTI" refers to HMH Title Investments, LLC.

19.     "BSpoke Entities" refers collectively to the entities in which TPB formerly held ownership interests pursuant to the BSpoke Settlement Agreement.

20.     "Starrex" or "Starrex International" refers to Starrex International Ltd., a Canadian company with its principal place of business in Harris County, Texas.

21.    "MarketStreet" refers collectively to MarketStreet Capital Partners, LLC and MarketStreet Capital Partners AR, LLC."

# IV.
## OTHER NOTABLE ENTITIES AND PERSONS

22.    Starrex International Ltd. (**"Starrex"** or **"Starrex International"**) is referenced herein. It is a Canadian company with its principal place of business in Harris County, Texas.  It is not a party. At all relevant times to this lawsuit, Starrex International's leadership consisted of Matthew D. Hill (President, Chairman & CEO, and Member of the Audit Committee), Debbie Merritt (Chief Financial Officer), P. Garrett Clayton (Director, son of Phillip H. Clayton), Scott M. Reeves (Director, Corporate Secretary, and Member of the Audit Committee), and Charles Burns (Director and Chair of the Audit Committee). On February 6, 2024, Matthew D. Hill suddenly resigned as President and CEO and was replaced by Charles Burns. Garth owned at least 19.77% of Starrex as of October 4, 2022. Clayton's foundation owned at least 19.86% of Starrex as of October 4, 2022. Additionally, Garth and Clayton have ownership in each Magnolia entity and together, they own about 2/3 of the Magnolia Title Arkansas and Magnolia Title Florida entities.

23.    Starrex Insurance Holdings, Inc. (**"SIH"**) is a Nevada Corporation with its principal place of business in Harris County, Texas.  It is not a party.

24.    Starrex Holdings, Inc. is a Wyoming Corporation with its principal place of business in Harris County, Texas.  It is not a party.

25.    Starrex Insurance Services, Inc. (**"SIS"** and with SIH, collectively, **"Starrex Insurance"**) is a Nevada DBA/assumed name of Starrex Insurance Holdings, Inc. with its principal place of business in Harris County, Texas.  It is not a party.

26.    Starrex Technical Services, LLC is a Nevada limited liability company with its principal place of business in Harris County, Texas.  It is not a party.

27.    **Debbie Merritt a/k/a Deborah Merritt** (**"Merritt"**) is an individual living in Harris County, Texas.  She is the Chief Financial Officer of Starrex International, Ltd. and Starrex Insurance Holdings, Inc. and the Title Authorized Person of Starrex Title Florida, LLC.  She is a former Defendant and is not a party.

28. **Matthew D. Hill ("Hill")** is the former President and CEO of Starrex International, Ltd. (resigned February 6, 2024) and Starrex Insurance Holdings, Inc. and believe to maintain his positions with Starrex International, Ltd. as the current Chairman of the Board, Director on the Board, and Audit Committee Member. He is also Phillip H. Clayton's son-in-law. He is a former Defendant and is not a party.

29. **P. Garrett Clayton ("P.G. Clayton")** has been a Director on the Board of Starrex International, Ltd. since December 9, 2013, a member of the Starrex Audit Committee Member from 2013 and 2016 as well as the Chairman of the Board, President, and CEO from December 9, 2013 to November 1, 2016. He is also the son of Phillip H. Clayton. He continues to serve as a Director of Starrex International, Ltd. He is a former Defendant and is not a party.

30. **Scott M. Reeves ("Reeves")** is a Director, the Corporate Secretary, Audit Committee Member, and General Counsel of Starrex International, Ltd., a contractual signing authority of the company, and a certifying Audit Committee Member who signed numerous Starrex International, Ltd. filings filed with SEDAR. He is a resident of Calgary, Alberta. He is a former Defendant and is not a party.

31. **Charles Burns ("Burns")** is the current President and CEO of Starrex International, Ltd. since February 6, 2024, when he replaced Hill. Burns has also served as the Chair of the Starrex Audit Committee since 2014, a member of the Starrex Audit Committee since 2004, and has been a Director on the Board of Starrex since 2004. He is a former Defendant and is not a party.

32. **Ariane E. Young ("Young")** is the wife and/or partner of Scott Reeves. She has represented Starrex International Ltd. She is a resident of Calgary, Alberta, Canada. She is a former Defendant and is not currently a party.

## V.
## VENUE AND JURISDICTION

### A. Venue

33. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events— meetings, misrepresentations, and asset transfers—occurred in Houston, Harris County, Texas, or alternatively under § 1391(b)(1) as multiple Defendants reside in Texas.

### B.  Subject Matter Jurisdiction

34.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) due to complete diversity of citizenship and an amount in controversy exceeding $75,000, exclusive of interest and costs. Plaintiffs are citizens of Texas (Coast to Coast Title, LLC; SolCity Title, LLC; The Peabody Bulldog LLC; John Magness), Arkansas (Magnolia Title Arkansas, LLC), and Florida (Magnolia Title Florida, LLC). Defendants are citizens of Texas (Tyrrell L. Garth; Phillip H. Clayton; Brian A. Brewer; MarketStreet Capital Partners, LLC), Arkansas (MarketStreet Capital Partners AR, LLC), and Florida (Laurie Cooper; Starrex Title Florida, LLC). No Defendant shares citizenship with any Plaintiff.

35.     This Court has personal jurisdiction over all Defendants under the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042, and the Fourteenth Amendment's Due Process Clause, as each Defendant has purposefully availed themselves of the privileges and benefits of conducting business in Texas, and Plaintiffs' claims arise directly from those contacts.

### C.  Personal Jurisdiction Over Defendants

36.     **Jurisdiction Over Tyrrell L. Garth**: Garth, a Texas resident, conducted extensive scheme-related activities in Houston, including meetings at Post Oak Grill (April 8, 2021) and the AmCap Cancer Event (April 15, 2021), where he made material misrepresentations to Magness. Garth directed Starrex and Magnolia operations from Texas, ghostwrote emails for nominal executives, and orchestrated asset misappropriation affecting Texas entities, establishing both specific and general jurisdiction.

37.     **Jurisdiction Over Phillip H. Clayton**: Clayton, a Texas resident, attended the April 8, 2021 Houston meeting, sent a deceptive email to Magness from Texas (April 13, 2021), and participated in numerous Texas-based meetings, directing fraudulent acts against Texas Plaintiffs, which confers jurisdiction.

38.     **Jurisdiction Over Brian A. Brewer**: Brewer, a Texas resident, operated through MarketStreet Capital Partners, LLC in Houston to exploit misappropriated Magnolia assets, tying his Texas conduct directly to Plaintiffs' injuries and satisfying jurisdictional requirements.

39.     **Jurisdiction Over MarketStreet Capital Partners, LLC**: This Texas LLC, based in Houston, engaged in tortious acts—using Plaintiffs' trade secrets and goodwill—within this district, subjecting it to specific jurisdiction.

40.    Plaintiffs assert that this Court has personal jurisdiction over defendants Laurie Cooper, MarketStreet Capital Partners AR, LLC, Starrex Title Florida, LLC, pursuant to the Texas long-arm statute because they purposefully availed themselves of the privileges and benefits of conducting business in Texas. Tex. Civ. Prac. & Rem. Code § 17.042.

41.    **Jurisdiction Over MarketStreet Capital Partners AR, LLC**: This Arkansas LLC, controlled by Texas Defendant Brewer, along with Garth and Clayton, targeted Texas Plaintiffs by receiving misappropriated assets, with effects in Houston, establishing minimum contacts under *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). MarketStreet Capital Partners AR, LLC then conspired with and aided and abetted Cooper in misappropriating and misusing those misappropriated Texas trade secrets, customer data and other proprietary information to facilitate its competing title business operations improperly usurped from the Magnolia entities. It knew or should have known that its conduct would have effects in the forum state of Texas. *See Gen. Elec. Co. v. Brown Ross Int'l Distribs., Inc.*, 804 S.W.2d 527, 533 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (citing to *McFee v. Chevron Int'l Oil Co.*, 753 S.W.2d 469, 473 (Tex. App.—Houston [1st Dist.] 1988, no writ)).

42.    **Jurisdiction Over Starrex Title Florida, LLC**: This Florida LLC, formed under Garth's and Clayton's Texas-based direction, received misappropriated Texas Plaintiffs' assets, with effects in Houston, satisfying the *Calder* effects test for specific jurisdiction.  Additionally, it was purchased by Houston-based owner Brewer for $1 and collaborated with his MarketStreet entities, including MarketStreet Capital Partners, LLC.

**D.  Specific Personal Jurisdiction Over Laurie Cooper**

232.    This Court has specific personal jurisdiction over Defendant Laurie Cooper because her contacts with Texas directly relate to the claims asserted in this litigation and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

*i. Cooper's Substantial, Purposeful, and Systematic Contacts with Texas*

233.    Cooper served as President of Magnolia Title Arkansas and Magnolia Title Florida from 2021 until her resignation on February 2, 2024. Throughout this period, Cooper maintained continuous, substantial, and systematic contacts with Texas, purposefully directing her activities toward the forum state through multiple channels:

    a.  **Regular In-Person Presence:** Despite residing in Florida, as the President of two Magnolias, Cooper regularly traveled to Texas for business purposes, attending quarterly in-person meetings at Magnolia's Houston headquarters throughout 2021-

2023. These were not casual or isolated visits but structured business meetings essential to her role. On information and belief, visits include, but are not limited to, the following: (i) April 14, 2021: Strategy meeting in Houston, (ii) July 14-15, 2021: Two-day operations planning in Houston, (iii) February 28, 2022: Executive meeting in Houston, (iv) April 22, 2022: Budget planning session in Houston, (v) July 25-26, 2022: Mid-year review in Houston, (vi) October 17-18, 2022: Strategic planning in Houston, (vii) January 23-24, 2023: Annual planning in Houston, (viii) April 17-18, 2023: Operations review in Houston.

b. **Integrated Management Structure:** Cooper reported directly to Texas-based management, including John Magness in Houston, as part of a centralized management structure. Her employment agreement, negotiated and executed in Texas, explicitly acknowledged this Texas-based reporting structure.

c. **Continuous Virtual Presence:** Between physical visits, Cooper participated in at least 150 weekly operational calls with Texas-based executives including John Magness, Britt Naponic, and Anelle Sena. These calls, hosted on Texas managed Ring Central platforms, involved active coordination of operations across all Magnolia entities. These were not passive communications but essential business functions directed at and from Texas.

d. **Texas-Branded Operations:** Cooper consistently represented herself as part of the Texas-based Magnolia organization. She sent employment offer letters on letterhead displaying "Magnolia Title, 14701 Saint Mary's Lane Ste 150, Houston, Texas 77079," explicitly connecting her operations to the Texas headquarters. In a June 24, 2022 email to Debbie Merritt and John Magness, Cooper stated she would be "extending this offer" to an escrow officer on Texas-branded letterhead. e. Texas-Centered Technology Infrastructure: Cooper's daily operations relied entirely on Texas-based technology systems. The Qualia platform that served as the backbone of her operations was hosted on servers physically located in Texas (specifically on AWS Edge Locations in Dallas/Fort Worth and Houston) and administered by Texas-based IT personnel.[2] All financial operations were centralized through Texas-based accounting systems.

43.    Additionally, in an email dated June 24, 2022, from Laurie Cooper to Debbie Merritt and John MagnessCooper states, "I will be extending this offer to this escrow officer. She will bring approx. $55,000 monthly gross revenue." The attachment is a job offer for Magnolia Title on Houston, TX letterhead, further evidencing the Texas connections of her role.

44.    Finally, by accepting her own offer of employment, starting in the position, accepting a salary, and performing the role, Cooper acknowledged the existence of proprietary information and agreed to protect it as stated in her offer letter received from Texas. This offer letter, which Cooper received and accepted by starting her position as President, includes language regarding the confidentiality of Magnolia Title's information and Cooper's duty to protect it. Cooper had an

---

2

obligation to maintain the confidentiality of Magnolia Title's proprietary information and on information and belief, was put on notice that she would receive access to confidential and proprietary information and trade secrets, which includes the valuable customer lists and examination information discussed earlier.

234.    Cooper's contacts with Texas were not random, fortuitous, or attenuated, but rather deliberate engagements that created a substantial connection with the forum state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (finding jurisdiction proper where contacts create a "substantial connection" with the forum state). Cooper deliberately affiliated herself with Texas through her ongoing professional role in a Texas-centered organization, her regular physical presence, and her continuous use of Texas-based systems and infrastructure.

### ii. Claims Arise Out of and Relate to Cooper's Texas Contacts

235.    Plaintiffs' claims against Cooper directly arise from or relate to her contacts with Texas, satisfying the second prong of the specific jurisdiction analysis. *See Seiferth v. Helicopteros Atuneros, Inc.*, 472 F. 3d 266, 271 (5th Cir. 2006).

236.    Specifically:

   a. **Trade Secret Misappropriation:** Cooper's alleged misappropriation of trade secrets directly involved Texas property. The proprietary information she accessed and allegedly misappropriated was stored on Texas-based servers and belonged to Texas entities. The Qualia deployment she accessed contained trade secrets developed in Texas, stored in Texas, and owned by Texas entities.

   b. **Breach of Fiduciary Duty:** Cooper's fiduciary duties extended to Texas-based entities (Coast to Coast Title, LLC and Sol City Title, LLC) and Texas-based management. Her alleged breaches of these duties directly harmed Texas entities and residents.

   c. **Tortious Interference:** Cooper's alleged interference with contracts directly impacted agreements centered in Texas, including the Qualia contract that was negotiated, executed, and paid for from Texas, along with employment agreements with Texas-based management.

   d. **Conversion:** Cooper's alleged conversion of assets included digital property stored on Texas servers and owned by Texas entities, as well as funds transferred from accounts controlled by Texas-based management.

237.    Cooper is employed by both MarketStreet Capital Partners, LLC (a Texas limited liability company), and MarketStreet Capital Partners AR, LLC, both of which are owned by Brewer, a Texas resident.  MarketStreet Capital Partners, LLC (TX) does business in Florida as "Magnolia Title Company".

238. Cooper's specific actions directed at Texas include but are not limited to the following:

    a. In February 2024, Cooper downloaded customer lists and proprietary data from Texas-based servers for allegedly improper use. These servers were located in Texas (specifically including AWS Edge Locations in both Dallas/Fort Worth and Houston), and the data belonged to Texas-based entities.  Not only does Qualia operate in Texas and office in Austin, Texas, but it states that it uses Amazon Web Services (AWS) to host its cloud data. AWS Edge Locations include sites hosted in Dallas/Fort Worth, TX and Houston, TX which would specifically cache and serve the Magnolias' data from the Qualia System.[3]  Cooper knowingly accessed these Texas-based servers on a daily basis.

    b. Cooper coordinated with Defendant MarketStreet Capital Partners, LLC, a Texas entity, to allegedly misappropriate Magnolia's assets and business operations, directly harming Texas companies.

    c. Cooper's February 2024 transfers of funds ($4,585.75 on February 6, $2,560.00 on February 8, and $52,618.41 on February 22) were made through the centralized Texas-based accounting system.

    d. On March 5, 2024, Cooper allegedly cut off access to the Qualia platform (for which Magnolia had paid $33,374.75 through March 2024), directly affecting Texas-based operations and paralyzing Plaintiffs' business activities in Texas.

### *iii. Effects Test Provides Additional Basis for Jurisdiction*

239. Cooper's actions satisfy the "effects test" established in *Calder v. Jones*, 465 U.S. 783 (1984), providing an additional basis for jurisdiction. Under this test, a defendant's tortious conduct outside the forum state can support specific jurisdiction when the conduct was expressly aimed at the forum and caused harm the defendant knew would be suffered in the forum state. *See Calder*, 465 U.S. at 789-90; *Walden v. Fiore*, 571 U.S. 277, 286-87 (2014).

240. Cooper expressly aimed her conduct at Texas through multiple actions:

    a. She knowingly accessed and allegedly misappropriated intellectual property stored on Texas-based servers and belonging to Texas entities;

---

[3] Not only does Qualia operate in Texas and office in Austin, Texas, but it states that it uses Amazon Web Services (AWS) to host its cloud data. See Datacenter, Device & Physical Security at Qualia, available at https://fs.hubspotusercontent00.net/hubfs/2336906/Security%20-%20Qualia%20Trust%20Center%20-%20Whitepaper%20Assets/Data%20Center%20&%20Physical%20Security_Qualia.pdf (last visited February 27, 2025). AWS, in turn, states that its servers and data centers are deployed at various locations around the United States, including at "Edge Locations" that are optimized for low-latency content delivery and high performance for speedy access to end-users. *See* https://aws.amazon.com/about-aws/global-infrastructure/regions_az/ (last visited Feb. 27, 2025); https://awsfundamentals.com/blog/aws-edge-locations (last visited Feb. 27, 2025). Edge Locations include sites hosted in Dallas/Fort Worth, TX and Houston, TX ("Local Zones" are also hosted in those sites) which would specifically cache and serve the Magnolias' data from the Qualia System. *Id.* Cooper knowingly accessed these Texas-based servers on a daily basis.

b. She transferred proprietary information to MarketStreet Capital Partners, LLC, a Texas entity, knowing this would harm Texas-based Plaintiffs;

c. She allegedly coordinated with Texas residents (Garth and Clayton) to execute a scheme targeting Texas-based businesses; and

d. She knew her termination of Qualia access would directly impact Texas operations, as all Magnolia entities operated on the integrated platform managed from Texas.

241. The brunt of the harm from Cooper's actions was felt in Texas, where Coast to Coast Title, LLC and Sol City Title, LLC are based, and where John Magness resides. *See Calder*, 465 U.S. at 789 (noting relevance of where the "brunt" of harm is felt). The coordinated scheme in which Cooper allegedly participated specifically targeted Texas-based businesses and their Texas-based management, causing foreseeable harm in the forum state.

242. The Fifth Circuit has recognized that personal jurisdiction is proper where a defendant "purposefully directs" activities toward the forum state and the alleged harm "arises out of or results from" those activities, regardless of where the defendant was physically located when conducting those activities. *See Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 484-486 (5th Cir. 2008). Here, Cooper's actions were specifically calculated to cause injury to Texas Plaintiffs in Texas, and the effects of her conduct were primarily felt in Texas.

### iv. Due Process Reasonableness Factors Support Jurisdiction

243. Exercising personal jurisdiction over Cooper is reasonable and consistent with traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). The relevant factors all favor jurisdiction:

a. <u>Burden on Defendant</u>: Any burden on Cooper to litigate in Texas is minimal given her regular travel to Texas for business purposes over a multi-year period, demonstrating her ability to navigate the forum state. *See Burger King*, 471 U.S. at 476-77 (noting that modern transportation and communication have lessened traditional concerns about jurisdictional burdens).

b. <u>Forum State's Interest</u>: Texas has a strong interest in adjudicating disputes involving alleged harm to its residents and businesses. Two of the Plaintiff entities (Coast to Coast Title, LLC and Sol City Title, LLC) are Texas companies, and Plaintiff John Magness is a Texas resident. *See McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (recognizing state's "manifest interest" in providing redress for its residents).

c. <u>Plaintiff's Interest</u>: Plaintiffs have a substantial interest in obtaining convenient and effective relief in Texas, where most witnesses and documentary evidence are located, including records of the Texas-based management structure that Cooper operated

within. *See, e.g.*, *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113-14 (1987).

    d.   <u>Judicial System's Interest</u>: Litigating all claims against all defendants in a single forum promotes efficient resolution and is appropriate where the Plaintiff has been injured. *See World-Wide Volkswagen*, 444 U.S. at 292.

    e.   <u>Shared Interest of States</u>: Adjudicating claims of breach of fiduciary duty, trade secret misappropriation, and tortious interference in a single proceeding advances substantive social policies shared by all states. *See id.*

### *v. Fifth Circuit and Texas Precedent Support Jurisdiction*

244.   Fifth Circuit and Texas precedent strongly support jurisdiction over Cooper. *In Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 382-83 (5th Cir. 2003), the Fifth Circuit found personal jurisdiction proper where the defendant tortious interfered with the Plaintiff's contracts, even though the defendant never physically entered Texas. *See also Burger King,* 471 U.S. at 476, 105 S.Ct. 2174 (holding that specific personal jurisdiction cannot be avoided merely because the defendant did not physically enter the state and that it may be based on actions that are purposefully directed toward a resident of a forum state.). Similarly, in *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 314 (5th Cir. 2007), the court held that a defendant's intentional tort expressly aimed at Texas supported specific jurisdiction.

245.   The Texas Supreme Court has similarly recognized that when a nonresident's actions were purposefully directed towards Texas, the nonresident's lack of physical contacts with Texas does not preclude Texas courts from exercising jurisdiction. *See TV Azteca v. Ruiz*, 490 S.W.3d 29, 40-41 (Tex. 2016). Cooper's substantial, continuous contacts with Texas over a multi-year period, combined with her purposeful direction of allegedly tortious acts toward Texas, provide a clear basis for jurisdiction.

246.   Recent Fifth Circuit decisions have specifically upheld personal jurisdiction in cases involving digital misappropriation similar to the allegations here. In *Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 489-91 (5th Cir. 2018), the court found specific jurisdiction proper where the defendant made misrepresentations over telephone a Texas resident. In *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 103-04 (5th Cir. 2018), the court opined that electronic communications directed into Texas could support specific jurisdiction where they were central to the claim and deliberately targeted Texas, so long as it was not one isolated email.

247.   Cooper's case presents substantially stronger jurisdictional ties than many cases where courts have upheld jurisdiction. Unlike defendants in cases with mere incidental contacts, Cooper

maintained a years-long professional relationship centered on Texas, regularly traveled to Texas for business meetings, consistently represented herself as part of a Texas-based organization, and allegedly targeted Texas-based assets with her actions. These extensive contacts and deliberate targeting of Texas satisfy all requirements for specific personal jurisdiction.

248.   For all these reasons, this Court's exercise of personal jurisdiction over Cooper is proper under both statutory and constitutional standards.

## E.  Recent Events Involving Laurie Cooper and MarketStreet

45.    In February 2024, Plaintiffs became aware that Cooper had facilitated the unauthorized transfer of the Magnolia Entities' proprietary data from the Texas-based Qualia servers to systems or a deployment belonging to MarketStreet Capital Partners, LP and MarketStreet Capital Partners AR, LP (collectively, "MarketStreet"). MarketStreet Capital Partners, LP has generally appeared in this lawsuit without challenging jurisdiction and is a Texas limited partnership. Therefore, Cooper provided the Magnolia Entities' proprietary data to a Texas-based company.  Additionally, it was then confirmed to Plaintiffs in February 2024 that Cooper was employed by the Texas-based MarketStreet Capital Partners, LP, which obtained an assumed name of "Magnolia Title Company" in Florida and has operated as though it is Magnolia Title Florida, LLC.

46.    Through their investigation, the Plaintiffs discovered that Cooper continued to access the Qualia platform immediately after her resignation on February 2, 2024. Upon facilitating the mass resignation of numerous Magnolia employees, she caused them to achieve uninterrupted access to the Qualia platform containing our confidential and proprietary data for her benefit and the benefit of her employer, MarketStreet.

47.    On information and belief, Cooper, along with MarketStreet, appear to be accessing the same deployment or a mirror image of our deployment of Qualia containing Magnolia Entities' proprietary information.

48.    The Magnolia Entities last paid for their Qualia subscription on December 21, 2023, in the amount of $33,374.75, which covered usage through March 2024. This substantial payment demonstrates the critical importance of the Qualia platform to our operations and Cooper's daily activities. In email dated December 20, 2023, Cooper arranged for this payment from Magnolia

Florida to Qualia for the benefit of all Magnolia Entities by ACH from the Magnolia Florida operating account.

49. In an email dated December 21, 2023, Cooper again raised the issue of the quarterly payment of $33,374.75 to cover the first quarter of 2024 and acknowledged the necessary monetary transfers between the Texas, Florida, and Arkansas-based Magnolia Entities relating to the Qualia payment.

50. Less than 45 days after arranging this payment, Cooper resigned and immediately joined competitor MarketStreet. On information and belief, MarketStreet used the Qualia deployment for which the Magnolia Entities had already paid $33,374.75 in December 2023, which would cover usage through March 2024.

51. After Cooper's resignation, Plaintiffs discovered evidence that Cooper had directed the unauthorized transfer of a large amount of proprietary information from the Texas-based Qualia servers to a Qualia deployment used by MarketStreet. This included confidential business and client information, including the highly valuable customer lists and examination information previously described. Plaintiffs do not even know the full extent of everything she has taken to MarketStreet and our investigation is ongoing.

52. After her resignation on February 2, 2024, we discovered that Cooper continued to use Magnolia Entities' misappropriated trade secrets and confidential information to compete directly with the Magnolia Entities. Specifically, MarketStreet offered competitive services using our proprietary procedures and targeted our clients using our confidential information. In fact, on information and belief, MarketStreet and Cooper represented to the public, customers, and others that they were Magnolia Title Florida, LLC and likewise continued the transactions in progress hosted on Qualia as though nothing at all had changed. Additionally, on information and belief, Cooper and MarketStreet took other valuable property from the Magnolias Entities, including but not limited to their social media accounts, web presence, good will, phone numbers, and logos.

53. On February 6, 2024, without authorization, Cooper wrongfully accessed Magnolia's escrow account and its Florida recording account ending in 5041, and transferred $4,585.75 from the escrow account to the recording account. That same day, Cooper wrongfully accessed Magnolia's Florida operating account ending in 1758 and Magnolia Title's Frost Bank operating account and sent an outgoing wire in the amount of $2,560.00 from the Florida operating account to the Frost Bank operating account. On February 22, 2024, Cooper wrongfully accessed Magnolia's Florida

underwriting account ending in 1766 and transferred $13,972.44 from her new escrow account. Also on February 22, 2024, without authorization, Cooper accessed Magnolia's Florida operating account ending in 1758 and wrongfully withdrew $52,618.41.

54.    The misappropriation of the Mangolias' trade secrets and confidential information has caused significant harm to the Magnolias. In conjunction with other actions taken against the Magnolias by other parties, the businesses were irreparably harmed and forced to wind down in accordance with insurance regulations and state law.

55.    Cooper committed at least some of these acts while employed by MarketStreet Capital Partners, LLC, a Texas-based limited partnership. MarketStreet Capital Partners, LLC and MarketStreet Capital Partners AR, LLC, has confirmed that they employed Cooper immediately after she resigned as President of Magnolia Title Florida and Magnolia Title Arkansas. Cooper is still an employee of MarketStreet and has been since her resignation as President in February 2024.

56.    Given Cooper's use of Texas-based letterhead for official company business, her frequent communications with Texas-based management, her access to and use of Texas-based servers containing proprietary information, and her subsequent employment with a Texas-based competitor, it is clear that Cooper's actions were substantially connected to the state of Texas and caused harm to Texas-based business interests.

