# EXHIBIT K

## CONTRIBUTION AGREEMENT

**THIS CONTRIBUTION AGREEMENT** (this "Agreement"), dated as of September 9, 2022, is by and between HMH Title Investments, LLC, a Texas limited liability company ("Investor"), Magnolia Title Arkansas, LLC (the "Company"), Alphabet Investments, LLC, ("Alphabet"), Peabody Bulldog, LLC, ("PB") and 405 Manhattan Investments, LLC, ("405") (Alphabet, PB and 405 are each an "Existing Class A Member" and collectively the "Existing Class A Members").

### RECITALS:

Pursuant and subject to the terms and conditions set forth in this Agreement, Investor desires to contribute or otherwise transfer, convey and assign to the Company, a contribution amount of $50,000 cash (the "Contribution Amount") and the Company desires to accept the Contribution Amount from Investor, free and clear of all Liens (other than Permitted Liens) and in consideration of the contribution of the Contribution Amount, issue to Investor Class A - Series II Units of the Company representing twenty percent (20%) of the issued and outstanding Units of the Company (the "Transaction");

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1

### CLOSING; CONTRIBUTION

**Section 1.1**    **Closing**.  The closing of the Transaction (the "Closing") shall take place remotely by electronic or facsimile transmissions at 10:00 a.m. Houston, Texas time on the date hereof ("Closing Date").  At the Closing, the Parties shall deliver the documents and take the actions specified in Article 2.

**Section 1.2**    **Contribution**.  Subject to the terms and conditions set forth in this Agreement, Investor hereby contributes or otherwise transfers, conveys and assigns to the Company, and the Company hereby accepts from Investor, free and clear of all Liens (other than Permitted Liens), all of Investor's right, title and interest in and to the Contribution Amount, receipt of which is hereby acknowledged by Company.  In consideration of the contribution, the Company shall issue to Investor Units of Class A – Series II of the Company that will equal twenty percent (20%) of the issued and outstanding Units of the Company, free and clear of all Liens.

### ARTICLE 2

### CLOSING

**Section 2.1**    **Documents to be Delivered by the Company**.  At the Closing and in consideration of the delivery of the Contribution Amount to the Company by the Investor, the

Company shall deliver the following to Investor, in each case, in form and substance satisfactory to Investor.  Except as otherwise specified, each shall be dated as of the Closing Date.

(a)     Units.   Company shall deliver to Investor 2,500 Units of Class A – Series II Units of the Company;

(b)     Company Agreement.   The Company Agreement duly executed by the Company and each member of the Company;

(c)     Side Letter.   The Side Letter duly executed by the Company and certain members of the Company;

(d)     Secretary's Certificate.   A certificate, dated as of the Closing Date, of the secretary of the Company with respect to such Person's Governing Documents and the resolutions adopted by its governing authority authorizing such Person's execution of the Transaction agreements; and

(e)     Further Assurances.   Such further instruments and documents as the Company may reasonably request for the purpose of facilitating the consummation of the Transaction.

**Section 2.2     Documents to be Delivered by Investor**.  At the Closing, Investor shall deliver the following documents to the Company, in each case, in form and substance satisfactory to the Company.  Except as otherwise specified, each shall be dated as of the Closing Date.

(a)     Delivery of the Contribution Amount.   Investor shall deliver the Contribution Amount to the Company in immediately available funds;

(b)     Secretary's Certificate.   A certificate, dated as of the Closing Date, of the secretary of Investor with respect to Investor's Governing Documents and the resolutions of its governing body authorizing Investor's execution of the Transaction agreements; and

(c)     Further Assurances.   Such further instruments and documents as Investor may reasonably request for the purpose of facilitating the consummation of the Transaction.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

As a material inducement to Investor to enter into this Agreement and to consummate the Transaction, each Existing Class A Member and the Company hereby represent and warrant to Investor, as of the date hereof that:

**Section 3.1     Existence**.  The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas and is authorized to do business in the State of Texas.  The Company is treated as a corporation for United States income tax purposes.  The Company has full power and authority to own, lease and operate its assets and to carry on its business as presently conducted. The Company is qualified or registered

2

to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of its business or operations would require such qualification or registration. The Company does not directly or indirectly own or have any interest in the shares of capital stock or any other Equity Securities in any Person. There is no outstanding Contract of any kind requiring the Company to make an investment in, or to acquire Equity Securities or any other security or other interest in, any Person directly or require such registration.

**Section 3.2** **Authorization and Power**. The Company has all requisite power and authority to execute, deliver, perform and consummate the Transaction. The execution, delivery and performance by the Company of the Transaction and the consummation of the Transaction have been duly authorized by its governing authority and as otherwise may be required under its Governing Documents. No further entity action on the part of the Company is necessary to authorize the execution, delivery and performance of any Transaction agreement or the consummation of the Transaction. Each Transaction agreement to which the Company is a party has been duly executed and delivered by such Party and constitutes the legal, valid and binding obligations of such Party enforceable against it in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles. The copies of all Governing Documents of the Company, as amended to date, have been made available to Investor, are complete and correct, and no amendments thereto are pending.

**Section 3.3** **Capitalization**. All of the issued and outstanding Equity Securities in the Company consist solely of the Equity Securities, as set forth on Annex 1(a). One hundred percent (100%) of the Equity Securities are beneficially and legally owned by the holders as set forth on Annex 1(a). All of the Equity Securities of the Company set forth on Annex 1(a) and all Equity Securities in the Company being issued to Investor hereunder are duly authorized and validly issued, are fully paid and non-assessable, were not issued in violation of any preemptive rights, rights of first refusal or first offer, any Contract, or other restriction, and were or are being issued under and in accordance with the Governing Documents of the Company and in compliance with applicable federal and state Laws. There are no Contracts to which the Company, any current holder of Equity Securities in the Company, or any other Person is a party with respect to registration rights or the voting of any Equity Securities in the Company or that restrict the transfer of any such interest. There are no outstanding contractual obligations of the Company to repurchase, redeem, or otherwise acquire any Equity Securities of itself. The Company does not own or hold any Equity Securities in any other Person.

**Section 3.4** **No Conflict; Consents**. The execution, delivery and performance by the Company of each Transaction agreement to which it is a party do not, and the consummation of the Transaction will not, (a) result in the imposition of any Lien upon any of the assets of the Company or (b) violate, conflict with or result in the breach (with or without notice or the passage of time, or both) of any term, condition or provision of, (i) any material Law to which the Company or any of its assets are subject, (ii) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to the Company or any of its assets, or (iii) the Governing Documents of the Company.

**Section 3.5    Brokers**.   Neither the Company nor any of the Parties or any of their respective Affiliates have incurred any Liability to pay any fee or commission to any broker, finder or agent in connection with the Transaction.

**Section 3.6    Financial Statements**.   Attached to Schedule 3.6 are true, correct and complete copies of the internally prepared balance sheet and statement of income of the Company as of and for the year-to-date period ended June 30, 2022 (the financial statements contemplated by the foregoing clause are collectively referred to herein as the, "Financial Statements"). The Financial Statements (x) have been prepared in accordance with IFBS (in the case of the Interim Financials, except for the absence of notes and subject to normal and customary year-end adjustments for recurring accruals (which shall not be material either individually or in the aggregate)), as consistently applied by the Company, based upon the books and records of the Company and its subsidiaries, and (y) fairly present in all material respects the financial condition of the business of the Company as of the dates thereof and the operating results and cash flows of it business for the periods then ended. Since December 31, 2021, there has been no change in any of the accounting (or Tax accounting) policies, practices or procedures of the Company. The Company has elected to be treated as a C Corporation for United Sates income tax purposes from and after June 30, 2022.

    (a)    Title and Sufficiency.   The Company has good and valid title to, or a valid leasehold interest, in all of the business assets.

    (b)    Condition.   The business assets (i) are in good operating condition and repair (ordinary wear and tear excepted), and (ii) are suitable for the purposes for which they are presently used by the business of the Company.

**Section 3.7    Compliance with Laws**.   The Company is and at all times since its formation has been, in compliance with all applicable Laws, and the Company has not received any notice, report, complaint, inquiry, claim, or other information alleging or relating to any violation of or Liability under any applicable Law relating to the Company.

**Section 3.8    Permits**.   the Company holds all Permits required to be held by it for the current and proposed conduct of its business, and the Company has been in compliance with all such Permits. Schedule 3.8 lists all Permits held by the Company with respect to the Company's conduct of the business.

**Section 3.9    Proceedings**.   Schedule 3.9 lists all Proceedings to which the Company has been a party. There here have been, no actions, suits, Orders, investigations, Claims or other Proceedings (including any arbitration proceedings) pending or, to the Knowledge of the Company, threatened against the Company, or pending or threatened by the Company against any third party, at law or in equity, or before or by any Governmental Bodies (including any actions, suits, Proceedings or investigations with respect to the Transaction). Except as set forth on Schedule 3.9, (a) there are no, Proceedings, Claims or Orders or, to the Company's Knowledge, investigation of any nature pending, rendered, or to the Company's Knowledge, threatened against the Company, and (b) there are no Orders outstanding against the Company.

4

**Section 3.10   Real Property**.

    (a)     The Company does not own and has never owned, any real property.

    (b)     Schedule 3.10(b) sets forth the address of any Leased Real Property, and a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease document).  The Company has a good and valid leasehold interest in and to all of the Leased Real Property, free and clear of all Liens (other than Permitted Liens).  With respect to each of the Leases and except as set forth in Schedule 3.10(b): (i) the possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed and there are no material disputes with respect to such Lease; (ii) no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (iii) the Company has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property or any portion thereof; (iv) the Company has not collaterally assigned or granted any other security interest in such Lease or any interest therein.

    (c)     The Leased Real Property constitutes all of the real property currently leased, occupied or otherwise utilized in connection with the business as currently conducted. All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property (collectively, the "Improvements") are sufficient for the conduct of the business.  To the Knowledge of the Company, there are no structural deficiencies or latent defects affecting any of the Improvements and there are no facts or conditions affecting any of the Improvements which would, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements, or any portion thereof in the operation of the business.  To the Knowledge of the Company, the Leased Real Property and Improvements and the Company's use thereof conform in all material respects to the Lease and all applicable building, zoning and other Laws.  All Permits necessary to the current occupancy and use of the Leased Real Property have been obtained, are in full force and effect and have not been violated.  There is no pending or, to the Knowledge of the Company, threatened condemnation or other Proceedings affecting any portion of the Lease Real Property or the Company's use thereof.

    **Section 3.11   Environmental**.  (a) the Company has been in compliance with all Environmental Laws, including with respect to any Permits required thereunder, (b) neither the Company nor any of its respective Affiliates has generated, transported, treated, stored, disposed of, handled, arranged for or permitted the disposal of, released or exposed any Person to any Hazardous Materials, or owned or operated any property or facility contaminated by any Hazardous Materials, in each case, so as to give rise to material Liability pursuant to any Environmental Law; (c) with respect to the business, the Real Property and the assets of the Company, the Company has not received any notice, report, or other information regarding any actual or alleged violation of or Liability under Environmental Law; and (d) except as set forth in Schedule 3.11, neither the Company nor any of their respective Affiliates has assumed, provided an indemnity with respect to or otherwise become subject to any material Liability of any other Person relating to Environmental Laws.  The Company has furnished to Investor all environmental audits, assessments, reports and other documents materially bearing on

environmental, health or safety matters, which are in their possession or under their reasonable control.

Section 3.12  **Taxes and Tax Returns**.  All Tax Returns of the Company have been timely filed with the appropriate Governmental Bodies in all jurisdictions in which such Tax Returns are required to be filed.  All such Tax Returns properly reflect the Liabilities of the Company for Taxes for the periods, property or events covered thereby.  All Taxes, including those which are called for by such Tax Returns, required to be paid, withheld or accrued by the Company or before the date hereof, including any deficiency assessments, penalties and interest assessed with respect to such Taxes, have been timely paid, withheld or accrued.  There are no Liens for Taxes (other than for current Taxes not yet due and payable) on the Assets of the Company.  The Company is not a "foreign person" within the meaning of Section 1445 of the Code.  No U.S. federal, state, local, or foreign audit, proceeding, or other examination of any Tax Return of the Company is presently in progress, nor is any such audit, proceeding, or other examination threatened or contemplated. No issue has been raised in any current or prior audit of any Tax Return of the Company that, by application of the same principles, would reasonably be expected to result in a material Tax deficiency for any subsequent Tax period. No deficiencies for any Taxes have been proposed, asserted or assessed against the Company that have not been resolved and paid in full.  No waivers of statutes of limitations have been given with respect to any Taxes of the Company and no request for any such waiver is currently pending. The Company has not requested an extension of time within which to file any Tax Return in any taxable year that has not since been filed. Company has not agreed to an extension of time with respect to a Tax assessment or deficiency or has executed any powers of attorney with respect to Tax matters that currently remain in effect. No requests for ruling or determination letters or competent authority relief with respect to the Company are currently pending with any Governmental Bodies with respect to any Taxes. The Company is not subject to any private letter ruling of the IRS or any comparable ruling of any other Governmental Bodies.  The Company (i) has never been a member of an Affiliated Group, or any similar affiliated or consolidated group for Tax purposes under state, local, or foreign Law, or (ii) has any liability for the Taxes of another Person (other than another Company Entity) pursuant to Treasury Regulation §1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise.  The Company is not a party to or bound by and does not have any obligations under, any Tax sharing agreement, Tax indemnification agreement or similar Contract or arrangement. The Company is not a party to any Contract or arrangement to pay, indemnify or make any payments with respect to any Tax Liabilities of any stockholder, member, manager, director, officer or other employee or contractor of the Company.  The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) use of an improper method of accounting for a taxable period ending on or prior to the Closing Date; (iii) "closing agreement" as described in Code Section 7121 (or any similar provision of state, local, or foreign Law) executed on or prior to the Closing Date; (iv) intercompany transactions or any excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local, or foreign Law); (v) installment sale or open transaction disposition made on or prior to the Closing Date; or (vi) prepaid amount received on or prior to the Closing Date.  The Company has made available to Investor true and complete copies of federal, state and local Tax Returns of each of the Company

6

Entities and their predecessors for the years ended December 31, 2019, 2020 and 2021 and true and complete copies of all examination reports and statements of deficiencies assessed against or agreed to by the Company or any predecessor with respect to Taxes. There is not currently in effect any power of attorney authorizing any Person to act on behalf of or receive information relating to, the Company with respect to any Tax matter. The Company has not received from any Governmental Body in a jurisdiction where the Company has not filed a Tax Return any (i) claim that the Company is or may be subject to taxation by that jurisdiction, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against the Company. The Company engaged in a "reportable transaction" as defined in Treas. Reg. § 1.6011-4(b). Within the past three years, the Company has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code Section 355 or Code Section 361. All of the individuals who are performing consulting or other services for the Company have been correctly classified as either "independent contractors" or "employees," as the case may be. The Company is not a party to any agreement, contract, arrangement, or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code Section 280G (or any similar provision of state, local, or foreign Law).

