# EXHIBIT O

**THE UNITS OF INTEREST REPRESENTED BY THIS COMPANY AGREEMENT
HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS
AMENDED OR THE SECURITIES LAWS OF ANY STATE**

**CERTAIN RESTRICTIONS ON TRANSFERS OF UNITS OF MEMBERSHIP
INTEREST ARE SET FORTH HEREIN**

**FIRST AMENDED AND RESTATED
COMPANY AGREEMENT
OF
COAST TO COAST TITLE, LLC**
A TEXAS LIMITED LIABILITY COMPANY

**ALL OF THE MEMBERS OF COAST TO COAST TITLE, LLC**, a Texas limited liability company (the "Company"), by their execution hereof do hereby amend and restate in its entirety that certain Company Agreement dated December 9, 2020 and duly adopted by the Company's sole Member at that time (the "Original Agreement"). The Members intend to amend and restate the Original Agreement in its entirety and hereby adopt this First Amended and Restated Company Agreement (this "Company Agreement") and agree as follows:

1. **DEFINITIONS.** For the purposes of this Company Agreement, certain capitalized terms not defined herein shall have the meanings set forth in Exhibit 1 attached hereto.

2. **FORMATION AND PURPOSE.**

2.1 Formation. The Company was formed on December 9, 2020, as a limited liability company pursuant to and in accordance with the Act upon the filing of a Certificate of Formation with the Texas Secretary of State (the "Certificate"). The rights and liabilities of the Members shall be determined pursuant to the Act and this Company Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Company Agreement than they would be in the absence of such provision, this Company Agreement shall, to the extent permitted by the Act, control.

2.2 Name. The name of the Company is Coast to Coast Title, LLC. The Business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate or advisable. The Board of Managers shall file, or shall cause to be filed, any assumed name certificates and similar filings, and any amendments thereto, that the Board of Managers considers appropriate or advisable.

2.3 Registered Office and Agent; Offices. The registered office and registered agent of the Company in the State of Texas shall be as specified in the Certificate or as designated by the Board of Managers in the manner provided by applicable law. The offices of the Company shall be at such places as the Board of Managers may designate from time to time, which need not be in the State of Texas. The Company may change its registered office or registered agent from time to time at the sole discretion of the Board of Managers, but in accordance with the Act.

2.4    Term.  The term of the Company shall continue indefinitely unless terminated as hereinafter provided.

2.5    Purpose.  The Company is formed for the objects and purposes of acting as a Title Insurance Agent, duly licensed under the Texas Insurance Code, and performing all related business and activities, whether through the Company or through Affiliates, and all lawful acts or activities for which limited liability companies may be formed under the Act (the "Business"); and in each instance, engaging in any and all lawful activities necessary, advisable, convenient or incidental thereto.

2.6    Specific Powers.  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Section 2.5.

2.7    Ownership of Company Property.  All Company property, both real and personal, presently owned or hereafter acquired by the Company, shall be owned by the Company and held in the name of the Company.

## 3.    COMPANY AND CAPITAL.

3.1    Members.  The names and addresses of the Members of the Company, each Member's Capital Contribution and the number and Class and Series of Units owned by the Members shall be listed on Exhibit 3.1 attached to this Company Agreement, as from time to time amended and supplemented in accordance with the provisions of this Company Agreement.

3.2    Additional Capital Contributions.  Except for the Capital Commitment of the Class A-1 Unit holders described herein, no Member shall be required to make additional Capital Contributions to the Company.  Provided, however, any Class A Member (whether Series I or Series II), in its sole discretion, but subject to the approval of the Board of Managers, may make voluntary additional Capital Contributions to the Company from time to time.  Additionally, any Member may make loans to the Company upon the terms and conditions approved by the Board of Managers.  The Capital Commitments of each of the Class A-1 Unit holders is set forth in Exhibit 3.1A.

3.3    Capital Accounts.  A separate account (each a "Capital Account") shall be established for each Member and maintained in accordance with the provisions of Section 704(b) of the Code and the Regulations thereunder and this Company Agreement shall be interpreted consistently therewith.

3.4    Return of Capital Contributions.  No Member shall have the right to demand a return of all or any part of its Capital Contributions, and any return of the Capital Contributions to any Member shall be made solely from the assets of the Company and only in accordance with the terms of this Company Agreement.  No interest shall be paid to any Member with respect to its Capital Contributions.  Each Member shall look solely to the assets of the Company for the

return of its Capital Contributions and, if the assets of the Company are insufficient to return its Capital Contributions, it shall have no recourse against any other Member for that purpose.

3.5    <u>Units</u>.    The Interests of the Members in the Company shall be represented by Units.    The Board of Managers may, but is not required to, adopt forms of, and issue to Members, certificates representing the Units.    Units will be classified as "Class A-Series I," "Class A-Series II," or "Class A-1 Units."

(a)    <u>Class A Units</u>.    The Class A Units (Series I and Series II) shall be the voting common Units of the Company.    The holders of all of the Class A Units (both Series I and Series II) shall have an aggregate 100% of the voting power of the Company in all matters as provided herein.    The holders of Class A–Series I Units shall have an aggregate 40% of the voting power of the Company and the holders of the Class A-Series II Units shall have an aggregate 60% of the voting power of the Company.    Subject to the Distribution rights of holders of Class A-1 Units and the Special Contribution distribution rights of Class A Unit holders, the holders of Class A Units (both Series I and Series II) shall be entitled to receive all Distributions of the Distributable Cash of the Company or Distributions from winding up and termination of the Company as provided herein and shall receive allocations of all remaining items of income, gain, loss, deduction and credit after the allocations of applicable items to the holders of Class A-1 Units as provided herein.    Issuances of additional Class A Units only may be made upon the approval of a Supermajority Vote.

(i)    <u>Class A-Series I Units</u>.    Rabbit Food, LLC and Sarah Blackburn (the "Existing Class A Members" described in <u>Exhibit 3.1</u>) are the current owners of Class A–Series I Units. Class A-Series I Units will be voted as a class on all issues.    The vote of Members holding a majority of the issued and outstanding Class A-Series I Units shall be binding on all Members holding Class A-Series I Units to approve or disapprove any issue to be voted on by the Class A-Series I Unit Holders and all 40% of the voting rights of the Class shall be voted to approve or disapprove the issue.

(ii)    <u>Class A-Series II Units</u>.    405 Manhattan Investments, LLC and Alphabet Investments, LLC (collectively the "Investors") have contributed an aggregate $1,000,000.00 to the capital of the Company, receipt of which is hereby acknowledged, in consideration of the issuance of the Class A-Series II Units in the Company as set forth on <u>Exhibit 3.1</u>.    Receipt of such capital contributions is hereby acknowledged by the Company and Investors hereby acknowledge receipt of an aggregate 6000 Class A-Series II Units as set forth on <u>Exhibit 3.1</u>.

(A)    Class A-Series II Units will be voted as a class on all issues.    The vote of Members holding a majority of the issued and outstanding Class A-Series II Units shall be binding on all Members holding Class A-Series II Units to approve or disapprove any issue to be voted on by the Class A-Series II Unit Holders and all 60% of the voting rights of the Class shall be voted to approve or disapprove the issue.

(b)    <u>Class A-1 Units</u>.    Except as provided herein, the holders of Class A-1 Units shall have an aggregate 0% of the voting power of the Company in all matters, it being understood by the Members that except as provided herein, the Class A-1 Units are non-voting Units of the

Company and will receive Distributions, allocations of Net Profit and Net Loss and other economic rights as provided herein. Except as approved by a Supermajority Vote, the Company shall not have the right to create additional classes of Units with rights and preferences senior to the Class A-1 Units other than the rights and preferences of Class A Units existing as of the date of this Agreement or to amend the rights and preferences of the Class A-1 Units without the unanimous consent of all holders of Class A-1 Units. The holders of the Class A-1 Units shall be entitled to cumulative annual Class A-1 Distribution Rights of 6% on the Class A-1 Unreturned Capital Contributions of the Class A-1 Members, payable as provided herein (the "Preferred Return"). Except for Capital Contributions to be made by Class A-1 Unit holders as shown on Exhibit 3.1 (which shall be paid the Preferred Return for contributions to capital after the Effective Date) the Preferred Return shall not be paid to Class A-1 Unit Holders for contributions to capital of the Company by Class A-1 Unit holders after the Effective Date.

     (c)    Class A-Series I Call Options.

     (i)    Subject to the terms hereof, the holders of Class A-Series I Units (as a Series) are hereby granted the option by written exercise to the holders of the Class A-Series II Units to purchase all but not less than all of the Class A-1 Units and all but not less than all of the Class A-Series II Units as provided herein if a Sale of the Company does not occur on or before December 31, 2022 (the "Class A-Series I Call Option"). The exercise of such option shall be required to be made on or before January 31, 2023 if such sale is not made as provided herein.

     (ii)    The purchase price to be paid for all of the Class A-1 Units will be the aggregate Class A-1 Unreturned Capital Contributions as of the date of exercise of the option plus the amount of any unpaid Class A-1 Distribution Rights as of the date of exercise of the option.

     (iii)    The purchase price to be paid for all of the Class A-Series II Units will be the "Fair Market Value" of such Units as determined in Section 3.7.

     (d)    Class A-Series II Call Options.

     (i)    Subject to the terms hereof, the holders of Class A-Series II Units (as a Series) are hereby granted the option by written exercise to the holders of the Class A-Series I Units to purchase all but not less than all of the Class A-Series I Units and repay all but not less than all of an aggregate amount equal to the unpaid Special Contributions Preferred Return plus the amount of any unpaid Special Contributions as provided herein if a Sale of the Company does not occur on or before December 31, 2022 and the Class A-Series I Call Option is not exercised in a timely manner. The exercise of such option shall be required to be made on or before February 28, 2023 if such Sale of the Company is not made as provided herein and the Class A-Series I Call Option is not exercised in a timely manner.

     (ii)    The purchase price to be paid for all of the Class A-Series I Units will be the "Fair Market Value" of such Units as determined in Section 3.7.

(e)     Closing.  The closing of a purchase and sale of Class A or Class A-1 Units and/or repayment of amounts due for Special Contributions pursuant to this Section 3.5 shall occur, unless mutually agreed otherwise, within the 120 day period following the date on which written notice of exercise of a right to purchase such Units is given hereunder. At the closing, the selling party(ies) shall deliver to the buying party(ies) an executed transfer instrument in such form as shall be required by the Company, and (ii) the buying party(ies) shall deliver to the selling party the entire amount of the purchase price for such Units.  The buying party(ies) shall pay the Purchase Price by immediately available funds at closing.

(f)     Voting.  Unless otherwise provided herein, the holders of the Class A Units (Series I and Series II) shall have 100% of the aggregate voting power of Members on all matters Series I-an aggregate 40% and Series II-an aggregate 60%).

3.6     Special Contributions.  #6 Metz Court, LLC, a member of Rabbit Food, LLC, has made contributions to the Company in the amounts set forth on Exhibit 3.6 (collectively the "Special Contributions").  Distribution rights on the Special Contributions and a preferred return of 6% on the unreturned Special Contributions are payable as provided herein (the "Special Contributions Preferred Return").

3.7     Fair Market Value. "Fair Market Value of a Class A (Series I or II) Unit or Class A-1 Unit" shall be determined as provided herein:

(a)     The fair market value of the Company shall be determined (A) by agreement of the buying party(ies) and selling party(ies), or (B) if such parties cannot agree on the fair market value of the Company within 60 days after the applicable notice then by an  appraiser who is satisfactory to the buying party(ies) and selling party(ies). If the Members are unable to unanimously agree upon an appraiser within 15 days of notice by either the selling party or the buying party(ies) that an appraisal is necessary, the selling party(ies) and the buying party(ies) shall each have 15 days from the expiration of such initial 15-day period to select one appraiser. The two appraisers selected by the selling party(ies) and the buying party(ies) shall then select, by common and mutual agreement within 15 days after the expiration of the prior 15-day period, a third appraiser, which shall itself make the determination of fair market value of the Company. If either the buying party(ies) or selling party(ies) does not appoint a appraiser within the required time period, then the appraiser appointed by the other shall be the sole appraiser and shall determine the fair market value of the Company.

(b)     The determination of fair market value by an appraiser as provided herein shall be communicated to all the Members by the Company within 90 days of the appointment of such appraiser.  Such determination of fair market value of the Company shall be used to determine the Fair Market Value of a Unit without any lack of liquidity or minority discounts and after taking into account all of the Company's accounts payable and other debt obligations upon the closing date of the sale of the selling party's Company Units.

(c)     Notwithstanding the foregoing, the parties may, at any time, agree in writing to a value of the applicable Units.

(d)     The value for a Member's Units being sold as determined in accordance with this provision shall be conclusive and binding thereafter upon the Members of the Company for all purposes and in all respects.

(e)     The expenses related to the appraisals of the fair market value of the Company and the purchase price of the Units in accordance with this Section shall be paid by the Company.

