## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| COAST TO COAST TITLE, LLC, et al., | § | |
| | § | |
| Plaintiffs | § | Civil Action No. 4:24-cv-02767 |
| | § | |
| v. | § | |
| | § | |
| TYRRELL L. GARTH, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

## DEFENDANTS TYRRELL L. GARTH AND PHILLIP H. CLAYTON'S
## MOTION FOR SANCTIONS

Defendants Tyrrell L. Garth and Phillip H. Clayton file this Motion for Sanctions pursuant to Federal Rule of Civil Procedure 11 as follows:

### INTRODUCTION

Rule 11 is designed to protect the integrity of the federal court system and deter the recreational filing of frivolous lawsuits. By signing and filing pleadings with a federal court, attorneys are required to certify to that court not only that the filing was made for a proper purpose, but also that the asserted claims are supported by non-frivolous legal arguments and factual contentions that either have evidentiary support, or if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Fed. R. Civ. P. 11. Plaintiffs have repeatedly violated their obligations under Rule 11 by filing knowingly false allegations against Garth and Clayton. With each amendment to their pleadings, the collection of falsehoods has only multiplied. What began as a false allegation of forgery expanded into thirteen groundless causes of action supported by a convoluted and fabricated statement of facts. Plaintiffs' Second Amended Complaint reflects the third time Garth and Clayton have been

forced to wade through hundreds of paragraphs of meandering false allegations in order to defend themselves and seek dismissal of an ever-increasing number of frivolous causes of action.

Plaintiffs were provided with the opportunity to file the Second Amended Complaint to bring their pleading in line with Rule 8 and provide both the parties and the Court with a concise, plain statement of their claims. Instead, they took the opportunity to invent new fraudulent "schemes" to expand on their previous failed attempt to state a coherent, viable claim against Garth and Clayton. The sensational allegations of fraud and misconduct peppered throughout the Second Amended Complaint are false, and Plaintiffs knew they were false when they filed and presented the allegations to the Court.

On March 21, 2025, Garth and Clayton filed their third motion to dismiss all causes of action asserted against them as a matter of law under Rule 12(b)(6). Dkt. No. 69. That same day, Garth and Clayton served Plaintiffs with a copy of this Motion for Sanctions pursuant to Rule 11(c)(2).[1] Plaintiffs responded to Garth and Clayton's Motion to Dismiss on April 16, 2025, and while the response voluntarily dismisses a number of Plaintiffs' frivolous causes of action, with rare exception, none of the falsely asserted factual allegations have been withdrawn or corrected. Plaintiffs have instead boldly reiterated many of the most egregious false allegations in spite of the incontrovertible contradictory evidence attached to this motion. Garth and Clayton are accordingly filing this motion to respectfully request an order sanctioning Plaintiffs and/or their counsel for repeatedly filing factually groundless allegations in violation of their obligations under Rule 11.

---

[1] The Motion for Sanctions was served on Plaintiffs' previous counsel, Ian F. McNeil and Philip Racusin of Hendershot Cowart P.C. and Plaintiffs' current lead counsel, Andino Reynal of The Reynal Law Firm. Chad Flores of Flores Law PLLC had not yet filed a notice of appearance at the time of service. Upon receipt of notice that Mr. Flores would be appearing as additional counsel of record on April 11, undersigned counsel ensured Mr. Flores was aware of the Motion for Sanctions. To accommodate Mr. Flores' recent addition to the case, Garth and Clayton granted Plaintiffs' request for an extension of their deadline to supply any necessary withdrawal or correction until April 16.

## PROCEDURAL AND FACTUAL BACKGROUND

### A.    The Original Petition

Plaintiffs' Original 136-page Petition was largely based on the fabricated tale that the Promissory Notes the Magnolia Companies executed in favor of Starrex were forged.  Plaintiffs told that tale to the Court despite the fact that John Magness, the Magnolia Companies' sole Manager, was provided with drafts of the Notes and directed Debbie Merritt, the Magnolia Companies' CFO, to affix his signature to them.  Magness did not simply fail to remember those critical facts.  Before filing the Original Petition, Plaintiffs were repeatedly made aware of the text message Magness sent to Merritt on April 19, 2023 explicitly directing her to sign the Notes:[2]



Plaintiffs ignored the contradictory evidence, and, on June 3, 2024, filed their Original Petition, falsely accusing Garth, Merritt, and others of participating in a criminal conspiracy to forge the Notes.  Dkt. 1-1, ¶¶ 86-199.  Plaintiffs relied on the false allegations to assert a claim against Garth for fraud based on common law forgery and against Garth and Clayton for conspiracy to "defraud the Magnolias by forging the . . . [N]otes."  Dkt. 1-1, ¶¶ 372-81, 437-40.

---

[2] *See* Ex. A, Starrex's Motion to Compel, Ex. 5, Declaration of D. Merritt, Cause No. 2023-85306, *Starrex Int'l, Ltd. v. Coast to Coast Title, LLC*, in the 11th District Court of Harris County, Texas.

2814595

B.    **The First Amended Complaint**

On November 18, 2024, in response to Garth and Clayton's original Motion to Dismiss, Plaintiffs dismissed the common law forgery claim against Garth.  Dkt. No. 29, ¶ 9.  The same day, however, Plaintiffs filed a 581-paragraph, 152-page First Amended Complaint ("FAC"), in which they continued to falsely accuse Garth and Clayton of conspiring with Merritt to "forg[e] Magness's signature [on the Notes] without any authorization or permission."  Dkt. No. 27, ¶¶ 88, 486.    Plaintiffs expanded on the allegation and falsely accused Garth and Clayton of "systematically forg[ing] Magness's signature on numerous checks to facilitate their [purported] scheme."  *Id.*, ¶ 536.  Plaintiffs knew the allegations were false when they were filed, and their convoluted pleading was devoid of any facts to support their fabricated, conclusory allegations.