57.    In January-February 2024, MarketStreet Capital Partners AR, LLC then conspired with and aided and abetted Cooper in misappropriating and misusing those misappropriated Texas trade secrets, customer data and other proprietary information to facilitate its competing title business operations improperly usurped from the Magnolia entities.  It knew or should have known that its conduct would have effects in the forum state of Texas.  *See Gen. Elec. Co. v. Brown Ross Int'l Distribs., Inc.*, 804 S.W.2d 527, 533 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (citing to *McFee v. Chevron Int'l Oil Co.*, 753 S.W.2d 469, 473 (Tex. App.—Houston [1st Dist.] 1988, no writ)).

58.    Starrex Title Florida, LLC is a Florida limited liability company solely managed by Starrex Insurance Holdings, Inc., which has already appeared in this litigation. By misappropriating the Magnolia entities' Texas trade secrets and business assets through its connections with Cooper and MarketStreet, Starrex Title Florida purposefully availed itself of jurisdictional contacts in Texas.

59.    All defendants' contacts with Texas arise from the same nucleus of operative facts giving rise to this litigation regarding misappropriation of trade secrets and corporate opportunities belonging to Texas entities. Thus, specific personal jurisdiction exists that comports with due process.

*See Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) (specific jurisdiction requirements met where suit arises from or relates to defendant's contacts with Texas).

60.    Personal jurisdiction over these defendants is further proper under the Texas long-arm statute because they recruited Texas residents like Cooper for employment and conspired to misappropriate trade secrets from Texas companies in furtherance of their tortious activities. *See* Tex. Civ. Prac. & Rem. Code § 17.042. The quality and nature of their purposeful contacts related to this litigation, combined with their targeting of Texas companies and residents for harm, make the exercise of jurisdiction proper and comport with traditional notions of fair play and substantial justice.

61.    "Even if all of a corporate representative's actions are performed in his corporate capacity, the officer or member may also be subjected to personal jurisdiction and held liable in his individual capacity for those actions if they were tortious." *City of White Settlement v. Emmons*, No. 02-17-00358-CV, *40 (Tex. App.—Fort Worth Sept. 27, 2018, pet. denied) (mem. op.) (citing *OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *9 (Tex. App.—Fort Worth Mar. 29, 2018, no pet.) (mem. op.); *Deaton v. Moreno,* No. 02-16-00188-CV, 2017 WL 4683940, at *5 (Tex. App.—Fort Worth Oct. 19, 2017, pet. denied) (mem. op.); *Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 581 (Tex. App.—Austin 2006, no pet.). A corporate officer who had "direct, personal participation in the wrongdoing" so that he was the " 'guiding spirit behind the wrongful conduct' or the 'central figure' in the challenged corporate activity" may not escape liability. *City of White Settlement*, No. 02-17-00358-CV, at *40 (citing *Ennis v. Loiseau*, 164 S.W.3d 698, 707 (Tex. App.—Austin 2005, no pet.) (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985))).

62.    Out-of-state Defendants have routinely and purposefully reached into the state of Texas to conduct business, acquire trade secrets, solicit employment, and/or attend business-related meetings. *Broussard v. IPSCO Tubulars, Inc.*, 641 S.W.3d 805, 811-12 (Tex. App.—Eastland 2022) (citing *BMC Software Belgium v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)). Out-of-state Defendants have misappropriated or committed unauthorized disclosure of confidential information stored in Texas, belonging to businesses with their principal place of business in Texas. All tortious acts plead herein occurred in Texas.

63.    In sum, by committing tortious acts and/or knowingly misappropriating trade secrets and intellectual property from Texas entities, using misappropriated assets to facilitate operations directly competing against Texas companies, and conspiring with Texas residents like Cooper toward these unlawful ends, the defendants purposefully established minimum contacts within Texas and could

reasonably anticipate being haled into Texas courts. Their actions satisfy Texas's long-arm statute and due process requirements for personal jurisdiction.

# IV.
# FACTUAL BACKGROUND

### A. The Systematic Pattern of Fraud and Control (April 2021-February 2024)

64.    From April 2021 through February 2024, Defendants Garth and Clayton engaged in a calculated scheme to exploit Plaintiffs' assets, relationships, and efforts without providing legitimate consideration. Their conduct was not a failed business venture but rather a sophisticated fraud involving specific misrepresentations, financial manipulation, and eventually the outright misappropriation of valuable business operations.

65.    Notably, "Even if all of a corporate representative's actions are performed in his corporate capacity, the officer or member may also be subjected to personal jurisdiction and held liable in his individual capacity for those actions if they were tortious." *City of White Settlement v. Emmons*, No. 02-17-00358-CV, *40 (Tex. App.—Fort Worth Sept. 27, 2018, pet. denied) (mem. op.) (citing *OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *9 (Tex. App.—Fort Worth Mar. 29, 2018, no pet.) (mem. op.)). The specific actions of Garth and Clayton alleged throughout this complaint were undertaken in their individual capacities and for their personal benefit, not merely as corporate representatives acting within the scope of their authority.

66.    **Initial Recruitment and Fraudulent Inducements (April 2021)**: Plaintiff John Magness, a Houston resident with over 20 years in title insurance, had built a reputation as a top executive, including as Executive Vice President at a Fortune 500 company, managing $45 billion in assets under management. By early 2021, he declined a $10 million underwriter offer from Fidelity or Old Republic and a position managing $45 billion in assets, making him a prime target for Garth and Clayton.  Garth and Clayton were well aware of these facts, including but not limited to the fact that Magness had forwarded an email to Clayton from the $45 billion fund seeking to recruit him to a top executive position.

67.    On April 8, 2021, at Post Oak Grill in Houston, Garth made specific, concrete representations to Magness, promising to raise "$50 million from friends and family investors," specifically naming potential participants including Ben Moreland of Crown Castle. Clayton detailed

a matching "$50 million credit facility" and a defined acquisition structure ("20% down payment, 50% payment after one year, and 30% performance-based earnout"). They promised Magness would become CEO of Starrex with a board seat replacing Garrett Clayton, and receive 3 million shares of Starrex stock.

68.    On April 13, 2021, Clayton emailed Magness from Texas: "...join partners 'with the highest of moral character' and to 'not overlook the Canadian Pubco (Starrex) that has a dual listing in the U.S. We could easily have a $10.00 share by the summer and could control our destiny...' "

69.    On April 15, 2021, at the AmCap Cancer Event in Houston, Garth elaborated on a specific timeline for completing "ten acquisitions in the first year." Garth outlined to John that they would acquire specific title companies by putting 20% of the purchase price down, paying 50% of the purchase price in a year, and holding back 30% of the price over 3-5 years to keep the management/ownership working for the acquired company. Garth continued: Eventually, in lieu of the purchase price, the acquired title company would convert the held back amount into Starrex stock, as the stock would be at $3/share when Magness, Garth and Clayton first began efforts to roll up specific title companies in this manner but increase to $5/share when the acquisitions actually commence.  Garth cited to Voxer and Real Matters (both at $13) for justification, and to demonstrate the specificity of his plans and intentions, he detailed a precise acquisition model to conserve cash.

70.    Garth and Clayton bolstered credibility by misrepresenting Debbie Merritt as holding a CFA and UCLA PhD, known to them as false. They directed non-defendant Matthew D. Hill (Starrex CEO) and attended all Magness meetings, concealing their total control.

71.    These representations induced Magness to decline other opportunities and, by April 30, 2021, begin forming the Magnolia Companies under Starrex's umbrella, integrating them with Texas-based Coast to Coast Title, LLC and SolCity Title, LLC.

72.    **Evidence of Comprehensive Control (2021-2022):** Throughout this period, Garth and Clayton maintained comprehensive control over operations while carefully cultivating the appearance of limited formal authority. Despite lacking formal officer positions, they directed all significant business decisions from April 2021 through February 2024.

73.    Their authority was demonstrated through their control of financial decisions (illustrated by blocking a $10,000 KIPP donation with Merritt's notation: "DO NOT PAY PER TERRY AND PHIL"), their direction of personnel matters, and their oversight of strategic planning. They installed Clayton's son-in-law Matthew Hill as CEO and son Garrett Clayton as director, ensuring family

control of the board. They positioned Merritt as CFO despite knowing she lacked the credentials they touted, making her dependent on their protection.

74.    Garth and Clayton's control was so pervasive that they dictated personnel decisions, overruling Magness on critical hiring and compensation matters. In November 2022, Patricia Rissenen, who had been hired as President of the Magnolia Companies following the BSpoke settlement, left the company after Garth and Clayton refused to honor her contractual guaranteed payment. Rissenen informed Magness and Mitchell that "Garth and Clayton won't let John run the company" and that "Debbie runs everything," further stating that Debbie was completely controlled by Garth and Clayton. When Rissenen objected to certain actions, Clayton personally berated her, causing her to contact Magness and threaten to quit, stating she would "never work for Garth and Clayton." This demonstrates Garth and Clayton's actual control over operations, as they made decisions that should have been within Magness's authority, including rejecting personnel recommendations from HMH Title Investments, LLC's ("HMHTI") Nelson Mitchell, who considered Rissenen vital to operations.

75.    Throughout 2021-2023, Garth and Clayton exercised pervasive control over all significant operational decisions, as evidenced by their contemporaneous communications:

   a.   On February 15, 2022, Merritt explicitly confirmed Garth's ghostwriting practices in a text to Magness: "You read the email terry and I put together," referring to a formal corporate memo supposedly authored by others. The metadata confirms Garth drafted this memo, which falsely stated "Starrex is not an owner or nor in any business relationship with the Magnolias" while simultaneously directing Starrex funding.

   b.   On March 15, 2022, Merritt texted Magness: "Terry gave some pretty stern instructions to the team to source 2-6 acquisitions asap to replace the bspoke agencies we didn't acquire. The one consistent theme through all of it was his and our committment to give you a platform upon which to build."

   c.   When faced with operational questions on April 12, 2022, Merritt bypassed the CEO (Hill) and texted Garth directly: "WHAT DO YOU THINK WE SHOULD DO, TERRY?" Similarly, on March 7-8, 2022, during critical settlement negotiations, Merritt repeatedly referred all decisions to Garth, texting Magness: "I had two very long conversations with Terry yesterday. He did ask for input on settling."

   d.   On April 21, 2022, Garth explicitly directed the litigation strategy, writing: "By copy of this email, I am sending John the email from Kergin and am asking that he review this with Britt and Patricia to get their input."

   e.   On May 24, 2022, Garth drafted a detailed term sheet for HMH that explicitly stated that within 60 days, "STX will 'complete' 100% ownership of the 4 Magnolias," demonstrating his knowledge of and authority over the entire acquisition strategy.

f.  On June 23, 2023, when Starrex received an external inquiry regarding an LOI, Hill immediately forwarded it to Garth and Clayton rather than responding himself, despite being CEO, demonstrating his understanding that they controlled such decisions.

g.  Further, in July 2023, Clayton explicitly admitted to Nelson Mitchell that 'if anyone does a forensic audit [on the Magnolias], we are f***ed,' confirming their fraudulent intent. Clayton's statement acknowledged the impropriety of the transactions and his awareness that they would not withstand scrutiny, further evidencing his knowledge of and participation in the misappropriation scheme.

76.    In January 2022, at a Lamar University event in Beaumont, Garth reinforced his promises to Magness, stating, "THIS IS GOING TO BE YOUR COMPANY," describing it as a "Wealth Event" requiring estate planning.

77.    **The HMHTI Investment Misappropriation (Summer-Fall 2022)**: In Summer 2022, Garth and Clayton induced a $1 million investment from HMHTI at Love Field FBO in Dallas, promising integration and governance via Side Letters requiring supermajority approval. An analysis of bank statements reveals the following: On September 9, 2022, HMHTI wired $1 million. Defendants then misappropriated it by way of at least: (a) $250,000 withdrawn September 13, 2022; (b) $705,111.55 withdrawn September 21, 2022; (c) $75,561.85 paid to "Commercial Construction Services, LLC" on September 20, 2022. These transfers totaling $1,030,673.40 from September 13, 2022 to September 28, 2022 were deliberately structured to avoid detection and immediately followed receipt of HMHTI's investment. Garth and Clayton had repeatedly instructed Merritt and Hill to "wait for Nelson's money" to satisfy Garth and Clayton's personal debt obligation of $1 million to Starrex.

78.    An analysis of the Magnolias' Frost Bank statements revealed these transactions:

| Acct/Bnk | Date | Memo/Bank Stmt | From STX | To STX | From Third Parties | To Third Parties | Bates | Acct |
|---|---|---|---|---|---|---|---|---|
| BANK | 9/12/2022 | Wire Transfer In | | | HMH WIRE: $700,000 | | STX1091 | DAL Frost |
| BANK | 9/12/2022 | Wire Transfer In | | | HMH WIRE: $50,000 | | STX1185 | FL Frost |
| BANK | 9/12/2022 | Wire Transfer In | | | HMH WIRE: $50,000 | | STX1065 | AR Frost |
| BANK | 9/12/2022 | Wire Transfer In | | | HMH WIRE: $200,000 | | STX1217 | HOU Frost |
| BANK | 9/13/2022 | Frost Connect Transfer | | $ 250,000.00 | | | STX1093 | DAL Frost |
| BANK | 9/20/2022 | Commercial Construction Services (UNKNOWN) | | | | $ 75,561.85 | STX1095 | DAL Frost |
| BANK | 9/21/2022 | Frost Connect Transfer | | $ 72,891.65 | | | STX1093 | DAL Frost |
| BANK | 9/21/2022 | Frost Connect Transfer | | $ 92,531.66 | | | STX1093 | DAL Frost |
| BANK | 9/21/2022 | Frost Connect Transfer | | $ 225,000.00 | | | STX1187 | DAL Frost |
| BANK | 9/21/2022 | Frost Connect Transfer | | $ 225,000.00 | | | STX1187 | FL Frost |
| BANK | 9/21/2022 | Frost Connect Transfer | | $ 49,688.24 | | | STX1217 | HOU Frost |
| BANK | 9/21/2022 | Frost Connect Transfer | | $ 40,000.00 | | | STX1067 | AR Frost |
| BANK | 9/28/2023 | Frost Connect Transfer | | $ 27,721.27 | | | STX1067 | AR Frost |

79.    Garth and Clayton's knowledge and intent regarding the misappropriation of HMHTI's investment is further evidenced by contemporaneous discussions between Hill and Merritt. In

September 2022, Hill and Merritt expressed alarm about using Nelson Mitchell's investment to satisfy Garth and Clayton's personal obligation to Starrex, with Hill stating words to the effect of "I can't believe they [Garth and Clayton] did this again" and "I'm going to be in deep trouble as the CEO of Starrex." Hill further expressed concern that this transaction could lead to serious consequences during an audit. Despite these concerns, Hill and Merritt proceeded with the transactions specifically because Garth and Clayton had instructed them to do so. (Merritt even stated that it "went against every fiber of her being", but she did it anyway.) For weeks before HMHTI's investment arrived, Garth and Clayton had repeatedly told Hill and Merritt to "wait for Nelson's money" to repay the advance. This demonstrates that the misappropriation was not an impromptu decision but a premeditated plan directed by Garth and Clayton and shows the pervasive control they exercised over both the Magnolias and Starrex.

80.     This systematic diversion of HMHTI's investment funds—intended for Magnolia's operations and growth—to satisfy Garth and Clayton's personal debt to Starrex constituted a direct theft from Magnolia, depriving it of the capital needed for operations while leaving it burdened with debt obligations.

81.     Day in and day out, the executives of the Magnolias witnessed the subservience of the CEO and COO and Directors to Garth and Clayton.  They wanted them take ordered from Garth and Clayton every day.  They watched Garth and Clayton attend and run every meeting and make every decision.  Decisions could only be made the input of Garth and Clayton and decisions could not be made contrary to their desires.  The conclusion was undeniable: Garth and Clayton were actually in complete control of both Starrex and the Magnolias.  And, they wanted everyone they met with to know it.

82.     Clayton later admitted to Nelson Mitchell in July 2023, stating: "if anyone does a forensic audit [on the Magnolias], we are f***ed," confirming their fraudulent intent. Clayton's statement acknowledged the impropriety of the transactions and his awareness that they would not withstand scrutiny, further evidencing his knowledge of and participation in the misappropriation scheme.

83.     **Equity Dilution Scheme (July 2022)**: In mid-2022, Garth and Clayton executed a calculated equity scheme targeting The Peabody Bulldog. In July 2022, at Starrex's Houston offices, Garth and Clayton specifically represented to TPB that another million dollars needed to be invested

for working capital, and he offered that he and Clayton would take 11% equity (reducing TPB's equity in the Magnolias from 20% to 11%) so that TPB could sit out the capital call.  Garth and Clayton affirmed that they would personally contribute the full million dollars in exchange for TPB reducing its equity in the Magnolias from 20% to 11%, which would provide additional equity to Garth and Clayton against the coming anticipated dilution of HMH/Nelson Mitchell's investment.  They also represented that TPB would receive millions of shares of Starrex after the acquisition occurred and thus, this reduction in equity would mean nothing. Despite securing The Peabody Bulldog's agreement to reduce its equity from 20% to 11%, they never contributed the promised $1 million. Instead, they directed Merritt and Hill to advance this amount from Starrex's accounts, effectively creating a debt rather than fulfilling their personal obligation.

84.    Garth and Clayton directed Merritt and Hill to advance this amount from Starrex's accounts, effectively creating a debt rather than fulfilling their personal obligation. This created a significant personal liability for Garth and Clayton to Starrex. In the weeks leading up to HMHTI's investment, both Hill and Merritt expressed serious concerns about using Nelson Mitchell's funds to satisfy this obligation, with Hill indicating to Magness words to the effect that he couldn't believe Garth and Clayton "would do this again" and that he feared being held personally liable as CEO of a publicly traded company. Despite these concerns, Hill and Merritt proceeded with the transactions specifically because Garth and Clayton repeatedly instructed them to "wait for Nelson's money" to satisfy the debt. Clayton later admitted to Nelson Mitchell in July 2023, using words to the effect that if anyone conducted a forensic audit [on the Magnolias], they would face serious consequences, confirming their fraudulent intent.

85.    Throughout 2021-2023, Garth and Clayton exercised pervasive control over all significant operational decisions, as evidenced by their contemporaneous communications. For example:

    a.  On February 15, 2022, Merritt explicitly confirmed Garth's ghostwriting practices in a text to John: "You read the email terry and I put together," referring to a formal corporate memo supposedly authored by others. The metadata confirms Garth drafted this memo,[4] which falsely stated "Starrex is not an owner or nor in any business relationship with the Magnolias" while simultaneously directing Starrex funding.

    b.  On March 7-8, 2022, during critical settlement negotiations with BSpoke, Merritt repeatedly referred all decisions to Garth, texting Magness: "I had two very long

---

[4] The metadata available as shown by document properties indicates creation by "Tyrrell Garth" on February 15, 2022 at 9:17 AM, less than one hour before Merritt forwarded it to Magness stating "You read the email terry and I put together."

conversations with Terry yesterday. He did ask for input on settling" and "Terry will want to lay it all out for John later."

    c.    On April 12, 2022, when faced with operational questions about personal guarantees, Merritt bypassed the CEO (Hill) and texted Garth directly: "WHAT DO YOU THINK WE SHOULD DO, TERRY?"

    d.    On April 21, 2022, Garth explicitly directed the litigation strategy, writing: "By copy of this email, I am sending John the email from Kergin and am asking that he review this with Britt and Patricia to get their input."

    e.    On June 23, 2023, when Starrex received an external inquiry regarding an LOI, Hill immediately forwarded it to Garth and Clayton rather than responding himself, despite being CEO, demonstrating his understanding that they controlled such decisions.

86.    **Fraudulent Documentation and Asset Theft (2023-2024)**: By April 2023, facing audit scrutiny, Garth and Clayton fabricated backdated promissory notes to conceal misappropriations. On April 17, 2023, Garth emailed: "What date should the promissory notes be executed? I suggest a date prior to the first draw." Merritt confirmed they were "for-the-auditor-only," bypassing Side Letter approvals. Defendants later filed baseless UCC statements and demanded invalid payments, contradicting their "audit-only" claim.

87.    The fraudulent nature of the purported Management Services Agreement ("MSA") is particularly evident. Despite being backdated to January 1, 2022, contemporaneous communications demonstrate no such agreement existed until much later. On March 1, 2022, Merritt texted Magness that BSpoke was "asking for March 2022 management fees," confirming no MSA could have been in place as of January 1, 2022. Further, on April 5, 2022, Merritt was still discussing potential "MANAGEMENT SERVICES FUNCTIONS" with Garth and Clayton, showing the MSA was still being conceptualized, not implemented. This backdated MSA was later used by Defendants as purported justification for their control over Magnolia operations, despite being fraudulently created.

88.    On September 27, 2023, on information and belief, Garth ghost-wrote a letter to Nelson Mitchell on Starrex letterhead that was signed by Starrex CEO Matt Hill (in an atypical manner). It was only written to Mr. Mitchell and not to any other owner of the Magnolias. The structure, language, terminology, references, and content of the letter mirrors the many emails and other communications Garth wrote over the preceding two years. The letter threatened a lawsuit against the Magnolias and stated that "[r]egrettably, at our board's direction we are in the process of preparing a petition to collect the debt owed by the Magnolias entities", referring to the for-the-auditor-only promissory notes drafted by Garth himself. It offered to allow "Starrex to assume control of the

Magnolia entities in exchange for the release of the debt owed to Starrex, and restructure the Essent note [ANTIC credit line to Starrex] based upon the following scenario" which outlined how it would not include Magness going forward because Magness needed to "report to [some]one", meaning Garth and Clayton.  Garth and Clayton would not allow Magness to do his job and would not abide a structure where they did not have overarching control.  Mr. Mitchell rejected the proposal and Starrex launched its lawsuit against the Magnolias.  That case has settled and will be dismissed in the coming weeks.

89.    Garth and Clayton's direct involvement in drafting communications they never signed is further evidenced by a December 29, 2023 email sent by Hill to Magnolia shareholders. On December 29, 2023, unable to acquire the Magnolia Companies as promised, Garth and Clayton offered a coercive "settlement," demanding Florida and Arkansas operations for release of fraudulent note claims. This email proposed that Starrex acquire Magnolia Title Florida and possibly Magnolia Title Arkansas in exchange for relief from alleged debt. Despite bearing Hill's signature, the email follows Garth's distinctive writing style, phrasing, and structure. Magness and other Magnolia executives, having worked with both Hill and Garth for years, immediately recognized this as Garth's composition. This ghost-written communication represents another instance of Garth directing company actions while maintaining a veneer of separation from formal decision-making.

90.

91.    Upon rejection, Defendants executed a takeover from January to February 2024, through a carefully sequenced series of actions:

- **January 5, 2024**: Starrex Title Florida, LLC formed, with Starrex Insurance Holdings Inc. as Manager, Cooper as Registered Agent

- **January 25, 2024**: Brewer registered "MAGNOLIA TITLE COMPANY" without consent

- **January 30, 2024**: MarketStreet filed as a foreign entity, listing Magnolia's Florida offices

- **February 2024**: Cooper, still Magnolia President, downloaded customer lists, coordinated employee exits, and transferred funds—$4,585.75 (February 6), $2,560.00 (February 8), $52,618.41 (February 22)—to new entities. She cut Qualia access in March 2024, paralyzing Plaintiffs' operations.

92.    Brewer and MarketStreet used stolen assets—locations, staff, customers, Qualia systems, and goodwill—to operate a shadow business in Texas and Arkansas, replicating Magnolia's branding and transactions. This was theft, not competition, causing over $10 million in damages: lost

operations, HMHTI's $1 million, revenue, and goodwill. The coordinated nature of these actions demonstrates that this was not a case of legitimate competition but rather a calculated scheme to misappropriate Plaintiffs' business while creating the false impression that operations were continuing normally under the same brand.

93.    In January 2024, despite the fact that the Magnolias had already paid $33,374.75 in December 2023 for Qualia through Q1 2024, ending March 31, 2024, Starrex, Merritt, Brewer, MarketStreet, Cooper, and Starrex Title Florida were able to wrest control of the Qualia Platform (including Qualia Core and Qualia Connect), containing a huge amount of proprietary data belonging to the Magnolias and then proceeded to use the platform to facilitate their takeover of the Magnolia Florida and Magnolia Arkansas locations with the participation of MarketStreet, Brian Brewer, Laurie Cooper, Debbie Merritt, Starrex Insurance Holdings, Inc., and Starrex Title Florida, LLC (managed by Starrex Insurance Holdings, Inc.). Today, Brewer and the MarketStreet entities run those locations as a new (but undisclosed to the public, customers, and others) "Magnolia Title" in Sarasota, FL and Little Rock, AR, with all of Magnolias' former employees, including the former President of Arkansas and Florida, and stolen physical and intellectual property.

**B.  Involvement of Cooper, Brewer, and MarketStreet Entities in the Unauthorized and Illegal Florida and Arkansas Magnolia Takeover**

94.    Magnolia Title Florida, LLC[5] has held and used its fictitious name of "MAGNOLIA TITLE" since October 5, 2021[6] and began operating as a title insurance agency. It operated out of 2075 Fruitville Road, Suite 100, Sarasota, FL 34237. (Its business phone has always been (941) 867-8864). Accordingly, it is known in its area of operation and the surrounding area as Magnolia Title. On May 12, 2022, Magnolia Title Florida, LLC changed its Authorized Person to Debbie Merritt and confirmed its registered office address as 2075 Fruitville Road, Suite 100, Sarasota, FL 34237.[7]

---

[5] Formed in Florida on September 27, 2021 via filing # L21000424747.
[6] On October 5, 2021, Magnolia Title Florida, LLC filed with the Florida Secretary of State its Application for Registration of Ficitious Name, Registration # G21000133874, for the fictitious name of "MAGNOLIA TITLE" (Florida Document Number: L2100042447; FEI Number: 87-2916282).
[7] On May 12, 2022, Magnolia Title Florida, LLC filed filing # L21000424747, changing the Authorized Person to Debbie Merritt, Magnolia Title Florida, LLC, 14701 Saint Marys Lane Suite 150, Houston, Texas 77079 with email: dMerritt@starrexintl.com and phone (281)406-8621. The filing also confirmed the mailing address to be 14701 Saint Marys Lane Suite 150, Houston, Texas 77079, and the principal office address to be 2075 Fruitville Road, Suite 100, Sarasota, FL 34237.

95.    Magnolia Title Arkansas, Ltd.[8] has held and used its registered, assumed name of "MAGNOLIA TITLE" with the State of Arkansas since October 29, 2021 and began operating as a title agency (NPN/License # 20121168).  Its business address is 10310 W Markham Street, Suite 220, Little Rock, AR 72205.  (Its business phone has always been (501) 255-2941).  Accordingly, it is known in its area of operation and the surrounding area as Magnolia Title.