     **Section 3.13**   <u>**Employees**</u>. <u>Schedule 3.13</u> contains a true, correct and complete (i) list of all employees of the Company as of May 1, 2022; (ii) list of the then current annual base compensation and target incentive compensation opportunity of, and a description of the fringe benefits (other than those generally available to employees) provided by the Company to any such employees, (iii) status of each employee as "exempt" or "non-exempt" under the Fair Labor Standards Act of 1938, as amended ("***FLSA***") and any applicable state law, (iv) list of the accrued but unused vacation, sick leave and personal time for all employees of the Company, (v) list of any increase, effective after December 31, 2021, in the rate of compensation of any employees if such increase exceeds 10% of the previous annual compensation of such employee, and (vi) and any payments owing or arising at or prior to the Closing from or as a result of the consummation of the Transactions, including any payments for stock appreciation or similar rights, any severance or bonus plan payment, or any similar payment, including the amount of each such payment. Except as set forth on <u>Schedule 3.13</u>, there are no temporary workers, leased employees, contingent workers, or any other Persons performing, and no such Person has performed, services for the Company who are not classified as an employee or former employee performing services for the Company. The Company is not delinquent in payment of or has delayed the payment to any of its employees, consultants, or independent contractors of any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees. The Company is not a party to, subject to or bound by, any collective bargaining or other agreement with a labor organization. There is no pending or, to the Knowledge of the Company, threatened, nor has there been since January 1, 2021, any, organizing effort or demand for recognition or certification or attempt to organize any of its employees or former employees.

     **Section 3.14**   <u>**Employee Benefit Plans**</u>. <u>Schedule 3.14</u> lists each Benefit Plan providing benefits to any of the Company's employees which is sponsored, established, maintained, or contributed to or required to be contributed to by the Company at any time since its inception.

Each Benefit Plan, and the administration thereof, is in compliance, in all material respects with its terms and with all compliance, funding, reporting, disclosure and other requirements of ERISA, the Code and other Laws applicable to such Benefit Plan. The Company has made available to Investor prior to the date hereof a true and complete copy of each Benefit Plan listed or required to be listed on Schedule 3.14 and except as set forth on Schedule 3.14, the Company or any entity that is treated as a single employer with the Company under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA (an "**ERISA Affiliate**") sponsors, maintains or contributes to or has any obligation to maintain or contribute to, or has any direct or indirect liability, whether absolute or contingent, with respect to any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which the Company is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, including, without limitation, any (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of the Company has any present or future right to benefits. Each Benefit Plan set forth on Schedule 3.14 has been established and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other applicable Laws; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor (the "**DOL**") or any other Governmental Body, or to the participants or beneficiaries of such Benefit Plan, have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter, opinion letter or advisory letter from the IRS with respect to such Benefit Plan's most recent remedial amendment cycle for which the IRS issued such letters, and there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or Tax under ERISA, the Code or any other applicable Law; (iv) other than routine claims for benefits, no Lien, lawsuit or complaint to or by any Person or Governmental Body has been filed against any Benefit Plan or the Company with respect to any Benefit Plan or, to the Knowledge of the Company, against any other Person and, to the Knowledge of the Company, no such Liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (v) no individual who has performed services for any Company Entity has been improperly excluded from participation in any Benefit Plan; and (vi) no Benefit Plan is under, and the Company has not received any notice of, an audit or investigation by the IRS, DOL or any other Governmental Body, and no such completed audit or investigation, if any, has resulted in the imposition of any Tax or penalty on the Company. No non-exempt "*prohibited transaction*," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred or is reasonably expected to occur with respect to any Benefit Plan set forth on Schedule 3.14. To the

Knowledge of the Company, no fiduciary of any Benefit Plan set forth on <u>Schedule 3.14</u> has any liability for a breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any such Benefit Plan. No fiduciary of any Benefit Plan has been sued by any Person alleging a breach of fiduciary duty with respect to a Benefit Plan or been the subject of an investigation by the DOL in which it was investigating an alleged or possible breach of fiduciary duty with respect to a Benefit Plan, and, to the Knowledge of the Company, no such suit or investigation is contemplated or threatened with respect to any Benefit Plan fiduciary.  Each Benefit Plan that is a "*nonqualified deferred compensation plan*" (as such term is defined in Section 409A(d)(1) of the Code) is in documentary and operational compliance in all material respects with the requirements of Section 409A of the Code and the Treasury Regulations issued thereunder. The Company does not have any obligation to indemnify, reimburse or gross up any individual with respect to any Tax that may be imposed on such individual under Section 409A of the Code.  All liabilities or expenses of the Company in respect of any Benefit Plan (including workers' compensation) which have not been paid have been properly accrued on the Company's most recent financial statements in compliance with GAAP. All contributions or premium payments required to have been made under the terms of any Benefit Plan or in accordance with applicable Law as of the date hereof have been timely made or reflected on the Company's financial statements in accordance with GAAP.  The Company does not have any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any Person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer, any temporary employee, or any employee of any professional employer organization. The Company has not been sued by any Person alleging such misclassification or been the subject of an investigation by the IRS of any other Governmental Body in which the IRS or other Governmental Body was investigating an alleged or possible misclassification, and to the Knowledge of the Company no such suit or investigation is contemplated or threatened.

**Section 3.15   Intellectual Property Matters**.   Schedule 3.15(a) lists the material Intellectual Property Assets used or held for use in the business, including all internet domain names.  the Company owns all right, title and interest or has a right or license to use (as necessary for the operation of the business in the Ordinary Course) all of the Intellectual Property Assets.  Except as set forth on <u>Schedule 3.15(b)</u>, the Company (i) has not granted any licenses or contractual rights relating to the Intellectual Property Assets or the use thereof or (ii) is not bound by or a party to any Contracts of any kind relating to the Intellectual Property Assets of any other Person (except for licenses to any unmodified, commercially available, off-the-shelf computer software with a replacement cost or annual license fee of less than $1,000).  To the Knowledge of the Company, the conduct of the business as it is presently being conducted, does not violate, conflict with or infringe upon the intellectual property of any other Person in any material manner.  The Company has taken commercially reasonable measures to maintain in confidence all material confidential information owned by the Company and Intellectual Property Assets that constitutes, or that the Company intends or intended to retain as, a trade secret. No such trade secret or confidential information has been disclosed by the Company to any Person other than employees, consultants or contractors of the Company who had a need to know and who used such Intellectual Property Assets in the Ordinary Course of employment or contract performance subject to a written and enforceable confidentiality agreement or obligation. There has been no unauthorized access to any such confidential information by third parties.

9

**Section 3.16 <u>Absence of Changes.</u>** Except as set forth on <u>Schedule 3.16</u>, since December 31, 2021, the business has been operated only in the Ordinary Course and, without limiting the foregoing, the Company has not:

(a)    created or otherwise incurred any Lien except for Permitted Liens on any assets;

(b)    suffered any loss exceeding $10,000 (whether or not covered by insurance), experienced any changes in the amount and scope of insurance coverage or suffered any destruction of its books and records;

(c)    sold, assigned, transferred, waived, released, leased or licensed, or permitted the cancellation, loss, lapse or abandonment or other disposition of, or failed to take reasonable steps to maintain, enforce and protect, any material right or material asset (tangible or intangible) used or held for use in the business (including any right related to any asset);

(d)    acquired (whether by merger, consolidation, purchase of equity interests, purchase of assets or otherwise) any business or the material assets of any Person;

(e)    managed the working capital of the business (including the inventory, accounts receivable, prepaid expenses, accounts payable and accrued expenses of the business) other than in the Ordinary Course;

(f)    cancelled, delayed or postponed the payment of any material Liability, the making of any capital expenditure or the replacement, repair or maintenance of any asset;

(g)    made any material change in the manner in which the business extends discounts or credits to, or otherwise deals with, customers;

(h)    made any material change in the manner in which the business markets its products or services;

(i)    engaged in any transaction outside the Ordinary Course;

(j)    discharged or satisfied any Lien or paid any material Liability, other than current liabilities paid in the Ordinary Course;

(k)    declared, set aside or made any payment, dividend or distribution of cash or other property with respect to its equity interests, or purchased, redeemed or otherwise acquired any of its equity interests (including any capital stock, warrants, options or other rights to acquire its equity interests);

(l)    made any material change in its cash management practices or in any method of accounting or accounting policies;

(m)    incurred, assumed or guaranteed any indebtedness, except in the Ordinary Course with respect to trade payables;

10

(n)    proposed or adopted any amendments or modifications to its Governing Documents or

(o)    agreed, whether orally or in writing, to do any of the foregoing.

**Section 3.17    Liabilities**.  The Company does not have any material Liabilities except Liabilities that (a) are fully and accurately disclosed on the face of the Financial Statements (rather than in the notes and schedules thereto), (b) have arisen or been incurred in the Ordinary Course since the Balance Sheet Date (none of which relate to violations of Law, a breach of Contract, or warranty Liabilities), or (c) are listed on Schedule 3.17 to this Agreement.

**Section 3.18    Affiliate Interests; Transactions with Certain Persons**.  Except as set forth on Schedule 3.18, and except for the Governing Documents, there are no Contracts or arrangements by and between the Company, on the one hand, and any holder of the Company Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing, on the other hand.  Except as set forth on Schedule 3.18 the Company is not a debtor or creditor of or has any Liability or other obligation of any nature to, any holder of the Company's Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing.

**Section 3.19    Material Contracts**.  Schedule 3.19 attached hereto (which lists Contracts by each applicable subsection referenced below in this Section 3.19) contains a complete, current and correct list of all of the following Contracts (collectively the "Material Contracts") to which the Company is a party or by which any of their respective properties or assets are bound and that are in effect on the date hereof or impose any continuing Liabilities (other than confidentiality obligations) on any party thereto:

(a)    any Contract or group of related Contracts that involve or involved expenditures or receipts by the Company of more than $50,000.00 for the year ended December 31, 2021, or involve or are expected to involve more than $50,000.00 of expenditures or receipts for the year ending December 31, 2022;

(b)    any Contract with any of the Company's officers, directors, managers, employees, or Affiliates, including all non-competition, severance, employment, bonus, change of control, retention, commission, or indemnification agreements;

(c)    any Contract evidencing the granting of a loan by the Company to any third party for which amounts remain outstanding (other than the advancement of business expenses to employees in the Ordinary Course);

(d)    any Contract evidencing or relating to indebtedness relating to the borrowing of money, extension of credit or the granting of any Lien on the assets or the Equity Securities of the Company;

(e)    any Contract containing any limitation on the freedom or ability of the Company (or that following the Closing Date would purport to limit the freedom of the Company or any of its Affiliates) (A) to engage in any line of business or compete with any

11

Person or to operate at any location in the world, including non-competition, non-solicitation and standstill obligations or exclusivity rights, or (B) to own, operate, lease, sell, transfer, pledge or otherwise dispose of or encumber any asset, or to hire solicit, or consult with any Person or that would so limit the Company or its Affiliates on or after the Closing Date;

        (f)     any power of attorney;

        (g)     any Contract relating to the (A) acquisition or disposition of any business or entity (whether by merger, sale of stock, sale of assets or otherwise) or (B) acquisition of all or substantially all assets of any Person;

        (h)     any Contract for future capital expenditures or the acquisition or construction of fixed assets requiring the payment by the Company of an amount in excess of $50,000.00 on or after the date hereof.

The Company has made available to Investor true, complete and current copies of all written Material Contracts (including any and all amendments, modifications, exhibits, annexes and schedules to such Contracts) and true, correct, and complete summaries of all non-written Contracts. Each of the Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms. There exists no material breach, default or violation on the part of the Company or, to the Knowledge of the Company, on the part of any other party thereto, under any Contract to which the Company is or was a party nor has the Company received written, or to the Knowledge of the the Company, other notice of any such breach, default or violation. the Company has not received written notice of an intention by any party to any Material Contract that provides for a continuing obligation by any party thereto on the date hereof to terminate such Contract or amend the terms thereof and (ii) the consummation of the Transactions will not affect the validity, enforceability or continuation of any Material Contract on the same terms applicable to such Material Contract as of the date hereof. The Company has not waived any material rights under any Material Contract. To the Knowledge of the Company, no event has occurred that either entitles, or would, with notice or lapse of time or both, entitle, any party to any Contract to which the Company is or was a party to declare a breach, default or violation under, or make an indemnification claim against the Company with respect to, any such Contract or to terminate, modify or accelerate, or that does terminate, modify or accelerate, any terms of any such Contract (including any right to accelerate the maturity of any indebtedness of the Company under any such Contract). Each of the Material Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms.

    **Section 3.20**   **Full Disclosure**. No representation or warranty made by the Company in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF INVESTOR

As a material inducement to the Company to enter into this Agreement and to consummate the Transaction, Investor hereby represents and warrants to the Company as of the date hereof that:

**Section 4.1    Capacity and Authority**.  Such Investor has full legal capacity and authority to execute, deliver and perform each Transaction agreement to which such Investor is a party and to consummate the Transaction.  Each Transaction agreement to which such Investor is a party has been duly executed and delivered by such Investor and constitutes the legal, valid and binding obligations of such Investor enforceable against him in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles.

**Section 4.2    No Conflict; Consents**.  The execution, delivery and performance by Investor of each Transaction agreement to which Investor is a party does not, and the consummation of the Transaction will not, violate, conflict with or result in the breach of any term, condition or provision of, (a) any Law to which Investor is subject, (b) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to such Investor or (c) any material Contract to which Investor is a party or by which Investor is otherwise bound.  No authorization, approval or consent of, and no notice to or registration or filing with, any Person is required in connection with the execution, delivery or performance of any Transaction agreement or the consummation of the Transaction by Investor.

**Section 4.3    Disclosure of Information**.  Investor has received and reviewed information about the Company, and its current and proposed subsidiaries and affiliates and has had an opportunity to ask questions and receive answers regarding the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and affiliates and to conduct such due diligence review as it has deemed appropriate.

**Section 4.4    Investment Experience**.  Investor acknowledges that it can bear the economic risk of its investment in the Transaction, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the Transaction.

**Section 4.5    Disclosure of Information**.  Investor has received and reviewed information about the Company and its current and proposed Affiliates, and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the equity consideration pursuant to this Agreement and the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and to conduct such due diligence review as it has deemed appropriate.

**Section 4.6    Investment Experience**.  Investor acknowledges that it can bear the economic risk of its investment in the equity consideration to be received hereunder, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of owning such an investment.

13

**Section 4.7    Accredited Investor**.    Investor is an "accredited investor" as defined under Rule 501 promulgated under the Securities Act.   Investor understands that the Class A - Series II Units issued as the equity consideration have not been registered under the Securities Act or any state securities laws and are being transferred to Investor, in part, in reliance on the foregoing representation.

**Section 4.8    Investment Intent**.    Investor is acquiring the equity consideration hereunder for its own account, with the present intention of holding such securities for purposes of investment, and has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities Laws.

**Section 4.9    No Public Market**.  Investor understands that no public market now exists for the equity consideration to be issued hereunder and that there is no assurance that a public market will ever exist for such equity consideration.   Investor also understands that Rule 144 promulgated under the Securities Act is not presently available with respect to the sale of any of the equity consideration.

**Section 4.10   No Other Representations**.  In purchasing equity consideration, Investor is not relying on (and Investor hereby expressly disclaims) any and all representations, warranties or information (including any projections or forecasts) that may have been provided to it from the Company or any other Person, except only for the representations and warranties of the parties expressly set forth in Article 3 hereof.