## 4.     STATUS OF MEMBERS.

4.1     <u>Limited Liability</u>.     No Member shall be bound by or personally liable for the expenses, liabilities, or obligations of the Company arising in contract, tort or otherwise, each of which is solely an obligation of the Company. In no event shall any Member be required to make up any deficit balance in such Member's Capital Account upon the winding up and termination of the Company or otherwise. Except as provided in this Company Agreement, no Members shall be personally liable, directly or indirectly, by way of indemnification, contribution, assessment, or otherwise for an obligation solely by reason of being or acting as a Member.

4.2     <u>Special Meetings</u>. Special meetings of the Members may be called at any time by the written request of the Managers or by the written request of any Member. The Managers shall provide written notice of all meetings of the Members to each Member stating the place, date and time of the meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

4.3     <u>Voting at Meetings</u>. Except as provided herein, the Majority Vote shall be required to approve any action or matter, including the termination of voluntary winding up proceedings. A Member shall be entitled to vote on any action or matter notwithstanding the Member has a direct or indirect interest in such matter.

4.4     <u>Actions with or without a Meeting and Telephone Meetings</u>. Notwithstanding any provision contained in this Company Agreement, all actions of the voting Members provided for herein shall be taken either at a meeting and evidenced by written minutes thereof or by written consent without a meeting. Any meeting of the voting Members may be held by means of a telephone conference or other electronic means, in each instance in accordance with Section 6.002 of the Act. Subject to applicable law, any action which may be taken by the voting Members without a meeting shall be effective only if the written consent (or consents) sets forth the action so taken, and is signed by the minimum number of voting Members necessary to take such action as if all of the voting Members were present and voted thereon. Prompt notice of the taking of any action without a meeting by less than a unanimous written consent of the voting Members shall be given by the Company to all voting Members. Any such consents may be executed by Members in multiple counterparts, including counterparts delivered by facsimile or

other electronic transmission, each of which shall be deemed an original and together shall be deemed one instrument.

4.5    Transactions with the Members, Managers or Affiliates.    The Company is expressly permitted to enter into transactions, agreements or modifications to transactions or agreements with any Member, Manager or any Affiliates of any Member or Manager, provided that such transactions, agreements or modifications to transactions or agreements are on terms taken as a whole not less favorable to the Company than the terms taken as a whole which could reasonably be obtained (as determined in good faith by the Board of Managers) from an unrelated party. Notwithstanding the foregoing standard for affiliated transactions, the Members agree that the transactions contemplated by Section 9 of this Company Agreement are fully authorized and shall be consummated on the terms set forth therein.

4.6    Competition. Except for any applicable restrictions in any agreement between the Company or its Affiliates and any Member or Manager, each Member and Manager, in its individual capacity or otherwise, and its respective principals and Affiliates, shall be free to engage and conduct or participate in any business or activity whatsoever, including, without limitation, the Business conducted by the Company or its Affiliates, without any accountability or obligation whatsoever to the Company or to any Member and each Member waives any right or claim it may have against any Member or Manager respect to any competing Business or activity or the income or profits therefrom.    Notwithstanding anything contained in this Agreement to the contrary, except as provided by separate agreement with the Company or its Affiliates and to the full extent permitted under applicable law, the parties hereto hereby waive any fiduciary or other duty of the Members or Managers not expressly set forth in this Agreement including (i) fiduciary or other duties that may be related to or associated with self-dealing, corporate opportunities or otherwise, and (ii) fiduciary or other duties to approve any transaction related to the operation of the Business or assets of the Company, in each case so long as such Person acts in a manner consistent with this Agreement.

4.7    Specific Limitations. Except as provided in this Company Agreement or with the approval of a Supermajority Vote, no Member shall have the right or power to: (a) withdraw or reduce its Capital Contribution except as provided by law, (b) bring an action for partition against the Company or any of the assets of the Company, (c) cause the winding up and termination of the Company, or (d) upon the return of its Capital Contribution require that property other than cash be distributed in return for its Capital Contribution. Each Member hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Company's property. Except as otherwise set forth in this Company Agreement, no Member shall have priority over any other Member either as to the return of its Capital Contribution or as to Net Profit, Net Loss or Distributions.

## 5.    THE BOARD OF MANAGERS.

5.1    Board of Managers. Except as provided herein, the Business of the Company shall be managed by a Board of Managers (each, a "Manager" and collectively, the "Managers"). Decisions of the Board of Managers shall be embodied in a vote or resolution adopted in accordance with the procedures set forth herein. Such decisions shall be carried out by officers or agents of the Company appointed by the Board of Managers in the vote or resolution in

question or in one or more standing votes or resolutions. A decision of the Board of Managers may be amended, modified or repealed in the same manner in which it was adopted or in accordance with the procedures set forth herein, but no such amendment, modification or repeal shall affect any Member until such Member has been notified in writing of such amendment, modification or repeal.

(a)    John Magness is hereby appointed and elected as the sole member of the Board of Managers, to serve until his successor is elected and qualified.

(b)    The Members may increase or decrease the number of Managers from time to time with the approval of a Supermajority Vote.

(c)    Each Manager shall, unless otherwise provided by law, hold office until such individual resigns, dies or is replaced by a Supermajority Vote. A Manager may resign by written notice to the Company which resignation shall not require acceptance and, unless otherwise specified in the resignation notice, shall be effective upon receipt by the Company. The Members may elect a replacement Manager upon a Supermajority Vote.

(d)    Meetings of the Board of Managers may be held at any time and at any place within or without the State of Texas designated in the notice of the meeting, when called by the Chairman of the Board of Managers, if any, the President or any two members acting together, reasonable notice thereof being given to each Manager by the Secretary or the President of the Company.

(e)    It shall be reasonable and sufficient notice to a Manager to send notice by overnight delivery at least 48 hours, or by facsimile at least 24 hours, before the meeting addressed to such Manager at such Manager's usual or last known business or residence address or to give notice to such Manager in person or by telephone at least 24 hours before the meeting. Notice of a meeting need not be given to any Manager if a written waiver of notice, executed by such Manager before or after the meeting, is filed with the records of the meeting, or to any Manager who attends the meeting without protesting prior thereto or at its commencement the lack of notice to such Manager. Neither notice of a meeting nor a waiver of a notice need specify the purposes of the meeting. Except as may be otherwise provided by law, at any meeting of the Board of Managers a majority of the Managers then in office shall constitute a quorum. Any meeting may be adjourned from time to time by a majority of the votes cast upon the question, whether or not a quorum is present, and the meeting may be held as adjourned without further notice. Except as may be otherwise provided herein or by law, when a quorum is present at any meeting the vote of a majority of the Managers present shall be the act of the Board of Managers.

(f)    Any action required or permitted to be taken at any meeting of the Managers may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action so taken is signed by the minimum number of Managers necessary to take such action as if all of the Managers were present and voted thereon. Prompt notice of the taking of any action without a meeting by less than a unanimous written consent of the Managers shall be given by the Company to all Managers. Such consent shall be treated for all purposes as the act

of the Board of Managers. Any such consents may be executed by Managers in multiple counterparts, including counterparts delivered by facsimile or other electronic transmission, each of which shall be deemed an original and together shall be deemed one instrument.

(g)    Managers may participate in a meeting of the Board of Managers by means of telephone conference or other communications equipment whereby all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation shall constitute presence in person at such meeting.

5.2    <u>Authority of Board of Managers</u>.  Subject to the provisions of this Company Agreement which specifically require the consent or approval of one or more of the Members, the Board of Managers shall have the complete and exclusive power and authority to manage the Business and affairs of the Company and to make all decisions with respect thereto. Except as otherwise expressly provided in this Company Agreement, the Board of Managers or Persons designated by the Board of Managers, including officers and agents appointed by the Board of Managers, shall be the only Persons authorized to execute documents which shall be binding on the Company.  To the fullest extent permitted by Texas law, but subject to any specific provisions hereof granting rights to Members, the Board of Managers shall have the power to do any and all acts, statutory or otherwise, with respect to the Company or this Company Agreement, which would otherwise be possessed by the Members under the laws of the State of Texas.  Except as expressly provided for in this Company Agreement, the Members hereby delegate and assign, to the maximum extent permitted by the Act and applicable law, the authority to manage the Company to the Board of Managers, acting as a group. Any Member purporting to act on behalf of the Company other than through or at the direction of the Board of Managers or as expressly provided for in this Company Agreement shall be liable for such act to the Company, its other Members and to the person with whom the Member purported to act on behalf of the Company for any damages (including any costs and expenses related to the recovery of such damages) to the Company, any of its other Members and to the person with whom the Member purported to act on behalf of the Company for such act.  Except as expressly provided in this Company Agreement, no Member shall take part in or interfere in any manner with the management of the Business and affairs of the Company or have any right or authority to act for or bind the Company.  The power and authority granted to the Board of Managers hereunder shall include all those necessary or convenient for the furtherance of the purposes of the Company and shall include the power to make all decisions with regard to the management, operations, assets, financing and capitalization of the Company., including without limitation, the power and authority to undertake and make decisions concerning: (a) hiring, firing and compensating employees, officers, attorneys, accountants, brokers, investment bankers and other advisors and consultants; (b) entering into leases for real or personal property; (c) opening of bank and other deposit accounts and operations thereunder; (d) purchasing, constructing, improving, developing, maintaining and disposing of real property; (e) purchasing of insurance, goods, supplies, equipment, materials and other personal property; (f) borrowing of money, obtaining of credit, issuance of notes, debentures, securities, equity or other interests of or in the Company and securing of the obligations undertaken in connection therewith with mortgages on and security interests in all or any portion of the real or personal property of the Company; (g) making of investments in or the acquisition of securities of any Person or entity, including but not limited to, the repurchase of any Units from Members; (h) giving of guarantees and

indemnities; (i) entering into contracts or agreements whether in the ordinary course of business or otherwise; (j) merging with or acquiring of other entities; (k) winding up and termination; (l) selling or leasing of all or any portion of the assets of the Company; (m) forming of subsidiaries or joint ventures; (n) compromising, arbitrating, adjusting and litigating of claims in favor of or against the Company; (o) any other agreements between the Company and the Members or any of their Affiliates; and (p) all other acts or activities necessary or desirable for the carrying out of the purposes of the Company.  Notwithstanding anything to the contrary contained herein, any matter approved by a Majority Vote as provided herein shall be an authorized act of the Company for all purposes and will not need the approval of the Board of Managers or the other Members, except for acts requiring a Supermajority Vote.

      5.3    <u>Officers; Agents</u>.  The Board of Managers by resolution or vote of the Board of Managers shall have the power to appoint agents (who may be referred to as officers) to act for the Company with such titles, if any, as the Board of Managers deems appropriate and to delegate to such officers or agents such of the powers as are granted to the Board of Managers hereunder, including the power to execute documents on behalf of the Company, as the Board of Managers may in its sole discretion determine.  The officers or agents so appointed may include persons holding titles such as Chief Executive Officer, President, Executive Vice President, Vice President, Chief Operating Officer, Chief Financial Officer, Secretary, Treasurer or Controller. Unless the authority of the agent designated as the officer in question is limited in the document appointing such officer or is otherwise specified by the Board of Managers, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Texas corporation would have to act for a Texas corporation in the absence of a specific delegation of authority and as more specifically set forth herein; provided, however, that unless such power is specifically delegated to the officer in question either for a specific transaction or generally, no such officer shall have the power to lease or acquire real property, to borrow money, to issue notes, debentures, securities, equity or other interests of or in the Company, to make investments in (other than the investment of surplus cash in the ordinary course of business) or to acquire securities of any Person, to give guarantees or indemnities, to merge, liquidate or dissolve the Company or to sell or lease all or any substantial portion of the assets of the Company. The Board of Managers, in its sole discretion, may ratify any act previously taken by an officer or agent acting on behalf of the Company.

      (a)    <u>Officers</u>.  Officers of the Company, if any, shall be appointed by the Board of Managers from time to time in its discretion.  An officer may be, but none need be, a Member or Manager.  Any two or more offices may be held by the same person.  Any officer may be required by the Board of Managers to secure the faithful performance of the officer's duties to the Company by giving bond in such amount and with sureties or otherwise as the Board of Managers may determine.  Officers may be designated by the Board of Managers at any time. At any time or from time to time the Board of Managers may delegate to any officer their power to elect or appoint any other officer or any agents.

      (b)    <u>Tenure</u>.  Each officer shall retain its authority at the pleasure of the Board of Managers or the officer by whom such officer was appointed or by the officer who then holds agent appointive power.

(c)    <u>Resignation; Removal; Vacancies</u>.  Any officer or agent may resign by delivering a written letter of resignation to the Chairman, if any, the President, the Secretary or to the Board of Managers, which resignation shall not require acceptance and, unless otherwise specified in the letter of resignation, shall be effective upon receipt.  The Board of Managers or the officer appointing the officer or agent may remove any officer or agent at any time without giving any reason for such removal and no officer or agent shall be entitled to any damages by virtue of such officer's removal from office or such position as agent.  If any office becomes vacant, the position may be filled by the Board of Managers or in such other manner as the officer in question was appointed.