On February 3, 2025, the Court held an Initial Conference, during which Plaintiffs advised the Court that they had reached a settlement with Merritt and the other Starrex-affiliated defendants.    Following oral argument on Garth and Clayton's Motion to Dismiss the FAC, Plaintiffs were directed to file yet another amended pleading – this time one that was supposed to set forth a short and plain statement of their claims against the remaining defendants and a summary organizational chart to clarify which claims applied to which parties.  Dkt. No. 57.  The Court warned Plaintiffs at the hearing that this would be their last chance to amend their pleading to state a claim against the remaining defendants.  Plaintiffs sought and obtained two extensions of their deadline to comply with the Court's orders to ensure the pending settlement agreement was final before they filed their Second Amended Complaint.  Dkt. Nos. 61, 65.

C.    **The Second Amended Complaint**

On February 28, 2025, with the settlement agreement with Merritt and the other Starrex-affiliated defendants now final, Plaintiffs filed their Second Amended Complaint ("SAC"), in which they finally admitted the truth about the alleged "forgery."  Although the SAC continues to

2814595

falsely characterize the Notes as "fake," and "fabricated," Magness admits that "*he permitted Merritt to place an image of his signature on the notes . . . .*" Dkt. No. 67, ¶ 155. The concession came after months of forcing Garth and Clayton to spend an inordinate amount of money so that their counsel could wade through Plaintiffs' elaborate pleadings and file repeated legal challenges to confront the false allegations. Plaintiffs' decision to come clean and admit that Magness explicitly directed Merritt to sign the Notes on his behalf was long overdue. Unfortunately, however, it did not signal a broader decision to file a complaint that complies with Rule 11. Instead, Plaintiffs buried this singular glimmer of truth in the middle of a 109-page, tortuous pleading that asserted thirteen baseless causes of action against Garth and Clayton.

Despite the Court's admonition, the SAC is as indecipherable as Plaintiffs' previous attempts at stating a claim against Garth and Clayton. Moreover, it is littered with knowing, factual misrepresentations. Although the SAC dispenses with the false allegations of forgery, those allegations have merely been replaced with newly fabricated allegations. The pleading also fails to comply with the Court's order to file a short, plain statement of their claims demonstrating their entitlement to relief in accordance with Rule 8. The rambling, 361-paragraph pleading is anything but a short, plain statement of anything. More critically, however, the pleading fails to comply with Plaintiffs' obligation under Rule 11 to ensure the factual contentions asserted actually have evidentiary support. Plaintiffs knowingly misstated their own financial records, invented purported oral contracts, and misrepresented the content of numerous foundational documents to bring thirteen baseless causes of action against Garth and Clayton—nine of which Plaintiffs have now voluntarily dismissed.

1.    **The Fabricated "Equity Scheme" and Alleged Misappropriation of Company Funds.**

The most glaring falsehood permeating the SAC is the allegation that Garth and Clayton orchestrated a "calculated equity scheme" to defraud The Peabody Bulldog ("TPB") out of a portion of its ownership stake in the Magnolia Companies. Dkt. No. 67, ¶¶ 83-84. Plaintiffs claim that Garth and Clayton persuaded TPB to "sit out" on a $1MM capital call in June of 2022 and allow Garth and Clayton to contribute 100% of the needed funds to the Magnolia Companies instead. *Id.* They falsely claim that this "scheme" reduced TPB's ownership interest in the Magnolia Companies from 20% to 11%. *Id.* Plaintiffs further contend that Garth and Clayton never actually made the $1MM contribution, and instead convinced Starrex to advance the funds to the Magnolia Companies on their behalf. *Id.*

Plaintiffs deceptively allege that Garth and Clayton's purported failure to contribute the funds personally indebted both gentlemen to Starrex. *Id.* And months later, when a third party invested $1MM in the Magnolia Companies, Plaintiffs contend those funds were misappropriated to satisfy Garth and Clayton's alleged personal debt obligation to Starrex. *Id.* As Plaintiffs well know, the fanciful tale is entirely divorced from reality. In order to tell it, Plaintiffs misrepresent financial records in their possession and ignore binding contracts to which they are parties. Stated plainly, the story is a fabrication, and it underlies all of Plaintiffs' causes of action against Garth and Clayton. *Id.*

The truth is that the Magnolia Companies were in financial trouble throughout the relevant period of time, and Starrex was providing operating capital to support the entities in the hope that they would become independently profitable. In June of 2022, Garth and Clayton, through entities they own and control (405 Manhattan Investments, LLC ("405 Manhattan") and GF Insurance Investments, LLC ("GF Insurance") for Garth  and Alphabet Investments, LLC ("Alphabet") for