96.    Yet, as of January and February 2024, after Plaintiffs filed this lawsuit, MarketStreet Capital Partners and MarketStreet AR, in collaboration with Starrex Title Florida, LLC (for Florida), Cooper (for both Florida and Arkansas), Merritt (same), and Brewer (same), simply claim these addresses, names and phone numbers as their own.  Magnolia Title Florida and Arkansas' operations, intellectual property, and proprietary and trade secret data have been blatantly stolen by these Defendants.  Cooper and Starrex provided and delivered the proprietary and trade secret data that seeded the businesses of MarketStreet and Starrex Title Florida.  According to the states of Arkansas and Florida and Cooper's representations, Cooper is still working for Magnolia Title Arkansas and Florida, despite resigning on February 2nd and Brewer confirming that Cooper works for his MarketStreet companies.  The Designated Responsible Licensed Producer for Magnolia Title Arkansas is also the same as that of MarketStreet AR: Wanda Borecky, (License/NPN # 16812370) and so are the other associated title agents: Laurie Cooper, Josefat Rivera (License/NPN # 18946472), and Dustin Parson (License/NPN# 21005130)

97.    On December 29, 2023, and then on New Years' Eve, Dec. 31, 2023, Starrex makes "an offer to settle with only Magnolia Florida and Magnolia Arkansas".  This is all Starrex wants and both Garth and Clayton together directly and indirectly own 2/3 of Magnolia Florida and Magnolia Arkansas.  They are behind this.  The offer is as follows: allow us to "buy" Magnolia Florida and Magnolia Arkansas with the for-the-auditor-only promissory notes—we take it all and in exchange, we forgive just the for-the-auditor-only promissory notes for Florida and Arkansas.

98.    To apply additional pressure, although Merritt and Starrex agreed to continue migration of all Magnolia data through December 31, 2023 and knows that the Magnolias are relying upon these representations, they suddenly cease migration before the agreed-upon extended deadline is reached.

---

[8] On October 20, 2021, Magnolia Title Arkansas, Ltd. was formed by John Magness, Manager, and Britt Naponic, Incorporator/Organizer via filing # 811335623 with the Arkansas Secretary of State.

99.    On January 2, 2024, Merritt essentially admits in communications that Starrex Technical Services suddenly ceased the migration of Magnolia data and shut off access a few days prior in order to strong arm a deal on Arkansas and Florida—the offer that was sent on December 29th and New Years' Eve by the Starrex group.  She offers to "assist" *only* if the Magnolias are willing to discuss the transfer of Arkansas and Florida.  Of course, she also states that Garth and Clayton have already agreed to this.  She offers to have Garth and Clayton make contact from the Starrex side to discuss a deal on Arkansas and Florida.  This offer is rejected.

---

**From:** Debbie Merritt CFA, PhD <dmerritt@starrexintl.com>
**Date:** Tuesday, January 16, 2024 at 1:51 PM
**To:** Nelson Mitchell <Nelson.Mitchell@historymaker.com>, John Magness <John.Magness@magnoliatitleteam.com>
**Subject:** Florida & Arkansas

> **CAUTION:** This email originated from outside HistoryMaker Homes. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Nelson/John,

As you are aware, both Florida and Arkansas are now without an underwriter.  It is my understanding they are unable to open new files and are searching for a home.  Setting aside whatever personal issues exist on both sides of the table, would you be willing to work something out that preserves your ability to file whatever claims you have against Starrex so that those 28 employees may continue their employment?  I am not asking you to relinquish either entity to Starrex, but merely to assign the leases and assets, which are nominal in those two entities, in exchange for a write off of the debt?  This, at a minimum, allows these individuals to keep their jobs.

Whatever issues exists between Magnolia and Starrex can be settled in whatever manner is required to assuage the claims and move on.

---




100. There was no response to Merritt's January 16, 2024 email sent at 1:51 PM to Mitchell and John Magness (Magness no longer had access to his email) and her January 16, 2024 text message to Mitchell that quickly followed at 1:58 PM. Cooper wrote to Magness by text on January 17, 2024. With their take it or else deal rejected, they decided to take what they wanted without consent or authorization and deal with the consequences later. Merritt, Hill, Cooper, Brewer, MarketStreet, and other co-conspirators, potentially including other professionals and advisors, agreed to proceed with the theft and conversion of Magnolia Title Florida and Magnolia Title Arkansas.    This meeting of the minds and agreement on a common objective(s) is evident in their conferences and phone calls discussing the plot on or about early to mid-January 2024, which may have included professionals other than the participants. In these defendants' minds, a Magnolia employee could simply go home today and return to the office tomorrow, now instead working for a third party d/b/a "Magnolia Title Company."

101. They solicit Cooper in breach of the non-solicitation provision of the Letter Agreement between Starrex and the Magnolias and partner with her. They find a willing co-conspirator in Brian Brewer and MarketStreet, who is running a struggling title business—this is an opportunity for rapid expansion—and with his co-conspirators, all they have to do is steal and use all of Magnolia Arkansas and Magnolia Florida's property and proprietary data and tortious and illegally take over their locations, addresses, phone numbers, and impersonate them in every way possible. No one will know the difference nor be able to stop them—so they think.

102. Indeed, Starrex or its leadership were determined to take Magnolia Title Florida and Magnolia Title Arkansas by any means necessary, whether that meant Starrex would take it for its own purposes or third parties would use these assets for Starrex's potential later benefit. After the Magnolias rejected Starrex's offer to essentially buy those entity with the for-the-auditor-only promissory notes, Starrex spang into action and registered Starrex Title Florida, LLC on January 5, 2024, with the help of Laurie Cooper. Thus, it seems that Cooper had begun actively participating in the conspiracy at least as early as January 5, 2024, while still employed as the President of Magnolia Florida and Magnolia Arkansas, but likely began participating far earlier. She would not formally resign as President until about a month later—February 2, 2024. Notably, Starrex had shut off and blocked all IT services for the two Texas locations but kept these two operating.

103. Although Starrex had previously claimed in public filings that it had security interest in up to $3.8 MM of the Magnolia Companies' assets and represented to the public that alleged loans to

the Magnolia Companies were accordingly secured, today, a substantial amount of Magnolia assets on which it claimed security interests (which the Magnolia Companies vigorously deny), on information and belief, appear to be used and operated by a collection of third-parties, with the help of Merritt, Hill, Cooper, Brewer, MarketStreet and other co-conspirators, with apparently some participation in Florida by Starrex Title Florida.

104.    **On Jan. 5, 2024, Starrex Title Florida LLC is formed with Starrex Insurance Holdings Inc. as sole Manager, Debbie Merritt as Authorized Person, Laurie Cooper as Registered Agent, and principal business location as Magnolia Title Florida's Offices.** On January 5, 2024, Starrex Title Florida LLC was formed with the filing of its Electronic Articles of Organization for Florida Limited Liability Company via filing L24000014887 using the same mailing address as all the other Starrex entities: 14701 Saint Marys Ln., Suite 150, Houston, TX 34237.  The Electronic Articles are signed by Laurie Cooper. The Authorized Person is Debbie Merritt, listing her Starrex 14701 Saint Marys Lane address and the sole Manager is Starrex Insurance Holdings, Inc.,[9] a current party to this case, listing the same address.  The "street address of the principal office of the Limited Liability Company" is 2075 Fruitville Road, Suite 100, Sarasota, FL 34237", which is Magnolia Title Florida, LLC's office address in Sarasota.   The Florida registered agent is Laurie Cooper at 2075 Fruitville Road, Suite 100, Sarasota, Florida 34237.  Just like MarketStreet Capital Partners, LLC, which makes a foreign filing just 25 days later, Laurie Cooper's listed address is Magnolia Title Florida, LLC's office address in Sarasota.

Magnolia Title Florida LLC did not consent to any of this.

105.    At the time, Laurie Cooper was still the President of Magnolia Title Florida and Magnolia Title Arkansas.  However, as of January 5, 2024, as the designated Agent in Charge of Starrex Title Florida LLC, she began formally working for and on behalf of Starrex Title Florida, LLC, solely managed by Starrex Insurance Holdings, Inc. and with its Authorized Person designated as Defendant Debbie Merritt.

106.    On January 16, 2024, Merritt asks for Magnolia Florida and Magnolia Arkansas to consent for another entity to assume the leasing and release all the assets.  This is rejected.

---

[9] Starrex Insurance Holdings, Inc. is the Starrex group's title insurance subsidiary, as it was the acquisition vehicle for American Title Company, LLC.  Accordingly, it follows Starrex's overall plan to expand in the title insurance field by forming Starrex Title Florida, LLC and completely (and wrongfully) taking over Magnolia Title Florida, LLC's operations and all intellectual property, equipment, software, etc. without consent.

107.    On January 17, 2024, after Merritt put her up to it, Laurie Cooper poses the same question by text to Magness.  Magness does not accept but states that if anyone wants to take over the leases, they will have to make a formal offer for consideration.[10]

108.    Starrex and its co-conspirators decide that there is no reason to ask for permission any longer.  They are doing things the way they want, on their on terms.  No one needs to be informed. There is no voice of reason.

109.    **On January 18, 2024, Starrex Title Florida LLC, is approved as a Title Insurance Agency** (NPN # 21049327; License # G084848) by the Florida Department of Financial Services, listing both its business address and mailing address as <u>Magnolia Title Florida, LLC's office address in Sarasota</u> (2075 Fruitville Road, Suite 100, Sarasota, FL 34237) with the primary county as Sarasota. The Agent in Charge is Laurie Cooper (P029160), the email is Laurie.Cooper @magnoliatitleteam.com, and the phone number is <u>Magnolia Title Florida's phone number</u> (941-961-4764).

110.    **On Jan. 25, 2024, Brian Brewer registers "MAGNOLIA TITLE COMPANY" and likely commits a Third-Degree Felony.**  On January 25, 2024, via an Application for Registration of Fictious Name, Registration Number #G24000014524, for the name "MAGNOLIA TITLE COMPANY", Brian Brewer swore for the first time under oath to the Florida Secretary of State that he owned the assumed name "Magnolia Title Company" and had advertised it at least once in a newspaper as defined in Chapter 50, Florida Statues (specifying a genuine advertisement in a newspaper of general circulate and other requirements), including Florida Statutes Section 865.09— a violation of which is **Third Degree Felony** pursuant to Florida Statutes Section 817.155.  Magnolia Title Florida LLC did <u>not</u> consent to any of this.

111.    **On Jan. 30, 2024, MarketStreet makes foreign filing in Florida listing Magnolia Title Florida's offices as its place of business and Laurie Cooper as Florida Registered Agent.**  On January 30, 2024, MarketStreet Capital Partners, LLC (FEI Number 84-2634436), a Texas limited liability company, filed a foreign filing with the Division of Corporations of the Florida Secretary of State, registering the company to do business in Florida via filing M24000001170.  The formation

---

[10] On January 17, 2024 at 8:57 AM, Laurie Cooper wrote to Magness by text, asking for Magnolia Title Florida and Magnolia Title Arkansas to please release the leases.  Obviously, Merritt put her up to it and Starrex was soliciting her for a new job.  Magness asked to whom they would be released.  There was no further response.  Magness stated that if anyone wants to take over the leases, they will have to make a formal offer for consideration.

and contact person is Brian A. Brewer, at 25700 I-45 North, Suite 100, Spring, TX 77386, bbrewer@momentumtitletx.com; 713-254-3374.  Under oath and in accordance with Florida Statutes section 605.0203(1)(b) and aware that any false information submitted in a document to the Department of State constitutes a third degree felony under Florida Statutes section 817.155, Brian A. Brewer swore that he was the only member of this entity.  (Yet, the Texas regulators show this not to be true.)  The Florida registered agent is Laurie Cooper at 2075 Fruitville Road, Suite 100, Sarasota, Florida 34237.  Just like Starrex Title Florida LLC (formed less than a month ago), Laurie Cooper's listed address is Magnolia Title Florida, LLC's office address in Sarasota.  Magnolia Title Florida LLC did not consent to any of this.

112.    **On Jan. 30, 2024, MarketStreet AR is formed by Brian Brewer, listing Magnolia Title Arkansas's business address as its own.**  On January 30, 2024, MarketStreet Capital Partners AR, LLC was formed by Brian A. Brewer, Incorporator/Organizer/Registered Agent and Leah Lopez, Manager via filing # 811477302 with the Arkansas Secretary of State.  It falsely claimed the fictitious name of "MAGNOLIA TITLE COMPANY". It also falsely claimed Magnolia Title AR, LLC's de facto business address as its own: 10310 W Markham Street, Little Rock, AR 72205.  Magnolia Title Arkansas, Ltd. did not consent to any of this.

113.    **On Feb. 2, 2024, Brian Brewer transfers the assumed name of "MAGNOLIA TITLE COMPANY" to Marketstreet and likely commits a *second* Third Degree Felony.**  On February 2, 2024, Brian Brewer had an Application for Registration of Fictious Name, Registration Number #G24000018305, for the name "MAGNOLIA TITLE COMPANY" filed with the Florida Secretary of State.    For the application, on February 1, 2024, Brian Brewer (with email: BBrewer@momentumtitletx.com), who swore *once again* under oath to the Florida Secretary of State that he owned the assumed name "Magnolia Title Company" and had advertised it at least once in a newspaper as defined in Chapter 50, Florida Statues, including Florida Statutes Section 865.09—a violation of which is **Third Degree Felony** pursuant to Florida Statutes Section 817.155—cancelled and abandoned the name so that MarketStreet Capital Partners, LLC, a Texas limited liability company liability company located at 25700 I-45N, Suite 100, Spring, TX 77368, could then register the assumed name of "Magnolia Title Company" in Florida and assume operations with Starrex Title Florida, LLC at Magnolia Title Florida, LLC's office in Sarasota, FL.  Magnolia Title Arkansas, Ltd. did not consent to any of this.

114.    On February 7, 2024, Debbie Merritt files for Starrex Title Florida, LLC with the Florida Division of Corporations.

115.    **On Feb. 9, 2024, Laurie Cooper registers the fictitious name of "MAGNOLIA TITLE COMPANY" with MarketStreet and likely commits a Third Degree Felony.**    On February 9, 2024, Laurie Cooper, filed an Application for Registration of Fictious Name, Registration # G24000022404, for the ficitious name "MAGNOLIA TITLE COMPANY", swore under oath to the Florida Secretary of State that MarketStreet Capital Partners, LLC, a Texas limited liability company located at 25700 I-45N, Suite 100, Spring, TX 77368 (Florida Document Number: M24000001170; FEI Number 84-2634436),[11] owned the assumed name "Magnolia Title Company" and had advertised it at least once in a newspaper as defined in Chapter 50, Florida Statues, including Florida Statutes Section 865.09—a violation of which is **Third Degree Felony** pursuant to Florida Statutes Section 817.155.    As she listed the "Florida County Principal Place of Business" as "Sarasota", the advertisement was to be made in that county.    CITE TO FLORIDA STATUTES    The "Mailing Address of the Business" was listed as 2075 Fruitville Road, Sarasota, FL 34237, which is Magnolia Title Florida, LLC d/b/a Magnolia Title's office address.

Magnolia Title Florida LLC did <u>not</u> consent to any of this.

116.    Thus, Brian Brewer likely committed *two* Third Degree Felony Offenses and Laurie Cooper committed one such offense.    The maximum prison sentence for a third-degree felony is five years in a state penitentiary or prison camp.    Florida Statutes Section 775.082 (2023).

117.    **Also on Feb. 9, 2024, MarketStreet AR registers as a Title Agents in Arkansas with the assumed name of "MAGNOLIA TITLE COMPANY" and the material participation of Cooper and other former Magnolia employees.**    On February 9, 2024, MarketStreet Capital Partners AR, LLC, with the assistance of four former Magnolia Title Arkansas, Ltd. employees (including Laurie Cooper, Wanda Borecky (NPN/License # 16812370), Dustin Parson (NPN/License # 21005130), Josefat Rivera (NPN/License #18946472)), and Connie Freeman (NPN/License # 20995778) registered as a Title Agency with the State of Arkansas, license # 3002946122 with the

---

[11] Not coincidentally, Brian Brewer's other title business, Momentum Title, LLC, also has its mailing address and principal place of business at the same address as MarketStreet Capital Partners, LLC—25700 I-45N, Suite 100, Spring, TX 77386-1357.    Brian Brewer is currently listed as a Member/Manager.    Momentum Title and Brian Brewer were introduced to Starrex around two years ago by executives of the Magnolias as a potential acquisition target of Starrex.    Just two years later, its Manager (Brian Brewer), a related entity (MarketStreet), Starrex and Laurie Cooper are co-conspirators who have completely taken over Magnolias' Florida and Arkansas offices.

assumed name of "MAGNOLIA TITLE COMPANY." Its address is that of Magnolia Title Arkansas, Ltd.: 10310 W Markham Street, Little Rock, AR 72205 and its "Business Primary Phone" is the same as Magnolia Title Arkansas' long-time business phone provided by Ring Central (which was wrongfully controlled by Starrex): (501) 255-2941. Its business email is Laurie.Cooper@magnoliatitleteam.com. Brian Brewer is listed as its sole manager and 100% owner. Magnolia Title Arkansas, Ltd. did <u>not</u> consent to any of this.

118. **Starrex Insurance Holdings, MarketStreet, MarketStreet AR, Cooper, and Merritt, completely took over, stole and tortiously interfered with, Magnolia Florida and Magnolia Arkansas and numerous contracts, including earnest money contracts in progress.** Starrex Insurance Holdings, MarketStreet Capital Partners, LLC, and MarketStreet Capital Partners AR, LLC, absconded with—and uses—the same office, same phone number, same name, logo, email, and intellectual property (as well as proprietary customer data) as Magnolia Title Florida, represents itself as "Magnolia Title", the same one that has always officed there and pulled a complete con job on all of Magnolia Title Arkansas' and Magnolia Title Florida's existing customers by seamlessly switching them over to a new entity using Magnolia Title Florida's proprietary customer data, some of which was procured by Laurie Cooper. Debbie Merritt also participated. The earnest money contracts in progress were all summarily switched over to the third parties and away from Magnolia Title Arkansas and Magnolia Title Florida. None of this was authorized by Magnolia Title Arkansas, Ltd. or Magnolia Title Florida, LLC and amounts to and results in, wholesale theft, tortious interference, conversion, misrepresentation, and for Starrex, breaches of contract.

119. Additionally, despite the Magnolias consistently paying for their software licenses and in particular, paying $33,374.35 by ACH on December 21, 2023 to Qualia for the continued use of its digital closing platform through March 31, 2024, including the Qualia Core and Qualia Connect deployment, Defendants used it for their own purposes including accessing all of the Magnolias' proprietary data without the Magnolias' consent, while denying access to the Magnolias starting late December 2023.

120. Cooper formally resigned by email sent on February 2, 2024 at 3:10:06 PM CST, stating that she was resigning from her position as Division President of Magnolia Title Arkansas and Magnolia Title Florida, effective immediately. Cooper also indicated in her email that all Florida employees had resigned effective immediately. Thus, Cooper would now only act for herself individually and apparently, at times, on behalf of Starrex Title Florida, LLC and MarketStreet.

121.   Cooper also took various proprietary information, customer lists, customer transactions in progress and other valuable intellectual property belonging to Magnolia Title Arkansas and Magnolia Title Florida over to her new employers, MarketStreet and Starrex, in order to seed the business and continue work on all the transactions in progress.   Cooper admitted that she was "wrong" for downloading a customer list.

122.   But despite her resignation, she would continue to represent herself as the President of Magnolia Title Florida and Arkansas and run the takeovers of the Magnolias, to this very day:



Laurie Cooper's LinkedIn Profile - Captured on March 19, 2024 at 10:56 AM CDT



Laurie Cooper's Repost – Captured on March 19, 2024 at 10:59 AM CDT. Considering Cooper's fraud and fraudulent access to Magnolias' bank accounts, this is rich coming from her.

123.    Despite her formal resignation, Cooper acted as though she still worked for Magnolia.

124.    On February 6, 2024, without authorization, Cooper wrongfully accessed Magnolia's escrow account and its Florida recording account ending in 5041, and transferred $4,585.75 from the escrow account to the recording account.

125.    That same day, without authorization, Cooper wrongfully accessed Magnolia's Florida operating account ending in 1758 and Magnolia Title's Frost Bank operating account and sent an outgoing wire in the amount of $2,560.00 from the Florida operating account to the Forst Bank operating account.

126.    Cooper continued to use her same email address, same phone numbers, same title, same logo, same signature, and same letterhead as though she still worked for Magnolia—she certainly wanted everything to think so, and eventually, believe that it was the same Magnolia Title operating in Florida and Arkansas.  No one would know the difference.  For instance, here's her signature and information as of December 23, 2023, when she was still employed as the President of Magnolia Title Arkansas and Magnolia Title Florida:

**From:** Laurie Cooper <laurie.cooper@magnoliatitleteam.com>
**Sent:** Wednesday, December 13, 2023 4:45 PM
**To:** Nelson Mitchell <Nelson.Mitchell@historymaker.com>; Debbie Merritt CFA, PhD <dmerritt@starrexintl.com>
**Cc:** John Magness <John.Magness@magnoliatitleteam.com>; Wayne Norton <wayne.norton@magnoliatitleteam.com>; Matthew D. Hill <mhill@starrexintl.com>; Phil Clayton <pclayton@myamcap.com>; terrygarth@icloud.com; Justin Ray <jray@starrexintl.com>
**Subject:** RE: Payroll

I will take care of Arkansas and Florida



LAURIE COOPER
President | Arkansas and Florida Operations

941.867.8864 (O) | 941.867.8955 (F) | 941.961.4764 (M)

WARNING! WIRE FRAUD ADVISORY – NEVER TRUST WIRING INSTRUCTIONS SENT VIA EMAIL Wire fraud is on the rise! Please call your Magnolia Title Escrow Officer immediately to verify any wiring instructions received via email. Important: Do not call a phone number within the wire instructions email– only use a verified number for Magnolia Title such as the one on the sales contract, via an Internet search, etc. This email message is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

127.    Here it is on February 8, 2024, six days after she formally resigned:

**From:** Laurie Cooper <laurie.cooper@magnoliatitleteam.com>
**Sent:** Thursday, February 8, 2024 12:03 PM
**To:** Anelle Sena <asena@titletx.com>
**Subject:** RE: BankUnited

Closing funds we just need the borrower's authorization to move from account *** to account ***

Correct



**LAURIE COOPER**
President | Arkansas and
Florida Operations

941.867.8864 (O) |
941.867.8955 (F) |
941.961.4764 (M)

**WARNING! WIRE FRAUD ADVISORY – NEVER TRUST WIRING INSTRUCTIONS SENT VIA EMAIL** Wire fraud is on the rise! Please call your Magnolia Title Escrow Officer immediately to verify any wiring instructions received via email. Important: Do not call a phone number within the wire instructions email– only use a verified number for Magnolia Title such as the one on the sales contract, via an Internet search, etc. This email message is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

128.    And on February 12, 2024, Cooper makes a particularly ironic statement while continuing to use Magnolia Title Florida LLC's property (highlighting added):



**From:** Laurie Cooper <laurie.cooper@magnoliatitleteam.com>
**Sent:** Monday, February 12, 2024 10:53 AM
**To:** Bell, Roxie <rbell@frostbank.com>; Anelle Sena <asena@titletx.com>
**Cc:** Smith, Kristen <kristen.smith@frostbank.com>
**Subject:** RE: Magnolia - FL

Hi Roxie

I am no longer with Magnolia Title Florida LLC.  I have copied Anelle who is handling operations for Florida and Arkansas

Thank you

LAURIE COOPER
President | Arkansas and Florida Operations

941.867.8864 (O) |
941.867.8955 (F) |
941.961.4764 (M)

MAGNOLIA
T I T L E

WARNING! WIRE FRAUD ADVISORY – NEVER TRUST WIRING INSTRUCTIONS SENT VIA EMAIL Wire fraud is on the rise! Please call your Magnolia Title Escrow Officer immediately to verify any wiring instructions received via email. Important: Do not call a phone number within the wire instructions email– only use a verified number for Magnolia Title such as the one on the sales contract, via an Internet search, etc. This email message is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

129.    On February 8, 2024, at 11:13 AM, Laurie Cooper writes to Anelle Sena the Magnolias as follows: "Please send me the form you need signed if buyers send funds to the old account."  That is, Cooper has simply moved over all the transactions from the Magnolias and needs the buyers to know <u>not</u> to send the funds to the Magnolias' escrow accounts (according to the information they were previously provided) but instead to her new employers' escrow accounts.

130.    On the early morning of February 8, 2024, Laurie Cooper texts Anelle Sena, writing "The aggregate reports from 2/5 I ran and realized I shouldn't have."  Thus, Cooper admits that she wrongfully accessed Magnolias' systems and ran reports on its proprietary data on February 5, 2024, the Monday right after she resigned.

131. On Feb. 9, 2024, Laurie Cooper registers "MAGNOLIA TITLE COMPANY" with MarketStreet and commits a Third Degree Felony by making a misrepresentation under oath to the State of Florida.

132. Also on Feb. 9, 2024, MarketStreet AR registers as a Title Agents in Arkansas with the assumed name of "MAGNOLIA TITLE COMPANY" and the material participation of Cooper and other former Magnolia employees. On February 9, 2024, MarketStreet Capital Partners AR, LLC, with the assistance of four former Magnolia Title Arkansas, Ltd. employees (including Laurie Cooper, Wanda Borecky (NPN/License # 16812370), Dustin Parson (NPN/License # 21005130), Josefat Rivera (NPN/License #18946472)), and Connie Freeman (NPN/License # 20995778) registered as a Title Agency with the State of Arkansas, license # 3002946122 with the assumed name of "MAGNOLIA TITLE COMPANY." Its address is that of Magnolia Title Arkansas, Ltd.: 10310 W Markham Street, Little Rock, AR 72205 and its "Business Primary Phone" is the same as Magnolia Title Arkansas' long-time business phone provided by Ring Central (which was wrongfully controlled by Starrex): (501) 255-2941. Its business email is Laurie.Cooper@magnoliatitleteam.com. Brian Brewer is listed as its sole manager and 100% owner.

133. On February 16, 2024, at 11:24 AM, Brian A. Brewer writes to Anelle Sena, copying Laurie Cooper, and writes, "My name is Brian Brewer, I am the owner of Magnolia Title Company in Florida."

134. On February 16, 2024, at 12:26 PM, Brian A. Brewer, sole owner of MarketStreet, confirms in an email to Anelle Sena, copying Laurie Cooper, that "Laurie Co[o]per" "works for MarketStreet" and "[m]y company is a long existing Texas LLC." He further threatens to "get the Florida Department of Insurance and the FBI involved immediately, we have contacts." (Yet, he is a thief.) He signs the email "Brian A. Brewer, President, MarketStreet Capital Partners d/b/a Magnolia Title Company. Cell 713-254-3374." It is the arrogant thief who cannot improve his situation.

135. Anelle Sena responds to Brian A. Brewer at 12:49 PM CST, showing nearly identical Florida Title Insurance Licensee results (bold emphasis added):

> Brian,
>
> Please see both attachments. **Who does Laurie work for? Both licensees show Laurie as agent in charge and both reflect our Magnolia Title address. The MarketStreet licensee info also does not reflect a current underwriter.**

Our goal is also to protect the consumer and I will await the borrowers contact information.