**Section 4.11   Full Disclosure**. No representation or warranty made by Investor in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

# ARTICLE 5

## POST-CLOSING COVENANTS

**Section 5.1    Further Assurances**.

    (a)    At any time and from time to time after the Closing Date, at Investor's request, and without further consideration therefor, the Company will execute and deliver any and all proper deeds, assignments and such other instruments of sale, transfer, conveyance, assignment and confirmation as Investor may reasonably deem necessary in order to effect, consummate, confirm and/or evidence the Transaction.

    (b)    The Company agrees to furnish or cause to be furnished, as promptly as practicable, such information and assistance relating to the business as is reasonably necessary (i) for the preparation and filing of any Tax Return or (ii) for any other claim, audit, filing or proceeding relating to Tax matters.

**Section 5.2    Uses of the Contribution Amount**.  From and after the Closing Date, the Company agrees to use the Contribution Amount exclusively for working capital and general

14

business purposes in the Ordinary Course; provided, however, the Contribution Amount may be used for other purposes with the prior written consent of Investor.

**Section 5.3**   **Disclosure**.  Without the prior written consent of Investor, and except as required by Law, the Company and its directors, members, managers, officers, employees and agents) shall not directly or indirectly make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of any of the terms, conditions or other aspects of the transactions contemplated herein; provided, however, that the Parties may continue such communications with employees, customers, suppliers, lenders, lessors and other particular groups as may be legally required or necessary in connection with the conduct of the Company's business in the Ordinary Course.

**Section 5.4**   **Intentionally omitted**

**Section 5.5**   **Closing of Each Contribution Agreement**.   Notwithstanding any provision hereof to the contrary, the obligations of Investor to contribute the Contribution Amount under this Agreement are conditioned upon the simultaneous closing and funding of each Contribution Agreement (defined below) by and between Investor and certain Affiliates of the Company, including Coast to Coast Title, LLC, Sol City Title, LLC d/b/a Magnolia Title, Magnolia Title Florida, LLC, under which Investor is contributing certain amounts of cash to such Affiliates of the Company in exchange for Equity Securities in such Affiliates of the Company (each a "Contribution Agreement").

**Section 5.6**   **Certain Waivers**.  Each Existing Class A Member, on behalf of itself and its Affiliates and each of their respective heirs, successors, assigns, descendants and beneficiaries (each, a " Releasing Party") hereby irrevocably waives, releases and discharges the Company and its Affiliates (including, after the Closing, Investor and its Affiliates) and each of their respective directors, managers, officers, employees, members, equityholders and partners (each, a " Released Party") from any and all Liabilities to such Releasing Parties of any kind or nature whatsoever, whether in the capacity as a direct or indirect equityholder, as a member, manager, officer or employee of the Company or otherwise and whether arising under any agreement or understanding (other than this Agreement) or otherwise at law or in equity, and each Existing Class A Member agrees on behalf of itself and the other Releasing Parties that none of the Existing Class A Member or such Releasing Party shall seek to recover any amounts in connection therewith or thereunder from any of the Released Parties. Notwithstanding the foregoing or anything else herein to the contrary, in no event shall the Company or any of the other Released Parties have any Liability whatsoever to any of the Existing Class A Member or the other Releasing Parties for any breaches (or matters causing or constituting breaches) of the representations, warranties, agreements or covenants of the Company or the Existing Class A Members hereunder, and, in any event, neither the Existing Class A member nor any Release Party may seek contribution or indemnification from the Company or any of the other Released Parties in respect of any payments required to be made by Existing Class A Members or the Releasing Parties pursuant to this Agreement.

15

## ARTICLE 6

## SURVIVAL; INDEMNIFICATION

**Section 6.1    Survival of Representations and Warranties**.  The representations and warranties of the Parties in this Agreement shall survive the consummation of the Transaction and shall remain in effect for a period of three (3) years after the Closing Date, provided, however, that the Fundamental Representations shall survive indefinitely and the representations and warranties set forth in Section 3.11 (Environmental) shall survive until 90 days after expiration of the applicable statute of limitations.  All covenants and agreements set forth herein shall survive the consummation of the Transaction in accordance with their respective terms.  In the event notice of any indemnifiable claim shall have been given within the applicable survival period, all representations and warranties that are the subject of such indemnifiable claim shall survive until such indemnifiable claim is finally resolved.  Indemnification obligations with respect to any Losses suffered relating to fraud or misrepresentation of a significant fact or the volitional withholding of any significant fact by any Party shall not expire.  If any representation or warranty contained in this Agreement is qualified based on materiality, including the terms "material" or any similar qualifier, such qualification shall in all respects be ignored and given no effect for purposes of determining whether any breach or inaccuracy has occurred and the amount of any related Loss.

**Section 6.2    Indemnification by the Company and the Existing Class A Members**. Subject to the terms, conditions and limitations set forth in this Article 6, the Company, the Existing Class A Members, and their respective Affiliates shall, jointly and severally, indemnify and defend Investor and its Affiliates and their respective officers, directors, managers, shareholders, members, partners, employees, lenders, agents, representatives, successors and permitted assigns (each a "Investor Indemnified Party") against, and shall hold each of them harmless from, any and all damages, losses, injuries, Liabilities, claims, demands, Proceedings, judgments, awards, settlements, assessments, deficiencies, Taxes, penalties, fines, charges, payments, costs or expenses (including reasonable investigation and legal fees) or reduction in value, whether or not involving a third-party claim (collectively, "Losses"), arising, directly or indirectly, from or in connection with:

> (a)    any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of the Company or its Affiliates in this Agreement or any certificate delivered by the Company or its affiliates pursuant to this Agreement;

> (b)    any breach or nonfulfillment of any covenant, agreement or obligation of the Company under this Agreement;

> (c)    the operation of the business prior to Closing and any Liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the Closing (including operations);

> (d)    any Tax Liability (whether incurred by the Company or Investor) as a result of the transactions contemplated by this Agreement;

16

(e)    any Tax Liability of the Company for tax periods up to and including Closing, including, without limitation, those Tax Liabilities that would have been or would be accrued under accrual accounting and/or any Tax Liabilities resulting from a change in the Company's method of accounting;

(f)    the Confidential Settlement Agreement and Release of All Claims and all matters relating thereto, referred to therein, or arising therefrom, including, for the avoidance of doubt, the Employment Litigation, the Proposed Starrex Transaction, the Derivative Litigation, the Stewart Litigation, and any Losses paid or otherwise incurred in the investigation, prosecution, defense, negotiation, settlement or collection of all matters relating to, referred to in, or arising out of the Confidential Settlement Agreement and Release of All Claims; and/or

(g)    any breach or nonfulfillment of any covenant, agreement or obligation of the Company or any Existing Class A Member under the Side Letter.

The Company, the Existing Class A Members, and their respective Affiliates shall not use any of the Contribution Amount to satisfy the above mentioned indemnity obligations.

**Section 6.3    Indemnification by Investor**.    Subject to the terms, conditions and limitations set forth in this Article 6, Investor shall indemnify and defend the Company and its successors and permitted assigns (each an "Magnolia Indemnified Party") against, and shall hold them harmless from, any Loss arising, directly or indirectly, from or in connection with:

(a)    any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of Investor in this Agreement or any certificate delivered by Investor pursuant to this Agreement; and/or

(b)    any breach or nonfulfillment of any covenant, agreement or obligation of Investor in this Agreement.

**Section 6.4    Limitations on Indemnification**.

(a)    In no event shall Investor, on the one hand, or the Company, on the other hand, be required to make indemnification payments hereunder for Losses that result solely from facts or circumstances which constitute a breach or inaccuracy of any representation or warranty in Article 3, Article 4 or Article 5 unless the aggregate amount of all such Losses suffered by the Investor Indemnified Parties or the Magnolia Indemnified Parties, as applicable, exceeds $10,000 (the "Deductible"), in which case, Investor or the Company, as the case may be, shall be liable for all such Losses in excess of the Deductible, provided, however, that the Deductible shall not apply to any claims for Losses incurred or suffered as a result of, arising out of or relating to a breach of, default in, or failure to perform, any of the Fundamental Representations and the representations and warranties set forth in Section 3.16(k), Section 3.16(l), or the matters set forth on in Section 6.2(f) and Section 6.2(g).

(b)    The limitations set forth in this Section 6.4 shall not apply to any claim involving criminal activity, fraud, willful misconduct or an intentional misrepresentation of fact in connection with the transactions contemplated by this Agreement.

17

**Section 6.5    Treatment of Indemnification Payments.**    Each Party will treat all payments made pursuant to Article 6 as adjustments of, the equity consideration or the Contribution Amount, as the case may be, for all purposes.

**Section 6.6    Exclusive Remedy.**    Except to the extent arising from fraud or willful misconduct and except as provided in any Transaction agreement, including Section 8.14 of this Agreement, the indemnification provided by this Article 6 shall be the sole and exclusive remedy in respect of any breach of or inaccuracy in any representation, warranty, agreement or covenant contained in this Agreement.  The foregoing shall not limit the Parties' right to obtain specific performance as provided herein.  In furtherance of the foregoing, each Party hereby waives, to the fullest extent permissible under applicable Law, and agrees in any case not to assert in any action or proceeding of any kind, any and all rights, claims and causes of action it may now or hereafter have (including any such rights, claims or causes of action arising under or based upon common law or other Law) against any indemnifying Party for any matter described in the previous sentence other than claims for indemnification asserted as permitted by and in accordance with the provisions set forth in this Article 6, provided, nothing in this Section 6.6 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled, or to seek any remedy on account of any Party's fraud or willful misconduct..

**Section 6.7    Waiver of Punitive Damages.**    NOTWITHSTANDING  ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL ANY PARTY OR ITS AFFILIATES, OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE HEREUNDER AT ANY TIME FOR PUNITIVE DAMAGES (EXCEPT TO THE EXTENT PAID TO A THIRD PARTY), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND EACH PARTY HEREBY EXPRESSLY RELEASES THE OTHER PARTIES, THEIR AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND REPRESENTATIVES THEREFROM.

**Section 6.8    Other Limitations on Losses.**    Any indemnification owing pursuant to this Article 6 in respect of an indemnifiable Loss shall be reduced by any insurance proceeds, indemnification payments or contribution payments actually received in respect of such indemnifiable Loss by the Investor Indemnified Party or Magnolia Indemnified Party, as the case may be, from third parties unaffiliated with such Investor Indemnified Party or Magnolia Indemnified Party (in each case, reduced by any costs of collection and/or increases in premiums incurred by such Investor Indemnified Party or Magnolia Indemnified Party in connection with such recovery)

**Section 6.9    Indemnification Procedures.** The Party making a claim under this Article 6 is referred to as the "Indemnified Party", and the Party against whom such claims are asserted under this Article 6 is referred to as the "Indemnifying Party."

(a)    Third Party Claims.

(i)    If an Indemnified Party receives notice of the assertion or commencement of an Action made or brought by any Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement (each, a "Third Party Claim") against such Indemnified Party that

the Indemnified Party has determined has or would reasonably be expected to give rise to a right of indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty days after receipt of such notice of such Third Party Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

(ii)    Subject to the terms of this Section 6.9(a), upon receiving notice of a Third Party Claim, the Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party within thirty business days of its receipt of notice of the Third Party Claim, to assume the investigation and defense of such Third Party Claim at the Indemnifying Party's expense and with counsel reasonably satisfactory to the Indemnified Party; provided, that the Indemnifying Party shall not have the right to assume the investigation and defense of a Third Party Claim if (A) the Indemnifying Party or its Affiliate is also a Party to such Third Party Claim and the Indemnified Party determines in good faith that joint representation would be inappropriate, (B) upon request, the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend such Third Party Claim, (C) in the reasonable judgment of the Indemnified Party, it involves material reputational risks to the Indemnified Party or any of its Affiliates, or (D) it seeks an injunction or other equitable relief against the Indemnified Party or relates to or arises in connection with any criminal proceeding, indictment, allegation or investigation. If the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 7.06(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name of and for the Indemnified Party.

(iii)    The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it, subject to the Indemnifying Party's right to assume the control of the defense thereof in accordance with Section 6.9(a)(ii). The fees and disbursements of any such counsel shall be at the expense of the Indemnified Party; provided, that if in the written opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party or any of their Affiliates that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.

(iv)    If the Indemnifying Party elects not to compromise or defend a Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in Section 6.9(a)(ii), or (subject to the proviso to this Section 6.9(a)(iv)) fails to diligently prosecute the defense of a Third Party Claim, the Indemnified Party may, subject to Section 6.9(b), pay, compromise, and defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim; provided that if the Indemnifying Party fails to diligently pursue the defense of the Third Party Claim or

19

the Indemnified Party reasonably concludes that the Third Party Claim is not being defended to its satisfaction, the Indemnified Party can assume the defense of the Third Party Claim if the Indemnified Party gives the Indemnifying Party written demand to diligently pursue the defense and the Indemnifying Party fails to do so within ten business days after receipt of the demand, or such shorter period as may be required to respond to any deadline imposed by a Governmental Body.

(v)     The Parties shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including promptly making available records relating to such Third Party Claim in their possession or control and furnishing, without expense (other than reimbursement of actual reasonable out-of-pocket expenses) to the defending Party, management employees of the non-defending Party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)     <u>Settlement of Third-Party Claims</u>. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 6.9(b). If a firm offer is made to settle a Third-Party Claim without leading to Liability on the part of the Indemnified Party or its Affiliates and provides, in customary form, for the unconditional release of each Indemnified Party and their Affiliates from all Liabilities in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten business days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to settlement of such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume the defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense of a Third-Party Claim under Section 6.9(a)(iv), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)     <u>Direct Claims</u>.

(i)     Any Proceeding initiated by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (each, a "Direct Claim") shall be asserted by the Indemnified Party by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than sixty days after the Indemnified Party becomes aware of such Direct Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

(ii)    The Indemnifying Party shall have forty-five days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim. The Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any unprivileged accounts, documents or records in its control or possession) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such forty-five (45) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 6.10    Payments.** Once a Loss is agreed to by the Indemnifying Party or adjudicated to be payable under this Article 6, the Indemnifying Party shall satisfy its obligations within ten business days of such adjudication by wire transfer of immediately available funds. Interest on any such amount payable will accrue from and including the date of agreement of the Indemnifying Party or adjudication to but excluding the date such payment has been made at a rate per annum equal to 12%, and such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

## ARTICLE 7

### DEFINED TERMS

**Section 7.1    Definitions**. As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with such first Person.

"Benefit Plan" means a Pension Plan, a Welfare Plan or any other plan or program for employees relating to deferred compensation, bonus, performance compensation, severance, vacation, sick pay, incentive, insurance, health or welfare.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Agreement" means the First Amended and Restated Company Agreement of Magnolia Title Arkansas, LLC, dated December 1, 2021.