(d)    <u>Compensation; Reimbursement of Expenses</u>.  The salaries or other compensation of the officers of the Company shall be fixed from time to time by the Board of Managers and disclosed in advance to all Members.  The officers of the Company shall be entitled to prompt reimbursement of all reasonable out-of-pocket expenses incurred in the course of the performance of their duties.

5.4    <u>Right of Third Parties to Rely on Authority of Board of Managers</u>. Notwithstanding any other provision of this Company Agreement to the contrary, no Person shall be required to verify any representation, resolution or consent by the Board of Managers or any officer, agent or representative of the Company duly authorized by such representation, resolution or consent of the Board of Managers as to the power or authority of any Manager, Member, officer or other agent or representative to bind or act for and on behalf of the Company, including, without limitation, the power to purchase assets for the Company and sell or encumber assets of the Company and any such Person shall be entitled to rely exclusively on any such representation, resolution or consent of the Board of Managers or any other officer duly authorized by resolution of the Board of Managers as to its or his individual authority to enter into any and all arrangements or contracts for and on behalf of the Company and shall be entitled to deal with the Board of Managers or any officer of the Company duly authorized by resolution of the Board of Managers as if they were the sole party in interest therein both legally and beneficially.

5.5    <u>Certain Limitations on Board of Managers Activities</u>. The Board of Managers shall not do any of the following without, in each instance, obtaining the approval of such actions by a Supermajority Vote: (i) do any act in contradiction of this Company Agreement; (ii) confess a judgment against the Company; (iii) possess Company assets or assign the rights in specific Company assets for other than a Company purpose; (iv) issue additional Units or new classes of Units; (v) amend the obligation of any Member to make a required capital contribution, (vi) make any Distribution in violation of the Act or this Company Agreement; (vii) voluntarily wind up and terminate the Company by the act of the Company or revoke voluntary winding up proceedings previously initiated by the Company; or (viii)  remove a Manager.

5.6    <u>Exculpation</u>. No Manager shall be liable, responsible or accountable in damages or otherwise to the Company, any Member or otherwise for any action taken or failure to act on behalf of the Company or its Affiliates, unless such act or omission was performed or omitted fraudulently, in bad faith, constituted gross negligence or pursuant to a knowing violation of a material provision of this Company Agreement.

5.7    Management Agreement.    The Company intends to amend its existing Management Agreement or to enter into a new Management Agreement with BSpoke Management Group in form mutually agreeable to the owners of Class A Units (Series I and Series II) and Class A-1 Units in an expeditious manner prior to January 15, 2022. A copy of the existing Management Agreement is attached hereto as Exhibit 5.7.    No amendment of the Management Agreement will be effective without the majority approval of the owners of Class A Units (Series I and Series II) and Class A-1 Units.

## 6.    BOOKS, RECORDS AND ACCOUNTING.

6.1    Books and Records.    The Company shall maintain at its principal office all of the following:

(a)    a current list of the full name and last known address of each Member together with information regarding the amount of cash and a description and the Book Value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each Member became a Member of the Company;

(b)    a copy of the Certificate and this Company Agreement, including any and all amendments to either thereof, or any amendments that have been executed;

(c)    copies of the Company's federal, state, and local income tax or information returns and reports, if any, for each taxable year after the Effective Date, provided that the Company need not retain any such records for more than four (4) fiscal years; and

(d)    the Company's books and records for each Fiscal Year after the Effective Date, provided that the Company need not retain any such records for more than four (4) fiscal years.

6.2    Inspection.    A Member, upon reasonable request and at the sole cost of such Member, may inspect the Company's books and records at the Company's offices during reasonable times and dates determined by the Board of Managers during business hours.

## 7.    ALLOCATIONS OF NET PROFIT AND NET LOSS AND DISTRIBUTIONS.

7.1.    Allocations of Net Profit and Net Loss.    Except as otherwise provided in Section 3.5(b) and in Section 7.2, Net Profit (and items thereof) and Net Loss (and items thereof) for any Fiscal Year (or other applicable period) shall be allocated among the Members in a manner such that the Adjusted Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the Distributions that would be made to such Member during such Fiscal Year (or other applicable period) pursuant to Section 7.4, based on the assumptions that (a) the Company is terminated, (b) its affairs are wound-up and each asset of the Company is sold for cash equal to its Book Value (as maintained by the Company for purposes of, and as maintained pursuant to, the Capital Account maintenance provisions of Section 1.704-1(b)(2)(ii) of the Regulations and Section 3.3 and assuming an adjustment pursuant to Section 7.2(e)), (c) all Company liabilities are satisfied

(limited with respect to each nonrecourse liability to the fair market value of the asset(s) securing such liability) and (d) the net assets of the Company are distributed in accordance with <u>Section 7.4</u> to the Members, immediately after giving effect to such allocation (taking into account Distributions made during such Fiscal Year or other applicable period).

7.2    <u>Other Capital Account and Income Tax Adjustments</u>.   Prior to making the allocations of Net Profit or Net Loss for the Fiscal Year in accordance with <u>Section 7.1</u> hereof, the Board of Managers shall allocate income, gain, loss, deduction and credit (and items thereof) in accordance with the provisions of this <u>Section 7.2</u> to the extent required by the Code and applicable Regulations.

(a)    <u>Certain Contributions of Property</u>.   In the event there is a difference between the Book Value at which any property is accepted as a contribution to the capital of the Company (or deemed accepted pursuant to Regulation Section 1.704-1 (b)(2)(iv)(g)) and the adjusted tax basis of such property to the Company, the Board of Managers shall, solely for federal income tax purposes (and not for purposes of allocating Net Profit or Net Loss under Section 7.4 or computing Net Profit or Net Loss), specially allocate the income, gain, loss and deduction attributable to such property to the extent required by Section 704(c) of the Code or any applicable Regulations under Code Section 704(b) or 704(c) using the method of allocation as determined by the Board of Managers in its sole discretion.

(b)    <u>Certain Adjustments</u>.   To the extent that an adjustment to the adjusted tax basis of any Company asset is required pursuant to an election under Section 754 of the Code, adjustments to the Capital Accounts shall be made as required pursuant to Regulation Section 1.704-1(b)(2)(iv)(m).

(c)    <u>Nonrecourse Deductions; Member Nonrecourse Deductions; Qualified Income Offset, etc.</u>   There are hereby included in this Company Agreement such provisions governing the allocation of taxable income, gain, loss, deduction and credit (and items thereof) determined under the Code as may be necessary to provide that the Company's allocation provisions contain a so-called "Qualified Income Offset" and comply with all provisions relating to the allocation of so-called "Nonrecourse Deductions" and "Member Nonrecourse Deductions" and the chargeback thereof as set forth in the Regulations under Section 704(b) of the Code; provided, however, that the incorporation of such provisions shall affect only the computation of taxable Net Profit and Net Loss and the allocation thereof as between Members and shall not otherwise affect the amount or timing of any Distribution of cash or property to any Member provided for in this Company Agreement.   Allocations of Nonrecourse Deductions shall be made ratably among the Members in accordance with the number of Units held by the Members.   Allocations of Member Nonrecourse Deductions shall be made to the Members in accordance with Regulation Section 1.704-2(i).

(d)    <u>Changes in Members' Units</u>.   If during any Fiscal Year of the Company there is a change in any Member's Units in the Company, the Board of Managers shall confer with the tax advisors to the Company and, in conformity with such advice and in their reasonable discretion, allocate the Net Profit or Net Loss to the Members so as to take into account the varying interests

of the Members in the Company in a manner that complies with the provisions of the Code and the Regulations thereunder.

(e)     Adjustment of Capital Accounts.  Unless the Board of Managers shall determine otherwise, the Book Values of all the Company's assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Board of Managers (and the Capital Accounts of the Members shall be adjusted accordingly), as of the following times: (a) the acquisition of additional Units by any new or existing Member in exchange for more than a de minimis additional Capital Contribution, services rendered or to be rendered or the exercise of an option to acquire such Units; (b) the Distribution by the Company to a Member of more than a de minimis amount of assets of the Company as consideration for Units; and (c) the winding up and termination of the Company; provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company.

(f)     Interpretation.  It is the intent of the Members that the provisions hereof relating to each Member's distributive share of income, gain, loss, deduction and credit (and items thereof) shall comply with the provisions of Sections 704(b), 704(c), 706 and other relevant provisions of the Code and the applicable Regulations.  In furtherance of the foregoing, the Board of Managers is hereby directed to resolve any ambiguity in the provisions of this Company Agreement in a manner that will preserve and protect the allocations provided for in this Section 7 for federal income tax purposes and, subject to the last sentence hereof, to adopt such curative provisions to this Section 7 as the Board of Managers may deem necessary or appropriate.  In the event of any dispute, the decision of independent certified public accountants employed by the Company shall be final.  Notwithstanding the foregoing, no Member shall have the right to require or compel any Distribution of cash or property not authorized or provided for by the provisions of this Company Agreement.

7.3     Compensatory Transfers or Issuances.

(a)     For avoidance of doubt, any items of deduction allowable to the Company on account of a compensatory Transfer or issuance of Units in accordance with this Company Agreement shall be allocated to and among the Members immediately prior to the date as of which the Transferee of such Units includes corresponding amounts as compensation income under Section 83 of the Code.

(b)     The determination of the items of income and deduction arising from any past or future Transfer or issuance of Units in connection with the performance of services shall be made in accordance with Rev. Proc. 93-27, 1993-2 C.B. 343, and Rev. Proc. 2001-43, 2001-2 C.B. 191.  As of the earliest date permitted under any IRS Revenue Procedure or other administrative guidance, the Board of Managers shall (without limitation of the preceding sentence) cause the Company to elect the safe harbor described in Notice 2005-43, 2005-1 C.B. 1221, under which the fair market value of any Unit Transferred in connection with the performance of services is treated as being equal to the liquidation value of such Units (the "Safe Harbor Election").  For any period in which the Safe Harbor Election is in effect, the Company

and each Member (including each Member to whom a Unit is Transferred or issued in connection with the performance of services) agree to comply with all requirements of the Safe Harbor Election with respect to all Units Transferred or issued in connection with the performance of services.   In the event of a forfeiture of any Units Transferred or issued in connection with the performance of services prior to vesting, if any, for which an election under Section 83(b) of the Code has been made, the Board of Managers may elect to make any special allocations of gross income or gain or gross income or loss required or permitted under the final Regulations contemplated by notice of proposed rulemaking REG 105346-03 (May 24, 2005) (including, if permitted under such final Regulations, notional allocations of tax or book items).

7.4    Distributions.

(a)    General.  To the extent the Board of Managers reasonably determines that the Company has Distributable Cash, the Board of Managers shall distribute such Distributable Cash to the Members in the manner, amounts and order of priority set forth in this Section 7.4.

(b)    Distributions.  Prior to the winding up and termination of the Company or a Sale of the Company, to the extent the Company has Distributable Cash, such Distributable Cash, to the extent thereof, shall be distributed monthly as follows:

(i)    Distributions of unpaid Class A-1 Distribution Rights and Special Contributions Preferred Return.  First, to the holders of Class A-1 Units pro rata in an aggregate amount equal to the unpaid Class A-1 Distribution Rights and to the Unit holders holding Special Contributions rights, pro rata, in an aggregate amount equal to the unpaid Special Contributions Preferred Return and Special Contributions;

(ii)    Remaining Distributions. Second, all remaining Distributable Cash shall be Distributed to the holders of the Class A Units (Series I and Series II), pro rata in accordance with the Series (40%/60%) and then ownership of Units within the Series.

(c)    Distributions on a Sale of the Company.  Upon a Sale of the Company, all cash, securities and other assets available for Distribution, which amount shall be determined in the sole discretion of the Board of Managers, net of reserves determined by the Board of Managers, amounts for the repayment of indebtedness and expenses required to be paid in connection with such Sale of the Company (the "Sale Proceeds"), shall be Distributed as follows:

(i)    First, to the holders of Class A-1 Units pro rata in an aggregate amount equal to the aggregate Unreturned Capital Contribution plus the amount of the unpaid Class A-1 Distribution Rights and to the Unit holders holding Special Contributions rights, pro rata, in an aggregate amount equal to the unpaid Special Contributions Preferred Return plus an aggregate amount equal to any unpaid Special Contributions;

(ii)    Second, all remaining Sale Proceeds Cash shall be Distributed to the holders of the Class A Units (Series I and Series II), pro rata in accordance with the Series (40%/60%) and then ownership of Units within the Series.

(iii)     Notwithstanding anything to the contrary contained herein, (A) if a Sale of the Company is structured as a disposition of direct or indirect Interests in the Company, then the purchase agreement governing such disposition shall contain provisions therein which replicate, to the maximum extent reasonably possible, the economic result which would have been attained under Section 7.4(c) had such Sale of the Company been structured as a sale of the Company's assets for an amount equal to the aggregate consideration actually received by the selling equity holders in such Sale of the Company, followed immediately by a liquidating Distribution of the sale proceeds and (B) such transaction shall otherwise be treated as a Drag Sale pursuant to Section 9.