Clayton) made a voluntary capital contribution of approximately $1MM to pay down a portion of the Magnolia Companies' accumulating debt to Starrex.[3]  Internal financial records reconciling the Magnolia Companies' outstanding debt to Starrex confirm the "promised" contribution was in fact made via wire transfers received from 405 Manhattan, GF Insurance, and Alphabet on June 14 and 17, 2022:

| Date | Description | Amount | Magnolia Company |
|------|-------------|--------|------------------|
| 6/14/2022 | Wire from Alphabet for the Magnolias | $33,105.10 | Sol City |
| 6/17/2022 | Wire from GF Financial for Magnolias | $33,105.10 | Sol City |
| 6/14/2022 | Wire from Alphabet for the Magnolias | $262,143.30 | Coast to Coast |
| 6/14/2022 | Wire from Alphabet for the Magnolias | $19,789.48 | Coast to Coast |
| 6/17/2022 | Wire from 405 Manhattan for the Magnolias | $262,143.30 | Coast to Coast |
| 6/14/2022 | Wire from Alphabet for the Magnolias | $137,872.45 | Florida |
| 6/17/2022 | Wire from 405 Manhattan for the Magnolias | $137,872.45 | Florida |
| 6/14/2022 | Wire from Alphabet for the Magnolias | $47,089.67 | Arkansas |
| 6/17/2022 | Wire from 405 Manhattan for the Magnolias | $47,089.67 | Arkansas |
|  | **TOTAL** | **$980,210.52** |  |

*See* Ex. B, STARREX013237-38.

Magness was privy to this information at the time as the Magnolia Companies' sole Manager and at least as early as July of 2023, when Merritt emailed him and Nelson Mitchell the referenced reconciliation data.  *Id.*  The reconciliation data was also produced months ago in the underlying litigation between Starrex and the Magnolia Companies (the "Starrex Litigation").  *See* Ex. C, E. Wade Decl., ¶ 3.  Plaintiffs' repeated allegation that Garth and Clayton never made the promised contribution is false, and Plaintiffs knew it was false when they asserted it.

The associated allegation that Garth and Clayton convinced TPB to reduce its equity stake in the Magnolia Companies from 20% to 11% in exchange for the ~$1MM contribution is also fabricated.  At the time the contributions were made in June of 2022, *TPB was not even a member*

---

[3] Neither Garth nor Clayton has ever been a member of the Magnolia Companies and neither of them was personally bound to make any contribution at all.

*of any of the Magnolia Companies*.  TPB's ownership in the Magnolia Companies was determined and agreed upon as part of the BSpoke Settlement Agreement, which did not become effective until more than two months later on August 28, 2022.  *See* Ex. D, COAST005542, ¶ 31.

Following the execution of the Settlement Agreement and the associated Partial Redemption Agreements, the Magnolia Companies' ownership was structured as follows:

| Sol City Title, LLC | Coast to Coast Title, LLC | Magnolia Title Florida, LLC | Magnolia Title Arkansas, LLC |
|---|---|---|---|
| Sol City Title Managers, LLC (500 Units/5%) | Rabbit Food, LLC (500 Units/5%) | Rabbit Food, LLC (375 Units/3.75%) | Rabbit Food, LLC (375 Units/3.75%) |
| GF Insurance Investments, LLC (3,850 Units/38.5%) | 405 Manhattan Investments, LLC (3,875 Units/38.75%) | 405 Manhattan Investments, LLC (4,162.5 Units/41.625%) | 405 Manhattan Investments, LLC (4,162.5 Units/41.625%) |
| Alphabet Investments, LLC (3,850 Units/38.5%) | Alphabet Investments, LLC (3,875 Units/38.75%) | Alphabet Investments, LLC (4,162.5 Units/41.625%) | Alphabet Investments, LLC (4,162.5 Units/41.625%) |
| The Peabody Bulldog, LLC (1,800 Units/18%) | The Peabody Bulldog, LLC (1,750 Units/17.5%) | The Peabody Bulldog, LLC (1,300 Units/13%) | The Peabody Bulldog, LLC (1,300 Units/13%) |

TBP is a party to the Settlement Agreement, and Magness was a signatory to both the Settlement Agreement and each of the Partial Redemption Agreements—all of which were also produced in discovery in the Starrex Litigation.  *Id.* at Ex. B-1; *see also* Ex. C, E. Wade Decl., ¶ 3.

In short, TPB's ownership interest in the Magnolia Companies was not diluted as a result of the ~$1MM capital contribution 405 Manhattan, GF Insurance, and Alphabet made in June of 2022.  It was instead diluted as a result of the $1MM investment Nelson Mitchell (through HMH Title Investments, LLC ("HMH")) made in the Magnolia Companies in September of 2022.  The fact that HMH was provided a 20% ownership interest in each of the Magnolia Companies in consideration for his investment is laid out in the four associated Contribution Agreements—each of which bears Magness's signature.  *See* Ex. E, COAST006079-6279.

As a member, TPB is also a party to each of the Contribution Agreements. *Id.* The HMH investment diluted all existing members' ownership interest in the Magnolia Companies. Following the September 9, 2022 effective date of the Contribution Agreements, the Magnolia Companies' ownership was structured as follows:

| Sol City Title, LLC | Coast to Coast Title, LLC | Magnolia Title Florida, LLC | Magnolia Title Arkansas, LLC |
|---|---|---|---|
| Sol City Title Managers, LLC (Owned by the Blackburns) (500 Units/3.2%) | Rabbit Food, LLC (Owned by the Blackburns) (500 Units/2.9%) | Rabbit Food, LLC (375 Units/3.0%) | Rabbit Food, LLC (375 Units/3.0%) |
| GF Insurance Investments, LLC (3,850 Units/24.65%) | 405 Manhattan Investments, LLC (3,875 Units/22.48%) | 405 Manhattan Investments, LLC (4,162.5 Units/33.3%) | 405 Manhattan Investments, LLC (4,162.5 Units/33.3%) |
| Alphabet Investments, LLC (3,850 Units/24.65%) | Alphabet Investments, LLC (3,875 Units/22.48%) | Alphabet Investments, LLC (4,162.5 Units/33.3%) | Alphabet Investments, LLC (4,162.5 Units/33.3%) |
| The Peabody Bulldog, LLC (1,800 Units/11.5%) | The Peabody Bulldog, LLC (1,750 Units/10.14%) | The Peabody Bulldog, LLC (1,300 Units/10.4%) | The Peabody Bulldog, LLC (1,300 Units/10.4%) |
| HMH Title Investments, LLC (5,625 Units/36%) | HMH Title Investments, LLC (7,240 Units/42%) | HMH Title Investments, LLC (2,500 Units/20%) | HMH Title Investments, LLC (2,500 Units/20%) |

Ex. F, COAST005592-93. TPB's ownership interest in the Magnolia Companies was diluted as a direct result of HMH's September 2022 investment. It was not impacted whatsoever by the voluntary capital contribution made by 405 Manhattan, GF Insurance, and Alphabet months earlier.

Plaintiffs' allegation that the HMH investment was "misappropriated" by Garth and Clayton is also a work of fiction. Plaintiffs appear to have done no more than review the Magnolia Companies' Frost Bank statements, add up legitimate transactions amounting to roughly $1MM, and call it fraud. Neither Garth nor Clayton was ever personally indebted to Starrex, and none of the funds HMH invested in the Magnolia Companies were misdirected to benefit either of them. The bank statements Plaintiffs cite in the SAC do not support any alternative conclusion. Dkt. No. 67, ¶¶ 77-78.

By way of example, the $75,561.85 transfer to Commercial Construction Services, LLC that Plaintiffs highlight to support their allegations of fraud was a legitimate payment to a general contractor that helped build out Coast to Coast's office space in McKinney, Texas. As the company's sole Manager, Magness was of course privy to that information. The payment is booked as a "lease improvement" on the company's general ledger (*See* Ex. G, STARREX000044 at p. 44) and is itemized as "McKinney Buildout" on the company's budgets (*See, e.g.*, Ex. H, STARREX009849-51 at pp. 4, 14.). These documents were produced in the Starrex Litigation and were in Plaintiffs' possession when they made the false allegations. *See* Ex. C, E. Wade Decl., ¶ 3.

The remainder of the purportedly fraudulent transfers were used to pay down the Magnolia Companies' outstanding debt to Starrex, a fact that is plainly reflected in the reconciliation data referenced above. *See* Ex. B. Plaintiffs ignored that data and misrepresented the transfers as payments to satisfy Garth and Clayton's non-existent personal obligation to Starrex. Plaintiffs did not even bother to add up the amounts from the Frost Bank statements correctly. When the transfers to Starrex did not neatly add up to $1MM to fit their narrative, Plaintiffs just invented a duplicate $225,000 transfer that does not appear anywhere on the cited bank statement. Dkt. No. 67, ¶ 78, Ex. I, STARREX001185 at 87. Plaintiffs have admitted to this error and concede a correction is in order. Dkt. No. 78 at 26. That singular correction, however, does not cure the fact that the "Equity Scheme" they allege was knowingly fabricated to provide a basis for Plaintiffs' claims against Garth and Clayton. Plaintiffs were presented with all of the foregoing evidence when this motion was served on March 21, and yet they have continued to tell this fanciful tale to the Court. Dkt. No. 78 at 8, 12, 13, 14, 15.

10

2.    **The False Allegation that Starrex was Ever Obligated to Acquire the Magnolia Companies**

Another of the pervasive falsehoods in the SAC is Plaintiffs' continued effort to plead a fraud claim against Garth and Clayton based on Starrex's failure to acquire the Magnolia Companies and provide Magness with the consideration he claims he would have been entitled to *if that transaction had ever been consummated.*  He asserts the consideration would have included Starrex stock, a board seat, and the title of CEO.   In their previous pleadings, Plaintiffs mischaracterized the Letter of Intent ("LOI") between Starrex and the Magnolia Companies as creating a "binding" obligation to close the proposed acquisition.  Dkt. No. 27, ¶ 143.  The LOI, as Garth and Clayton explained in their previous motions to dismiss, explicitly provided it was "not legally binding on the Parties." Dkt. No. 37 at 16, 19.  Having been confronted with that fact, Plaintiffs belatedly concede in the SAC that the LOI is "non-binding."  Dkt. No. 67, ¶ 194.  They have persisted, however, in continuing to claim that Garth and Clayton misrepresented Starrex's intentions with respect to the merger and the consideration Magness would receive if and when the transaction closed.  *See* Dkt. No. 78 at 6 (alleging Garth and Clayton made "false promises— including . . . Starrex acquisition , and a CEO role for Magness").

As Magness well knows, the consideration he claims he was entitled to was always contingent upon the proposed merger transaction actually closing—a fact he repeatedly acknowledged in writing.   In the SAC, Magness seeks to support his allegations by mischaracterizing a number of documents, including the February 15, 2022 "formal corporate memo" he claims was "ghostwritten" by Garth.  Dkt. No. 67, ¶¶ 75(a), 85(a), 286(c).  Magness did not learn Garth wrote the memo from the document's metadata, as he claims, rather he was directly informed of that fact by Merritt, who asked him to review and comment on the draft.  *See* Ex. J, COAST008705-06.  Magness claims the memo falsely asserted that "Starrex is not an owner nor

in any business relationship with the Magnolias," but omits the fact that he approved the memo and responded to Merritt's inquiry by stating that he was "good with it." *See* Ex. K, COAST008714. Magness also neglects to mention that the memo directly addresses Starrex's proposed acquisition of the Magnolia Companies:

> Starrex has expressed an intention, ***although not a commitment***, to acquire these entities (along with Magnolia Florida and Magnolia Arkansas if the ownership issues are resolved) at some point in the future when it is determined that the timing is appropriate.