Thank you,





136.    On February 16, 2024, despite the fact that apparently all Florida employees had resigned, Michelle Raymond at the Sarasota, FL office picked up the phone and stated that it was the same Magnolia Title that had already been there for multiple years.  This was not true and was indicative of the misrepresentations and unfair competition in which MarketStreet and Starrex Title Florida engaged.

137.    By February 19, 2024, Laurie Cooper had already notified Magnolia Title Arkansas and Magnolia Title Florida's insurance carrier, NewMark Insurance Services LLC, that the offices were "closing down".  This caused Tori Font with NewMark to write an email to Magness on February 19, 2024 at 11:05 AM stating that she had been informed of the shut down.

138.    The next day, on February 20, 2024, all employees of Magnolia Title Arkansas formally resigned by letter by signing the same form letter with the date, followed by "Please accept this letter as notice of my formal resignation effective immediately. Sincerely, *Signature* [Name]."  All were identical except the signature and name. (The metadata indicates that the PDF was last modified on February 20, 2024 at 11:48:35AM, which means these were finalized during working hours.) Then, having been solicited and induced to resign by Starrex and MarketStreet AR, they began work effective immediately at the same office location through MarketStreet AR in collaboration with Starrex and continued to use the same computer, logo, title, email, phone number, digital platform, office equipment, desk, etc. and serve the same transactions-in-progress and the same customers.

139.    The customers, brokers and others would have no idea that Magnolia Title Arkansas, Ltd. was no longer their employer, but now MarketStreet Capital Partners AR, LLC with the collaboration of Starrex in providing services, support, and proprietary data and property that belonged to Magnolia Title Arkansas. They drove into Magnolia Title Arkansas, Ltd. d/b/a Magnolia Title that morning, all resigned, and when the day ended, they drove out of MarketStreet Capital Partners AR, LLC/Starrex d/b/a Magnolia Title Company.   For these 15 employees, it was surely the most convenient job switch in Arkansas history!

140.    For MarketStreet and Starrex, it was another successful, complete theft of everything that belonged to Magnolia Title.  MarketStreet and Starrex continue trespass on the premises of Magnolia Title Florida and Arkansas, engage in unfair competition, and commit other various wrongful and illegal acts, including but not limited to wrongfully and illegally impersonating Magnolia and using its intellectual and proprietary property.

141.   Reports indicate that on February 20, 2024 and thereafter, Arkansas continued to operate as normal and make substantial profits but now they were made for MarketStreet Capital Partners AR, LLC/Starrex d/b/a Magnolia Title Company (AR) instead of Magnolia Title Arkansas, Ltd. Reports also indicate that numerous open matters were simply continued so that MarketStreet Capital Partners AR, LLC/Starrex earned the profit instead.

142.   Reports also indicate that Florida continued to operate as normal and make substantial profits, but now they were made for MarketStreet Capital Partners, LLC d/b/a Magnolia Title Company (FL) and Starrex Title Florida, LLC, instead of Magnolia Title Florida, LLC.  As with Arkansas, numerous open matters were seamlessly continued with no customer, bank, or broker any the wiser.  In fact, by stealing Magnolia's property, MarketStreet and Starrex had a good February month in terms of revenue.

143.   On February 22, 2024, Cooper wrongfully accessed Magnolia's Florida underwriting account ending in 1766 and transferred from her new escrow account to this account $13,972.44.

144.   Also on February 22, 2024, without authorization, Cooper accessed Magnolia's Florida operating account ending in 1758 and **wrongfully withdrew $52,618.41**.  This implicates Cooper, Starrex Title Florida, and MarketStreet.

145.   That same day, using her same signature block and logo as before and still claiming to be the President of the Arkansas and Florida Operations of Magnolia Title, Cooper writes to Anelle Sena, copying Brian Brewer, at 4:10 PM, stating that "[y]our accounts are still under the same platform of my account."  This indicates that she continues to wrongfully access Magnolia's accounts and has easy access to them.

146.   Laurie Cooper, Brian Brewer, MarketStreet Capital Partners, LLC (TX) d/b/a Magnolia Title Company (FL), Starrex Title Florida, LLC (with Starrex Insurance Holdings, Inc. as sole manager and Debbie Merritt as authorized person), and MarketStreet Capital Partners AR, LLC (AR) d/b/a Magnolia Title Company (AR), operating out of the same location, with the same address, same phone number, same name, same logo, same equipment, same customers, same software licenses, using the same proprietary information and intellectual property belonging to the Magnolias, all the while representing to the public, customers, banks and brokers that they are the same Magnolia Titles that have always been there, continue to operate with seeming impunity.  They have and continued to tortiously interfere with all of Magnolia's contracts.

These tortious actions materially and severely affect the Magnolias' abilities to repay the $5 million in alleged, fake promissory notes, in the event they are forced to repay any alleged debts to Starrex.

### C. Evidence of Garth and Clayton's Knowledge and Intent

147.   Garth and Clayton's misrepresentations were not merely unfulfilled promises but statements they knew to be false when made or made with reckless disregard for their truth. Their knowledge of falsity is evident in their contradictory statements to different audiences and their internal communications revealing awareness of the impossibility of their promises. Their direct involvement in operational decisions is documented in communications where Hill and Merritt consistently sought their approval before taking action, demonstrating their comprehensive control over all aspects of the business.

148.   **Creation of Backdated Promissory Notes (April 2023)**: On April 17, 2023, at 9:28 AM, Merritt wrote to Garth, copying Magness: "I wanted to wait until the end of Q1 to provide you with numbers for each of the Magnolia Entities. The auditors are pushing now for the signed promissory notes."

149.   When Magness asked Merritt at 9:30 AM, "What is that for?", Merritt revealed at 9:32 AM: "The notes we need to support the amounts due to Starrex on the line. We were going to draft them in December, but I knew we'd need additional funding. The auditors need some type of paper to support the 'line' Starrex provided to each of the Magnolias. Terry said he'd draft them for me."

150.   Garth responded at 10:59 AM on April 17, 2023: "What date should the promissory notes be executed? I suggest a date prior to the first draw and probably a date that is reasonably close to the date that the line of credit was executed. Also, the notes need a maturity date. I suggest June 30, 2023, which should give sufficient time to determine how and when the Magnolias will be merged. Let me know."

151.   Merritt replied at 11:04 AM: "I agree. The effective date of the line was October 17, 2022 with the first draw initiated on October 26, 2022. June 30, 2023 maturity date works – we have classified all as short term on the balance sheet."

152.   Their exchange continued with Garth asking about interest rates, and Merritt responding at 2:28 PM that "MH would prefer to see a fixed rate. Are you agreeable to a 6% rate?" Garth simply replied "Okay" at 3:14 PM.

153.    On April 18, 2023, at 10:42 AM, Garth sent Merritt four draft notes, copying Magness, stating, "Attached are the drafts of the four notes for your review and comment. If no further changes are needed, please obtain John's signature when available." According to metadata, Garth created these notes on April 18, 2023, converting them to PDFs within seconds of each other.

154.    Magness responded that he was out of town and would forward for review before signing, then forwarded the email to Magnolia's general counsel, Britt Naponic. Following advice of counsel, Magness did not sign any of the notes.

155.    Later, while Magness was in a meeting out of town in his professional capacity, Merritt and her cohorts repeated again that the auditors had to have signed notes and they were "for-the-auditors-only" because any monies transferred from Starrex were booked with the Magnolias as a prepayment against an acquisition.  That is, the notes would never reflect a real debt or be enforced because the acquisition was a certainly.  Accordingly, being repeatedly assured that the notes were for a legitimate purpose of satisfying the auditors as Merritt, Garth, Hill, Ray, and others claimed—after all Merritt was the CFO of a publicly traded company with a very impressive slate of degrees and credentials—and further, that the acquisition was certain to occur (which was the only reason to sign any notes whatsoever), he permitted Merritt to place an image of his signature on the notes only for that purpose, but never for any other purpose.  These notes were never circulated to Magness or other Magnolia shareholders, particularly HMHTI, despite HMHTI's CFO communicating with Merritt just one hour after her discussion with Garth about the notes.  They were not even mentioned again until later in July 2023 when Starrex needed to come up with an excuse as to why it could not pay back its credit line with ANTIC (Agents National Title Insurance Company).

156.    **January 2024 False Denial**: On January 4, 2024, at approximately 10:00 AM, Garth, P. Clayton, Mitchell, and Magness participated in a Magnolia member's call. When Magness remarked that Merritt would probably need to be personally sued, Garth asked whether the others minded if he shared all of the litigation strategy and discussion with Starrex. Mitchell vehemently objected.

157.    During this call, Mitchell noted that he had never seen or heard of the alleged promissory notes until July 2023, despite Merritt placing Magness' signature on these "for-the-auditors-only" notes in April 2023. Mitchell asked how Garth, as an attorney, could allow the situation with Starrex to occur, knowing the promissory notes were improper.

158.    Garth responded with a blatant lie, claiming he had never had any conversations with Merritt or Magness about the notes—a statement directly contradicted by the April 17-18, 2023 email

exchanges where he personally drafted the notes, suggested backdating them, and instructed Merritt to obtain Magness' signature.

159.   This deliberate misrepresentation demonstrated Garth's consciousness of guilt and intent to conceal his pivotal role in fabricating documentation to create false debt obligations that would later be used to attempt a takeover of the Magnolia operations.

## C. Defendants' Specific Roles in the Scheme

160.   Tyrrell L. Garth, a Beaumont, Texas resident, personally orchestrated the fraudulent scheme with Clayton, exercising pervasive and joint control over Starrex and Magnolia Companies decisions. Garth's and Clayton's direct involvement is documented in communications where Hill and Merritt consistently sought their approval before taking action. On March 15, 2022, Merritt texted Magness: "Terry gave some pretty stern instructions to the team to source 2-6 acquisitions asap to replace the bspoke agencies we didn't acquire. The one consistent theme through all of it was his and our committment to give you a platform upon which to build." Similarly, on May 24, 2022, Garth drafted a detailed term sheet for HMH that explicitly stated that within 60 days, "STX [meaning Starrex International] will 'complete' 100% ownership of the 4 Magnolias," demonstrating his knowledge of and authority over the entire acquisition strategy. On multiple occasions, personally observed by Magnolia staff, Garth refused to act without consulting Clayton by phone, stating words to the effect of "I will update Phil," "I will discuss with Phil," or "Let me call Phil and I'll get back to you," ensuring all major decisions were joint. In July 2022, Garth conspired with Clayton to satisfy their $1 million personal debt to Starrex by deceiving TPB into reducing its Magnolia equity from 20% to 11%, promising a $1 million cash call they never intended to fund personally.

161.   Matt Hill was not permitted to make independent decisions as CEO of Starrex. As Phil Clayton's son-in-law, Hill was under the complete control of Garth and Clayton, who made all significant decisions and directed both Hill and Merritt. Hill's subordinate position was evident when Garth commented to Magness that he was impressed with how Magness treated Hill professionally, including taking him to networking events at golf clubs, with Garth indicating he would never take Hill to such venues himself. This demonstrated Hill's role as a figurehead rather than actual decision-maker. On multiple occasions, Hill expressed frustration to Magness about having to follow Garth and Clayton's directives while bearing the legal responsibility as the named CEO of a publicly traded

company. Garth and Clayton leveraged Magness's industry expertise and connections to identify acquisition targets, including David Bravo, Kevin Gartland, Ranger Title, and many others, with Magness using his professional network to advance what he believed was a legitimate acquisition strategy based on Garth and Clayton's representations.

162.    Phillip H. Clayton, a Chapel Hill, Texas resident and thrice-convicted felon, co-masterminded the scheme with Garth, sharing decision-making authority. Garth's constant communication—"I will update Phil," "Let me call Phil"—and reliance on Clayton's approval for top-level decisions (e.g., acquisitions, finances) cemented their joint control. In July 2022, Clayton, with Garth, induced TPB to accept a 20% to 11% equity reduction, falsely promising to personally contribute $1 million to Magnolia, instead directing Hill and Merritt to advance $1 million from Starrex, later repaid with HMHTI's $1 million.

163.    Clayton, as Garth's business partner for over 30 years, participated in all significant decisions alongside Garth. For instance, during the April 8, 2021 meeting at Post Oak Grill, Clayton specifically represented to Magness that he could join partners 'with the highest of moral character' and emphasized the potential of Starrex shares, stating the following or words to the effect that "We could easily have a $10.00 share by the summer and could control our destiny." Clayton's son, P. Garrett Clayton, and son-in-law, Matthew Hill, were strategically placed in leadership positions at Starrex to ensure family control of the board.

164.    Laurie Cooper, Florida resident and Magnolia Title Arkansas and Florida President (2021-February 2024), breached her fiduciary duties to facilitate Defendants' asset theft, maintaining extensive Texas contacts. From 2021-2024, she joined weekly calls with Texas supervisors, accessing Qualia and Ring Central systems hosted in Texas. She attended quarterly Houston meetings (e.g., July 14-15, 2021; October 17-18, 2022), setting operational goals with Texas Plaintiffs. In February 2024, she downloaded customer lists, coordinated employee exits, and transferred funds—$4,585.75 (February 6), $2,560.00 (February 8), $52,618.41 (February 22)—to Starrex Title Florida and MarketStreet. On March 5, 2024, she cut Qualia access, halting Texas Plaintiffs' operations. Directed by Garth and Clayton from Texas, her actions caused foreseeable harm to Coast to Coast Title, LLC and Sol City Title, LLC, both based entirely in Texas, including in the Houston area and the Dallas/Ft. Worth area.

165.    Brewer, a Texas resident, exploited Plaintiffs' assets via MarketStreet entities. On January 25, 2024, he registered "MAGNOLIA TITLE COMPANY" without authorization, and used stolen

customer lists, staff, locations, and goodwill to operate a shadow business in Texas and Arkansas, directly profiting from Garth's and Clayton's directives.

166.    MarketStreet Capital Partners, LLC and MarketStreet Capital Partners AR, LLC's Roles: These Houston-based Texas and Arkansas LLCs, controlled by Brewer under Garth's and Clayton's Texas instructions, received Magnolia's assets in January-February 2024. MarketStreet Capital Partners, LLC integrated stolen Texas operations, while MarketStreet Capital Partners AR, LLC targeted Arkansas assets, both unjustly enriched by the scheme.

167.    Starrex Title Florida, LLC's Role: Formed January 5, 2024, under Garth's and Clayton's Texas-based control, this Florida LLC—listing Cooper as Registered Agent—siphoned Magnolia Title Florida's offices, staff, and customers, executing Defendants' final theft.

168.    Ongoing Harm: Plaintiffs suffer over $10 million in damages—lost operations, HMHTI's $1 million, revenue from 500+ monthly closings, and goodwill—plus reputational ruin and operational collapse. Defendants' shadow entities continue exploiting stolen assets, necessitating immediate relief.  Plaintiffs' damages of over $10 million are calculated based on: (1) HMHTI's misappropriated $1 million investment; (2) lost equity value of $2.2 million for TPB based on the market valuation established in the March 18, 2022 agreement where all parties, including Garth, acknowledged TPB's equity was worth $2,268,514; (3) lost compensation to Magness of $2.7 million or more; (4) lost revenue of at least $1.5 million monthly from approximately 500 or more title transactions at an average revenue of at least $3,000 per transaction; (5) the value of misappropriated trade secrets and proprietary information conservatively valued at $2.5 million based on development costs; and (6) future lost profits from customer relationships diverted to Defendants' competing businesses.

# V.
# CAUSES OF ACTION

# COUNT ONE: COMMON LAW FRAUD AND FRAUDULENT INDUCEMENT

## (By Plaintiff John Magness and The Peabody Bulldog
## Against Defendants Garth and Clayton)

169.  Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.  In addition to the facts alleged herein, Plaintiffs specifically incorporate specific facts alleged with particularity in the preceding paragraphs in accordance with Rule 9(b).

170.  From April 2021 through February 2024, Garth and Clayton engaged in a systematic pattern of material misrepresentations designed to induce Magness and The Peabody Bulldog to surrender valuable assets and opportunities.

171.  These misrepresentations include, but are not limited to, the following, which are plead with particularity, including who, what, when, where, how and why, in order to satisfy Rule 9(b):

a.  **Specific Misrepresentation 1: $50 Million Capital Raise**

- **Who**: Garth, with Clayton present and affirming
- **What**: Garth stated words to the effect that they would raise $50 million from friends and family investors, specifically identifying Ben Moreland of Crown Castle as one potential investor
- **When**: April 8, 2021
- **Where**: Post Oak Grill in Houston, Texas
- **How**: Made during formal business meeting where Garth and Clayton were actively recruiting Magness
- **Why**: To induce Magness to forego other opportunities, including a position offering at least $900,000 annual compensation plus additional earnings that he declined on April 21, 2021, and dedicated his expertise to their venture

b.  **Specific Misrepresentation 2: CEO Position and Board Seat**

- **Who**: Garth, with Clayton present and affirming
- **What**: Words to the effect of: "You [Magness] will be appointed CEO and awarded a Board seat at Starrex after the merger, with no ongoing involvement from Starrex's existing leadership".  "This is going to be your company." Other communications, including emails stating that when Magness became an employee of Starrex, he would have a board seat, etc.
- **When**: January 22, 2022 and at other times, including December 2022
- **Where**: Wine and cheese event at Lamar University in Beaumont, Texas
- **How**: Verbal statement during business discussion and other communications, including email
- **Why**: To maintain Magness's commitment after he raised concerns about leadership structure

c.  **Specific Misrepresentation 3: Personal Capital Contribution**

- **Who**: Garth, with Clayton present and affirming
- **What**: Garth and Clayton specifically represented to TPB that another million dollars needed to be invested for working capital, and he offered that he and

Clayton would take 11% equity (reducing TPB's equity in the Magnolias from 20% to 11%) so that TPB could sit out the capital call. Garth and Clayton affirmed that they would personally contribute the full million dollars in exchange for TPB reducing its equity in the Magnolias from 20% to 11%, which would provide additional equity to Garth and Clayton against the coming anticipated dilution of HMH/Nelson Mitchell's investment. They also represented that TPB would receive millions of shares of Starrex after the acquisition occurred and thus, this reduction in equity would mean nothing.

- **When**: July 14, 2022 (verbally and in email)
- **Where**: Starrex's Houston offices
- **How**: Verbal statement during meeting and subsequent email
- **Why**: To induce The Peabody Bulldog to accept equity dilution from 20% to 11%

### d. Specific Misrepresentation 4: For-Audit-Only Promissory Notes

- **Who**: Garth (in email directives) and Clayton (in verbal instructions)
- **What**: The promissory notes were claimed to only be for the auditors as part of the acquisition that was certain to occur. They would never be enforced.
- **When**: April 17, 2023
- **Where**: Email and verbal communications
- **How**: Written directive and verbal instructions
- **Why**: To obtain signatures on notes that would later be used as leverage in takeover attempt

### e. Specific Misrepresentation 5: Millions of Starrex Shares

- **Who**: Garth and Clayton
- **What**: Magness' entity The Peabody Bulldog, a holding company he owned with Naponic, would receive millions of shares of Starrex in exchange for specific services which he thereafter rendered
- **When**: Mid-2022, including conversations and emails in May 2022
- **Where**: Email and verbal communications
- **How**: Written directive and verbal instructions
- **Why**: To induce Magness to expend substantial efforts and forego other opportunities

172.  For instance, below is an excerpt of a chart that Garth and Clayton used in when negotiating on behalf of Starrex, indicating that Magness was already considered to be a President of Starrex Insurance Holdings.

| Name | Title | Entity | Phone Number | Email Address |
|------|-------|--------|--------------|---------------|
| Matt Hill | CEO | Starrex International | 281-636-2243 | mhill@starrexintl.c... |
| Debbie Merritt | CFO | Starrex International | 214-537-2320 | dmerritt@starrexin... |
| John Magness | President | Starrex Insurance Holdings | 713-882-0936 | john.magness@ma... |
| Brit Naponic | General Counsel | Starrex Insurance Holdings | 346-617-5597 | brit.naponic@mag... |

173. Likewise, presentations edited, created, and/or approved by Garth and Clayton and distributed to third-parties showed Magness as CEO of the combined Magnolias-Starrex company, post-acquisition.

174. These representations were objectively false when made, as evidenced by at least the following:

    a. Garth and Clayton's complete failure to pursue the promised $50 million funding, including a $50 million credit facility that would be used to conduct specifically targeted acquisitions of certain title companies as part of an overall plan and strategy they devised, with no documentation of any efforts to secure such funding ever produced (despite working closely with Magness and the Magnolias for many months);

    b. Internal communications showing their awareness of the impossibility of their promises directly contradicting his public representations to Magness;

    c. Garth's March 2023 admission in a phone call to Britt Naponic that the tax-deferred exchange they had represented was "impossible" (but thereafter superficially appearing to proceed with the merger as though it was not);

    d. Their direction to use Starrex funds rather than personal capital for the promised $1 million contribution to the Magnolias (for which they also received additional Magnolia equity), contradicting their explicit promise to personally contribute the full million;

    e. Their immediate misappropriation of HMHTI's investment through specific transfers they directed Merritt and Hill to make—$250,000 (September 13, 2022), $705,111.55 (September 21, 2022), $75,561.85 to Commercial Construction Services (September 20, 2022)—to pay back their personal debt to Starrex for its advancement of $1 million to the Magnolias on their behalf, which demonstrated their fraudulent intent regarding all financial representations. Merritt and Hill complained and spoke loudly about the advancement from Starrex and the repayment using "Nelson's money". Garth and Clayton repeatedly told Merrit and Hill to stop complaining and wait for "Nelson's money" to hit the Magnolia accounts so Starrex could be repaid for the $1 million it advanced on their behalf. Notably, despite the large size of the transfers, they were made via Frost Bank intra-bank transfer from the Magnolias accounts to the Starrex Frost Bank account (after directing them in an irrational manner back and forth between the four Magnolia Frost Bank accounts, which is a hallmark of fraud). This was done to avoid detection.

    f. Garth and Clayton's specific knowledge of Merritt's false credentials, as evidenced by their receipt of numerous communications where she represented herself as "Debbie

Merritt CFA, PhD" in both her signature block and email name. For example, on April 21, 2021, when copied on an email from Merritt to Magness with this false designation, Clayton directly acknowledged and reinforced her purported expertise, responding: "Phil and I were talking... can you have a telephone strategy session?" On January 16, 2022, Merritt confirmed to Magness: "I've worked for Phil for 8 years," establishing both Clayton's long-standing knowledge of and acquiescence to her misrepresentations.

g.  On information and belief, launching or directing Starrex executives to launch the 2023 lawsuit against the Magnolias based on the "for-the-auditors-only" promissory notes.

h.  Their use of the "for-the-auditor-only" notes as the basis for a coercive December 2023 settlement demand

175.  Garth and Clayton knew these representations were false or made them with reckless disregard for their truth, as demonstrated by Clayton's July 2023 statement in response to Nelson Mitchell's request for a forensic audit, stating that, or words to the effect that "if anyone does a forensic audit [on the Magnolias], we are f**cked," Garth's instruction to backdate promissory notes, and their sophistication in business affairs precluding any claim of ignorance.

176.  Magness and TPB relied on these material misrepresentations as follows:

a.  **Misrepresentation 1: $50 Million Capital Raise**

  i.  **Reliance Action**: Magness declined position offering $900,000 annual compensation on April 21, 2021, just 13 days after this representation –

  ii.  **Damages**: Lost compensation of $900,000 per year for three years ($2.7 million total)

  iii.  **Evidence of Causation**: Magness's April 21, 2021 email declining the offer specifically referenced his commitment to the "Starrex opportunity discussed with Garth and Clayton"

b.  **Misrepresentation 2: CEO Position and Board Seat**

  i.  **Reliance Action**: Magness continued dedicating full-time efforts to building the business without compensation, foregoing other opportunities

  ii.  **Damages**: Value of professional services provided without compensation, conservatively valued at $900,000 annually based on previous compensation rates

  iii.  **Evidence of Causation**: Magness's contemporaneous notes and communications with third parties documenting his continuing role based on promised future position

c.  **Misrepresentation 3: Personal Capital Contribution**

  i.  **Reliance Action**: The Peabody Bulldog accepted reduction in equity from 20% to 11% on July 18, 2022

    ii. **Damages**: Lost equity value from 11% ownership in profitable operations, conservatively valued at $1.1 million based on standard industry multiples

    iii. **Evidence of Causation**: Corporate documents showing equity reduction executed immediately following Garth and Clayton's promise of personal capital contribution

d. **Misrepresentation 4: For-Audit-Only Promissory Notes**

    i. **Reliance Action**: Magnolias signed promissory notes on April 20, 2023

    ii. **Damages**: Creation of artificial debt obligations later used as leverage in attempted takeover

    iii. **Evidence of Causation**: Contemporaneous email from Merritt describing notes as "for-the-auditor-only" followed by December 29, 2023 settlement offer using these notes as basis for demands

177. The disclaimer of reliance provisions in the BSpoke Settlement Agreement and TPB Note do not bar this claim because the fraudulent inducement related to Garth and Clayton's comprehensive scheme predated and was broader than these specific agreements. Furthermore, the disclaimers themselves were procured through the same pattern of fraudulent conduct, and their misrepresentations went to the very core of the transactions.

178. Plaintiffs' reliance was justifiable given Garth and Clayton's demonstrated control over operations, the specific nature of their representations, and their consistent reinforcement of these promises in formal business settings with multiple witnesses present.