"Confidential Settlement Agreement and Release of All Claims" means that certain Confidential Settlement Agreement and Release of All Claims between John Magness ("Magness") and The Peabody Bulldog, LLC ("Peabody") ( collectively with Magness, the "Magness Parties"), and Bo and Sarah Blackburn (the "Blackburns"), #6 Metz Court ("Metz Court"), Sol City Title Managers, LLC ("Sol City Managers"), Rabbit Food, LLC ("Rabbit Food"), BS Title Team, LLC ("BS Title Team"), Pacific Waters Title, LLC ("1845 Title"), Blue Goose Title, LLC ("Noteworthy Title"), CSP Texas Joint Venture, LLC ("Key Title"), CSP Texas Joint Venture - San Antonio, LLC ("Key Title San Antonio"), Tall City Title, LLC ("Tall

City Title"), Amarillo Title, LLC ("Amarillo Title"), Joy Title LLC ("Joy Title"), Gateway City Title, LLC ("Gateway City Title"), Gateway City Title Managers, LLC ("Gateway City Managers"), Corpus Christi Title, LLC ("Corpus Christi Title"), and Corpus Christi Title Managers, LLC ("Corpus Christi Managers") ( each a "BSpoke Party," and collectively with the Blackburns, the "BSpoke Parties"), and 405 Manhattan Investments, LLC ("405 Manhattan") and Alphabet Investments, LLC ("Alphabet") ( collectively with 405 Manhattan, the "the Alphabet Parties"), and Sol City Title, LLC ("Magnolia Houston"), Coast to Coast Title, LLC ("Magnolia Dallas"), Magnolia Title Florida ("Magnolia Florida"), and Magnolia Title Arkansas, LLC ("Magnolia Arkansas") (collectively, the "Magnolia Parties"), and Britt Naponic ("Naponic"), and Starrex International Ltd. ("Starrex").

"Contract" means any agreement, contract, lease, sublease, license, sublicense, indenture, mortgage, instrument, note, guaranty, customer order, purchase order, franchise, joint venture agreement, partnership agreement or other arrangement, understanding, permission or commitment, in each case, whether written or oral.

"Control," "Controlled by," and "under common Control with" as used with respect to any Person, mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Environmental Law" means, whenever in effect, all Laws and contractual Liabilities concerning public or worker health or safety, pollution or protection of the environment.

"Equity Securities" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (howsoever designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contract which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Fundamental Representations" means the representations and warranties set forth in Sections 3.1 (Existence), 3.2 (Authorization and Power), 3.4 (No Conflict; Consents), 3.5 (Brokers), 3.6(a) (Title and Sufficiency), 3.12 (Taxes and Tax Returns), Section 3.14 (Employee Benefit Plans, 4.1 (Capacity and Authority), 4.2 (No Conflict; Consents).

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, in the case of a corporation, its certificate or articles of incorporation and the by-laws (or analogous documents), in the case of a limited liability company, its certificate of formation and operating or limited liability company agreement (or analogous documents) and in the case of a limited partnership its certificate of formation and limited partnership agreement (or analogous documents).

22

"Governmental Body" means any federal, state, municipal, local or other government department, quasi-governmental department, commission, board, bureau, agency or instrumentality, regulatory or self-regulatory authority, any tribunal, any court, or any other political or other subdivision, department or branch of any of the foregoing, in each case whether of the United States or foreign.

"Hazardous Material" means any material, substance or waste for which Liability or standards of conduct may be imposed pursuant to any Environmental Law, including petroleum.

"Intellectual Property Assets" means all intellectual property and proprietary rights throughout the world, including all: (i) patents, patent applications and inventions (whether or not patentable or reduced to practice); (ii) trademarks, service marks, logos, trade names, slogans and internet domain names, social media handles, and all registrations, applications and renewals for any of the foregoing, and all goodwill associated with the foregoing; (iii) copyrights and works of authorship, and all registrations, applications and renewals for any of the foregoing; (iv) trade secrets and other proprietary information; (v) computer software and software systems; (vi) all other intellectual, proprietary or industrial rights including rights arising under license agreements; and (vii) all rights and remedies relating thereto, including remedies against, and the right to recover damages from, present and past infringement and rights to protection of interests therein..

"Knowledge" means, as to any Person (other than the Company), the actual knowledge or awareness of such Person after due and reasonable inquiry, and with respect to the Company, the actual knowledge of any Manager, officer, executive level employee, and supervisory level employee of the Company and any Existing Class A Member and their respective Affiliates, after due and reasonable inquiry.

"Law" means any foreign or domestic law, common law, treaty, statute, ordinance, rule, regulation, enforceable requirement, binding determination, order, decree, judgment, injunction or other pronouncement having the effect of law.

"Liability" and "Liabilities" means any direct or indirect liability, indebtedness, Claim, loss, damage, deficiency, assessment, responsibility, or obligation of whatever kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, fixed or unfixed, determined or determinable, due or to become due, choate or inchoate, matured or unmatured, and whether due or to become due.

"Lien" means any lien, collateral assignment, encumbrance, mortgage, security interest, conditional or other sales agreements, pledge, hypothecations, claims, interferences, options, rights of first refusal, preemptive rights, restrictions of any nature, or other encumbrances (including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the possession, exercise, transfer or any other attribute of ownership of any asset), as applicable and, in each case, applicable with respect to such asset or property.

"Ordinary Course" means, with respect to any Person, an action taken by such Person will be deemed to have been taken in the "Ordinary Course" only if such action is recurring in nature, is consistent in all material respects with the past practices of such Person (including with respect to quantity and frequency), and is taken in the ordinary course of the normal day to day operations of such Person.

"Pension Plan" means an "employee pension benefit plan" as defined in Section 3(2) of ERISA.

"Permit" means any license, permit, approval, franchise, registration, certificate, variance, authorization or similar right issued by or obtained from a Governmental Body.

"Permitted Liens" means (a) non-delinquent statutory Liens arising other than by reason of default, (b) Liens of carriers, warehousemen, mechanics and materialmen incurred in the Ordinary Course for sums not yet due, (c) Liens incurred or deposits made in the Ordinary Course in connection with workers' compensation, unemployment insurance and other types of social security and (d) with respect to Real Property only, (i) Taxes which are a lien and not yet due and payable as of the Closing Date, (ii) zoning, building and other land use regulations imposed by governmental agencies having jurisdiction over the Real Property which are not violated by the current use or occupancy of the Real Property or the operation of the business thereon, (iii) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Real Property which, in each case, do not materially impair (x) the value or marketability of the parcel of Real Property to which they pertain or (y) the occupancy or use of the Real Property by the business for the purposes for which it is currently used, and (iv) landlord liens under Leases set forth on Schedule 3.10(b).

"Person" means any individual, corporation, limited liability company, partnership, joint venture, trust, business association, organization, Governmental Body or other entity.

"Proceeding" means any action, claim, complaint, charge, injunction, order, judgement, decree, arbitration, audit, hearing, investigation, litigation, suit or proceeding (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before any Governmental Body or arbitrator.

"Side Letter" means that certain letter agreement dated of even date herewith and duly executed by the Company, the Investor, and certain members of the Company regarding the Company Agreement.

"Tax" means any federal, state, local or foreign tax, assessment, governmental charge or imposition, including any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, escheat, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Body.

"Tax Return" means any federal, state, local and foreign return, report, statement or other similar document required to be filed with any Governmental Body with respect to Taxes.

"Transaction" means the transactions contemplated by this Agreement and the other Transaction agreements.

"Welfare Plan" means an "employee welfare benefit plan" as defined in Section 3(1) of ERISA.

## ARTICLE 8

## MISCELLANEOUS

**Section 8.1    Expenses**.  Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the Transaction, including all fees and expenses of its agents, representatives, counsel and accountants and public announcements.

**Section 8.2    Entire Agreement**.   This Agreement and the other Transaction agreements set forth the entire understanding of the Parties with respect to the Transaction. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

**Section 8.3    Amendments and Waivers**.  This Agreement may not be amended except by an instrument in writing signed by or on behalf of each of the Parties.

**Section 8.4    Assignment and Binding Effect**.  This Agreement may not be assigned by any Party without the prior written consent of the other Parties; provided that Investor may, without the prior written consent of any Party, assign any or all of its rights hereunder to (a) one or more of its Affiliates, (b) any lender for collateral purposes or (c) any future purchaser of all or substantially all of the assets of the Company; provided, further, that no such assignment shall relieve Investor of its obligations hereunder.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, heirs, personal representatives, successors and permitted assigns.

**Section 8.5    Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand, (b) when sent by electronic transmission (including facsimile and email) with written confirmation of transmission, (c) one business day following the day sent by reputable overnight courier (with written confirmation of receipt) or (d) three business days following the date sent by U.S. registered or certified mail (return receipt requested), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to the Company, to:

Magnolia Title Arkansas, LLC
14701 Saint Mary's Lane
Suite 150
Houston, Texas 77079
Attention: John Magness
Email: john.magness@magnoliatitleteam.com


If to Investor:

HMH Title Investments, LLC
c/o BNMJR, Inc.
1038 Texan Trail
Grapevine, Texas 76051
E-mail: Nelson.Mitchell@historymaker.com
Attention: CEO

with required copies (which shall not
constitute notice:

York & Hinds, P.C.
1885 St. James Place
Suite 770
Houston, Texas 77056
Attention:  William York
Facsimile: 713-659-5755
Email:  wey@yorkhinds.com


with required copies (which shall not
constitute notice:

Decker Jones, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, TX 76102
E-mail: afulkerson@deckerjones.com
Attention: Adam J. Fulkerson


      **Section 8.6**    <u>**Governing Law**</u>.  This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of Texas.

      **Section 8.7**    <u>**Jurisdiction and Venue**</u>.  All Proceedings arising out of or relating to this Agreement and/or the Transaction shall be heard and determined exclusively in a state or federal court in the State of Texas.  Consistent with the preceding sentence, each Party hereby expressly, irrevocably and unconditionally (a) submits to the exclusive jurisdiction of any state or federal court in State of Texas for the purpose of any Proceeding brought by any Party hereto arising out of or relating to this Agreement and/or the Transaction, (b) waives any objection to the above courts based on lack of personal jurisdiction or inconvenient forum and (c) waives its right to bring any Proceeding arising out of or relating to this Agreement and/or the Transaction in any other jurisdiction.

      **Section 8.8**    <u>**Waiver of Jury Trial**</u>.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO THAT IS RELATED TO THE TRANSACTION.

**Section 8.9    No Third Party Beneficiaries**.    Other than those Persons entitled to indemnification pursuant to Article 6, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 8.10    No Strict Construction**.    The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 8.11    Rules of Construction**.  All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.  The words "hereof," "herein" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, the word "or" shall include both the conjunctive and disjunctive and the word "any" shall mean "one or more".  The terms "Dollars" and "$" mean United States Dollars; Wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."  Any statute defined or referred to herein or in any other Transaction agreement means such statute as from time to time amended, modified or supplemented, including by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  All accounting terms not otherwise defined in this Agreement shall have the meanings ascribed to them under GAAP.

**Section 8.12    Schedules and Exhibits**.  All Schedules and Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement and, unless otherwise defined therein, all terms used in any Schedule or Exhibit shall have the respective meanings ascribed to such terms in this Agreement.

**Section 8.13    Severability**.    Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof; and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 8.14    Remedies**.  In the event of any breach of this Agreement by any Party, the non-breaching Party shall, in addition to any other remedy provided herein or by law or in equity, be entitled to seek specific enforcement of the terms hereof, including appropriate injunctive relief in any court of competent jurisdiction, and no bond or other security shall be required in connection therewith.

**Section 8.15  <u>Counterparts</u>**.    This Agreement may be executed in multiple counterparts, including counterparts delivered by facsimile or other electronic transmission, each of which shall be deemed an original and together shall be deemed one instrument.

*Signature page follows:*

**IN WITNESS WHEREOF,** the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
   B. Nelson Mitchell, Jr., CEO


Magnolia Title Arkansas, LLC

By:_____
   John Magness, Manager

Alphabet Investments, LLC

By:_____
   Matthew Clayton Hill, Manager


Peabody Bulldog, LLC

By:_____
   John Magness, Manager

405 Manhattan Investments, LLC

By:_____
   Alyse Angelle, Manager


*Signature Page to Contribution Agreement*

**IN WITNESS WHEREOF,** the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
   B. Nelson Mitchell, Jr., CEO


Magnolia Title Arkansas, LLC


By:_____
   John Magness, Manager


Alphabet Investments, LLC


By: *M. Clayton Hill*
   Matthew Clayton Hill, Manager


Peabody Bulldog, LLC


By:_____
   John Magness, Manager


405 Manhattan Investments, LLC


By:_____
   Alyse Angelle, Manager


*Signature Page to Contribution Agreement*

DocuSign Envelope ID: B9E196FB-452F-4798-B7E9-31E6E5F72FAA

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By: _____
    B. Nelson Mitchell, Jr., CEO

Magnolia Title Arkansas, LLC

By: _____
    John Magness, Manager

Alphabet Investments, LLC

By: _____
    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By: _____
    John Magness, Manager

405 Manhattan Investments, LLC

By: _____
    Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____

    B. Nelson Mitchell, Jr., CEO

Magnolia Title Arkansas, LLC

By:_____

    John Magness, Manager

Alphabet Investments, LLC

By:_____

    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____

    John Magness, Manager

405 Manhattan Investments, LLC

By:_____

    Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

**MAGNOLIA TITLE ARKANSAS**
**INDEX OF SCHEDULES TO CONTRIBUTION AGREEMENT**

Schedule 3.3 – List of Equity Securities of Company

Schedule 3.6 – Company Financial Statements

Schedule 3.9 – Permits

Schedule 3.10 – Proceedings

Schedule 3.11(b) – Leased Real Property

Schedule 3.12 – Environmental

Schedule 3.14 – List of Employees

Schedule 3.15 – Benefit Plans

Schedule 3.16(a) – Intellectual Property Assets

Schedule 3.16(b) – Intellectual Property Licenses and Contracts

Schedule 3.17 – Absence of Changes

Schedule 3.19 – Affiliates

Schedule 3.20 – Material Contracts

**SCHEDULE 3.3**

**LIST OF EQUITY SECURITIES OF COMPANY**

**See Attached.**

**MAGNOLIA TITLE ARKANSAS, LLC**
**REVISED**
**EXHIBIT 3.1**
**EFFECTIVE:  DECEMBER 31, 2021**

**MEMBER INFORMATION**

| **Member** | **Units**<br>**(by Class)** |
|---|---|
| **Class A Series I Member**: | |
| Rabbit Food, LLC | 375 Units (3.75%) |
| **Class A Series II Members**: | |
| 405 Manhattan Investments, LLC | 4,162.5 Units (41.625%) |
| Alphabet Investments, LLC | 4,162.5 Units (41.625%) |
| Peabody Bulldog, LLC | 1,300 Units (13%   ) |
| Total | 10,000 Units (100%) |

**Newly Admitted Class A-1 Members**:  Cancelled effective 12/31/21 and converted to Class A-Series II Units

**MAGNOLIA TITLE ARKANSAS, LLC**
**REVISED**
**EXHIBIT 3.1**
**EFFECTIVE:  SEPTEMBER 9, 2022**

**MEMBER INFORMATION**

| <u>Member</u> | <u>Units</u><br><u>(by Class)</u> |
|---|---|
| **Class A Series I Member**: | |
| Rabbit Food, LLC | 375 Units (3.0%) |
| **Class A Series II Members**: | |
| 405 Manhattan Investments, LLC | 4,162.5 Units (33.3%) |
| Alphabet Investments, LLC | 4,162.5 Units (33.3%) |
| Peabody Bulldog, LLC | 1,300 Units (10.4%) |
| HMH Title Investments, LLC | <u>2,500 Units (20%)</u> |
| Total | 12,500 Units (100%) |