(d)     Distributions on Winding up and Termination.     Upon a winding up and termination of the Company other than pursuant to a Sale of the Company, all cash, securities and other assets available for Distribution pursuant to Section 10.2 (the "Termination Proceeds"), shall be Distributed as follows:

(i)     First, to the holders of Class A-1 Units pro rata in an aggregate amount equal to the aggregate Unreturned Capital Contribution plus the amount of the unpaid Class A-1 Distribution Rights and to the Unit holders holding Special Contributions rights, pro rata, in an aggregate amount equal to the unpaid Special Contributions Preferred Return plus an aggregate amount equal to any unpaid Special Contributions;

(ii)     Second, all remaining proceeds from winding up shall be Distributed to the holders of the Class A Units (Series I and Series II), pro rata in accordance with the Series (40%/60%) and then ownership of Units within the Series.

(e)     Withholding; Indemnity. To the extent the Company is required by applicable Law to withhold or to make tax payments on behalf of or with respect to any Member, the Board of Managers is hereby authorized to withhold such amounts and make such tax payments as so required. All amounts withheld pursuant to applicable Law with respect to any Member (and not paid to the Company by such Member pursuant to the immediately following sentence) shall be treated as distributed to such Member pursuant to this Section 7.4 for all purposes of this Company Agreement and shall reduce amounts which such Member would otherwise be entitled to receive under this Section 7.4 To the extent that at any time any such withheld amounts exceeds the Distributions that such Member would have received but for such withholding, such Member shall, upon demand by the Company, as reasonably determined by the Board of Managers, promptly pay to the Company the amount of such excess. Each Member hereby agrees, severally and not jointly or jointly or severally, to indemnify and hold harmless the Company and the other Members from and against any liability (including any liability for taxes, penalties, additions to tax or interest) with respect to income attributable to or Distributions or other payments to such Member.

7.5     Distributions In-Kind.  Any Distribution of the Company's assets in-kind will require the approval of the Board of Managers in its reasonable discretion. No Member shall be entitled to the Distribution of any specific Company property. And for clarity, if the consideration received in any Sale of the Company transaction or to be Distributed pursuant to the winding up and termination of the Company consists of property or cash and part property,

then the Termination or Sale Distributions related thereto shall be made in such property (at the fair market value determined by the Board of Managers in its reasonable discretion) or in part cash and part property (at the fair market value determined by the Board of Managers in its reasonable discretion) pro rata in accordance with the aggregate cash amounts and fair market value of property available for Distribution by the Company.

7.6     Record Members and Transferees.  Distributions under Sections 7.4 and 10 shall be made only to Members and their Transferees which, according to the books and records of the Company, are Members or Transferees of Members on the actual date of Distribution.  None of the Company, the Members or the Board of Managers shall incur any liability for making Distributions in accordance with this Section 7.6.

7.7     Interpretation and Member Intent.

(a)     The allocations set forth in Section 7.2 or otherwise required by applicable law or regulations (the "Regulatory Allocations") are intended to comply with certain requirements of applicable Regulations.  The Regulatory Allocations may not be consistent with the manner in which the Members intend to divide Distributions hereunder.  Accordingly, the Board of Managers is authorized to further allocate Net Profit, Net Loss and other items thereof among the Members so as to prevent the Regulatory Allocations from distorting the manner in which Distributions would be divided among the Members under this Section 7, but for application of the Regulatory Allocations.  In general, the reallocation will be accomplished by specially allocating other Net Profit, Net Loss and items of income, gain, loss and deduction, to the extent they exist, among the Members so that the net amount of the Regulatory Allocations and the special allocations to each Member is zero.  The Board of Managers will have discretion to accomplish this result in any reasonable manner.

(b)     Income, gains, expenses, deductions and losses and items thereof of the Company are intended to be allocated under this Company Agreement in a manner that will cause the aggregate Distributions made to the Members with respect to their respective Units (from the date of the issuance thereof by the Company), including Distributions to be made under Section 10.2, to be made in accordance with the order and priority set forth in this Section 7.  The Board of Managers is authorized and directed to amend this Company Agreement, without further approval by the Members, to correct or adjust any allocation provision under this Company Agreement if the Board of Managers reasonably determines such correction or adjustment to be necessary or appropriate (and not unfairly discriminatory against any Member) for Distributions, in the aggregate, to be made in the manner provided in the preceding sentence.

7.8     Tax Distributions.  Except as otherwise provided in this Company Agreement, and provided that such Distributions are not prohibited by and will not result in a breach or default by the Company under any applicable loan agreement or other contractual or legal restraints, the Board of Managers may make Distributions to the Members no later than March 1 of each Fiscal Year of the Company to the extent necessary to cause each Member to have received aggregate Distributions during all Fiscal Years of the Company of an amount equal to the product of (a) the estimated cumulative net taxable income allocable to that Member as of the end of the immediately preceding Fiscal Year, multiplied by (b) 38% or any other rate that the

Board of Managers from time to time may determine to be appropriate, including reducing such rate for long term capital gains ("Tax Distributions"). Tax Distributions made to a Member shall be debited against such Member's Capital Account and shall be treated as an advance Distribution that will reduce on a dollar-for-dollar basis the amount of later Distributions due and owing to such Member hereunder.

7.9    <u>Clawback</u>. If it is determined by the Board of Managers in its reasonable discretion that the Members have not received the correct amounts of Distributions hereunder for any applicable period, then payments shall be paid by the Member(s) that received excess distributions in respect thereof to the other Members (or to the Company and its Affiliates at the discretion of the Board of Managers) in the amount of such excesses in order to balance out the correct amounts that should have been made. The amount of such payments determined by the Board of Managers shall be binding upon the parties.

## 8.    COMPANY REPRESENTATIVE.

8.1    <u>Company Representative</u>. Unless and until another person or entity is designated by the Board of Managers, John Magness shall be designated the Partnership Representative as described in Section 6223 of the Code and any analogous provisions of state law (herein the "Company Representative"). The Company Representative shall represent the Company, at the Company's expense, in connection with all examinations of the Company's affairs by tax authorities including any resulting administrative or judicial proceedings. The Company Representative shall give prompt written notice to each Member of any and all notices it receives from the Internal Revenue Service concerning the Company. The Company Representative in its reasonable discretion may extend the statute of limitations, file a request for administrative adjustment, file suit concerning any federal, state or local tax refund or deficiency relating to any Company administrative adjustment or enter into any settlement agreement relating to any Company item of income, gain, loss, deduction or credit for any fiscal year of the Company, or take any other material action relating to any federal, state or local tax proceeding involving the Company. In the event that the Board of Managers determines that the foregoing provisions are no longer applicable to the Company, either due to a change of controlling law or the enactment of applicable Treasury Regulations, the Board of Managers is authorized to take any reasonable actions as may be required concerning tax matters of the Company not otherwise addressed in this Section 8. Without limiting the foregoing, all elections relating to audit rules and regulations applicable to the Company and promulgated pursuant to the Internal Revenue Code may be made by the Company Representative in its reasonable discretion, including, without limitation:

(a)    The Members agree that the Company Representative may, in its reasonable discretion, make the election provided in Internal Revenue Code Section 6221(b)(1) for each taxable year of the Company for which the Company is eligible to make such election. The Company Representative is authorized to make the disclosure required under Internal Revenue Code Section 6221(b)(D)(ii) and the Members hereby agree to provide their names and taxpayer identification numbers to the Company Representative for this purpose. In the event that any Member is an entity that has elected under Internal Revenue Code section 1362(a) to be taxed as an "S corporation" (as defined in Internal Revenue Code section 1361(a)(1)), such Member agrees to provide the Company Representative with the name and taxpayer identification number

of each person with respect to whom such Member is required to furnish a statement under Internal Revenue Code section 6037(b) for the taxable year of such Member ending with or within the Company's taxable year for which the election out under Internal Revenue Code section 6221(b)(1) is made.

(b)     The Company Representative has the reasonable discretion to make a valid election pursuant to Section 6226 of the Internal Revenue Code to the extent it is legally able to do so.

(c)     If the Company becomes liable for any taxes, interest or penalties under section 6225 of the Internal Revenue Code (following a final determination of such liability by the relevant governmental authority, or as reasonably determined by the Board of Managers), each Member that was a Member of the Company for the taxable year to which such liability relates shall indemnify and hold harmless the Company for such Member's allocable share of the amount of such tax liability, including any interest and penalties associated therewith, as reasonably determined by the Board of Managers. The Company shall have a right of set-off against Distributions to a Member or former Member in the amount of such withholding tax or other liability or obligation. Any amount withheld pursuant to this Section 8 shall be treated as an amount distributed to such Member or former Member for all purposes under this Company Agreement.

8.2     <u>Consent of all of the Members</u>.  Notwithstanding the foregoing, the Company Representative shall take actions as directed by the consent of all of the Class A Members to the extent the Company Representative is legally able to do so.

8.3     <u>Indemnity of Company Representative</u>.  The Company shall indemnify and reimburse the Company Representative for all expenses (including legal and accounting fees) incurred as Company Representative pursuant to this Section 8 in connection with any administrative or judicial proceeding with respect to the tax liability of the Members as long as the Company Representative has determined in good faith that its course of conduct was in, or not opposed to, the best interest of the Company. The payment of all such expenses shall be made before any Distributions are made to the Members. The taking of any action and the incurring of any expense by the Company Representative in connection with any such proceeding, except to the extent provided herein or required by law, is a matter in the sole discretion of the Company Representative and the provisions on limitations of liability of the Company Representative, and indemnification set forth in this Company Agreement shall be fully applicable to the Company Representative in its capacity as such.

8.4     <u>Notices to Company Representative</u>.  Any Member that receives a notice of an administrative proceeding under Code Section 6233 relating to the Company shall promptly notify the Company Representative of the treatment of any Company item on such Member's federal income tax return that is or may be inconsistent with the treatment of that item on the Company's return.  Any Member that enters into a settlement agreement with the Internal Revenue Service with respect to any Company item shall notify the Company Representative of such agreement and its terms within 60 days after its date of execution.

## 9.    TRANSFER OF UNITS.

9.1    <u>Restrictions on Transfer</u>. No Member shall have the right, and each Member hereby waives such Member's right under the Act and at law to Transfer all or any portion of a Member's Units except in compliance with the terms of this <u>Section 9</u> and this Company Agreement without the approval of a Supermajority Vote.  Notwithstanding any other provision of this Company Agreement, no Transfer of a Member's Units, or any rights hereunder, shall release the disposing Member from such Member's liabilities to the other Members, the Company or the Company's Business, which such liabilities shall survive such Transfer and shall not be discharged by assumption of such liabilities by any other Person.

9.2    <u>Substitute Members</u>. Subject to allocation in the year of transfer to take into account the varying interests of the parties, an Assignee of Units shall be entitled to receive the share of the Company Net Profit, Net Loss, capital and Distributions to which such Assignee's immediate predecessor would have been entitled and shall not have any other rights as a Member hereunder, but shall be otherwise subject to the requirements and obligations of a "Member" pursuant to this Company Agreement, including, without limitation, the requirements and obligations of a Member pursuant to this <u>Section 9</u>.  The Board of Managers, in their sole discretion, shall have the right to admit an Assignee of a Member's Units as a substituted Member, subject to the Assignee and the assignor of the Units fully complying with the provisions of this Company Agreement and the Assignee and assignor executing and delivering such documentation as reasonably required by the Board of Managers. Upon becoming a substituted Member, such Assignee shall have all of the rights and powers of, shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of, such Assignee's predecessor, and shall be a Member under and pursuant to this Company Agreement.  For the purpose of defining and ascertaining the rights and powers accruing to, the restrictions and obligations imposed upon, and the status of a substituted Member as a result of his, her or its substitution hereunder, the use of the term "Member" in this Company Agreement shall be deemed to include a substituted Member. No Member shall have the right to constitute such Member's Assignee as a substituted member.  Notwithstanding the foregoing, the estate of a deceased Member shall be a substituted Member for the purposes of this Company Agreement until such time that the Units belonging to the deceased Member have been distributed or assigned from such estate, at which time the transferee will be deemed an Assignee subject to this <u>Section 9.2</u>; provided, however, if the Units are directly or indirectly (whether in trust or otherwise) bequeathed to the deceased Member's spouse, the spouse shall be a substituted Member for the purposes of this Company Agreement.

9.3    <u>Right of First Refusal</u>.  Subject to the requirements of <u>Section 9.1</u>:

(a)    Any Member (a "Transferring Member") who receives an offer from a third party other than a Transfer pursuant to the last sentence of Section 9.5, and desires to make a Transfer of some or all of its Units to such third party shall first offer to sell the Units that such Transferring Member proposes to Dispose of to such third party (the "Offered Interest") to the Company and the other Members.  Such offer shall be made by an irrevocable written offer ("Offer Notice") to the Company and all of the Members other than the Transferring Member, to

make a Transfer of all, but not less than all, of the Offered Interest, for the same price and on the same terms for which the Transferring Member proposes to Dispose of such Offered Interest. Such offer shall also contain a complete description of any transaction in which the Transferring Member proposes to make a Transfer of such Offered Interest, including the name of the proposed transferee and the consideration for and other terms of the proposed transfer. If the consideration for such Transfer described in the offer is not cash or publicly traded securities, the Offer Notice shall state the value of such consideration.