*See* Ex. J at p. 3 (emphasis added). Based on Magness's response, he was presumably "good with" that representation as well. All of these documents were produced by the Magnolia Companies in the underlying Starrex Litigation, and Plaintiffs were well aware of them before they asserted these false allegations. *See* Ex. C, E. Wade Decl., ¶ 3.

Plaintiffs also mischaracterize the non-binding term sheet drawn up in June of 2022 to memorialize the parties' agreement with respect to HMH's proposed investment in the Magnolia Companies. Plaintiffs repeatedly claim the term sheet "explicitly stated that within 60 days, 'STX will complete 100% ownership of the 4 Magnolias." Dkt. No. 67, ¶¶ 75, 160, 333, 337. Plaintiffs leave out, however, the fact that the term sheet was explicitly non-binding and disclaimed the existence of *any commitment* among the parties with respect to the proposed transaction. *See* Ex. E at COAST006278. In relevant part, the term sheet provides as follows:

> This proposal does not reflect any form of legally binding commitment or obligation on the part of either party or its affiliates . . . . No contract . . . shall be deemed to exist between the parties or any of their affiliates unless and until final definitive agreements with respect to the proposed transactions have been executed and delivered and only thereafter as and to the extent specified therein. The parties hereby acknowledge and agree that (a) the terms in this proposal do not contain all material terms to be negotiated as part of the definitive agreements or otherwise with respect to the proposed transactions; (b) ***no oral agreement, public or private statements or course of conduct or dealings between the parties and/or their affiliates may be as evidence that there exists . . . any binding contract or commitment between the parties with respect to any of the transactions***

> ***contemplated hereby*** . . . **and (c) neither party shall be justified in relying on**
> **any provision of this proposal . . . in connection with the transactions hereby**.
>
> In turn, this proposal is for negotiating purposes only and does not constitute a
> binding agreement between the parties . . . . In the event definitive agreements are
> not able to be completed . . . neither party herein shall have any further duty to
> negotiate or discuss these matters any further . . . .

*Id.* (emphasis added).  Magness signed the term sheet in his capacity as the sole Manager of all

four of the Magnolia Companies, and Plaintiffs were plainly aware of its terms when they filed the

SAC.

Plaintiffs also repeatedly claim that on December 13, 2022, Garth directed Starrex's CEO

Matt Hill to promise Magness additional compensation and a board seat "WHEN YOU BECOME

AN EMPLOYEE OF STX," an allegation Plaintiffs presumably capitalize for dramatic effect.

Dkt. No. 67, ¶¶ 198, 337.  The communication Plaintiffs reference provides as follows:

> John,
> I propose that once we close on the All American Deal that you receive a $100,000.00 finders fee and
> 250,000 shares of stock and when you become an employee of STX receive another $100,000 signing
> bonus plus 250,000 shares (you may want to consider stock options instead, depending on tax
> ramifications).  I am in agreement on the board seat.  We simply need to discuss the timing.  I believe
> you wanted to wait to go on the board after or at the same time as we acquired the Magnolias.  If Britt's
> catch up money is still not paid by that time, I would propose that she receive the outstanding balance
> as a signing bonus once she becomes a STX employee.  I am in agreement with you on the EBITDA
> bonus and stock per transaction portion to be included in your employment agreement.

*See* Ex. L, COAST015256-59.  What Plaintiffs omit from the SAC is Magness's contemporaneous

response, which clearly demonstrates his knowledge that the consideration Hill proposes is

contingent upon the referenced transactions actually closing:

> On Dec 13, 2022, at 11:43 AM, John Magness <John.Magness@magnoliatitleteam.com> wrote:
>
> If either one ever becomes a reality we can discuss then.
>
> Sent from my iPhone

*Id.* There was never any "false promise" to provide Magness with the consideration to which he now claims he was entitled. Magness was well aware of that fact, and Plaintiffs' persistent claims to the contrary lack any evidentiary support.

The facts Plaintiffs rely on to demonstrate Garth and Clayton's purported "comprehensive control" over both Starrex and the Magnolia Companies (which presumably would have allowed them to make the non-existent "false promise" on behalf of those entities) are also fabricated. Plaintiffs, for example, cite a $10,000 KIPP Academy donation that Garth and Clayton allegedly "blocked" the Magnolia Companies from making. The false allegation appears no less than nine times in the SAC, and Plaintiffs have reiterated it in their response to Garth and Clayton's Motion to Dismiss. Dkt. No. 67, ¶¶ 73, 188, 234(b), 247(d), 248(c), 249(c), 251, 286(f), 287(b); Dkt. No. 78 at 12. While Garth and Clayton did recommend against making the sizeable donation, Magness—as the sole Manager of the Magnolia Companies—overrode that recommendation. Magness directed the Magnolia Companies' controller to make the donation (*see* Ex. M, STARREX042425, 42431, 43263), and it was in fact made on September 1, 2023 as clearly reflected on Sol City Title, LLC's general ledger. *See* Ex. N, STARREX000049 at p. 268. These documents were again produced in the Starrex Litigation and were plainly in Plaintiffs' possession when they asserted the false allegations. *See* Ex. C, E. Wade Decl., ¶ 3.