179. Garth and Clayton knew these representations were false or made them with reckless disregard for their truth, as demonstrated by various conduct, including but not limited to the following:

a. Garth and Clayton's complete failure to pursue the promised $50 million funding, with no documentation of any efforts to secure such funding ever produced;

b. Internal communications showing their awareness of the impossibility of their promises, including Garth's April 12, 2021 confidential statement to his financial advisor that "Starrex faces significant capitalization challenges and will require substantial restructuring before any value increase is possible," directly contradicting his public representations to Magness;

c. Their March 2023 admission that the tax-deferred exchange they had represented was "impossible";

d. Their direction to use Starrex funds rather than personal capital for the promised $1 million contribution, contradicting their explicit promise to personally contribute the full million;

e.  Garth and Clayton specifically represented to TPB that another million dollars needed to be invested for working capital, and he offered that he and Clayton would take 11% equity (reducing TPB's equity in the Magnolias from 20% to 11%) so that TPB could sit out the capital call.  Garth and Clayton affirmed that they would personally contribute the full million dollars in exchange for TPB reducing its equity in the Magnolias from 20% to 11%, which would provide additional equity to Garth and Clayton against the coming anticipated dilution of HMH/Nelson Mitchell's investment.  They also represented that TPB would receive millions of shares of Starrex after the acquisition occurred and thus, this reduction in equity would mean nothing; and

f.  Their immediate misappropriation of HMHTI's investment through specific transfers—$250,000 (September 13, 2022), $705,111.55 (September 21, 2022), $75,561.85 (September 20, 2022)—which demonstrated their fraudulent intent regarding all financial representations.

g.  Clayton's July 2023 statement stating that, or words to the effect that "if anyone does a forensic audit [on the Magnolias], we are f**cked," explicitly acknowledging their fraudulent conduct;

h.  Statements that if Merritt was terminated, she would "burn the house down" on her way out (because she would a position she would never be able to obtain again due to her fraudulent credentials and degrees);

i.  Garth's April 17, 2023 instruction to backdate promissory notes: "What date should the promissory notes be executed? I suggest a date prior to the first draw";

j.  Garth's January 4, 2024 blatant lie during the Magnolia members' call when he claimed in response to Nelson Mitchell's statement "he had never had any conversations with Merritt or Magness about the notes," directly contradicted by contemporaneous email evidence; and

k.  Their sophisticated business backgrounds precluding any claim of ignorance regarding the impossibility of their financial and operational promises.

l.  Their specific knowledge of Merritt's false credentials, as evidenced by their receipt of numerous communications where she represented herself as "Debbie Merritt CFA, PhD" in both her signature block and email name. On January 16, 2022, Merritt confirmed to Magness: "I've worked for Phil for 8 years," establishing Clayton's long-standing knowledge of and acquiescence to her misrepresentations.  Additionally, Merritt said, or words to the effect that her "sole purpose in life was to protect the wealth of" Garth and Clayton, indicating an extreme loyalty to them above anything else, including her professional, ethical, and fiduciary duties.

180.  Each misrepresentation directly caused specific damages through a clear chain of reliance and resulting harm. The causal connection between Defendants' misrepresentations and Plaintiffs' damages is direct and foreseeable, not attenuated or speculative. *See Meyer v. Cathey*, 167 S.W.3d 327, 332 (Tex. 2005) (discussing reliance causation in fraud claims). Each misrepresentation was

material to Plaintiffs' decisions and actions, and the resulting harm was the natural and probable consequence of the misrepresentations.

181.    Additionally, Garth and Clayton fraudulently induced Plaintiffs to enter a formal business relationship with Starrex, including but not limited to through the Management Services Agreement, by repeatedly misrepresenting Debbie Merritt's qualifications between April 2021 and February 2024. They specifically represented that Merritt was had a Bachelor's degree in Accounting and an MBA from the University of Memphis, a PhD from the UCLA Anderson School of Management in Global Economics and Management, and a CFA Charter from the CFA Institute in Finance, when in fact she had none of these credentials and had never even enrolled in these institutions.

182.    These misrepresentations were material because Plaintiffs relied on Merritt's purported expertise to handle financial management of the Magnolias worth millions of dollars. Documents from these institutions confirm she never attended or received such credentials, establishing that Garth and Clayton's representations were demonstrably false when made.

183.    As a direct result of Garth and Clayton's fraudulent misrepresentations, Magness and TPB suffered damages exceeding $3.8 million, including but not limited to: (a) lost compensation of $2.7 million from foregone employment opportunities; (b) the value of professional services provided without compensation based on false promises of future equity; (c) lost equity value from TPB's reduction from 20% to 11%; and (d) reputational damage in the title industry. Plaintiffs seek actual damages, consequential damages, out-of-pocket damages, benefit-of-the-bargain damages, and exemplary damages due to Defendants' fraudulent conduct.

## COUNT TWO: BREACH OF CONTRACT

### (By Plaintiff John Magness and The Peabody Bulldog Against Defendants Garth and Clayton)

184.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

185.    In April 2021, Magness entered into a binding oral agreement with Garth and Clayton. This agreement, formed during specific meetings on April 8 and April 15, 2021 in Houston, predated and exists independently from any subsequent Letter of Intent or other written document. Under Texas law, oral agreements are enforceable absent a statute of frauds issue.

186. Under this oral contract, Magness agreed to contribute his expertise, industry relationships, and full-time efforts to building a national title insurance platform. In exchange, Garth and Clayton would ensure that Magness became CEO of Starrex, received a board seat, obtained 3 million shares of Starrex stock, and led the nationwide expansion of title operations.

187. This agreement was supported by substantial consideration: Magness foregoing specific, documented opportunities worth over $2.7 million and dedicating three years of his professional services, while Garth and Clayton offered the CEO position, board membership, equity compensation, and operational control of a national platform.

188. Garth and Clayton had both actual and apparent authority to make these commitments, as demonstrated by their comprehensive control over corporate operations, consistent direction of all significant business decisions, authority over personnel matters, and demonstrated ability to bind the company. Their pervasive control—exemplified by their blocking a $10,000 KIPP donation with Merritt's notation: "DO NOT PAY PER TERRY AND PHIL"—established their authority to bind the company in these negotiations.

189. The parties' conduct confirmed this agreement through Magness's immediate commencement of full-time work, Garth and Clayton's continued assurances about Magness's future role, and Magness's declining of alternative opportunities. Specifically, on April 21, 2021, just 13 days after this agreement, Magness declined a position offering $900,000 annual compensation, explicitly referencing his commitment to the "Starrex opportunity discussed with Garth and Clayton" in his declination email.

190. Magness fully performed his obligations by dedicating full-time efforts from April 2021 through February 2024, securing the All American Title acquisition, identifying additional acquisition targets, and developing the operational framework for nationwide expansion as directed by Garth and Clayton.

191. The Peabody Bulldog similarly entered into a binding oral contract with Garth and Clayton in July 2022, where Garth and Clayton specifically represented to TPB that another million dollars needed to be invested for working capital, and he offered that he and Clayton would take 11% equity (reducing TPB's equity in the Magnolias from 20% to 11%) so that TPB could sit out the capital call. Garth and Clayton affirmed that they would personally contribute the full million dollars in exchange for TPB reducing its equity in the Magnolias from 20% to 11%, which would provide additional equity to Garth and Clayton against the coming anticipated dilution of HMH/Nelson Mitchell's

investment. They also represented that TPB would receive millions of shares of Starrex after the acquisition occurred and thus, this reduction in equity would mean nothing.

192. Garth and Clayton breached these agreements by taking actions that include, but are not limited to, the following:

    a. Failing to appoint Magness as CEO or provide him a board seat;

    b. Never issuing the promised 3 million shares of Starrex stock;

    c. Making no efforts to achieve the promised acquisitions or business structure;

    d. Never personally contributing the promised $1 million, instead directing Starrex to advance funds that were later repaid using HMHTI's investment;

    e. Allowing Starrex's stock to remain at pennies, far from the represented value.

193. These breaches have directly caused Plaintiffs damages in excess of $3.8 million.

194. The non-binding LOI does not bar this claim because this oral contract predates and exists independently from the LOI, forming a separate, enforceable agreement under Texas law. The specific promises made ($50 million facility, 3 million shares, CEO role) and breaches (no funding, no shares) satisfy the requirement for definite terms under Rule 8, going beyond mere conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

195. As a direct and proximate result of Garth and Clayton's breaches of the agreements described above, Magness and The Peabody Bulldog have suffered actual damages exceeding $5 million, including:

    a. <u>For Magness</u>: Lost compensation of at least $2.7 million based on the position he declined, lost equity value in Starrex that would have accompanied his CEO position, additional lost benefits and compensation associated with the board position and operational control he was promised, and reputational damage in the title insurance industry;

    b. <u>For The Peabody Bulldog</u>: Lost equity value from the reduction of its ownership interest from 20% to 11% without the promised capital contribution, conservatively valued at $1.1 million based on standard industry multiples, lost distributions and profits that would have resulted from appropriate capitalization with the promised $1 million contribution, and lost value of the promised 3 million shares of Starrex stock.

    c. Under Texas law, Plaintiffs are entitled to recover the benefit of their bargain, including all foreseeable damages that naturally flow from the breach. *Mays v. Pierce*, 203 S.W.3d 564, 577-78 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

## COUNT THREE: PROMISSORY ESTOPPEL

### (By Plaintiffs The Peabody Bulldog and Magness Against Defendants Garth and Clayton)

196.    Plaintiffs The Peabody Bulldog and Magness reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

197.    Alternatively to their breach of contract claims, The Peabody Bulldog and John Magness assert promissory estoppel based on specific promises made by Garth and Clayton regarding equity compensation, corporate positions, financing, and business structure. Under Texas law, "[t]he requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983).

198.    From April 2021 through February 2024, Garth and Clayton made clear, definite, and specific promises to Magness and The Peabody Bulldog, including but not limited to:

    a.    During their April 8, 2021 meeting at Post Oak Grill in Houston, Garth and Clayton specifically promised Magness that he would become CEO of Starrex with a board seat replacing Garrett Clayton, and receive 3 million shares of Starrex stock;

    b.    During the April 15, 2021 meeting at the AmCap Cancer Event in Houston, Garth elaborated on this promise, providing specific details about Magness's leadership role in the combined entity and the implementation of the nationwide acquisition strategy;

    c.    In June 2022, Garth and Clayton explicitly promised The Peabody Bulldog would receive 3 million shares of Starrex stock in exchange for its BSpoke assets, not merely a casual suggestion but a specific, quantifiable commitment in formal business negotiations;

    d.    In July 2022, at Starrex's Houston offices, Garth and Clayton informed The Peabody Bulldog that the Magnolias needed another million dollars for working capital as a capital call round. They represented to Magness and The Peabody Bulldog that they would personally contribute the needed $1 million if The Peabody Bulldog would accept a reduced percentage of equity, presenting a structured proposal whereby TPB's equity would be reduced from 20% to 11%, explicitly as consideration for "sitting out this round" while they contributed the full $1 million themselves;

    e.    On January 22, 2022, at a Lamar University event in Beaumont, Garth reinforced his promises to Magness, stating, "THIS IS GOING TO BE YOUR COMPANY," and describing it as a "Wealth Event" requiring estate planning; and

    f.    On December 13, 2022, Hill, at Garth's direction, promised Magness a "$100k finders fee + 250k shares of stock" and "WHEN YOU BECOME AN EMPLOYEE OF STX...COMP...BOARD SEAT," which Hill confirmed was still proceeding on February 2, 2023.

199.    These promises were not mere opinions, predictions, or statements of future intent, but specific, concrete commitments. The specificity of these promises—including exact number of shares (3 million), precise position (CEO), particular corporate governance structure (board seat), and defined equity arrangements—demonstrates their definite nature.

200.    Garth and Clayton could reasonably foresee that Magness and The Peabody Bulldog would rely on these promises as evidenced by:

a.    Their active solicitation of information about Magness's other professional opportunities, including his potential position offering $900,000 in annual compensation;

b.    Their specific encouragement for Magness to decline other opportunities to focus on building the Magnolia Companies under the promise of future leadership of Starrex;

c.    Their knowledge of The Peabody Bulldog's equity position and the significance of a reduction from 20% to 11%;

d.    Their increasing specificity in promises as they learned what would induce action;

e.    Their systematic reinforcement whenever Plaintiffs showed hesitation; and

f.    Their explicit requests for Magness's expertise in identifying acquisition targets and developing operational frameworks that would be implemented once he assumed the CEO position.

201.    Magness and The Peabody Bulldog substantially relied on these promises to their detriment through concrete actions including:

a.    Magness declined a position offering a minimum of $900,000 annual compensation in early 2021 (although he expected make seven figures and was accustomed to doing so), just weeks after Garth and Clayton's initial promises, with his declination email specifically referencing his commitment to the "Starrex opportunity discussed with Garth and Clayton";

b.    Magness forwent an opportunity to manage $45 billion in assets with a major financial institution, as evidenced by email communications in which Magness informed the institution he was pursuing the Starrex opportunity;

c.    Magness dedicated three years of full-time professional services from April 2021 through February 2024 to building the Magnolia Companies and Starrex's acquisition strategy without compensation, based on the promise of future equity and executive position;

d.    Magness leveraged his professional reputation and industry relationships to secure the All American Title acquisition and identify additional acquisition targets, as specifically directed by Garth and Clayton;

e.    Magness developed a comprehensive operational framework for Starrex's nationwide expansion that he expected to implement as CEO;

     f.    The Peabody Bulldog surrendered its $2.2 million equity position in profitable BSpoke operations;

     g.    The Peabody Bulldog accepted reduction in Magnolia equity from 20% to 11%, effectively giving away half of its ownership interest based on Garth and Clayton's promise to personally contribute $1 million in capital; and

     h.    Both owners of The Peabody Bulldog remember this arrangement and, along with The Peabody Bulldog, relied on these representations.

202.   The equity transfer that occurred in July 2022, whereby TPB's equity in the Magnolias was reduced from 20% to 11% based on Garth and Clayton's promise to personally contribute $1 million to the Magnolias, was entirely separate from any settlement with BSpoke. This transaction took place after the BSpoke Settlement Agreement had been executed and was driven by Garth and Clayton's representation that the Magnolias needed additional capital and that Nelson Mitchell's anticipated investment would dilute everyone's equity. Garth and Clayton indicated that they would personally absorb the impact if TPB would accept reduced percentage ownership.

203.   Despite securing agreement to substantial equity reduction, Garth and Clayton never contributed the promised capital. Instead, they directed Merritt and Hill to advance $1 million in funds from Starrex to the Magnolias, creating a debt they owed to Starrex rather than fulfilling their personal obligation to the Magnolias and The Peabody Bulldog by contributing their own capital. While this demonstrated the amount of control and power they had over Starrex—which was completely improper for a publicly traded company—Garth and Clayton could have handled the matter by personally repaying Starrex the $1 million advance. But they did not. Instead, they engineered a scheme to steal $1 million from the Magnolias.

204.   Their scheme culminated when HMHTI invested $1 million in September 2022. After repeatedly telling Hill and Merritt to "wait for Nelson's money," Clayton explicitly stated during an August 2022 call that once Nelson's money came in, they'd be able to clean up the Starrex $1 million advance. Within days of the Magnolias receiving the $1MM HMHTI investment, they directed transfers of $1 million out to Starrex via Merritt's access to the Magnolia Frost Bank accounts specifically to satisfy their own personal debt to Starrex. After Merritt and Hill had effected the transfer for Garth and Clayton, they told Garth and Clayton that they should never put Hill and Merritt in such a position again.

205.   The result was that the Magnolias were out $1 million, The Peabody Bulldog gave away 11% of the equity in the company (having reduced its holdings from 20% to 11%, a reduction of about

half of its own equity) and Garth and Clayton obtained more equity in the Magnolias for free as a result of this scheme.

206. Plaintiffs' reliance was reasonable and justified based on:

    a. The specificity and definite nature of Garth and Clayton's promises;

    b. Garth and Clayton's demonstrated control over Starrex's operations, evidencing their ability to fulfill these promises;

    c. Their consistent reinforcement of these promises in formal business settings with multiple witnesses present;

    d. Their active encouragement of reliance through ongoing reassurances about the timeline for implementation; and

    e. The equity transfer to Garth and Clayton being discussed in meetings throughout the summer of 2022, with the specific understanding that they, not Starrex, would be responsible for the capital contribution.

207. This reliance caused substantial injury including:

    a. The Peabody Bulldog's loss of $2.2 million in equity value in the BSpoke entities;

    b. The Peabody Bulldog's diminished ownership in the Magnolias (decreasing from 20% to 11%, approximately half of its equity) without receiving the promised capital contribution;

    c. Lost distributions and profits that would have resulted from appropriate capitalization with the promised $1 million contribution;

    d. Magness's lost compensation of at least $2.7 million from the position he declined ($900,000 annually for three years);

    e. The value of Magness's professional services provided without compensation for three years;

    f. Lost future compensation and equity value Magness would have received in the promised CEO position; and

    g. Diminished professional opportunities for Magness resulting from dedicating three years to Garth and Clayton's venture.

208. Injustice can be avoided only through enforcement of Garth and Clayton's promises because:

    a. Plaintiffs' substantial reliance actions are complete and irreversible;

    b. The magnitude of their financial losses is significant;

    c. Garth and Clayton received substantial benefits from Magness's expertise and services without providing the promised consideration;

d.   Garth and Clayton obtained increased equity in the Magnolias without contributing the promised capital; and

e.   Compelling Garth and Clayton to fulfill their promises, or provide equivalent compensation, is necessary to prevent them from being unjustly enriched by Plaintiffs' reliance.

209.    Neither the disclaimer of reliance provisions in the BSpoke Settlement Agreement nor the non-binding LOI bar this promissory estoppel claim because:

a.   The promises upon which Magness relied were made prior to and independent of the LOI, forming the basis for his initial commitment to the venture;

b.   The equity reduction reliance by The Peabody Bulldog predates contractual limitations in the BSpoke Settlement Agreement, making it actionable under *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965);

c.   The promises and misrepresentations Garth and Clayton made to The Peabody Bulldog regarding the $1 million contribution/equity reduction had no connection at all to any written agreement and were independent of the BSpoke Settlement Agreement (or occurred after execution); and

d.   The Texas Supreme Court has recognized that promissory estoppel may apply even absent a binding contract when justice requires. *See Wheeler*, 398 S.W.2d at 96-97.

210.    Garth and Clayton made specific promises—$1 million personal contribution, 3 million shares, CEO position, board seat—not mere puffery. These definite commitments induced substantial, detrimental reliance by both Magness and The Peabody Bulldog.

211.    As a direct and proximate result of their detrimental reliance on Garth and Clayton's promises, Magness has suffered actual damages exceeding $2.7 million and The Peabody Bulldog has suffered actual damages exceeding $2.2 million. Under Texas law, Plaintiffs are entitled to reliance damages "limited to the amount necessary to restore the position that the promisee would have been in had he not relied on the promise." *Wheeler*, 398 S.W.2d at 97.

## **COUNT FOUR: COMMON LAW FRAUD**

### **(By All Plaintiffs Against Defendants Garth and Clayton)**

212.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.  This claim is based on specific factual allegations stated with particularity in the preceding paragraphs which establish all elements of fraud including the who, what, when, where,

how, and why of each alleged misrepresentation, to the extent required under Rule 9(b). Additional allegations and details are provided in the following paragraphs.

213.    Between April 2021 and February 2024, Garth and Clayton made numerous material misrepresentations to Plaintiffs regarding their authority and intentions, financial resources and plans, and Merritt's qualifications.

214.    These specific, verifiable misrepresentations included false claims about Merritt's educational credentials (Bachelor's in Accounting and a Masters of Business Administration from University of Memphis, PhD from the UCLA Anderson School of Management in Global Economics, and a CFA Charter from the CFA Institute in Finance), which have been conclusively disproven through sworn certifications from these institutions.

215.    These representations were objectively false, as confirmed by the University of Memphis Registrar, UCLA Registrar, and CFA Institute's Assistant General Counsel, as well as Garth's admission that the tax-deferred exchange they had represented was "impossible" and their direction to use Starrex funds rather than personal capital for the promised $1 million contribution.

216.    Plaintiffs later learned these representations about Merritt's qualifications were false, as she did not possess any of the degrees or credentials that Garth and Clayton claimed she had during these meetings and as specifically represented to Plaintiffs for the purpose of relying upon her financial acumen to handle all of the finances, accounting, and financial management of the Magnolias. They represented her as extremely well qualified, a "doctor" with a "PhD from UCLA!" and thus, "wicked smart" and able to handle anything financial at all, especially the financial management of the Magnolias, involving millions of dollars a year. In fact, she had absolutely <u>none</u> of these degrees or credentials, which was known to Garth and Clayton as they knew she was overqualified for her position as Chief Financial Officer (CFO) of a publicly traded company and used her fear of losing a position she could never again obtain (as she possessed no degrees or credentials) to completely control her. Clayton also indicated that they had knowledge when they made comments that Merritt would seemingly "burn the house down" if she lost her position because she could never obtain such a position again. (Merritt enjoyed calling herself "Dr. Merritt, PhD, CFA" signing official documents as such, and appearing in lists like the Top 50 Women in Finance.) They also ensured that after she and Hill did their bidding, their compensation packages were at least doubled from around $120,000 or $150,000 to $300,000 or more.

217.    Garth and Clayton knew these representations were false or made them with reckless disregard for their truth, as evidenced by Clayton's admission stating that, or words to the effect that "if anyone does a forensic audit [on the Magnolias], we are f\*\*cked," Garth's instruction to backdate promissory notes, and their sophisticated business backgrounds precluding any claim of ignorance.

218.    Additionally or alternatively, each of these representations was knowingly false when made. Scienter may be established by evidence showing that a party made representations with knowledge of their falsity or recklessly without knowledge of their truth. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526-27 (Tex. 1998). Here, Garth and Clayton's knowledge of falsity is demonstrated by their contemporaneous communications revealing awareness that their promises could not be fulfilled, their admissions to third parties expressing concern about potential audits, and their sophisticated background in business and finance that precludes any claim of innocent mistake or mere optimism.

219.    Garth and Clayton's specific misrepresentations that Merritt held a Bachelor's degree in Accounting and an MBA from the University of Memphis, a PhD from UCLA's Anderson School of Management in Global Economics, and a CFA Charter from the CFA Institute, when in fact she possessed none of these credentials (and had never even enrolled) were material because Plaintiffs relied on Merritt's purported expertise to handle financial management of the Magnolias worth millions of dollars. Documents from these institutions confirm she never attended or received such credentials, establishing that Garth and Clayton's representations were demonstrably false when made.

220.    These misrepresentations were made with specific intent to induce reliance, as demonstrated by their systematic pattern of making promises calculated to secure particular actions, their tailoring of representations to address specific concerns, and their strategic reinforcement whenever Plaintiffs showed hesitation.

221.    Plaintiffs actually and justifiably relied on these misrepresentations through specific actions: Magness foregoing opportunities worth over $2.7 million, The Peabody Bulldog surrendering equity positions worth $2.2 million and accepting equity dilution, HMHTI investing $1 million, and the Magnolia Companies entering into the Management Services Agreement.

222.    This reliance caused substantial injury to Plaintiffs including The Peabody Bulldog's loss of $2.2 million in equity value, Magness's lost compensation exceeding $2.7 million, HMHTI's misappropriated $1 million investment, and the Magnolia Companies' damages from relying on

falsely represented qualifications and capabilities.  Plaintiffs seek recovery of these damages in this lawsuit.

## COUNT FIVE: DECEPTIVE TRADE PRACTICES ACT
### (By The Peabody Bulldog Against Defendants Garth and Clayton)

223.   Plaintiff The Peabody Bulldog realleges and incorporates by reference all preceding and following paragraphs as if fully set forth herein.  This claim is based on specific factual allegations stated with particularity in the preceding paragraphs, which establish all elements of fraudulent inducement including the who, what, when, where, how, and why of each alleged misrepresentation to the extent required under Rule 9(b).  Additional allegations and details are provided in the following paragraphs.

224.   The Peabody Bulldog (TPB) qualifies as a "consumer" under the DTPA because it sought and acquired services through transactions in which it paid valuable consideration.

225.   TPB qualifies as a "consumer" under the DTPA because it sought and acquired services through transactions in which it paid valuable consideration. Specifically, it sought and acquired professional financial services (valuation services, capital structuring services, financial planning services, and investment advisory services) and professional management services (strategic advisory services, corporate development services, operational consulting, and regulatory compliance services) from Garth and Clayton. TPB paid valuable consideration for these services by relinquishing its $2.2 million equity position in profitable title operations, accepting reduction in Magnolia equity from 20% to 11%, and contributing proprietary business relationships and operational knowledge. The Texas Supreme Court has even recognized that the definition of a consumer in section 17.45 or any other provision of the DTPA does not restrict its application only to deceptive practices committed by persons who actually furnish the goods or services on which the complaint is based. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981).  Further, TPB is capitalized with less than $25 million in assets.

226.   These services were the central object of the transactions, not merely incidental aspects, as demonstrated by the nature of the business relationship, the substantial consideration provided specifically for these services, and the explicit discussions focused on service elements.

227.   Garth and Clayton engaged in false, misleading, and deceptive acts prohibited by specific sections of the DTPA, including but not limited to the following: (a) Section 17.46(b)(5) by representing that services have characteristics they do not have; (b) Section 17.46(b)(12) by representing that an agreement confers rights it does not have; and (c) Section 17.46(b)(24) by failing to disclose material information with the intention to induce a transaction. Additionally, Garth and Clayton generally violated Section 17.46(a).

228.   In compliance with Rule 9(b)'s heightened pleading requirements, should it be necessary, The Peabody Bulldog specifies that Garth and Clayton engaged in deceptive acts, including but not limited to the following specific deceptive acts:

    a.   On or about July 2022, at Starrex's Houston offices, Garth specifically represented that professional financial services provided by him and Clayton would include their "personal contribution of $1 million" to the Magnolia Companies, when in fact they already planned to direct Starrex to advance these funds, as evidenced by their subsequent communications;

    b.   On or about July 2022, Garth and Clayton represented that the operational management services they provided included the specific expertise to structure a tax-efficient acquisition by Starrex, which they knew to be false as they later admitted in March 2023 that such a structure was "impossible"; and

    c.   Throughout 2022, Garth and Clayton represented that their advisory services included specific expertise in publicly traded company compliance, when they knew that Merritt lacked the credentials they claimed made her qualified to provide such services.

229.   These specific misrepresentations directly relate to the services acquired by The Peabody Bulldog, not merely to goods or financing arrangements.

230.   These violations were committed knowingly and intentionally, as evidenced by Garth and Clayton's sophistication in business and financial matters, their systematic pattern of misrepresentations throughout the relationship, their documented history of making representations they knew could not be fulfilled, and their exploitation of The Peabody Bulldog's trust in their business expertise. A party's intent may be established by circumstantial evidence, such as remaining silence when one has a duty to speak. *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434-35 (Tex. 1986).

231.   Garth and Clayton's violations of the DTPA were committed "knowingly" and "intentionally" as those terms are defined in the DTPA, entitling The Peabody Bulldog to additional damages under Tex. Bus. & Com. Code § 17.50(b)(1). Under Section 17.45(9) of the TBCC,

"knowingly" means "actual awareness of the falsity, deception, or unfairness of the act or practice," which may be inferred from objective manifestations. "Intentionally" under Section 17.45(13) requires this same awareness coupled with "the specific intent that the consumer act in detrimental reliance on the falsity or deception." Garth and Clayton acted knowingly and intentionally when they: (a) made false representations about personally contributing $1 million in capital while secretly planning to use Starrex's funds, as evidenced by their contemporaneous instructions to Merritt and Hill; (b) promised 3 million shares of Starrex stock while being fully aware of Starrex's capitalization challenges; (c) misrepresented Merritt's qualifications while knowing she lacked the claimed credentials; and (d) specifically engineered the scheme to use HMHTI's investment to satisfy their personal obligations to Starrex. Their sophistication as business professionals and Clayton's background in securities (despite his criminal history in securities fraud) demonstrates they were fully aware of the falsity of their representations when made. Furthermore, their specific targeting of The Peabody Bulldog's equity position, their calculated timing of promises to coincide with key decision points, and Clayton's explicit admission that "if anyone does a forensic audit [on the Magnolias], we are f***ed" conclusively establishes both their awareness of falsity and their specific intent that The Peabody Bulldog rely on their misrepresentations. Accordingly, The Peabody Bulldog is entitled to recover up to three times the amount of economic damages under Section 17.50(b)(1) of the Texas Business and Commerce Code.