**Newly Admitted Class A-1 Members**:  Cancelled effective 12/31/21 and converted to Class A-Series II Units

**SCHEDULE 3.6**
**COMPANY FINANCIAL STATEMENTS**

**See Attached.**

## SCHEDULE 3.6
## FINANCIAL STATEMENTS

### Consolidating Balance Sheet as at June 30, 2022

**Magnolia Title**
Condensed Interim Consolidating Statements of Financial Position
As at June 30, 2022
(Unaudited) (Expressed in U.S. dollars)

| | Magnolia Title Arkansas, LLC | Coast to Coast Title, LLC | Magnolia Title Florida, LLC | Sol City Title, LLC | Magnolia Title et al, Corporate | Total |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash | $ 49,669 | $ 81,424 | $ 147,308 | $ 82,441 | $ - | $ 360,842 |
| Accounts receivable | 52,618 | 161,684 | 23,980 | 147,014 | 85,065 | 470,361 |
| Prepaid expenses | 9,726 | 29,571 | 32,305 | 8,115 | 21,938 | 101,655 |
| | 112,013 | 272,679 | 203,593 | 237,570 | 107,003 | 932,858 |
| **Non-current assets** | | | | | | |
| Property and equipment, net of depreciation | 61,706 | 199,704 | 92,346 | 89,937 | 18,245 | 461,938 |
| Right-of-use assets | 62,790 | 803,401 | 406,094 | - | - | 1,272,285 |
| **Total Assets** | $ 236,509 | $ 1,275,784 | $ 702,033 | $ 327,507 | $ 125,248 | $ 2,667,081 |
| **LIABILITIES** | | | | | | |
| **Current Liabilities** | | | | | | |
| Accounts payable and accrued liabilities | $ 221,186 | $ 81,990 | $ 127,852 | $ 200,926 | $ 125,248 | $ 757,202 |
| Current portion of lease liabilities | 221,186 | 81,990 | 127,852 | 200,926 | 125,248 | 757,202 |
| **Non-current Liabilities** | | | | | | |
| Lease liabilities | 64,041 | 819,452 | 416,420 | 15,363 | - | 1,315,276 |
| **Total liabilities** | $ 285,227 | $ 901,442 | $ 544,272 | $ 216,289 | $ 125,248 | $ 2,072,478 |
| **Shareholders' Equity** | | | | | | |
| Common stock | $ 11,000 | $ 11,000 | $ 11,000 | $ 634,500 | $ - | $ 667,500 |
| Additional paid in capital | 215,762 | 1,298,628 | 577,799 | 167,795 | - | 2,259,984 |
| Special contribution | - | 468,751 | 76,000 | 183,000 | - | 727,751 |
| Deficit | (275,480) | (1,404,037) | (507,038) | (874,077) | - | (3,060,632) |
| **Total equity** | (48,718) | 374,342 | 157,261 | 111,218 | - | 594,603 |
| **Total liabilities and equity** | $ 236,509 | $ 1,275,784 | $ 702,033 | $ 327,507 | $ 125,248.00 | $ 2,667,081 |

*Consolidating Statements of Loss as at June 30, 2022*

Magnolia Title
Condensed Interim Consolidating Statements of Loss
For the period ending June 30, 2022
(Unaudited) (Expressed in U.S. dollars)

| | Magnolia Title Arkansas, LLC | Coast to Coast Title, LLC | Magnolia Title Florida, LLC | Sol City Title, LLC | Magnolia Title et al, Corporate | Total |
|---|---|---|---|---|---|---|
| Revenue | 214,038 | 495,369 | 472,498 | 898,038 | - | 2,079,942 |
| Cost of Revenue | 2,301 | 93,480 | 49,754 | 193,625 | - | 339,160 |
| Gross Profit | 211,737 | 401,888 | 422,744 | 704,413 | - | 1,740,782 |
| Operating Expenses | | | | | | |
| General and Administrative Expenses | 115,406 | 222,147 | 105,652 | 212,376 | (278,902) | 376,679 |
| Marketing and Advertising Expenses | 6,415 | 42,778 | 19,049 | 14,287 | 991 | 83,520 |
| Depreciation and Amortization Expense | 10,706 | 70,284 | 27,357 | 7,874 | - | 116,222 |
| Payroll and Related Expense | 253,884 | 612,983 | 469,906 | 441,462 | 230,248 | 2,008,483 |
| Utilities and Facilities | 14,888 | 61,919 | 30,829 | 80,821 | - | 188,457 |
| Taxes and Insurance | 4,848 | 2,501 | 4,369 | 4,075 | - | 15,794 |
| Travel, Meals and Entertainment | 6,694 | 15,190 | 19,590 | 9,260 | 12,046 | 62,780 |
| Professional Services | 60,841 | 206,681 | 92,103 | 116,629 | 35,617 | 511,869 |
| Total Operating Expenses | 473,683 | 1,234,483 | 768,854 | 886,785 | - | 3,363,804 |
| 5702 - Interest Expense- ROU Lease | (1,655) | (17,705) | (9,781) | 0 | - | (29,140) |
| 8013 - Sales Tax | 0 | 0 | 1,658 | 78 | - | 1,736 |
| Net Income (Loss) | (263,601) | (850,299) | (357,548) | (182,450) | - | (1,653,898) |

**Magnolia Title Arkansas, LLC**
Statement of Cash Flows
For the Period Ending June 30, 2022

|  | June 30, 2022 |
|---|---:|
| **Cash Flows from Operating Activities:** | |
| Net Income (Loss) | (263,601) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Depreciation | 9,448 |
| Amortization | 1,258 |
| Changes in Operating Assets and Liabilities: | |
| Changes in Net Accounts Receivable | |
| Changes in Accounts Receivable | (52,619) |
| Changes in Prepaid Expenses and Other Assets | 773 |
| Changes to Accounts Payable | 274,145 |
| Changes to Accrued Liabilities and Other Liabilities | (19,290) |
| Net cash provided by operating Activities | (49,885) |
| **Cash Flows from Investing Activities** | |
| Capital Expenditures | (135,202) |
| Net cash provided by investing activities | (135,202) |
| **Cash Flows from Financing Activities** | |
| Changes in Debt Proceeds | 64,041 |
| Changes in Capital Stock | 156,036 |
| Net cash provided by financing activities | 220,078 |
| **Net increase (decrease) in cash** | 34,990 |
| **Cash - Beginning of Period** | 0.43 |
| **Cash - End of Period** | 49,669 |

**Coast to Coast, LLC**
**Statement of Cash Flows**
For the Period Ending June 30, 2022

|  | June 30, 2022 |
|---|---|
| **Cash Flows from Operating Activities:** |  |
| Net Income (Loss) | (850,299) |
| Adjustments to reconcile net loss to net cash used in operating activities: |  |
| Depreciation | 65,758 |
| Amortization | 4,526 |
| Changes in Operating Assets and Liabilities: |  |
| Changes in Net Accounts Receivable |  |
| Changes in Accounts Receivable | (113,103) |
| Changes in Prepaid Expenses and Other Assets | (13,119) |
| Changes to Accounts Payable | 159,902 |
| Changes to Accrued Liabilities and Other Liabilities | (65,612) |
| Net cash provided by operating Activities | (811,947) |
| **Cash Flows from Investing Activities** |  |
| Capital Expenditures | (688,706) |
| Net cash provided by investing activities | (688,706) |
| **Cash Flows from Financing Activities** |  |
| Changes in Debt Proceeds | 446,380 |
| Changes in Capital Stock | 1,100,551 |
| Net cash provided by financing activities | 1,546,931 |
| **Net increase (decrease) in cash** | 46,278 |
| **Cash - Beginning of Period** | 35,146 |
| **Cash - End of Period** | 81,424 |

**Magnolia Title Florida, LLC**
**Statement of Cash Flows**
For the Period Ending June 30, 2022

|  | June 30, 2022 |
|---|---|
| **Cash Flows from Operating Activities:** | |
| Net Income (Loss) | (357,548) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Depreciation | 27,357 |
| Changes in Operating Assets and Liabilities: | |
| Changes in Net Accounts Receivable | |
| Changes in Accounts Receivable | (23,451) |
| Changes in Prepaid Expenses and Other Assets | (32,305) |
| Changes to Accounts Payable | 306,145 |
| Changes to Accrued Liabilites and Other Liabilities | (116,149) |
| Net cash provided by operating Activities | (195,950) |
| **Cash Flows from Investing Activities** | |
| Capital Expenditures | (276,240) |
| Net sales (purchases) of ST investements | 0 |
| Net cash provided by investing activities | (276,240) |
| **Cash Flows from Financing Activities** | |
| Changes in Debt Proceeds | 171,743 |
| Changes in Capital Stock | 433,602 |
| Net cash provided by financing activities | 605,345 |
| **Net increase (decrease) in cash** | **133,155** |
| Cash - Beginning of Period | 14,153 |
| Cash - End of Period | 147,308 |

**Sol City Title, LLC**
**Statement of Cash Flows**
For the Period Ending June 30, 2022

|  | June 30, 2022 |
|---|---|
| **Cash Flows from Operating Activities:** | |
| Net Income (Loss) | (182,450) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Depreciation | 7,172 |
| Amortization | 703 |
| Changes in Operating Assets and Liabilities: | |
| Changes in Net Accounts Receivable | |
| Changes in Accounts Receivable | 41,905 |
| Changes in Prepaid Expenses and Other Assets | 1,744 |
| Changes to Accounts Payable | 150,634 |
| Changes to Accrued Liabilities and Other Liabilities | (13,943) |
| Net cash provided by operating Activities | 5,764 |
| **Cash Flows from Financing Activities** | |
| Changes in Debt Proceeds | (47,100) |
| Changes in Capital Stock | 68,795 |
| Net cash provided by financing activities | 21,695 |
| **Net increase (decrease) in cash** | **27,460** |
| **Cash - Beginning of Period** | **27,167** |
| **Cash - End of Period** | **82,441** |

## SCHEDULE 3.9
## PERMITS

**Texas Department of Insurance:**  **Sol City Title, LLC dba Magnolia Title**
**Effective Date: 3/04/2019**  **Expiration Date: 4/01/2023**
**License Number: 2385842**  **Firm ID Number: 153863**

**Texas Department of Insurance:**  **Coast to Coast Title, LLC dba Magnolia Title**
**Effective Date: 9/10/2021**  **Expiration Date: 10/01/2023**
**License Number 2726647**  **Firm ID Number: 184346**

**Florida Department of Financial Services:**  **Magnolia Title Florida, LLC dba**
**Magnolia Title**
**Issued On: 10/26/2021**
**Agency License Number: W796549**

**State of Arkansas Insurance Department:**  **Magnolia Title Arkansas, LLC**
**Effective Date: 10/29/2021**  **Expiration Date: 9/30/2023**
**License No. 3001626863**

**EXHIBIT 3.10**

**PROCEEDINGS**

**NONE**

## SCHEDULE 3.11(b)
## REAL PROPERTY

Commercial building lease dated March 1, 2022, between Shirley Enterprises. LLC and Magnolia Title Arkansas, LLC regarding leased premises located at 321 Section Line Road, Suite J, Hot Springs. Arkansas 71913.  The lease has a maturity date of February 28, 2025, with an option to renew for an additional 36 months upon mutual agreement of tenant and landlord.

Commercial building lease dated June 1, 2022, between 10-3-10 LLC and Magnolia Title Arkansas, LLC regarding leased premises located at 10310 West Markham, Suite 220, Little Rock, Arkansas 72205.  The lease has a maturity date of May 31, 2025.

Commercial building lease dated March 1, 2022, between Parscrog Realty, LLC and Magnolia Title Arkansas, LLC regarding leased premises located at 1622 Donaghey, Conway, Arkansas 72032.  The lease has a maturity date of December 31, 2022.

**SCHEDULE 3.12**
**ENVIRONMENTAL**

None

## SCHEDULE 3.14
## EMPLOYEES

| Last name | First name | Primary job title | Annual Comp | FLSA Classification | Accrued PTO Hours |
|---|---|---|---|---|---|
| Bailey | Nicole | Branch Manager/Escrow Officer | $ 85,000 | Exempt | (1) |
| Bishop | Robin | Business Consultant | $ 66,000 | Non Exempt | 53 |
| Borecky | Wanda | Title Manager | $ 60,000 | Non Exempt | 15 |
| Boshears | Beth | Escrow Officer | $ 50,000 | Non Exempt | 29 |
| Brannon | Lisa | Escrow Assistant | $ 40,000 | Non Exempt | 45 |
| Freeman | Connie | Title Researcher | $ 35,000 | Non Exempt | 46 |
| Neal | Angela | Escrow Officer | $ 60,000 | Non Exempt | 21 |
| Rivera | Josefat | Title Researcher | $ 45,000 | Non Exempt | 70 |
| Rogers | Leslie | Escrow Assistant | $ 40,000 | Non Exempt | 80 |
| Wood | Shauna | Escrow Officer | $ 45,000 | Non Exempt | 10 |
| Yancey | Sandra | Escrow Assistant | $ 38,500 | Non Exempt | 10 |

**SCHEDULE 3.15**
**EMPLOYEE BENEFIT PLANS**

**DENTAL BENEFITS SUMMARY**
# Beam Dental

**PLAN:** SmartPremium Plus 100/80/50/50-1500-1500a

## WHY BEAM

Beam is the future of group dental insurance for employers large and small. We're pairing innovative tech with personal service to deliver an insurance experience unlike any other.

- 90th Percentile UCR OON
- Digital implementation and admin
- Nationwide network (Over 400,000 access points)
- Beam Perks included

## BEAM PERKS INCLUDED

Essentials for great dental care delivered right to member's doors.

- **Beam Brush**
  Smart, electric toothbrush.

- **Beam Paste**
  High-quality, custom formulated toothpaste.



3 colors available!

Remember: Visit an in-network dentist to save the most money!

## QUESTIONS?

If you have questions, call us at (800) 648-1179. We'd love to help! Or visit app.beam.dental and login to view more info. Please check your Certificate of Insurance for a description of coverage, limitations, and exclusions under the plan. Some Services require prior authorization.