(b)     The Company shall have the first right for thirty (30) days after notification from the Transferring Member (the "Company Exercise Period") to purchase all of the Offered Interest by notice thereof to the Transferring Member and the other Members within the Company Exercise Period.

(c)     If the Company does not exercise its rights to purchase all of such Offered Interest within the Company Exercise Period, then the other Members shall have the option to purchase any remaining portion of the Offered Interest for a period of thirty (30) days immediately succeeding the Company's offer period (the "Member Exercise Period"). Each such other Member shall have the right to purchase such portion of the Offered Interest as the Units owned by such Member at such time shall bear to the total Units owned by all the Members excluding the Transferring Member by notice to the Transferring Member, the other Members and the Company within the Member Exercise Period. If any Member does not elect to purchase its full portion of such Offered Interest, the remaining portion of the Offered Interest may be purchased by the other Members, pro rata, in the same manner.

(d)     If the Company and the other Members give notice of exercise to purchase all of the Offered Interest within the relevant exercise periods, the Company or the other Members shall purchase all of such Offered Interest upon the same terms and conditions as set forth in the Offer Notice. The closing shall take place at the principal offices of the Company thirty (30) days after the expiration of the Member Exercise Period. The selling Member or other person or persons holding such Units shall execute all documents that the Company or the purchasing Members reasonably determine to be necessary or desirable to effect the transfer of the selling Member's Units to the applicable Person(s), free and clear of all encumbrances (other than restrictions imposed on all Members under this Company Agreement or transfer restrictions imposed under any applicable securities laws). The provisions of Section 9.7(d) shall apply to the closing of such purchase and sale of Units.

(e)     If the Company or the other Members do not give notice of exercise to purchase all of the Offered Interest within the relevant exercise periods, the other Members and the Company shall not be entitled to purchase any of such Offered Interest, and the Transferring Member shall, subject to the prior application of the provisions of Section 9.7 below, then have sixty (60) days within which to consummate the Transfer of such Offered Interest to the third party named in the Offer Notice, upon the terms described in such Offer Notice. If the Transfer of such Offered Interest to the third party is not so completed within such sixty (60) day period, the Offer Notice given to the non-Transferring Members shall be deemed to have terminated and a new Offer Notice shall be required before any Transfer may be made of all or any portion of the Offered Interest. Any Transfer of Units pursuant to the terms and provisions of this Section

9.3 to a third party shall be subject to all of the terms and provisions of this Company Agreement. The third party Transferee shall then execute a written adoption to this Company Agreement in form reasonably acceptable to the Managers and shall be bound by all of the terms and provisions hereof.

9.4     Involuntary Transfers. In the event of any Transfer or proposed Transfer of Units by a Member by operation of law, including, but not limited to, any adjudication in bankruptcy or any appointment of a receiver of the assets of a Member, the divorce of a Member (if pursuant to such divorce, title to 100% of a Member's Units do not become titled in or for the benefit of such Member), the death of the spouse of a Member (if pursuant to such death of the spouse, title to 100% of a Member's Units do not become titled in or for the benefit of such Member, in trust or otherwise) (each an "Involuntary Transfer"), then the Member or his representatives shall give written notice of such Involuntary Transfer to the Company and the other Members, including in such notice the date and circumstances of such Transfer and the name and address of the transferee. Except as provided in the last sentence of this Section 9.4, an Involuntary Transfer shall constitute an "Offer" for all of such Member's Units at a purchase price equal to the Fair Market Value thereof and the provisions of Section 9.5 hereof shall apply and the date of the Offer shall be later of such Involuntary Transfer or the giving of such notice. And for the avoidance of doubt, if the Member does not receive title to 100% of the Member's Units pursuant to a divorce or the death of a spouse, the Offer shall apply only to the spouse's interest in the Units.

9.5     Provisions Relating to Offers. If the provisions of this Section 9.5 are specifically applicable to an Offer (other than an Offer pursuant to Section 9.6):

(a)     Any such Offer shall be sent to the Company and to all of the other Members. The date of the Offer shall be the date on which a written notice containing the Offer has been so sent to all Persons entitled to receive it or as provided in the applicable Section of this Section 9.

(b)     The Company, acting by and through the Board of Managers in their sole discretion, shall have the option for thirty (30) days following the date of the Offer to exercise its option to purchase all or a portion of the Units by written notice to the selling Member; provided, however, the Company shall not buy all or any portion of such Units unless it and the other Members exercising their option pursuant to Section 9.5(c) hereof purchase all of the Units subject to the Offer.

(c)     If the Company does not exercise its option, the other Members shall have the option, exercisable by written notice to the selling Member within thirty (30) days following the expiration of the Company's option to purchase not less than all the remaining Units offered pro rata in accordance with their Units or otherwise in such proportions as they mutually agree.

(d)     The closing of a purchase of the selling Member's Units to the Company or the purchasing Members shall take place at the offices of the Company on the later to occur of sixty (60) days from the date of the Offer, if applicable, thirty (30) days after the Fair Market Value of such has been established. The Company and each of those Members purchasing the selling Member's Units may individually elect to pay their respective portion of the total purchase price

in cash or in installments. If the Company or a Member elects to pay in cash, the full amount of the purchase price must be made in immediately available funds at closing. If the Company or a Member elects to pay its respective portion of the total purchase price in installments, the initial payment of the purchase price shall be paid at closing in immediately available funds in an amount not less than ten percent (10%) of the purchase price of that portion of Units being purchased on the installment basis by the Company or such electing Member. The balance of the purchase price shall be paid in equal quarterly installments of one-sixteenth (1/16th) of the purchase price (less the initial payment) per quarter, on the first day of each quarter, together with accrued interest at a rate per annum determined on the/ date of the initial payment equal to the lesser of the Prime Rate as reported by the Wall Street Journal on the last business day preceding the closing or six percent (6%), with such payments beginning on the first day of the quarter immediately subsequent to the date of the initial payment, with like installments being due and payable until the entire portion of each party's respective balance of the purchase price is paid in full. Such respective balance shall be evidenced by an installment note in form reasonably acceptable to the Board of Managers, executed by such party and delivered to the selling Member at the time for the initial payment of the purchase price. The promissory note shall be secured by a security interest in the purchased Units, as evidenced by a security agreement executed by the purchasers in favor of the selling Member. The selling Member or other person or persons holding such Units shall execute all documents that the Company or the purchasing Members reasonably determine to be necessary or desirable to effect the transfer of the selling Member's Units to the applicable Person(s), free and clear of all encumbrances (other than restrictions imposed on applicable Members under this Company Agreement or transfer restrictions imposed under any applicable securities laws).

9.6    Drag-Along Rights.

(a)    In the event that Class A Members holding more than fifty percent (50%) of the Class A Units (the "Dragging Members") propose to make a Transfer of all their Class A Units to a third-party (a "Drag Event"), then the Dragging Members proposing to dispose of their Class A Units in the contemplated Drag Event shall have the right to consummate such Drag Event and to require all other Members (the "Dragged Members") to sell all of their Units in the Company free and clear of any encumbrances of any kind or nature whatsoever based on the same pricing structure and on the same terms as the Dragging Members are to receive in such proposed Transfer (a "Drag Sale"); provided, however, the Members agree that the Dragging Members may not consummate a Drag Event unless all other Members have the opportunity to participate in the Drag Event as provided herein.

(b)    Not less than thirty (30) days prior to the proposed date of consummation of a Drag Sale, the Dragging Members shall cause written notice (a "Drag-Along Notice") to be sent to all other Dragged Members, which Drag-Along Notice shall set forth: (i) the intention of the Dragging Members to initiate the drag-along rights under this Section 9.6; (ii) the name of the intended Third Party Purchaser(s); (iii) the proposed amount and type of consideration to be paid in the transactions; and (iv) any other information deemed to be appropriate by the Dragging Members, in their sole discretion, relating to such Drag Sale.

(c)    In connection with any such Drag Sale, all Members shall consent to, and raise no objections against, the Drag Sale, and if the Drag Sale is structured as (i) a merger, conversion,

exchange of Units or consolidation of the Company, or a sale of all or substantially all of the assets of the Company, each Dragged Member shall vote in favor of the Drag Sale and shall waive any appraisal rights or similar rights (to the extent applicable) in connection with transaction, or (ii) a sale of Units, each Dragged Member shall agree to sell all of its Units that are the subject of the Drag Sale, on the terms and conditions of such Drag Sale. The Dragged Members shall promptly take all necessary and desirable actions requested by the Dragging Members in connection with the consummation of the Drag Sale. Notwithstanding anything contained in this Company Agreement to the contrary, the Members shall be permitted to Transfer their Units pursuant to a Drag Sale under this Section 9 without complying with any other provisions of this Section 9; and for clarity, in the event of a conflict between the provisions of this Section 9.6 and any other provision of Section 9 the provisions of this Section 9.6 shall control, except that nothing contained in this Section 9.6 shall prevent the full application of the rights and obligations set forth in Section 9.8.

(d)    Notwithstanding anything to the contrary in this Section 9, a Drag Sale shall be treated as a Sale of the Company for all purposes, and the purchase agreement governing such disposition will contain provisions therein which replicate, to the maximum extent possible, the economic result which would have been obtained under Section 7.4 had the Drag Sale been structured as a sale of the Company's assets for an amount equal to the aggregate consideration actually received by the selling equity holders in such Drag Sale, followed immediately by a liquidating Distribution of the sale proceeds.

(e)    The obligations of the Dragged Members pursuant to this Section 9.6 are subject to the following terms and conditions:

(i)    upon the consummation of the Drag Sale, each Member shall, to the maximum extent reasonably possible, be entitled to receive out of the net proceeds from such Drag Sale an amount equal to that which such Member would receive if all the net proceeds from such Drag Sale were distributed as Sale Proceeds in the manner set forth in Section 7.4 as a Sale of the Company;

(ii)    if any Member is given an option as to the form and amount of consideration to be received, all Dragged Members shall be given the same option;

(iii)    no Dragged Member shall be required to provide any representations, warranties or indemnities in connection with the Drag Sale, other than customary (including with respect to qualifications) representations and warranties, subject to any exceptions set forth on a disclosure schedule, concerning (A)(1) such Dragged Member's valid title to and ownership of Units, free and clear of all liens, claims and encumbrances (excluding those arising under applicable securities Laws), (2) such Dragged Member's authority, power and right to enter into and consummate such Sale of the Company, (3) the absence of any violation, default or acceleration of any agreement or Laws to which such Dragged Member is subject or by which its assets are bound, (4) the absence of, or compliance with, any governmental or third party consents, approvals, filings or notifications required to be obtained or made by such Dragged Member in connection with such Drag Sale, and (5) other matters to the extent the Dragging Members and each other Dragged Member are similarly obligated; and (B) indemnities by a

Dragged Member on a several basis, limited to breaches or inaccuracies of such Dragged Member's representations and warranties;

(iv)     no Dragged Member shall be liable for, or obligated with respect to, the inaccuracy of any representation or warranty made by another Person (other than the Company) in connection with a Drag Sale.

(f)     Notwithstanding anything to the contrary in this <u>Section 9.6</u>, if the consideration proposed to be paid to Members in a Drag Sale includes securities with respect to which no registration statement covering the issuance of such securities has been declared effective under the Securities Act, then each Member that is not then an "accredited investor" (as such term is defined in Rule 501 under the Securities Act) may be required at the request and election of the Dragging Members, to (i) appoint a purchaser representative (as such term is defined in Rule 501 under the Securities Act) reasonably acceptable to such Member or (ii) accept cash in lieu of any securities such Member would otherwise receive in an amount equal to the fair market value of such securities.

9.7     <u>Insurance</u>.

(a)     The Company may apply for insurance on the lives of the Members. The Company shall be the sole owner and beneficiary of any insurance policies issued pursuant to such applications and may apply any dividends toward the payment of premiums. Any policies covered by and subject to this Company Agreement shall be listed in the Insurance Exhibit attached hereto as <u>Exhibit 9.7</u>, as amended by the Company from time to time to reflect the actual policies owned by the Company. Upon the death of any Member insured by any such policy, the Company shall collect and retain all proceeds of such policy.

(b)     Each insurance policy on the life of a Member obtained by the Company pursuant to this Company Agreement may be purchased by such Member at his option (the "Insurance Option") upon the happening of either the following events: (i) the termination of such Member's ownership of all of his Units for any reason other than death or (ii) the termination of this Company Agreement. The Insurance Option shall be exercised by payment to the Company within ninety (90) days from the date of the event giving rise to the Insurance Option (the "Date") of an amount equal to the cash surrender value of each policy as of the Date, minus the amount of any indebtedness outstanding against such policy, plus an amount equal to the portion of any premium paid which covers the period beginning with the Date.