In reality, the Magnolia Companies were controlled by Magness as the sole Manager of all four entities, subject to the provisions of the Side Letters associated with the HMH contribution requiring both a Supermajority Vote and HMH approval for a host of major decisions, including:

> (i) to change or reorganize the Company into any other legal form; (ii) to dissolve the Company at will; (iii) to sell, transfer, convey, assign, lease, license or otherwise dispose of substantially all of the Company's assets or properties; (iv) to amend the Company Agreement; (v) to amend the certificate of formation or any other governing document of the Company; (vi) to merge, consolidate, or otherwise combine the Company with or into any other person or entity, or to agree to a share

14

or interest exchange or any other transaction authorized by or subject to the provisions of Chapter Ten of the Texas Business Organizations Code or similar applicable law; (vii) to enter into any reorganization, recapitalization or other similar transaction effecting the Company or its assets or properties; (viii) to authorize any transaction, agreement, or action on behalf of the Company that is unrelated to its purpose as set forth in the Company Agreement or the Certificate or that contravenes the Company Agreement or the Term Sheet.

Ex. E at COAST006264.  Garth and Clayton did not have "pervasive control" over the Magnolia

Companies.  Dkt. No. 67, ¶ 79.  Magness and HMH did, and Plaintiffs, as parties and signatories

to all of the Side Letters, were aware of all of these facts before they filed the SAC.

### 3.  Additional Misstatements of Fact

The SAC is littered with other knowingly false representations and strained inferences of

fact.  For example, Plaintiffs use a blank email from Starrex's CEO to Garth and Clayton to

demonstrate their purported "control" over the entity.  Dkt. No. 67, ¶¶ 75(f), 85(e); Ex. O,

STARREX011864.  They also vaguely contend Garth "explicitly directed the litigation strategy,"

but use an email regarding a compliance issue related to the Magnolia Companies' title plant

agreements to support that false assertion.   Dkt. No. 67, ¶¶ 75(d), 85(d); Ex. P, COAST012018.

Both of these documents were produced in the Starrex Litigation (the latter by Plaintiffs) and were

clearly in Plaintiffs' possession prior to filing the SAC.  *See* Ex. C, E. Wade Decl., ¶ 3.

Moreover, although Plaintiffs have admitted that Magness authorized and directed Merritt

to affix his signature to the Notes, Plaintiffs persist in characterizing the Notes as "fake" and

"fabricated." Their allegations focus on an April 17, 2023 email in which Garth asked, "What date

should the promissory notes be executed?"  Dkt. 67, ¶¶ 86, 150, 179(i).  They contend the email is

evidence of Garth's fraudulent intent and control over the Magnolia Companies, but neglect to

mention that Magness himself was a party to the communication and every other communication

Plaintiffs cite surrounding the allegedly "fake" Notes that Magness explicitly authorized Merritt to sign:

> **From:** TGarth@cheyenneinvest.com <TGarth@cheyenneinvest.com>
> **Sent:** Monday, April 17, 2023 10:59 AM
> **To:** Debbie Merritt CFA, PhD <dmerritt@starrexintl.com>
> **Cc:** John Magness <John.Magness@magnoliatitleteam.com >|
> **Subject:** RE: Promissory Notes
>
> What date should the promissory notes be executed? I suggest a date prior to the first draw and probably a date that is reasonably close to the date that the line of credit was executed. Also, the notes need a maturity date. I suggest June 30, 2023, which should give sufficient time to determine how and when the Magnolias will be merged. Let me know.

Ex. Q, STARREX027021.   Merritt's response expresses her agreement to the terms Garth proposed and confirms that the Notes had been classified as short-term debt on the Magnolia Companies' balance sheet.   Magness, of course, was copied on that communication as well:

> **From:** Debbie Merritt CFA, PhD
> **Sent:** Monday, April 17, 2023 11:04 AM
> **To:** TGarth@cheyenneinvest.com
> **CC:** John Magness|
> **Subject:** RE: Promissory Notes
>
> I agree. The effective date of the line was October 17, 2022 with the first draw initiated on October 26, 2022. June 30, 2023 maturity date works – we have classified all as short term on the balance sheet.

*Id.*   The Notes are not "fake" or "fabricated," nor was Magness ever under the impression that the Notes reflected anything other than legitimate debt to Starrex.   Plaintiffs' allegations to the contrary are false, and Plaintiffs knew they were false when they asserted them.   Plaintiffs have sought leave to withdraw the repeated false allegation that the Notes were "created for audit purposes only." Dkt. No. 78 at 22.   They inexplicably, however, continue to characterize the Notes as reflecting "fake debt."   *Id.* at 18.

In short, the SAC is permeated with knowingly false allegations.   Plaintiffs' continued failure to abide by their duty of candor to the Court and their associated obligations under Rule 11 warrant the imposition of sanctions to deter further abuses of the judicial system.