232.    The Peabody Bulldog has suffered economic damages in excess of $2.2 million, as well as its loss of nearly half of its equity in the Magnolias, and is entitled to treble damages under the DTPA.

## COUNT SIX: BREACH OF FIDUCIARY DUTY
### (By All Plaintiffs Against Defendants Garth and Clayton)

233.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

234.    Garth and Clayton owed fiduciary duties to Plaintiffs arising from their positions of trust and confidence and de facto control over operations, established through at least the following:

    a.    Direction of all significant business decisions from April 2021 through February 2024;

    b.    Authority over finances and personnel demonstrated through specific directives (e.g., "DO NOT PAY PER TERRY AND PHIL" notation on blocked KIPP donation);

    c.   Comprehensive oversight of strategic planning; and

    d.   Their representation to third parties as having ultimate decision-making authority.

235.   These fiduciary relationships created duties of loyalty, care, good faith, and full disclosure. Garth and Clayton breached these duties through various actions, including but not limited to the following:

    a.   Misappropriation of corporate funds: diverting HMHTI's $1 million investment through specific transfers—$250,000 (September 13, 2022), $705,111.55 (September 21, 2022), $75,561.85 (September 20, 2022)—to satisfy personal obligations;

    b.   Creating fraudulent documentation: fabricating backdated promissory notes in April 2023 with explicit instructions to make them appear to predate the "first draw";

    c.   Self-dealing transactions: manipulating The Peabody Bulldog's equity position through false promises of personal capital contributions in July 2022; and

    d.   $1MM "Nelson's money"

    e.   Breaching their duty of disclosure: concealing material information about finances, misrepresenting Merritt's qualifications, and Garth's false January 4, 2024 denial of involvement with the promissory notes.

236.   These breaches were knowing and intentional, as demonstrated by several factors, including but not limited to the following: (a0 Their systematic pattern of self-interested conduct over three years; (b) efforts to conceal through fraudulent documentation; (c) Clayton's admission in July 2023 about the anticipated, devastating effect of a forensic audit; and (d) their coordinated approach to misappropriating assets in January-February 2024.

237.   These breaches caused Plaintiffs substantial damages, including but not limited to the following:

    a.   Direct financial losses (HMHTI's $1 million, equity dilution, unauthorized transfers);

    b.   Lost business opportunities;

    c.   Diminished value of business interests; and

    d.   Costs incurred due to their breach of fiduciary obligations.

238.   Garth and Clayton's Houston meetings, financial directives, and 2/3 ownership establish fiduciary roles, contradicting any non-involvement assertions. The specific acts alleged—HMHTI withdrawals, note fabrication, and settlement demands, to name a few—tie them directly to breaches, satisfying pleading requirements under *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*.

239.    Plaintiffs are entitled to actual damages, including lost profits, consequential damages, and exemplary damages due to Defendants' willful and malicious conduct. *See Iqbal*, 556 U.S. at 678.

## COUNT SEVEN: CONVERSION

### (By All Plaintiffs Against Defendants Cooper, Starrex Title Florida, MarketStreet, and Brewer)

240.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

241.    Plaintiffs owned, possessed, or had the right to possess specific property including but not limited to the following:

    a.    Customer lists, proprietary interpretations and compilations of data, and proprietary transaction data stored on Qualia servers (Qualia Labs, Inc.) that included servers hosted in Texas, developed through significant investment and containing detailed information not available to competitors;

    b.    Corporate funds in Magnolia's accounts totaling over $60,000, which Cooper transferred without authorization in specific transactions on February 6, 8, and 22, 2024;

    c.    The "MAGNOLIA TITLE COMPANY" trade name, which Brewer registered without authorization on January 25, 2024; and

    d.    Physical assets and business operations in Florida and Arkansas, including office equipment, furniture, business records, and operational systems.

242.    Defendants wrongfully exercised dominion and control over this property through at least the following actions:

    a.    Cooper's unauthorized downloading of proprietary information and transfer of funds—$4,585.75 (February 6), $2,560.00 (February 8), $52,618.41 (February 22)—to Starrex Title Florida and MarketStreet entities as well as other transfers;

    b.    Brewer's unauthorized registration of the "MAGNOLIA TITLE COMPANY" trade name on January 25, 2024 (especially for the purpose of operating out of the Magnolias' existing offices and confusing brokers, agents, customers, and banks into believing that MarketStreet was either a continuation or authorized continuance of the Magnolias or was simply the same company);

    c.    MarketStreet's improper filings listing Magnolia's offices as its place of business on January 30, 2024; and

    d.    Their collective occupation of physical locations and continued use of Magnolia's equipment, systems, and customer relationships.

243.   This exercise of dominion was unauthorized and wrongful, as evidenced by the absence of any legitimate transfer of ownership, lack of compensation, Cooper's breach of fiduciary duties, and continued use despite demands to cease. Under Texas law, the unauthorized exercise of control over another's property constitutes conversion. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971).   For instance, Brewer has made two completely contradictory statements—the combination of which show his full awareness of his wrongful acts: (a) he claimed that Magness authorized Cooper to "do whatever she needed to do" by taking all the assets of the Florida and Arkansas Magnolia (an absurd proposition), which he says Cooper then did, and Cooper and Brewer took pains to make it appear to the public, customers, brokers, and industry partners that it was the same company.  But, on the other hand, when it is convenient, Brewer claims that his companies are completely separate companies and have no relationship whatsoever with the Arkansas and Florida Magnolias, despite using absolutely all of their assets and IP, including the social media accounts, software licenses Plaintiffs had paid for, logos, proprietary customer lists and compilations, and phone numbers.

244.   Defendants' wrongful exercise of dominion interfered with Plaintiffs' right of possession, preventing access to customer data, transaction information, funds, and control over proprietary systems and trade name.

245.   This conversion has caused Plaintiffs damages exceeding $10 million including the value of physical assets appropriated without compensation, the value of customer relationships and proprietary data, lost revenue from ongoing operations, and costs incurred in attempting to reconstitute operations.

## COUNT EIGHT: TORTIOUS INTERFERENCE WITH CONTRACT
### (By All Plaintiffs Against All Defendants)

246.   Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.  The detailed allegations herein satisfy the plausibility standard under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

247.   Plaintiffs had valid, enforceable contracts with third parties including, but not limited to the following:

     a.   **HMHTI Investment Agreement (September 9, 2022)**: A detailed contract whereby HMHTI invested $1 million in Magnolia based on Side Letters requiring

supermajority approval for major decisions, which Garth and Clayton executed with HMHTI at Love Field FBO in Dallas;

b. **Qualia Platform Contract:** A software license agreement paid through March 2024, essential for Plaintiffs' title operations, providing technical infrastructure for all closings;

c. **Agency Agreements with Major Underwriters:** Contracts with ANTIC, Old Republic, Fidelity, and First American, which provided the essential underwriting authority for Plaintiffs' title operations;

d. **KIPP Educational Foundation Client Agreement:** A significant client relationship generating up to $350,000 in annual premiums, which Garth and Clayton directly interfered with by blocking a $10,000 donation already committed and contributed every year despite the relationship's value; and

e. **Employment Agreements with Key Personnel:** Formal agreements with 12 staff members in Florida and Arkansas who were systematically induced to breach these agreements in February 2024.

248. Defendants had actual knowledge of these contracts through documented means:

a. Garth and Clayton personally negotiated the HMHTI investment, as evidenced by their attendance at the August 15, 2022 Love Field FBO meeting in Dallas;

b. Cooper, as President, directly administered the Qualia contract, agency agreements, and employment contracts, with access to all contract documents;

c. Garth and Clayton explicitly referenced the KIPP relationship in their directive blocking the donation: "DO NOT PAY PER TERRY AND PHIL"; and

d. MarketStreet and Brewer targeted these specific contractual relationships in their takeover strategy, evidenced by their immediate continuation of services to the same clients using the same staff.

249. Defendants willfully and intentionally interfered with these contracts through specifically documented actions:

a. **HMHTI Agreement**: Garth and Clayton willfully interfered by directing the unauthorized diversion of funds—$250,000 (September 13, 2022), $705,111.55 (September 21, 2022), $75,561.85 (September 20, 2022)—to satisfy personal obligations, breaching the Side Letters' requirement for supermajority approval;

b. **Qualia Contract**: Cooper terminated access on March 5, 2024, despite Plaintiffs' payment through March 2024, directly preventing contract performance;

c. **KIPP Relationship:** Garth and Clayton interfered by blocking the $10,000 donation in 2022 despite up to $350,000 in annual premiums, damaging the client relationship;

1. Contemporaneous documentary evidence proves Garth and Clayton's direct interference with this relationship through a June 29, 2023 notation on the KIPP invoice stating "DO NOT PAY per Terry & Phil." This notation explicitly

ties them to the interference, contrary to their denial of involvement. Multiple subsequent communications through October 18, 2023 reference this unpaid pledge that damaged a significant business relationship generating $350,000 in annual premiums.

d. **Employment Agreements**: Cooper coordinated the simultaneous resignation of 12 employees who immediately began working for MarketStreet entities, evidencing a planned solicitation of breach rather than coincidental departures; and

e. **Ongoing Transactions**: By February 20, 2024, Defendants had diverted approximately 500 monthly closings to competing entities they controlled, representing intentional interference with these client contracts.

250.    Defendants had no privilege or justification for their interference, as they lacked any legitimate business interest and further, used improper means including breaches of fiduciary duty and conversion.   Additionally, they had no privilege or justification for the reasons that they deliberately coordinated to maximize disruption rather than compete legitimately and continued their pattern of unlawful conduct despite demands to cease.

251.    This interference proximately caused substantial damage including but not limited to: (a) lost revenue from disrupted transactions exceeding $1.5 million monthly; (b) damaged underwriter relationships representing millions in premium potential; (c) lost customer relationships, including KIPP's up to $350,000 annual premiums; and (d) liability exposure from inability to perform contractual obligations. Plaintiffs are entitled to actual damages, including lost profits, consequential damages, and exemplary damages due to Defendants' willful and malicious conduct.

## COUNT NINE: MISAPPROPRIATION OF TRADE SECRETS - TUTSA

### (By All Plaintiffs Against Defendants Cooper, Starrex Title Florida, MarketStreet, and Brewer)

252.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.   Plaintiffs bring an action for violation of the Texas Uniform Trade Secrets Act.   *See* Tex. Civ. Prac. & Rem. Code Chatper 134A.

253.    Plaintiffs developed valuable trade secrets meeting the definition espoused in Tex. Civ. Prac. & Rem. Code § 134A.002(6), including but not limited to: (a) Customer information: proprietary lists, relationship histories, pricing structures stored on Texas-based Qualia servers; (b) Operational systems: specialized closing procedures, transaction management workflows, quality control processes; and (c) Financial information: pricing models, cost structures, revenue forecasts.

These trade secrets constitute information that derives independent economic value from not being generally known or readily ascertainable through proper means by others who could obtain economic value from its disclosure or use, and Plaintiffs took reasonable measures under the circumstances to keep such information secret. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6).

254.    These trade secrets derived independent economic value from not being generally known or readily ascertainable, as demonstrated by at least the following: (a) The substantial competitive advantage they provided in the title insurance industry; (b) significant investment in development over years of operation; (c) Defendants' specific targeting of this information in their takeover plan; and (d) immediate benefit Defendants derived from possession, enabling them to operate competing businesses without development costs.

255.    Plaintiffs implemented reasonable measures to maintain secrecy through at least the following: (a) Confidentiality agreements with employees; (b) password-protected systems with limited access protocols; (c) specific non-disclosure provisions in corporate documents; and (d) compartmentalized access to different categories of information.

256.    In February 2024, Plaintiffs became aware that Cooper had facilitated the unauthorized transfer of the Magnolia Entities' proprietary data from the Texas-based Qualia servers to systems or a deployment belonging to MarketStreet Capital Partners, LP and MarketStreet Capital Partners AR, LP (collectively, "MarketStreet"). In email dated December 20, 2023, Cooper arranged for payment from Magnolia Florida to Qualia for the benefit of all Magnolia Entities by ACH from the Magnolia Florida operating account in the amount of $33,374.75, which covered usage through March 2024. Less than 45 days after arranging this payment, Cooper resigned and immediately joined competitor MarketStreet.

257.    In February 2024, Defendants misappropriated these trade secrets through at least the following: (a) Cooper's unauthorized downloading of customer lists and transaction data from Texas Qualia servers while still employed as Magnolia's President; (b) transfer of proprietary information to Starrex Title Florida and MarketStreet entities; (c) exploitation of Cooper's access rights for improper purposes; and (d) their collective use of this information to operate competing businesses.

258.    Garth and Clayton directly participated in the misappropriation of trade secrets by:

   a.   On information and belief, working with Merritt, Cooper, and/or Brewer to complete a takeover of Magnolia Arkansas and Magnolia Florida;

b.  Participating in a scheme to use for-the-auditor-only notes to attempt to force the Magnolias to voluntarily part with Magnolia Arkansas and Magnolia Florida in order to satisfy some of the alleged debt; and

c.  Facilitating the sale and transfer of Starrex Title Florida to Brewer/MarketStreet.

259.   This misappropriation was willful and malicious, as demonstrated by at least the following: (a) The systematic nature of information gathering during Cooper's employment; (b) coordination among Defendants to maximize the value of misappropriated information; (c) continued use despite demands to cease; and (d) efforts to conceal through rapid transition of operations.

260.   This misappropriation has caused substantial damage to Plaintiffs exceeding $10 million, including but not limited to: (a) Loss of competitive advantage in key markets; (b) lost value of proprietary information developed over years; (c) Diverted business from existing and prospective customers; and (d) Costs of attempting to reconstitute operations without access to misappropriated information.

261.   Cooper's misappropriation of trade secrets was directed from Texas since the Qualia deployment was paid for by the Magnolias in December 2023, in the amount of $33,374.75 to cover usage through March 2024. The deployment was maintained on Texas servers and Cooper accessed these Texas-based servers daily to perform her job duties. After her resignation, Cooper and MarketStreet used the Qualia deployment for which the Magnolia Entities had already paid through March 2024.

262.   Plaintiffs are entitled to actual damages, unjust enrichment damages, reasonable royalty, exemplary damages not exceeding twice the amount of actual damages, and attorneys' fees under TUTSA. Tex. Civ. Prac. & Rem. Code § 134A.004-005.

## COUNT TEN: UNJUST ENRICHMENT

### (By All Plaintiffs Against Defendants Garth, Clayton, Starrex Title Florida, MarketStreet, and Brewer)

263.   Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

264.   Defendants have been unjustly enriched through their wrongful acquisition of benefits belonging to Plaintiffs, obtained through fraud, duress, and undue advantage, creating a situation where retention would be unconscionable.

265.    Garth and Clayton obtained substantial benefits including:

   a.    Misappropriated HMHTI's $1 million investment, documented by specific transfers—$250,000 (September 13, 2022), $705,111.55 (September 21, 2022), $75,561.85 (September 20, 2022)—with, on information and belief, internal accounting records identifying these as satisfying Garth and Clayton's personal obligations, as confirmed by contemporaneous communications where Clayton explicitly stated during an August 2022 call words to the effect that once Nelson's money comes in, they will be able to clean up the Starrex advance;

   b.    Increased equity without capital contribution, as evidenced by the First Amended and Restated Company Agreement of Coast to Coast Title, LLC showing contributions of $5k each and of $495k each (credited in the amount of $250k representing a loan) for Garth and Clayton's entities;

   c.    Acquisition of Magness's professional services without compensation, detailed in communications where Garth explicitly promised future consideration; and

   d.    The Peabody Bulldog's surrendered equity positions worth $2.2 million, confirmed in a March 18, 2022 letter where all parties, including Garth, agreed that Peabody Bulldog's equity was worth $2,268,514.

266.    MarketStreet, Starrex Title Florida, and Brewer obtained substantial benefits including but not limited to:

   a.    Acquiring going concern operations without purchase (physical locations, trained staff, established customer relationships);

   b.    Appropriating the customer base and transaction pipeline (approximately 500+ monthly transactions);

   c.    Appropriating established professional relationships;

   d.    Using the Magnolias' trade name and market presence;

   e.    Using certain assets of the Magnolias' that they had already paid for, including but not limited to the Qualia Core platform, for which the Magnolias had already paid over $33,374.75 to use through mid-March 2024 and, on information and belief, leased space and other assets; and

   f.    Benefiting from proprietary methodologies, proprietary compilations of data, and customer data, including proprietary compiled profiles of customers.

267.    Retention of these benefits would be unconscionable because they were obtained through fraudulent misrepresentations, without legitimate (or any) consideration, in violation of fiduciary duties, and/or while perpetuating ongoing harm to Plaintiffs.

268.    Plaintiffs have specifically identified benefits received—HMHTI funds, All American proceeds, and asset transfers—beyond mere conclusory allegations. Clayton's audit admission and

Merritt's text tie Garth and Clayton directly to personal enrichment, showing comprehensive unjust gains. Garth and Clayton's dual role as purported investors while actually controlling Starrex's operations allowed them to extract benefits without appropriate corporate approvals or disclosures. For example, Garth instructed Magness to use specific language in communications with BSpoke regarding potential litigation and derivative claims in early 2022, demonstrating his behind-the-scenes control while maintaining plausible deniability.

269.    Defendants' unjust enrichment has directly caused Plaintiffs substantial damages exceeding $10 million, which include but are not limited to:

    a.  The value of misappropriated funds, including HMHTI's $1 million investment;

    b.  The value of misappropriated physical assets in Florida and Arkansas offices;

    c.  The value of proprietary customer relationships, operational systems, and goodwill;

    d.  The revenue and profit diverted from Plaintiffs to Defendants through the unauthorized operations;

    e.  The value of the professional services provided by Magness without compensation based on fraudulent promises;

    f.  The value of TPB's equity positions surrendered based on false representations; and

    g.  The costs incurred in attempting to restore operations following Defendants' misappropriation.

270.    These benefits retained by Defendants violate principles of justice, equity, and good conscience, and Plaintiffs are entitled to full restitution under Texas law. *See Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).


## COUNT ELEVEN: TEXAS THEFT LIABILITY ACT

### (By the Magnolias Plaintiffs <u>Only</u>
### Against Defendants Garth, Clayton, and Cooper)

249.    Plaintiffs Magnolia Title Arkansas, LLC, Magnolia Title Florida, LLC, Coast to Coast Title, LLC, and Sol City Title, LLC (collectively, "the Magnolias") reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.  No other Plaintiff brings this claim; only the Magnolias bring this claim.

250.    The Texas Theft Liability Act ("TTLA"), Tex. Civ. Prac. & Rem. Code § 134.001 *et seq.*, provides a civil cause of action for theft, which constitutes unlawfully appropriating property as

described by Texas Penal Code § 31.03. Under the TTLA, a person who commits theft is liable for the damages resulting from the theft, as well as additional statutory damages and attorneys' fees.

251.    Defendants Garth and Clayton unlawfully appropriated the Magnolias' property with intent to deprive the Magnolias of said property. Their actions constitute theft under the Texas Penal Code and give rise to civil liability under the TTLA.

252.    Specifically, Garth and Clayton committed theft of the following property:

a.    **HMHTI's $1 Million Investment**: On September 9, 2022, HMHTI invested $1 million in the Magnolias for specific business purposes, including working capital and growth. This investment became the property of the Magnolias upon transfer. Garth and Clayton unlawfully appropriated these funds through their direction of specific transfers—$250,000 (September 13, 2022), $705,111.55 (September 21, 2022), and $75,561.85 (September 20, 2022)—to satisfy their personal obligations. On information and belief, Starrex's internal accounting records designated these transfers as satisfying personal obligations of Garth and Clayton, documenting their intent to misappropriate these funds for personal benefit.

b.    **Corporate Funds from Operations**: Between April 2021 and February 2024, Garth and Clayton directed the diversion of additional corporate funds from the Magnolias' accounts, including the misallocation of operating capital and revenue to satisfy personal obligations and fund unrelated ventures.

c.    **Business Operations and Goodwill**: Through their orchestrated takeover in January-February 2024, Garth and Clayton effectively stole the Magnolias' business operations in Florida and Arkansas, including established client relationships, operational systems, and goodwill built through years of investment and market presence.

253.    Likewise, on February 6, 2024, without authorization, Cooper wrongfully accessed Magnolias' escrow account and its Florida recording account ending in 5041, and transferred and misappropriated $4,585.75 from the escrow account to the recording account. That same day, Cooper wrongfully accessed Magnolia's Florida operating account ending in 1758 and Magnolia Title's Frost Bank operating account and sent an outgoing wire in the amount of $2,560.00 from the Florida operating account to the Frost Bank operating account. On February 22, 2024, Cooper wrongfully accessed Magnolia's Florida underwriting account ending in 1766 and transferred $13,972.44 from her new escrow account. Also on February 22, 2024, without authorization, Cooper accessed Magnolia's Florida operating account ending in 1758 and wrongfully withdrew $52,618.41.

254.    Garth, Clayton, and Cooper's misappropriation of the Magnolias' property was without the Magnolias' effective consent. The HMHTI investment was specifically provided for the Magnolias' working capital and growth, not to satisfy Garth and Clayton's personal obligations. No

legitimate transfer of ownership was executed through proper corporate channels, and the Magnolias never authorized the diversion of their funds to satisfy Garth and Clayton's personal debts. Cooper was no longer an employee of any Magnolia entity when she made the transfers and was completely unauthorized to do so.

255.    Garth, Clayton and Cooper acted with the requisite culpable mental state for theft.

256.    Garth and Clayton's intent to unlawfully appropriate the Magnolias' property is evidenced by at least the following: (a) Clayton's August 25, 2022 text to Garth indicating words to the effect of "Once Nelson's money hits, we can clean up the advance. Need exact timing to coordinate with Debbie," demonstrating premeditation to misappropriate HMHTI's investment before it was even received; (b) the systematic transfers immediately following receipt of HMHTI's investment, showing their intent to divert these funds; (c) on information and belief, internal accounting records identifying these transfers as satisfying personal obligations of Garth and Clayton, and (d) Clayton's July 2023 admission stating that, or words to the effect that "if anyone does a forensic audit [on the Magnolias], we are f***ed," acknowledging their awareness that their financial manipulations constituted wrongdoing.

257.    Cooper's admitted her intent to unlawfully appropriate the Magnolias' property, conceding that she was no longer employed by the Magnolias but that she felt she had the right to make these transfers. To make the transfers, Cooper had to knowingly log into Magnolia bank accounts that she knew she was no longer authorized to access, locate a certain account, fill out all details of the transfer, including the receiving account, and then initiate the transfer. She did this multiple times. Nothing could be more intentional.

258.    The Magnolias owned the misappropriated property, including customer lists, proprietary information, transaction data, and funds totaling over $60,000 transferred by Cooper in February 2024. Defendants Garth and Clayton's involvement was not merely passive; they orchestrated and directed the scheme to deprive the Magnolias of this property through their control of Starrex and direction of Cooper and other defendants. Their actions constitute theft under Texas Penal Code § 31.03 as they unlawfully appropriated property with intent to deprive the owner of property without the effective consent of the owner.

259.    The Magnolias have suffered actual damages from Garth and Clayton's theft, including:

   a.   The approximately $1,030,673.40 misappropriated from HMHTI's investment;

   b.   Additional corporate funds diverted for unauthorized purposes;

    c.   Lost revenue from operations that could have been generated with the stolen capital; and

    d.   Costs incurred in attempting to reconstitute business without access to the stolen assets and capital.

Under Tex. Civ. Prac. & Rem. Code § 134.005, the Magnolias are entitled to recover the amount of the Magnolias' actual damages resulting from the theft, additional statutory damages of $1,000, and court costs and reasonable and necessary attorney's fees. The Magnolias specifically request that the Court award them all damages, statutory damages, costs, and attorney's fees available under the TTLA.

## COUNT TWELVE: UNFAIR COMPETITION

### (By All Plaintiffs Against Defendants Cooper, MarketStreet, Starrex Title Florida, and Brewer)

260.   Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

261.   Defendants Cooper, MarketStreet, Starrex Title Florida, and Brewer engaged in unfair competition through conduct that violated established standards of business ethics and offended public policy. Their actions went beyond legitimate competition to encompass wholesale misappropriation of Plaintiffs' business operations, proprietary information, and market presence.

262.   Rather than developing competing operations legitimately, they systematically appropriated the Magnolias' entire business infrastructure through at least the following:

    a.   Cooper, while still employed as President, downloading proprietary information and transferring it to MarketStreet and Starrex Title Florida in February 2024;

    b.   Brewer's unauthorized registration of the "MAGNOLIA TITLE COMPANY" trade name on January 25, 2024;

    c.   Coordinated resignations of at least 12 or more employees in multiple offices who immediately began working for Defendants' entities; and

    d.   Operation from identical physical locations, maintaining the same telephone numbers and contact information.

263.   Defendants engaged in deceptive practices designed to confuse customers and misappropriate goodwill by way of at least the following actions:

a.   Operating from the same physical locations;

b.   Maintaining identical telephone numbers and contact information;

c.   Employing the same staff; and

d.   Presenting themselves to customers as the continuation of the Magnolias' business.

264.   By approximately February 20-22, 2024, Defendants had effectively transferred entire operational teams from the Magnolias to MarketStreet, maintaining identical business operations while diverting all revenue to themselves.

265.   This pattern of conduct constitutes unfair competition under Texas law, through which Defendants caused substantial damage to the Magnolias through at least the following: (a) diverting business from the Magnolias, (b) causing the Magnolias to lose relationships they had built over time and/or with substantial investment; (c)  misappropriating the Magnolias' systems and proprietary information, including but not limited to Qualia Core, Microsoft 365 (and all apps), email addresses, customer records, customer lists, proprietary compilations of title information and interpretations, transactions in progress, logos, content, goodwill, social media accounts, phone numbers, and other property; (d) damaging the Magnolias' market positions; and (e) causing the loss of the Magnolias' competitive advantages.

266.   Plaintiffs are entitled to both injunctive relief to prevent continuing harm and damages for losses already incurred, which exceed $10 million.


## COUNT THIRTEEN: BREACH OF FIDUCIARY DUTY

### (By Magnolias Against Defendant Cooper)

267.   Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

268.   As President of Magnolia Title Florida and Magnolia Title Arkansas, Cooper owed fiduciary duties to the Magnolias including duties of loyalty, care, good faith, and protection of confidential information.

269.   Despite her physical location in Florida and Arkansas, Cooper established substantial connections with Texas that created jurisdiction in this Court, including regular attendance at quarterly meetings at Magnolia's Houston headquarters throughout 2021-2023, participation in

multiple weekly conference calls with Texas-based executives, daily access to and use of Texas-based technological systems, and submission to Texas-based management authority in her daily operations.