**FIND A DENTIST**
dentists.beam.dental

**QUESTIONS?**
support@beam.dental

**CHECK CLAIMS & ELIGIBILITY**
https://providers.beam.dental



BM-SOB-0002-202004    Valid as of 08/01/21

## PLAN COVERAGE

| | IN NETWORK (PPO FEE) | OUT-OF-NETWORK (90TH PERCENTILE UCR) |
|---|---|---|
| **PREVENTIVE & DIAGNOSTIC** <br> **Diagnostic and preventive:** exams, cleanings, fluoride, space maintainers, x-rays, and sealants | 100% | 100% |
| **BASIC** <br> **Minor restorative:** fillings <br> **Prosthetic maintenance:** relines and repairs to bridges, implants, and dentures <br> **Emergency palliative treatment:** to temporarily relieve pain <br> **Endodontics:** root canals <br> **Periodontics:** to treat gum disease <br> **Oral surgery:** extractions and dental surgery | 80% | 80% |
| **MAJOR** <br> **Major restorative:** crowns, inlays, and onlays <br> **Prosthodontics:** dentures <br> **Prosthetics:** bridges <br> **Implants:** | 50% | 50% |
| **ORTHODONTIA** <br> **Adult Orthodontics:** braces over the age of 19 <br> **Child Orthodontics:** braces with age limit of 19 | 50% | 50% |

## PLAN MAXES

Annual maximum applies to diagnostic & preventive, basic services, and major services. Lifetime maximum applies to orthodontic services.
**Annual Max based on Policy Year.**

| | |
|---|---|
| **ANNUAL MAX** | $1,500 /yr |
| **ORTHO LIFETIME MAX** | $1,500 /lifetime |

## PLAN DEDUCTIBLE

The deductible is waived for diagnostic & preventive services.

| | |
|---|---|
| **INDIVIDUAL** | $50.00 /yr |
| **FAMILY** | $150.00 /yr |

## CLAIMS INFORMATION

| Beam Insurance Administrators <br> PO Box 75372 <br> Cincinnati, OH 45275 | Electronic payer ID <br> BEAM1 | NEA ID <br> BEAM1 | Fax number <br> (844) 688 - 4821 | Phone number <br> (800) 648 - 1179 | Claim form accepted <br> ADA form 2006 or later |
|---|---|---|---|---|---|

Beam Dental PPO Standard coverages, as of August 1, 2020



 **beam** smarter dental care

**Coverage Summary**

Providers can access additional coverage information online at
providers.beam.dental

## COVERAGE RULES

| CODE | PROCEDURE | COVERED UNDER | FREQUENCY | NOTES |
|------|-----------|---------------|-----------|-------|
| D0120, D0150, D9310 | Periodic oral exam, Comprehensive oral exam, Consultation | Diagnostic | Limit of three per 12 months | Limited to 3 oral evaluation procedures, in any combination (D0120, D0150, D9310) per 12 month period |
| D0140 | Limited oral exam | Diagnostic | Two per 12 months | Can do treatment on same day; no shared freq with D0120; shared freq with D0170 |
| D0210 | Radiographs-FMX | Diagnostic | One per 60 months | Shared freq with D0330; not reimbursed within 6 months of Bitewing Radiographs |
| D0220 | Radiographs-periapical (first) | Diagnostic | Not covered if inclusive of a procedure with x-rays. | Bitewings and 7 or more periapicals will be reimbursed as FMX. Not covered on same day as D0210, D0330 or if considered a part of billed procedures |
| D0230 | Radiographs-periapical (each additional) | Diagnostic | Not covered if inclusive of a procedure with x-rays. | Bitewings and 7 or more periapicals will be reimbursed as FMX. Not covered on same day as D0210, D0330 or if considered a part of billed procedures |
| D0270-D0274 | Radiographs-bitewings | Diagnostic | Every 6 months | Can perform 6 months after D0210 |
| D0330 | Radiographs-panoramic | Diagnostic | One per 60 months | Shared freq with D0210 |
| D1110 | Prophylaxis | Preventive | Two per benefit period | Three per 12 months if pregnant 2nd/3rd trimester, four per 12 months if diabetic (N, V); not covered within 3 months of D4910 |
| D1206, D1208 | Fluoride | Preventive | One per 12 months | Covered under age 16 |
| D1351, D1352 | Sealants, Resins | Preventive | One per 36 months, per tooth | Covered under age 16, 1st & 2nd permanent molars |
| D2140-D2161 | Fillings | Minor Restorative | One per 24 months, per tooth | Multiple restorations on one surface are payable as one surface. Multiple surfaces on a single tooth will not be paid as separate restorations. |
| D2330-D2394 | Fillings | Minor Restorative | One per 24 months, per tooth | Multiple restorations on one surface are payable as one surface. Multiple surfaces on a single tooth will not be paid as separate restorations. Posterior composites covered. |
| D2740, D2750 ... | Crowns (N,X,A) | Major | One per 60 months, paid on seat date; seat date required | See * note below for details |
| D2950 | Core Build-up (X) | Major | One per 60 months | See * note below for details |
| D4341-D4342 | Periodontal scaling and root planing (N, P, X) | Periodontics | One per 24 months, per quadrant | Can perform all 4 quads in one day |
| D4910 | Periodontal maintenance (H) | Periodontics | Two per year unless pregnant (3) or diabetes (4) | After peridontal treatment; can be alternated with D1110 for one per three months |
| D6010 | Endosteal Implants (N,M,X2) | Major | One per lifetime | In lieu of a single tooth replacement when a 2 or 3 unit bridge has been approved for coverage when adjacent teeth are not in need of crowns on their own merit; if there are no additional teeth missing throughout the arch. Alternate benefit of a partial denture will be considered if criteria is not met. |

**Not covered:** D0350, D0364, D0470, D1330, D2962, D3110, D3120, D8093, D9230, D9248
*Exclusions include, but are not limited to: correction of attrition, abrasion, erosion, or abfraction; for teeth that are not broken down by extensive decay or accidental injury; to restore teeth with microfractures fracture lines, undermined cusps, or existing large restorations without overt pathology.

## FREQUENTLY ASKED QUESTIONS

| | | | |
|---|---|---|---|
| **Continuation of service?** | Covered starting on patient's effective date | N = Narrative of medical necessity | |
| **Continuation of benefits?** | Earlier effective date is primary | P = Perio charting | |
| **Frequency of ortho payments?** | Monthly — submit claims for on-going treatment | X = Labeled & dated, pre-op x-rays | |
| **Are prior extractions covered?** | Yes — no missing tooth clause | X2 = Labeled & dated, pre-op and post op x-rays | |
| **Timely Filing limit?** | 12 months from date of service unless otherwise specified by state law. Please refer to your Certificate | H = Periodontal history | |
| **Is pre-authorization mandatory?** | No — but estimates recommended for $300+ services | A = date of prior insertion of existing crown | |
| | | M = panoramic x-ray or FMX (if available), all missing teeth | |
| | | V = Verification from physician (if pregnant requires due date) | |

**DISCLAIMER:** Depending on the coverage you selected, your benefits may differ from those outlined above. Please review your Certificate of Insurance for full benefit descriptions and limitations. If there are any discrepancies between this summary and the plan documents, the plan documents will prevail.

 

| | |
|---|---|
| 📍 **FIND A DENTIST** https://dentists.beam.dental | ❓ **QUESTIONS?** support@beam.dental |
| 📄 **CHECK ELIGIBILITY** https://providers.beam.dental |  **beam** |

Dental and vision insurance products underwritten by National Guardian Life Insurance Company† (NGL), Madison, WI, marketed by Beam Insurance Services LLC. Dental policy form series numbers NDNGRP 04/06, NDNGRP 2010, and NDNGRP 2020. Vision Policy form series numbers NVIGRP 11-13, NVIGRP 5-07 and NVIGRP 2020. Dental and vision products underwritten by Nationwide Life Insurance Company in DE, ID, and NY. Dental and vision products administered by Beam Insurance Administrators LLC (Beam Dental Insurance Administrators LLC, in Texas). Vision insurance products underwritten by Vision Service Plan (VSP) in WA. Not all products available in all states. Vision insurance products administered by Vision Service Plan Insurance Company. Life insurance product is underwritten by Nationwide Life Insurance Company, marketed by Beam Insurance Services LLC and administered by Beam Insurance Administrators LLC (Beam Dental Insurance Administrators LLC in Texas). Group Short-Term Disability and Long-Term Disability insurance products are underwritten by Nationwide Life Insurance Company, marketed by Beam Insurance Services LLC and administered by Beam Insurance Administrators LLC (Beam Dental Insurance Administrators LLC in Texas). Life, Short-Term Disability, and Long-Term Disability products are not available to members living in Puerto Rico and product availability may vary by state. Program restrictions and exclusions apply. Life, Short-Term Disability and Long-Term Disability Additional Value Added Services are not available in the state of Louisiana.

† National Guardian Life Insurance Company, Madison, WI, is not affiliated with The Guardian Life Insurance Company of America, a.k.a. The Guardian, or Guardian Life.

FIND A DENTIST
https://dentists.beam.dental

QUESTIONS?
support@beam.dental

CHECK ELIGIBILITY
https://providers.beam.dental




BM-WEB-0010-201810



## Life Benefit Summary

### About Your Benefits:

Life insurance provides crucial financial protection for your family if something were to ever happen to you.  Benefits can be used towards income replacement, a mortgage, tuition, outstanding debt, and more – allowing you to take care of your loved ones even if you are not there.  Better yet, this important coverage is being made available to you at economical group rates.  Take advantage and enroll today!

### What Your Benefits Cover:

|  | EMPLOYER PAID TERM LIFE |
|---|---|
| **Employee Benefit** | $50,000 |
| **Accidental Death and Dismemberment** | Standard employee coverage. Maximum 1 times life amount. |
| **Guarantee Issue:** The 'guarantee' means you are not required to answer health questions to qualify for coverage up to and including the specified amount, when you sign up for coverage during the initial enrollment period. | We Guarantee all amounts of coverage for Employees less than age 65.* |
| **Premiums** | Will be paid for by your employer. |
| **Conversion:** Allows you to continue your coverage after your group plan has terminated | Yes, with restrictions; see certificate of benefits. |
| **Accelerated Life Benefit:** A lump sum benefit is paid to you if you are diagnosed with a terminal condition, as defined by the plan. | Yes |
| **Waiver of Premiums:** Premium will not need to be paid if you are totally disabled | For employee disabled prior to age 60, with premiums waived until age 65, if conditions met |
| **Benefit Reductions:** Benefits are reduced by a certain percentage as an employee ages. | 35% at age 65, 60% at age 70, 75% at age 75, 85% at age 80 |

Subject to coverage limits
* Employees ages 65-69 are eligible for $10,000 Guarantee Issue.  Employees ages 70+ will need to submit Evidence of Insurability for all amounts.

1

*This document is a summary of the major features of the referenced insurance coverage. It is intended for illustrative purposes only and does not constitute a contract. The insurance plan documents, including the policy and certificate, comprise the contract for coverage. The full plan description, including the benefits and all terms, limitations and exclusions that apply will be contained in your insurance certificate. The plan documents are the final arbiter of coverage. Coverage terms may vary by state and actual sold plan.*

## LIMITATIONS AND EXCLUSIONS:

### A SUMMARY OF PLAN LIMITATIONS AND EXCLUSIONS FOR LIFE AND AD&D COVERAGE

You must be working full-time on the effective date of your coverage; otherwise, your coverage becomes effective after you have completed a specific waiting period. Employees must be legally working in the United States in order to be eligible for coverage.

Underwriting must approve coverage for employees on temporary assignment: (a) exceeding one year; or (b) in an area under travel warning by the US Department of State. Subject to state specific variations. Evidence of Insurability is required on all late enrollees. This coverage will not be effective until approved by a Guardian underwriter. This proposal is hedged subject to satisfactory financial evaluation. Please refer to certificate of coverage for full plan description.

A person is ADL-disabled if he or she is (a) physically unable to perform two or more ADLs without continuous physical assistance; or (b) cognitively impaired, and requires verbal cueing to protect himself/herself or others. ADLs are bathing, dressing, toileting, transferring, continence, and eating.

Accelerated Life Benefit is not paid to an employee under the following circumstances; one who is required by law to use the benefit to pay creditors; is required by court order to pay the benefit to another person; is required by a government agency to use the payment to receive a government benefit; or loses his or her group coverage before an accelerated benefit is paid.

We pay no benefits if the insured's death is due to suicide within two years from the insured's original effective date. This two year limitation also applies to any increase in benefit. This exclusion may vary according to state law. Late entrants and benefit increases require underwriting approval.

GP-I-R-EOPT-96

Guarantee Issue/Conditional Issue amounts may vary based on age and case size. See your Plan Administrator for details.

**For AD&D:** We pay no benefits for any loss caused: by willful self-injury; sickness, disease or medical treatment; by participating in a civil disorder or committing a felony; Traveling on any type of aircraft while having duties er on that aircraft; by declared or undeclared act of war or armed aggression; while a member of any armed force (May vary by state); while driving a motor vehicle without a current, valid driver's license; by legal intoxication; or by voluntarily using a non-prescription controlled substance. Contract #GP-I-R-ADCL 1 -00 et al. We won't pay more than 100% of the Insurance amount for all losses due to the same accident, except as stated. The loss must occur within 365 days of the accident. Please see contract for specific definition; definition of loss may vary depending on the benefit payable.

2

# Guardian

## Short-Term Disability Benefit Summary

### About Your Benefits:

Your paycheck is your greatest asset. How else would you pay for expenses like your rent or mortgage, food and transportation? Disability insurance helps replace lost income if you have an accident or illness that prevents you from working. Unfortunately, disabilities occur more often than you may think. Be prepared and take advantage of an opportunity to help protect your financial well being. Enroll today!

### What Your Benefits Cover:

| | Non Contributory Short-Term Disability |
|---|---|
| **Coverage amount** | 60% of salary to maximum$1500/week |
| **Maximum payment period:** Maximum length of time you can receive disability benefits. | 13 weeks |
| **Accident benefits begin:** The length of time you must be disabled before benefits begin. | Day 8 |
| **Illness benefits begin:** The length of time you must be disabled before benefits begin. | Day 8 |
| **Minimum work hours/week:** Minimum number of hours you must regularly work each week to be eligible for coverage. | 30 |
| **\*\*Pre-existing conditions:** A pre-existing condition includes any condition/symptom for which you, in the specified time period prior to coverage in this plan, consulted with a physician, received treatment, or took prescribed drugs. | 3 months look back; 12 months after 2 week limitation |

\*\*Applies to groups with 2- 9 Eligible Employees; N/A for 10+ Eligible

## UNDERSTANDING YOUR BENEFITS—DISABILITY (Some information may vary by state)

- **Earnings definition:** Your covered salary excludes bonuses and commissions.

1

*This document is a summary of the major features of the referenced insurance coverage. It is intended for illustrative purposes only and does not constitute a contract. The insurance plan documents, including the policy and certificate, comprise the contract for coverage. The full plan description, including the benefits and all terms, limitations and exclusions that apply will be contained in your insurance certificate. The plan documents are the final arbiter of coverage. Coverage terms may vary by state and actual sold plan.*

## A SUMMARY OF DISABILITY PLAN LIMITATIONS AND EXCLUSIONS

- Evidence of Insurability is required on all late enrollees. This coverage will not be effective until approved by a Guardian underwriter. This proposal is hedged subject to satisfactory financial evaluation. Please refer to certificate of coverage for full plan description.

- You must be working full-time on the effective date of your coverage; otherwise, your coverage becomes effective after you have completed a specific waiting period.

- Employees must be legally working in the United States in order to be eligible for coverage. Underwriting must approve coverage for employees on temporary assignment: (a) exceeding one year; or (b) in an area under travel warning by the US Department of State. Subject to state specific variations.

- For Short-Term Disability coverage, benefits for a disability caused or contributed to by a pre-existing condition are limited, unless the disability starts after you have been insured under this plan for a specified period of time. We do not pay short term disability benefits for any job-related or on-the-job injury, or conditions for which Workers' Compensation benefits are payable.