(c)     In the event that a conflict arises between the provisions of this <u>Section 9.7</u> and any other provision in this Agreement relating to insurance, the provisions of this <u>Section 9.7</u> shall control.

9.8     <u>Transfers in Violation of this Section</u>. Any attempted Transfer of Units in violation of this <u>Section 9</u> shall be void and of no effect, and if such Transfer is a Transfer of Class A Units, shall constitute an Offer, and the provisions of <u>Section 9.5</u> hereof shall apply thereto; and the price to be paid for such Class A Units shall be the Fair Market Value thereof and the date of the Offer shall be the date on which the Company has actual knowledge of such

attempted Transfer. No such Transfer shall cause or constitute an event requiring the winding up and termination of the Company. Each party hereto acknowledges that a remedy at law for any breach or attempted breach of the provisions of this <u>Section 9</u> will be inadequate, agrees the Company that each of the other parties hereto shall be entitled to specific performance and injunctive and other equitable relief in case of any such breach or attempted breach and further agrees to waive any proof of damage or requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief.

**10.    WINDING UP AND TERMINATION.**

10.1    <u>Events of Winding Up and Termination</u>.  The Business of the Company shall be wound up and the Company terminated upon the happening of any of the following events: (a) the Majority Vote of the Members or (b) any event under applicable law requiring winding up of the Company. The winding up and termination of the Company pursuant to Majority Vote of the Members as set forth in this Section <u>10.1</u> may be revoked at any time prior to termination by a Majority Vote of the Members.

10.2    <u>Winding Up</u>.  Upon the occurrence of an event of termination in <u>Section 10.1</u>, the Board of Managers shall direct the winding up of the Company's affairs.  On winding up of the Company, the assets of the Company shall be distributed in the following order of priority: (a) first, to pay the costs and expenses of the winding up, liquidation and termination of the Company; (b) second, to creditors of the Company, including Members who are creditors, to the extent otherwise permitted by applicable Law, in satisfaction of the liabilities of the Company; (c) third, to establish reserves reasonably adequate to meet any and all contingent or unforeseen liabilities or obligations of the Company (including to purchase customary tail coverage on customary terms for any Managers and officers or errors and omissions coverage maintained by the Company as of immediately prior to such winding up and termination); and (d) fourth, the balance, including any amounts released from reserves for Distribution under this <u>Section 10.2</u>, to the Members in accordance with the provisions of <u>Section 7.4(d)</u>.

10.3    <u>No Action for Winding Up and Termination</u>.  The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to terminate the Company under circumstances where winding up and termination are not required by <u>Section 10.1</u>.  This Company Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Units of all Members.  Accordingly, except where the Board of Managers has failed to liquidate the Company as required by <u>Section 10.2</u> and except as specifically provided in the Act, each Member hereby waives and renounces its right to initiate legal action to seek termination or to seek the appointment of a receiver or trustee to liquidate the Company.

10.4    <u>No Further Claim</u>.  Upon termination, each Member shall look solely to the assets of the Company for the return of its capital, and if the Company's property remaining after payment or discharge of the debts and liabilities of the Company, including debts and liabilities owed to one or more of the Members, is insufficient to return the aggregate Capital Contributions of each Member, such Members shall have no recourse against the Company, the Board of Managers or any other Member.

## 11 . INDEMNIFICATION.

11.1    <u>General</u>.  The Company shall indemnify, defend and hold harmless the Board of Managers and each member of the Board of Managers, each Member, including the Company Representative, each Assignee and each such Person's officers, directors, shareholders, members, Members, employees and agents; and the employees, officers and agents of the Company (all indemnified persons being referred to as "Indemnified Persons") from any liability, loss or damage incurred by the Indemnified Person by reason of any act performed or omitted to be performed by the Indemnified Person in connection with the Business of the Company or its Affiliates and from liabilities or obligations of the Company or its Affiliates imposed on such Person by virtue of such Person's position with the Company or its Affiliates, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss or damage; provided, however, that if the liability, loss, damage or claim arises out of any action or inaction of an Indemnified Person, indemnification under this <u>Section 11.1</u> shall be available only if (a) either (i) the Indemnified Person, at the time of such action or inaction, determined in good faith that its, his or her course of conduct was in, or not opposed to, the best interests of the Company or its Affiliates, or (ii) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend its, his or her inaction to be harmful or opposed to the best interests of the Company or its Affiliates, and (b) the action or inaction did not constitute fraud, gross negligence or willful misconduct by the Indemnified Person; and provided, further, that indemnification under this <u>Section 11.1</u> shall be recoverable only from the assets of the Company and not from any assets of the Members.  **The foregoing indemnity is intended to indemnify each Indemnified Person for his own acts of negligence and shall apply irrespective of any claim of concurrent or contributory negligence on the part of such Indemnified Person.**  The Company may pay or reimburse attorneys' fees of an Indemnified Person as incurred, if such Indemnified Person executes an undertaking to repay the amount so paid or reimbursed if there is a final determination by a court of competent jurisdiction that such Indemnified Person is not entitled to indemnification under this <u>Section 11</u>.  The Company may pay for insurance covering liability of the Indemnified Persons for negligence in operation of the Company's affairs.

11.2    <u>Persons Entitled to Indemnity</u>.  Any Person who is within the definition of "Indemnified Person" at the time of any action or inaction in connection with the Business of the Company shall be entitled to the benefits of this <u>Section 11</u> as an Indemnified Person with respect thereto, regardless if such Person continues to be within the definition of "Indemnified Person" at the time of such Indemnified Person's claim for indemnification or exculpation hereunder.

11.3    <u>Procedure Agreements</u>.  The Company may enter into an agreement with any of its officers, employees and agents, or the members of the Board of Managers, setting forth procedures consistent with applicable law for implementing the indemnities provided in this <u>Section 11</u>.

11.4    <u>Fiduciary and Other Duties</u>.  An Indemnified Person acting under this Company Agreement shall not be liable to the Company or to any other Indemnified Person for its good

faith reliance on the provisions of this Company Agreement. The provisions of this Company Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of an Indemnified Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Indemnified Person.

11.5    Expenses. The Company shall reimburse the Members and their Affiliates for all out-of-pocket costs and expenses reasonably incurred by them in connection with the funding of the Company pursuant to this Company Agreement, the negotiation and execution on behalf of the Company of this Company Agreement, any acquisition agreements or related agreements of the Company or its Affiliates, and the consummation of the transactions contemplated by such agreements, including the fees and expenses of lawyers, accountants, advisors, travel and other expenses. All such reimbursement shall be made in cash promptly after submission to the Company of an invoice therefor accompanied by reasonable supporting documentation.

11.6    Exculpation. No Indemnified Person shall be liable, in damages or otherwise, to the Company or to any Member for any loss that arises out of any act performed or omitted to be performed by it or him pursuant to the authority granted by this Company Agreement if such Indemnified Person is exculpated from liability under other provisions of this Company Agreement or (a) either (i) the Indemnified Person, at the time of such action or inaction, determined, in good faith, that such Indemnified Person's course of conduct was in, or not opposed to, the best interests of the Company, or (ii) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend such Indemnified Person's inaction to be harmful or opposed to the best interests of the Company, and (b) the conduct of the Indemnified Person did not constitute fraud, gross negligence or willful misconduct by such Indemnified Person.

11.7    No Obligation. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Indemnified Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being an Indemnified Person. All persons dealing with the Company shall look solely to the assets of the Company for the payment of the debts, obligations or liabilities of the Company.

11.8    Insurance. To the full extent permitted under the Act, the Company may purchase and maintain insurance on behalf of any Person who is or was a Member, Manager, employee or agent of the Company or its Affiliates or who is or was serving at the request of the Company as a director, manager, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic corporation, limited liability company, partnership, joint venture, sole proprietorship, trust, other enterprise or employee benefit plan against any liability asserted against him or her and incurred by him or her in such a capacity, whether or not the Company would have the power to indemnify him or her against that liability under this Company Agreement.

12.    **AMENDMENT.** Except as otherwise expressly set forth in this Company Agreement, the Certificate of Formation of the Company and this Company Agreement may be amended, supplemented or restated only upon obtaining a Supermajority Vote approving such amendment;

provided, however, any amendment that would require any Member to provide additional Capital Contributions to the Company in excess of the amounts of Capital Contributions set forth in Exhibit 3.1 shall require the consent of such Member, and any amendment that would disproportionately (as in relation to other Members holding the same class or type of Units), materially and adversely affect the rights or duties of a Member shall require the consent of such Member. Notwithstanding anything to the contrary in this Section 12, the Board of Managers may amend any provision of the Certificate of Formation or this Company Agreement, and execute, swear to, acknowledge, deliver, file and record whatever documents may be required in connection therewith, to reflect  (i) a change in the location of the principal place of business, registered office or registered agent of the Company, (ii) admission, substitution or termination of Members or changes in Units in accordance with this Company Agreement (including, without limitation, an amended Exhibit 3.1 to this Company Agreement), (iii) a change that is necessary to qualify the Company under the laws of any state and (iv) any other amendments similar to the foregoing.

## 13.    MISCELLANEOUS.

13.1    Additional Documents.  At any time and from time to time after the date of this Company Agreement, upon the request of the Board of Managers, each Member shall do and perform, or cause to be done and performed, all such additional acts and deeds, and shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such additional instruments and documents as may be required to effectuate the purposes and intent of this Company Agreement.

13.2    General.  This Company Agreement: (a) shall be binding upon the executors, administrators, estates, heirs and legal successors of the Members; (b) shall be governed by and construed in accordance with the laws of the State of Texas, without regard to principles of conflict of laws; (c) may be executed in more than one counterpart, including counterparts delivered by facsimile or other electronic transmission, as of the day and year first above written; each of which shall be deemed an original and together one and the same instrument; and (d) contains the entire contract among the Members as to the subject matter hereof.  The waiver of any of the provisions, terms or conditions contained in this Company Agreement shall not be considered as a waiver of any of the other provisions, terms or conditions hereof.

13.3    Notices, etc.  All notices provided for in this Company Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered by hand or messenger, facsimile or other electronic transmission, overnight air courier or mailed by certified mail, return receipt requested with postage prepaid as follows (or to such other addresses as shall be specified by the parties by like notice) and shall be deemed to have been duly given or received (a) in the case of personal or messenger delivery, on the date of such delivery; (b) in the case of facsimile or other electronic transmission, on the date on which the sender receives confirmation of delivery on sender's machine, provided that a copy of such transmission is additionally sent by mail as set forth herein; (c) in the case of overnight air courier, on the second business day following the day sent, with receipt confirmed by the courier; and (d) in the case of mailing by certified mail, on the third business day following such mailing, in each instance

addressed to a Member as set forth on Exhibit 3.1 attached hereto or to the Company at its registered address (or to such other address designated by notice as aforesaid).

      13.4    Execution of Papers. The Members agree to execute such instruments, documents and papers as the Board of Managers deems necessary or appropriate to carry out the intent of this Company Agreement. Each Member, including each new and substituted Member, by the execution of this Company Agreement or by agreeing in writing to be bound by the provisions of this Company Agreement, irrevocably constitutes and appoints each member of the Board of Managers or any Person designated by the Board of Managers to act on its behalf for purposes of this Section 13.4 its true and lawful attorney-in-fact with full power and authority in its name, place and stead to execute, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Company Agreement, including but not limited to:

      (a)    all certificates and other instruments (specifically including counterparts of this Company Agreement), and any amendment thereof, that the Board of Managers deems appropriate to qualify or continue the Company as a limited liability company in any jurisdiction in which the Company may conduct business or in which such qualification or continuation is, in the opinion of the Board of Managers, necessary to protect the limited liability of the Members;

      (b)    all amendments to this Company Agreement adopted in accordance with the terms hereof and all instruments that the Board of Managers deems appropriate to reflect a change or modification of the Company in accordance with the terms of this Company Agreement; and

      (c)    all conveyances and other instruments that the Board of Managers deems appropriate to reflect the winding up of the Company.

The appointment by each Member of each member of the Board of Managers or any Person designated by the Board of Managers as its attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Members under this Company Agreement will be relying upon the power of the Board of Managers to act as contemplated by this Company Agreement in any filing and other action by it on behalf of the Company, and shall survive and shall not be affected by the subsequent disability, incapacity, the bankruptcy, dissolution, death, adjudication of incompetence or insanity of any Member giving such power and the transfer or assignment of all or any part of such Member's Units; provided, however, that in the event of a Transfer by a Member of all of its Units, the power of attorney given by the transferor shall survive such assignment only until such time as the Assignee shall have been admitted to the Company as a substituted Member and all required documents and instruments shall have been duly executed, filed and recorded to effect such substitution.