16

## LEGAL STANDARD

Federal Rule of Civil Procedure 11 serves an important gatekeeping function in federal court. The rule provides that by presenting a pleading to the court, litigants and their counsel are certifying that to the best of their knowledge, after a reasonable inquiry: (1) the filing is not being presented for an improper purpose, such as harassment, delay, or increasing costs; (2) the claims are supported by non-frivolous legal arguments; and (3) the factual contentions are or likely will have evidentiary support. Fed. R. Civ. P. 11(b). The rule is "aimed at curbing abuses of the judicial system," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397 (1990), and designed to "spare innocent parties and overburdened courts from the filing of frivolous lawsuits." *Zuffante v. Stephens*, No. 3:13-cv-1146-B, 2013 WL 4829193, at *1 (N.D. Tex. Sept. 9, 2013) (quoting *Kurkowski v. Volcker*, 819 F.2d 201, 204 (8th Cir. 1987)). If "the court determines Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Permissible sanctions include monetary and injunctive sanctions, and where justified, dismissal. *Finkelberg v. UBS Realty Investors LLC*, No. 3:21-cv-1828-E-BH, 2022 WL 527863, at *5 (N.D. Tex. Feb. 4, 2022).[4] All aspects of a district court's decision to invoke Rule 11 and award sanctions are reviewed under an abuse of discretion standard. *Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*, 128 F.3d 872, 884 (5th Cir. 1997).

## ARGUMENT

From this case's inception, Plaintiffs have persisted in making knowingly false allegations against Garth and Clayton. Plaintiffs' Original Petition falsely accused both gentlemen of

---

[4] The Court's jurisdiction to order sanctions is not impacted by any ruling it may issue dismissing the causes of action pled. Even after a court dismisses a case, it retains authority to sanction. *See Willy v. Coastal Corp.*, 503 U.S. 131, 137, (1992) (upholding a Rule 11 award following dismissal for lack of subject matter jurisdiction).

2814595

participating in a criminal conspiracy to forge the Notes in favor of Starrex and falsely accused Garth of fraud for his purported role in the alleged forgery.  Dkt. 1-1, ¶¶ 372-81, 437-40.  Plaintiffs had evidence in their possession at the time those allegations were made demonstrating their falsity.  *See* Ex. A.  Plaintiffs' First Amended Complaint dropped the fraud claim against Garth but persisted in accusing both Garth and Clayton of conspiring to forge the Notes.  Dkt. No. 27, ¶¶ 88, 486.  It was not until Plaintiffs filed their Second Amended Complaint that they finally admitted the forgery allegations had been a sham all along.  Plaintiffs admit Magness "permitted Merritt to place an image of his signature on the notes" and in doing so concede the forgery allegations they forced Garth and Clayton to defend were simply invented out of whole-cloth.  Dkt. No. 67, ¶ 155.

Although the forgery charade is now over, the SAC continues to characterize the Notes as "fake" and "fabricated" and asserts a multitude of new falsehoods against Garth and Clayton in a futile attempt to state a viable claim against them.  The SAC tells an imaginary tale of deceit and broken "false promises" that has no basis in reality.  The purported "equity dilution scheme" is completely fabricated, as is the allegation that Garth and Clayton forced the Magnolia Companies to "misappropriate" the HMH investment for their personal benefit.  Plaintiffs were in possession of documents clearly demonstrating the falsity of those allegations when the SAC was filed.  *See* Exs. B, D–I.  Plaintiffs were also in possession of multiple documents directly foreclosing any argument that Garth or Clayton ever misrepresented Starrex's intentions with respect to the proposed acquisition of the Magnolia Companies or falsely promised Magness any of the consideration to which he now claims he was entitled.  *See* Exs. E, J–L; Dkt. No. 67, ¶ 194.  Plaintiffs knowingly misrepresented the content of corporate documents, financial records, bank

statements, and written communications in order to make these claims and weave together 109 meandering pages of false allegations.

By signing and filing the SAC, Plaintiffs' attorneys certified to the Court, among other things, that to the best of their "knowledge, information, and belief following an inquiry reasonable under the circumstances," that "the factual contentions ha[d] evidentiary support or, if specifically so identified, [would] likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). "The Courts are not to be used for frivolous . . . proceedings that have no basis in fact and are wholly contrived." *Bellot v. Ocwen Loan Servicing, LLC*, No. 4:11–cv–03280, 2012 WL 5967442, at *3 (S.D. Tex. Nov. 28, 2012). Attorneys have a duty to conduct a "reasonable inquiry into the facts . . . at the time which [they] affix[ their] signature on any papers to the court." *Mercury Air Grp., Inc. v. Mansour*, 237 F.3d 542, 548 (5th Cir. 2001).

As the Fifth Circuit has consistently recognized, sanctions are accordingly appropriate to reprimand attorneys for violating Rule 11 and "filing pleadings containing baseless factual allegations." *Barrett-Bowie v. Select Portfolio Servicing, Inc.*, 631 F. App'x 219, 221 (5th Cir. 2015) (wherein plaintiff's counsel persisted in falsely alleging PNC Bank was not the noteholder after having been shown the note in question reflecting the indorsement to PNC Bank); *see also Worrell v. Houston Can! Academy*, 287 F. App'x 320 (5th Cir. 2008) (affirming district court's ruling that an attorney and his law firm's conduct in failing to conduct a reasonable pre-filing investigation and signing and filing a complaint with numerous incorrect factual allegations warranted a monetary sanction of reimbursement of attorney's fees to the injured party). Parties, themselves, are also subject to sanctions to the extent they were the ones responsible for the violation. Fed. R. Civ. P. 11(c)(2).