270.    Cooper breached her fiduciary duties through specific unauthorized actions between February 6-22, 2024, including but not limited to the following:

    a.    Unauthorized transfers totaling over $60,000, specifically $4,585.75 on February 6, 2024, $2,560.00 on February 8, 2024, and $52,618.41 on February 22, 2024;

    b.    Downloading proprietary customer information while still employed;

    c.    Coordinating mass employee departures to competitors;

    d.    Facilitating formation of competing entities using the Magnolias' resources; and

    e.    Serving as registered agent for competing entities while still employed as President.

271.    These breaches were knowing and intentional, as demonstrated by her systematic transfer of proprietary information, coordination with competitors while still employed, calculated timing of employee departures, and continued use of Magnolia property after stating on February 12, 2024, that she was "no longer with Magnolia Title Florida LLC."

272.    Cooper's breaches directly caused damages including loss of funds through unauthorized transfers, loss of confidential information and proprietary data, disruption of operations through coordinated employee departures, and loss of ongoing business due to the diversion of customers and transactions to competing entities.  More specifically, the damages include but are not limited to, the following:

    a.    Direct financial losses exceeding $73,764.16 through unauthorized transfers ($4,585.75 on February 6, 2024, $2,560.00 on February 8, 2024, $13,972.44 and $52,618.41 on February 22, 2024) and other transfers;

    b.    Lost value of proprietary customer data, transaction information, and business relationships misappropriated by Cooper, conservatively valued at $2.5 million based on development costs and revenue potential;

    c.    Lost revenue from approximately 500+ monthly closings diverted to competing entities through Cooper's actions, with average revenue of approximately $3,000 per transaction, totaling approximately $1.5 million or more monthly;

    d.    Operational disruption costs incurred in attempting to recover from systematic data theft;

    e.    Reputational damage and lost client relationships caused by Cooper's disparaging statements to clients; and

    f.    Costs of replacing key personnel following the coordinated departure of 15 or more employees arranged by Cooper.

273.    Under Texas law, these damages are recoverable for breach of fiduciary duty, as are fee forfeiture and exemplary damages due to Cooper's intentional breach. *See ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010).

## COUNT FOURTEEN: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (By All Plaintiffs Against Defendants MarketStreet, Starrex Title Florida, and Brewer)

274.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

275.    Defendants MarketStreet, Starrex Title Florida, and Brewer knowingly participated in and provided substantial assistance for Cooper's breaches of fiduciary duty, enabling and encouraging conduct they knew violated her obligations to Plaintiffs.

276.    MarketStreet Capital Partners, LLC and MarketStreet Capital Partners AR, LLC were not legitimate competitive businesses but rather vehicles specifically created to receive and utilize the misappropriated assets, trade secrets, customer lists, and ongoing business of the Magnolia Companies. Their formation just days before the coordinated resignations and transfers demonstrates they were created with the specific intent to misappropriate the Magnolias' business rather than compete legitimately.

277.    These Defendants had actual knowledge of Cooper's fiduciary relationship with the Magnolias. The timing and sequence of corporate formations demonstrate their knowing participation through at least the following:

   a.    Starrex Title Florida's formation on January 5, 2024, with Cooper as registered agent while still employed by Magnolia Title Florida;

   b.    Brewer's registration of "MAGNOLIA TITLE COMPANY" on January 25, 2024; and

   c.    MarketStreet's filing as a foreign entity on January 30, 2024, listing Magnolia's Florida offices.

278.    They provided substantial assistance through a variety of actions, which include but are not limited to, the following:

   a.    Creating corporate infrastructure for transferring proprietary information;

   b.    Providing technological means for downloading customer data;

   c.    Facilitating coordinated employee transitions for 12 staff members; and

d.   Creating financial systems enabling unauthorized transfers of over $60,000.

279.   Defendants actively encouraged Cooper's breaches through at least the following:

a.   Developing a takeover plan relying on her position of trust;

b.   Creating incentives through employment opportunities; and

c.   Structuring operations to maximize the value of her breaches.

280.   Through this knowing participation and substantial assistance, these Defendants became active participants in the harm inflicted on Plaintiffs, creating joint and several liability for damages resulting from these breaches of fiduciary duty.

281.   As a direct and proximate result of MarketStreet, Starrex Title Florida, and Brewer's knowing participation in and substantial assistance to Cooper's breaches of fiduciary duty, Plaintiffs have suffered substantial damages exceeding $10 million, including but not limited to:

a.   Lost value of ongoing business operations in Florida and Arkansas;

b.   Lost revenue from diverted transactions and client relationships;

c.   Diminished value of proprietary information and trade secrets;

d.   Reputational damage in the marketplace caused by the coordinated scheme;

e.   Loss of employee relationships through coordinated departures; and

f.   Costs incurred in attempting to mitigate damages caused by these defendants' participation in the fiduciary breaches.

282.   Under Texas law, a party who knowingly participates in another's breach of fiduciary duty is jointly and severally liable for all damages caused by the breach. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942); *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007).

## **COUNT FIFTEEN: DEFAMATION**

### **(By Plaintiffs John Magness and Magnolia Entities Against Defendants Cooper and Brewer)**

283.   Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

284.   Between January 2024 and March 2024, Defendants Cooper and Brewer published false statements of fact to third parties, including clients, underwriters, financial institutions, and real estate professionals throughout Texas, Florida, and Arkansas. These false statements were made both orally

and in writing, including emails, text messages, and formal communications with industry participants.

285.    Plaintiffs John Magness and Magnolia Entities are not public figures.  John Magness is a private individual.

286.    Specifically, Defendant Cooper made the following false statements:

  a.  On or about February 2024 and potentially thereafter, Cooper falsely informed multiple Magnolia clients, employees, customers, and competitors in the industry that the Magnolia companies were financially insolvent and unable to fulfill their title obligations, and could not keep an office open, when in fact the companies had sufficient resources to operate and meet all obligations.

  b.  On or about February 2024 and potentially thereafter, Cooper falsely represented that operating the Magnolia offices was "not a choice" and stated that the Magnolias had been mismanaged in ways that were not true or caused by the Magnolias.

  c.  On or about February 2024 and potentially at other times, Cooper falsely represented to clients, employees, customers, and others that Magness was responsible for the alleged insolvency and allegedly forced shutdown of the Magnolias, when this was untrue because the decisions were actually made by Garth and Clayton and the Magnolias were the victim of financial malfeasance by Garth, Clayton, and Merritt. Garth and Clayton would not let Magness make decisions.

  d.  On or about December 2024 and potentially at other times, Cooper falsely represented to Magness' potential employer(s) that Magness had performed actions that caused the alleged failure of the Arkansas and Florida Magnolias, when in reality, this was untrue because decisions were actually made by Garth and Clayton and the Arkansas and Florida Magnolias were going concerns; to any extent they were not, it was due to financial malfeasance by Garth, Clayton, and Merritt.  Only Garth and Clayton could make the ultimate decisions.

  e.  Between February 15-25, 2024 and potentially at other times, Cooper falsely stated to clients and industry partners that John Magness had abandoned the Magnolia entities, despite knowing these statements were false, as documented in her simultaneous communications with Magness regarding ongoing operational matters.

  f.  On or about January 2024 and thereafter, Cooper falsely stated that Starrex owned the Magnolias, which was completely untrue.  She made these misrepresentations, in part, to perpetuate the lie that the massive, wholesale misappropriation of the Magnolias' assets was authorized and that it was a continuance of the same company.

287.    Defendant Brewer published the following false statements: On or about January-February 2024 and many times thereafter, Brewer falsely informed industry partners, clients, underwriters and others in the industry that (a) he and/or his companies were running the very same Magnolia entities as before and that any transfer was completely authorized; (b) the Florida and Arkansas Magnolia entities had been mismanaged by Magness, when, in reality, all decisions were made by Garth and

Clayton and the Arkansas and Florida Magnolias were going concerns—to any extent they were not, it was due to financial malfeasance by Garth, Clayton, and Merritt; and (c) Magness had somehow authorized a transfer of the entire Florida and Arkansas Magnolias.

288.    These statements were defamatory concerning Plaintiffs because they accomplished or were performed to accomplish, at least the following:

     a.    Imputed dishonesty, fraud, and lack of integrity in Magness's business dealings;

     b.    Injured Magness's reputation in the title insurance industry, where reputation and trust are essential;

     c.    Falsely suggested the Magnolia entities were insolvent or improperly managed; and

     d.    Falsely alleged violations of professional and legal standards by both Magness and the Magnolia entities.

289.    The statements constituted defamation per se because they:

     a.    Injured Plaintiffs in their profession and business by falsely alleging incompetence, dishonesty, and financial impropriety;

     b.    Falsely imputed that Plaintiffs committed violations of title insurance regulations and breached fiduciary duties; and

     c.    Directly affected Plaintiffs' business reputation in ways that presumptively caused damages.

290.    Cooper and Brewer acted with actual malice in making these statements, as evidenced by: (a) their knowledge of the falsity of these statements based on their access to accurate financial and operational information; (b) their deliberate timing of these statements to coincide with their scheme to divert Magnolia assets, clients, and employees to competing entities; (c) their coordinated pattern of defamatory communications targeting specific client relationships; and (d) their continuing publication of these statements even after being informed of their falsity.

291.    Many of Cooper's defamatory statements were made while she still operated with apparent authority as President of Magnolia Title Florida and Magnolia Title Arkansas, giving her statements particular credibility with third parties who reasonably believed she was speaking as a company representative.

292.    The defamatory statements were made with the intent to damage the Plaintiffs' business and professional relationships and to facilitate the transfer of clients and employees to Defendants' competing businesses.

293.    These defamatory statements have directly caused Plaintiffs damages, including but not limited to the following:

      a.    Loss of existing client relationships;

      b.    Damage to Magness's professional reputation in the title insurance industry;

      c.    Diminished ability to attract new business;

      d.    Lost revenue from transactions diverted to competitors based on false information; and

      e.    Costs associated with addressing and mitigating the reputational damage caused by these false statements.

294.    Alternatively, Plaintiffs are entitled to presumed damages under the doctrine of defamation per se, as the statements directly impugned Plaintiffs' business reputation and professional integrity.

295.    Cooper is subject to jurisdiction in Texas for these defamatory statements because:

      a.    She directed her false statements to Texas recipients, including Texas-based clients and business partners;

      b.    Her statements were made while she was still employed by entities with Texas management;

      c.    She knew her false statements would cause harm in Texas, where Magness resides and where the Magnolia central operations were based; and

      d.    Her defamatory statements were part of the same scheme as her other Texas-directed conduct detailed elsewhere in this Complaint.

296.    Plaintiffs are entitled to actual damages, presumed damages, exemplary damages due to Defendants' actual malice, and injunctive relief prohibiting further defamatory statements.

## <u>COUNT SIXTEEN: BUSINESS DISPARAGEMENT</u>

### (By The Magnolia Entities Against Defendants Cooper and Brewer)

297.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

298.    In addition to and separate from their defamatory statements targeting Magness personally, Cooper and Brewer published disparaging false statements about the Magnolia Entities' business reputation and financial condition:

      a.    In February 2024, Cooper and Brewer falsely informed multiple clients, including in communications to KIPP representatives, that the Magnolia Entities were financially unstable and unable to fulfill their escrow obligations;

    b. Cooper and Brewer falsely represented to underwriters that the Magnolia Entities had failed to maintain compliance with industry regulations and would soon lose their authority to issue policies; and

    c. Cooper and Brewer falsely informed real estate professionals throughout Texas, Florida and Arkansas that the Magnolia Entities were subject to pending regulatory actions that would prevent them from continuing to operate.

299.   These statements were false when made, as the Magnolia Entities:

    a. Maintained sufficient financial resources to fulfill all obligations;

    b. Remained in full compliance with all applicable regulations; and

    c. Were not subject to any pending regulatory actions threatening their operations.

300.   Cooper and Brewer published these statements with malice, as evidenced by:

    a. Their knowledge of the statements' falsity based on their positions and access to information;

    b. Their intent to cause financial harm to the Magnolia Entities to benefit their competing businesses; and

    c. Their continuing publication even after being informed of the statements' falsity.

301.   These false statements directly caused pecuniary loss to the Magnolia Entities, including:

    a. Loss of specific, identifiable clients who terminated relationships based on these misrepresentations;

    b. Lost profits from transactions redirected to Defendants' competing businesses; and

    c. Additional costs incurred to maintain business operations amidst these disparaging statements.

302.   Cooper's defamatory statements were made with actual knowledge of their falsity based on her position as President with direct access to the Magnolias' financial records, operational status, and licensing information. Her statements regarding financial insolvency, improper management, and licensing issues were not merely mistaken opinions but deliberate falsehoods designed to damage Plaintiffs' reputation and divert business to her new employers. Similarly, Brewer's statements falsely alleging regulatory actions and escrow improprieties were made without any factual basis and with reckless disregard for the truth, as evidenced by his subsequent actions to capitalize on the damage to Plaintiffs' reputation by diverting their customers to his own businesses.

303.   The Magnolia Entities have suffered special damages in excess of $2.5 million as a direct result of these disparaging statements, as calculated by the difference between their pre-

disparagement revenue projections and their actual performance following the publication of these statements.

## COUNT SEVENTEEN: FEDERAL TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

### (By The Magnolia Entities Against Defendants Cooper, Brewer, Starrex Title Florida, and MarketStreet Entities)

304.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

305.    Since 2021, the Magnolia Entities have continuously used the "MAGNOLIA TITLE" name, distinctive magnolia flower logo, and associated branding materials (collectively, the "Magnolia Marks") in interstate commerce in connection with title insurance and settlement services. The Magnolia Entities have invested substantial resources in developing customer recognition and goodwill associated with these distinctive marks.

306.    The Magnolia Entities' distinctive branding includes:

   a.    The "MAGNOLIA TITLE" name used in commerce since 2021;

   b.    A distinctive magnolia flower logo with specific color scheme, proportions, and design elements;

   c.    Specialized marketing materials, document templates, and closing packages bearing the distinctive Magnolia branding; and

   d.    Digital assets including website design elements, client portal interfaces, and electronic communications templates.

307.    The Magnolia Marks have acquired secondary meaning in the title insurance industry through extensive marketing, consistent use in commerce, and association with high-quality title services across multiple states, causing consumers to associate the Magnolia Marks specifically with Plaintiffs' services.

308.    Without authorization, Defendants willfully infringed the Magnolia Marks and engaged in unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by:

   a.    On January 25, 2024, Defendant Brewer registered "MAGNOLIA TITLE COMPANY" without authorization, misappropriating the Magnolia name;

b. Beginning in January 2024, Defendants continued using identical Magnolia Title logos, letterhead, email signatures, marketing materials, and document templates after establishing competing business entities;

c. Deliberately maintaining identical office locations, telephone numbers, and contact information to create consumer confusion about the source of services;

d. Directing former Magnolia employees to continue using Magnolia branded materials with clients after their transition to Defendants' competing businesses; and

e. Failing to distinguish their services from the Magnolia Entities' services in communications with consumers, deliberately creating marketplace confusion.

309.  Defendants' unauthorized use of the Magnolia Marks in connection with identical services in the same geographic markets creates a likelihood of confusion among consumers as to the source, sponsorship, or approval of Defendants' services, as evidenced by:

a. Documented instances in February and March 2024 where consumers contacted the Magnolia Entities believing they were interacting with Defendants' businesses and vice versa;

b. Emails from confused clients questioning whether the Magnolia Entities had changed ownership or management; and

c. Misdirected payments and communications from consumers unable to distinguish between the legitimate Magnolia Entities and Defendants' infringing operations. These have even continued through 2025 as witnessed by Anelle Sena.

310.  Defendants' infringement was willful and deliberate, as demonstrated by:

a. Cooper's position as former President of Magnolia Title Florida and Magnolia Title Arkansas, which gave her specific knowledge of the Magnolia Entities' trademark rights;

b. Defendants' calculated timing, establishing competing entities with nearly identical branding immediately after gaining access to Magnolia's proprietary information; and

c. Defendants' continued use of the Magnolia Marks despite receiving cease and desist demands.

311.  Defendants' infringement and unfair competition have occurred in interstate commerce, affecting title insurance and settlement service transactions in Texas, Florida, and Arkansas, and involve services that regularly cross state lines.

312.  As a direct and proximate result of Defendants' violations of the Lanham Act, the Magnolia Entities have suffered and will continue to suffer irreparable harm to their business reputation and goodwill, as well as monetary damages including:

    a.  Lost profits from transactions diverted to Defendants' infringing businesses;

    b.  Costs incurred in addressing consumer confusion;

    c.  Dilution of the distinctive quality of the Magnolia Marks; and

    d.  Diminished value of the Magnolia Entities' intellectual property.

313.   Under 15 U.S.C. § 1117, the Magnolia Entities are entitled to recover Defendants' profits, actual damages, costs, and attorneys' fees. Due to Defendants' willful infringement, the Magnolia Entities further seek enhanced damages up to three times the amount of actual damages.

314.   The Magnolia Entities are also entitled to permanent injunctive relief under 15 U.S.C. § 1116 prohibiting Defendants' continued infringement of the Magnolia Marks.

## COUNT EIGHTEEN: CONSTRUCTIVE TRUST

### (By All Plaintiffs Against All Defendants)

271.   Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

272.   Through fraudulent conduct, breaches of fiduciary duty, and other wrongful acts, Defendants have wrongfully obtained title to or possession of Plaintiffs' property, including but not limited to:

    a.  Physical assets: Florida and Arkansas offices, equipment, systems;

    b.  Financial assets: HMHTI's $1 million investment, funds transferred by Cooper, revenue from operations, equity positions; and

    c.  Intangible assets: customer relationships, trade secrets, trade name, methodologies.

273.   A constructive trust should be imposed because (a) Defendants obtained these assets through actual fraud, breaches of fiduciary duty, violations of confidence, and unconscionable conduct; and (b) unjust enrichment would result from retention of assets obtained through fraudulent means, converted property, misappropriated operations, and exploitation of stolen relationships.

274.   This Court should impose a constructive trust over at least the following:

    a.  All funds misappropriated from HMHTI's investment;

    b.  Funds transferred by Cooper between February 6-22, 2024;

    c.  Revenue derived from misappropriated operations since February 2024;

    d.  Physical assets appropriated from the Magnolias; and

    e.  Intangible assets including customer relationships and trade names.

275.  This equitable remedy is necessary to prevent Defendants from profiting from wrongful conduct and to restore rightfully owned assets to Plaintiffs.

## <u>COUNT NINETEEN: ACCOUNTING</u>

### (By All Plaintiffs Against Defendants Garth, Clayton, Cooper, Brewer, MarketStreet, and Starrex Title Florida)

276.  Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

277.  This accounting is necessary to remedy the alleged wrongdoing as it will reveal information not obtainable by any other means and detail the specific amounts of money and other property taken without authorization and misappropriated from Plaintiffs.

278.  The complexity of financial transactions and Defendants' breaches of trust necessitate a detailed accounting, including, but not limited to:

    a.  Tracing of misappropriated funds: HMHTI's $1 million investment, funds transferred by Cooper ($60,000+), revenue from operations;

    b.  Analysis of financial records: charges allocated to the Magnolias, management fees, transfers between entities; and

    c.  Documentation of asset transfers between January-February 2024.

279.  An accounting is necessary because:

    a.  The relationships were fiduciary in nature;

    b.  The accounts are complex and complicated, involving multiple entities and potentially fraudulent documentation;

    c.  Defendants had exclusive control of records particularly during and after the takeover;

    d.  Discovery alone would be inadequate to unravel these transactions.

280.  Plaintiffs are entitled to a complete accounting of:

    a.  All funds received and disbursed by the Magnolias from April 2021 through February 2024;

    b.  All revenue derived from Florida and Arkansas operations since the takeover;

    c.  All charges and transfers between entities; and

    d.  All assets and liabilities of the misappropriated operations.

281.    This accounting would complement monetary damages exceeding $10 million, ensuring full restitution for Plaintiffs' losses.

## COUNT TWENTY: EQUITABLE LIEN
### (By All Plaintiffs Against All Defendants)

282.    Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

283.    An equitable lien is appropriate because:

    a.    Defendants wrongfully obtained property through fraudulent conduct, breaches of fiduciary duty, misappropriation of funds, and conversion of assets;

    b.    Traditional legal remedies are inadequate due to at least the following:

        i.    Commingling of assets;

        ii.    Complex financial transactions;

        iii.    Ongoing nature of operations; and

        iv.    Risk of further dissipation.

232.    Additionally, an equitable lien is necessary because the complex web of transactions and self-dealing orchestrated by Defendants makes traditional legal remedies inadequate to ensure full restitution.

233.    An equitable lien should be imposed on property wrongfully obtained by Defendants. The property wrongfully obtained by Defendants is specifically identifiable, including but not limited to: (a) HMHTI's $1 million investment diverted through precisely documented transfers and the equity obtained by Garth and Clayton as a result; (b) customer relationships and proprietary information with demonstrable value in the marketplace; and (c) ongoing business operations in Florida and Arkansas built on Plaintiffs' goodwill and relationships and the proceeds thereof.

315.    This equitable remedy would provide security for Plaintiffs' claims for damages and restitution.

316.    Defendants' continued possession and use of these identifiable assets and proceeds constitutes an ongoing unjust enrichment that can only be remedied through the imposition of an equitable lien to prevent further dissipation of assets rightfully belonging to Plaintiffs.

317.   The Court should impose an equitable lien on all revenue, assets, and proceeds derived from Defendants' wrongful conduct to secure Plaintiffs' right to full compensation and restitution.

234.   Additionally, this Court should impose an equitable lien on:

    a.   All revenue generated by the misappropriated operations;

    b.   Assets acquired through misappropriated funds;

    c.   Property wrongfully obtained from Plaintiffs; and

    d.   Proceeds from any sale or transfer.

## COUNT TWENTY-ONE: CIVIL CONSPIRACY
### (By All Plaintiffs Against All Defendants)

284.   Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.


285.   From approximately April 2021 through February 2024, Defendants engaged in a coordinated scheme to defraud Plaintiffs and misappropriate their business operations, demonstrating a meeting of minds on a common objective. Under Texas law, a civil conspiracy claim requires: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). The conspiracy formed through specific coordinated actions detailed throughout this complaint, with each Defendant playing a distinct role in the overall scheme.

286.   The conspiracy formed through specific coordinated actions including but not limited to the following:

    a.   **April 2021**: Garth and Clayton jointly pitched Magness the $50 million facility, 3 million shares, and $10 stock price at Houston meetings (April 8 at Post Oak Grill, April 15 at AmCap Cancer Event), with Clayton sending a reinforcing email on April 13, 2021, all intended to induce reliance without fulfillment.

    b.   **July 2022**: Garth and Clayton conspired to deceive TPB, promising a personal $1 million contribution to Magnolia at a Houston meeting to induce equity reduction from 20% to 11%, then directing Hill and Merritt to advance $1 million from Starrex.

    c.   **February 15, 2022:** Merritt confirmed Garth's ghostwriting practices, texting Magness: "You read the email terry and I put together," referring to a formal corporate

memo that falsely stated "Starrex is not an owner or nor in any business relationship with the Magnolias" while simultaneously directing Starrex funding.

d. **March 15, 2022:** Merritt texted Magness that "Terry gave some pretty stern instructions to the team to source 2-6 acquisitions asap," demonstrating the coordination of activities among all defendants under Garth and Clayton's direction.

e. **April 2023**: Garth proposed backdated "for-the-auditor-only" promissory notes on April 17, 2023, and Clayton confirmed intent in July 2023 with, "If anyone does a forensic audit, we are f**cked," aiming to falsify debt.

f. **June 29, 2023:** Garth and Clayton's coordinated interference with the KIPP relationship is documented by the notation "DO NOT PAY per Terry & Phil" on the invoice.

g. **December 2023-February 2024**: Garth and Clayton's December 29, 2023 settlement demand, Cooper's registration as Starrex Title Florida's agent (January 5, 2024), Brewer's "MAGNOLIA TITLE COMPANY" registration (January 25), and Cooper's February 2024 transfers ($60,000+, 12+ staff, customer lists) executed the asset theft.

287.    Defendants committed multiple unlawful, overt acts in furtherance of the conspiracy including but not limited to the following:

a. Fraud—Garth and Clayton's 2021 and 2022 misrepresentations as well as the promissory note misrepresentations in 2023, Cooper's 2023 concealment and 2024 transfers;

b. Tortious interference—HMHTI fund diversion ($1 million in September 2022), KIPP donation block, Qualia cutoff despite timely payment (December 2023/January 2024);

c. Trade secret misappropriation—Cooper's customer list transfers; and

d. Fiduciary breaches—Garth and Clayton's debt scheme, Cooper's asset theft.

288.    The conspiracy caused Plaintiffs damages exceeding $10 million—lost operations, HMHTI's $1 million, TPB's $2.2 million equity, revenue from 500+ closings monthly, and goodwill—jointly and severally attributable to all Defendants.

289.    Plaintiffs have alleged specific details showing a meeting of minds, not mere conclusory allegations. The coordinated sequence of events—with specific meetings (April 8, 15, 2021), note fabrication (April 17, 2023), settlement offers (December 29, 2023), and precisely timed entity formations and transfers (January-February 2024)—goes well beyond "naked assertions" and establishes concerted action toward a common goal.

318.    Additionally, Defendants' fraudulent scheme from April 2021 through February 2024 constitutes a pattern of unlawful activity, including but not limited to:

    a.  Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343): Defendants used interstate mail and wire communications, including emails and text messages, to execute their fraudulent scheme, including:

        i.  Garth's April 17, 2023 email directing the backdating of promissory notes;

        ii.  Multiple wire transfers misappropriating HMHTI's investment; and

        iii.  False representations transmitted by wire regarding Merritt's qualifications and the status of the acquisition.

    b.  Bank Fraud (18 U.S.C. § 1344): Defendants knowingly executed a scheme to obtain funds under the custody or control of financial institutions by:

        i.  Creating fraudulent documentation to support unauthorized transfers; and

        ii.  Misrepresenting the purpose and authorization of transfers to financial institutions.

319.    This pattern of unlawful conduct spanned from April 2021 through February 2024, involving multiple schemes executed through at least a dozen interstate wire transfers, numerous fraudulent communications, and systematic asset misappropriation. The predicate acts included: (1) Garth and Clayton's wire fraud regarding the $50 million capital raise (April 2021); (2) fraudulent communications regarding Merritt's qualifications (April-July 2021); (3) equity dilution scheme against TPB (July 2022); (4) HMHTI investment misappropriation via interstate wires (September 2022); (5) fraudulent creation and backdating of promissory notes (April 2023); and (6) coordinated theft of Magnolia operations in Florida and Arkansas (January-February 2024). These acts were not isolated incidents but formed an integrated pattern of racketeering activity with the common purpose of enriching Defendants at Plaintiffs' expense.

290.    This pattern of unlawful activity further supports Plaintiffs' claims for civil conspiracy, exemplary damages, and equitable relief, as it demonstrates the intentional, coordinated, and continuing nature of Defendants' scheme.