- We do not pay benefits for charges relating to a covered person: taking part in any war or act of war (including service in the armed forces) committing a felony or taking part in any riot or other civil disorder or intentionally injuring themselves or attempting suicide while sane or insane. We do not pay benefits for charges relating to legal intoxication, including but not limited to the operation of a motor vehicle, and for the voluntary use of any poison, chemical, prescription or non-prescription drug or controlled substance unless it has been prescribed by a doctor and is used as prescribed. We limit the duration of payments for long term disabilities caused by mental or emotional conditions, or alcohol or drug abuse. We do not pay benefits during any period in which a covered person is confined to a correctional facility, an employee is not under the care of a doctor, an employee is receiving treatment outside of the US or Canada, and the employee's loss of earnings is not solely due to disability.

- This policy provides disability income insurance only. It does not provide "basic hospital", "basic medical", or "medical" insurance as defined by the New York State Insurance Department.

- If this plan is transferred from another insurance carrier, the time an insured is covered under that plan will count toward satisfying Guardian's pre-existing condition limitation period. State variations may apply.

- When applicable, this coverage will integrate with NJ TDB, NY DBL, CA SDI, RI TDI, Hawaii TDI and Puerto Rico DBA.

  Contract #.s GP-1-STD94-1.0 et al; GP-1-STD2K-1.0 et al; , GP-1-STD07-1.0 et al.

 **Principal**®

# Vision Benefit Summary
## Plan 2

This chart provides you a brief summary of the key benefits of the vision coverage available from Principal Life Insurance Company. Following the chart, you will find additional information to answer questions you may have. For a complete list of all your vision coverage benefits and restrictions, please refer to your booklet or contact your employer.

| Eligibility | |
|---|---|
| Job Class | Active Members |

| Your Coverage with a VSP Preferred Provider | | |
|---|---|---|
| Doctor Network | VSP Choice Network | |
| **Covered Charges** | **Benefit** | **Frequency** |
| Exams | $10 copay | One exam every 12 months |
| Prescription Glasses | $25 copay | |
| Lenses | Single vision, lined bifocal, lined trifocal and lenticular lenses; polycarbonate lenses for dependent children under age 18 | Two lenses (one pair) every 12 months |
| | Members pay for lens enhancements as an out-of-pocket expense after the copay; they are discounted 20-25% by VSP providers.*** | |
| Frames* | $150 allowance for a wide selection of frames; 20% off amount over allowance*** | One set every 24 months |
| Elective Contacts | Up to $60 copay for your elective contact lens exam (fitting and evaluation) | Once every 12 months |
| | $150 allowance for elective contacts | Contacts are instead of frames and lenses |
| Necessary Contacts** | $25 copay | Once every 12 months |
| | Covered in full for members who have specific conditions | Contacts are instead of frames and lenses |

| Additional Savings *** | |
|---|---|
| Glasses and Sunglasses | Members save an average of 20-25% off additional glasses and sunglasses, including lens options, from any VSP doctor within 12 months of your last covered vision exam |
| Laser Vision Correction | Average 15% off the regular price or 5% off the promotional price; discounts only available from contracted facilities |

VISION

| Your Coverage with Other Providers (Non-Network) | | |
|---|---|---|
| Covered Charges | Scheduled Benefit Amount | Frequency |
| Vision Exams | Up to $45 | One per 12 month period |
| Single Vision lenses | Up to $30 | One pair per 12 month period |
| Lined bifocal lenses | Up to $50 | One pair per 12 month period |
| Lined trifocal lenses | Up to $65 | One pair per 12 month period |
| Lenticular lenses | Up to $100 | One pair per 12 month period |
| Frames | Up to $70 | One set per 24 month period |
| Elective Contacts | Up to $105 | In lieu of lenses and frame benefits |
| Necessary Contacts** | Up to $210 | In lieu of lenses and frame benefits |

*VSP has agreements established with some Participating Retail Chain Providers that may also provide benefits for this covered service.  Up to a $80 allowance is given for a wide selection of frames. Please talk to your provider or contact VSP customer care for further details.

** Necessary contact lenses are prescribed to correct extreme visual problems that cannot be corrected with regular lenses.

*** Based on applicable laws; benefits may vary by doctor location.

There is Coordination of Benefits, which is a procedure for limiting benefits from two or more carriers to 100% of the claimant's covered expenses.

VISION

## Understanding Your Vision Benefits

### Am I Eligible For Coverage?

To be eligible for coverage, you must qualify as an eligible member and be considered actively at work.

You must be enrolled for vision coverage before it can be offered to your dependents. Eligible dependents include your spouse (if not also enrolled as an employee), qualified domestic partner, and children, including those of your qualified domestic partner. Additional eligibility requirements may apply.

Open enrollment applies. Any employee or dependent that didn't enroll with 31 days of being eligible can only enroll during the open enrollment period.

### How Do I Find a VSP Provider?

Use the Provider Directory on www.vsp.com to locate nearby VSP providers or to see if your current eye care professional participates in the VSP network.  To speak to a representative by phone, please call 800-877-7195.

### How Do I Submit A Claim?

When visiting a VSP provider for services, the provider submits the claim for payment.  If visiting a non-network provider for services, you are responsible for submitting the claim to VSP.  Obtain a claim form by logging on to vsp.com or by calling 800-877-7195.  Include a copy of your itemized receipt with your claim form and mail it to the following address.

Vision Service Plan
P.O. Box 385018
Birmingham, AL  35238-5018

VISION

## What Are The Restrictions Of My Coverage?

This Benefit Summary is a summary only.  For a complete list of benefit restrictions, please refer to your booklet.

| Non-Medically Necessary Services | The coverage does not pay for visual analysis or vision aids that are not medically necessary. |
|---|---|
| Benefit Limitations | The following items are excluded under this coverage:<br>· Two pairs of glasses instead of bifocals<br>· Replacement of lenses, frames or contacts<br>· Medical or surgical treatment<br>· Orthoptics, vision training or supplemental testing<br>· Plano lenses (lenses with refractive correction of less than ± .50 diopter) |
| Contact Lens Limitations | The following items are not covered under the contact lens coverage:<br>· Insurance policies or service agreements<br>· Artistically painted or non-prescription lenses<br>· Additional office visits for contact lens pathology<br>· Contact lens modification, polishing or cleaning<br>· Refitting of contact lenses after the initial (90 day) fitting period |
| Other Limitations | There are additional limitations to your coverage.  A complete list is included in your booklet. |





Principal Life Insurance Company, Des Moines, Iowa 50392-0002, www.principal.com

This is a summary of vision coverage underwritten by or with administrative services provided by Principal Life Insurance Company.  This benefit summary is for administrative purposes and is not a complete statement of the rights, benefits, limitations or exclusions of the coverage. You'll receive a benefit booklet with details about your coverage. If there is a discrepancy between this summary and your benefit booklet, the benefit booklet prevails.
Principal, Principal and symbol design and Principal Financial Group are trademarks and service marks of Principal Financial Services, Inc., a member of the Principal Financial Group.
GP61101-12 | 09/2019 | © 2019 Principal Financial Services, Inc.

**Summary of Benefits and Coverage:** What this Plan Covers & What You Pay for Covered Services **Coverage Period: Based on group plan year**

UnitedHealthcare® Choice Plus CN3D /K81Y **Coverage for: Employee/Family | Plan Type: HMP**

Case 4:24-cv-01167  Document 70-11  Filed on 03/21/25 in TXSD  Page 63 of 77

⚠️ The Summary of Benefits and Coverage (SBC) document will help you choose a health plan. The SBC shows you how you and the plan would share the cost for covered health care services. NOTE: Information about the cost of this plan (called the premium) will be provided separately. This is only a summary. For more information about your coverage, or to get a copy of the complete terms of coverage, visit www.welcometouhc.com or by calling 1-800-782-3158. For general definitions of common terms, such as allowed amount, balance billing, coinsurance, copayment, deductible, provider, or other underlined terms, see the Glossary. You can view the Glossary at www.healthcare.gov/sbc-glossary or call 1-866-487-2365 to request a copy.

| Important Questions | Answers | Why This Matters: |
|---|---|---|
| **What is the overall deductible?** | Designated Network and Network: $5,500 Individual / $10,000 Family out-of-Network: $10,000 Individual / $20,000 Family Per calendar year. | Generally, you must pay all of the costs from providers up to the deductible amount before this plan begins to pay. If you have other family members on the plan, each family member must meet their own individual deductible until the total amount of deductible expenses paid by all family members meets the overall family deductible. |
| **Are there services covered before you meet your deductible?** | Yes. Preventive care and categories with a copay are covered before you meet your deductible. | This plan covers some items and services even if you haven't yet met the deductible amount. But a copayment or coinsurance may apply. For example, this plan covers certain preventive services without cost-sharing and before you meet your deductible. See a list of covered preventive services at www.healthcare.gov/coverage/preventive-care-benefits/. |
| **Are there other deductibles for specific services?** | No. | You don't have to meet deductibles for specific services. |
| **What is the out-of-pocket limit for this plan?** | Designated Network and Network: $8,550 Individual / $17,100 Family out-of-Network: $20,000 Individual / $40,000 Family | The out-of-pocket limit is the most you could pay in a year for covered services. If you have other family members in this plan, they have to meet their own out-of-pocket limits until the overall family out-of-pocket limit has been met. |
| **What is not included in the out-of-pocket limit?** | Premiums, balance-billing charges (unless balanced billing is prohibited), health care this plan doesn't cover and penalties for failure to obtain preauthorization for services. | Even though you pay these expenses, they don't count toward the out-of-pocket limit. |
| **Will you pay less if you use a network provider?** | Yes. See www.welcometouhc.com or call 1-800-782-3158 for a list of network providers. | You pay the least if you use a provider in the Designated Network. You pay more if you use a provider in the Network. You will pay the most if you use an out-of-Network provider, and you might receive a bill from a provider for the difference between the provider's charge and what your plan pays (balance billing). Be aware, your Network provider might use an out-of-Network provider for some services (such as lab work). Check with your provider before you get services. |
| **Do you need a referral to see a specialist?** | No. | You can see the specialist you choose without a referral. |

CN3D - Underwritten by UnitedHealthcare of Arkansas, Inc.    **Page 1 of 9**

 All **copayment** and **coinsurance** costs shown in this chart are after your **deductible** has been met, if a **deductible** applies.

| | | What You Will Pay | | | |
|---|---|---|---|---|---|
| **Common Medical Event** | **Services You May Need** | **Designated Network Provider (You will pay the least)** | **Network Provider** | **Out-of-Network Provider (You will pay the most)** | **Limitations, Exceptions, & Other Important Information** |
| **If you visit a health care provider's office or clinic** | Primary care visit to treat an injury or illness | $25 copay per visit, deductible does not apply | $25 copay per visit, deductible does not apply | 50% coinsurance | If you receive services in addition to office visit, additional copays, deductibles, or coinsurance may apply e.g. surgery. Virtual visits (Telehealth) - $25 copay per visit by a Designated Virtual Network Provider, deductible does not apply. No virtual coverage for out-of-Network. Children up to age 26: No Charge. |
| | Specialist visit | $60 copay per visit, deductible does not apply | $110 copay per visit, deductible does not apply | 50% coinsurance | If you receive services in addition to office visit, additional copays, deductibles, or coinsurance may apply e.g. surgery. |
| | Preventive care/screening /immunizatio-n | No Charge | No Charge | * Not Covered | Includes preventive health services specified in the health care reform law. You may have to pay for services that aren't preventive. Ask your provider if the services needed are preventive. Then check what your plan will pay for. *Certain services are covered when using an out-of-Network. *Deductible/coinsurance may not apply to certain services. |
| **If you have a test** | Diagnostic test (x-ray, blood work) | Lab: 30% coinsurance X-ray: 30% coinsurance | Lab: 50% coinsurance X-ray: 30% coinsurance | 50% coinsurance | For Designated Network Benefits, lab services must be received by a Designated Diagnostic Provider. Network Benefits are lab services received from a Network provider that is not a Designated Diagnostic Provider and is covered at 50% coinsurance . Preauthorization required for out-of-Network for certain services or benefit reduces to 50% of allowed. |

| Imaging (CT/PET scans, MRIs) | 50% coinsurance | 50% coinsurance | 50% coinsurance | $500 per occurrence deductible applies out-of-Network prior to the overall deductible. $500 per occurrence deductible for Network Benefits from a Network provider that is not a Designated Diagnostic Provider, applies prior to the overall deductible. Preauthorization required for out-of-Network or benefit reduces to 50% of allowed. |

| Common Medical Event | Services You May Need | Designated Network Provider (You will pay the least) | Network Provider | Out-of-Network Provider (You will pay the most) | Limitations, Exceptions, & Other Important Information |
|---|---|---|---|---|---|
| **If you need drugs to treat your illness or condition**<br><br>More information about **prescription drug coverage** is available at www.welcometouhc.com. | Tier 1 - Your Lowest-Cost Option | <u>Deductible</u> does not apply. Retail: $15 <u>copay</u> Mail-Order: $37.50 <u>copay</u> <u>Specialty Drugs</u>**: $15 <u>copay</u> | <u>Deductible</u> does not apply. Retail: $15 <u>copay</u> Mail-Order: $37.50 <u>copay</u> <u>Specialty Drugs</u>**: $15 <u>copay</u> | <u>Deductible</u> does not apply. Retail: $15 <u>copay</u> <u>Specialty Drugs</u>: $15 <u>copay</u> | <u>Provider</u> means pharmacy for purposes of this section. Retail: Up to a 31 day supply. Mail-Order*: Up to a 90 day supply or *Preferred 90 Day Retail <u>Network</u> Pharmacy. If you use an out-of-<u>Network</u> pharmacy (including a mail order pharmacy), you may be responsible for any amount over the <u>allowed amount</u>. **Your cost shown is for a Preferred Specialty <u>Network</u> Pharmacy. Non-Preferred Specialty <u>Network</u> Pharmacy: <u>Copay</u> is 2 times the Preferred Specialty <u>Network</u> Pharmacy <u>Copay</u> or the <u>coinsurance</u> (up to 50% of the <u>Prescription Drug</u> Charge) based on the applicable Tier.<br><u>Copay</u> is per prescription order up to the day supply limit listed above.<br>You may need to obtain certain drugs, including certain <u>specialty drugs</u>, from a pharmacy designated by us. Certain drugs may have a <u>preauthorization</u> requirement or may result in a higher cost. See the website listed for information on drugs covered by your <u>plan</u>. Not all drugs are covered. Prescription Drug List (PDL): Essential . <u>Network</u>: National You may be required to use a lower-cost drug(s) prior to benefits under your policy being available for certain prescribed drugs. Certain preventive medications and Tier 1 contraceptives are covered at No Charge.<br>If a dispensed drug has a chemically equivalent drug, the cost difference between drugs in addition to any applicable <u>copay</u> and/or <u>coinsurance</u> may be applied. |
| | Tier 2 - Your Midrange-Cost Option | <u>Deductible</u> does not apply. Retail: $55 <u>copay</u> Mail-Order: $137.50 <u>copay</u> <u>Specialty Drugs</u>**: $55 <u>copay</u> | <u>Deductible</u> does not apply. Retail: $55 <u>copay</u> Mail-Order: $137.50 <u>copay</u> <u>Specialty Drugs</u>**: $55 <u>copay</u> | <u>Deductible</u> does not apply. Retail: $55 <u>copay</u> <u>Specialty Drugs</u>: $55 <u>copay</u> | |
| | Tier 3 - Your Midrange-Cost Option | <u>Deductible</u> does not apply. Retail: $135 <u>copay</u> Mail-Order: $337.50 <u>copay</u> <u>Specialty Drugs</u>**: $135 <u>copay</u> | <u>Deductible</u> does not apply. Retail: $135 <u>copay</u> Mail-Order: $337.50 <u>copay</u> <u>Specialty Drugs</u>**: $135 <u>copay</u> | <u>Deductible</u> does not apply. Retail: $135 <u>copay</u> <u>Specialty Drugs</u>: $135 <u>copay</u> | |
| | Tier 4 - Additional High-Cost Options | <u>Deductible</u> does not apply. Retail: $250 <u>copay</u> Mail-Order: $625 <u>copay</u> <u>Specialty Drugs</u>**: $500 <u>copay</u> | <u>Deductible</u> does not apply. Retail: $250 <u>copay</u> Mail-Order: $625 <u>copay</u> <u>Specialty Drugs</u>**: $500 <u>copay</u> | <u>Deductible</u> does not apply. Retail: $250 <u>copay</u> <u>Specialty Drugs</u>: $500 <u>copay</u> | |