      13.5    Confidentiality. The terms of this Agreement, the identity of any Member, any principal of a Member or any Affiliate of any Member or the relative or absolute rights or interests of any of the Members, all business, financial or other information relating directly to the conduct of the business and affairs of the Company, and the identity of any Person with whom the Company may be holding discussions with respect to any investment, acquisition or

other transaction or in whom the Company may invest directly or indirectly that has not been publicly disclosed with the consent of the Board of Managers is confidential and proprietary information of the Company the disclosure or use of which would cause irreparable harm to the Company and the Members.    Accordingly, each Member represents that it will not and will direct its shareholders, partners, members, directors, officers, managers, agents, advisors (including, without limitation, any appraiser selected by or on behalf of it) and Affiliates not to, disclose to any Person any confidential information or confirm any statement made by third persons regarding confidential information or use any confidential information unless the Board of Managers consents thereto or until the Company has publicly disclosed the confidential information and has notified each Member that it has done so. The covenants contained in this <u>Section 13.5</u> will survive the Transfer of the Units of any Member and the termination of the Company. Notwithstanding any contrary provision in this Section 13.5, any Member may, without breach of the covenants set forth in this Section 13.5 and without notice to or consent of the Board of Manager, disclose any confidential information in any filing required of such Member with any securities commission or other regulatory agency, to any financial advisors, accountants, attorneys or similar representatives, in each case, that are under an obligation to maintain the confidentiality of such disclosed confidential information, or as may otherwise be required by applicable law.

     13.6   <u>Construction</u>. The parties have participated jointly in the negotiation and drafting of this Company Agreement and related documents.  If an ambiguity or questions of intent or interpretation arises, this Company Agreement or related documents will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Company Agreement or any such other document.  Any reference to any federal, state, local, or foreign law will be deemed also to refer to the law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise, words "include," "includes," and "including" will be deemed to be followed by "without limitation," "or" shall include both the conjunctive and disjunctive and "any" shall mean "one or more."  Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Company Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Company Agreement as a whole and not to any particular subdivision unless expressly so limited.

     13.7   <u>Severability</u>. If any provision of this Company Agreement is determined by a court to be invalid or unenforceable, that determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein.  That invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each said provision shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

     13.8   <u>Headings</u>. The headings used in this Company Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing the terms of this Company Agreement.

13.9    No Third Party Rights.  The provisions of this Company Agreement are for the benefit of the Company, the Board of Managers, the Members and Assignees and no other Person, including creditors of the Company, shall have any right or claim against the Company, the Board of Managers or any Member by reason of this Company Agreement or any provision hereof or be entitled to enforce any provision of this Company Agreement.

13.10    Arbitration.

(a)    Agreement to Arbitrate.  In the event of disputes between the parties with respect to the terms and conditions of this Company Agreement, such disputes shall be resolved by and through an arbitration proceeding to be conducted under the auspices of the American Arbitration Association (or any like successor organization thereof) at Houston, Texas.  Such arbitration proceeding shall be conducted in as expedited a manner as is then permitted by the commercial arbitration rules (formal or informal) of the American Arbitration Association, and the arbitrator in any such arbitration shall be a person who is expert in the subject matter of the dispute.  Both the foregoing agreement of the parties to arbitrate any and all such claims and the results, determination, finding judgment or award rendered through such arbitration shall be final and binding on the parties to this Company Agreement and may be specifically enforced by legal proceedings and the parties agree that a judgment of any Texas court of competent jurisdiction may be rendered upon any arbitration award rendered pursuant to this Section 13.10.  The parties agree and acknowledge that monetary damages may not be an adequate remedy for any breach of the provisions of this Company Agreement and that any party may, in his or its sole discretion, ask for specific performance or injunctive relief in order to enforce or prevent any violations of the provisions of this Company Agreement and any such equitable relief granted by the arbitrator shall be binding upon the parties.  Notwithstanding the foregoing, however, any request to a court of competent jurisdiction solely for equitable relief, including a temporary restraining order or temporary injunction, shall not be deemed incompatible with the agreement to arbitrate, or as a waiver of the right to arbitrate.

(b)    Procedure.  Such arbitration may be initiated by written notice from either party to the other which shall initiate a compulsory and binding proceeding on each party.  The arbitration shall be conducted before one (1) arbitrator selected in accordance with the rules of the American Arbitration Association.  The prevailing party in any dispute arising out of or relating to this Company Agreement or the breach thereof shall be entitled to recover all costs and attorney's fees incurred.  Time is of the essence of this arbitration procedure, and the arbitrator shall be instructed and required to render a decision with ten (10) days following completion of the arbitration.

13.11    Spouses.  Each undersigned spouse of a Member acknowledges that he or she has reviewed this Amended and Restated Company Agreement of the Company and agrees that he or she understands each of its respective terms, including rights that restrict such Member's right to Transfer or all or any portion of such Member's Units and agrees that the terms of this Company Agreement bind any and all interests, ownership or otherwise, that such spouse may have in such Units, if any.  Such spouse further agrees that the provisions of this Section 13.11 shall bind such spouse and such spouse's heirs, personal representatives, executors, successors and permitted assigns.

**IN WITNESS WHEREOF**, all of the Members of the Company have executed this Company Agreement as of the Effective Date.

**CLASS A MEMBERS:**

**EXISTING CLASS A-SERIES I MEMBERS:**

RABBIT FOOD, LLC

BY: _____
       SARAH BLACKBURN,
       MANAGER

_____
SARAH BLACKBURN

SPOUSAL JOINDER: _____
BO BLACKBURN

**NEWLY ADMITTED CLASS A-SERIES II MEMBERS:**

405 MANHATTAN INVESTMENTS, LLC

BY: _____
       ALYSE ANGELLE, MANAGER

ALPHABET INVESTMENTS, LLC

BY: _____
       M. CLAYTON HILL, MANAGER

**CLASS A-1 MEMBERS:**

405 MANHATTAN INVESTMENTS, LLC

BY: _____
       ALYSE ANGELLE, MANAGER

ALPHABET INVESTMENTS, LLC

BY: _____
       M. CLAYTON HILL, MANAGER

*Signature page follows:*

## EXHIBIT 1

### Defined Terms

"Act" means the Texas Business Organizations Code, as the same may be amended from time to time.

"Adjusted Capital Account" means, with respect to any Member, the balance, if any, in such Member's Capital Account as of the end of the relevant taxable year or other relevant period as determined in accordance with this Company Agreement, after (i) crediting to such Capital Account any amounts that such Member is obligated to restore pursuant to Section 1.704-1(b)(2)(ii)(c) of the Regulations (or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations) and (ii) debiting to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations. This definition is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and be interpreted consistently with such intent.

"Affiliate" means, with respect to any specified Person, any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Assignee" means a Person that has acquired the right from a Member to (i) share in Net Profit and Net Loss of the Company, (ii) receive Distributions and (iii) receive the allocation of taxable income, gain, loss, deduction or credit (and items thereof) of the Company to which the transferor Member was entitled in accordance with the provisions of <u>Section 9</u>, but has not been admitted as a Member of the Company in accordance with the provisions of <u>Section 10</u>.

"Board of Managers" means the board of managers elected and determined as provided in <u>Section 5.1</u>.

"Book Value" of an asset means, as of any particular date, the value at which the asset is properly reflected on the books and records of the Company as of such date. The initial Book Value of each asset shall be its cost, unless such asset was contributed to the Company by a Member, in which case the initial Book Value shall be the fair market value of such asset at the time of contribution, as agreed to by the Members or determined by the Board of Managers, and such Book Value shall thereafter be adjusted for Depreciation with respect to such asset rather than for the cost recovery deductions to which the Company is entitled for federal income tax purposes with respect thereto.

"Business" is defined in <u>Section 2.5</u>.

"Capital Contribution" means with respect to any Member, the amount of money plus the fair market value of any other property (net of liabilities assumed or to which the property is

subject) contributed to the Company with respect to the Units held by such Member pursuant to the terms of this Company Agreement.

"Class A Member" means a Member holding Class A Units (Series I or Series II).

"Class A-1 Member" means a Member holding Class A-1 Units.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the corresponding provisions of any future federal tax law.

"Company" means the Limited Liability Company formed by virtue of this Company Agreement and the filing of the Certificate in accordance with the Act.

"Depreciation" means for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period for federal income tax purposes, except if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of any such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization, or other cost recovery deduction computed for tax purposes with respect to such asset for the applicable period bears to the adjusted tax basis of such asset at the beginning of such period, or if such asset has a zero adjusted tax basis, Depreciation shall be an amount determined under any reasonable method selected by the Board of Managers, with the advice of its independent accountants.

"Distributable Cash" means, all cash funds of the Company from operations or any other source, at any particular time, available for Distribution to the Members after the Board of Managers has made provision for (a) payment of all operating expenses of the Company as of such time, (b) payment of all outstanding and unpaid current obligations of the Company as of such time, (c) amounts required to service debt and taxes, (d) reserves as deemed appropriate by the Board of Managers; provided, however, the following shall not constitute "Distributable Cash" hereunder: (i) Termination Proceeds, (ii) Sale Proceeds; and (iii) unless otherwise approved by the Board of Managers, (A) Insurance proceeds; (B) Capital Contributions; or (C) amounts borrowed by the Company.

"Distribution" means cash or property (net of liabilities assumed or to which the property is subject) distributed to a Member or an Assignee in respect of the Member's Units in the Company.

"Effective Date" means December 1, 2021.

"Fiscal Year" means the fiscal year of the Company, which shall be the calendar year, or such other fiscal year as determined by the Board of Managers.

"Interest" means the entire interest of a Member in the Company, including, without limitation, rights to management, capital, allocations, Net Profit, Net Loss and Distributions of the Company and any and all rights and benefits to which a Member may be entitled as provided in this Company Agreement, together with the obligations of such Member to comply with all

the terms and provisions of this Company Agreement. A Member's Interest shall be represented by Units.

"Majority Vote" means the vote or consent of Members owning or holding 51% or more of the aggregate voting power of all issued and outstanding Class A Units as of the applicable date of determination.

"Managers" means the members of the Board of Managers and "Manager" means any member of the Board of Managers.

"Member Nonrecourse Deductions" shall have the meaning set forth in Regulation Section 1.704-2(i)(1).

"Members" whether one or more, means the Persons listed as Members on Exhibit 3.1 to this Company Agreement and any other Person that both acquires Units (whether Class A Units or Class A-1 Units) in the Company and is admitted to the Company as a Member of the Company.

"Net Profit" and "Net Loss" means the net taxable income or net taxable loss of the Company, respectively, as determined for federal income tax purposes, for each Fiscal Year of the Company, including each item of Company income, gain, loss or deduction, taking into account the following adjustments, and any other adjustments necessary in order to comply with Section 1.704-1(b)(2)(iv) of the Regulations: (a) any income that is exempt from federal income tax and not otherwise taken into account shall be added to such taxable income or loss; (b) any expenditure that is not deductible in computing federal taxable income and not properly chargeable to capital accounts and not otherwise taken into account shall be subtracted from such taxable income or loss; (c) any adjustments to the "book values" of Company Property pursuant to Section 1.704-1(b)(2)(iv) shall be treated as an item of gain or loss; and (d) other than for federal income tax purposes, depreciation with respect to, and gain or loss from the disposition of, Company Property shall be computed by reference to the adjusted "book values" of the Company Property, rather than the adjusted tax basis of such assets.

"Nonrecourse Deductions" shall have the meaning set forth in Regulation Section 1.704-2(b)(1).

"Person" means an individual, Company, joint venture, association, corporation, trust, estate, limited Company, limited liability Company or any other legal entity.

"Qualified Income Offset" shall have the meaning set forth in Regulation Section 1.704-1(b)(2)(ii)(d).

"Regulations" means the Treasury regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including the corresponding provisions of any future regulations) as such regulations are applicable to the Company or transactions of the Company.

"Sale of the Company" means the first to occur of any of the following: (a) the merger, reorganization, combination or consolidation of the Company into or with, or any other acquisition of the Company by, a Third Party Purchaser or any other Person not Affiliated with the Company or any Member or any Affiliate thereof, in any case which involves the direct or indirect Transfer by the Class A Members, collectively, of one hundred percent (100%) of the issued and outstanding Class A Units and one hundred percent (100%) of the issued and outstanding Class A-1 Units by the Class A-1 Members; or (b) the sale, transfer or lease, whether in a single transaction or pursuant to a series of related transactions, of assets or businesses constituting all or substantially all of the assets or businesses of the Company, taken as a whole, in a transaction other than as described in the foregoing clause (a) to a Third Party Purchaser or any other Person not Affiliated with the Company or any Member or any Affiliate thereof. A Drag Sale will be deemed hereunder as a Sale of the Company, but a deemed sale of the assets of the Company at fair market value and the Distribution of such deemed proceeds in complete liquidation of the Company for tax or administrative purposes will be treated as a winding up and termination of the Company and not a Sale of the Company. The terms of a Sale of the Company cannot subordinate or negatively affect the distribution rights of the Class A-1 Members. A Sale of the Company requires the approval of a Majority Vote of the Members, in which case all Class A Members and Class A-1 Members will be bound by such vote.