Here, the fault appears to lie with Plaintiffs themselves and possibly one or more of their current or former counsel.[5]  Plaintiffs' allegations directly misrepresent the content of numerous documents that were clearly in Plaintiffs' and their counsel's possession at the time the SAC was filed.  Every document cited and attached to this Motion for Sanctions was produced in the underlying Starrex Litigation, many of them by the Magnolia Companies themselves.[6]  Plaintiffs' former counsel at Hendershot Cowart P.C. represented the Magnolia Companies in that proceeding.  Ex. C, E. Wade Decl., ¶ 1. The SAC, for example, misrepresents the content of specific, Bates-labeled Frost Bank statements to conjure up Plaintiffs' allegation that the HMH funds were "misappropriated."  *See* Ex. I.  And numerous communications are misleadingly and selectively quoted to create the appearance of misconduct.  *See* Exs. J – L, O, P.  The evidence strongly suggests not only a failure to conduct a reasonable factual investigation before making the false allegations, but also the invention of fraudulent "schemes" that bear no relationship to the facts.

Were this Plaintiffs' first offense, Garth and Clayton would likely merely be moving to dismiss the claims asserted against them as a matter of law under Rule 12(b)(6).  This is, however, the third, tortiously convoluted pleading they have been forced to defend and the third time Plaintiffs have knowingly asserted false allegations against them.  Remarkably, in response to this motion, Plaintiffs have sought leave of Court to file these same false allegations for a *fourth* time. Dkt. No. 78 at 23.  Plaintiffs were provided with the opportunity to replead in order to comply with Rule 8 and provide both the parties and the Court with a short, plain statement of their entitlement

---

[5] The undersigned takes no pleasure in filing this motion and has only rarely sought such relief.  But the inordinate burden placed on Garth and Clayton in having to respond to Plaintiffs' tortured and invented complaints led to the filing of this motion.
[6] All documents referenced herein bearing the COAST Bates prefix were produced by the Magnolia Companies. *See* Ex. C, E. Wade Decl., ¶ 3.

to relief.  They sought and were afforded two extensions of their deadline to do so.  Dkt. Nos. 63, 66. In spite of the parties' and the Court's grace, they filed a 109-page, one-and-a-half spaced, collection of materially false representations and thirteen groundless causes of action against Garth and Clayton based on those falsehoods.  Their voluntary dismissal of nine of those causes of action does not cure the numerous Rule 11 violations detailed in this motion.

Plaintiffs' repeated, frivolous filings have caused Garth and Clayton to incur significant attorneys' fees, and monetary sanctions are accordingly appropriate to remedy that harm and deter future abuses of the judicial process. *See Skidmore Energy Inc. v. KPMG*, 455 F.3d 564, 568 (5th Cir. 2006) (upholding sanctions against a law firm's clients "for the numerous *factually* groundless allegations in their Complaint") (emphasis in original)).   Although the Court is given wide discretion to fashion suitable sanctions, Rule 11 specifically provides that where warranted, "an order directing payment to the movant of part or all of the reasonable attorney's fees and expenses directly resulting from the violation" is appropriate.  Fed. R. Civ. P. 11(c)(4).  Here, such sanctions are warranted to address Plaintiffs' and their counsel's flagrant and repeated violations of Rule 11 and to deter any future violations.

Garth and Clayton have incurred over $150,000 to date in defending Plaintiffs' false allegations and pursuing this motion for sanctions. *See* Ex. R, F. Alexander Decl., ¶ 3.  Garth and Clayton anticipate they will incur at least an additional $30,000 in fees – assuming this frivolous matter is dismissed soon.  *Id.*  Garth and Clayton accordingly respectfully request an order imposing sanctions against Plaintiffs and/or their counsel in an amount the Court considers adequate.   Garth and Clayton respectfully submit that sanctions of no less than $100,000 should be imposed.

21

## CONCLUSION

For the reasons set forth above, Defendants Tyrrell L. Garth and Phillip H. Clayton respectfully request that the Court enter sanctions against Plaintiffs and their counsel awarding Garth and Clayton the attorneys' fees they have incurred in defending Plaintiffs' false allegations and pursuing this motion for sanctions.

Dated:  April 21, 2025

BECK REDDEN LLP

/s/ *Fields Alexander*
Fields Alexander – *Attorney in Charge*
State Bar No. 00783528
Federal Bar No. 16427
falexander@beckredden.com
Amy Parker Beeson – *of Counsel*
State Bar No. 24051156
Federal Bar No. 626178
abeeson@beckredden.com
Kaitie Sorenson – *of Counsel*
State Bar No. 24128633
Federal Bar No. 3859186
ksorenson@beckredden.com
1221 McKinney Street, Suite 4500
Houston, Texas 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

**ATTORNEYS FOR DEFENDANTS
TYRRELL L. GARTH AND PHILLIP H.
CLAYTON**

2814595

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument (including Exhibits A through R) was served upon Plaintiffs' previous counsel, Ian F. McNeil and Philip Racusin of Hendershot Cowart P.C. and Plaintiffs' current lead counsel, Andino Reynal of The Reynal Law Firm by electronic mail on March 21, 2025. A true and correct copy of the March 21, 2025 email communication is attached hereto as Exhibit S.  When Chad Flores of Flores Law PLLC notified our firm that he had been retained to additionally represent Plaintiffs on April 11, he was also made aware of the motion for sanctions that had previously been served.  With limited exception noted herein, the challenged claims have not been withdrawn or appropriately corrected in the twenty-one days following service, and therefore pursuant to Federal Rule of Civil Procedure 11(c)(2), Defendants Tyrrell L. Garth and Phillip H. Clayton are presently authorized to file this Motion for Sanctions with the Court.

*/s/ Amy Parker Beeson*

Amy Parker Beeson

2814595