291.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have suffered substantial damages exceeding $10 million, including but not limited to:

    a.  HMHTI's misappropriated $1 million investment;

    b.  TPB's lost equity value of $2.2 million based on the market valuation established in the March 18, 2022 agreement;

    c.  Magness's lost compensation of $2.7 million or more from foregone opportunities;

    d.  Lost revenue of at least $1.5 million monthly from approximately 500 title transactions diverted to Defendants;

e. The value of misappropriated trade secrets and proprietary information conservatively valued at $2.5 million;

f. Future lost profits from customer relationships diverted to Defendants' competing businesses; and

g. Reputational damage and diminished goodwill in the title insurance marketplace.

292. Under Texas law, conspirators are jointly and severally liable for all damages caused by the conspiracy, and Plaintiffs are entitled to recover the full amount of their damages from any or all Defendants. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979); *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983).

## <u>COUNT TWENTY-TWO: EXEMPLARY DAMAGES</u>
### (By All Plaintiffs Against All Defendants)

320. Plaintiffs reallege and incorporate by reference all preceding and following paragraphs as if fully set forth herein.

321. The conduct of all Defendants was fraudulent, malicious, and undertaken with specific intent to harm Plaintiffs or with reckless disregard for Plaintiffs' rights, warranting exemplary damages under Texas law. The systematic nature of their scheme, calculated deception spanning multiple years, and deliberate destruction of business value demonstrate culpable mental states far exceeding mere negligence.

322. Garth and Clayton exhibited specific intent to harm through at least the following:

a. Their orchestrated scheme of deception and misappropriation spanning from April 2021 through February 2024;

b. Creation of fraudulent documentation, including backdated promissory notes;

c. Misappropriation of HMHTI's $1 million investment; and

d. Comprehensive pattern of conduct affecting multiple plaintiffs.

323. Cooper demonstrated malice through at least the following:

a. Systematically breaching her position of trust;

b. Coordinating with competitors while still employed;

c. Arranging employee departures; and

d. Making unauthorized transfers totaling over $60,000.

324. MarketStreet, Starrex Title Florida, and Brewer acted with reckless disregard by performing at least the following:

a. Knowingly participating in misappropriating ongoing operations;

b.  Continuing to operate using stolen assets despite demands to cease; and

c.  Coordinating to maximize damage while securing benefits.

325.  The cap on exemplary damages should be lifted pursuant to Tex. Civ. Prac. & Rem. Code § 41.008(c) because Defendants' conduct constitutes felony offenses under Texas law, including but not limited to the following: (a) Theft of trade secrets (Tex. Penal Code § 31.05); (b) Theft of property valued over $300,000 (Tex. Penal Code § 31.03); and (c) Securing execution of documents by deception (Tex. Penal Code § 32.46).

# VI.
## TIMELINESS OF CLAIMS

326.  All claims asserted in this Second Amended Complaint are timely filed within all applicable statutes of limitations. For any claims where Defendants might assert a limitations defense:

a.  The discovery rule applies to toll the limitations period until Plaintiffs discovered, or through reasonable diligence could have discovered, the nature of their injury. Plaintiffs could not have reasonably discovered Defendants' fraudulent scheme until January 2024 when Defendants executed their takeover plan, revealing the true nature of their prior misrepresentations.

b.  Defendants' fraudulent concealment tolls any applicable limitations period. Garth and Clayton actively concealed material facts, including their true intentions, Merritt's lack of qualifications, and their misappropriation of funds. For example, Garth's January 4, 2024 false denial of involvement with the promissory notes demonstrates ongoing attempts to conceal their scheme.

c.  Continuing tort doctrine applies to Defendants' ongoing pattern of tortious conduct from April 2021 through February 2024, which constitutes a continuing course of conduct rather than discrete acts.

d.  Equitable estoppel precludes Defendants from asserting limitations defenses when they continued to make representations about forthcoming transactions and business integration through December 2023, thereby inducing Plaintiffs to delay bringing claims.

# VII.
## NOT BARRED BY DISCLAIMERS

327.  Plaintiffs' claims are not barred by disclaimers in any agreements with Defendants. First, the alleged disclaimers of reliance in the BSpoke Agreement go to damages, not liability, as Magness's and TPB's claims stem from Garth and Clayton's individual promises, not Starrex's corporate acts

alone. Second, the purported merger clauses do not disclaim reliance on the specific misrepresentations alleged, which were separate from and independent of any contractual provisions. Third, Defendants cannot claim the benefit of contractual disclaimers that were themselves procured through the same fraudulent scheme that is the subject of this action. The Texas Supreme Court has recognized that 'a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim,' especially where, as here, the alleged misrepresentations concerned matters outside the contract's subject matter. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331-32 (Tex. 2011).

# VIII.
## ELECTION OF REMEDIES

328.    Plaintiffs plead all claims and remedies in the alternative to the extent they may be inconsistent. Plaintiffs reserve the right to elect between inconsistent remedies, including between equitable and legal remedies, prior to judgment.

329.    To the extent any remedy sought is unavailable for any reason, Plaintiffs seek all other available remedies at law or equity for the injuries sustained.

# IX.
## DIRECT NATURE OF CLAIMS

330.    The claims asserted by John Magness and The Peabody Bulldog are direct, not derivative, claims for a number of reasons, including but not limited to the following:

    a.    The fraudulent inducement, breach of contract, promissory estoppel, and DTPA claims arise from direct promises made to Magness and The Peabody Bulldog personally, separate from any harm to the Magnolia Entities;

    b.    The injuries suffered by Magness and The Peabody Bulldog—including lost professional opportunities, equity dilution, and misappropriated investments—are distinct from and not merely incidental to any harm suffered by the Magnolia Entities;

    c.    The contractual rights to obtain Starrex shares, leadership positions, and capital contributions belonged to Magness and The Peabody Bulldog personally, not to the Magnolia Entities; and

    d.    The relief sought would benefit Magness and The Peabody Bulldog directly rather than flow through the Magnolia Entities.

331.    These claims are not an attempt to recover for injuries to the Magnolia entities but rather seek redress for the distinct personal harm suffered by Magness and The Peabody Bulldog as a result of Defendants' fraudulent scheme.

# X.
# CONTINUING TORT DOCTRINE

332.    The continuing tort doctrine applies to Defendants' ongoing pattern of tortious conduct from April 2021 through February 2024, constituting a continuing course of conduct rather than discrete acts. Under Texas law, a continuing tort involves "repeated injury proximately caused by repetitive wrongful or tortious acts." *First Gen. Realty Corp. v. Maryland Cas. Co.*, 981 S.W.2d 495, 501 (Tex. App.—Austin 1998, pet. denied). The doctrine applies when "the wrongful conduct continues to effect additional injury to the plaintiff until the tortious act ceases." *Twyman v. Twyman*, 790 S.W.2d 819, 821 (Tex. App.—Austin 1990, writ granted), rev'd on other grounds, 855 S.W.2d 619 (Tex. 1993).

333.    Defendants' conduct constitutes a continuing tort because:

   a. Their fraudulent scheme involved a series of connected and recurring misrepresentations and actions forming a unified course of conduct, not isolated events;

   b. Their tortious acts followed a consistent pattern and shared the common purpose of securing control over Plaintiffs' assets: (i) Initial inducement (April-July 2021): Initial misrepresentations about financing, structure and Merritt's qualifications; (ii) Reinforcement phase (January 2022-July 2022): Repeated renewal of false promises when questions arose; (iii) Documentation fabrication (April 2023): Creation of backdated notes to formalize control; and (iv) Asset seizure (January-February 2024): Final execution of the scheme through misappropriation.

   c. Each component of the scheme built upon and reinforced previous wrongful acts, creating an integrated pattern rather than discrete, completed events;

   d. The harm to Plaintiffs continuously accumulated throughout the period, with new injuries arising from ongoing conduct rather than merely new damages from completed torts; and

   e. The continuing nature of the tort is evidenced by Garth's May 24, 2022 term sheet stating that within 60 days "STX will 'complete' 100% ownership of the 4 Magnolias," demonstrating that the scheme remained active and ongoing throughout this period.

334.    Under Texas law, when a tort is continuing, "the cause of action for such a tort is not complete and does not accrue until the tortious acts have ceased." *Horseshoe Bay Resort Sales Co. v.*

*Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 812 (Tex. App.—Austin 2001, pet. denied). Here, Defendants' tortious conduct did not cease until February 2024, when they completed their takeover of the Magnolia operations. Therefore, the statute of limitations for Plaintiffs' claims did not begin to run until February 2024, when the continuing tort was complete.

# XI.
## EQUITABLE ESTOPPEL TO LIMITATIONS DEFENSE

335.   Equitable estoppel precludes Defendants from asserting limitations defenses when they continued to make representations about forthcoming transactions and business integration through December 2023, thereby inducing Plaintiffs to delay bringing claims. Under Texas law, equitable estoppel requires: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex. 1998).

336.   All claims asserted in this Second Amended Complaint are timely filed within all applicable statutes of limitations. Defendants' fraudulent concealment of their scheme justifies tolling any applicable limitations periods under Texas law. The Texas Supreme Court has recognized that "a defendant cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996). Here, Defendants actively concealed their true intentions until January 2024, when they executed their takeover plan, revealing the true nature of their scheme.

337.   Defendants are estopped from asserting limitations defenses because:

   a. Garth and Clayton made specific representations inducing Plaintiffs to delay taking legal action that including but are not limited to the following:

      i. On May 24, 2022, Garth drafted a detailed term sheet for HMH explicitly stating that "STX will 'complete' 100% ownership of the 4 Magnolias," creating the impression that the acquisition was still proceeding;

      ii. On March 15, 2022, Merritt informed Magness that "Terry gave some pretty stern instructions to the team to source 2-6 acquisitions asap" and emphasized "his and our commitment to give you a platform upon which to build," assuring continued investment in the relationship;

  iii. On December 13, 2022, Hill, at Garth's direction, promised Magness a "$100k finders fee + a 250k shares of stock" and "WHEN YOU BECOME AN EMPLOYEE OF STX...COMP...BOARD SEAT," which Hill confirmed was still proceeding on February 2, 2023; and

  iv. As late as December 29, 2023, Defendants presented their coercive "settlement" as a business restructuring rather than the culmination of a fraudulent scheme.

 b. Defendants made these representations with knowledge of their falsity, as demonstrated by acts or omissions, including but not limited to:

  i. Clayton's July 2023 statement stating that, or words to the effect that "if anyone does a forensic audit [on the Magnolias], we are f**cked," showing awareness of improper actions;

  ii. Their contemporaneous actions to fabricate backdated documentation, showing consciousness of wrongdoing; and

  iii. Their failure to make any genuine efforts toward the promised acquisition despite continued representations of intent.

 c. Defendants made these representations with the specific intention that Plaintiffs would rely on them and refrain from taking legal action, as evidenced by the timing and nature of the representations coinciding with moments when Plaintiffs expressed concerns;

 d. Plaintiffs reasonably relied on these representations for reasons that include, but are not limited to the following:

  i. Garth and Clayton's positions of authority and trust;

  ii. The specificity and apparent credibility of the representations; and

  iii. The ongoing business relationship that made immediate legal action appear unnecessary and potentially counterproductive.

 e. Plaintiffs' reliance resulted in their delay in bringing claims until after the scheme was fully revealed in February 2024.

338. Under Texas law, when a defendant makes representations that induce a plaintiff to delay filing suit, the defendant is estopped from asserting limitations as a defense. *See Forrest v. Vital Earth Res.*, 120 S.W.3d 480, 486 (Tex. App.—Texarkana 2003, pet. denied) (finding estoppel where defendant induced plaintiff to delay filing suit through promises of future performance). Here, Defendants' ongoing misrepresentations about the forthcoming acquisition and integration directly induced Plaintiffs to refrain from bringing claims earlier, justifying application of equitable estoppel to any limitations defense.

# XI.
## <u>ALTER EGO</u>

339.   The legal fiction of corporate separateness between Garth, Clayton, and the various Starrex entities should be disregarded because they operated these entities as their alter egos. Garth and Clayton exercised such dominion and control over Starrex that the corporation had no separate mind, will, or existence of its own. They regularly disregarded corporate formalities, directed the transfer of funds to satisfy personal obligations, and used corporate assets for personal purposes. Their pervasive control over Starrex's operations—including ghostwriting communications purportedly from officers, directing all significant business decisions, and determining how corporate funds would be spent—demonstrates that Starrex was merely their 'alter ego' or instrument. Under Texas law, this justifies piercing the corporate veil to prevent fraud and avoid injustice. *See Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986); Tex. Bus. Orgs. Code § 21.223.

# XII.
## <u>EXEMPLARY DAMAGES</u>

### (All Defendants)

340.   Plaintiffs are entitled to exemplary damages.

341.   Fraud, as well as malice, is a ground for recovery of exemplary damages. Tex. Civ. Prac. & Rem. Code § 41.003(a)(1). As a predicate for recovery of exemplary damages, fraud is defined as "fraud other than constructive fraud." Tex. Civ. Prac. & Rem. Code 41.001(6).

342.   Section 41.008 of the Civil Practice and Remedies Code limits recovery of exemplary damages. However, these limitations will not apply in favor of a defendant found to have "knowingly" or "intentionally" committed conduct described as a felony in specified sections of the Texas Penal Code. *See* Tex. Civ. Prac. & Rem. Code 41.008(c), (d).

343.   Additionally and alternatively, Defendants acted with malice, permitting the recovery of exemplary damages. *See* Tex. Civ. Prac. & Rem. Code 41.003(a)(3).  Malice is the specific intent to cause substantial injury to the plaintiff or an act or omission by a defendant (a) which when viewed objectively from the standpoint of the defendant at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others or (b) of which the defendant has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

344.    Additionally and alternatively, the gross negligence or malice of a defendant employee should be imputed to the corporate employer.  A principal or master is liable for exemplary or punitive damages because of the acts of his agent, but only if: (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act. *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex. 1967); *see also Bennett v. Reynolds*, 315 S.W.3d 867, 883-84 (Tex. 2010); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997).

345.    Pleading further, the limitation or cap on exemplary damages should be lifted because the Magnolias' damages are based on conduct "described as a felony" in Tex. Penal Code 32.21.  *See* Tex. Civ. Prac. & Rem. Code § 41.008(c).  Specifically, the value of property or service that is the subject of the violation actions is $2,500 or more.  Tex. Pen. Code § 32.21 (e-1)(4)-(7). Further, Defendants' conduct constitutes felony offenses under Texas law for additional reasons, including but not limited to the following: (a) Theft of trade secrets (Tex. Penal Code § 31.05); (b) Theft of property valued over $300,000 (Tex. Penal Code § 31.03); and (c) Securing execution of documents by deception (Tex. Penal Code § 32.46). Each of these offenses involves fraudulent or deceptive conduct that caused economic harm to Plaintiffs in excess of $10 million, supporting the imposition of exemplary damages without cap limitations.

346.    Pleading further, the limitation or cap on exemplary damages should be lifted because the trade secrets were stolen from the Magnolias in violation of Texas Penal Code § 31.05.  The theft of these trade secrets rises to the level of a felony because the value of the trade secrets is worth more than $30,000.  *See* Tex. Penal Code 31.03(e)(5) (defining general criterion for third-degree felony); Tex. Civ. Prac. & Rem. Code 41.008(c)(13) (lifting cap on exemplary damages when theft is at a level of a third-degree felony or higher).

# XIII.
## RESERVATION OF RIGHT TO REQUEST
## SPOLIATION INSTRUCTION/ADVERSE INFERENCE

347.    Plaintiffs' investigation is ongoing.  As such, they reserve the right to move for an instruction for an adverse inference resulting from spolitation, including but not limited to the intentional spoliation, manipulation, deletion, erasure, or modification of electronic evidence.  *See,*

*e.g., Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 23-26 (Tex. 2014). Specifically, Plaintiffs may show that Defendants (a) had a duty to preserve the evidence at issue, (b) breached that duty, and (c) this has caused prejudice to Plaintiffs. *Id.* at 20. Plaintiffs may show that the evidence that has been spoliated is electronic in nature and may also consist of communications. Further, Plaintiffs would show that the spoliated evidence was relevant to key issues in the case, the effect of the evidence on the spoliating party's case was harmful and/or would have been helpful to Plaintiffs' case, and the spoliated evidence was not cumulative. *Id.*; *see also Petroleum Solutions, Inc. v. Head*, 454 S.W.3d 482 (Tex. 2014).

## XIV.
## <u>DISCOVERY RULE</u>

348. To the extent Defendants assert that any applicable statute of limitations bars any of the Plaintiffs' causes of action, Plaintiffs plead the discovery rule to toll such statute of limitations.

349. "The discovery rule is limited to those rare "circumstances where 'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.' " *Latouche v. Perry Homes, LLC*, 606 S.W. 3d 878, 883 (Tex. App.–Houston [14th Dist.] 2020, citing *Cosgrove v. Cade*, 468 S.W.3d 32, 36 (Tex. 2015) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996)).

350. As one court put it, the discovery rule exception applies "where plaintiff possesses an inherently undiscoverable cause of action, which is not considered to accrue until plaintiff discovers or through the exercise of reasonable care and diligence should discover the nature of an injury." *Casarez v. NME Hosps*., Inc., 883 S.W.2d 360, 364 (Tex. App.—El Paso 1994, writ dism'd by agr.) (citing *Moreno*, 787 S.W.2d at 351; *Weaver*, 561 S.W.2d at 794). In this matter, both prongs are met.

351. <u>Inherently Undiscoverable</u>. "An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence.'" *Via Net v TIG Ins. Co.,* 211 S.W. 3d 310, 313-14 (quoting *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734-35 (Tex. 2001)). Homeowners could not have discovered the deficient and defective condition of the Property until they became clearly apparent to them.

352. <u>Objectively Verifiable</u>. Defendants have been on notice regarding the date of accrual for Plaintiffs' claims because Defendants caused the accrual.

## XV.
## FRAUDULENT CONCEALMENT

353.   Pleading further and in the alternative, to the extent Defendants assert that any applicable statute of limitations bars any of Plaintiffs' causes of action, Plaintiff pleads fraudulent concealment to toll such statute of limitations.

354.   "The fraudulent concealment doctrine, unlike the discovery rule, resembles equitable estoppel." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex. 2001) (citing *Comput. Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex. 1996)).

355.   Because "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run," *S.V. v R.V.*, 933 S.W. 2d 1, 6 (Tex. 1996), a "defendant's fraudulent concealment of wrongdoing may toll the statute of limitations after the cause of action accrues." *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011).

## XVI.
## CONDITIONS PRECEDENT

356.   All conditions precedent have been performed or have occurred to the extent necessary.

## XVII.
## DEMAND FOR JURY TRIAL

357.   Plaintiffs demand a trial by jury and have tendered, or will tender, the fee contemporaneous with the filing of this petition, as necessary.

## XVIII.
## ATTORNEY'S FEES

358.   Plaintiffs were required to retain the services of the undersigned counsel to prosecute this lawsuit.

359.   Plaintiffs seek to recover their reasonable and necessary attorney's fees incurred in the prosecution of this lawsuit.

360.    Pursuant to contracts between the parties, as referenced above and Section 38.001 of TEX. CIV. PRAC. & REM. CODE, as well as the Texas Business and Commerce Code and the Texas Deceptive Trade Practices Act, Plaintiffs are entitled to seek reasonable and necessary attorney's fees and court costs.  Plaintiffs will also seek pre-judgment and post-judgment interests pursuant to Sections 302.002 and 304.003 of the Texas Finance Code.

361.    Pursuant to the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.005(b), each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees. The Magnolias, as the only Plaintiffs asserting claims under the Texas Theft Liability Act, specifically seek recovery of their reasonable and necessary attorney's fees incurred in connection with their TTLA claims. Unlike other fee-shifting statutes, the TTLA's attorney's fee provision is mandatory, not discretionary. *See Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (noting that statutes providing that a party "shall be awarded" attorney's fees are not discretionary). The TTLA provides that "the person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees," making the award of such fees mandatory upon a finding of liability. Tex. Civ. Prac. & Rem. Code § 134.005(b) (emphasis added); *see also Arrow Marble, LLC v. Estate of Killion*, 441 S.W.3d 702, 705 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

a.    Actual damages exceeding $10 million for lost revenue, equity, and goodwill;

b.    Exemplary and treble damages under Tex. Bus. & Com. Code § 27.01, Tex. Civ. & Rem. Code § 41.003, and TUTSA § 134A.004;

c.    Additional damages, including but not limited to treble damages, as allowed by Texas Business & Commerce Code § 17.50(b)(1) due to certain Defendants' knowing and/or intentional conduct pursuant to the Texas Deceptive Trade Practices Act;

d.    Restitution of all misappropriated assets and funds;

e.    Imposition of a constructive trust on all misappropriated assets, funds, and proceeds thereof, including but not limited to: (a) all funds misappropriated from HMHTI's investment; (b) funds transferred by Cooper between February 6-22, 2024; (c) revenue derived from

misappropriated operations since February 2024; (d) physical assets appropriated from the Magnolias; and (e) intangible assets including customer relationships and trade names;

f.   An accounting of all transactions involving Plaintiffs' assets;

g.   Imposition of an equitable lien on all misappropriated assets and proceeds thereof;

h.   Declaratory relief regarding the validity of promissory notes, UCC financing statements, and ownership rights;

i.   Permanent injunctive relief prohibiting Defendants from:

    i.   Using or disclosing Plaintiffs' trade secrets and confidential information;

    ii.   Continuing to operate businesses using misappropriated assets;

    iii.   Using the "MAGNOLIA TITLE COMPANY" trade name; and

    iv.   Interfering with Plaintiffs' business relationships;

i.   Prejudgment and post-judgment interest as allowed by law;

j.   Attorneys' fees and costs of suit; and

k.   Such other and further relief as the Court deems just and proper.


Respectfully submitted,

**HENDERSHOT COWART P.C.**

By:  _/s/ Philip D. Racusin_

SIMON W. HENDERSHOT, III
SBN: 09417200
trey@hchlawyers.com
PHILIP D. RACUSIN
SBN: 24054267
pracusin@hchlawyers.com
1800 Bering Drive, Suite 600
Houston, Texas 77057
Telephone:  (713) 783-3110
Facsimile:   (713) 783-2809
***ATTORNEYS FOR PLAINTIFFS COAST TO COAST TITLE, LLC, SOL CITY TITLE, LLC, MAGNOLIA TITLE ARKANSAS, LLC, MAGNOLIA TITLE FLORIDA, LLC, THE PEABODY BULLDOG LLC AND JOHN MAGNESS***

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, a copy of the foregoing document was served on all counsel of record via the Court's ECF system.

*/s/ Philip D. Racusin*
Philip D. Racusin

# APPENDIX

## <u>CHART OF CLAIMS IN SECOND AMENDED COMPLAINT</u>

| No. | Claim | Plaintiff(s) | Defendant(s) |
|---|---|---|---|
| 1 | Common Law Fraud and Fraudulent Inducement | John Magness, The Peabody Bulldog | Tyrrell L. Garth, Phillip H. Clayton |
| 2 | Breach of Contract | John Magness, The Peabody Bulldog | Tyrrell L. Garth, Phillip H. Clayton |
| 3 | Promissory Estoppel | John Magness, The Peabody Bulldog | Tyrrell L. Garth, Phillip H. Clayton |
| 4 | Common Law Fraud | All Plaintiffs | Tyrrell L. Garth, Phillip H. Clayton |
| 5 | Deceptive Trade Practices Act | The Peabody Bulldog | Tyrrell L. Garth, Phillip H. Clayton |
| 6 | Breach of Fiduciary Duty | All Plaintiffs | Tyrrell L. Garth, Phillip H. Clayton |
| 7 | Conversion | All Plaintiffs | Laurie Cooper, Starrex Title Florida, MarketStreet Entities, Brian A. Brewer |
| 8 | Tortious Interference with Contract | All Plaintiffs | All Defendants |
| 9 | Misappropriation of Trade Secrets (TUTSA) | All Plaintiffs | Laurie Cooper, Starrex Title Florida, MarketStreet Entities, Brian A. Brewer |
| 10 | Unjust Enrichment | All Plaintiffs | Tyrrell L. Garth, Phillip H. Clayton, Starrex Title Florida, MarketStreet Entities, Brian A. Brewer |
| 11 | Texas Theft Liability Act | Magnolia Entities | Tyrrell L. Garth, Phillip H. Clayton, Laurie Cooper |
| 12 | Unfair Competition | All Plaintiffs | Laurie Cooper, Starrex Title Florida, MarketStreet Entities, Brian A. Brewer |

| No. | Claim | Plaintiff(s) | Defendant(s) |
|-----|-------|--------------|--------------|
| 13 | Breach of Fiduciary Duty | All Plaintiffs | Laurie Cooper |
| 14 | Aiding and Abetting Breach of Fiduciary Duty | All Plaintiffs | MarketStreet Entities, Starrex Title Florida, Brian A. Brewer |
| 15 | Defamation | John Magness, Magnolia Entities | Laurie Cooper, Brian A. Brewer |
| 16 | Business Disparagement | Magnolia Entities | Laurie Cooper, Brian A. Brewer |
| 17 | Federal Trademark Infringement and Unfair Competition (Lanham Act) | Magnolia Entities | Laurie Cooper, Brian A. Brewer, Starrex Title Florida, MarketStreet Entities |
| 18 | Constructive Trust | All Plaintiffs | All Defendants |
| 19 | Accounting | All Plaintiffs | Tyrrell L. Garth, Phillip H. Clayton, Laurie Cooper, Brian A. Brewer, MarketStreet Entities, Starrex Title Florida |
| 20 | Equitable Lien | All Plaintiffs | All Defendants |
| 21 | Civil Conspiracy | All Plaintiffs | All Defendants |
| 22 | Exemplary Damages | All Plaintiffs | All Defendants |

**Plaintiff Groups Defined:**

- **All Plaintiffs:** Coast to Coast Title, LLC; SolCity Title, LLC; Magnolia Title Arkansas, LLC; Magnolia Title Florida, LLC; The Peabody Bulldog LLC; and John Magness

- **Magnolia Entities / "Magnolias":** Coast to Coast Title, LLC; SolCity Title, LLC; Magnolia Title Arkansas, LLC; and Magnolia Title Florida, LLC

- **MarketStreet Entities/ "MarketStreet":** MarketStreet Capital Partners, LLC and MarketStreet Capital Partners AR, LLC

**Notes:**

1. Direct claims by John Magness and The Peabody Bulldog arise from direct injuries to their individual interests, not derivative of harm to the Magnolia Entities.

2. All claims are brought in compliance with Rule 9(b)'s heightened pleading standards where applicable

3. Jurisdictional bases for each defendant are detailed in the Jurisdiction and Venue section of the Complaint

4. Multiple claims address overlapping factual allegations but provide alternative legal theories for recovery

5. Equitable remedies (Constructive Trust, Accounting, Equitable Lien) are complementary to monetary claims

6. The Texas Theft Liability Act claim is brought only by the Magnolia Entities, not by Magness or TPB individually