| Common Medical Event | Services You May Need | Designated Network Provider (You will pay the least) | Network Provider | Out-of-Network Provider (You will pay the most) | Limitations, Exceptions, & Other Important Information |
|---|---|---|---|---|---|
| **If you have outpatient surgery** | Facility fee (e.g., ambulatory surgery center) | 30% coinsurance | 30% coinsurance | 50% coinsurance | Preauthorization required for certain services for out-of-Network or benefit reduces to 50% of allowed. |
| | Physician/surgeon fees | 30% coinsurance | 30% coinsurance | 50% coinsurance | None |
| **If you need immediate medical attention** | Emergency room care | $500 copay per visit | $500 copay per visit | $500 copay per visit | None |
| | Emergency medical transportation | 30% coinsurance | 30% coinsurance | 30% coinsurance | None |
| | Urgent care | $25 copay per visit, deductible does not apply | $25 copay per visit, deductible does not apply | 50% coinsurance | If you receive services in addition to urgent care visit, additional copays, deductibles, or coinsurance may apply e.g. surgery. |
| **If you have a hospital stay** | Facility fee (e.g., hospital room) | 30% coinsurance | 30% coinsurance | 50% coinsurance | Preauthorization required for out-of-Network or benefit reduces to 50% of allowed. |
| | Physician/surgeon fees | 30% coinsurance | 30% coinsurance | 50% coinsurance | None |
| **If you need mental health, behavioral health, or substance abuse services** | Outpatient services | $25 copay per visit, deductible does not apply | $25 copay per visit, deductible does not apply | 50% coinsurance | Network partial hospitalization /intensive outpatient treatment: 30% coinsurance Preauthorization required for certain services for out-of-Network or benefit reduces to 50% of allowed. |
| | Inpatient services | 30% coinsurance | 30% coinsurance | 50% coinsurance | Preauthorization required for out-of-Network or benefit reduces to 50% of allowed. |
| **If you are pregnant** | Office visits | No Charge | No Charge | 25% coinsurance | Cost sharing does not apply for preventive services. Depending on the type of services, a copayment, deductibles, or coinsurance may apply. |
| | Childbirth/delivery professional services | 30% coinsurance | 30% coinsurance | 50% coinsurance | Maternity care may include tests and services described elsewhere in the SBC (i.e. ultrasound.) |

| Common Medical Event | Services You May Need | Designated Network Provider (You will pay the least) | Network Provider | Out-of-Network Provider (You will pay the most) | Limitations, Exceptions, & Other Important Information |
|---|---|---|---|---|---|
| | Childbirth/delivery facility services | 30% coinsurance | 30% coinsurance | 50% coinsurance | Inpatient preauthorization apply for out-of-Network if stay exceeds 48 hours (C-Section: 96 hours) or benefit reduces to 50% of allowed. |
| **If you need help recovering or have other special health needs** | Home health care | 30% coinsurance | 30% coinsurance | 50% coinsurance | Limited to 60 visits per calendar year. Preauthorization required for out-of-Network or benefit reduces to 50% of allowed. |
| | Rehabilitation services | $25 copay per outpatient visit, deductible does not apply | $25 copay per outpatient visit, deductible does not apply | 50% coinsurance | Limits per calendar year: Physical, Speech, Occupational: 30 visits (combined). Pulmonary: Unlimited. Cardiac 36 visits. |
| | Habilitation services | $25 copay per outpatient visit, deductible does not apply | $25 copay per outpatient visit, deductible does not apply | 50% coinsurance | Limits per calendar year: Physical, Speech, Occupational: 30 visits (combined). Cost share applies for outpatient services only. Preauthorization required for out-of-Network inpatient services or benefit reduces to 50% of allowed. |
| | Skilled nursing care | 30% coinsurance | 30% coinsurance | 50% coinsurance | Skilled Nursing Facility is limited to 60 days per calendar year. (Inpatient Rehabilitation and Habilitation limited to 60 days each). Preauthorization required for out-of-Network or benefit reduces to 50% of allowed. |
| | Durable medical equipment | 30% coinsurance | 30% coinsurance | Not covered | None |
| | Hospice services | 30% coinsurance | 30% coinsurance | 50% coinsurance | Preauthorization required for out-of-Network before admission for an Inpatient Stay in a hospice facility or benefit reduces to 50% of allowed. |
| **If your child needs dental or eye care** | Children's eye exam | $10 copay per visit, deductible does not apply | $10 copay per visit, deductible does not apply | 50% coinsurance | One exam every 12 months. |
| | Children's glasses | $25 copay per frame, deductible does not apply | $25 copay per frame, deductible does not apply | 50% coinsurance | One pair every 12 months. Costs may increase depending on the frames selected. You may choose contact lenses instead of eyeglasses. The benefit does not cover both. |

| Common Medical Event | Services You May Need | Designated Network Provider (You will pay the least) | Network Provider | Out-of-Network Provider (You will pay the most) | Limitations, Exceptions, & Other Important Information |
|---|---|---|---|---|---|
| | Children's dental check-up | No Charge | No Charge | 20% coinsurance | Cleanings covered 2 times per 12 months. |

## Excluded Services & Other Covered Services:

| Services Your Plan Generally Does NOT Cover (Check your policy or plan document for more information and a list of any other excluded services.) | | | | |
|---|---|---|---|---|
| • Acupuncture | • Bariatric Surgery | • Cosmetic surgery | • Dental Care (Adult) | • Infertility Treatment |
| • Long-Term Care | • Non-emergency care when traveling outside the U.S. | • Private Duty Nursing | • Routine Eye Care (Adult) | • Routine Foot Care |
| • Weight Loss Programs | | | | |

| Other Covered Services (Limitations may apply to these services. This isn't a complete list. Please see your plan document.) | |
|---|---|
| • Chiropractic care-30 visits per calendar year | • Hearing Aids |

**Your Rights to Continue Coverage:** There are agencies that can help if you want to continue your coverage after it ends. The contact information for those agencies is: 1-866-444-3272 or www.dol.gov/ebsa/healthreform for the U.S. Department of Labor, Employee Benefits Security Administration, you may also contact us at 1-800-782-3158 . Other coverage options may be available to you too, including buying individual insurance coverage through the Health Insurance Marketplace. For more information about the Marketplace, visit www.HealthCare.gov or call 1-800-318-2596.

**Your Grievance and Appeals Rights:** There are agencies that can help if you have a complaint against your plan for a denial of a claim. This complaint is called a grievance or appeal. For more information about your rights, look at the explanation of benefits you will receive for that medical claim. Your plan documents also provide complete information on how to submit a claim, appeal, or a grievance for any reason to your plan. For more information about your rights, this notice, or assistance, contact: 1-800-782-3158 ; or the Employee Benefits Security Administration at 1-866-444-EBSA (3272) or www.dol.gov/ebsa/healthreform or the Arkansas Insurance Department at 1-501-371-2640 or 1-800-852-5494 or www.insurance.arkansas.gov. Additionally, a consumer assistance program can help you file your appeal Contact Arkansas Insurance Department, Consumer Services Division 855-332-2227 or visit www.insurance.arkansas.gov.

**Does this plan provide Minimum Essential Coverage? Yes.**

<u>Minimum Essential Coverage</u> generally includes <u>plans</u>, <u>health</u> <u>insurance</u> available through the <u>Marketplace</u> or other individual market policies, Medicare, Medicaid, CHIP, TRICARE, and certain other coverage. If you are eligible for certain types of <u>Minimum Essential Coverage</u>, you may not be eligible for the <u>premium tax credit</u>.

**Does this plan meet Minimum Value Standards? Yes.**

If your <u>plan</u> doesn't meet the <u>Minimum Value Standards</u>, you may be eligible for a <u>premium tax credit</u> to help you pay for a <u>plan</u> through the <u>Marketplace</u>.

**Language Access Services:**

Spanish (Español): Para obtener asistencia en Español, llame al 1-800-782-3158 .
Tagalog (Tagalog): Kung kailangan ninyo ang tulong sa Tagalog tumawag sa 1-800-782-3158 .
Chinese (中文): 如果需要中文的帮助，请拨打这个号码 1-800-782-3158 .
Navajo (Dine): Dinek'ehgo shika at' ohwol ninisingo, kwiijigo holne' 1-800-782-3158 .

---

*To see examples of how this <u>plan</u> might cover costs for a sample medical situation, see the next section.*

---

 **This is not a cost estimator.** Treatments shown are just examples of how this plan might cover medical care. Your actual costs will be different depending on the actual care you receive, the prices your providers charge, and many other factors. Focus on the cost sharing amounts (deductibles, copayments and coinsurance) and excluded services under the plan. Use this information to compare the portion of costs you might pay under different health plans. Please note these coverage examples are based on self-only coverage.

### Peg is Having a Baby
*(9 months of in-network pre-natal care and a hospital delivery)*

- The plan's overall deductible — $ 5,500
- Specialist  copayment — $110
- Hospital (facility) coinsurance — 30%
- Other coinsurance — 30%

This **EXAMPLE** event includes services like:
Specialist office visits *(prenatal care)*
Childbirth/Delivery Professional Services
Childbirth/Delivery Facility Services
Diagnostic tests *(ultrasounds and blood work)*
Specialist visit *(anesthesia)*

| Total Example Cost | $12,700 |
|---|---|

**In this example, Peg would pay:**

| Cost Sharing | |
|---|---|
| Deductible | $5,500 |
| Copayments | $10 |
| Coinsurance | $1,700 |
| *What isn't covered* | |
| Limits or exclusions | $60 |
| **The total Peg would pay is** | $7,270 |

### Managing Joe's Type 2 Diabetes
*(a year of routine in-network care of a well-controlled condition)*

- The plan's overall deductible — $5,500
- Specialist  copayment — $110
- Hospital (facility) coinsurance — 30%
- Other coinsurance — 30%

This **EXAMPLE** event includes services like:
Primary care physician office visits *(including disease education)*
Diagnostic tests *(blood work)*
Prescription drugs
Durable medical equipment *(glucose meter)*

| Total Example Cost | $5,600 |
|---|---|

**In this example, Joe would pay:**

| Cost Sharing | |
|---|---|
| Deductible | $200 |
| Copayments | $1,400 |
| Coinsurance | $0 |
| *What isn't covered* | |
| Limits or exclusions | $0 |
| **The total Joe would pay is** | $1,600 |

### Mia's Simple Fracture
*(in-network emergency room visit and follow up care)*

- The plan's overall deductible — $ 5,500
- Specialist  copayment — $110
- Hospital (facility) coinsurance — 30%
- Other coinsurance — 30%

This **EXAMPLE** event includes services like:
Emergency room care *(including medical supplies)*
Diagnostic test *(x-ray)*
Durable medical equipment *(crutches)*
Rehabilitation services *(physical therapy)*

| Total Example Cost | $2,800 |
|---|---|

**In this example, Mia would pay:**

| Cost Sharing | |
|---|---|
| Deductible | $2,200 |
| Copayments | $100 |
| Coinsurance | $0 |
| *What isn't covered* | |
| Limits or exclusions | $0 |
| **The total Mia would pay is** | $2,300 |

The plan would be responsible for the other costs of these EXAMPLE covered services

## Notice of Non-Discrimination

We do not treat members differently because of sex, age, race, color, disability or national origin.

If you think you were treated unfairly because of your sex, age, race, color, disability or national origin, you can send a complaint to the Civil Rights Coordinator.
**Online:** UHC_Civil_Rights@uhc.com
**Mail:** Civil Rights Coordinator. UnitedHealthcare Civil Rights Grievance. P.O. Box 30608 Salt Lake City, UTAH 84130

You must send the complaint within 60 days of when you found out about it. A decision will be sent to you within 30 days. If you disagree with the decision, you have 15 days to ask us to look at it again. If you need help with your complaint, please call the toll-free number listed within this Summary of Benefits and Coverage (SBC), TTY 711, Monday through Friday, 8 a.m. to 8 p.m.

You can also file a complaint with the U.S. Dept. of Health and Human Services.
**Online:** https://ocrportal.hhs.gov/ocr/portal/lobby.jsf
Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html.
**Phone:** Toll-free 1-800-368-1019, 800-537-7697 (TDD)
**Mail:** U.S. Dept. of Health and Human Services.
200 Independence Avenue, SW Room 509F, HHH
Building Washington, D.C. 20201

We provide free services to help you communicate with us. Such as, letters in other languages or large print. Or, you can ask for an interpreter. To ask for help, please call the number contained within this Summary of Benefits and Coverage (SBC), TTY 711, Monday through Friday, 8 a.m. to 8 p.m.

**SCHEDULE 3.16(a)**
**INTELLECTUAL PROPERTY MATTERS**

(a) The following is a listing of internet domains utilized by each of Magnolia Title
Arkansas, LLC, Magnolia Title Florida, LLC, Sol City Title, LLC and Coast to Coast
Title,                                                                                      LLC.

www.magnoliatitleteam.com

www.magnoliatitlear.com

www.magnoliatitleflorida.com

www.magnoliatitleinsurance.com

www.magnoliatitletx.com

(b) None

**SCHEDULE 3.16(b)**

**Intellectual Property Licenses and Contracts**

**None**

**SCHEDULE 3.17**
**ABSENCE OF CHANGES**

(a)  None
(b)  None
(c)  None
(d)  None
(e)  None
(f)  None
(g)  None
(h)  None
(i)  None
(j)  None
(k)  None
(l)  None
(m) None
(n)  None
(o)  None

**SCHEDULE 3.19**
**AFFILIATE INTERESTS**

None.

**SCHEDULE 3.20**
**MATERIAL CONTRACTS**

(a)  None
(b)  None
(c)  None
(d)  None
(e)  None
(f)  None
(g)  None
(h)  None