"Supermajority Vote" means the vote or consent of Members owning or holding at least 67% of the voting rights of the issued and outstanding Class A Units (both Series I and Series II) as of the applicable date of determination and the vote or consent of Members owning or holding at least 67% of the Class A-1 Units as of the applicable date of determination

"Third Party Purchaser" means a Person that is not, immediately prior to the consummation of a transaction involving such Person, a Member, an Affiliate of the Company, or an Affiliate of any Member.

"Transfer" means a sale, assignment, pledge, encumbrance, abandonment, disposition, contribution, distribution, exchange or other transfer, including but not limited to, any Distribution to members, shareholders, partners or equity holders of any entity, and may be used either as a verb or a noun.

"Unit" as to an applicable class, at the time of determination means a percentage Interest in the applicable class equal to the quotient obtained dividing 1 by the aggregate number of Units of the applicable class that are issued and outstanding at the time of determination.

"Unreturned Capital Contributions" shall mean the aggregate Capital Contributions of the Class A-1 Unit Holders less the amount of Distributions of Capital Contributions to the Class A-1 Unit holders.

## EXHIBIT 3.1

## MEMBER INFORMATION

| Member and Address | Initial Capital Contributions | Units (by Class and Series) |
|---|---|---|
| **EXISTING CLASS A-SERIES I MEMBERS:** | | |
| Rabbit Food, LLC | $990.00 | 3,960 Units |
| Sarah Blackburn | $10.00 | 40 Units |
| **NEWLY ADMITTED CLASS A-SERIES II MEMBERS:** | | |
| 405 Manhattan Investments, LLC | $5,000.00 | 3,000 Units |
| Alphabet Investments, LLC | $5,000.00 | 3,000 Units |
| Total | $11,000.00 | 10,000 Units |
| **NEWLY ADMITTED CLASS A-1 MEMBERS:** | | |
| 405 Manhattan Investments, LLC | $495,000.00 | |
| Alphabet Investments, LLC | $495,000.00 | |

Note: Class A-1 Contributions shall be credited in the amount of $250,000 representing a loan dated December 29, 2021 to BS Title Team, LLC, and said Capital Contributions are subject to call provisions.

Special Contributions:

#6 Metz Court, LLC                     $_____
                                       (subject to Special Contribution
                                       Provisions)

## EXHIBIT 3.1A

## CAPITAL COMMITMENTS OF CLASS A-1 UNIT HOLDERS

      The Investors are Class A-1 Unit Holders of the Company and each Investor has agreed to contribute to the Company an amount or amounts not exceeding an aggregate $990,000.00 (the "Committed Amount") called from time to time during the "Contribution Term" commencing on the Effective Date ending on the first to occur of (a) December 31, 2022, or (b) the Sale of the Company. The timing and amount of contributions called during the Contribution Term will be determined by the working capital needs of the Company, based upon a monthly financial forecast of the Company's operations, which shall be approved by the Investors before the capital call is made. Each Investor shall be liable for 50% of the amount called (subject to a limitation of the Committed Amount of each Investor). The Manager of the Company shall request capital contributions of not less than $25,000.00 each and not more often than 30 day increments. All capital calls shall be wired to the Company's operating account within 3 business days of receiving each capital call.

**COAST TO COAST TITLE, LLC**
**REVISED**
**EXHIBIT 3.1**
**EFFECTIVE: DECEMBER 31, 2021**

**MEMBER INFORMATION**

| <u>**Member**</u> | <u>**Units**</u><br><u>**(by Class)**</u> |
|---|---|
| **Class A Series I Member**: | |
| Rabbit Food, LLC | 500 Units (5%) |
| **Class A Series II Members**: | |
| 405 Manhattan Investments, LLC | 3,875 Units (38.75%) |
| Alphabet Investments, LLC | 3,875 Units (38.75%) |
| Peabody Bulldog, LLC | <u>1,750 Units (17.5%  )</u> |
| Total | 10,000 Units (100%) |

**Newly Admitted Class A-1 Members**: Cancelled effective 12/31/21 and converted to Class A-Series II Units

**Special Contributions:**

| 1. | #6 Metz Court, LLC | $161,025 |
|---|---|---|
| 2. | 405 Manhattan Investments, LLC | $153,863 |
| 3. | Alphabet Investments, LLC | <u>$153,863</u> |
| **Total** | | $468,751<br>(subject to<br>Special Contribution<br>Provisions) |

**COAST TO COAST TITLE, LLC**
**REVISED**
**EXHIBIT 3.1**
**EFFECTIVE: SEPTEMBER 9, 2022**

**MEMBER INFORMATION**

| <u>Member</u> | <u>Units</u><br><u>(by Class)</u> |
|---|---|
| **Class A Series I Member**: | |
| Rabbit Food, LLC | 500 Units (2.9%) |
| **Class A Series II Members**: | |
| 405 Manhattan Investments, LLC | 3,875 Units (22.48%) |
| Alphabet Investments, LLC | 3,875 Units (22.48%) |
| Peabody Bulldog, LLC | 1,750 Units (10.14%) |
| HMH Title Investments, LLC | <u>7,240 Units (42%)</u> |
| Total | 17,240 Units (100%) |

**Newly Admitted Class A-1 Members**: Cancelled effective 12/31/21 and converted to Class A-Series II Units

**Special Contributions:**

| 1. | #6 Metz Court, LLC | $  87,000 |
|---|---|---|
| 2. | 405 Manhattan Investments, LLC | $190,875 |
| 3. | Alphabet Investments, LLC | <u>$190,876</u> |
| **Total** | | $468,751<br>(subject to<br>Special Contribution<br>Provisions) |

## EXHIBIT 3.6

## SPECIAL CONTRIBUTIONS

Name and Address                    Special Contribution

# 6 Metz Court, LLC                 $_____
P.O. Box 162022
Austin, Texas 78716

# EXHIBIT 5.7

## MANAGEMENT AGREEMENT WITH BSPOKE MANAGEMENT GROUP

See Attached.

# Bspoke Title Holdings
# Management Agreement

This MANAGEMENT AGREEMENT (this "Agreement") is made effective as of December 1, 2021 by and between BS TITLE TEAM, LLC, dba Bspoke Title Holdings (the "Manager"), a Texas limited liability company and Coast to Coast Title, LLC (the "Title Agent"), an Texas limited liability company.

## RECITALS

WHEREAS, the Title Agent desires to engage the Manager to support certain functions of its Business, defined as operating a title insurance agency in the State of Texas, and the Manager desires to support the Business on the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

Article I.        Appointment of Manager; Relationship of Title Agent and the Manager.

Manager shall provide management services to the Title Agent, as hereinafter provided. Manager, at all times, shall be independent of the Title Agent. Nothing contained herein shall be deemed to make or render the Title Agent a partner, co-venturer or other participant in the business or operations of the Manager, or in any manner to render Title Agent liable, as principal, surety, guarantor, agent or otherwise for any of the debts, obligations or liabilities of Manager. Similarly, nothing contained herein shall be deemed to make or render the Manager a partner, co-venturer or other participant in the business or operations of the Title Agent, or in any manner to render Manager liable, as principal, surety, guarantor, agent or otherwise for any of the debts, obligations or liabilities of Title Agent.

Article II.        Management Services.

Commencing on the date of this Agreement, Manager will provide, supply and render such management and support services as are necessary to support the Title Agent including, *but not limited to*, the following:

    i. Operational Accounting
    ii. Escrow Accounting
    iii. Audit Management
    iv. Management of Escrow and Operational Bank Accounts
    v. Vendor Management
    vi. General Operations
    vii. Onboarding and Offboarding of Employees
    viii. Human Resources
    ix. Escrow Team Management
    x. Maintenance of all Licensing

    xi.  Assistance in Recruiting
    xii.  Information Reporting
    xiii.  Maintenance of Data and Records
    xiv.  Liaison with Underwriters
    xv.  Liaison with Texas Department of Insurance
    xvi.  Maintenance of all Insurance and Bonds
    xvii.  IT Support
    xviii.  Title Examination
    xix.  Title Production

Title Agent may, at any time and upon notice to Manager, take responsibility for managing any of the above services. In such case, Manager agrees to assist Title Agent with any and all assistance needed to transition management of such service to Title Agent.

Article III.    <u>Obligations of the Title Agent</u>.

Prior to the expiration of this Agreement, the Title Agent shall provide the Manager with true and correct information relating to all functions for which the Manager has responsibility hereunder, access to all databases, financials and other information requested by Manager, and shall not take any action, or inaction, which interferes with the Manager's performance of its duties hereunder.

Article IV.    <u>Expenses and Manager Compensation</u>.

During the term of this Agreement, Title Agent shall pay Manager on the first (1st) day of each month, beginning December 1, 2021, a monthly fee of Twenty Thousand and no/100 Dollars ($20,000.00) (the "Management Fee") per physical location. The parties agree that the Management Fee may be amended only by mutual, written agreement signed by both the Title Agent and Manager. In addition, Title Agent is responsible for any expenses incurred by Manager, or funds loaned to Title Agent by Manager, prior to the date of this Agreement, that remain unpaid.

Article V.    <u>Term of Agreement; Termination of Rights</u>.

The term of this Agreement shall commence on its execution, and terminate upon Title Agent or Manager providing 30 days' written notice of termination to the other party.

Article VI.    <u>Indemnification</u>.

    a.  Title Agent shall indemnify, defend and hold harmless Manager and its affiliates, their respective shareholders, officers, directors, employees, and agents, against and in respect of any and all losses arising out of or due to the acts performed by Manager, its affiliates, agents, servants and/or employees, on behalf of Business, as outlined in this Agreement.

    b.  If a party entitled to indemnification (the "Indemnitee") receives notice of any

claim or the commencement of any action or proceeding with respect to which a party is obligated to provide indemnification (the "Indemnifying Party") pursuant to subsections (a) and (b) of this Section, the Indemnitee shall promptly give the Indemnifying Party notice thereof (Indemnification Notice"). Such Indemnification Notice shall be a condition precedent to any liability of the Indemnifying Party under the provisions for indemnification contained in this Agreement. Except as provided below, the Indemnifying Party may compromise, settle or defend, at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel, any such matter involving the asserted liability of the Indemnitee. In any event, the Indemnitee, the Indemnifying Party and the Indemnifying Party's counsel shall cooperate in the compromise of, or defense against, any such asserted liability. If the Indemnifying Party provides the Indemnitee a defense to a third party claim at the Indemnifying Party's cost with a qualified attorney, Indemnitee may participate and/or monitor the defense with an attorney of the Indemnitee's selection (at the Indemnitee's own expense). Provided that the Indemnifying Party pays for the full cost of the settlement of any claim, the Indemnifying Party may settle any claim without the consent of the Indemnitee. If the Indemnifying Party chooses to defend any claim, the Indemnitee shall make available to the Indemnifying Party any books, records or other documents within its control that are necessary or appropriate for such defense.

Article VII.    Additional Provisions.

a.    Title Agent agrees to license it's logo and name to Manager for use by Manager in marketing, public relations and other uses, at Title Agent's discretion.

b.    Manager agrees to license it's log and name to Title Agent for use by Title Agent in marketing, public relations and other uses, at Manager's discretion.

c.    Title Agent agrees to include Manager as an additional insured on Title Agent's Errors and Omissions policy as well as any other insurance policy the Manager may, from time to time, deem appropriate.

d.    This Agreement sets forth the entire understanding and agreement among the parties hereto with reference to the subject matter hereof and may not be modified, amended, discharged or terminated except by a written instrument signed by the parties hereto.

e.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas applicable to agreements made, delivered and to be performed within such State.

f.    This Agreement may not be assigned without the consent of Manager and Title Agent, in writing.

g.   All of the terms and provisions of this Management Agreement shall be binding upon, inure to the benefit of, and be enforceable by each of the parties hereto and their respective successors and assigns. Except for affiliates of the Title Agent and Manager and their respective shareholders, officers, directors, employees and agents, no person other than the parties hereto shall be a third-party beneficiary of this Agreement or have any rights hereunder.

h.   No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other rights, power or remedy.

i.   Any legal action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby may be instituted in any state or Federal court located in Travis County, Texas, and each party waives any objection which such party may now or hereafter have to the laying of the venue of any such action, suit or proceeding, and irrevocably submits to the jurisdiction of any such court in any such action, suit or proceeding. Any and all service of process and any other notice in any such action, suit or proceeding shall be effective against any party if given by registered or certified mail, return receipt requested, or by any other means of mail which requires a signed receipt, postage prepaid, mailed to such party as herein provided. Nothing herein contained shall be deemed to affect the right to any party to service of process in any other manner permitted by law.

j.   If any provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect the remaining provisions of this Agreement, all of which shall remain in full force and effect.

k.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

l.   The headings in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Management Agreement as of the date first above written.

**MANAGER:**

BS TITLE TEAM, LLC


By: _____
Sarah Blackburn, CEO


**TITLE AGENT:**

Coast to Coast Title, LLC


By: _____
John Magness, Manager

**EXHIBIT 9.7**

**Insurance**

1.    NONE