# EXHIBIT E

| From: | Adam Fulkerson |
|---|---|
| Sent: | Monday, September 12, 2022 9:45 AM CDT |
| To: | TGarth@cheyenneinvest.com; 'Nelson Mitchell' |
| CC: | Debbie Merritt CFA, PhD; 'Matt Wiggins'; John Magness |
| Subject: | RE: Sol City Title, LLC Schedule Package |
| Attachments: | 1. Contribution Agreement (Coast to Coast Title, LLC).pdf, 2. Side Letter (Coast to Coast Title, LLC).pdf, |
| | 1. Contribution Agreement (Magnolia Title Arkansas, LLC).pdf, 2. Side Letter (Magnolia Title Arkansas, LLC).pdf, |
| | 1. Contribution Agreement (Magnolia Title Florida, LLC).pdf, 2. Side Letter (Magnolia Title Florida, LLC).pdf, |
| | 1. Contribution Agreement (Sol City Title, LLC).pdf, 2. Side Letter (Sol City Title, LLC).pdf |

All,

Attached please find fully executed Contribution Agreements and Side Letters for Coast to Coast, Sol
City, Arkansas, and Florida.  I will plan to send around a complete closing binder once Bill York sends
over the Certificate of Membership Units being issued to HMH Title Investments, LLC and once the
Exhibits 3.1 are revised.

Sincerely,
Adam

**Adam J. Fulkerson,** *LL.M.*
DECKER JONES, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102-6836
817.336.2400
817.336.2181 (Fax)
Firm Website | My Bio



CONFIDENTIALITY NOTICE: This e-mail (and/or the attachments accompanying it) may contain confidential information belonging to the
sender which is protected by the attorney-client privilege.  If you are not the intended recipient, any disclosure, copying, distribution or the
taking of any action in reliance on the contents of the information is strictly prohibited. If you have received this transmission in error,
please promptly notify the sender and destroy all copies of this email.

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice
contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of
(i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or
matter addressed herein.

**From:** TGarth@cheyenneinvest.com <TGarth@cheyenneinvest.com>
**Sent:** Friday, September 9, 2022 3:51 PM
**To:** Adam Fulkerson <afulkerson@deckerjones.com>; 'Nelson Mitchell'
<Nelson.Mitchell@historymaker.com>
**Cc:** 'Debbie Merritt CFA, PhD' <dmerritt@starrexintl.com>; 'Matt Wiggins'
<Matt.Wiggins@historymaker.com>; 'John Magness' <John.Magness@magnoliatitleteam.com>
**Subject:** RE: Sol City Title, LLC Schedule Package

Attached are signature page sets for the four Contribution Agreements and the four side letters, which
have been executed  by our side.  Please attach these signature pages to your document packages and
please transmit your signed signature pages to my office for attachment to our document packages.

Bill York is preparing Certificates of Membership for the four Magnolias which will be signed and delivered on Monday. I will prepare Revised Exhibits 3.1 reflecting the post HMH ownership table for each Magnolia and will forward it to you on Monday as well.

Let me know if you need anything else from our side and hope you have a good weekend.


Tyrrell L. Garth
Cheyenne Capital Corp.
7350 Phelan Blvd.
Beaumont, Tx 77706
(409) 866-5444
(409) 866-3666 / Fax
tgarth@cheyenneinvest.com

---

**From:** Adam Fulkerson [mailto:afulkerson@deckerjones.com]
**Sent:** Friday, September 9, 2022 12:58 PM
**To:** TGarth@cheyenneinvest.com; 'Nelson Mitchell'
**Cc:** 'Debbie Merritt CFA, PhD'; 'Matt Wiggins'; 'John Magness'
**Subject:** RE: Sol City Title, LLC Schedule Package

I have HMH Title Investment, LLC's signature pages in hand. Let me know when you are ready to exchange signature pages, and I'll send you our side's signature pages to hold in escrow pending release for closing.

Thanks,
Adam

Adam J. Fulkerson, *LL.M.*
DECKER JONES, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102-6836
817.336.2400
817.336.2181 (Fax)
Firm Website | My Bio



CONFIDENTIALITY NOTICE: This e-mail (and/or the attachments accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. If you have received this transmission in error, please promptly notify the sender and destroy all copies of this email.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** TGarth@cheyenneinvest.com <TGarth@cheyenneinvest.com>
**Sent:** Friday, September 9, 2022 10:29 AM
**To:** Adam Fulkerson <afulkerson@deckerjones.com>; 'Nelson Mitchell'

<Nelson.Mitchell@historymaker.com>
**Cc:** 'Debbie Merritt CFA, PhD' <dmerritt@starrexintl.com>; 'Matt Wiggins'
<Matt.Wiggins@historymaker.com>; 'John Magness' <John.Magness@magnoliatitleteam.com>
**Subject:** RE: Sol City Title, LLC Schedule Package

We received it and are starting to circulate signature pages.

Tyrrell L. Garth
Cheyenne Capital Corp.
7350 Phelan Blvd.
Beaumont, Tx  77706
(409) 866-5444
(409) 866-3666 / Fax
tgarth@cheyenneinvest.com


**From:** Adam Fulkerson <afulkerson@deckerjones.com>
**Sent:** Friday, September 9, 2022 9:43 AM
**To:** TGarth@cheyenneinvest.com; Nelson Mitchell <Nelson.Mitchell@historymaker.com>
**Cc:** 'Debbie Merritt CFA, PhD' <dmerritt@starrexintl.com>; John Magness <John.Magness@magnoliatitleteam.com>
**Subject:** RE: Sol City Title, LLC Schedule Package

Terry and Nelson,

Attached is a zip file that contains execution versions of the Contribution Agreements and the Side
Letters (organized by applicable Magnolia entity).

For reference, the Contribution Agreements are the same as the last draft I received from Bill York.  The
only incremental change is dating each document for today, removing Rabbit Food, LLC as a signatory,
adding the date of each Company Agreement in the definition of Company Agreement, and removing
the date reference in the definition of Confidential Settlement Agreement and Release of All Claims
(because I couldn't find a consistent date to use because most of the dates were on the signature
pages).  Each Side Letter is the same as the last draft I sent to Bill York, and the only incremental change
is dating each Side Letter for todays date.

Each party will need to sign the Contribution Agreements and the Side Letters.  I am also including in this
zip file each set of disclosure schedules and the Manager Certificate of HMH Title Investments, LLC.
Neither of these documents need to be signed, and they are in this zip file for reference only and to
complete the deliverables for closing.

Nelson, once you have signed, please email me your signature pages.  I can collate the documents on my
end.  I will then send your signature pages to Bill York and/or Terry to hold in escrow pending closing.
Hopefully, Terry and Bill York can do the same.  Once everyone confirms they have everything they need
for closing, we can release signature pages and initiate the wires to each Magnolia entity.  Let me know
if anyone has any objections to this closing plan.

Sincerely,

COAST006081

Adam

**Adam J. Fulkerson,** *LL.M.*
DECKER JONES, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102-6836
817.336.2400
817.336.2181 (Fax)
Firm Website | My Bio



CONFIDENTIALITY NOTICE: This e-mail (and/or the attachments accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. If you have received this transmission in error, please promptly notify the sender and destroy all copies of this email.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

---

**From:** Adam Fulkerson
**Sent:** Friday, September 9, 2022 8:11 AM
**To:** 'TGarth@cheyenneinvest.com' <TGarth@cheyenneinvest.com>
**Cc:** 'Debbie Merritt CFA, PhD' <dmerritt@starrexintl.com>; 'Nelson Mitchell' <Nelson.Mitchell@historymaker.com>; 'Matt Wiggins' <Matt.Wiggins@historymaker.com>; 'John Magness' <John.Magness@magnoliatitleteam.com>
**Subject:** RE: Sol City Title, LLC Schedule Package

Terry,

I just wanted to bump my last two emails to the top of your inbox because I'd like to get execution documents out ASAP. Let me know your thoughts on:

1. Why Sarah Blackburn was added by your side as a signatory to the Contribution Agreements—again, we are fine with this but wanted to confirm that was Magnolia's plan;
2. If you would like me to include any Magnolia deliverables in the zip folder I will be sending around with execution documents; and
3. If the answer to number 2 is "no" or "none," whether you can give us a preview of the deliverable the Magnolia entities will be delivering to the Investor at closing to evidence the issuance of the Units in the various Magnolia entities.

Thanks,
Adam

**Adam J. Fulkerson,** *LL.M.*
DECKER JONES, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102-6836
817.336.2400
817.336.2181 (Fax)
Firm Website | My Bio



**CONFIDENTIALITY NOTICE**: This e-mail (and/or the attachments accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. If you have received this transmission in error, please promptly notify the sender and destroy all copies of this email.

**IRS CIRCULAR 230 DISCLOSURE**: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Adam Fulkerson
**Sent:** Thursday, September 8, 2022 7:05 PM
**To:** TGarth@cheyenneinvest.com
**Cc:** 'Debbie Merritt CFA, PhD' <dmerritt@starrexintl.com>; 'Nelson Mitchell' <Nelson.Mitchell@historymaker.com>; 'Matt Wiggins' <Matt.Wiggins@historymaker.com>; John Magness <John.Magness@magnoliatitleteam.com>
**Subject:** RE: Sol City Title, LLC Schedule Package

Terry,

Also let me know what the Magnolia entities will be delivering at closing to evidence the issuance of the membership units. Nelson mentioned you all may be delivering an amended cap table to the Company Agreements. I guess that would be in the form of an amendment to the company agreements. That's perfectly fine, just let me know what will be delivered and if you want me to include it in the zip file I will be sending around that has the other closing documents that need to be executed.

I'm ready to send around the closing documents once we nail down whether you all are requiring Sarah Blackburn to sign the Contribution Agreement. I purposefully left her off the Side Letters because I didn't think she would be signing anything, but because Bill York added her to the Contribution Agreements I would like you to confirm what the plan is.

Thanks,
Adam

Adam J. Fulkerson, *LL.M.*
DECKER JONES, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2400
Fort Worth, Texas 76102-6836
817.336.2400
817.336.2181 (Fax)
Firm Website | My Bio



**CONFIDENTIALITY NOTICE**: This e-mail (and/or the attachments accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. If you have received this transmission in error, please promptly notify the sender and destroy all copies of this email.

**IRS CIRCULAR 230 DISCLOSURE**: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of

COAST006083

(i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Adam Fulkerson
**Sent:** Thursday, September 8, 2022 6:01 PM
**To:** TGarth@cheyenneinvest.com
**Cc:** 'Debbie Merritt CFA, PhD' <dmerritt@starrexintl.com>; 'Nelson Mitchell' <Nelson.Mitchell@historymaker.com>; 'Matt Wiggins' <Matt.Wiggins@historymaker.com>; John Magness <John.Magness@magnoliatitleteam.com>
**Subject:** RE: Sol City Title, LLC Schedule Package

Terry,

Is Sarah Blackburn planning to sign the Contribution Agreements for Sol City and Coast to Coast? In the last revisions I got from Bill York, it looks like he added Sarah Blackburn as a signatory. I'm attaching the last versions I got from Bill hereto for convenience. I hadn't paid much attention to the signature pages until now, and I didn't want to change them if your plan was to have Sarah execute the contribution agreements. Please advise.

Thanks,
Adam

Adam J. Fulkerson, *LL.M.*
DECKER JONES, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102-6836
817.336.2400
817.336.2181 (Fax)
Firm Website | My Bio



CONFIDENTIALITY NOTICE: This e-mail (and/or the attachments accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. If you have received this transmission in error, please promptly notify the sender and destroy all copies of this email.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** TGarth@cheyenneinvest.com <TGarth@cheyenneinvest.com>
**Sent:** Thursday, September 8, 2022 2:41 PM
**To:** Adam Fulkerson <afulkerson@deckerjones.com>
**Cc:** 'Debbie Merritt CFA, PhD' <dmerritt@starrexintl.com>; 'Nelson Mitchell' <Nelson.Mitchell@historymaker.com>; 'Matt Wiggins' <Matt.Wiggins@historymaker.com>; John Magness <John.Magness@magnoliatitleteam.com>
**Subject:** RE: Sol City Title, LLC Schedule Package

I am asking Debbie to respond to your questions and I am also including John on this email chain so that he may assist in the response. Assuming this issue is clarified, can I expect clean drafts of the Contribution Agreement and side letter to begin circulating for signatures?

Tyrrell L. Garth
Cheyenne Capital Corp.
7350 Phelan Blvd.
Beaumont, Tx 77706
(409) 866-5444
(409) 866-3666 / Fax
tgarth@cheyenneinvest.com

**From:** Adam Fulkerson [mailto:afulkerson@deckerjones.com]
**Sent:** Thursday, September 8, 2022 2:29 PM
**To:** TGarth@cheyenneinvest.com
**Cc:** Debbie Merritt CFA, PhD; Nelson Mitchell; Matt Wiggins
**Subject:** FW: Sol City Title, LLC Schedule Package

Terry,

On the Sol City Disclosure Schedules (Houston), I have some questions about the employee census (Schedule 3.14). Unless it is a mistake, Jess Naponic is an hourly employee making $125,000 per year (seems high), and Cheri Naponic is a salaried employee making $1,000 per year (this does not meet the safe harbor). I wanted to make sure these people and their comp/classifications are listed correct. Stephen Witt also doesn't look right (hourly employee making $100 per year) Can you please explain what these three people do for Sol City Title, LLC, confirm their comp is correct, confirm their exempt/non-exempt classification is correct, and let us know if there is any family relation between Cheri Naponic, Jess Naponic, and Britt Naponic.

We are good on the other disclosure schedules, and we are signed off on those.

Sincerely,
Adam

Adam J. Fulkerson, *LL.M.*
DECKER JONES, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, Texas 76102-6836
817.336.2400
817.336.2181 (Fax)
Firm Website | My Bio



CONFIDENTIALITY NOTICE: This e-mail (and/or the attachments accompanying it) may contain confidential information belonging to the sender which is protected by the attorney-client privilege. If you are not the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of the information is strictly prohibited. If you have received this transmission in error, please promptly notify the sender and destroy all copies of this email.

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** TGarth@cheyenneinvest.com <TGarth@cheyenneinvest.com>
**Sent:** Friday, September 2, 2022 2:34 PM
**To:** Adam Fulkerson <afulkerson@deckerjones.com>; Matt Wiggins <Matt.Wiggins@historymaker.com>
**Subject:** Sol City Title, LLC Schedule Package

Attached is the fully collated schedule package for Sol City Title, LLC.


Tyrrell L. Garth
Cheyenne Capital Corp.
7350 Phelan Blvd.
Beaumont, Tx  77706
(409) 866-5444
(409) 866-3666 / Fax
tgarth@cheyenneinvest.com

COAST006086

## CONTRIBUTION AGREEMENT

**THIS CONTRIBUTION AGREEMENT** (this "Agreement"), dated as of 9, 2022, is by and between HMH Title Investments, LLC, a Texas limited liability company ("Investor"), Magnolia Title Florida, LLC (the "Company"), Alphabet Investments, LLC, ("Alphabet"), Peabody Bulldog, LLC, ("PB") and 405 Manhattan Investments, LLC, ("405") Alphabet, PB and 405 are each an "Existing Class A Member" and collectively the "Existing Class A Members").

### RECITALS:

Pursuant and subject to the terms and conditions set forth in this Agreement, Investor desires to contribute or otherwise transfer, convey and assign to the Company, a contribution amount of $50,000 cash (the "Contribution Amount") and the Company desires to accept the Contribution Amount from Investor, free and clear of all Liens (other than Permitted Liens) in consideration of the contribution of the Contribution Amount, issue to Investor Class A - Series II Units of the Company representing twenty percent (20%) of the issued and outstanding Units of the Company (the "Transaction");

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1

### CLOSING; CONTRIBUTION

**Section 1.1    Closing**.  The closing of the Transaction (the "Closing") shall take place remotely by electronic or facsimile transmissions at 10:00 a.m. Houston, Texas time on the date hereof ("Closing Date").  At the Closing, the Parties shall deliver the documents and take the actions specified in Article 2.

**Section 1.2    Contribution**.  Subject to the terms and conditions set forth in this Agreement, Investor hereby contributes or otherwise transfers, conveys and assigns to the Company, and the Company hereby accepts from Investor, free and clear of all Liens (other than Permitted Liens), all of Investor's right, title and interest in and to the Contribution Amount, receipt of which is hereby acknowledged by Company.  In consideration of the contribution, the Company shall issue to Investor Units of Class A – Series II of the Company that will equal twenty percent (20%) of the issued and outstanding Units of the Company, free and clear of all Liens.

### ARTICLE 2

### CLOSING

**Section 2.1    Documents to be Delivered by the Company**.  At the Closing and in consideration of the delivery of the Contribution Amount to the Company by the Investor, the Company shall deliver the following to Investor, in each case, in form and substance satisfactory to Investor.  Except as otherwise specified, each shall be dated as of the Closing Date.

(a)    <u>Units</u>.  Company shall deliver to Investor 2,500 Units of Class A – Series II Units of the Company;

(b)    <u>Company Agreement.</u>  The Company Agreement duly executed by the Company and each member of the Company;

(c)    <u>Side Letter.</u>  The Side Letter duly executed by the Company and certain members of the Company;

(d)    <u>Secretary's Certificate</u>.  A certificate, dated as of the Closing Date, of the secretary of the Company with respect to such Person's Governing Documents and the resolutions adopted by its governing authority authorizing such Person's execution of the Transaction agreements; and

(e)    <u>Further Assurances</u>.  Such further instruments and documents as the Company may reasonably request for the purpose of facilitating the consummation of the Transaction.

**Section 2.2    <u>Documents to be Delivered by Investor</u>**.  At the Closing, Investor shall deliver the following documents to the Company, in each case, in form and substance satisfactory to the Company.  Except as otherwise specified, each shall be dated as of the Closing Date.

(a)    <u>Delivery of the Contribution Amount</u>.  Investor shall deliver the Contribution Amount to the Company in immediately available funds;

(b)    <u>Secretary's Certificate</u>.  A certificate, dated as of the Closing Date, of the secretary of Investor with respect to Investor's Governing Documents and the resolutions of its governing body authorizing Investor's execution of the Transaction agreements; and

(c)    <u>Further Assurances</u>.  Such further instruments and documents as Investor may reasonably request for the purpose of facilitating the consummation of the Transaction.

# ARTICLE 3

## <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

As a material inducement to Investor to enter into this Agreement and to consummate the Transaction, each Existing Class A Member and the Company hereby represent and warrant to Investor, as of the date hereof that:

**Section 3.1    <u>Existence</u>**.  The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas and is authorized to do business in the State of Texas.  The Company is treated as a corporation for United States income tax purposes.  The Company has full power and authority to own, lease and operate its assets and to carry on its business as presently conducted.  The Company is qualified or registered to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of its business or operations would require such qualification or registration.  The Company does not directly or indirectly own or have any interest in the shares

2

of capital stock or any other Equity Securities in any Person. There is no outstanding Contract of any kind requiring the Company to make an investment in, or to acquire Equity Securities or any other security or other interest in, any Person directly or require such registration.

Section 3.2     **Authorization and Power**.  The Company has all requisite power and authority to execute, deliver, perform and consummate the Transaction.  The execution, delivery and performance by the Company of the Transaction and the consummation of the Transaction have been duly authorized by its governing authority and as otherwise may be required under its Governing Documents.  No further entity action on the part of the Company is necessary to authorize the execution, delivery and performance of any Transaction agreement or the consummation of the Transaction.  Each Transaction agreement to which the Company is a party has been duly executed and delivered by such Party and constitutes the legal, valid and binding obligations of such Party enforceable against it in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles.  The copies of all Governing Documents of the Company, as amended to date, have been made available to Investor, are complete and correct, and no amendments thereto are pending.

Section 3.3     **Capitalization**.  All of the issued and outstanding Equity Securities in the Company consist solely of the Equity Securities, as set forth on Annex 1(a). One hundred percent (100%) of the Equity Securities are beneficially and legally owned by the holders as set forth on Annex 1(a). All of the Equity Securities of the Company set forth on Annex 1(a) and all Equity Securities in the Company being issued to Investor hereunder are duly authorized and validly issued, are fully paid and non-assessable, were not issued in violation of any preemptive rights, rights of first refusal or first offer, any Contract, or other restriction, and were or are being issued under and in accordance with the Governing Documents of the Company and in compliance with applicable federal and state Laws. There are no Contracts to which the Company, any current holder of Equity Securities in the Company, or any other Person is a party with respect to registration rights or the voting of any Equity Securities in the Company or that restrict the transfer of any such interest. There are no outstanding contractual obligations of the Company to repurchase, redeem, or otherwise acquire any Equity Securities of itself.   The Company does not own or hold any Equity Securities in any other Person.

Section 3.4     **No Conflict; Consents**.  The execution, delivery and performance by the Company of each Transaction agreement to which it is a party do not, and the consummation of the Transaction will not, (a) result in the imposition of any Lien upon any of the assets of the Company or (b) violate, conflict with or result in the breach (with or without notice or the passage of time, or both) of any term, condition or provision of, (i) any material Law to which the Company or any of its assets are subject, (ii) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to the Company or any of its assets, or (iii) the Governing Documents of the Company.

Section 3.5     **Brokers**.  Neither the Company nor any of the Parties or any of their respective Affiliates have incurred any Liability to pay any fee or commission to any broker, finder or agent in connection with the Transaction.

COAST006089

**Section 3.6    Financial Statements**.    Attached to <u>Schedule 3.6</u> are true, correct and complete copies of the internally prepared balance sheet and statement of income of the Company as of and for the year-to-date period ended June 30, 2022 (the financial statements contemplated by the foregoing clause are collectively referred to herein as the, "Financial Statements"). The Financial Statements (x) have been prepared in accordance with IFBS (in the case of the Interim Financials, except for the absence of notes and subject to normal and customary year-end adjustments for recurring accruals (which shall not be material either individually or in the aggregate)), as consistently applied by the Company, based upon the books and records of the Company and its subsidiaries, and (y) fairly present in all material respects the financial condition of the business of the Company as of the dates thereof and the operating results and cash flows of it business for the periods then ended. Since December 31, 2021, there has been no change in any of the accounting (or Tax accounting) policies, practices or procedures of the Company.  The Company has elected to be treated as a C Corporation for United Sates income tax purposes from and after June 30, 2022.

(a)    <u>Title and Sufficiency</u>.  The Company has good and valid title to, or a valid leasehold interest, in all of the business assets.

(b)    <u>Condition</u>.  The business assets (i) are in good operating condition and repair (ordinary wear and tear excepted), and (ii) are suitable for the purposes for which they are presently used by the business of the Company.

**Section 3.7    Compliance with Laws**.  The Company is and at all times since its formation has been, in compliance with all applicable Laws, and the Company has not received any notice, report, complaint, inquiry, claim, or other information alleging or relating to any violation of or Liability under any applicable Law relating to the Company.

**Section 3.8    Permits**.  the Company holds all Permits required to be held by it for the current and proposed conduct of its business, and the Company has been in compliance with all such Permits. <u>Schedule 3.8</u> lists all Permits held by the Company with respect to the Company's conduct of the business.

**Section 3.9    Proceedings**.  <u>Schedule 3.9</u> lists all Proceedings to which the Company has been a party.  There here have been, no actions, suits, Orders, investigations, Claims or other Proceedings (including any arbitration proceedings) pending or, to the Knowledge of the Company, threatened against the Company, or pending or threatened by the Company against any third party, at law or in equity, or before or by any Governmental Bodies (including any actions, suits, Proceedings or investigations with respect to the Transaction). Except as set forth on <u>Schedule 3.9</u>, (a) there are no, Proceedings, Claims or Orders or, to the Company's Knowledge, investigation of any nature pending, rendered, or to the Company's Knowledge, threatened against the Company, and (b) there are no Orders outstanding against the Company.

**Section 3.10    Real Property**.

(a)    The Company does not own and has never owned, any real property.

(b)    <u>Schedule 3.10(b)</u> sets forth the address of any Leased Real Property, and a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties

COAST006090

and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease document). The Company has a good and valid leasehold interest in and to all of the Leased Real Property, free and clear of all Liens (other than Permitted Liens). With respect to each of the Leases and except as set forth in Schedule 3.10(b): (i) the possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed and there are no material disputes with respect to such Lease; (ii) no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (iii) the Company has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property or any portion thereof; (iv) the Company has not collaterally assigned or granted any other security interest in such Lease or any interest therein.

(c)     The Leased Real Property constitutes all of the real property currently leased, occupied or otherwise utilized in connection with the business as currently conducted. All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property (collectively, the "Improvements") are sufficient for the conduct of the business. To the Knowledge of the Company, there are no structural deficiencies or latent defects affecting any of the Improvements and there are no facts or conditions affecting any of the Improvements which would, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements, or any portion thereof in the operation of the business. To the Knowledge of the Company, the Leased Real Property and Improvements and the Company's use thereof conform in all material respects to the Lease and all applicable building, zoning and other Laws. All Permits necessary to the current occupancy and use of the Leased Real Property have been obtained, are in full force and effect and have not been violated. There is no pending or, to the Knowledge of the Company, threatened condemnation or other Proceedings affecting any portion of the Lease Real Property or the Company's use thereof.

**Section 3.11   Environmental**.   (a) the Company has been in compliance with all Environmental Laws, including with respect to any Permits required thereunder, (b) neither the Company nor any of its respective Affiliates has generated, transported, treated, stored, disposed of, handled, arranged for or permitted the disposal of, released or exposed any Person to any Hazardous Materials, or owned or operated any property or facility contaminated by any Hazardous Materials, in each case, so as to give rise to material Liability pursuant to any Environmental Law; (c) with respect to the business, the Real Property and the assets of the Company, the Company has not received any notice, report, or other information regarding any actual or alleged violation of or Liability under Environmental Law; and (d) except as set forth in Schedule 3.11, neither the Company nor any of their respective Affiliates has assumed, provided an indemnity with respect to or otherwise become subject to any material Liability of any other Person relating to Environmental Laws. The Company has furnished to Investor all environmental audits, assessments, reports and other documents materially bearing on environmental, health or safety matters, which are in their possession or under their reasonable control.

**Section 3.12   Taxes and Tax Returns**.   All Tax Returns of the Company have been timely filed with the appropriate Governmental Bodies in all jurisdictions in which such Tax Returns are required to be filed. All such Tax Returns properly reflect the Liabilities of the

5

COAST006091

Company for Taxes for the periods, property or events covered thereby. All Taxes, including those which are called for by such Tax Returns, required to be paid, withheld or accrued by the Company or before the date hereof, including any deficiency assessments, penalties and interest assessed with respect to such Taxes, have been timely paid, withheld or accrued. There are no Liens for Taxes (other than for current Taxes not yet due and payable) on the Assets of the Company. The Company is not a "foreign person" within the meaning of Section 1445 of the Code. No U.S. federal, state, local, or foreign audit, proceeding, or other examination of any Tax Return of the Company is presently in progress, nor is any such audit, proceeding, or other examination threatened or contemplated. No issue has been raised in any current or prior audit of any Tax Return of the Company that, by application of the same principles, would reasonably be expected to result in a material Tax deficiency for any subsequent Tax period. No deficiencies for any Taxes have been proposed, asserted or assessed against the Company that have not been resolved and paid in full. No waivers of statutes of limitations have been given with respect to any Taxes of the Company and no request for any such waiver is currently pending. The Company has not requested an extension of time within which to file any Tax Return in any taxable year that has not since been filed. Company has not agreed to an extension of time with respect to a Tax assessment or deficiency or has executed any powers of attorney with respect to Tax matters that currently remain in effect. No requests for ruling or determination letters or competent authority relief with respect to the Company are currently pending with any Governmental Bodies with respect to any Taxes. The Company is not subject to any private letter ruling of the IRS or any comparable ruling of any other Governmental Bodies. The Company (i) has never been a member of an Affiliated Group, or any similar affiliated or consolidated group for Tax purposes under state, local, or foreign Law, or (ii) has any liability for the Taxes of another Person (other than another Company Entity) pursuant to Treasury Regulation §1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise. The Company is not a party to or bound by and does not have any obligations under, any Tax sharing agreement, Tax indemnification agreement or similar Contract or arrangement. The Company is not a party to any Contract or arrangement to pay, indemnify or make any payments with respect to any Tax Liabilities of any stockholder, member, manager, director, officer or other employee or contractor of the Company. The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) use of an improper method of accounting for a taxable period ending on or prior to the Closing Date; (iii) "closing agreement" as described in Code Section 7121 (or any similar provision of state, local, or foreign Law) executed on or prior to the Closing Date; (iv) intercompany transactions or any excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local, or foreign Law); (v) installment sale or open transaction disposition made on or prior to the Closing Date; or (vi) prepaid amount received on or prior to the Closing Date. The Company has made available to Investor true and complete copies of federal, state and local Tax Returns of each of the Company Entities and their predecessors for the years ended December 31, 2019, 2020 and 2021 and true and complete copies of all examination reports and statements of deficiencies assessed against or agreed to by the Company or any predecessor with respect to Taxes. There is not currently in effect any power of attorney authorizing any Person to act on behalf of or receive information relating to, the Company with respect to any Tax matter. The Company has not received from

6

COAST006092

any Governmental Body in a jurisdiction where the Company has not filed a Tax Return any (i) claim that the Company is or may be subject to taxation by that jurisdiction, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against the Company. The Company engaged in a "reportable transaction" as defined in Treas. Reg. § 1.6011-4(b). Within the past three years, the Company has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code Section 355 or Code Section 361. All of the individuals who are performing consulting or other services for the Company have been correctly classified as either "independent contractors" or "employees," as the case may be. The Company is not a party to any agreement, contract, arrangement, or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code Section 280G (or any similar provision of state, local, or foreign Law).

Section 3.13   **Employees**. Schedule 3.13 contains a true, correct and complete (i) list of all employees of the Company as of May 1, 2022; (ii) list of the then current annual base compensation and target incentive compensation opportunity of, and a description of the fringe benefits (other than those generally available to employees) provided by the Company to any such employees, (iii) status of each employee as "exempt" or "non-exempt" under the Fair Labor Standards Act of 1938, as amended ("*FLSA*") and any applicable state law, (iv) list of the accrued but unused vacation, sick leave and personal time for all employees of the Company, (v) list of any increase, effective after December 31, 2021, in the rate of compensation of any employees if such increase exceeds 10% of the previous annual compensation of such employee, and (vi) and any payments owing or arising at or prior to the Closing from or as a result of the consummation of the Transactions, including any payments for stock appreciation or similar rights, any severance or bonus plan payment, or any similar payment, including the amount of each such payment. Except as set forth on Schedule 3.13, there are no temporary workers, leased employees, contingent workers, or any other Persons performing, and no such Person has performed, services for the Company who are not classified as an employee or former employee performing services for the Company. The Company is not delinquent in payment of or has delayed the payment to any of its employees, consultants, or independent contractors of any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees. The Company is not a party to, subject to or bound by, any collective bargaining or other agreement with a labor organization. There is no pending or, to the Knowledge of the Company, threatened, nor has there been since January 1, 2021, any, organizing effort or demand for recognition or certification or attempt to organize any of its employees or former employees.

Section 3.14   **Employee Benefit Plans**. Schedule 3.14 lists each Benefit Plan providing benefits to any of the Company's employees which is sponsored, established, maintained, or contributed to or required to be contributed to by the Company at any time since its inception. Each Benefit Plan, and the administration thereof, is in compliance, in all material respects with its terms and with all compliance, funding, reporting, disclosure and other requirements of ERISA, the Code and other Laws applicable to such Benefit Plan. The Company has made available to Investor prior to the date hereof a true and complete copy of each Benefit Plan listed or required to be listed on Schedule 3.14 and except as set forth on Schedule 3.14, the Company

7

or any entity that is treated as a single employer with the Company under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA (an "*ERISA Affiliate*") sponsors, maintains or contributes to or has any obligation to maintain or contribute to, or has any direct or indirect liability, whether absolute or contingent, with respect to any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which the Company is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, including, without limitation, any (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of the Company has any present or future right to benefits. Each Benefit Plan set forth on <u>Schedule 3.14</u> has been established and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other applicable Laws; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor (the "*DOL*") or any other Governmental Body, or to the participants or beneficiaries of such Benefit Plan, have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter, opinion letter or advisory letter from the IRS with respect to such Benefit Plan's most recent remedial amendment cycle for which the IRS issued such letters, and there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or Tax under ERISA, the Code or any other applicable Law; (iv) other than routine claims for benefits, no Lien, lawsuit or complaint to or by any Person or Governmental Body has been filed against any Benefit Plan or the Company with respect to any Benefit Plan or, to the Knowledge of the Company, against any other Person and, to the Knowledge of the Company, no such Liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (v) no individual who has performed services for any Company Entity has been improperly excluded from participation in any Benefit Plan; and (vi) no Benefit Plan is under, and the Company has not received any notice of, an audit or investigation by the IRS, DOL or any other Governmental Body, and no such completed audit or investigation, if any, has resulted in the imposition of any Tax or penalty on the Company. No non-exempt "*prohibited transaction*," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred or is reasonably expected to occur with respect to any Benefit Plan set forth on <u>Schedule 3.14</u>. To the Knowledge of the Company, no fiduciary of any Benefit Plan set forth on <u>Schedule 3.14</u> has any liability for a breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any such Benefit Plan. No fiduciary of any Benefit Plan has been sued by any Person alleging a breach of fiduciary duty with respect to a Benefit Plan or been the subject of an investigation by the DOL in which it was investigating an alleged

8

or possible breach of fiduciary duty with respect to a Benefit Plan, and, to the Knowledge of the Company, no such suit or investigation is contemplated or threatened with respect to any Benefit Plan fiduciary. Each Benefit Plan that is a "*nonqualified deferred compensation plan*" (as such term is defined in Section 409A(d)(1) of the Code) is in documentary and operational compliance in all material respects with the requirements of Section 409A of the Code and the Treasury Regulations issued thereunder. The Company does not have any obligation to indemnify, reimburse or gross up any individual with respect to any Tax that may be imposed on such individual under Section 409A of the Code. All liabilities or expenses of the Company in respect of any Benefit Plan (including workers' compensation) which have not been paid have been properly accrued on the Company's most recent financial statements in compliance with GAAP. All contributions or premium payments required to have been made under the terms of any Benefit Plan or in accordance with applicable Law as of the date hereof have been timely made or reflected on the Company's financial statements in accordance with GAAP. The Company does not have any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any Person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer, any temporary employee, or any employee of any professional employer organization. The Company has not been sued by any Person alleging such misclassification or been the subject of an investigation by the IRS of any other Governmental Body in which the IRS or other Governmental Body was investigating an alleged or possible misclassification, and to the Knowledge of the Company no such suit or investigation is contemplated or threatened.

      **Section 3.15   Intellectual Property Matters**.   Schedule 3.15(a) lists the material Intellectual Property Assets used or held for use in the business, including all internet domain names. the Company owns all right, title and interest or has a right or license to use (as necessary for the operation of the business in the Ordinary Course) all of the Intellectual Property Assets. Except as set forth on Schedule 3.15(b), the Company (i) has not granted any licenses or contractual rights relating to the Intellectual Property Assets or the use thereof or (ii) is not bound by or a party to any Contracts of any kind relating to the Intellectual Property Assets of any other Person (except for licenses to any unmodified, commercially available, off-the-shelf computer software with a replacement cost or annual license fee of less than $1,000). To the Knowledge of the Company, the conduct of the business as it is presently being conducted, does not violate, conflict with or infringe upon the intellectual property of any other Person in any material manner. The Company has taken commercially reasonable measures to maintain in confidence all material confidential information owned by the Company and Intellectual Property Assets that constitutes, or that the Company intends or intended to retain as, a trade secret. No such trade secret or confidential information has been disclosed by the Company to any Person other than employees, consultants or contractors of the Company who had a need to know and who used such Intellectual Property Assets in the Ordinary Course of employment or contract performance subject to a written and enforceable confidentiality agreement or obligation. There has been no unauthorized access to any such confidential information by third parties.

      **Section 3.16 Absence of Changes.**   Except as set forth on Schedule 3.16, since December 31, 2021, the business has been operated only in the Ordinary Course and, without limiting the foregoing, the Company has not:

<div align="center">9</div>

(a)     created or otherwise incurred any Lien except for Permitted Liens on any assets;

(b)     suffered any loss exceeding $10,000 (whether or not covered by insurance), experienced any changes in the amount and scope of insurance coverage or suffered any destruction of its books and records;

(c)     sold, assigned, transferred, waived, released, leased or licensed, or permitted the cancellation, loss, lapse or abandonment or other disposition of, or failed to take reasonable steps to maintain, enforce and protect, any material right or material asset (tangible or intangible) used or held for use in the business (including any right related to any asset);

(d)     acquired (whether by merger, consolidation, purchase of equity interests, purchase of assets or otherwise) any business or the material assets of any Person;

(e)     managed the working capital of the business (including the inventory, accounts receivable, prepaid expenses, accounts payable and accrued expenses of the business) other than in the Ordinary Course;

(f)     cancelled, delayed or postponed the payment of any material Liability, the making of any capital expenditure or the replacement, repair or maintenance of any asset;

(g)     made any material change in the manner in which the business extends discounts or credits to, or otherwise deals with, customers;

(h)     made any material change in the manner in which the business markets its products or services;

(i)     engaged in any transaction outside the Ordinary Course;

(j)     discharged or satisfied any Lien or paid any material Liability, other than current liabilities paid in the Ordinary Course;

(k)     declared, set aside or made any payment, dividend or distribution of cash or other property with respect to its equity interests, or purchased, redeemed or otherwise acquired any of its equity interests (including any capital stock, warrants, options or other rights to acquire its equity interests);

(l)     made any material change in its cash management practices or in any method of accounting or accounting policies;

(m)     incurred, assumed or guaranteed any indebtedness, except in the Ordinary Course with respect to trade payables;

(n)     proposed or adopted any amendments or modifications to its Governing Documents or

(o)     agreed, whether orally or in writing, to do any of the foregoing.

10

**Section 3.17    Liabilities**. The Company does not have any material Liabilities except Liabilities that (a) are fully and accurately disclosed on the face of the Financial Statements (rather than in the notes and schedules thereto), (b) have arisen or been incurred in the Ordinary Course since the Balance Sheet Date (none of which relate to violations of Law, a breach of Contract, or warranty Liabilities), or (c) are listed on Schedule 3.17 to this Agreement.

**Section 3.18    Affiliate Interests; Transactions with Certain Persons**.  Except as set forth on Schedule 3.18, and except for the Governing Documents, there are no Contracts or arrangements by and between the Company, on the one hand, and any holder of the Company Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing, on the other hand.  Except as set forth on Schedule 3.18 the Company is not a debtor or creditor of or has any Liability or other obligation of any nature to, any holder of the Company's Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing.

**Section 3.19    Material Contracts**.  Schedule 3.19 attached hereto (which lists Contracts by each applicable subsection referenced below in this Section 3.19) contains a complete, current and correct list of all of the following Contracts (collectively the "Material Contracts") to which the Company is a party or by which any of their respective properties or assets are bound and that are in effect on the date hereof or impose any continuing Liabilities (other than confidentiality obligations) on any party thereto:

(a)    any Contract or group of related Contracts that involve or involved expenditures or receipts by the Company of more than $50,000.00 for the year ended December 31, 2021, or involve or are expected to involve more than $50,000.00 of expenditures or receipts for the year ending December 31, 2022;

(b)    any Contract with any of the Company's officers, directors, managers, employees, or Affiliates, including all non-competition, severance, employment, bonus, change of control, retention, commission, or indemnification agreements;

(c)    any Contract evidencing the granting of a loan by the Company to any third party for which amounts remain outstanding (other than the advancement of business expenses to employees in the Ordinary Course);

(d)    any Contract evidencing or relating to indebtedness relating to the borrowing of money, extension of credit or the granting of any Lien on the assets or the Equity Securities of the Company;

(e)    any Contract containing any limitation on the freedom or ability of the Company (or that following the Closing Date would purport to limit the freedom of the Company or any of its Affiliates) (A) to engage in any line of business or compete with any Person or to operate at any location in the world, including non-competition, non-solicitation and standstill obligations or exclusivity rights, or (B) to own, operate, lease, sell, transfer, pledge or otherwise dispose of or encumber any asset, or to hire solicit, or consult with any Person or that would so limit the Company or its Affiliates on or after the Closing Date;

11

COAST006097

(f)      any power of attorney;

(g)      any Contract relating to the (A) acquisition or disposition of any business or entity (whether by merger, sale of stock, sale of assets or otherwise) or (B) acquisition of all or substantially all assets of any Person;

(h)      any Contract for future capital expenditures or the acquisition or construction of fixed assets requiring the payment by the Company of an amount in excess of $50,000.00 on or after the date hereof.

The Company has made available to Investor true, complete and current copies of all written Material Contracts (including any and all amendments, modifications, exhibits, annexes and schedules to such Contracts) and true, correct, and complete summaries of all non-written Contracts. Each of the Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms. There exists no material breach, default or violation on the part of the Company or, to the Knowledge of the Company, on the part of any other party thereto, under any Contract to which the Company is or was a party nor has the Company received written, or to the Knowledge of the the Company, other notice of any such breach, default or violation. the Company has not received written notice of an intention by any party to any Material Contract that provides for a continuing obligation by any party thereto on the date hereof to terminate such Contract or amend the terms thereof and (ii) the consummation of the Transactions will not affect the validity, enforceability or continuation of any Material Contract on the same terms applicable to such Material Contract as of the date hereof. The Company has not waived any material rights under any Material Contract. To the Knowledge of the Company, no event has occurred that either entitles, or would, with notice or lapse of time or both, entitle, any party to any Contract to which the Company is or was a party to declare a breach, default or violation under, or make an indemnification claim against the Company with respect to, any such Contract or to terminate, modify or accelerate, or that does terminate, modify or accelerate, any terms of any such Contract (including any right to accelerate the maturity of any indebtedness of the Company under any such Contract). Each of the Material Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms.

**Section 3.20** **<u>Full Disclosure</u>**. No representation or warranty made by the Company in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

## ARTICLE 4

## <u>REPRESENTATIONS AND WARRANTIES OF INVESTOR</u>

As a material inducement to the Company to enter into this Agreement and to consummate the Transaction, Investor hereby represents and warrants to the Company as of the date hereof that:

12

COAST006098

**Section 4.1    Capacity and Authority.**    Such Investor has full legal capacity and authority to execute, deliver and perform each Transaction agreement to which such Investor is a party and to consummate the Transaction.  Each Transaction agreement to which such Investor is a party has been duly executed and delivered by such Investor and constitutes the legal, valid and binding obligations of such Investor enforceable against him in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles.

**Section 4.2    No Conflict; Consents.**    The execution, delivery and performance by Investor of each Transaction agreement to which Investor is a party does not, and the consummation of the Transaction will not, violate, conflict with or result in the breach of any term, condition or provision of, (a) any Law to which Investor is subject, (b) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to such Investor or (c) any material Contract to which Investor is a party or by which Investor is otherwise bound.  No authorization, approval or consent of, and no notice to or registration or filing with, any Person is required in connection with the execution, delivery or performance of any Transaction agreement or the consummation of the Transaction by Investor.

**Section 4.3    Disclosure of Information.**    Investor has received and reviewed information about the Company, and its current and proposed subsidiaries and affiliates and has had an opportunity to ask questions and receive answers regarding the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and affiliates and to conduct such due diligence review as it has deemed appropriate.

**Section 4.4    Investment Experience.**    Investor acknowledges that it can bear the economic risk of its investment in the Transaction, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the Transaction.

**Section 4.5    Disclosure of Information.**    Investor has received and reviewed information about the Company and its current and proposed Affiliates, and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the equity consideration pursuant to this Agreement and the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and to conduct such due diligence review as it has deemed appropriate.

**Section 4.6    Investment Experience.**    Investor acknowledges that it can bear the economic risk of its investment in the equity consideration to be received hereunder, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of owning such an investment.

**Section 4.7    Accredited Investor.**    Investor is an "accredited investor" as defined under Rule 501 promulgated under the Securities Act.  Investor understands that the Class A - Series II Units issued as the equity consideration have not been registered under the Securities Act or any state securities laws and are being transferred to Investor, in part, in reliance on the foregoing representation.

13

COAST006099

**Section 4.8**    **Investment Intent**.    Investor is acquiring the equity consideration hereunder for its own account, with the present intention of holding such securities for purposes of investment, and has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities Laws.

**Section 4.9**    **No Public Market**.  Investor understands that no public market now exists for the equity consideration to be issued hereunder and that there is no assurance that a public market will ever exist for such equity consideration.  Investor also understands that Rule 144 promulgated under the Securities Act is not presently available with respect to the sale of any of the equity consideration.

**Section 4.10**    **No Other Representations**.  In purchasing equity consideration, Investor is not relying on (and Investor hereby expressly disclaims) any and all representations, warranties or information (including any projections or forecasts) that may have been provided to it from the Company or any other Person, except only for the representations and warranties of the parties expressly set forth in Article 3 hereof.

**Section 4.11**    **Full Disclosure**. No representation or warranty made by Investor in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

# ARTICLE 5
## POST-CLOSING COVENANTS

**Section 5.1**    **Further Assurances**.

(a)    At any time and from time to time after the Closing Date, at Investor's request, and without further consideration therefor, the Company will execute and deliver any and all proper deeds, assignments and such other instruments of sale, transfer, conveyance, assignment and confirmation as Investor may reasonably deem necessary in order to effect, consummate, confirm and/or evidence the Transaction.

(b)    The Company agrees to furnish or cause to be furnished, as promptly as practicable, such information and assistance relating to the business as is reasonably necessary (i) for the preparation and filing of any Tax Return or (ii) for any other claim, audit, filing or proceeding relating to Tax matters.

**Section 5.2**    **Uses of the Contribution Amount**.  From and after the Closing Date, the Company agrees to use the Contribution Amount exclusively for working capital and general business purposes in the Ordinary Course; provided, however, the Contribution Amount may be used for other purposes with the prior written consent of Investor.

**Section 5.3**    **Disclosure**. Without the prior written consent of Investor, and except as required by Law, the Company and its directors, members, managers, officers, employees and agents) shall not directly or indirectly make any public comment, statement or communication

14

with respect to, or otherwise disclose or permit the disclosure of any of the terms, conditions or other aspects of the transactions contemplated herein; provided, however, that the Parties may continue such communications with employees, customers, suppliers, lenders, lessors and other particular groups as may be legally required or necessary in connection with the conduct of the Company's business in the Ordinary Course.

**Section 5.4    Intentionally omitted**

**Section 5.5    Closing of Each Contribution Agreement**.    Notwithstanding any provision hereof to the contrary, the obligations of Investor to contribute the Contribution Amount under this Agreement are conditioned upon the simultaneous closing and funding of each Contribution Agreement (defined below) by and between Investor and certain Affiliates of the Company, including Coast to Coast Title, LLC, Sol City Title, LLC d/b/a Magnolia Title, Magnolia Title Arkansas, LLC, under which Investor is contributing certain amounts of cash to such Affiliates of the Company in exchange for Equity Securities in such Affiliates of the Company (each a "Contribution Agreement").

**Section 5.6    Certain Waivers**.  Each Existing Class A Member, on behalf of itself and its Affiliates and each of their respective heirs, successors, assigns, descendants and beneficiaries (each, a " Releasing Party") hereby irrevocably waives, releases and discharges the Company and its Affiliates (including, after the Closing, Investor and its Affiliates) and each of their respective directors, managers, officers, employees, members, equityholders and partners (each, a " Released Party") from any and all Liabilities to such Releasing Parties of any kind or nature whatsoever, whether in the capacity as a direct or indirect equityholder, as a member, manager, officer or employee of the Company or otherwise and whether arising under any agreement or understanding (other than this Agreement) or otherwise at law or in equity, and each Existing Class A Member agrees on behalf of itself and the other Releasing Parties that none of the Existing Class A Member or such Releasing Party shall seek to recover any amounts in connection therewith or thereunder from any of the Released Parties. Notwithstanding the foregoing or anything else herein to the contrary, in no event shall the Company or any of the other Released Parties have any Liability whatsoever to any of the Existing Class A Member or the other Releasing Parties for any breaches (or matters causing or constituting breaches) of the representations, warranties, agreements or covenants of the Company or the Existing Class A Members hereunder, and, in any event, neither the Existing Class A member nor any Release Party may seek contribution or indemnification from the Company or any of the other Released Parties in respect of any payments required to be made by Existing Class A Members or the Releasing Parties pursuant to this Agreement.

## ARTICLE 6

## SURVIVAL; INDEMNIFICATION

**Section 6.1    Survival of Representations and Warranties**.  The representations and warranties of the Parties in this Agreement shall survive the consummation of the Transaction and shall remain in effect for a period of three (3) years after the Closing Date, provided, however, that the Fundamental Representations shall survive indefinitely and the representations and warranties set forth in Section 3.11 (Environmental) shall survive until 90 days after expiration of the applicable statute of limitations.  All covenants and agreements set forth herein

15

shall survive the consummation of the Transaction in accordance with their respective terms. In the event notice of any indemnifiable claim shall have been given within the applicable survival period, all representations and warranties that are the subject of such indemnifiable claim shall survive until such indemnifiable claim is finally resolved. Indemnification obligations with respect to any Losses suffered relating to fraud or misrepresentation of a significant fact or the volitional withholding of any significant fact by any Party shall not expire. If any representation or warranty contained in this Agreement is qualified based on materiality, including the terms "material" or any similar qualifier, such qualification shall in all respects be ignored and given no effect for purposes of determining whether any breach or inaccuracy has occurred and the amount of any related Loss.

**Section 6.2     Indemnification by the Company and the Existing Class A Members**. Subject to the terms, conditions and limitations set forth in this Article 6, the Company, the Existing Class A Members, and their respective Affiliates shall, jointly and severally, indemnify and defend Investor and its Affiliates and their respective officers, directors, managers, shareholders, members, partners, employees, lenders, agents, representatives, successors and permitted assigns (each a "Investor Indemnified Party") against, and shall hold each of them harmless from, any and all damages, losses, injuries, Liabilities, claims, demands, Proceedings, judgments, awards, settlements, assessments, deficiencies, Taxes, penalties, fines, charges, payments, costs or expenses (including reasonable investigation and legal fees) or reduction in value, whether or not involving a third-party claim (collectively, "Losses"), arising, directly or indirectly, from or in connection with:

> (a)     any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of the Company or its Affiliates in this Agreement or any certificate delivered by the Company or its affiliates pursuant to this Agreement;

> (b)     any breach or nonfulfillment of any covenant, agreement or obligation of the Company under this Agreement;

> (c)     the operation of the business prior to Closing and any Liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the Closing (including operations);

> (d)     any Tax Liability (whether incurred by the Company or Investor) as a result of the transactions contemplated by this Agreement;

> (e)     any Tax Liability of the Company for tax periods up to and including Closing, including, without limitation, those Tax Liabilities that would have been or would be accrued under accrual accounting and/or any Tax Liabilities resulting from a change in the Company's method of accounting;

> (f)     the Confidential Settlement Agreement and Release of All Claims and all matters relating thereto, referred to therein, or arising therefrom, including, for the avoidance of doubt, the Employment Litigation, the Proposed Starrex Transaction, the Derivative Litigation, the Stewart Litigation, and any Losses paid or otherwise incurred in the investigation, prosecution, defense, negotiation, settlement or collection of all

16

COAST006102

matters relating to, referred to in, or arising out of the Confidential Settlement Agreement and Release of All Claims; and/or

(g)     any breach or nonfulfillment of any covenant, agreement or obligation of the Company or any Existing Class A Member under the Side Letter.

The Company, the Existing Class A Members, and their respective Affiliates shall not use any of the Contribution Amount to satisfy the above mentioned indemnity obligations.

**Section 6.3     Indemnification by Investor**.   Subject to the terms, conditions and limitations set forth in this <u>Article 6</u>, Investor shall indemnify and defend the Company and its successors and permitted assigns (each an "<u>Magnolia Indemnified Party</u>") against, and shall hold them harmless from, any Loss arising, directly or indirectly, from or in connection with:

(a)     any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of Investor in this Agreement or any certificate delivered by Investor pursuant to this Agreement; and/or

(b)     any breach or nonfulfillment of any covenant, agreement or obligation of Investor in this Agreement.

**Section 6.4     Limitations on Indemnification**.

(a)     In no event shall Investor, on the one hand, or the Company, on the other hand, be required to make indemnification payments hereunder for Losses that result solely from facts or circumstances which constitute a breach or inaccuracy of any representation or warranty in <u>Article 3</u>, <u>Article 4</u> or <u>Article 5</u> unless the aggregate amount of all such Losses suffered by the Investor Indemnified Parties or the Magnolia Indemnified Parties, as applicable, exceeds $10,000 (the "<u>Deductible</u>"), in which case, Investor or the Company, as the case may be, shall be liable for all such Losses in excess of the Deductible, provided, however, that the Deductible shall not apply to any claims for Losses incurred or suffered as a result of, arising out of or relating to a breach of, default in, or failure to perform, any of the Fundamental Representations and the representations and warranties set forth in <u>Section 3.16(k), Section 3.16(l),</u> or the matters set forth on <u>in Section 6.2(f)</u> and <u>Section 6.2(g)</u>.

(b)     The limitations set forth in this <u>Section 6.4</u> shall not apply to any claim involving criminal activity, fraud, willful misconduct or an intentional misrepresentation of fact in connection with the transactions contemplated by this Agreement.

**Section 6.5     Treatment of Indemnification Payments**.   Each Party will treat all payments made pursuant to <u>Article 6</u> as adjustments of, the equity consideration or the Contribution Amount, as the case may be, for all purposes.

**Section 6.6     Exclusive Remedy**.   Except to the extent arising from fraud or willful misconduct and except as provided in any Transaction agreement, including Section 8.14 of this Agreement, the indemnification provided by this <u>Article 6</u> shall be the sole and exclusive remedy in respect of any breach of or inaccuracy in any representation, warranty, agreement or covenant contained in this Agreement.  The foregoing shall not limit the Parties' right to obtain specific

17

performance as provided herein.  In furtherance of the foregoing, each Party hereby waives, to the fullest extent permissible under applicable Law, and agrees in any case not to assert in any action or proceeding of any kind, any and all rights, claims and causes of action it may now or hereafter have (including any such rights, claims or causes of action arising under or based upon common law or other Law) against any indemnifying Party for any matter described in the previous sentence other than claims for indemnification asserted as permitted by and in accordance with the provisions set forth in this Article 6, provided, nothing in this Section 6.6 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled, or to seek any remedy on account of any Party's fraud or willful misconduct..

Section 6.7    **Waiver of Punitive Damages**.    NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL ANY PARTY OR ITS AFFILIATES, OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE HEREUNDER AT ANY TIME FOR PUNITIVE DAMAGES (EXCEPT TO THE EXTENT PAID TO A THIRD PARTY), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND EACH PARTY HEREBY EXPRESSLY RELEASES THE OTHER PARTIES, THEIR AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND REPRESENTATIVES THEREFROM.

Section 6.8    **Other Limitations on Losses**.  Any indemnification owing pursuant to this Article 6 in respect of an indemnifiable Loss shall be reduced by any insurance proceeds, indemnification payments or contribution payments actually received in respect of such indemnifiable Loss by the Investor Indemnified Party or Magnolia Indemnified Party, as the case may be, from third parties unaffiliated with such Investor Indemnified Party or Magnolia Indemnified Party (in each case, reduced by any costs of collection and/or increases in premiums incurred by such Investor Indemnified Party or Magnolia Indemnified Party in connection with such recovery)

Section 6.9    **Indemnification Procedures**. The Party making a claim under this Article 6 is referred to as the "Indemnified Party", and the Party against whom such claims are asserted under this Article 6 is referred to as the "Indemnifying Party."

(a)    Third Party Claims.

(i)    If an Indemnified Party receives notice of the assertion or commencement of an Action made or brought by any Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement (each, a "Third Party Claim") against such Indemnified Party that the Indemnified Party has determined has or would reasonably be expected to give rise to a right of indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty days after receipt of such notice of such Third Party Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be

18

COAST006104

sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

        (ii)     Subject to the terms of this Section 6.9(a), upon receiving notice of a Third Party Claim, the Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party within thirty business days of its receipt of notice of the Third Party Claim, to assume the investigation and defense of such Third Party Claim at the Indemnifying Party's expense and with counsel reasonably satisfactory to the Indemnified Party; provided, that the Indemnifying Party shall not have the right to assume the investigation and defense of a Third Party Claim if (A) the Indemnifying Party or its Affiliate is also a Party to such Third Party Claim and the Indemnified Party determines in good faith that joint representation would be inappropriate, (B) upon request, the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend such Third Party Claim, (C) in the reasonable judgment of the Indemnified Party, it involves material reputational risks to the Indemnified Party or any of its Affiliates, or (D) it seeks an injunction or other equitable relief against the Indemnified Party or relates to or arises in connection with any criminal proceeding, indictment, allegation or investigation. If the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 7.06(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name of and for the Indemnified Party.

        (iii)    The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it, subject to the Indemnifying Party's right to assume the control of the defense thereof in accordance with Section 6.9(a)(ii). The fees and disbursements of any such counsel shall be at the expense of the Indemnified Party; provided, that if in the written opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party or any of their Affiliates that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.

        (iv)    If the Indemnifying Party elects not to compromise or defend a Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in Section 6.9(a)(ii), or (subject to the proviso to this Section 6.9(a)(iv)) fails to diligently prosecute the defense of a Third Party Claim, the Indemnified Party may, subject to Section 6.9(b), pay, compromise, and defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim; provided that if the Indemnifying Party fails to diligently pursue the defense of the Third Party Claim or the Indemnified Party reasonably concludes that the Third Party Claim is not being defended to its satisfaction, the Indemnified Party can assume the defense of the Third Party Claim if the Indemnified Party gives the Indemnifying Party written demand to diligently pursue the defense and the Indemnifying Party fails to do so within ten business days after receipt of the demand, or such shorter period as may be required to respond to any deadline imposed by a Governmental Body.

COAST006105

(v)     The Parties shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including promptly making available records relating to such Third Party Claim in their possession or control and furnishing, without expense (other than reimbursement of actual reasonable out-of-pocket expenses) to the defending Party, management employees of the non-defending Party as may be reasonably necessary for the preparation of the defense of such  Third Party Claim.

(b)     <u>Settlement of Third-Party Claims</u>. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 6.9(b). If a firm offer is made to settle a Third-Party Claim without leading to Liability on the part of the Indemnified Party or its Affiliates and provides, in customary form, for the unconditional release of each Indemnified Party and their Affiliates from all Liabilities in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten business days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to settlement of such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume the defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense of a Third-Party Claim under Section 6.9(a)(iv), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)     <u>Direct Claims</u>.

(i)     Any Proceeding initiated by an Indemnified Party on account of a Loss which does not result from a  Third-Party Claim (each, a "Direct Claim") shall be asserted by the Indemnified Party by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than sixty days after the Indemnified Party becomes aware of such Direct Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

(ii)     The Indemnifying Party shall have forty-five days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim. The Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any unprivileged accounts, documents or records in its control or possession) as the Indemnifying Party or any of its

20

professional advisors may reasonably request. If the Indemnifying Party does not so respond within such forty-five (45) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

      **Section 6.10**   **Payments.** Once a Loss is agreed to by the Indemnifying Party or adjudicated to be payable under this Article 6, the Indemnifying Party shall satisfy its obligations within ten business days of such adjudication by wire transfer of immediately available funds. Interest on any such amount payable will accrue from and including the date of agreement of the Indemnifying Party or adjudication to but excluding the date such payment has been made at a rate per annum equal to 12%, and such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

## ARTICLE 7

## DEFINED TERMS

      **Section 7.1**   **Definitions**. As used in this Agreement, the following terms shall have the following meanings:

      "Affiliate" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with such first Person.

      "Benefit Plan" means a Pension Plan, a Welfare Plan or any other plan or program for employees relating to deferred compensation, bonus, performance compensation, severance, vacation, sick pay, incentive, insurance, health or welfare.

      "Code" means the Internal Revenue Code of 1986, as amended.

      "Company Agreement" means the First Amended and Restated Company Agreement of Magnolia Title Florida, LLC, dated December 1, 2021.

      "Confidential Settlement Agreement and Release of All Claims" means that certain Confidential Settlement Agreement and Release of All Claims between John Magness ("Magness") and The Peabody Bulldog, LLC ("Peabody") ( collectively with Magness, the "Magness Parties"), and Bo and Sarah Blackburn (the "Blackburns"), #6 Metz Court ("Metz Court"), Sol City Title Managers, LLC ("Sol City Managers"), Rabbit Food, LLC ("Rabbit Food"), BS Title Team, LLC ("BS Title Team"), Pacific Waters Title, LLC ("1845 Title"), Blue Goose Title, LLC ("Noteworthy Title"), CSP Texas Joint Venture, LLC ("Key Title"), CSP Texas Joint Venture - San Antonio, LLC ("Key Title San Antonio"), Tall City Title, LLC ("Tall City Title"), Amarillo Title, LLC ("Amarillo Title"), Joy Title LLC ("Joy Title"), Gateway City Title, LLC ("Gateway City Title"), Gateway City Title Managers, LLC ("Gateway City Managers"), Corpus Christi Title, LLC ("Corpus Christi Title"), and Corpus Christi Title Managers, LLC ("Corpus Christi Managers") ( each a "BSpoke Party," and collectively with the Blackburns, the "BSpoke Parties"), and 405 Manhattan Investments, LLC ("405 Manhattan") and Alphabet Investments, LLC ("Alphabet") ( collectively with 405 Manhattan, the "the Alphabet Parties"), and Sol City Title, LLC ("Magnolia Houston"), Coast to Coast Title, LLC ("Magnolia Dallas"), Magnolia Title Florida ("Magnolia Florida"), and Magnolia Title Arkansas, LLC

21

COAST006107

("Magnolia Arkansas") (collectively, the "Magnolia Parties"), and Britt Naponic ("Naponic"), and Starrex International Ltd. ("Starrex").

"Contract" means any agreement, contract, lease, sublease, license, sublicense, indenture, mortgage, instrument, note, guaranty, customer order, purchase order, franchise, joint venture agreement, partnership agreement or other arrangement, understanding, permission or commitment, in each case, whether written or oral.

"Control," "Controlled by," and "under common Control with" as used with respect to any Person, mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Environmental Law" means, whenever in effect, all Laws and contractual Liabilities concerning public or worker health or safety, pollution or protection of the environment.

"Equity Securities" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (howsoever designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contract which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Fundamental Representations" means the representations and warranties set forth in Sections 3.1 (Existence), 3.2 (Authorization and Power), 3.4 (No Conflict; Consents), 3.5 (Brokers), 3.6(a) (Title and Sufficiency), 3.12 (Taxes and Tax Returns), Section 3.14 (Employee Benefit Plans, 4.1 (Capacity and Authority), 4.2 (No Conflict; Consents).

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, in the case of a corporation, its certificate or articles of incorporation and the by-laws (or analogous documents), in the case of a limited liability company, its certificate of formation and operating or limited liability company agreement (or analogous documents) and in the case of a limited partnership its certificate of formation and limited partnership agreement (or analogous documents).

"Governmental Body" means any federal, state, municipal, local or other government department, quasi-governmental department, commission, board, bureau, agency or instrumentality, regulatory or self-regulatory authority, any tribunal, any court, or any other political or other subdivision, department or branch of any of the foregoing, in each case whether of the United States or foreign.

22

COAST006108

"Hazardous Material" means any material, substance or waste for which Liability or standards of conduct may be imposed pursuant to any Environmental Law, including petroleum.

"Intellectual Property Assets" means all intellectual property and proprietary rights throughout the world, including all: (i) patents, patent applications and inventions (whether or not patentable or reduced to practice); (ii) trademarks, service marks, logos, trade names, slogans and internet domain names, social media handles, and all registrations, applications and renewals for any of the foregoing, and all goodwill associated with the foregoing; (iii) copyrights and works of authorship, and all registrations, applications and renewals for any of the foregoing; (iv) trade secrets and other proprietary information; (v) computer software and software systems; (vi) all other intellectual, proprietary or industrial rights including rights arising under license agreements; and (vii) all rights and remedies relating thereto, including remedies against, and the right to recover damages from, present and past infringement and rights to protection of interests therein..

"Knowledge" means, as to any Person (other than the Company), the actual knowledge or awareness of such Person after due and reasonable inquiry, and with respect to the Company, the actual knowledge of any Manager, officer, executive level employee, and supervisory level employee of the Company and any Existing Class A Member and their respective Affiliates, after due and reasonable inquiry.

"Law" means any foreign or domestic law, common law, treaty, statute, ordinance, rule, regulation, enforceable requirement, binding determination, order, decree, judgment, injunction or other pronouncement having the effect of law.

"Liability" and "Liabilities" means any direct or indirect liability, indebtedness, Claim, loss, damage, deficiency, assessment, responsibility, or obligation of whatever kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, fixed or unfixed, determined or determinable, due or to become due, choate or inchoate, matured or unmatured, and whether due or to become due.

"Lien" means any lien, collateral assignment, encumbrance, mortgage, security interest, conditional or other sales agreements, pledge, hypothecations, claims, interferences, options, rights of first refusal, preemptive rights, restrictions of any nature, or other encumbrances (including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the possession, exercise, transfer or any other attribute of ownership of any asset), as applicable and, in each case, applicable with respect to such asset or property.

"Ordinary Course" means, with respect to any Person, an action taken by such Person will be deemed to have been taken in the "Ordinary Course" only if such action is recurring in nature, is consistent in all material respects with the past practices of such Person (including with respect to quantity and frequency), and is taken in the ordinary course of the normal day to day operations of such Person.

"Pension Plan" means an "employee pension benefit plan" as defined in Section 3(2) of ERISA.

"Permit" means any license, permit, approval, franchise, registration, certificate, variance, authorization or similar right issued by or obtained from a Governmental Body.

COAST006109

"Permitted Liens" means (a) non-delinquent statutory Liens arising other than by reason of default, (b) Liens of carriers, warehousemen, mechanics and materialmen incurred in the Ordinary Course for sums not yet due, (c) Liens incurred or deposits made in the Ordinary Course in connection with workers' compensation, unemployment insurance and other types of social security and (d) with respect to Real Property only, (i) Taxes which are a lien and not yet due and payable as of the Closing Date, (ii) zoning, building and other land use regulations imposed by governmental agencies having jurisdiction over the Real Property which are not violated by the current use or occupancy of the Real Property or the operation of the business thereon, (iii) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Real Property which, in each case, do not materially impair (x) the value or marketability of the parcel of Real Property to which they pertain or (y) the occupancy or use of the Real Property by the business for the purposes for which it is currently used, and (iv) landlord liens under Leases set forth on Schedule 3.10(b).

"Person" means any individual, corporation, limited liability company, partnership, joint venture, trust, business association, organization, Governmental Body or other entity.

"Proceeding" means any action, claim, complaint, charge, injunction, order, judgement, decree, arbitration, audit, hearing, investigation, litigation, suit or proceeding (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before any Governmental Body or arbitrator.

"Side Letter" means that certain letter agreement dated of even date herewith and duly executed by the Company, the Investor, and certain members of the Company regarding the Company Agreement.

"Tax" means any federal, state, local or foreign tax, assessment, governmental charge or imposition, including any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, escheat, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Body.

"Tax Return" means any federal, state, local and foreign return, report, statement or other similar document required to be filed with any Governmental Body with respect to Taxes.

"Transaction" means the transactions contemplated by this Agreement and the other Transaction agreements.

"Welfare Plan" means an "employee welfare benefit plan" as defined in Section 3(1) of ERISA.

COAST006110

**ARTICLE 8**

**MISCELLANEOUS**

**Section 8.1    Expenses**.  Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the Transaction, including all fees and expenses of its agents, representatives, counsel and accountants and public announcements.

**Section 8.2    Entire Agreement**.    This Agreement and the other Transaction agreements set forth the entire understanding of the Parties with respect to the Transaction. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

**Section 8.3    Amendments and Waivers**.  This Agreement may not be amended except by an instrument in writing signed by or on behalf of each of the Parties.

**Section 8.4    Assignment and Binding Effect**.  This Agreement may not be assigned by any Party without the prior written consent of the other Parties; provided that Investor may, without the prior written consent of any Party, assign any or all of its rights hereunder to (a) one or more of its Affiliates, (b) any lender for collateral purposes or (c) any future purchaser of all or substantially all of the assets of the Company; provided, further, that no such assignment shall relieve Investor of its obligations hereunder.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, heirs, personal representatives, successors and permitted assigns.

**Section 8.5    Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand, (b) when sent by electronic transmission (including facsimile and email) with written confirmation of transmission, (c) one business day following the day sent by reputable overnight courier (with written confirmation of receipt) or (d) three business days following the date sent by U.S. registered or certified mail (return receipt requested), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

| If to the Company, to: | with required copies (which shall not constitute notice): |
|---|---|
| Magnolia Title Florida, LLC<br>14701 Saint Mary's Lane<br>Suite 150<br>Houston, Texas 77079<br>Attention: John Magness<br>Email: john.magness@magnoliatitleteam.com | York & Hinds, P.C.<br>1885 St. James Place<br>Suite 770<br>Houston, Texas 77056<br>Attention:  William York<br>Facsimile: 713-659-5755<br>Email:  wey@yorkhinds.com |

25

COAST006111

If to Investor:                                      with required copies (which shall not
                                                     constitute notice:

HMH Title Investments, LLC                           Decker Jones, P.C.
c/o BNMJR, Inc.                                      801 Cherry Street, Unit #46
1038 Texan Trail                                     Burnett Plaza, Suite 2000
Grapevine, Texas 76051                               Fort Worth, TX 76102
E-mail: Nelson.Mitchell@historymaker.com             E-mail: afulkerson@deckerjones.com
Attention: CEO                                       Attention: Adam J. Fulkerson

     **Section 8.6**    **Governing Law**.  This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of Texas.

     **Section 8.7**    **Jurisdiction and Venue**.  All Proceedings arising out of or relating to this Agreement and/or the Transaction shall be heard and determined exclusively in a state or federal court in the State of Texas.  Consistent with the preceding sentence, each Party hereby expressly, irrevocably and unconditionally (a) submits to the exclusive jurisdiction of any state or federal court in State of Texas for the purpose of any Proceeding brought by any Party hereto arising out of or relating to this Agreement and/or the Transaction, (b) waives any objection to the above courts based on lack of personal jurisdiction or inconvenient forum and (c) waives its right to bring any Proceeding arising out of or relating to this Agreement and/or the Transaction in any other jurisdiction.

     **Section 8.8**    **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO THAT IS RELATED TO THE TRANSACTION.

     **Section 8.9**    **No Third Party Beneficiaries**.  Other than those Persons entitled to indemnification pursuant to Article 6, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

     **Section 8.10**    **No Strict Construction**.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

     **Section 8.11**    **Rules of Construction**.  All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect

COAST006112

in any way the meaning or interpretation of this Agreement. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires. The words "hereof," "herein" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, the word "or" shall include both the conjunctive and disjunctive and the word "any" shall mean "one or more". The terms "Dollars" and "$" mean United States Dollars; Wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation." Any statute defined or referred to herein or in any other Transaction agreement means such statute as from time to time amended, modified or supplemented, including by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. All accounting terms not otherwise defined in this Agreement shall have the meanings ascribed to them under GAAP.

Section 8.12  **Schedules and Exhibits**.  All Schedules and Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement and, unless otherwise defined therein, all terms used in any Schedule or Exhibit shall have the respective meanings ascribed to such terms in this Agreement.

Section 8.13  **Severability**.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof; and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 8.14  **Remedies**.  In the event of any breach of this Agreement by any Party, the non-breaching Party shall, in addition to any other remedy provided herein or by law or in equity, be entitled to seek specific enforcement of the terms hereof, including appropriate injunctive relief in any court of competent jurisdiction, and no bond or other security shall be required in connection therewith.

Section 8.15  **Counterparts**.  This Agreement may be executed in multiple counterparts, including counterparts delivered by facsimile or other electronic transmission, each of which shall be deemed an original and together shall be deemed one instrument.

*Signature page follows:*

COAST006113

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
B. Nelson Mitchell, Jr., CEO

Magnolia Title Florida, LLC

By:_____
John Magness, Manager

Alphabet Investments, LLC

By:_____
Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
John Magness, Manager

405 Manhattan Investments, LLC

By:_____
Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

COAST006114

**IN WITNESS WHEREOF,** the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
    B. Nelson Mitchell, Jr., CEO

Magnolia Title Florida, LLC

By:_____
    John Magness, Manager

Alphabet Investments, LLC

By:_____
    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
    John Magness, Manager

405 Manhattan Investments, LLC

By:_____
    Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
    B. Nelson Mitchell, Jr., CEO

Magnolia Title Florida, LLC

By:_____
    John Magness, Manager

Alphabet Investments, LLC

By: *M. Clayta—Hill*
    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
    John Magness, Manager

405 Manhattan Investments, LLC

By:_____
    Alyse Angello, Manager

*Signature Page to Contribution Agreement*

COAST006116

DocuSign Envelope ID: B9E196FB-452F-4798-B7E9-31E6E5F72FAA

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
    B. Nelson Mitchell, Jr., CEO

Magnolia Title Florida, LLC

By:_____
    John Magness, Manager

Alphabet Investments, LLC

By:_____
    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
    John Magness, Manager

405 Manhattan Investments, LLC

By: *Alyse Angelle*_____
    Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

COAST006117

## CONTRIBUTION AGREEMENT

**THIS CONTRIBUTION AGREEMENT** (this "Agreement"), dated as of September 9, 2022, is by and between HMH Title Investments, LLC, a Texas limited liability company ("Investor"), Sol City Title, LLC d/b/a Magnolia Title (the "Company"), GF Insurance Investments, LLC, ("GFI"), Alphabet Investments, LLC, ("Alphabet") and Peabody Bulldog, LLC "PB" (GFI, Alphabet, and PB are each an "Existing Class A Member" and collectively the "Existing Class A Members").

### RECITALS:

Pursuant and subject to the terms and conditions set forth in this Agreement, Investor desires to contribute or otherwise transfer, convey and assign to the Company, a contribution amount of $200,000 cash (the "Contribution Amount") and the Company desires to accept the Contribution Amount from Investor, free and clear of all Liens (other than Permitted Liens) and in consideration of the contribution of the Contribution Amount, issue to Investor Class A - Series II Units of the Company representing thirty six percent (36%) of the issued and outstanding Units of the Company (the "Transaction");

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1

### CLOSING; CONTRIBUTION

**Section 1.1    Closing**.  The closing of the Transaction (the "Closing") shall take place remotely by electronic or facsimile transmissions at 10:00 a.m. Houston, Texas time on the date hereof ("Closing Date").  At the Closing, the Parties shall deliver the documents and take the actions specified in Article 2.

**Section 1.2    Contribution**.  Subject to the terms and conditions set forth in this Agreement, Investor hereby contributes or otherwise transfers, conveys and assigns to the Company, and the Company hereby accepts from Investor, free and clear of all Liens (other than Permitted Liens), all of Investor's right, title and interest in and to the Contribution Amount, receipt of which is hereby acknowledged by Company.  In consideration of the contribution, the Company shall issue to Investor Units of Class A – Series II of the Company that will equal thirty-six percent (36%) of the issued and outstanding Units of the Company, free and clear of all Liens.

### ARTICLE 2

### CLOSING

**Section 2.1    Documents to be Delivered by the Company**.  At the Closing and in consideration of the delivery of the Contribution Amount to the Company by the Investor, the

COAST006118

Company shall deliver the following to Investor, in each case, in form and substance satisfactory to Investor.  Except as otherwise specified, each shall be dated as of the Closing Date.

(a)    <u>Units</u>.   Company shall deliver to Investor 5,625 Units of Class A – Series II Units of the Company;

(b)    <u>Company Agreement.</u>   The Company Agreement duly executed by the Company and each member of the Company;

(c)    <u>Side Letter.</u>   The Side Letter duly executed by the Company and certain members of the Company;

(d)    <u>Secretary's Certificate</u>.   A certificate, dated as of the Closing Date, of the secretary of the Company with respect to such Person's Governing Documents and the resolutions adopted by its governing authority authorizing such Person's execution of the Transaction agreements; and

(e)    <u>Further Assurances</u>.   Such further instruments and documents as the Company may reasonably request for the purpose of facilitating the consummation of the Transaction.

**Section 2.2    <u>Documents to be Delivered by Investor</u>**.  At the Closing, Investor shall deliver the following documents to the Company, in each case, in form and substance satisfactory to the Company.  Except as otherwise specified, each shall be dated as of the Closing Date.

(a)    <u>Delivery of the Contribution Amount</u>.   Investor shall deliver the Contribution Amount to the Company in immediately available funds;

(b)    <u>Secretary's Certificate</u>.   A certificate, dated as of the Closing Date, of the secretary of Investor with respect to Investor's Governing Documents and the resolutions of its governing body authorizing Investor's execution of the Transaction agreements; and

(c)    <u>Further Assurances</u>.   Such further instruments and documents as Investor may reasonably request for the purpose of facilitating the consummation of the Transaction.

## ARTICLE 3

## <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

As a material inducement to Investor to enter into this Agreement and to consummate the Transaction, each Existing Class A Member and the Company hereby represent and warrant to Investor, as of the date hereof that:

**Section 3.1    <u>Existence</u>**.  The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas and is authorized to do business in the State of Texas.  The Company is treated as a corporation for United States income tax purposes.  The Company has full power and authority to own, lease and operate its assets and to carry on its business as presently conducted. The Company is qualified or registered

2

COAST006119

to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of its business or operations would require such qualification or registration. The Company does not directly or indirectly own or have any interest in the shares of capital stock or any other Equity Securities in any Person. There is no outstanding Contract of any kind requiring the Company to make an investment in, or to acquire Equity Securities or any other security or other interest in, any Person directly or require such registration.

Section 3.2 **Authorization and Power**. The Company has all requisite power and authority to execute, deliver, perform and consummate the Transaction. The execution, delivery and performance by the Company of the Transaction and the consummation of the Transaction have been duly authorized by its governing authority and as otherwise may be required under its Governing Documents. No further entity action on the part of the Company is necessary to authorize the execution, delivery and performance of any Transaction agreement or the consummation of the Transaction. Each Transaction agreement to which the Company is a party has been duly executed and delivered by such Party and constitutes the legal, valid and binding obligations of such Party enforceable against it in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles. The copies of all Governing Documents of the Company, as amended to date, have been made available to Investor, are complete and correct, and no amendments thereto are pending.

Section 3.3 **Capitalization**. All of the issued and outstanding Equity Securities in the Company consist solely of the Equity Securities, as set forth on Annex 1(a). One hundred percent (100%) of the Equity Securities are beneficially and legally owned by the holders as set forth on Annex 1(a). All of the Equity Securities of the Company set forth on Annex 1(a) and all Equity Securities in the Company being issued to Investor hereunder are duly authorized and validly issued, are fully paid and non-assessable, were not issued in violation of any preemptive rights, rights of first refusal or first offer, any Contract, or other restriction, and were or are being issued under and in accordance with the Governing Documents of the Company and in compliance with applicable federal and state Laws. There are no Contracts to which the Company, any current holder of Equity Securities in the Company, or any other Person is a party with respect to registration rights or the voting of any Equity Securities in the Company or that restrict the transfer of any such interest. There are no outstanding contractual obligations of the Company to repurchase, redeem, or otherwise acquire any Equity Securities of itself. The Company does not own or hold any Equity Securities in any other Person.

Section 3.4 **No Conflict; Consents**. The execution, delivery and performance by the Company of each Transaction agreement to which it is a party do not, and the consummation of the Transaction will not, (a) result in the imposition of any Lien upon any of the assets of the Company or (b) violate, conflict with or result in the breach (with or without notice or the passage of time, or both) of any term, condition or provision of, (i) any material Law to which the Company or any of its assets are subject, (ii) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to the Company or any of its assets, or (iii) the Governing Documents of the Company.

3

**Section 3.5    Brokers**.  Neither the Company nor any of the Parties or any of their respective Affiliates have incurred any Liability to pay any fee or commission to any broker, finder or agent in connection with the Transaction.

**Section 3.6    Financial Statements**.  Attached to Schedule 3.6 are true, correct and complete copies of the internally prepared balance sheet and statement of income of the Company as of and for the year-to-date period ended June 30, 2022 (the financial statements contemplated by the foregoing clause are collectively referred to herein as the, "Financial Statements").  The Financial Statements (x) have been prepared in accordance with IFBS (in the case of the Interim Financials, except for the absence of notes and subject to normal and customary year-end adjustments for recurring accruals (which shall not be material either individually or in the aggregate)), as consistently applied by the Company, based upon the books and records of the Company and its subsidiaries, and (y) fairly present in all material respects the financial condition of the business of the Company as of the dates thereof and the operating results and cash flows of it business for the periods then ended. Since December 31, 2021, there has been no change in any of the accounting (or Tax accounting) policies, practices or procedures of the Company.  The Company has elected to be treated as a C Corporation for United Sates income tax purposes from and after June 30, 2022.

(a)    Title and Sufficiency.  The Company has good and valid title to, or a valid leasehold interest, in all of the business assets.

(b)    Condition.  The business assets (i) are in good operating condition and repair (ordinary wear and tear excepted), and (ii) are suitable for the purposes for which they are presently used by the business of the Company.

**Section 3.7    Compliance with Laws**.  The Company is and at all times since its formation has been, in compliance with all applicable Laws, and the Company has not received any notice, report, complaint, inquiry, claim, or other information alleging or relating to any violation of or Liability under any applicable Law relating to the Company.

**Section 3.8    Permits**.  the Company holds all Permits required to be held by it for the current and proposed conduct of its business, and the Company has been in compliance with all such Permits.  Schedule 3.8 lists all Permits held by the Company with respect to the Company's conduct of the business.

**Section 3.9    Proceedings**.  Schedule 3.9 lists all Proceedings to which the Company has been a party.  There here have been, no actions, suits, Orders, investigations, Claims or other Proceedings (including any arbitration proceedings) pending or, to the Knowledge of the Company, threatened against the Company, or pending or threatened by the Company against any third party, at law or in equity, or before or by any Governmental Bodies (including any actions, suits, Proceedings or investigations with respect to the Transaction). Except as set forth on Schedule 3.9, (a) there are no, Proceedings, Claims or Orders or, to the Company's Knowledge, investigation of any nature pending, rendered, or to the Company's Knowledge, threatened against the Company, and (b) there are no Orders outstanding against the Company.

4

COAST006121

**Section 3.10    Real Property**.

(a)    The Company does not own and has never owned, any real property.

(b)    Schedule 3.10(b) sets forth the address of any Leased Real Property, and a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease document).  The Company has a good and valid leasehold interest in and to all of the Leased Real Property, free and clear of all Liens (other than Permitted Liens).  With respect to each of the Leases and except as set forth in Schedule 3.10(b): (i) the possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed and there are no material disputes with respect to such Lease; (ii) no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (iii) the Company has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property or any portion thereof; (iv) the Company has not collaterally assigned or granted any other security interest in such Lease or any interest therein.

(c)    The Leased Real Property constitutes all of the real property currently leased, occupied or otherwise utilized in connection with the business as currently conducted.  All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property (collectively, the "Improvements") are sufficient for the conduct of the business.  To the Knowledge of the Company, there are no structural deficiencies or latent defects affecting any of the Improvements and there are no facts or conditions affecting any of the Improvements which would, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements, or any portion thereof in the operation of the business.  To the Knowledge of the Company, the Leased Real Property and Improvements and the Company's use thereof conform in all material respects to the Lease and all applicable building, zoning and other Laws.  All Permits necessary to the current occupancy and use of the Leased Real Property have been obtained, are in full force and effect and have not been violated.  There is no pending or, to the Knowledge of the Company, threatened condemnation or other Proceedings affecting any portion of the Lease Real Property or the Company's use thereof.

**Section 3.11   Environmental**.    (a) the Company has been in compliance with all Environmental Laws, including with respect to any Permits required thereunder, (b) neither the Company nor any of its respective Affiliates has generated, transported, treated, stored, disposed of, handled, arranged for or permitted the disposal of, released or exposed any Person to any Hazardous Materials, or owned or operated any property or facility contaminated by any Hazardous Materials, in each case, so as to give rise to material Liability pursuant to any Environmental Law; (c) with respect to the business, the Real Property and the assets of the Company, the Company has not received any notice, report, or other information regarding any actual or alleged violation of or Liability under Environmental Law; and (d) except as set forth in Schedule 3.11, neither the Company nor any of their respective Affiliates has assumed, provided an indemnity with respect to or otherwise become subject to any material Liability of any other Person relating to Environmental Laws.    The Company has furnished to Investor all environmental audits, assessments, reports and other documents materially bearing on

5

COAST006122

environmental, health or safety matters, which are in their possession or under their reasonable control.

　　　Section 3.12　**Taxes and Tax Returns**.  All Tax Returns of the Company have been timely filed with the appropriate Governmental Bodies in all jurisdictions in which such Tax Returns are required to be filed.  All such Tax Returns properly reflect the Liabilities of the Company for Taxes for the periods, property or events covered thereby.  All Taxes, including those which are called for by such Tax Returns, required to be paid, withheld or accrued by the Company or before the date hereof, including any deficiency assessments, penalties and interest assessed with respect to such Taxes, have been timely paid, withheld or accrued.  There are no Liens for Taxes (other than for current Taxes not yet due and payable) on the Assets of the Company.  The Company is not a "foreign person" within the meaning of Section 1445 of the Code.  No U.S. federal, state, local, or foreign audit, proceeding, or other examination of any Tax Return of the Company is presently in progress, nor is any such audit, proceeding, or other examination threatened or contemplated. No issue has been raised in any current or prior audit of any Tax Return of the Company that, by application of the same principles, would reasonably be expected to result in a material Tax deficiency for any subsequent Tax period. No deficiencies for any Taxes have been proposed, asserted or assessed against the Company that have not been resolved and paid in full.  No waivers of statutes of limitations have been given with respect to any Taxes of the Company and no request for any such waiver is currently pending. The Company has not requested an extension of time within which to file any Tax Return in any taxable year that has not since been filed. Company has not agreed to an extension of time with respect to a Tax assessment or deficiency or has executed any powers of attorney with respect to Tax matters that currently remain in effect. No requests for ruling or determination letters or competent authority relief with respect to the Company are currently pending with any Governmental Bodies with respect to any Taxes. The Company is not subject to any private letter ruling of the IRS or any comparable ruling of any other Governmental Bodies.  The Company (i) has never been a member of an Affiliated Group, or any similar affiliated or consolidated group for Tax purposes under state, local, or foreign Law, or (ii) has any liability for the Taxes of another Person (other than another Company Entity) pursuant to Treasury Regulation §1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise.  The Company is not a party to or bound by and does not have any obligations under, any Tax sharing agreement, Tax indemnification agreement or similar Contract or arrangement. The Company is not a party to any Contract or arrangement to pay, indemnify or make any payments with respect to any Tax Liabilities of any stockholder, member, manager, director, officer or other employee or contractor of the Company.  The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) use of an improper method of accounting for a taxable period ending on or prior to the Closing Date; (iii) "closing agreement" as described in Code Section 7121 (or any similar provision of state, local, or foreign Law) executed on or prior to the Closing Date; (iv) intercompany transactions or any excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local, or foreign Law); (v) installment sale or open transaction disposition made on or prior to the Closing Date; or (vi) prepaid amount received on or prior to the Closing Date.  The Company has made available to Investor true and complete copies of federal, state and local Tax Returns of each of the Company

COAST006123

Entities and their predecessors for the years ended December 31, 2019, 2020 and 2021 and true and complete copies of all examination reports and statements of deficiencies assessed against or agreed to by the Company or any predecessor with respect to Taxes. There is not currently in effect any power of attorney authorizing any Person to act on behalf of or receive information relating to, the Company with respect to any Tax matter. The Company has not received from any Governmental Body in a jurisdiction where the Company has not filed a Tax Return any (i) claim that the Company is or may be subject to taxation by that jurisdiction, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against the Company. The Company engaged in a "reportable transaction" as defined in Treas. Reg. § 1.6011-4(b). Within the past three years, the Company has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code Section 355 or Code Section 361. All of the individuals who are performing consulting or other services for the Company have been correctly classified as either "independent contractors" or "employees," as the case may be. The Company is not a party to any agreement, contract, arrangement, or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code Section 280G (or any similar provision of state, local, or foreign Law).

Section 3.13   **Employees**. Schedule 3.13 contains a true, correct and complete (i) list of all employees of the Company as of May 1, 2022; (ii) list of the then current annual base compensation and target incentive compensation opportunity of, and a description of the fringe benefits (other than those generally available to employees) provided by the Company to any such employees, (iii) status of each employee as "exempt" or "non-exempt" under the Fair Labor Standards Act of 1938, as amended ("*FLSA*") and any applicable state law, (iv) list of the accrued but unused vacation, sick leave and personal time for all employees of the Company, (v) list of any increase, effective after December 31, 2021, in the rate of compensation of any employees if such increase exceeds 10% of the previous annual compensation of such employee, and (vi) and any payments owing or arising at or prior to the Closing from or as a result of the consummation of the Transactions, including any payments for stock appreciation or similar rights, any severance or bonus plan payment, or any similar payment, including the amount of each such payment. Except as set forth on Schedule 3.13, there are no temporary workers, leased employees, contingent workers, or any other Persons performing, and no such Person has performed, services for the Company who are not classified as an employee or former employee performing services for the Company. The Company is not delinquent in payment of or has delayed the payment to any of its employees, consultants, or independent contractors of any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees. The Company is not a party to, subject to or bound by, any collective bargaining or other agreement with a labor organization. There is no pending or, to the Knowledge of the Company, threatened, nor has there been since January 1, 2021, any, organizing effort or demand for recognition or certification or attempt to organize any of its employees or former employees.

Section 3.14   **Employee Benefit Plans**. Schedule 3.14 lists each Benefit Plan providing benefits to any of the Company's employees which is sponsored, established, maintained, or contributed to or required to be contributed to by the Company at any time since its inception.

COAST006124

Each Benefit Plan, and the administration thereof, is in compliance, in all material respects with its terms and with all compliance, funding, reporting, disclosure and other requirements of ERISA, the Code and other Laws applicable to such Benefit Plan.  The Company has made available to Investor prior to the date hereof a true and complete copy of each Benefit Plan listed or required to be listed on <u>Schedule 3.14</u> and except as set forth on <u>Schedule 3.14</u>, the Company or any entity that is treated as a single employer with the Company under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA (an "*ERISA Affiliate*") sponsors, maintains or contributes to or has any obligation to maintain or contribute to, or has any direct or indirect liability, whether absolute or contingent, with respect to any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which the Company is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, including, without limitation, any (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of the Company has any present or future right to benefits.  Each Benefit Plan set forth on <u>Schedule 3.14</u> has been established and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other applicable Laws; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor (the "*DOL*") or any other Governmental Body, or to the participants or beneficiaries of such Benefit Plan, have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter, opinion letter or advisory letter from the IRS with respect to such Benefit Plan's most recent remedial amendment cycle for which the IRS issued such letters, and there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or Tax under ERISA, the Code or any other applicable Law; (iv) other than routine claims for benefits, no Lien, lawsuit or complaint to or by any Person or Governmental Body has been filed against any Benefit Plan or the Company with respect to any Benefit Plan or, to the Knowledge of the Company, against any other Person and, to the Knowledge of the Company, no such Liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (v) no individual who has performed services for any Company Entity has been improperly excluded from participation in any Benefit Plan; and (vi) no Benefit Plan is under, and the Company has not received any notice of, an audit or investigation by the IRS, DOL or any other Governmental Body, and no such completed audit or investigation, if any, has resulted in the imposition of any Tax or penalty on the Company.  No non-exempt "*prohibited transaction*," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred or is reasonably expected to occur with respect to any Benefit Plan set forth on <u>Schedule 3.14</u>.  To the

8

COAST006125

Knowledge of the Company, no fiduciary of any Benefit Plan set forth on <u>Schedule 3.14</u> has any liability for a breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any such Benefit Plan. No fiduciary of any Benefit Plan has been sued by any Person alleging a breach of fiduciary duty with respect to a Benefit Plan or been the subject of an investigation by the DOL in which it was investigating an alleged or possible breach of fiduciary duty with respect to a Benefit Plan, and, to the Knowledge of the Company, no such suit or investigation is contemplated or threatened with respect to any Benefit Plan fiduciary.  Each Benefit Plan that is a "*nonqualified deferred compensation plan*" (as such term is defined in Section 409A(d)(1) of the Code) is in documentary and operational compliance in all material respects with the requirements of Section 409A of the Code and the Treasury Regulations issued thereunder. The Company does not have any obligation to indemnify, reimburse or gross up any individual with respect to any Tax that may be imposed on such individual under Section 409A of the Code.  All liabilities or expenses of the Company in respect of any Benefit Plan (including workers' compensation) which have not been paid have been properly accrued on the Company's most recent financial statements in compliance with GAAP. All contributions or premium payments required to have been made under the terms of any Benefit Plan or in accordance with applicable Law as of the date hereof have been timely made or reflected on the Company's financial statements in accordance with GAAP.  The Company does not have any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any Person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer, any temporary employee, or any employee of any professional employer organization. The Company has not been sued by any Person alleging such misclassification or been the subject of an investigation by the IRS of any other Governmental Body in which the IRS or other Governmental Body was investigating an alleged or possible misclassification, and to the Knowledge of the Company no such suit or investigation is contemplated or threatened.

    **Section 3.15   Intellectual Property Matters**.   <u>Schedule 3.15(a)</u> lists the material Intellectual Property Assets used or held for use in the business, including all internet domain names.  the Company owns all right, title and interest or has a right or license to use (as necessary for the operation of the business in the Ordinary Course) all of the Intellectual Property Assets.  Except as set forth on <u>Schedule 3.15(b)</u>, the Company (i) has not granted any licenses or contractual rights relating to the Intellectual Property Assets or the use thereof or (ii) is not bound by or a party to any Contracts of any kind relating to the Intellectual Property Assets of any other Person (except for licenses to any unmodified, commercially available, off-the-shelf computer software with a replacement cost or annual license fee of less than $1,000).  To the Knowledge of the Company, the conduct of the business as it is presently being conducted, does not violate, conflict with or infringe upon the intellectual property of any other Person in any material manner.  The Company has taken commercially reasonable measures to maintain in confidence all material confidential information owned by the Company and Intellectual Property Assets that constitutes, or that the Company intends or intended to retain as, a trade secret. No such trade secret or confidential information has been disclosed by the Company to any Person other than employees, consultants or contractors of the Company who had a need to know and who used such Intellectual Property Assets in the Ordinary Course of employment or contract performance subject to a written and enforceable confidentiality agreement or obligation. There has been no unauthorized access to any such confidential information by third parties.

COAST006126

**Section 3.16** <u>**Absence of Changes.**</u>     Except as set forth on <u>Schedule 3.16</u>, since December 31, 2021, the business has been operated only in the Ordinary Course and, without limiting the foregoing, the Company has not:

(a)     created or otherwise incurred any Lien except for Permitted Liens on any assets;

(b)     suffered any loss exceeding $10,000 (whether or not covered by insurance), experienced any changes in the amount and scope of insurance coverage or suffered any destruction of its books and records;

(c)     sold, assigned, transferred, waived, released, leased or licensed, or permitted the cancellation, loss, lapse or abandonment or other disposition of, or failed to take reasonable steps to maintain, enforce and protect, any material right or material asset (tangible or intangible) used or held for use in the business (including any right related to any asset);

(d)     acquired (whether by merger, consolidation, purchase of equity interests, purchase of assets or otherwise) any business or the material assets of any Person;

(e)     managed the working capital of the business (including the inventory, accounts receivable, prepaid expenses, accounts payable and accrued expenses of the business) other than in the Ordinary Course;

(f)     cancelled, delayed or postponed the payment of any material Liability, the making of any capital expenditure or the replacement, repair or maintenance of any asset;

(g)     made any material change in the manner in which the business extends discounts or credits to, or otherwise deals with, customers;

(h)     made any material change in the manner in which the business markets its products or services;

(i)     engaged in any transaction outside the Ordinary Course;

(j)     discharged or satisfied any Lien or paid any material Liability, other than current liabilities paid in the Ordinary Course;

(k)     declared, set aside or made any payment, dividend or distribution of cash or other property with respect to its equity interests, or purchased, redeemed or otherwise acquired any of its equity interests (including any capital stock, warrants, options or other rights to acquire its equity interests);

(l)     made any material change in its cash management practices or in any method of accounting or accounting policies;

(m)     incurred, assumed or guaranteed any indebtedness, except in the Ordinary Course with respect to trade payables;

10

COAST006127

(n)    proposed or adopted any amendments or modifications to its Governing Documents or

(o)    agreed, whether orally or in writing, to do any of the foregoing.

**Section 3.17    Liabilities**. The Company does not have any material Liabilities except Liabilities that (a) are fully and accurately disclosed on the face of the Financial Statements (rather than in the notes and schedules thereto), (b) have arisen or been incurred in the Ordinary Course since the Balance Sheet Date (none of which relate to violations of Law, a breach of Contract, or warranty Liabilities), or (c) are listed on Schedule 3.17 to this Agreement.

**Section 3.18    Affiliate Interests; Transactions with Certain Persons**.  Except as set forth on Schedule 3.18, and except for the Governing Documents, there are no Contracts or arrangements by and between the Company, on the one hand, and any holder of the Company Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing, on the other hand.  Except as set forth on Schedule 3.18 the Company is not a debtor or creditor of or has any Liability or other obligation of any nature to, any holder of the Company's Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing.

**Section 3.19    Material Contracts**.  Schedule 3.19 attached hereto (which lists Contracts by each applicable subsection referenced below in this Section 3.19) contains a complete, current and correct list of all of the following Contracts (collectively the "Material Contracts") to which the Company is a party or by which any of their respective properties or assets are bound and that are in effect on the date hereof or impose any continuing Liabilities (other than confidentiality obligations) on any party thereto:

(a)    any Contract or group of related Contracts that involve or involved expenditures or receipts by the Company of more than $50,000.00 for the year ended December 31, 2021, or involve or are expected to involve more than $50,000.00 of expenditures or receipts for the year ending December 31, 2022;

(b)    any Contract with any of the Company's officers, directors, managers, employees, or Affiliates, including all non-competition, severance, employment, bonus, change of control, retention, commission, or indemnification agreements;

(c)    any Contract evidencing the granting of a loan by the Company to any third party for which amounts remain outstanding (other than the advancement of business expenses to employees in the Ordinary Course);

(d)    any Contract evidencing or relating to indebtedness relating to the borrowing of money, extension of credit or the granting of any Lien on the assets or the Equity Securities of the Company;

(e)    any Contract containing any limitation on the freedom or ability of the Company (or that following the Closing Date would purport to limit the freedom of the Company or any of its Affiliates) (A) to engage in any line of business or compete with any

11

Person or to operate at any location in the world, including non-competition, non-solicitation and standstill obligations or exclusivity rights, or (B) to own, operate, lease, sell, transfer, pledge or otherwise dispose of or encumber any asset, or to hire solicit, or consult with any Person or that would so limit the Company or its Affiliates on or after the Closing Date;

        (f)     any power of attorney;

        (g)     any Contract relating to the (A) acquisition or disposition of any business or entity (whether by merger, sale of stock, sale of assets or otherwise) or (B) acquisition of all or substantially all assets of any Person;

        (h)     any Contract for future capital expenditures or the acquisition or construction of fixed assets requiring the payment by the Company of an amount in excess of $50,000.00 on or after the date hereof.

The Company has made available to Investor true, complete and current copies of all written Material Contracts (including any and all amendments, modifications, exhibits, annexes and schedules to such Contracts) and true, correct, and complete summaries of all non-written Contracts. Each of the Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms. There exists no material breach, default or violation on the part of the Company or, to the Knowledge of the Company, on the part of any other party thereto, under any Contract to which the Company is or was a party nor has the Company received written, or to the Knowledge of the the Company, other notice of any such breach, default or violation. the Company has not received written notice of an intention by any party to any Material Contract that provides for a continuing obligation by any party thereto on the date hereof to terminate such Contract or amend the terms thereof and (ii) the consummation of the Transactions will not affect the validity, enforceability or continuation of any Material Contract on the same terms applicable to such Material Contract as of the date hereof. The Company has not waived any material rights under any Material Contract. To the Knowledge of the Company, no event has occurred that either entitles, or would, with notice or lapse of time or both, entitle, any party to any Contract to which the Company is or was a party to declare a breach, default or violation under, or make an indemnification claim against the Company with respect to, any such Contract or to terminate, modify or accelerate, or that does terminate, modify or accelerate, any terms of any such Contract (including any right to accelerate the maturity of any indebtedness of the Company under any such Contract). Each of the Material Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms.

    **Section 3.20**  <u>**Full Disclosure**</u>. No representation or warranty made by the Company in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

12

COAST006129

## ARTICLE 4

### REPRESENTATIONS AND WARRANTIES OF INVESTOR

As a material inducement to the Company to enter into this Agreement and to consummate the Transaction, Investor hereby represents and warrants to the Company as of the date hereof that:

**Section 4.1     Capacity and Authority**.   Such Investor has full legal capacity and authority to execute, deliver and perform each Transaction agreement to which such Investor is a party and to consummate the Transaction.  Each Transaction agreement to which such Investor is a party has been duly executed and delivered by such Investor and constitutes the legal, valid and binding obligations of such Investor enforceable against him in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles.

**Section 4.2     No Conflict; Consents**.   The execution, delivery and performance by Investor of each Transaction agreement to which Investor is a party does not, and the consummation of the Transaction will not, violate, conflict with or result in the breach of any term, condition or provision of, (a) any Law to which Investor is subject, (b) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to such Investor or (c) any material Contract to which Investor is a party or by which Investor is otherwise bound.  No authorization, approval or consent of, and no notice to or registration or filing with, any Person is required in connection with the execution, delivery or performance of any Transaction agreement or the consummation of the Transaction by Investor.

**Section 4.3     Disclosure of Information**.   Investor has received and reviewed information about the Company, and its current and proposed subsidiaries and affiliates and has had an opportunity to ask questions and receive answers regarding the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and affiliates and to conduct such due diligence review as it has deemed appropriate.

**Section 4.4     Investment Experience**.   Investor acknowledges that it can bear the economic risk of its investment in the Transaction, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the Transaction.

**Section 4.5     Disclosure of Information**.   Investor has received and reviewed information about the Company and its current and proposed Affiliates, and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the equity consideration pursuant to this Agreement and the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and to conduct such due diligence review as it has deemed appropriate.

**Section 4.6     Investment Experience**.   Investor acknowledges that it can bear the economic risk of its investment in the equity consideration to be received hereunder, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of owning such an investment.

13

COAST006130

**Section 4.7     Accredited Investor**.  Investor is an "accredited investor" as defined under Rule 501 promulgated under the Securities Act.  Investor understands that the Class A - Series II Units issued as the equity consideration have not been registered under the Securities Act or any state securities laws and are being transferred to Investor, in part, in reliance on the foregoing representation.

**Section 4.8     Investment Intent**.  Investor is acquiring the equity consideration hereunder for its own account, with the present intention of holding such securities for purposes of investment, and has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities Laws.

**Section 4.9     No Public Market**.  Investor understands that no public market now exists for the equity consideration to be issued hereunder and that there is no assurance that a public market will ever exist for such equity consideration.  Investor also understands that Rule 144 promulgated under the Securities Act is not presently available with respect to the sale of any of the equity consideration.

**Section 4.10     No Other Representations**.  In purchasing equity consideration, Investor is not relying on (and Investor hereby expressly disclaims) any and all representations, warranties or information (including any projections or forecasts) that may have been provided to it from the Company or any other Person, except only for the representations and warranties of the parties expressly set forth in Article 3 hereof.

**Section 4.11     Full Disclosure**. No representation or warranty made by Investor in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

# ARTICLE 5

## POST-CLOSING COVENANTS

**Section 5.1     Further Assurances**.

      (a)     At any time and from time to time after the Closing Date, at Investor's request, and without further consideration therefor, the Company will execute and deliver any and all proper deeds, assignments and such other instruments of sale, transfer, conveyance, assignment and confirmation as Investor may reasonably deem necessary in order to effect, consummate, confirm and/or evidence the Transaction.

      (b)     The Company agrees to furnish or cause to be furnished, as promptly as practicable, such information and assistance relating to the business as is reasonably necessary (i) for the preparation and filing of any Tax Return or (ii) for any other claim, audit, filing or proceeding relating to Tax matters.

**Section 5.2     Uses of the Contribution Amount**.  From and after the Closing Date, the Company agrees to use the Contribution Amount exclusively for working capital and general

14

business purposes in the Ordinary Course; provided, however, the Contribution Amount may be used for other purposes with the prior written consent of Investor.

Section 5.3    **Disclosure**.  Without the prior written consent of Investor, and except as required by Law, the Company and its directors, members, managers, officers, employees and agents) shall not directly or indirectly make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of any of the terms, conditions or other aspects of the transactions contemplated herein; provided, however, that the Parties may continue such communications with employees, customers, suppliers, lenders, lessors and other particular groups as may be legally required or necessary in connection with the conduct of the Company's business in the Ordinary Course.

Section 5.4    **Intentionally omitted**

Section 5.5    **Closing of Each Contribution Agreement**.    Notwithstanding any provision hereof to the contrary, the obligations of Investor to contribute the Contribution Amount under this Agreement are conditioned upon the simultaneous closing and funding of each Contribution Agreement (defined below) by and between Investor and certain Affiliates of the Company, including Coast to Coast Title, LLC, Magnolia Title Florida, LLC, Magnolia Arkansas, LLC, under which Investor is contributing certain amounts of cash to such Affiliates of the Company in exchange for Equity Securities in such Affiliates of the Company (each a "Contribution Agreement").

Section 5.6    **Certain Waivers**.  Each Existing Class A Member, on behalf of itself and its Affiliates and each of their respective heirs, successors, assigns, descendants and beneficiaries (each, a " Releasing Party") hereby irrevocably waives, releases and discharges the Company and its Affiliates (including, after the Closing, Investor and its Affiliates) and each of their respective directors, managers, officers, employees, members, equityholders and partners (each, a " Released Party") from any and all Liabilities to such Releasing Parties of any kind or nature whatsoever, whether in the capacity as a direct or indirect equityholder, as a member, manager, officer or employee of the Company or otherwise and whether arising under any agreement or understanding (other than this Agreement) or otherwise at law or in equity, and each Existing Class A Member agrees on behalf of itself and the other Releasing Parties that none of the Existing Class A Member or such Releasing Party shall seek to recover any amounts in connection therewith or thereunder from any of the Released Parties. Notwithstanding the foregoing or anything else herein to the contrary, in no event shall the Company or any of the other Released Parties have any Liability whatsoever to any of the Existing Class A Member or the other Releasing Parties for any breaches (or matters causing or constituting breaches) of the representations, warranties, agreements or covenants of the Company or the Existing Class A Members hereunder, and, in any event, neither the Existing Class A member nor any Release Party may seek contribution or indemnification from the Company or any of the other Released Parties in respect of any payments required to be made by Existing Class A Members or the Releasing Parties pursuant to this Agreement.

15

COAST006132

## ARTICLE 6

## SURVIVAL; INDEMNIFICATION

**Section 6.1     Survival of Representations and Warranties**.  The representations and warranties of the Parties in this Agreement shall survive the consummation of the Transaction and shall remain in effect for a period of three (3) years after the Closing Date, provided, however, that the Fundamental Representations shall survive indefinitely and the representations and warranties set forth in Section 3.11 (Environmental) shall survive until 90 days after expiration of the applicable statute of limitations.  All covenants and agreements set forth herein shall survive the consummation of the Transaction in accordance with their respective terms.  In the event notice of any indemnifiable claim shall have been given within the applicable survival period, all representations and warranties that are the subject of such indemnifiable claim shall survive until such indemnifiable claim is finally resolved.  Indemnification obligations with respect to any Losses suffered relating to fraud or misrepresentation of a significant fact or the volitional withholding of any significant fact by any Party shall not expire.  If any representation or warranty contained in this Agreement is qualified based on materiality, including the terms "material" or any similar qualifier, such qualification shall in all respects be ignored and given no effect for purposes of determining whether any breach or inaccuracy has occurred and the amount of any related Loss.

**Section 6.2     Indemnification by the Company and the Existing Class A Members**. Subject to the terms, conditions and limitations set forth in this Article 6, the Company, the Existing Class A Members, and their respective Affiliates shall, jointly and severally, indemnify and defend Investor and its Affiliates and their respective officers, directors, managers, shareholders, members, partners, employees, lenders, agents, representatives, successors and permitted assigns (each a "Investor Indemnified Party") against, and shall hold each of them harmless from, any and all damages, losses, injuries, Liabilities, claims, demands, Proceedings, judgments, awards, settlements, assessments, deficiencies, Taxes, penalties, fines, charges, payments, costs or expenses (including reasonable investigation and legal fees) or reduction in value, whether or not involving a third-party claim (collectively, "Losses"), arising, directly or indirectly, from or in connection with:

(a)     any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of the Company or its Affiliates in this Agreement or any certificate delivered by the Company or its affiliates pursuant to this Agreement;

(b)     any breach or nonfulfillment of any covenant, agreement or obligation of the Company under this Agreement;

(c)     the operation of the business prior to Closing and any Liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the Closing (including operations);

(d)     any Tax Liability (whether incurred by the Company or Investor) as a result of the transactions contemplated by this Agreement;

16

COAST006133

(e)     any Tax Liability of the Company for tax periods up to and including Closing, including, without limitation, those Tax Liabilities that would have been or would be accrued under accrual accounting and/or any Tax Liabilities resulting from a change in the Company's method of accounting;

(f)     the Confidential Settlement Agreement and Release of All Claims and all matters relating thereto, referred to therein, or arising therefrom, including, for the avoidance of doubt, the Employment Litigation, the Proposed Starrex Transaction, the Derivative Litigation, the Stewart Litigation, and any Losses paid or otherwise incurred in the investigation, prosecution, defense, negotiation, settlement or collection of all matters relating to, referred to in, or arising out of the Confidential Settlement Agreement and Release of All Claims; and/or

(g)     any breach or nonfulfillment of any covenant, agreement or obligation of the Company or any Existing Class A Member under the Side Letter.

The Company, the Existing Class A Members, and their respective Affiliates shall not use any of the Contribution Amount to satisfy the above mentioned indemnity obligations.

**Section 6.3     Indemnification by Investor**.     Subject to the terms, conditions and limitations set forth in this Article 6, Investor shall indemnify and defend the Company and its successors and permitted assigns (each an "Magnolia Indemnified Party") against, and shall hold them harmless from, any Loss arising, directly or indirectly, from or in connection with:

(a)     any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of Investor in this Agreement or any certificate delivered by Investor pursuant to this Agreement; and/or

(b)     any breach or nonfulfillment of any covenant, agreement or obligation of Investor in this Agreement.

**Section 6.4     Limitations on Indemnification**.

(a)     In no event shall Investor, on the one hand, or the Company, on the other hand, be required to make indemnification payments hereunder for Losses that result solely from facts or circumstances which constitute a breach or inaccuracy of any representation or warranty in Article 3, Article 4 or Article 5 unless the aggregate amount of all such Losses suffered by the Investor Indemnified Parties or the Magnolia Indemnified Parties, as applicable, exceeds $10,000 (the "Deductible"), in which case, Investor or the Company, as the case may be, shall be liable for all such Losses in excess of the Deductible, provided, however, that the Deductible shall not apply to any claims for Losses incurred or suffered as a result of, arising out of or relating to a breach of, default in, or failure to perform, any of the Fundamental Representations and the representations and warranties set forth in Section 3.16(k), Section 3.16(l), or the matters set forth on in Section 6.2(f) and Section 6.2(g).

(b)     The limitations set forth in this Section 6.4 shall not apply to any claim involving criminal activity, fraud, willful misconduct or an intentional misrepresentation of fact in connection with the transactions contemplated by this Agreement.

17

**Section 6.5     Treatment of Indemnification Payments**.   Each Party will treat all payments made pursuant to Article 6 as adjustments of, the equity consideration or the Contribution Amount, as the case may be, for all purposes.

**Section 6.6     Exclusive Remedy**.   Except to the extent arising from fraud or willful misconduct and except as provided in any Transaction agreement, including Section 8.14 of this Agreement, the indemnification provided by this Article 6 shall be the sole and exclusive remedy in respect of any breach of or inaccuracy in any representation, warranty, agreement or covenant contained in this Agreement.   The foregoing shall not limit the Parties' right to obtain specific performance as provided herein.   In furtherance of the foregoing, each Party hereby waives, to the fullest extent permissible under applicable Law, and agrees in any case not to assert in any action or proceeding of any kind, any and all rights, claims and causes of action it may now or hereafter have (including any such rights, claims or causes of action arising under or based upon common law or other Law) against any indemnifying Party for any matter described in the previous sentence other than claims for indemnification asserted as permitted by and in accordance with the provisions set forth in this Article 6, provided, nothing in this Section 6.6 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled, or to seek any remedy on account of any Party's fraud or willful misconduct..

**Section 6.7     Waiver of Punitive Damages**.     NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL ANY PARTY OR ITS AFFILIATES, OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE HEREUNDER AT ANY TIME FOR PUNITIVE DAMAGES (EXCEPT TO THE EXTENT PAID TO A THIRD PARTY), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND EACH PARTY HEREBY EXPRESSLY RELEASES THE OTHER PARTIES, THEIR AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND REPRESENTATIVES THEREFROM.

**Section 6.8     Other Limitations on Losses**.   Any indemnification owing pursuant to this Article 6 in respect of an indemnifiable Loss shall be reduced by any insurance proceeds, indemnification payments or contribution payments actually received in respect of such indemnifiable Loss by the Investor Indemnified Party or Magnolia Indemnified Party, as the case may be, from third parties unaffiliated with such Investor Indemnified Party or Magnolia Indemnified Party (in each case, reduced by any costs of collection and/or increases in premiums incurred by such Investor Indemnified Party or Magnolia Indemnified Party in connection with such recovery)

**Section 6.9     Indemnification Procedures**. The Party making a claim under this Article 6 is referred to as the "Indemnified Party", and the Party against whom such claims are asserted under this Article 6 is referred to as the "Indemnifying Party."

(a)     Third Party Claims.

(i)     If an Indemnified Party receives notice of the assertion or commencement of an Action made or brought by any Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement (each, a "Third Party Claim") against such Indemnified Party that

18

the Indemnified Party has determined has or would reasonably be expected to give rise to a right of indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty days after receipt of such notice of such Third Party Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

(ii)    Subject to the terms of this Section 6.9(a), upon receiving notice of a Third Party Claim, the Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party within thirty business days of its receipt of notice of the Third Party Claim, to assume the investigation and defense of such  Third Party Claim at the Indemnifying Party's expense and with counsel reasonably satisfactory to the Indemnified Party; provided, that the Indemnifying Party shall not have the right to assume the investigation and defense of a  Third Party Claim if (A) the Indemnifying Party or its Affiliate is also a Party to such Third Party Claim and the Indemnified Party determines in good faith that joint representation would be inappropriate, (B) upon request, the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend such  Third Party Claim, (C) in the reasonable judgment of the Indemnified Party, it involves material reputational risks to the Indemnified Party or any of its Affiliates, or (D) it seeks an injunction or other equitable relief against the Indemnified Party or relates to or arises in connection with any criminal proceeding, indictment, allegation or investigation. If the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 7.06(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name of and for the Indemnified Party.

(iii)    The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it, subject to the Indemnifying Party's right to assume the control of the defense thereof in accordance with Section 6.9(a)(ii). The fees and disbursements of any such counsel shall be at the expense of the Indemnified Party; provided, that if in the written opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party or any of their Affiliates that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.

(iv)    If the Indemnifying Party elects not to compromise or defend a  Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in Section 6.9(a)(ii), or (subject to the proviso to this Section 6.9(a)(iv)) fails to diligently prosecute the defense of a Third Party Claim, the Indemnified Party may, subject to Section 6.9(b), pay, compromise, and defend such  Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such  Third Party Claim; provided that if the Indemnifying Party fails to diligently pursue the defense of the Third Party Claim or

19

COAST006136

the Indemnified Party reasonably concludes that the Third Party Claim is not being defended to its satisfaction, the Indemnified Party can assume the defense of the Third Party Claim if the Indemnified Party gives the Indemnifying Party written demand to diligently pursue the defense and the Indemnifying Party fails to do so within ten business days after receipt of the demand, or such shorter period as may be required to respond to any deadline imposed by a Governmental Body.

(v)    The Parties shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including promptly making available records relating to such Third Party Claim in their possession or control and furnishing, without expense (other than reimbursement of actual reasonable out-of-pocket expenses) to the defending Party, management employees of the non-defending Party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)    Settlement of Third-Party Claims. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 6.9(b). If a firm offer is made to settle a Third-Party Claim without leading to Liability on the part of the Indemnified Party or its Affiliates and provides, in customary form, for the unconditional release of each Indemnified Party and their Affiliates from all Liabilities in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten business days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to settlement of such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume the defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense of a Third-Party Claim under Section 6.9(a)(iv), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)    Direct Claims.

(i)    Any Proceeding initiated by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (each, a "Direct Claim") shall be asserted by the Indemnified Party by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than sixty days after the Indemnified Party becomes aware of such Direct Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

COAST006137

(ii)    The Indemnifying Party shall have forty-five days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim. The Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any unprivileged accounts, documents or records in its control or possession) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such forty-five (45) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 6.10    Payments.** Once a Loss is agreed to by the Indemnifying Party or adjudicated to be payable under this Article 6, the Indemnifying Party shall satisfy its obligations within ten business days of such adjudication by wire transfer of immediately available funds. Interest on any such amount payable will accrue from and including the date of agreement of the Indemnifying Party or adjudication to but excluding the date such payment has been made at a rate per annum equal to 12%, and such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

## ARTICLE 7

## DEFINED TERMS

**Section 7.1    Definitions**. As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with such first Person.

"Benefit Plan" means a Pension Plan, a Welfare Plan or any other plan or program for employees relating to deferred compensation, bonus, performance compensation, severance, vacation, sick pay, incentive, insurance, health or welfare.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Agreement" means the Third Amended and Restated Company Agreement of Sol City Title, LLC, dated November 4, 2021.

"Confidential Settlement Agreement and Release of All Claims" means that certain Confidential Settlement Agreement and Release of All Claims between John Magness ("Magness") and The Peabody Bulldog, LLC ("Peabody") ( collectively with Magness, the "Magness Parties"), and Bo and Sarah Blackburn (the "Blackburns"), #6 Metz Court ("Metz Court"), Sol City Title Managers, LLC ("Sol City Managers"), Rabbit Food, LLC ("Rabbit Food"), BS Title Team, LLC ("BS Title Team"), Pacific Waters Title, LLC ("1845 Title"), Blue Goose Title, LLC ("Noteworthy Title"), CSP Texas Joint Venture, LLC ("Key Title"), CSP Texas Joint Venture - San Antonio, LLC ("Key Title San Antonio"), Tall City Title, LLC ("Tall

21

City Title"), Amarillo Title, LLC ("Amarillo Title"), Joy Title LLC ("Joy Title"), Gateway City Title, LLC ("Gateway City Title"), Gateway City Title Managers, LLC ("Gateway City Managers"), Corpus Christi Title, LLC ("Corpus Christi Title"), and Corpus Christi Title Managers, LLC ("Corpus Christi Managers") ( each a "BSpoke Party," and collectively with the Blackburns, the "BSpoke Parties"), and 405 Manhattan Investments, LLC ("405 Manhattan") and Alphabet Investments, LLC ("Alphabet") ( collectively with 405 Manhattan, the "the Alphabet Parties"), and Sol City Title, LLC ("Magnolia Houston"), Coast to Coast Title, LLC ("Magnolia Dallas"), Magnolia Title Florida ("Magnolia Florida"), and Magnolia Title Arkansas, LLC ("Magnolia Arkansas") (collectively, the "Magnolia Parties"), and Britt Naponic ("Naponic"), and Starrex International Ltd. ("Starrex").

"Contract" means any agreement, contract, lease, sublease, license, sublicense, indenture, mortgage, instrument, note, guaranty, customer order, purchase order, franchise, joint venture agreement, partnership agreement or other arrangement, understanding, permission or commitment, in each case, whether written or oral.

"Control," "Controlled by," and "under common Control with" as used with respect to any Person, mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Environmental Law" means, whenever in effect, all Laws and contractual Liabilities concerning public or worker health or safety, pollution or protection of the environment.

"Equity Securities" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (howsoever designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contract which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Fundamental Representations" means the representations and warranties set forth in Sections 3.1 (Existence), 3.2 (Authorization and Power), 3.4 (No Conflict; Consents), 3.5 (Brokers), 3.6(a) (Title and Sufficiency), 3.12 (Taxes and Tax Returns), Section 3.14 (Employee Benefit Plans, 4.1 (Capacity and Authority), 4.2 (No Conflict; Consents).

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, in the case of a corporation, its certificate or articles of incorporation and the by-laws (or analogous documents), in the case of a limited liability company, its certificate of formation and operating or limited liability company agreement (or analogous documents) and in the case of a limited partnership its certificate of formation and limited partnership agreement (or analogous documents).

22

"Governmental Body" means any federal, state, municipal, local or other government department, quasi-governmental department, commission, board, bureau, agency or instrumentality, regulatory or self-regulatory authority, any tribunal, any court, or any other political or other subdivision, department or branch of any of the foregoing, in each case whether of the United States or foreign.

"Hazardous Material" means any material, substance or waste for which Liability or standards of conduct may be imposed pursuant to any Environmental Law, including petroleum.

"Intellectual Property Assets" means all intellectual property and proprietary rights throughout the world, including all: (i) patents, patent applications and inventions (whether or not patentable or reduced to practice); (ii) trademarks, service marks, logos, trade names, slogans and internet domain names, social media handles, and all registrations, applications and renewals for any of the foregoing, and all goodwill associated with the foregoing; (iii) copyrights and works of authorship, and all registrations, applications and renewals for any of the foregoing; (iv) trade secrets and other proprietary information; (v) computer software and software systems; (vi) all other intellectual, proprietary or industrial rights including rights arising under license agreements; and (vii) all rights and remedies relating thereto, including remedies against, and the right to recover damages from, present and past infringement and rights to protection of interests therein..

"Knowledge" means, as to any Person (other than the Company), the actual knowledge or awareness of such Person after due and reasonable inquiry, and with respect to the Company, the actual knowledge of any Manager, officer, executive level employee, and supervisory level employee of the Company and any Existing Class A Member and their respective Affiliates, after due and reasonable inquiry.

"Law" means any foreign or domestic law, common law, treaty, statute, ordinance, rule, regulation, enforceable requirement, binding determination, order, decree, judgment, injunction or other pronouncement having the effect of law.

"Liability" and "Liabilities" means any direct or indirect liability, indebtedness, Claim, loss, damage, deficiency, assessment, responsibility, or obligation of whatever kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, fixed or unfixed, determined or determinable, due or to become due, choate or inchoate, matured or unmatured, and whether due or to become due.

"Lien" means any lien, collateral assignment, encumbrance, mortgage, security interest, conditional or other sales agreements, pledge, hypothecations, claims, interferences, options, rights of first refusal, preemptive rights, restrictions of any nature, or other encumbrances (including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the possession, exercise, transfer or any other attribute of ownership of any asset), as applicable and, in each case, applicable with respect to such asset or property.

"Ordinary Course" means, with respect to any Person, an action taken by such Person will be deemed to have been taken in the "Ordinary Course" only if such action is recurring in nature, is consistent in all material respects with the past practices of such Person (including with respect to quantity and frequency), and is taken in the ordinary course of the normal day to day operations of such Person.

23

COAST006140

"<u>Pension Plan</u>" means an "employee pension benefit plan" as defined in Section 3(2) of ERISA.

"<u>Permit</u>" means any license, permit, approval, franchise, registration, certificate, variance, authorization or similar right issued by or obtained from a Governmental Body.

"<u>Permitted Liens</u>" means (a) non-delinquent statutory Liens arising other than by reason of default, (b) Liens of carriers, warehousemen, mechanics and materialmen incurred in the Ordinary Course for sums not yet due, (c) Liens incurred or deposits made in the Ordinary Course in connection with workers' compensation, unemployment insurance and other types of social security and (d) with respect to Real Property only, (i) Taxes which are a lien and not yet due and payable as of the Closing Date, (ii) zoning, building and other land use regulations imposed by governmental agencies having jurisdiction over the Real Property which are not violated by the current use or occupancy of the Real Property or the operation of the business thereon, (iii) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Real Property which, in each case, do not materially impair (x) the value or marketability of the parcel of Real Property to which they pertain or (y) the occupancy or use of the Real Property by the business for the purposes for which it is currently used, and (iv) landlord liens under Leases set forth on <u>Schedule 3.10(b)</u>.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, joint venture, trust, business association, organization, Governmental Body or other entity.

"<u>Proceeding</u>" means any action, claim, complaint, charge, injunction, order, judgement, decree, arbitration, audit, hearing, investigation, litigation, suit or proceeding (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before any Governmental Body or arbitrator.

"<u>Side Letter</u>" means that certain letter agreement dated of even date herewith and duly executed by the Company, the Investor, and certain members of the Company regarding the Company Agreement.

"<u>Tax</u>" means any federal, state, local or foreign tax, assessment, governmental charge or imposition, including any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, escheat, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Body.

"<u>Tax Return</u>" means any federal, state, local and foreign return, report, statement or other similar document required to be filed with any Governmental Body with respect to Taxes.

"<u>Transaction</u>" means the transactions contemplated by this Agreement and the other Transaction agreements.

COAST006141

"Welfare Plan" means an "employee welfare benefit plan" as defined in Section 3(1) of ERISA.

## ARTICLE 8

## MISCELLANEOUS

**Section 8.1    Expenses**.  Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the Transaction, including all fees and expenses of its agents, representatives, counsel and accountants and public announcements.

**Section 8.2    Entire Agreement**.    This Agreement and the other Transaction agreements set forth the entire understanding of the Parties with respect to the Transaction. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

**Section 8.3    Amendments and Waivers**.  This Agreement may not be amended except by an instrument in writing signed by or on behalf of each of the Parties.

**Section 8.4    Assignment and Binding Effect**.  This Agreement may not be assigned by any Party without the prior written consent of the other Parties; provided that Investor may, without the prior written consent of any Party, assign any or all of its rights hereunder to (a) one or more of its Affiliates, (b) any lender for collateral purposes or (c) any future purchaser of all or substantially all of the assets of the Company; provided, further, that no such assignment shall relieve Investor of its obligations hereunder.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, heirs, personal representatives, successors and permitted assigns.

**Section 8.5    Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand, (b) when sent by electronic transmission (including facsimile and email) with written confirmation of transmission, (c) one business day following the day sent by reputable overnight courier (with written confirmation of receipt) or (d) three business days following the date sent by U.S. registered or certified mail (return receipt requested), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

COAST006142

If to the Company, to:

with required copies (which shall not
constitute notice:

Sol City Title, LLC d/b/a Magnolia Title
14701 Saint Mary's Lane
Suite 150
Houston, Texas 77079
Attention: John Magness
Email: john.magness@magnoliatitleteam.com

York & Hinds, P.C.
1885 St. James Place
Suite 770
Houston, Texas 77056
Attention:  William York
Facsimile: 713-659-5755
Email:  wey@yorkhinds.com

If to Investor:

with required copies (which shall not
constitute notice:

HMH Title Investments, LLC
c/o BNMJR, Inc.
1038 Texan Trail
Grapevine, Texas 76051
E-mail: Nelson.Mitchell@historymaker.com
Attention: CEO

Decker Jones, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, TX 76102
E-mail: afulkerson@deckerjones.com
Attention: Adam J. Fulkerson

**Section 8.6    Governing Law**.  This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of Texas.

**Section 8.7    Jurisdiction and Venue**.  All Proceedings arising out of or relating to this Agreement and/or the Transaction shall be heard and determined exclusively in a state or federal court in the State of Texas.  Consistent with the preceding sentence, each Party hereby expressly, irrevocably and unconditionally (a) submits to the exclusive jurisdiction of any state or federal court in State of Texas for the purpose of any Proceeding brought by any Party hereto arising out of or relating to this Agreement and/or the Transaction, (b) waives any objection to the above courts based on lack of personal jurisdiction or inconvenient forum and (c) waives its right to bring any Proceeding arising out of or relating to this Agreement and/or the Transaction in any other jurisdiction.

**Section 8.8    Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO THAT IS RELATED TO THE TRANSACTION.

COAST006143

**Section 8.9     No Third Party Beneficiaries**.   Other than those Persons entitled to indemnification pursuant to Article 6, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 8.10     No Strict Construction**.   The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 8.11     Rules of Construction**.   All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.  The words "hereof," "herein" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, the word "or" shall include both the conjunctive and disjunctive and the word "any" shall mean "one or more".  The terms "Dollars" and "$" mean United States Dollars; Wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."  Any statute defined or referred to herein or in any other Transaction agreement means such statute as from time to time amended, modified or supplemented, including by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  All accounting terms not otherwise defined in this Agreement shall have the meanings ascribed to them under GAAP.

**Section 8.12     Schedules and Exhibits**.   All Schedules and Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement and, unless otherwise defined therein, all terms used in any Schedule or Exhibit shall have the respective meanings ascribed to such terms in this Agreement.

**Section 8.13     Severability**.   Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof; and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 8.14     Remedies**.   In the event of any breach of this Agreement by any Party, the non-breaching Party shall, in addition to any other remedy provided herein or by law or in equity, be entitled to seek specific enforcement of the terms hereof, including appropriate injunctive relief in any court of competent jurisdiction, and no bond or other security shall be required in connection therewith.

**Section 8.15     Counterparts**.   This Agreement may be executed in multiple counterparts, including counterparts delivered by facsimile or other electronic transmission, each of which shall be deemed an original and together shall be deemed one instrument.

27

COAST006144

*Signature page follows:*

COAST006145

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
B. Nelson Mitchell, Jr., CEO

Sol City Title, LLC d/b/a Magnolia Title

By:_____
John Magness, Manager

GF Insurance Investments, LLC

By:_____
Jessica Garth, Manager

Alphabet Investments, LLC

By:_____
Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
John Magness, Manager

*Signature Page to Contribution Agreement*

COAST006146

**IN WITNESS WHEREOF,** the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
    B. Nelson Mitchell, Jr., CEO

Sol City Title, LLC d/b/a Magnolia Title

By:_____
    John Magness, Manager

GF Insurance Investments, LLC

By:_____
    Jessica Garth, Manager

Alphabet Investments, LLC

By:_____
    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
    John Magness, Manager

*Signature Page to Contribution Agreement*

COAST006147

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
   B. Nelson Mitchell, Jr., CEO

Sol City Title, LLC d/b/a Magnolia Title

By:_____
   John Magness, Manager

GF Insurance Investments, LLC

By:_____
   Jessica Garth, Manager

Alphabet Investments, LLC

By:_____
   Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
   John Magness, Manager

*Signature Page to Contribution Agreement*

COAST006148

September 9, 2022

HMH Title Investments, LLC
1038 Texan Trail
Grapevine, Texas 76051

                Re:    First Amended and Restated Company Agreement of Magnolia Title
                           Arkansas, LLC

Mr. Mitchell:

       This letter agreement is between HMH Title Investments, LLC ("HMH"), Magnolia Title Arkansas, LLC, an Arkansas limited liability company (the "Company"), 405 Manhattan Investments, LLC, ("405"), Alphabet Investments, LLC, ("Alphabet") and Peabody Bulldog, LLC ("PB" and 405, Alphabet, and PB are each an "Existing Class A Member" and collectively the "Existing Class A Members") and is being entered into in connection with and is in further consideration of the investment by HMH in the Company, pursuant to the Contribution Agreement dated of even date herewith ("Contribution Agreement"), Statement of Preliminary Terms of Proposed Transactions attached hereto as Exhibit "A" and incorporated herein by reference for all purposes ("Term Sheet"), and the First Amended and Restated Company Agreement of the Company, dated as of December 1, 2021 (as amended, restated, waived or otherwise modified from time to time, the "Company Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Company Agreement.

       1.      Classification of Units (Section 3.5). Notwithstanding the terms of the Company Agreement, there are no Class A-1 Units currently issued and outstanding, and the Company will not issue any Class A-1 Units without the prior written consent of HMH. All Class A Units shall be voting common Units of the Company. Each Member shall be entitled to one vote per Class A Unit on all matters upon which the Members have the right to vote under the Company Agreement or under this letter agreement. Any references to "Series I," "Series II," "A-1," or any similar connotation shall have no significance and all Class A Units shall have the same rights and privileges (whether voting or economic). For the avoidance of doubt, all Class A Units will be voted as a single class, and all Class A-Series I Units and Class A-Series II Units shall vote as a single class of Units.

       2.      Assumed Liabilities (Section 3.5). The Existing Class A Members signing this letter agreement, agree to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses arising out of, pursuant to, or relating to the Special Contributions (as defined in the Company Agreement). For the avoidance of doubt, the Existing Class A Members hereby expressly waive and release any claims they may have against the Company for indemnity or contribution and any claims the Existing Class A Members may have or may ever incur against the Company arising out of, pursuant to, or relating to the Special Contributions.

COAST006149

3.     Class A-Series I and Class A-Series II Call Options (Section 3.5).  All options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option, are hereby terminated in all respects and any such options shall be of no further force and effect.  The Existing Class A Members signing this letter agreement, agree to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses arising out of, pursuant to, or relating to any options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option.  For the avoidance of doubt, the Existing Class A Members hereby expressly waive and release any claims they may have against the Company for indemnity or contribution and any claims the Existing Class A Members may have or may ever incur against the Company arising out of, pursuant to, or relating to to any options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option.

4.     Competition (Section 4.6).  The Existing Class A Members and each of their respective managers, governing persons, officers, representatives, and Affiliates are  not currently and will not after the date of this letter agreement: (i) compete with the Company; (ii) usurp business opportunities away from the Company' or (iii) further their own financial interests to the detriment of the Company.

5.     No Withdrawal (Section 4.7).  Notwithstanding anything to the contrary in the Company Agreement, no Member may withdraw or resign as a Member while the Member holds Units in the Company until the winding up and termination of the Company. Any purported withdrawal or resignation by a Member holding Units in the Company before the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units in the Company, such Person shall no longer be a Member. No Member is entitled to any distribution upon withdrawal, whether under § 101.205 of the Texas Business Organizations Code or otherwise.

6.     Certain Limitations on Board of Manager Activities (Section 5.5).  Notwithstanding anything contained in the Company Agreement to the contrary, the following acts shall be deemed to be an act in contradiction of the Company Agreement, and shall need the approval of a Supermajority Vote and HMH: (i) to change or reorganize the Company into any other legal form; (ii) to dissolve the Company at will; (iii) to sell, transfer, convey, assign, lease, license or otherwise dispose of substantially all of the Company's assets or properties;  (iv) to amend the Company Agreement; (v) to amend the certificate of formation or any other governing document of the Company; (vi) to merge, consolidate, or otherwise combine the Company with or into any other person or entity, or to agree to a share or interest exchange or any other transaction authorized by or subject to the provisions of Chapter Ten of the Texas Business Organizations Code or similar applicable law; (vii) to enter into any reorganization, recapitalization or other similar transaction effecting the Company or its assets or properties; (viii) to authorize any transaction, agreement, or action on behalf of the Company that is unrelated to its purpose as set forth in the Company Agreement or the Certificate or that contravenes the Company Agreement or the Term Sheet.

COAST006150

7.    <u>Management Agreement (Section 5.7)</u>.  All agreements, contracts, and obligations of the Company with BSpoke Management Group and any of its Affiliates or representatives have been satisfied, fully performed, or terminated on or before the date of this letter agreement.

8.    <u>Distributions (Section 7.4)</u>.  Notwithstanding anything contained in the Company Agreement to the contrary, and after giving effect to the terms of this letter agreement, including the indemnification by the Existing Class A Members for certain matters contained herein, all cash, securities and other assets available for Distribution, which amount shall be determined in the sole discretion of the Board of Managers, net of reserves determined by the Board of Managers, amounts for the repayment of indebtedness and expenses of the Company, shall be Distributed as follows: (i) First, to the holders of Class A Units in proportion to their relative portion of all Unreturned Capital Contributions, until each holder of Class A Units has received Distributions under this Agreement in an aggregate amount equal to the aggregate Unreturned Capital Contribution with respect to such holder's Class A Units outstanding immediately prior to such Distribution; and (ii) then  to the holders of Class A Units, in proportion to the number of Class A Units held by such Members.

9.    <u>Permitted Transfers</u>.  The undersigned, constituting a Supermajority Vote, hereby consents to the Transfer from time to time by the members of HMH of their membership interests in HMH; provided that BNMJR, Inc. or its Affiliates shall at all times remain the Manager of HMH.  Furthermore, with respect to HMH, the transfer restrictions in Article 9 of the Company Agreement, including Section 9.1, shall not apply to any Transfer by HMH of all or any portion of its Units to any Affiliate of HMH.

10.    <u>Winding Up and Termination of the Company (Article 10)</u>.  Notwithstanding anything contained in the Company Agreement to the contrary, including, but not limited to Section 10.1 of the Company Agreement, any requisite vote to voluntarily wind up and/or terminate the Company shall include the affirmative vote and approval of HMH, and the Majority Vote of the Members shall not be sufficient unless such Majority Vote of the Members includes the affirmative vote and approval of HMH.

11.    <u>Tag-Along Right in Favor of HMH</u>.  Subject to the other transfer restrictions set forth in the Company Agreement, if one or more Members other than HMH (the "<u>Selling Member</u>") proposes to Transfer at least 20% of the Class A Units outstanding in any transaction or series of related transactions, then HMH (HMH, together with its permitted transferees designated herein, a "<u>Tag-Along Member</u>") may participate in such sale or transaction (a "<u>Tag-Along Sale</u>") on the terms and conditions in this Section 11.  Before any Transfer of Class A Units, the Selling Member shall deliver to the Company and each other Member a written notice (a "<u>Sale Notice</u>") of the proposed Tag-Along Sale as soon as practicable, and in no event later than two (2) days after the Selling Member enters into a definitive agreement. The Sale Notice shall reference the Tag-Along Members' rights hereunder and shall describe in reasonable detail: (i) the aggregate percentage of Class A Units the proposed transferee has offered to purchase; (ii) the name of the proposed transferee; (iii) the proposed date, time and location of the Tag-Along Sale's closing; (iv) the proposed amount of consideration for the Tag-Along Sale (both the aggregate and for each exercising Tag-Along Member), and the other material terms and conditions of the Tag-Along

COAST006151

Sale, including a description of any non-cash consideration that is sufficiently detailed to permit the consideration's valuation; and (v) a copy of the definitive agreements, and any proposed form of agreement or Member delivery for the Tag-Along Sale. The Selling Member and each Tag-Along Member timely electing to participate in the Tag-Along Sale under this Section 11 shall have the right to Transfer in the Tag-Along Sale the amount of Class A Units equal to the product of (x) the total number of Class A Units that the proposed transferee proposes to buy as stated in the Sale Notice and (y) a fraction (A) the numerator of which is the number of Class A Units then held by the applicable Member, and (B) the denominator of which is the number of Class A Units then held by the Selling Member and all of the Tag-Along Members timely electing to participate in the Tag-Along Sale under Section 11 (such product, the "Tag-Along Portion"). Each Tag-Along Member may exercise its right to participate in a Tag-Along Sale by delivering to the Selling Member a written notice (a "Tag-Along Notice") stating its election to do so and specifying the number of Class A Units (up to its Tag-Along Portion) it will Transfer, no later than 20 days after the Tag-Along Member receives the Sale Notice (the "Tag-Along Period"). The Tag-Along Sale and right of the Selling Member to Transfer its Class A Units is subject to all the following conditions: (i) Each Member participating in the Tag-Along Sale shall receive the same form and amount of consideration to be received by the Selling Member per Unit of a given class (after deduction of such Member's proportionate share of the related expenses in accordance with Section 11, and the other terms and conditions of the Drag-Along Sale shall, except as provided in Section 11, be the same as those upon which the Selling Member sells its Units of such class below; and (ii) Each Tag-Along Member shall provide the same representations, warranties, covenants, and indemnities as the Selling Member provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, and indemnities pertaining specifically to the Selling Member, the Tag-Along Member shall make the comparable representations, warranties, covenants, and indemnities pertaining specifically to itself); provided, that all representations, warranties, covenants and indemnities shall be made by the Selling Member and each Tag-Along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Selling Member and each Tag-Along Member (other than any indemnification obligation pertaining specifically to the representations, warranties, covenants, and indemnities of the Selling Member or a Tag-Along Member, which obligation shall be the sole obligation of such Selling Member or Tag-Along Member), in each case in an amount not to exceed the aggregate proceeds received by the Selling Member or Tag-Along Member (as applicable) in connection with the Tag-Along Sale. The requirement in the previous sentence that indemnification obligations be several and joint may be satisfied by a contribution agreement between the Selling Member and Tag-Along Members. The fees and expenses of the Selling Member incurred in connection with a Tag-Along Sale and for the benefit of all Tag-Along Members (it being understood that costs incurred by or for a Selling Member for its sole benefit will not be considered to be for the benefit of all Tag-Along Members), to the extent not paid or reimbursed by the Company or the proposed transferee, shall be shared by the Selling Member and all the participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; provided, that no Tag-Along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Tag-Along Sale. The Selling Member shall have 30 days following the expiration of the Tag-Along Period in which to consummate the Tag-Along Sale, on terms not more favorable to the Selling Member than those

COAST006152

set forth in the Tag-Along Notice (which such 30-day period may be extended for a reasonable time not to exceed 60 days to the extent reasonably necessary to obtain required approvals or consents from any governmental authority). If the Tag-Along Sale has not been consummated by the end of such period, the Selling Member may not exercise its rights under this Section 11 without again complying with Section 11 in its entirety. If the Selling Member sells or otherwise Transfers to the proposed transferee any of its Class A Units in breach of this Section 11, then each Tag-Along Member may sell to the Selling Member, and the Selling Member undertakes to purchase from each Tag-Along Member, the number of Class A Units that such Tag-Along Member would have had the right to sell to the proposed transferee under this Section 11, for a price and upon the terms and conditions on which the proposed transferee bought such Class A Units from the Selling Member, but without indemnity being granted by any Tag-Along Member to the Selling Member; provided, that nothing contained in this Section 11 shall preclude any Member from seeking alternative remedies for a breach of this Section 11. The Selling Member shall also reimburse each Tag-Along Member for any reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred in the exercise or attempted exercise of the Tag-Along Member's rights under this Section 11.

12.    <u>Amendment (Article 12)</u>.  Notwithstanding anything contained in the Company Agreement to the contrary, including, but not limited to Section 12 of the Company Agreement, the Certificate of Formation of the Company and the Company Agreement may be amended, supplemented or restated only upon obtaining a Supermajority Vote approving such amendment and the affirmative vote and approval of HMH.  Any such amendment that does not receive the affirmative vote and approval of HMH shall be void and of no force and effect.

The Existing Class A Members have agreed to this letter agreement at the request of HMH and acknowledge and agree that this letter agreement is an inducement to HMH's decision to enter into the Contribution Agreement without requiring a substantive amendment to the Company Agreement.  The intent of this letter agreement is to shift the liability for certain existing Company obligations, liabilities, costs and expenses away from the Company and on to the Existing Class A Members.  To the extent the Existing Class A Members are required to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses set forth herein, the parties will agree to negotiate in good faith to determine the appropriate accounting and tax treatment of such indemnification payments in an effort to give effect to the substantive intent of this letter agreement.  The Existing Class A Members will not, however, receive any preferential treatment under Article 7 or any other provision of the Company Agreement over HMH for such indemnification expenses.  This letter agreement is being entered into by the parties subsequent to their execution of the Contribution Agreement, and for the avoidance of doubt, is not superseded or preempted by the Contribution Agreement, notwithstanding any language to the contrary in Section 8.2 thereof.  This letter agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.  Any dispute relating hereto shall be heard in the state or federal courts of the State of Texas, and the parties agree to jurisdiction and venue therein.  This letter agreement may

COAST006153

be executed in multiple counterparts which, taken together, shall constitute one and the same agreement.

* * * * *

COAST006154

Sincerely,

**Magnolia Title Arkansas, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title: CEO

*[Signature Page- Side Letter]*

COAST006155

DocuSign Envelope ID: B9E196FB-452F-4798-B7E9-31E6E5F72FAA

Sincerely,

**Magnolia Title Arkansas, LLC**

By: _____
Name: John Magness
Title: Manager


**405 Manhattan Investments, LLC**

By: *Alyse Angelle* _____
Name: Alyse Angelle
Title: Manager


**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager


**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager


Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title:  CEO


*[Signature Page- Side Letter]*

COAST006156

Sincerely,

**Magnolia Title Arkansas, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: *M. Clayton Hill*
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title: CEO

*[Signature Page- Side Letter]*

Sincerely,

**Magnolia Title Arkansas, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006158

<p style="text-align:center; color:red;">Exhibit "A"</p>

**Statement of Preliminary Terms of Proposed Transactions**

Parties:    HMH Lifestyles, L.P. (HMH) and/or its affiliates.[1]

Sol City Title, LLC d/b/a Magnolia Title – Houston

Coast to Coast Title, LLC d/b/a Magnolia – North Texas

Magnolia Title Florida, LLC

Magnolia Title Arkansas, LLC

Starrex International, Ltd. and Starrex Insurance Services, Inc., a Nevada Corporation (a subsidiary of Starrex International, Ltd.) (collectively, "STX")

Transaction No. 1:    A designated affiliate of HMH will acquire the following equity interests in all Magnolias for a total consideration of $1MM cash and the completion of Transaction No. 2, below. The purchase price will be allocated as follows:

- Magnolia North Texas: $700,000; 42% ownership[2]
- Magnolia Houston $200,000; 36% ownership
- Magnolia Florida $50,000; 20% ownership
- Magnolia Arkansas $50,000; 20% ownership

The capital contributions will be used exclusively for working capital and general business purposes. The transactions contemplated in this Section will be memorialized in a contribution agreement between a designated affiliate of HMH and each Magnolia entity, as applicable. Each contribution agreement will be structured as tax free transaction under the Internal Revenue Code. Each contribution agreement will contain customary post-closing covenants. Each contribution agreement will contain obligations and restrictions in respect of the operation of the Magnolia business after closing, to help ensure that the business is sufficiently resourced and appropriately organized so as to be able to achieve the revenue targets. To this end, each contribution agreement will include adequate protections of the confidential information and trade secrets of each Magnolia entity. Each party to the contribution agreements will make customary representations and warranties that will survive for 3 years after the closing date, except for those representations and warranties of the applicable Magnolia entity related to (i) taxes, tax returns, and employee benefit matters, which shall survive until 90 days following the expiration of the applicable statute of limitations period; and (ii) certain "fundamental" representations, which shall survive indefinitely. With regard to taxes, each Magnolia entity will be responsible to pay (without use of any capital contributed by the designated affiliate of HMH in connection with the transactions described above): (i) any taxes of the applicable Magnolia entity for tax periods up to and including the date of closing, and (ii) any taxes arising by virtue or as a result of the transactions contemplated above and any tax liabilities relating to tax periods prior to closing that are not yet accrued, including, without limitation, those tax liabilities that would have been or would be accrued under accrual accounting and/or any amounts resulting from a change in the applicable Magnolia entity's method

---

[1] NTD: HMH is determining the proper parties for each transaction described herein.
[2] NTD: Are there any consent requirements to issue this equity? If so, we would like to outline any consents that have to be obtained in this Term Sheet.

of accounting (e.g., cash to accrual basis). Each Magnolia entity would indemnify HMH and its designated affiliates for (i) breaches of the applicable Magnolia entity's representations and warranties, (ii) the applicable Magnolia entity's covenants included as part of the contribution agreement, and (iii) liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the closing (including operations). Except in the case of fraud and taxes, such indemnification obligations for clauses (i) and (iii) above would be capped at the aggregate amount of HMH's (or its designate affiliate's) capital contribution to the applicable Magnolia entity.

- Projected closing date: August 1, 2022

Transaction No. 2:    HMH's affiliate (HMH Financial Services, Inc.) will terminate its existing Members' Agreement with Stewart Title Texas that is currently being operated under HMH Title Company, LLC and will begin transferring all existing files (to the extent such transfer would not violate fiduciary duties or otherwise breach the Members' Agreement) and new files (except files covering property in Denton County, Texas, until the applicable non-competition provisions expire) to Magnolia North Texas and Magnolia Houston, which will become preferred title vendors for HMH. Neither HMH nor its affiliates will receive any consideration, payments or distributions (other than the ownership to be received by HMH's designated affiliate described in Transaction No. 1, above) from either Magnolia North Texas or Magnolia Houston as a result of the transfer of any such files.

Magnolia North Texas and Magnolia Houston, (hereinafter referred to as the "HMH divisions"), both of which are duly licensed title agencies in good standing in the state of Texas, shall keep separate accounting records reflecting the monthly profit and loss of the HMH files.

The transactions contemplated in this Section will be memorialized in a preferred vendor relationship agreement between a designated affiliate of HMH and each Magnolia entity, as applicable. The parties agree that the preferred vendor relationship agreement will contain a mutual right to terminate the preferred vendor relationship at any time upon advance written notice, and there will be no restrictive covenants after any such termination, provided, the parties agree that such preferred vendor relationship (and the attendant termination right) may need to be revisited in connection with Transaction No. 3 set forth below.

- Projected closing date: August 15, 2022

Transaction No. 3:    Within 60 days after the completion of Transactions No. 1 and No. 2, STX shall complete the purchase of 100% ownership of the 4 Magnolias (but not later than September 15, 2022), through a series of transactions structured as tax-free reorganizations, for a total estimated consideration of US $21,000,000. All of the purchase price shall be paid by the delivery of STX common shares and warrants, allocated between the 4 Magnolias as follows:

(1)    Magnolia North Texas:
- Allocated to HMH (or its designated affiliate): (a) US $4,200,000 of STX stock[3], to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations[4]; and (b) 350,000 of STX warrants (the "earned warrants"), giving HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock at closing. The warrants shall be exercisable any time within three (3) years after closing and shall

_____

[3] NTD: What consents are required to approve this transaction. We are assuming Board consent and shareholder consent is required. Are there any concerns with obtaining the required consents. Will either party have a remedy if the counter party is unable to obtain the requisite consents?

contain usual and customary provisions regarding exercise procedures, restrictions and mandatory conversion.[5]

o  Allocated to Remaining Members:  US $5,800,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

o  A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones), but the earned warrants shall be issued at closing free and clear of any escrow requirements.

o  In addition to the earned warrants, HMH (or its designated affiliate) shall at closing be issued additional 750,000 of warrants (the "performance warrants") which shall give HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock as of the closing date and which shall be non-exercisable until the following combined revenue milestones of the HMH divisions are achieved:

  (i)    US $6,000,000 annual run rate revenue within the first 12 months after closing (the "First Expiration Date"):  250,000 warrants, to be exercised within three (3) years after closing;

  (ii)   US $8,000,000 annual run rate revenue within the first 36 months after closing (the "Second Expiration Date"):  250,000 warrants, to be exercised within four (4) years after closing;

  (iii)  US $10,000,000 annual run rate revenue within the first 48 months after closing (the "Final Expiration Date"):  250,000 warrants, to be exercised within five (5) years after closing.

  All annual run rate revenue calculations shall be based upon the average of 2 months actual revenue of the HMH divisions and will be calculated on a monthly basis beginning on the 2 month anniversary of closing.  STX covenants and agrees to adhere to a standard of good faith and fair dealing with regard to the revenues of the HMH divisions, will not divert business opportunities or revenues away from the HMH divisions, will not delay the collection of receivables, and shall not take any actions with the intent or effect of reducing or depriving the HMH divisions of revenue.

(2)   Magnolia Houston:[6]
  o  Allocated to HMH (or its designated affiliate): (a) US $2,200,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations; and (b) 150,000 of STX warrants (the "earned warrants"), giving HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock at closing. The warrants shall be exercisable any time within 3 years after closing and shall contain usual and customary provisions regarding exercise procedures, restrictions and mandatory conversion.

  o  Allocated to Remaining Members:  US $3,800,000 of STX stock, to be issued at closing

---

[5] NTD: If these usual and customary provisions are known, let's outline them in the term sheet.  If they are not known, let's outline what they will look like.
[6] NTD: Comments 2-5 above apply to the Magnolia Houston transaction as well.

COAST006161

under the same provisions as the HMH stock, above.

- o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones), but the earned warrants shall be issued at closing free and clear of any escrow requirements.

(3)   Magnolia Florida:
- o   Allocated to HMH (or its designated affiliate): US $600,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date in accordance with Canadian Stock Exchange regulations.

- o   Allocated to Remaining Members:  US $2,400,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

- o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved, (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones).

(4)   Magnolia Arkansas:
- o   Allocated to HMH (or its designated affiliate): (a) US $400,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations.

- o   Allocated to Remaining Members:  US $1,600,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

- o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved, (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones).

All shares of common stock and warrants issued by STX shall contain restrictions against free trading[7] as prescribed by the Ontario Securities Commission and the Canadian Stock Exchange and shall be subject to lock-up agreements to insure that an orderly market in maintained for the trading of STX stock in the public markets. In this regard, all STX shares and warrants issued at closing and each person receiving STX shares and warrants at closing will be subject to the same restrictions against trading, and the lock-up agreements will be substantially similar and contain the same substantive terms and restrictions.

The transactions contemplated in this Section will be memorialized by merger agreements between STX (or a designated affiliate of STX) and each Magnolia entity, as applicable.  The mergers will be structured as tax free reorganizations under the Internal Revenue Code.  Each merger agreement will contain customary post-closing covenants.  Each merger agreement will require STX (as a condition to closing) to deliver a non-compete agreement between STX and each officer of STX that is managing a title division under which each such officer would be prohibited from competing with STX in any business that has been or is proposed to be engaged in by STX.  Each merger agreement would also contain non-solicitation provisions and

---

[7] NTD:  STX and its major shareholders need to enter into a registration rights agreement such that the shareholders would have certain registration rights and the parties would reasonably cooperate if STX or any shareholder wanted to register STX shares.

COAST006162

requirements related to confidential information and trade secrets to protect the business of STX. Each party to the merger agreements will make customary representations and warranties that will survive for 3 years after the closing date, except for those representations and warranties of STX related to (i) taxes, tax returns, employee benefit matters, environmental, and health and safety matters which shall survive until 90 days following the expiration of the applicable statute of limitations period; and (ii) certain "fundamental" representations, which shall survive indefinitely. With regard to taxes, STX will be responsible for (i) any taxes of STX for periods up to and including the date of closing, and (ii) any taxes arising by virtue or as a result of the transactions contemplated above and any tax liabilities relating to periods prior to closing that are not yet accrued, including, without limitation, those tax liabilities that would have been or would be accrued under accrual accounting and/or any amounts resulting from a change in STX's method of accounting (e.g., cash to accrual basis). STX would indemnify each Magnolia entity for (i) breaches of STX's representations and warranties, (ii) STX's covenants included as part of the merger agreement, and (iii) liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the closing (including operations). Except in the case of fraud and taxes, such indemnification obligations for clauses (i) and (iii) above would be capped at the aggregate amount of the consideration paid by STX to the applicable Magnolia entity.

Projected Closing Date: September 15, 2022

Other Matters:

(1)    HMH or its affiliates will be granted the right, but is under no obligation, to participate in a minimum amount of $500,000 in one or more initial equity placements that STX contemplates to complete in connection with the closing of the Magnolia transactions and other acquisitions.

(2)    STX grants to HMH and its affiliates a first and preferential right, but not obligation, to participate in all future debt or equity capital raises, subsequent to the initial capital raise described in paragraph (1) above. Notwithstanding the foregoing, STX agrees that it will not issue any stock that has a higher voting or distribution priority than the stock being issued hereunder without affording HMH and its affiliates the right to participate in any such offering.

(3)    Nelson Mitchell has expressed an interest in becoming a director of STX.[8] In the event the Magnolia transactions are completed into STX, STX senior management agrees to place his name on its recommended slate of directors at the next ensuing shareholder meeting following the closing.[9] Furthermore, in the event a vacancy occurs on the board of directors of STX, prior to such annual meeting, STX management agrees to recommend that Nelson Mitchell be nominated by the board to fill such vacancy.

(4)    HMH acknowledges that certain affiliates of STX own Amcap Mortgage, Ltd. In consideration of the terms set forth in this proposal, HMH agrees to use reasonable efforts and good faith in negotiating a mortgage relationship with Amcap, assuming that, and in all respects conditioned upon, the transactions described herein closing.

Documents and timing: The Magnolia entities and the STX entities, as the case may be, will prepare the first draft of the definitive agreements and will provide a first draft to HMH at least 30 days prior to each project closing date set forth herein. The parties, however, may decide that HMH should draft and deliver the first draft of the contribution agreements relating to Transaction No. 1. If that decision is made, legal counsel for the

---

[8] NTD: We need confirmation that STX has D&O insurance, and we would like to review the policy. This will be included in our initial due diligence request list.
[9] NTD: I think STX senior management owns a controlling interest of the STX shares. In turn, as a part of closing, I think this agreement to nominate Nelson to the board needs to be added to a voting agreement to make it legally binding.

COAST006163

Magnolia entities and legal counsel for HMH will endeavor to discuss and agree upon the structure of the contribution agreements before an initial draft is prepared such that each contribution agreement results in a tax free transaction under the Internal Revenue Code. HMH will submit an initial due diligence request list to the Magnolia entities and STX within 5 days after the signing of this proposal. The Magnolia entities and STX will use commercially reasonable efforts to respond to such due diligence request list and make the underlying responsive documents available to HMH and its representatives on or prior to the date that each initial draft of the definitive agreements are delivered to HMH.

Confidentiality: The contents of this proposal, and the fact that it has been signed, are subject to the terms of the Confidentiality and Non-Circumvention Agreement between HMH and STX dated May 20, 2022 and, unless otherwise provided under that agreement, may only be disclosed by the parties hereto to each of their respective owners, directors, governing persons, and advisers on a need to know basis.

THIS PROPOSAL SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF TEXAS. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS PROPOSAL OR THE DEFINITIVE AGREEMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS PROPOSAL AND THE DEFINITIVE AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. ANY ACTION OR PROCEEDING INVOLVING ANY DISPUTE, CLAIM OR CONTROVERSY RELATING TO OR ARISING UNDER THIS PROPOSAL, ANY DEFINITIVE AGREEMENTS, OR THE DEALINGS OF THE PARTIES SHALL BE COMMENCED AND PROSECUTED EXCLUSIVELY IN THE STATE DISTRICT COURTS LOCATED IN TARRANT COUNTY, TEXAS, OR THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS (FORT WORTH DIVISION), AND EACH OF THE PARTIES HERETO HEREBY (A) EXPRESSLY AND IRREVOCABLY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS) IN ANY SUCH ACTION OR PROCEEDING, AND (B) IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AGREES NOT TO ASSERT ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SUCH COURTS, THAT SUCH LEGAL PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH PROCEEDING IS IMPROPER.

This proposal may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

This proposal does not reflect any form of legally binding commitment or obligation on the part of either party or its affiliates, except with regard to confidentiality, governing law, consent to jurisdiction, and waiver of jury trial (collectively, the "Binding Provisions"). No contract, joint venture, partnership or fiduciary relationship shall be deemed to exist between the parties or any of their affiliates unless and until final definitive agreements with respect to the proposed transactions have been executed and delivered and only thereafter as and to the extent specified therein. The parties hereby acknowledge and agree that (a) the terms in this proposal do not contain all material terms to be negotiated as part of the definitive agreements or otherwise with respect to the proposed transactions; (b) no oral agreement, public or private statements or course of conduct or dealings between the parties and/or their affiliates may be introduced as evidence that there exists a joint venture or partnership or any binding contract or commitment between the parties with respect to any of the transactions contemplated hereby, other than the Binding Provisions; and (c) neither party shall be justified in relying on any provision of this proposal (other than the Binding Provisions), in connection with the transactions hereby.

In turn, this proposal is for negotiating purposes only and does not constitute a binding agreement between the parties, except for the Binding Provisions. In the event definitive agreements are not able to be completed by the projected closing dates set forth above, unless extended by mutual agreement

COAST006164

of the parties, neither party herein shall have any further duty to negotiate or discuss these matters any further, provided, however, the Binding Provisions shall survive and remain in full force and effect indefinitely.

DATE

DATE

DATE

JOHN MAGNESS, MANAGER OF THE MAGNOLIAS[10]

MATT HILL, CEO OF STARREX INTERNATIONAL, LTD. AND STARREX INSURANCE SERVICES, INC.

NELSON MITCHELL, CEO OF BNMJR, INC., the general partner of HMH Lifestyles, L.P.

---

[10] Does John have the authority to enter into this transaction on behalf of the Magnolia entities without further consent of the other members.

COAST006165

September 9, 2022

HMH Title Investments, LLC
1038 Texan Trail
Grapevine, Texas 76051

        Re:    Third Amended and Restated Limited Liability Company Agreement of Sol
               City Title, LLC

Mr. Mitchell:

This letter agreement is between HMH Title Investments, LLC ("HMH"), Sol City Title, LLC, a Texas limited liability company (the "Company"), GF Insurance Investments, LLC, ("GFI"), Alphabet Investments, LLC, ("Alphabet") and Peabody Bulldog, LLC ("PB" and GFI, Alphabet, and PB are each an "Existing Class A Member" and collectively the "Existing Class A Members") and is being entered into in connection with and is in further consideration of the investment by HMH in the Company, pursuant to the Contribution Agreement dated of even date herewith ("Contribution Agreement"), Statement of Preliminary Terms of Proposed Transactions attached hereto as Exhibit "A" and incorporated herein by reference for all purposes ("Term Sheet"), and the Third Amended and Restated Limited Liability Company Agreement of the Company, dated as of November 4, 2021 (as amended, restated, waived or otherwise modified from time to time, the "Company Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Company Agreement.

        1.      Classification of Units (Section 3.5). Notwithstanding the terms of the Company Agreement, there are no Class A-1 Units currently issued and outstanding, and the Company will not issue any Class A-1 Units without the prior written consent of HMH. All Class A Units shall be voting common Units of the Company. Each Member shall be entitled to one vote per Class A Unit on all matters upon which the Members have the right to vote under the Company Agreement or under this letter agreement. Any references to "Series I," "Series II," "A-1," or any similar connotation shall have no significance and all Class A Units shall have the same rights and privileges (whether voting or economic). For the avoidance of doubt, all Class A Units will be voted as a single class, and all Class A-Series I Units and Class A-Series II Units shall vote as a single class of Units.

        2.      Assumed Liabilities (Section 3.5). The Existing Class A Members signing this letter agreement, agree to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses arising out of, pursuant to, or relating to the Assumed Liabilities and the Special Contributions (each as defined in the Company Agreement). For the avoidance of doubt, the Existing Class A Members hereby expressly waive and release any claims they may have against the Company for indemnity or contribution and any claims the Existing Class A Members may have or may ever incur against the Company arising out of, pursuant to, or relating to the Assumed Liabilities or the Special Contributions.

COAST006166

3. <u>Class A-Series I and Class A-Series II Call Options (Section 3.5)</u>. All options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option, are hereby terminated in all respects and any such options shall be of no further force and effect. The Existing Class A Members signing this letter agreement, agree to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses arising out of, pursuant to, or relating to any options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option. For the avoidance of doubt, the Existing Class A Members hereby expressly waive and release any claims they may have against the Company for indemnity or contribution and any claims the Existing Class A Members may have or may ever incur against the Company arising out of, pursuant to, or relating to to any options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option.

4. <u>Competition (Section 4.6)</u>. The Existing Class A Members and each of their respective managers, governing persons, officers, representatives, and Affiliates are  not currently and will not after the date of this letter agreement: (i) compete with the Company; (ii) usurp business opportunities away from the Company' or (iii) further their own financial interests to the detriment of the Company.

5. <u>No Withdrawal (Section 4.7)</u>. Notwithstanding anything to the contrary in the Company Agreement, no Member may withdraw or resign as a Member while the Member holds Units in the Company until the winding up and termination of the Company. Any purported withdrawal or resignation by a Member holding Units in the Company before the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units in the Company, such Person shall no longer be a Member. No Member is entitled to any distribution upon withdrawal, whether under § 101.205 of the Texas Business Organizations Code or otherwise.

6. <u>Certain Limitations on Board of Manager Activities (Section 5.5)</u>. Notwithstanding anything contained in the Company Agreement to the contrary, the following acts shall be deemed to be an act in contradiction of the Company Agreement, and shall need the approval of a Supermajority Vote and HMH: (i) to change or reorganize the Company into any other legal form; (ii) to dissolve the Company at will; (iii) to sell, transfer, convey, assign, lease, license or otherwise dispose of substantially all of the Company's assets or properties;  (iv) to amend the Company Agreement; (v) to amend the certificate of formation or any other governing document of the Company; (vi) to merge, consolidate, or otherwise combine the Company with or into any other person or entity, or to agree to a share or interest exchange or any other transaction authorized by or subject to the provisions of Chapter Ten of the Texas Business Organizations Code or similar applicable law; (vii) to enter into any reorganization, recapitalization or other similar transaction effecting the Company or its assets or properties; (viii) to authorize any transaction, agreement, or action on behalf of the Company that is unrelated to its purpose as set forth in the Company Agreement or the Certificate or that contravenes the Company Agreement or the Term Sheet.

COAST006167

7.    Management Agreement (Section 5.7).  All agreements, contracts, and obligations of the Company with BSpoke Management Group and any of its Affiliates or representatives have been satisfied, fully performed, or terminated on or before the date of this letter agreement.

8.    Distributions (Section 7.4).  Notwithstanding anything contained in the Company Agreement to the contrary, and after giving effect to the terms of this letter agreement, including the indemnification by the Existing Class A Members for certain matters contained herein, all cash, securities and other assets available for Distribution, which amount shall be determined in the sole discretion of the Board of Managers, net of reserves determined by the Board of Managers, amounts for the repayment of indebtedness and expenses of the Company, shall be Distributed as follows: (i) First, to the holders of Class A Units in proportion to their relative portion of all Unreturned Capital Contributions, until each holder of Class A Units has received Distributions under this Agreement in an aggregate amount equal to the aggregate Unreturned Capital Contribution with respect to such holder's Class A Units outstanding immediately prior to such Distribution; and (ii) then  to the holders of Class A Units, in proportion to the number of Class A Units held by such Members.

9.    Permitted Transfers.  The undersigned, constituting a Supermajority Vote, hereby consents to the Transfer from time to time by the members of HMH of their membership interests in HMH; provided that BNMJR, Inc. or its Affiliates shall at all times remain the Manager of HMH.  Furthermore, with respect to HMH, the transfer restrictions in Article 9 of the Company Agreement, including Section 9.1, shall not apply to any Transfer by HMH of all or any portion of its Units to any Affiliate of HMH.

10.    Winding Up and Termination of the Company (Article 10).  Notwithstanding anything contained in the Company Agreement to the contrary, including, but not limited to Section 10.1 of the Company Agreement, any requisite vote to voluntarily wind up and/or terminate the Company shall include the affirmative vote and approval of HMH, and the Majority Vote of the Members shall not be sufficient unless such Majority Vote of the Members includes the affirmative vote and approval of HMH.

11.    Tag-Along Right in Favor of HMH.  Subject to the other transfer restrictions set forth in the Company Agreement, if one or more Members other than HMH (the "Selling Member") proposes to Transfer at least 20% of the Class A Units outstanding in any transaction or series of related transactions, then HMH (HMH, together with its permitted transferees designated herein, a "Tag-Along Member") may participate in such sale or transaction (a "Tag-Along Sale") on the terms and conditions in this Section 11.  Before any Transfer of Class A Units, the Selling Member shall deliver to the Company and each other Member a written notice (a "Sale Notice") of the proposed Tag-Along Sale as soon as practicable, and in no event later than two (2) days after the Selling Member enters into a definitive agreement. The Sale Notice shall reference the Tag-Along Members' rights hereunder and shall describe in reasonable detail: (i) the aggregate percentage of Class A Units the proposed transferee has offered to purchase; (ii) the name of the proposed transferee; (iii) the proposed date, time and location of the Tag-Along Sale's closing; (iv) the proposed amount of consideration for the Tag-Along Sale (both the aggregate and for each exercising Tag-Along Member), and the other material terms and conditions of the Tag-Along

COAST006168

Sale, including a description of any non-cash consideration that is sufficiently detailed to permit the consideration's valuation; and (v) a copy of the definitive agreements, and any proposed form of agreement or Member delivery for the Tag-Along Sale.  The Selling Member and each Tag-Along Member timely electing to participate in the Tag-Along Sale under this Section 11 shall have the right to Transfer in the Tag-Along Sale the amount of Class A Units equal to the product of (x) the total number of Class A Units that the proposed transferee proposes to buy as stated in the Sale Notice and (y) a fraction (A) the numerator of which is the number of Class A Units then held by the applicable Member, and (B) the denominator of which is the number of Class A Units then held by the Selling Member and all of the Tag-Along Members timely electing to participate in the Tag-Along Sale under Section 11 (such product, the "Tag-Along Portion").  Each Tag-Along Member may exercise its right to participate in a Tag-Along Sale by delivering to the Selling Member a written notice (a "Tag-Along Notice") stating its election to do so and specifying the number of Class A Units (up to its Tag-Along Portion) it will Transfer, no later than 20 days after the Tag-Along Member receives the Sale Notice (the "Tag-Along Period").  The Tag-Along Sale and right of the Selling Member to Transfer its Class A Units is subject to all the following conditions: (i) Each Member participating in the Tag-Along Sale shall receive the same form and amount of consideration to be received by the Selling Member per Unit of a given class (after deduction of such Member's proportionate share of the related expenses in accordance with Section 11, and the other terms and conditions of the Drag-Along Sale shall, except as provided in Section 11, be the same as those upon which the Selling Member sells its Units of such class below; and (ii) Each Tag-Along Member shall provide the same representations, warranties, covenants, and indemnities as the Selling Member provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, and indemnities pertaining specifically to the Selling Member, the Tag-Along Member shall make the comparable representations, warranties, covenants, and indemnities pertaining specifically to itself); provided, that all representations, warranties, covenants and indemnities shall be made by the Selling Member and each Tag-Along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Selling Member and each Tag-Along Member (other than any indemnification obligation pertaining specifically to the representations, warranties, covenants, and indemnities of the Selling Member or a Tag-Along Member, which obligation shall be the sole obligation of such Selling Member or Tag-Along Member), in each case in an amount not to exceed the aggregate proceeds received by the Selling Member or Tag-Along Member (as applicable) in connection with the Tag-Along Sale. The requirement in the previous sentence that indemnification obligations be several and joint may be satisfied by a contribution agreement between the Selling Member and Tag-Along Members.  The fees and expenses of the Selling Member incurred in connection with a Tag-Along Sale and for the benefit of all Tag-Along Members (it being understood that costs incurred by or for a Selling Member for its sole benefit will not be considered be for the benefit of all Tag-Along Members), to the extent not paid or reimbursed by the Company or the proposed transferee, shall be shared by the Selling Member and all the participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; provided, that no Tag-Along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Tag-Along Sale. The Selling Member shall have 30 days following the expiration of the Tag-Along Period in which to consummate the Tag-Along Sale, on terms not more favorable to the Selling Member than those

COAST006169

set forth in the Tag-Along Notice (which such 30-day period may be extended for a reasonable time not to exceed 60 days to the extent reasonably necessary to obtain required approvals or consents from any governmental authority). If the Tag-Along Sale has not been consummated by the end of such period, the Selling Member may not exercise its rights under this Section 11 without again complying with Section 11 in its entirety. If the Selling Member sells or otherwise Transfers to the proposed transferee any of its Class A Units in breach of this Section 11, then each Tag-Along Member may sell to the Selling Member, and the Selling Member undertakes to purchase from each Tag-Along Member, the number of Class A Units that such Tag-Along Member would have had the right to sell to the proposed transferee under this Section 11, for a price and upon the terms and conditions on which the proposed transferee bought such Class A Units from the Selling Member, but without indemnity being granted by any Tag-Along Member to the Selling Member; provided, that nothing contained in this Section 11 shall preclude any Member from seeking alternative remedies for a breach of this Section 11. The Selling Member shall also reimburse each Tag-Along Member for any reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred in the exercise or attempted exercise of the Tag-Along Member's rights under this Section 11.

12.    <u>Amendment (Article 12)</u>.    Notwithstanding anything contained in the Company Agreement to the contrary, including, but not limited to Section 12 of the Company Agreement, the Certificate of Formation of the Company and the Company Agreement may be amended, supplemented or restated only upon obtaining a Supermajority Vote approving such amendment and the affirmative vote and approval of HMH. Any such amendment that does not receive the affirmative vote and approval of HMH shall be void and of no force and effect.

The Existing Class A Members have agreed to this letter agreement at the request of HMH and acknowledge and agree that this letter agreement is an inducement to HMH's decision to enter into the Contribution Agreement without requiring a substantive amendment to the Company Agreement. The intent of this letter agreement is to shift the liability for certain existing Company obligations, liabilities, costs and expenses away from the Company and on to the Existing Class A Members. To the extent the Existing Class A Members are required to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses set forth herein, the parties will agree to negotiate in good faith to determine the appropriate accounting and tax treatment of such indemnification payments in an effort to give effect to the substantive intent of this letter agreement. The Existing Class A Members will not, however, receive any preferential treatment under Article 7 or any other provision of the Company Agreement over HMH for such indemnification expenses. This letter agreement is being entered into by the parties subsequent to their execution of the Contribution Agreement, and for the avoidance of doubt, is not superseded or preempted by the Contribution Agreement, notwithstanding any language to the contrary in Section 8.2 thereof. This letter agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas. Any dispute relating hereto shall be heard in the state or federal courts of the State of Texas, and the parties agree to jurisdiction and venue therein. This letter agreement may

COAST006170

be executed in multiple counterparts which, taken together, shall constitute one and the same agreement.

\* \* \* \* \*

COAST006171

Sincerely,

**Sol City Title, LLC**

By: _____
Name: John Magness
Title: Manager

**GF Insurance Investments, LLC**

By: _____
Name: Jessica Garth
Title: Manager

**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006172

Sincerely,

**Sol City Title, LLC**


By: _____
Name: John Magness
Title: Manager


**GF Insurance Investments, LLC**

By: _____
Name: Jessica Garth
Title: Manager


**Alphabet Investments, LLC**

By: *M. Clayton Hill*
Name: Matthew Clayton Hill
Title: Manager


**Peabody Bulldog, LLC**


By: _____
Name: John Magness
Title: Manager


Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**


By:_____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006173

Sincerely,

**Sol City Title, LLC**

By: _____
Name: John Magness
Title: Manager

**GF Insurance Investments, LLC**

By: _____
Name: Jessica Garth
Title: Manager

**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006174

Exhibit "A"

### Statement of Preliminary Terms of Proposed Transactions

Parties:        HMH Lifestyles, L.P. (HMH) and/or its affiliates.[1]

Sol City Title, LLC d/b/a Magnolia Title – Houston

Coast to Coast Title, LLC d/b/a Magnolia – North Texas

Magnolia Title Florida, LLC

Magnolia Title Arkansas, LLC

Starrex International, Ltd. and Starrex Insurance Services, Inc., a Nevada Corporation (a subsidiary of Starrex International, Ltd.) (collectively, "STX")

Transaction No. 1:     A designated affiliate of HMH will acquire the following equity interests in all Magnolias for a total consideration of $1MM cash and the completion of Transaction No. 2, below. The purchase price will be allocated as follows:

- Magnolia North Texas: $700,000; 42% ownership[2]
- Magnolia Houston $200,000; 36% ownership
- Magnolia Florida $50,000; 20% ownership
- Magnolia Arkansas $50,000; 20% ownership

The capital contributions will be used exclusively for working capital and general business purposes. The transactions contemplated in this Section will be memorialized in a contribution agreement between a designated affiliate of HMH and each Magnolia entity, as applicable. Each contribution agreement will be structured as tax free transaction under the Internal Revenue Code. Each contribution agreement will contain customary post-closing covenants. Each contribution agreement will contain obligations and restrictions in respect of the operation of the Magnolia business after closing, to help ensure that the business is sufficiently resourced and appropriately organized so as to be able to achieve the revenue targets. To this end, each contribution agreement will include adequate protections of the confidential information and trade secrets of each Magnolia entity. Each party to the contribution agreements will make customary representations and warranties that will survive for 3 years after the closing date, except for those representations and warranties of the applicable Magnolia entity related to (i) taxes, tax returns, and employee benefit matters, which shall survive until 90 days following the expiration of the applicable statute of limitations period; and (ii) certain "fundamental" representations, which shall survive indefinitely. With regard to taxes, each Magnolia entity will be responsible to pay (without use of any capital contributed by the designated affiliate of HMH in connection with the transactions described above): (i) any taxes of the applicable Magnolia entity for tax periods up to and including the date of closing, and (ii) any taxes arising by virtue or as a result of the transactions contemplated above and any tax liabilities relating to tax periods prior to closing that are not yet accrued, including, without limitation, those tax liabilities that would have been or would be accrued under accrual accounting and/or any amounts resulting from a change in the applicable Magnolia entity's method

---

[1] NTD: HMH is determining the proper parties for each transaction described herein.
[2] NTD: Are there any consent requirements to issue this equity? If so, we would like to outline any consents that have to be obtained in this Term Sheet.

of accounting (e.g., cash to accrual basis). Each Magnolia entity would indemnify HMH and its designated affiliates for (i) breaches of the applicable Magnolia entity's representations and warranties, (ii) the applicable Magnolia entity's covenants included as part of the contribution agreement, and (iii) liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the closing (including operations). Except in the case of fraud and taxes, such indemnification obligations for clauses (i) and (iii) above would be capped at the aggregate amount of HMH's (or its designate affiliate's) capital contribution to the applicable Magnolia entity.

- Projected closing date: August 1, 2022

Transaction No. 2:    HMH's affiliate (HMH Financial Services, Inc.) will terminate its existing Members' Agreement with Stewart Title Texas that is currently being operated under HMH Title Company, LLC and will begin transferring all existing files (to the extent such transfer would not violate fiduciary duties or otherwise breach the Members' Agreement) and new files (except files covering property in Denton County, Texas, until the applicable non-competition provisions expire) to Magnolia North Texas and Magnolia Houston, which will become preferred title vendors for HMH. Neither HMH nor its affiliates will receive any consideration, payments or distributions (other than the ownership to be received by HMH's designated affiliate described in Transaction No. 1, above) from either Magnolia North Texas or Magnolia Houston as a result of the transfer of any such files.

Magnolia North Texas and Magnolia Houston, (hereinafter referred to as the "HMH divisions"), both of which are duly licensed title agencies in good standing in the state of Texas, shall keep separate accounting records reflecting the monthly profit and loss of the HMH files.

The transactions contemplated in this Section will be memorialized in a preferred vendor relationship agreement between a designated affiliate of HMH and each Magnolia entity, as applicable. The parties agree that the preferred vendor relationship agreement will contain a mutual right to terminate the preferred vendor relationship at any time upon advance written notice, and there will be no restrictive covenants after any such termination, provided, the parties agree that such preferred vendor relationship (and the attendant termination right) may need to be revisited in connection with Transaction No. 3 set forth below.

- Projected closing date: August 15, 2022

Transaction No. 3:    Within 60 days after the completion of Transactions No. 1 and No. 2, STX shall complete the purchase of 100% ownership of the 4 Magnolias (but not later than September 15, 2022), through a series of transactions structured as tax-free reorganizations, for a total estimated consideration of US $21,000,000. All of the purchase price shall be paid by the delivery of STX common shares and warrants, allocated between the 4 Magnolias as follows:

(1)    Magnolia North Texas:
   o Allocated to HMH (or its designated affiliate): (a) US $4,200,000 of STX stock[3], to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations[4]; and (b) 350,000 of STX warrants (the "earned warrants"), giving HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock at closing. The warrants shall be exercisable any time within three (3) years after closing and shall

---

[3] NTD: What consents are required to approve this transaction. We are assuming Board consent and shareholder consent is required. Are there any concerns with obtaining the required consents. Will either party have a remedy if the counter party is unable to obtain the requisite consents?

COAST006176

contain usual and customary provisions regarding exercise procedures, restrictions and mandatory conversion.[5]

o  Allocated to Remaining Members:  US $5,800,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

o  A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones), but the earned warrants shall be issued at closing free and clear of any escrow requirements.

o  In addition to the earned warrants, HMH (or its designated affiliate) shall at closing be issued additional 750,000 of warrants (the "performance warrants") which shall give HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock as of the closing date and which shall be non-exercisable until the following combined revenue milestones of the HMH divisions are achieved:

   (i)    US $6,000,000 annual run rate revenue within the first 12 months after closing (the "First Expiration Date"):  250,000 warrants, to be exercised within three (3) years after closing;

   (ii)   US $8,000,000 annual run rate revenue within the first 36 months after closing (the "Second Expiration Date"):  250,000 warrants, to be exercised within four (4) years after closing;

   (iii)  US $10,000,000 annual run rate revenue within the first 48 months after closing (the "Final Expiration Date"):  250,000 warrants, to be exercised within five (5) years after closing.

   All annual run rate revenue calculations shall be based upon the average of 2 months actual revenue of the HMH divisions and will be calculated on a monthly basis beginning on the 2 month anniversary of closing.  STX covenants and agrees to adhere to a standard of good faith and fair dealing with regard to the revenues of the HMH divisions, will not divert business opportunities or revenues away from the HMH divisions, will not delay the collection of receivables, and shall not take any actions with the intent or effect of reducing or depriving the HMH divisions of revenue.

(2)  Magnolia Houston:[6]
   o  Allocated to HMH (or its designated affiliate): (a) US $2,200,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations; and (b) 150,000 of STX warrants (the "earned warrants"), giving HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock at closing. The warrants shall be exercisable any time within 3 years after closing and shall contain usual and customary provisions regarding exercise procedures, restrictions and mandatory conversion.

   o  Allocated to Remaining Members:  US $3,800,000 of STX stock, to be issued at closing

---

[5] NTD: If these usual and customary provisions are known, let's outline them in the term sheet.  If they are not known, let's outline what they will look like.
[6] NTD: Comments 2-5 above apply to the Magnolia Houston transaction as well.

COAST006177

under the same provisions as the HMH stock, above.

- o A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones), but the earned warrants shall be issued at closing free and clear of any escrow requirements.

(3)   Magnolia Florida:
- o Allocated to HMH (or its designated affiliate): US $600,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date in accordance with Canadian Stock Exchange regulations.

- o Allocated to Remaining Members: US $2,400,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

- o A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved, (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones).

(4)   Magnolia Arkansas:
- o Allocated to HMH (or its designated affiliate): (a) US $400,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations.

- o Allocated to Remaining Members: US $1,600,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

- o A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved, (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones).

All shares of common stock and warrants issued by STX shall contain restrictions against free trading[7] as prescribed by the Ontario Securities Commission and the Canadian Stock Exchange and shall be subject to lock-up agreements to insure that an orderly market in maintained for the trading of STX stock in the public markets. In this regard, all STX shares and warrants issued at closing and each person receiving STX shares and warrants at closing will be subject to the same restrictions against trading, and the lock-up agreements will be substantially similar and contain the same substantive terms and restrictions.

The transactions contemplated in this Section will be memorialized by merger agreements between STX (or a designated affiliate of STX) and each Magnolia entity, as applicable. The mergers will be structured as tax free reorganizations under the Internal Revenue Code. Each merger agreement will contain customary post-closing covenants. Each merger agreement will require STX (as a condition to closing) to deliver a non-compete agreement between STX and each officer of STX that is managing a title division under which each such officer would be prohibited from competing with STX in any business that has been or is proposed to be engaged in by STX. Each merger agreement would also contain non-solicitation provisions and

---

[7] NTD: STX and its major shareholders need to enter into a registration rights agreement such that the shareholders would have certain registration rights and the parties would reasonably cooperate if STX or any shareholder wanted to register STX shares.

COAST006178

requirements related to confidential information and trade secrets to protect the business of STX. Each party to the merger agreements will make customary representations and warranties that will survive for 3 years after the closing date, except for those representations and warranties of STX related to (i) taxes, tax returns, employee benefit matters, environmental, and health and safety matters which shall survive until 90 days following the expiration of the applicable statute of limitations period; and (ii) certain "fundamental" representations, which shall survive indefinitely. With regard to taxes, STX will be responsible for (i) any taxes of STX for periods up to and including the date of closing, and (ii) any taxes arising by virtue or as a result of the transactions contemplated above and any tax liabilities relating to periods prior to closing that are not yet accrued, including, without limitation, those tax liabilities that would have been or would be accrued under accrual accounting and/or any amounts resulting from a change in STX's method of accounting (e.g., cash to accrual basis). STX would indemnify each Magnolia entity for (i) breaches of STX's representations and warranties, (ii) STX's covenants included as part of the merger agreement, and (iii) liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the closing (including operations). Except in the case of fraud and taxes, such indemnification obligations for clauses (i) and (iii) above would be capped at the aggregate amount of the consideration paid by STX to the applicable Magnolia entity.

Projected Closing Date: September 15, 2022

Other Matters:

(1)     HMH or its affiliates will be granted the right, but is under no obligation, to participate in a minimum amount of $500,000 in one or more initial equity placements that STX contemplates to complete in connection with the closing of the Magnolia transactions and other acquisitions.

(2)     STX grants to HMH and its affiliates a first and preferential right, but not obligation, to participate in all future debt or equity capital raises, subsequent to the initial capital raise described in paragraph (1) above. Notwithstanding the foregoing, STX agrees that it will not issue any stock that has a higher voting or distribution priority than the stock being issued hereunder without affording HMH and its affiliates the right to participate in any such offering.

(3)     Nelson Mitchell has expressed an interest in becoming a director of STX.[8] In the event the Magnolia transactions are completed into STX, STX senior management agrees to place his name on its recommended slate of directors at the next ensuing shareholder meeting following the closing.[9] Furthermore, in the event a vacancy occurs on the board of directors of STX, prior to such annual meeting, STX management agrees to recommend that Nelson Mitchell be nominated by the board to fill such vacancy.

(4)     HMH acknowledges that certain affiliates of STX own Amcap Mortgage, Ltd. In consideration of the terms set forth in this proposal, HMH agrees to use reasonable efforts and good faith in negotiating a mortgage relationship with Amcap, assuming that, and in all respects conditioned upon, the transactions described herein closing.

Documents and timing: The Magnolia entities and the STX entities, as the case may be, will prepare the first draft of the definitive agreements and will provide a first draft to HMH at least 30 days prior to each project closing date set forth herein. The parties, however, may decide that HMH should draft and deliver the first draft of the contribution agreements relating to Transaction No. 1. If that decision is made, legal counsel for the

---

[8] NTD: We need confirmation that STX has D&O insurance, and we would like to review the policy. This will be included in our initial due diligence request list.
[9] NTD: I think STX senior management owns a controlling interest of the STX shares. In turn, as a part of closing, I think this agreement to nominate Nelson to the board needs to be added to a voting agreement to make it legally binding.

COAST006179

Magnolia entities and legal counsel for HMH will endeavor to discuss and agree upon the structure of the contribution agreements before an initial draft is prepared such that each contribution agreement results in a tax free transaction under the Internal Revenue Code.  HMH will submit an initial due diligence request list to the Magnolia entities and STX within 5 days after the signing of this proposal.  The Magnolia entities and STX will use commercially reasonable efforts to respond to such due diligence request list and make the underlying responsive documents available to HMH and its representatives on or prior to the date that each initial draft of the definitive agreements are delivered to HMH.

Confidentiality: The contents of this proposal, and the fact that it has been signed, are subject to the terms of the Confidentiality and Non-Circumvention Agreement between HMH and STX dated May 20, 2022 and, unless otherwise provided under that agreement, may only be disclosed by the parties hereto to each of their respective owners, directors, governing persons, and advisers on a need to know basis.

THIS PROPOSAL SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF TEXAS.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS PROPOSAL OR THE DEFINITIVE AGREEMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS PROPOSAL AND THE DEFINITIVE AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  ANY ACTION OR PROCEEDING INVOLVING ANY DISPUTE, CLAIM OR CONTROVERSY RELATING TO OR ARISING UNDER THIS PROPOSAL, ANY DEFINITIVE AGREEMENTS, OR THE DEALINGS OF THE PARTIES SHALL BE COMMENCED AND PROSECUTED EXCLUSIVELY IN THE STATE DISTRICT COURTS LOCATED IN TARRANT COUNTY, TEXAS, OR THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS (FORT WORTH DIVISION), AND EACH OF THE PARTIES HERETO HEREBY (A) EXPRESSLY AND IRREVOCABLY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS) IN ANY SUCH ACTION OR PROCEEDING, AND (B) IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AGREES NOT TO ASSERT  ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SUCH COURTS, THAT SUCH LEGAL PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH PROCEEDING IS IMPROPER.

This proposal may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

This proposal does not reflect any form of legally binding commitment or obligation on the part of either party or its affiliates, except with regard to confidentiality, governing law, consent to jurisdiction, and waiver of jury trial (collectively, the "Binding Provisions"). No contract, joint venture, partnership or fiduciary relationship shall be deemed to exist between the parties or any of their affiliates unless and until final definitive agreements with respect to the proposed transactions have been executed and delivered and only thereafter as and to the extent specified therein. The parties hereby acknowledge and agree that (a) the terms in this proposal do not contain all material terms to be negotiated as part of the definitive agreements or otherwise with respect to the proposed transactions; (b) no oral agreement, public or private statements or course of conduct or dealings between the parties and/or their affiliates may be introduced as evidence that there exists a joint venture or partnership or any binding contract or commitment between the parties with respect to any of the transactions contemplated hereby, other than the Binding Provisions; and (c) neither party shall be justified in relying on any provision of this proposal (other than the Binding Provisions), in connection with the transactions hereby.

In turn, this proposal is for negotiating purposes only and does not constitute a binding agreement between the parties, except for the Binding Provisions. In the event definitive agreements are not able to be completed by the projected closing dates set forth above, unless extended by mutual agreement

COAST006180

of the parties, neither party herein shall have any further duty to negotiate or discuss these matters any further, provided, however, the Binding Provisions shall survive and remain in full force and effect indefinitely.

DATE    6-17·22

JOHN MAGNESS, MANAGER OF THE MAGNOLIAS[superscript]

DATE    6/17/22

MATT HILL, CEO OF STARREX INTERNATIONAL, LTD. AND STARREX INSURANCE SERVICES, INC.

DATE    6/17/22

NELSON MITCHELL, CEO OF BNMJR, INC., the general partner of HMH Lifestyles, L.P.

---

[superscript]10 Does John have the authority to enter into this transaction on behalf of the Magnolia entities without further consent of the other members.

COAST006181

September 9, 2022

HMH Title Investments, LLC
1038 Texan Trail
Grapevine, Texas 76051

           Re:    First Amended and Restated Company Agreement of Coast to Coast Title,
                    LLC

Mr. Mitchell:

       This letter agreement is between HMH Title Investments, LLC ("HMH"), Coast to Coast Title, LLC, a Texas limited liability company (the "Company"), 405 Manhattan Investments, LLC, ("405"), Alphabet Investments, LLC, ("Alphabet") and Peabody Bulldog, LLC ("PB" and 405, Alphabet, and PB are each an "Existing Class A Member" and collectively the "Existing Class A Members") and is being entered into in connection with and is in further consideration of the investment by HMH in the Company, pursuant to the Contribution Agreement dated of even date herewith ("Contribution Agreement"), Statement of Preliminary Terms of Proposed Transactions attached hereto as Exhibit "A" and incorporated herein by reference for all purposes ("Term Sheet"), and the First Amended and Restated Company Agreement of the Company, dated as of December 1, 2021 (as amended, restated, waived or otherwise modified from time to time, the "Company Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Company Agreement.

       1.     Classification of Units (Section 3.5). Notwithstanding the terms of the Company Agreement, there are no Class A-1 Units currently issued and outstanding, and the Company will not issue any Class A-1 Units without the prior written consent of HMH. All Class A Units shall be voting common Units of the Company. Each Member shall be entitled to one vote per Class A Unit on all matters upon which the Members have the right to vote under the Company Agreement or under this letter agreement. Any references to "Series I," "Series II," "A-1," or any similar connotation shall have no significance and all Class A Units shall have the same rights and privileges (whether voting or economic). For the avoidance of doubt, all Class A Units will be voted as a single class, and all Class A-Series I Units and Class A-Series II Units shall vote as a single class of Units.

       2.     Assumed Liabilities (Section 3.5). The Existing Class A Members signing this letter agreement, agree to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses arising out of, pursuant to, or relating to the Special Contributions (as defined in the Company Agreement). For the avoidance of doubt, the Existing Class A Members hereby expressly waive and release any claims they may have against the Company for indemnity or contribution and any claims the Existing Class A Members may have or may ever incur against the Company arising out of, pursuant to, or relating to the Special Contributions.

COAST006182

3. <u>Class A-Series I and Class A-Series II Call Options (Section 3.5)</u>. All options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option, are hereby terminated in all respects and any such options shall be of no further force and effect. The Existing Class A Members signing this letter agreement, agree to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses arising out of, pursuant to, or relating to any options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option. For the avoidance of doubt, the Existing Class A Members hereby expressly waive and release any claims they may have against the Company for indemnity or contribution and any claims the Existing Class A Members may have or may ever incur against the Company arising out of, pursuant to, or relating to to any options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option.

4. <u>Competition (Section 4.6)</u>. The Existing Class A Members and each of their respective managers, governing persons, officers, representatives, and Affiliates are not currently and will not after the date of this letter agreement: (i) compete with the Company; (ii) usurp business opportunities away from the Company' or (iii) further their own financial interests to the detriment of the Company.

5. <u>No Withdrawal (Section 4.7)</u>. Notwithstanding anything to the contrary in the Company Agreement, no Member may withdraw or resign as a Member while the Member holds Units in the Company until the winding up and termination of the Company. Any purported withdrawal or resignation by a Member holding Units in the Company before the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units in the Company, such Person shall no longer be a Member. No Member is entitled to any distribution upon withdrawal, whether under § 101.205 of the Texas Business Organizations Code or otherwise.

6. <u>Certain Limitations on Board of Manager Activities (Section 5.5)</u>. Notwithstanding anything contained in the Company Agreement to the contrary, the following acts shall be deemed to be an act in contradiction of the Company Agreement, and shall need the approval of a Supermajority Vote and HMH: (i) to change or reorganize the Company into any other legal form; (ii) to dissolve the Company at will; (iii) to sell, transfer, convey, assign, lease, license or otherwise dispose of substantially all of the Company's assets or properties; (iv) to amend the Company Agreement; (v) to amend the certificate of formation or any other governing document of the Company; (vi) to merge, consolidate, or otherwise combine the Company with or into any other person or entity, or to agree to a share or interest exchange or any other transaction authorized by or subject to the provisions of Chapter Ten of the Texas Business Organizations Code or similar applicable law; (vii) to enter into any reorganization, recapitalization or other similar transaction effecting the Company or its assets or properties; (viii) to authorize any transaction, agreement, or action on behalf of the Company that is unrelated to its purpose as set forth in the Company Agreement or the Certificate or that contravenes the Company Agreement or the Term Sheet.

COAST006183

7. <u>Management Agreement (Section 5.7)</u>.  All agreements, contracts, and obligations of the Company with BSpoke Management Group and any of its Affiliates or representatives have been satisfied, fully performed, or terminated on or before the date of this letter agreement.

8. <u>Distributions (Section 7.4)</u>.  Notwithstanding anything contained in the Company Agreement to the contrary, and after giving effect to the terms of this letter agreement, including the indemnification by the Existing Class A Members for certain matters contained herein, all cash, securities and other assets available for Distribution, which amount shall be determined in the sole discretion of the Board of Managers, net of reserves determined by the Board of Managers, amounts for the repayment of indebtedness and expenses of the Company, shall be Distributed as follows: (i) First, to the holders of Class A Units in proportion to their relative portion of all Unreturned Capital Contributions, until each holder of Class A Units has received Distributions under this Agreement in an aggregate amount equal to the aggregate Unreturned Capital Contribution with respect to such holder's Class A Units outstanding immediately prior to such Distribution; and (ii) then  to the holders of Class A Units, in proportion to the number of Class A Units held by such Members.

9. <u>Permitted Transfers</u>.  The undersigned, constituting a Supermajority Vote, hereby consents to the Transfer from time to time by the members of HMH of their membership interests in HMH; provided that BNMJR, Inc. or its Affiliates shall at all times remain the Manager of HMH.  Furthermore, with respect to HMH, the transfer restrictions in Article 9 of the Company Agreement, including Section 9.1, shall not apply to any Transfer by HMH of all or any portion of its Units to any Affiliate of HMH.

10. <u>Winding Up and Termination of the Company (Article 10)</u>.  Notwithstanding anything contained in the Company Agreement to the contrary, including, but not limited to Section 10.1 of the Company Agreement, any requisite vote to voluntarily wind up and/or terminate the Company shall include the affirmative vote and approval of HMH, and the Majority Vote of the Members shall not be sufficient unless such Majority Vote of the Members includes the affirmative vote and approval of HMH.

11. <u>Tag-Along Right in Favor of HMH</u>.  Subject to the other transfer restrictions set forth in the Company Agreement, if one or more Members other than HMH (the "<u>Selling Member</u>") proposes to Transfer at least 20% of the Class A Units outstanding in any transaction or series of related transactions, then HMH (HMH, together with its permitted transferees designated herein, a "<u>Tag-Along Member</u>") may participate in such sale or transaction (a "<u>Tag-Along Sale</u>") on the terms and conditions in this Section 11.  Before any Transfer of Class A Units, the Selling Member shall deliver to the Company and each other Member a written notice (a "<u>Sale Notice</u>") of the proposed Tag-Along Sale as soon as practicable, and in no event later than two (2) days after the Selling Member enters into a definitive agreement. The Sale Notice shall reference the Tag-Along Members' rights hereunder and shall describe in reasonable detail: (i) the aggregate percentage of Class A Units the proposed transferee has offered to purchase; (ii) the name of the proposed transferee; (iii) the proposed date, time and location of the Tag-Along Sale's closing; (iv) the proposed amount of consideration for the Tag-Along Sale (both the aggregate and for each exercising Tag-Along Member), and the other material terms and conditions of the Tag-Along

COAST006184

Sale, including a description of any non-cash consideration that is sufficiently detailed to permit the consideration's valuation; and (v) a copy of the definitive agreements, and any proposed form of agreement or Member delivery for the Tag-Along Sale. The Selling Member and each Tag-Along Member timely electing to participate in the Tag-Along Sale under this Section 11 shall have the right to Transfer in the Tag-Along Sale the amount of Class A Units equal to the product of (x) the total number of Class A Units that the proposed transferee proposes to buy as stated in the Sale Notice and (y) a fraction (A) the numerator of which is the number of Class A Units then held by the applicable Member, and (B) the denominator of which is the number of Class A Units then held by the Selling Member and all of the Tag-Along Members timely electing to participate in the Tag-Along Sale under Section 11 (such product, the "Tag-Along Portion"). Each Tag-Along Member may exercise its right to participate in a Tag-Along Sale by delivering to the Selling Member a written notice (a "Tag-Along Notice") stating its election to do so and specifying the number of Class A Units (up to its Tag-Along Portion) it will Transfer, no later than 20 days after the Tag-Along Member receives the Sale Notice (the "Tag-Along Period"). The Tag-Along Sale and right of the Selling Member to Transfer its Class A Units is subject to all the following conditions: (i) Each Member participating in the Tag-Along Sale shall receive the same form and amount of consideration to be received by the Selling Member per Unit of a given class (after deduction of such Member's proportionate share of the related expenses in accordance with Section 11, and the other terms and conditions of the Drag-Along Sale shall, except as provided in Section 11, be the same as those upon which the Selling Member sells its Units of such class below; and (ii) Each Tag-Along Member shall provide the same representations, warranties, covenants, and indemnities as the Selling Member provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, and indemnities pertaining specifically to the Selling Member, the Tag-Along Member shall make the comparable representations, warranties, covenants, and indemnities pertaining specifically to itself); provided, that all representations, warranties, covenants and indemnities shall be made by the Selling Member and each Tag-Along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Selling Member and each Tag-Along Member (other than any indemnification obligation pertaining specifically to the representations, warranties, covenants, and indemnities of the Selling Member or a Tag-Along Member, which obligation shall be the sole obligation of such Selling Member or Tag-Along Member), in each case in an amount not to exceed the aggregate proceeds received by the Selling Member or Tag-Along Member (as applicable) in connection with the Tag-Along Sale. The requirement in the previous sentence that indemnification obligations be several and joint may be satisfied by a contribution agreement between the Selling Member and Tag-Along Members. The fees and expenses of the Selling Member incurred in connection with a Tag-Along Sale and for the benefit of all Tag-Along Members (it being understood that costs incurred by or for a Selling Member for its sole benefit will not be considered to be for the benefit of all Tag-Along Members), to the extent not paid or reimbursed by the Company or the proposed transferee, shall be shared by the Selling Member and all the participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; provided, that no Tag-Along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Tag-Along Sale. The Selling Member shall have 30 days following the expiration of the Tag-Along Period in which to consummate the Tag-Along Sale, on terms not more favorable to the Selling Member than those

COAST006185

set forth in the Tag-Along Notice (which such 30-day period may be extended for a reasonable time not to exceed 60 days to the extent reasonably necessary to obtain required approvals or consents from any governmental authority). If the Tag-Along Sale has not been consummated by the end of such period, the Selling Member may not exercise its rights under this Section 11 without again complying with Section 11 in its entirety. If the Selling Member sells or otherwise Transfers to the proposed transferee any of its Class A Units in breach of this Section 11, then each Tag-Along Member may sell to the Selling Member, and the Selling Member undertakes to purchase from each Tag-Along Member, the number of Class A Units that such Tag-Along Member would have had the right to sell to the proposed transferee under this Section 11, for a price and upon the terms and conditions on which the proposed transferee bought such Class A Units from the Selling Member, but without indemnity being granted by any Tag-Along Member to the Selling Member; provided, that nothing contained in this Section 11 shall preclude any Member from seeking alternative remedies for a breach of this Section 11. The Selling Member shall also reimburse each Tag-Along Member for any reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred in the exercise or attempted exercise of the Tag-Along Member's rights under this Section 11.

12.     Amendment (Article 12). Notwithstanding anything contained in the Company Agreement to the contrary, including, but not limited to Section 12 of the Company Agreement, the Certificate of Formation of the Company and the Company Agreement may be amended, supplemented or restated only upon obtaining a Supermajority Vote approving such amendment and the affirmative vote and approval of HMH. Any such amendment that does not receive the affirmative vote and approval of HMH shall be void and of no force and effect.

The Existing Class A Members have agreed to this letter agreement at the request of HMH and acknowledge and agree that this letter agreement is an inducement to HMH's decision to enter into the Contribution Agreement without requiring a substantive amendment to the Company Agreement. The intent of this letter agreement is to shift the liability for certain existing Company obligations, liabilities, costs and expenses away from the Company and on to the Existing Class A Members. To the extent the Existing Class A Members are required to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses set forth herein, the parties will agree to negotiate in good faith to determine the appropriate accounting and tax treatment of such indemnification payments in an effort to give effect to the substantive intent of this letter agreement. The Existing Class A Members will not, however, receive any preferential treatment under Article 7 or any other provision of the Company Agreement over HMH for such indemnification expenses. This letter agreement is being entered into by the parties subsequent to their execution of the Contribution Agreement, and for the avoidance of doubt, is not superseded or preempted by the Contribution Agreement, notwithstanding any language to the contrary in Section 8.2 thereof. This letter agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas. Any dispute relating hereto shall be heard in the state or federal courts of the State of Texas, and the parties agree to jurisdiction and venue therein. This letter agreement may

COAST006186

be executed in multiple counterparts which, taken together, shall constitute one and the same agreement.

\* \* \* \* \*

COAST006187

Sincerely,

**Coast to Coast Title, LLC**

By: _____
Name: John Magness
Title: Manager


**405 Manhattan Investments, LLC**

By: _____
Name: Alyse Angelle
Title: Manager


**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager


**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager


Accepted and Agreed as of
the date first written above:


**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**


By:_____
Name: B. Nelson Mitchell, Jr.
Title:  CEO


*[Signature Page- Side Letter]*

COAST006188

DocuSign Envelope ID: B9E198FB-452F-4798-B7E9-31E6E5F72FAA

Sincerely,

**Coast to Coast Title, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: *Alyse Angelle* _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By:_____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006189

Sincerely,

**Coast to Coast Title, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: _M. Clayton Hill_
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By:_____
Name: B. Nelson Mitchell, Jr.
Title: CEO

*[Signature Page- Side Letter]*

Sincerely,

**Coast to Coast Title, LLC**


By: _____
Name: John Magness
Title: Manager


**405 Manhattan Investments, LLC**


By: _____
Name: Alyse Angelle
Title: Manager


**Alphabet Investments, LLC**


By: _____
Name: Matthew Clayton Hill
Title: Manager


**Peabody Bulldog, LLC**


By: _____
Name: John Magness
Title: Manager


Accepted and Agreed as of
the date first written above:


**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title:  CEO


*[Signature Page- Side Letter]*

COAST006191

<span style="color:red">Exhibit "A"</span>

<u>Statement of Preliminary Terms of Proposed Transactions</u>

Parties:          HMH Lifestyles, L.P. (HMH) and/or its affiliates.[1]

Sol City Title, LLC d/b/a Magnolia Title – Houston

Coast to Coast Title, LLC d/b/a Magnolia – North Texas

Magnolia Title Florida, LLC

Magnolia Title Arkansas, LLC

Starrex International, Ltd. and Starrex Insurance Services, Inc., a Nevada Corporation (a subsidiary of Starrex International, Ltd.) (collectively, "STX")

Transaction No. 1:    A designated affiliate of HMH will acquire the following equity interests in all Magnolias for a total consideration of $1MM cash and the completion of Transaction No. 2, below. The purchase price will be allocated as follows:

- Magnolia North Texas: $700,000; 42% ownership[2]
- Magnolia Houston $200,000; 36% ownership
- Magnolia Florida $50,000; 20% ownership
- Magnolia Arkansas $50,000; 20% ownership

The capital contributions will be used exclusively for working capital and general business purposes. The transactions contemplated in this Section will be memorialized in a contribution agreement between a designated affiliate of HMH and each Magnolia entity, as applicable. Each contribution agreement will be structured as tax free transaction under the Internal Revenue Code. Each contribution agreement will contain customary post-closing covenants. Each contribution agreement will contain obligations and restrictions in respect of the operation of the Magnolia business after closing, to help ensure that the business is sufficiently resourced and appropriately organized so as to be able to achieve the revenue targets. To this end, each contribution agreement will include adequate protections of the confidential information and trade secrets of each Magnolia entity. Each party to the contribution agreements will make customary representations and warranties that will survive for 3 years after the closing date, except for those representations and warranties of the applicable Magnolia entity related to (i) taxes, tax returns, and employee benefit matters, which shall survive until 90 days following the expiration of the applicable statute of limitations period; and (ii) certain "fundamental" representations, which shall survive indefinitely. With regard to taxes, each Magnolia entity will be responsible to pay (without use of any capital contributed by the designated affiliate of HMH in connection with the transactions described above): (i) any taxes of the applicable Magnolia entity for tax periods up to and including the date of closing, and (ii) any taxes arising by virtue or as a result of the transactions contemplated above and any tax liabilities relating to tax periods prior to closing that are not yet accrued, including, without limitation, those tax liabilities that would have been or would be accrued under accrual accounting and/or any amounts resulting from a change in the applicable Magnolia entity's method

---

[1] NTD: HMH is determining the proper parties for each transaction described herein.
[2] NTD: Are there any consent requirements to issue this equity? If so, we would like to outline any consents that have to be obtained in this Term Sheet.

COAST006192

of accounting (e.g., cash to accrual basis). Each Magnolia entity would indemnify HMH and its designated affiliates for (i) breaches of the applicable Magnolia entity's representations and warranties, (ii) the applicable Magnolia entity's covenants included as part of the contribution agreement, and (iii) liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the closing (including operations). Except in the case of fraud and taxes, such indemnification obligations for clauses (i) and (iii) above would be capped at the aggregate amount of HMH's (or its designate affiliate's) capital contribution to the applicable Magnolia entity.

- Projected closing date: August 1, 2022

Transaction No. 2:    HMH's affiliate (HMH Financial Services, Inc.) will terminate its existing Members' Agreement with Stewart Title Texas that is currently being operated under HMH Title Company, LLC and will begin transferring all existing files (to the extent such transfer would not violate fiduciary duties or otherwise breach the Members' Agreement) and new files (except files covering property in Denton County, Texas, until the applicable non-competition provisions expire) to Magnolia North Texas and Magnolia Houston, which will become preferred title vendors for HMH. Neither HMH nor its affiliates will receive any consideration, payments or distributions (other than the ownership to be received by HMH's designated affiliate described in Transaction No. 1, above) from either Magnolia North Texas or Magnolia Houston as a result of the transfer of any such files.

Magnolia North Texas and Magnolia Houston, (hereinafter referred to as the "HMH divisions"), both of which are duly licensed title agencies in good standing in the state of Texas, shall keep separate accounting records reflecting the monthly profit and loss of the HMH files.

The transactions contemplated in this Section will be memorialized in a preferred vendor relationship agreement between a designated affiliate of HMH and each Magnolia entity, as applicable. The parties agree that the preferred vendor relationship agreement will contain a mutual right to terminate the preferred vendor relationship at any time upon advance written notice, and there will be no restrictive covenants after any such termination, provided, the parties agree that such preferred vendor relationship (and the attendant termination right) may need to be revisited in connection with Transaction No. 3 set forth below.

- Projected closing date: August 15, 2022

Transaction No. 3:    Within 60 days after the completion of Transactions No. 1 and No. 2, STX shall complete the purchase of 100% ownership of the 4 Magnolias (but not later than September 15, 2022), through a series of transactions structured as tax-free reorganizations, for a total estimated consideration of US $21,000,000. All of the purchase price shall be paid by the delivery of STX common shares and warrants, allocated between the 4 Magnolias as follows:

(1)    Magnolia North Texas:
   o    Allocated to HMH (or its designated affiliate): (a) US $4,200,000 of STX stock[3], to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations[4]; and (b) 350,000 of STX warrants (the "earned warrants"), giving HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock at closing. The warrants shall be exercisable any time within three (3) years after closing and shall

---

[3] NTD: What consents are required to approve this transaction. We are assuming Board consent and shareholder consent is required. Are there any concerns with obtaining the required consents. Will either party have a remedy if the counter party is unable to obtain the requisite consents?

contain usual and customary provisions regarding exercise procedures, restrictions and mandatory conversion.[5]

o   Allocated to Remaining Members: US $5,800,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones), but the earned warrants shall be issued at closing free and clear of any escrow requirements.

o   In addition to the earned warrants, HMH (or its designated affiliate) shall at closing be issued additional 750,000 of warrants (the "performance warrants") which shall give HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock as of the closing date and which shall be non-exercisable until the following combined revenue milestones of the HMH divisions are achieved:

     (i)    US $6,000,000 annual run rate revenue within the first 12 months after closing (the "First Expiration Date"): 250,000 warrants, to be exercised within three (3) years after closing;

     (ii)   US $8,000,000 annual run rate revenue within the first 36 months after closing (the "Second Expiration Date"): 250,000 warrants, to be exercised within four (4) years after closing;

     (iii)  US $10,000,000 annual run rate revenue within the first 48 months after closing (the "Final Expiration Date"): 250,000 warrants, to be exercised within five (5) years after closing.

All annual run rate revenue calculations shall be based upon the average of 2 months actual revenue of the HMH divisions and will be calculated on a monthly basis beginning on the 2 month anniversary of closing. STX covenants and agrees to adhere to a standard of good faith and fair dealing with regard to the revenues of the HMH divisions, will not divert business opportunities or revenues away from the HMH divisions, will not delay the collection of receivables, and shall not take any actions with the intent or effect of reducing or depriving the HMH divisions of revenue.

(2)    Magnolia Houston:[6]

o   Allocated to HMH (or its designated affiliate): (a) US $2,200,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations; and (b) 150,000 of STX warrants (the "earned warrants"), giving HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock at closing. The warrants shall be exercisable any time within 3 years after closing and shall contain usual and customary provisions regarding exercise procedures, restrictions and mandatory conversion.

o   Allocated to Remaining Members: US $3,800,000 of STX stock, to be issued at closing

---

[5] NTD: If these usual and customary provisions are known, let's outline them in the term sheet. If they are not known, let's outline what they will look like.
[6] NTD: Comments 2-5 above apply to the Magnolia Houston transaction as well.

under the same provisions as the HMH stock, above.

    o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones), but the earned warrants shall be issued at closing free and clear of any escrow requirements.

(3)   Magnolia Florida:

    o   Allocated to HMH (or its designated affiliate): US $600,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date in accordance with Canadian Stock Exchange regulations.

    o   Allocated to Remaining Members: US $2,400,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

    o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved, (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones).

(4)   Magnolia Arkansas:

    o   Allocated to HMH (or its designated affiliate): (a) US $400,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations.

    o   Allocated to Remaining Members: US $1,600,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

    o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved, (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones).

All shares of common stock and warrants issued by STX shall contain restrictions against free trading[7] as prescribed by the Ontario Securities Commission and the Canadian Stock Exchange and shall be subject to lock-up agreements to insure that an orderly market in maintained for the trading of STX stock in the public markets. In this regard, all STX shares and warrants issued at closing and each person receiving STX shares and warrants at closing will be subject to the same restrictions against trading, and the lock-up agreements will be substantially similar and contain the same substantive terms and restrictions.

The transactions contemplated in this Section will be memorialized by merger agreements between STX (or a designated affiliate of STX) and each Magnolia entity, as applicable. The mergers will be structured as tax free reorganizations under the Internal Revenue Code. Each merger agreement will contain customary post-closing covenants. Each merger agreement will require STX (as a condition to closing) to deliver a non-compete agreement between STX and each officer of STX that is managing a title division under which each such officer would be prohibited from competing with STX in any business that has been or is proposed to be engaged in by STX. Each merger agreement would also contain non-solicitation provisions and

---

[7] NTD: STX and its major shareholders need to enter into a registration rights agreement such that the shareholders would have certain registration rights and the parties would reasonably cooperate if STX or any shareholder wanted to register STX shares.

COAST006195

requirements related to confidential information and trade secrets to protect the business of STX. Each party to the merger agreements will make customary representations and warranties that will survive for 3 years after the closing date, except for those representations and warranties of STX related to (i) taxes, tax returns, employee benefit matters, environmental, and health and safety matters which shall survive until 90 days following the expiration of the applicable statute of limitations period; and (ii) certain "fundamental" representations, which shall survive indefinitely. With regard to taxes, STX will be responsible for (i) any taxes of STX for periods up to and including the date of closing, and (ii) any taxes arising by virtue or as a result of the transactions contemplated above and any tax liabilities relating to periods prior to closing that are not yet accrued, including, without limitation, those tax liabilities that would have been or would be accrued under accrual accounting and/or any amounts resulting from a change in STX's method of accounting (e.g., cash to accrual basis). STX would indemnify each Magnolia entity for (i) breaches of STX's representations and warranties, (ii) STX's covenants included as part of the merger agreement, and (iii) liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the closing (including operations). Except in the case of fraud and taxes, such indemnification obligations for clauses (i) and (iii) above would be capped at the aggregate amount of the consideration paid by STX to the applicable Magnolia entity.

Projected Closing Date: September 15, 2022

Other Matters:

(1)    HMH or its affiliates will be granted the right, but is under no obligation, to participate in a minimum amount of $500,000 in one or more initial equity placements that STX contemplates to complete in connection with the closing of the Magnolia transactions and other acquisitions.

(2)    STX grants to HMH and its affiliates a first and preferential right, but not obligation, to participate in all future debt or equity capital raises, subsequent to the initial capital raise described in paragraph (1) above. Notwithstanding the foregoing, STX agrees that it will not issue any stock that has a higher voting or distribution priority than the stock being issued hereunder without affording HMH and its affiliates the right to participate in any such offering.

(3)    Nelson Mitchell has expressed an interest in becoming a director of STX.[8] In the event the Magnolia transactions are completed into STX, STX senior management agrees to place his name on its recommended slate of directors at the next ensuing shareholder meeting following the closing.[9] Furthermore, in the event a vacancy occurs on the board of directors of STX, prior to such annual meeting, STX management agrees to recommend that Nelson Mitchell be nominated by the board to fill such vacancy.

(4)    HMH acknowledges that certain affiliates of STX own Amcap Mortgage, Ltd. In consideration of the terms set forth in this proposal, HMH agrees to use reasonable efforts and good faith in negotiating a mortgage relationship with Amcap, assuming that, and in all respects conditioned upon, the transactions described herein closing.

Documents and timing: The Magnolia entities and the STX entities, as the case may be, will prepare the first draft of the definitive agreements and will provide a first draft to HMH at least 30 days prior to each project closing date set forth herein. The parties, however, may decide that HMH should draft and deliver the first draft of the contribution agreements relating to Transaction No. 1. If that decision is made, legal counsel for the

---

[8] NTD: We need confirmation that STX has D&O insurance, and we would like to review the policy. This will be included in our initial due diligence request list.

[9] NTD: I think STX senior management owns a controlling interest of the STX shares. In turn, as a part of closing, I think this agreement to nominate Nelson to the board needs to be added to a voting agreement to make it legally binding.

Magnolia entities and legal counsel for HMH will endeavor to discuss and agree upon the structure of the contribution agreements before an initial draft is prepared such that each contribution agreement results in a tax free transaction under the Internal Revenue Code. HMH will submit an initial due diligence request list to the Magnolia entities and STX within 5 days after the signing of this proposal. The Magnolia entities and STX will use commercially reasonable efforts to respond to such due diligence request list and make the underlying responsive documents available to HMH and its representatives on or prior to the date that each initial draft of the definitive agreements are delivered to HMH.

Confidentiality: The contents of this proposal, and the fact that it has been signed, are subject to the terms of the Confidentiality and Non-Circumvention Agreement between HMH and STX dated May 20, 2022 and, unless otherwise provided under that agreement, may only be disclosed by the parties hereto to each of their respective owners, directors, governing persons, and advisers on a need to know basis.

THIS PROPOSAL SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF TEXAS. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS PROPOSAL OR THE DEFINITIVE AGREEMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS PROPOSAL AND THE DEFINITIVE AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. ANY ACTION OR PROCEEDING INVOLVING ANY DISPUTE, CLAIM OR CONTROVERSY RELATING TO OR ARISING UNDER THIS PROPOSAL, ANY DEFINITIVE AGREEMENTS, OR THE DEALINGS OF THE PARTIES SHALL BE COMMENCED AND PROSECUTED EXCLUSIVELY IN THE STATE DISTRICT COURTS LOCATED IN TARRANT COUNTY, TEXAS, OR THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS (FORT WORTH DIVISION), AND EACH OF THE PARTIES HERETO HEREBY (A) EXPRESSLY AND IRREVOCABLY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS) IN ANY SUCH ACTION OR PROCEEDING, AND (B) IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AGREES NOT TO ASSERT ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SUCH COURTS, THAT SUCH LEGAL PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH PROCEEDING IS IMPROPER.

This proposal may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

This proposal does not reflect any form of legally binding commitment or obligation on the part of either party or its affiliates, except with regard to confidentiality, governing law, consent to jurisdiction, and waiver of jury trial (collectively, the "Binding Provisions"). No contract, joint venture, partnership or fiduciary relationship shall be deemed to exist between the parties or any of their affiliates unless and until final definitive agreements with respect to the proposed transactions have been executed and delivered and only thereafter as and to the extent specified therein. The parties hereby acknowledge and agree that (a) the terms in this proposal do not contain all material terms to be negotiated as part of the definitive agreements or otherwise with respect to the proposed transactions; (b) no oral agreement, public or private statements or course of conduct or dealings between the parties and/or their affiliates may be introduced as evidence that there exists a joint venture or partnership or any binding contract or commitment between the parties with respect to any of the transactions contemplated hereby, other than the Binding Provisions; and (c) neither party shall be justified in relying on any provision of this proposal (other than the Binding Provisions), in connection with the transactions hereby.

In turn, this proposal is for negotiating purposes only and does not constitute a binding agreement between the parties, except for the Binding Provisions. In the event definitive agreements are not able to be completed by the projected closing dates set forth above, unless extended by mutual agreement

of the parties, neither party herein shall have any further duty to negotiate or discuss these matters any further, provided, however, the Binding Provisions shall survive and remain in full force and effect indefinitely.

DATE ___6-17-22___

_____
JOHN MAGNESS, MANAGER OF THE MAGNOLIAS[10]

DATE ___6/17/22___

_____
MATT HILL, CEO OF STARREX INTERNATIONAL, LTD. AND STARREX INSURANCE SERVICES, INC.

DATE ___6/17/22___

_____
NELSON MITCHELL, CEO OF BNMJR, INC., the general partner of HMH Lifestyles, L.P.

---

[10] Does John have the authority to enter into this transaction on behalf of the Magnolia entities without further consent of the other members.

COAST006198

## CONTRIBUTION AGREEMENT

**THIS CONTRIBUTION AGREEMENT** (this "Agreement"), dated as of September 9, 2022, is by and between HMH Title Investments, LLC, a Texas limited liability company ("Investor"), Magnolia Title Arkansas, LLC (the "Company"), Alphabet Investments, LLC, ("Alphabet"), Peabody Bulldog, LLC, ("PB") and 405 Manhattan Investments, LLC, ("405") (Alphabet, PB and 405 are each an "Existing Class A Member" and collectively the "Existing Class A Members").

### RECITALS:

Pursuant and subject to the terms and conditions set forth in this Agreement, Investor desires to contribute or otherwise transfer, convey and assign to the Company, a contribution amount of $50,000 cash (the "Contribution Amount") and the Company desires to accept the Contribution Amount from Investor, free and clear of all Liens (other than Permitted Liens) and in consideration of the contribution of the Contribution Amount, issue to Investor Class A - Series II Units of the Company representing twenty percent (20%) of the issued and outstanding Units of the Company (the "Transaction");

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1

### CLOSING; CONTRIBUTION

**Section 1.1    Closing**.  The closing of the Transaction (the "Closing") shall take place remotely by electronic or facsimile transmissions at 10:00 a.m. Houston, Texas time on the date hereof ("Closing Date").  At the Closing, the Parties shall deliver the documents and take the actions specified in Article 2.

**Section 1.2    Contribution**.  Subject to the terms and conditions set forth in this Agreement, Investor hereby contributes or otherwise transfers, conveys and assigns to the Company, and the Company hereby accepts from Investor, free and clear of all Liens (other than Permitted Liens), all of Investor's right, title and interest in and to the Contribution Amount, receipt of which is hereby acknowledged by Company.  In consideration of the contribution, the Company shall issue to Investor Units of Class A – Series II of the Company that will equal twenty percent (20%) of the issued and outstanding Units of the Company, free and clear of all Liens.

### ARTICLE 2

### CLOSING

**Section 2.1    Documents to be Delivered by the Company**.  At the Closing and in consideration of the delivery of the Contribution Amount to the Company by the Investor, the

COAST006199

Company shall deliver the following to Investor, in each case, in form and substance satisfactory to Investor. Except as otherwise specified, each shall be dated as of the Closing Date.

        (a)    <u>Units</u>. Company shall deliver to Investor 2,500 Units of Class A – Series II Units of the Company;

        (b)    <u>Company Agreement.</u> The Company Agreement duly executed by the Company and each member of the Company;

        (c)    <u>Side Letter.</u> The Side Letter duly executed by the Company and certain members of the Company;

        (d)    <u>Secretary's Certificate</u>. A certificate, dated as of the Closing Date, of the secretary of the Company with respect to such Person's Governing Documents and the resolutions adopted by its governing authority authorizing such Person's execution of the Transaction agreements; and

        (e)    <u>Further Assurances</u>. Such further instruments and documents as the Company may reasonably request for the purpose of facilitating the consummation of the Transaction.

    **Section 2.2**    **<u>Documents to be Delivered by Investor</u>**. At the Closing, Investor shall deliver the following documents to the Company, in each case, in form and substance satisfactory to the Company. Except as otherwise specified, each shall be dated as of the Closing Date.

        (a)    <u>Delivery of the Contribution Amount</u>. Investor shall deliver the Contribution Amount to the Company in immediately available funds;

        (b)    <u>Secretary's Certificate</u>. A certificate, dated as of the Closing Date, of the secretary of Investor with respect to Investor's Governing Documents and the resolutions of its governing body authorizing Investor's execution of the Transaction agreements; and

        (c)    <u>Further Assurances</u>. Such further instruments and documents as Investor may reasonably request for the purpose of facilitating the consummation of the Transaction.

## ARTICLE 3

## <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

As a material inducement to Investor to enter into this Agreement and to consummate the Transaction, each Existing Class A Member and the Company hereby represent and warrant to Investor, as of the date hereof that:

    **Section 3.1**    **<u>Existence</u>**. The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas and is authorized to do business in the State of Texas. The Company is treated as a corporation for United States income tax purposes. The Company has full power and authority to own, lease and operate its assets and to carry on its business as presently conducted. The Company is qualified or registered

2

COAST006200

to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of its business or operations would require such qualification or registration. The Company does not directly or indirectly own or have any interest in the shares of capital stock or any other Equity Securities in any Person. There is no outstanding Contract of any kind requiring the Company to make an investment in, or to acquire Equity Securities or any other security or other interest in, any Person directly or require such registration.

**Section 3.2**  **Authorization and Power**.  The Company has all requisite power and authority to execute, deliver, perform and consummate the Transaction. The execution, delivery and performance by the Company of the Transaction and the consummation of the Transaction have been duly authorized by its governing authority and as otherwise may be required under its Governing Documents. No further entity action on the part of the Company is necessary to authorize the execution, delivery and performance of any Transaction agreement or the consummation of the Transaction. Each Transaction agreement to which the Company is a party has been duly executed and delivered by such Party and constitutes the legal, valid and binding obligations of such Party enforceable against it in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles. The copies of all Governing Documents of the Company, as amended to date, have been made available to Investor, are complete and correct, and no amendments thereto are pending.

**Section 3.3**  **Capitalization**.  All of the issued and outstanding Equity Securities in the Company consist solely of the Equity Securities, as set forth on Annex 1(a). One hundred percent (100%) of the Equity Securities are beneficially and legally owned by the holders as set forth on Annex 1(a). All of the Equity Securities of the Company set forth on Annex 1(a) and all Equity Securities in the Company being issued to Investor hereunder are duly authorized and validly issued, are fully paid and non-assessable, were not issued in violation of any preemptive rights, rights of first refusal or first offer, any Contract, or other restriction, and were or are being issued under and in accordance with the Governing Documents of the Company and in compliance with applicable federal and state Laws. There are no Contracts to which the Company, any current holder of Equity Securities in the Company, or any other Person is a party with respect to registration rights or the voting of any Equity Securities in the Company or that restrict the transfer of any such interest. There are no outstanding contractual obligations of the Company to repurchase, redeem, or otherwise acquire any Equity Securities of itself. The Company does not own or hold any Equity Securities in any other Person.

**Section 3.4**  **No Conflict; Consents**.  The execution, delivery and performance by the Company of each Transaction agreement to which it is a party do not, and the consummation of the Transaction will not, (a) result in the imposition of any Lien upon any of the assets of the Company or (b) violate, conflict with or result in the breach (with or without notice or the passage of time, or both) of any term, condition or provision of, (i) any material Law to which the Company or any of its assets are subject, (ii) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to the Company or any of its assets, or (iii) the Governing Documents of the Company.

3

**Section 3.5**     **Brokers**.  Neither the Company nor any of the Parties or any of their respective Affiliates have incurred any Liability to pay any fee or commission to any broker, finder or agent in connection with the Transaction.

**Section 3.6**     **Financial Statements**.  Attached to Schedule 3.6 are true, correct and complete copies of the internally prepared balance sheet and statement of income of the Company as of and for the year-to-date period ended June 30, 2022 (the financial statements contemplated by the foregoing clause are collectively referred to herein as the, "Financial Statements").  The Financial Statements (x) have been prepared in accordance with IFBS (in the case of the Interim Financials, except for the absence of notes and subject to normal and customary year-end adjustments for recurring accruals (which shall not be material either individually or in the aggregate)), as consistently applied by the Company, based upon the books and records of the Company and its subsidiaries, and (y) fairly present in all material respects the financial condition of the business of the Company as of the dates thereof and the operating results and cash flows of it business for the periods then ended. Since December 31, 2021, there has been no change in any of the accounting (or Tax accounting) policies, practices or procedures of the Company.  The Company has elected to be treated as a C Corporation for United Sates income tax purposes from and after June 30, 2022.

(a)     Title and Sufficiency.  The Company has good and valid title to, or a valid leasehold interest, in all of the business assets.

(b)     Condition.  The business assets (i) are in good operating condition and repair (ordinary wear and tear excepted), and (ii) are suitable for the purposes for which they are presently used by the business of the Company.

**Section 3.7**     **Compliance with Laws**.  The Company is and at all times since its formation has been, in compliance with all applicable Laws, and the Company has not received any notice, report, complaint, inquiry, claim, or other information alleging or relating to any violation of or Liability under any applicable Law relating to the Company.

**Section 3.8**     **Permits**.  the Company holds all Permits required to be held by it for the current and proposed conduct of its business, and the Company has been in compliance with all such Permits.  Schedule 3.8 lists all Permits held by the Company with respect to the Company's conduct of the business.

**Section 3.9**     **Proceedings**.  Schedule 3.9 lists all Proceedings to which the Company has been a party.  There here have been, no actions, suits, Orders, investigations, Claims or other Proceedings (including any arbitration proceedings) pending or, to the Knowledge of the Company, threatened against the Company, or pending or threatened by the Company against any third party, at law or in equity, or before or by any Governmental Bodies (including any actions, suits, Proceedings or investigations with respect to the Transaction). Except as set forth on Schedule 3.9, (a) there are no, Proceedings, Claims or Orders or, to the Company's Knowledge, investigation of any nature pending, rendered, or to the Company's Knowledge, threatened against the Company, and (b) there are no Orders outstanding against the Company.

4

COAST006202

**Section 3.10    Real Property.**

(a)    The Company does not own and has never owned, any real property.

(b)    Schedule 3.10(b) sets forth the address of any Leased Real Property, and a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease document).  The Company has a good and valid leasehold interest in and to all of the Leased Real Property, free and clear of all Liens (other than Permitted Liens).  With respect to each of the Leases and except as set forth in Schedule 3.10(b): (i) the possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed and there are no material disputes with respect to such Lease; (ii) no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (iii) the Company has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property or any portion thereof; (iv) the Company has not collaterally assigned or granted any other security interest in such Lease or any interest therein.

(c)    The Leased Real Property constitutes all of the real property currently leased, occupied or otherwise utilized in connection with the business as currently conducted.  All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property (collectively, the "Improvements") are sufficient for the conduct of the business.  To the Knowledge of the Company, there are no structural deficiencies or latent defects affecting any of the Improvements and there are no facts or conditions affecting any of the Improvements which would, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements, or any portion thereof in the operation of the business.  To the Knowledge of the Company, the Leased Real Property and Improvements and the Company's use thereof conform in all material respects to the Lease and all applicable building, zoning and other Laws.  All Permits necessary to the current occupancy and use of the Leased Real Property have been obtained, are in full force and effect and have not been violated.  There is no pending or, to the Knowledge of the Company, threatened condemnation or other Proceedings affecting any portion of the Lease Real Property or the Company's use thereof.

**Section 3.11    Environmental.**    (a) the Company has been in compliance with all Environmental Laws, including with respect to any Permits required thereunder, (b) neither the Company nor any of its respective Affiliates has generated, transported, treated, stored, disposed of, handled, arranged for or permitted the disposal of, released or exposed any Person to any Hazardous Materials, or owned or operated any property or facility contaminated by any Hazardous Materials, in each case, so as to give rise to material Liability pursuant to any Environmental Law; (c) with respect to the business, the Real Property and the assets of the Company, the Company has not received any notice, report, or other information regarding any actual or alleged violation of or Liability under Environmental Law; and (d) except as set forth in Schedule 3.11, neither the Company nor any of their respective Affiliates has assumed, provided an indemnity with respect to or otherwise become subject to any material Liability of any other Person relating to Environmental Laws.  The Company has furnished to Investor all environmental audits, assessments, reports and other documents materially bearing on

5

COAST006203

environmental, health or safety matters, which are in their possession or under their reasonable control.

      **Section 3.12**  <u>**Taxes and Tax Returns**</u>.  All Tax Returns of the Company have been timely filed with the appropriate Governmental Bodies in all jurisdictions in which such Tax Returns are required to be filed.  All such Tax Returns properly reflect the Liabilities of the Company for Taxes for the periods, property or events covered thereby.  All Taxes, including those which are called for by such Tax Returns, required to be paid, withheld or accrued by the Company or before the date hereof, including any deficiency assessments, penalties and interest assessed with respect to such Taxes, have been timely paid, withheld or accrued.  There are no Liens for Taxes (other than for current Taxes not yet due and payable) on the Assets of the Company.  The Company is not a "foreign person" within the meaning of Section 1445 of the Code.  No U.S. federal, state, local, or foreign audit, proceeding, or other examination of any Tax Return of the Company is presently in progress, nor is any such audit, proceeding, or other examination threatened or contemplated. No issue has been raised in any current or prior audit of any Tax Return of the Company that, by application of the same principles, would reasonably be expected to result in a material Tax deficiency for any subsequent Tax period. No deficiencies for any Taxes have been proposed, asserted or assessed against the Company that have not been resolved and paid in full.  No waivers of statutes of limitations have been given with respect to any Taxes of the Company and no request for any such waiver is currently pending. The Company has not requested an extension of time within which to file any Tax Return in any taxable year that has not since been filed. Company has not agreed to an extension of time with respect to a Tax assessment or deficiency or has executed any powers of attorney with respect to Tax matters that currently remain in effect. No requests for ruling or determination letters or competent authority relief with respect to the Company are currently pending with any Governmental Bodies with respect to any Taxes. The Company is not subject to any private letter ruling of the IRS or any comparable ruling of any other Governmental Bodies.  The Company (i) has never been a member of an Affiliated Group, or any similar affiliated or consolidated group for Tax purposes under state, local, or foreign Law, or (ii) has any liability for the Taxes of another Person (other than another Company Entity) pursuant to Treasury Regulation §1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise.  The Company is not a party to or bound by and does not have any obligations under, any Tax sharing agreement, Tax indemnification agreement or similar Contract or arrangement. The Company is not a party to any Contract or arrangement to pay, indemnify or make any payments with respect to any Tax Liabilities of any stockholder, member, manager, director, officer or other employee or contractor of the Company.  The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) use of an improper method of accounting for a taxable period ending on or prior to the Closing Date; (iii) "closing agreement" as described in Code Section 7121 (or any similar provision of state, local, or foreign Law) executed on or prior to the Closing Date; (iv) intercompany transactions or any excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local, or foreign Law); (v) installment sale or open transaction disposition made on or prior to the Closing Date; or (vi) prepaid amount received on or prior to the Closing Date.  The Company has made available to Investor true and complete copies of federal, state and local Tax Returns of each of the Company

6

COAST006204

Entities and their predecessors for the years ended December 31, 2019, 2020 and 2021 and true and complete copies of all examination reports and statements of deficiencies assessed against or agreed to by the Company or any predecessor with respect to Taxes. There is not currently in effect any power of attorney authorizing any Person to act on behalf of or receive information relating to, the Company with respect to any Tax matter. The Company has not received from any Governmental Body in a jurisdiction where the Company has not filed a Tax Return any (i) claim that the Company is or may be subject to taxation by that jurisdiction, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against the Company. The Company engaged in a "reportable transaction" as defined in Treas. Reg. § 1.6011-4(b). Within the past three years, the Company has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code Section 355 or Code Section 361. All of the individuals who are performing consulting or other services for the Company have been correctly classified as either "independent contractors" or "employees," as the case may be. The Company is not a party to any agreement, contract, arrangement, or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code Section 280G (or any similar provision of state, local, or foreign Law).

Section 3.13   **Employees**. Schedule 3.13 contains a true, correct and complete (i) list of all employees of the Company as of May 1, 2022; (ii) list of the then current annual base compensation and target incentive compensation opportunity of, and a description of the fringe benefits (other than those generally available to employees) provided by the Company to any such employees, (iii) status of each employee as "exempt" or "non-exempt" under the Fair Labor Standards Act of 1938, as amended ("**FLSA**") and any applicable state law, (iv) list of the accrued but unused vacation, sick leave and personal time for all employees of the Company, (v) list of any increase, effective after December 31, 2021, in the rate of compensation of any employees if such increase exceeds 10% of the previous annual compensation of such employee, and (vi) and any payments owing or arising at or prior to the Closing from or as a result of the consummation of the Transactions, including any payments for stock appreciation or similar rights, any severance or bonus plan payment, or any similar payment, including the amount of each such payment. Except as set forth on Schedule 3.13, there are no temporary workers, leased employees, contingent workers, or any other Persons performing, and no such Person has performed, services for the Company who are not classified as an employee or former employee performing services for the Company. The Company is not delinquent in payment of or has delayed the payment to any of its employees, consultants, or independent contractors of any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees. The Company is not a party to, subject to or bound by, any collective bargaining or other agreement with a labor organization. There is no pending or, to the Knowledge of the Company, threatened, nor has there been since January 1, 2021, any, organizing effort or demand for recognition or certification or attempt to organize any of its employees or former employees.

Section 3.14   **Employee Benefit Plans**. Schedule 3.14 lists each Benefit Plan providing benefits to any of the Company's employees which is sponsored, established, maintained, or contributed to or required to be contributed to by the Company at any time since its inception.

7

Each Benefit Plan, and the administration thereof, is in compliance, in all material respects with its terms and with all compliance, funding, reporting, disclosure and other requirements of ERISA, the Code and other Laws applicable to such Benefit Plan. The Company has made available to Investor prior to the date hereof a true and complete copy of each Benefit Plan listed or required to be listed on Schedule 3.14 and except as set forth on Schedule 3.14, the Company or any entity that is treated as a single employer with the Company under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA (an "***ERISA Affiliate***") sponsors, maintains or contributes to or has any obligation to maintain or contribute to, or has any direct or indirect liability, whether absolute or contingent, with respect to any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which the Company is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, including, without limitation, any (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of the Company has any present or future right to benefits. Each Benefit Plan set forth on Schedule 3.14 has been established and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other applicable Laws; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor (the "***DOL***") or any other Governmental Body, or to the participants or beneficiaries of such Benefit Plan, have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter, opinion letter or advisory letter from the IRS with respect to such Benefit Plan's most recent remedial amendment cycle for which the IRS issued such letters, and there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or Tax under ERISA, the Code or any other applicable Law; (iv) other than routine claims for benefits, no Lien, lawsuit or complaint to or by any Person or Governmental Body has been filed against any Benefit Plan or the Company with respect to any Benefit Plan or, to the Knowledge of the Company, against any other Person and, to the Knowledge of the Company, no such Liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (v) no individual who has performed services for any Company Entity has been improperly excluded from participation in any Benefit Plan; and (vi) no Benefit Plan is under, and the Company has not received any notice of, an audit or investigation by the IRS, DOL or any other Governmental Body, and no such completed audit or investigation, if any, has resulted in the imposition of any Tax or penalty on the Company. No non-exempt "*prohibited transaction*," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred or is reasonably expected to occur with respect to any Benefit Plan set forth on Schedule 3.14. To the

8

COAST006206

Knowledge of the Company, no fiduciary of any Benefit Plan set forth on Schedule 3.14 has any liability for a breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any such Benefit Plan. No fiduciary of any Benefit Plan has been sued by any Person alleging a breach of fiduciary duty with respect to a Benefit Plan or been the subject of an investigation by the DOL in which it was investigating an alleged or possible breach of fiduciary duty with respect to a Benefit Plan, and, to the Knowledge of the Company, no such suit or investigation is contemplated or threatened with respect to any Benefit Plan fiduciary. Each Benefit Plan that is a "*nonqualified deferred compensation plan*" (as such term is defined in Section 409A(d)(1) of the Code) is in documentary and operational compliance in all material respects with the requirements of Section 409A of the Code and the Treasury Regulations issued thereunder. The Company does not have any obligation to indemnify, reimburse or gross up any individual with respect to any Tax that may be imposed on such individual under Section 409A of the Code. All liabilities or expenses of the Company in respect of any Benefit Plan (including workers' compensation) which have not been paid have been properly accrued on the Company's most recent financial statements in compliance with GAAP. All contributions or premium payments required to have been made under the terms of any Benefit Plan or in accordance with applicable Law as of the date hereof have been timely made or reflected on the Company's financial statements in accordance with GAAP. The Company does not have any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any Person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer, any temporary employee, or any employee of any professional employer organization. The Company has not been sued by any Person alleging such misclassification or been the subject of an investigation by the IRS of any other Governmental Body in which the IRS or other Governmental Body was investigating an alleged or possible misclassification, and to the Knowledge of the Company no such suit or investigation is contemplated or threatened.

     **Section 3.15  Intellectual Property Matters**.  Schedule 3.15(a) lists the material Intellectual Property Assets used or held for use in the business, including all internet domain names.  the Company owns all right, title and interest or has a right or license to use (as necessary for the operation of the business in the Ordinary Course) all of the Intellectual Property Assets.  Except as set forth on Schedule 3.15(b), the Company (i) has not granted any licenses or contractual rights relating to the Intellectual Property Assets or the use thereof or (ii) is not bound by or a party to any Contracts of any kind relating to the Intellectual Property Assets of any other Person (except for licenses to any unmodified, commercially available, off-the-shelf computer software with a replacement cost or annual license fee of less than $1,000).  To the Knowledge of the Company, the conduct of the business as it is presently being conducted, does not violate, conflict with or infringe upon the intellectual property of any other Person in any material manner.  The Company has taken commercially reasonable measures to maintain in confidence all material confidential information owned by the Company and Intellectual Property Assets that constitutes, or that the Company intends or intended to retain as, a trade secret. No such trade secret or confidential information has been disclosed by the Company to any Person other than employees, consultants or contractors of the Company who had a need to know and who used such Intellectual Property Assets in the Ordinary Course of employment or contract performance subject to a written and enforceable confidentiality agreement or obligation. There has been no unauthorized access to any such confidential information by third parties.

COAST006207

**Section 3.16  <u>Absence of Changes.</u>**    Except as set forth on <u>Schedule 3.16</u>, since December 31, 2021, the business has been operated only in the Ordinary Course and, without limiting the foregoing, the Company has not:

(a)    created or otherwise incurred any Lien except for Permitted Liens on any assets;

(b)    suffered any loss exceeding $10,000 (whether or not covered by insurance), experienced any changes in the amount and scope of insurance coverage or suffered any destruction of its books and records;

(c)    sold, assigned, transferred, waived, released, leased or licensed, or permitted the cancellation, loss, lapse or abandonment or other disposition of, or failed to take reasonable steps to maintain, enforce and protect, any material right or material asset (tangible or intangible) used or held for use in the business (including any right related to any asset);

(d)    acquired (whether by merger, consolidation, purchase of equity interests, purchase of assets or otherwise) any business or the material assets of any Person;

(e)    managed the working capital of the business (including the inventory, accounts receivable, prepaid expenses, accounts payable and accrued expenses of the business) other than in the Ordinary Course;

(f)    cancelled, delayed or postponed the payment of any material Liability, the making of any capital expenditure or the replacement, repair or maintenance of any asset;

(g)    made any material change in the manner in which the business extends discounts or credits to, or otherwise deals with, customers;

(h)    made any material change in the manner in which the business markets its products or services;

(i)    engaged in any transaction outside the Ordinary Course;

(j)    discharged or satisfied any Lien or paid any material Liability, other than current liabilities paid in the Ordinary Course;

(k)    declared, set aside or made any payment, dividend or distribution of cash or other property with respect to its equity interests, or purchased, redeemed or otherwise acquired any of its equity interests (including any capital stock, warrants, options or other rights to acquire its equity interests);

(l)    made any material change in its cash management practices or in any method of accounting or accounting policies;

(m)    incurred, assumed or guaranteed any indebtedness, except in the Ordinary Course with respect to trade payables;

10

(n)      proposed or adopted any amendments or modifications to its Governing Documents or

(o)      agreed, whether orally or in writing, to do any of the foregoing.

**Section 3.17    Liabilities**. The Company does not have any material Liabilities except Liabilities that (a) are fully and accurately disclosed on the face of the Financial Statements (rather than in the notes and schedules thereto), (b) have arisen or been incurred in the Ordinary Course since the Balance Sheet Date (none of which relate to violations of Law, a breach of Contract, or warranty Liabilities), or (c) are listed on Schedule 3.17 to this Agreement.

**Section 3.18    Affiliate Interests; Transactions with Certain Persons**.  Except as set forth on Schedule 3.18, and except for the Governing Documents, there are no Contracts or arrangements by and between the Company, on the one hand, and any holder of the Company Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing, on the other hand.  Except as set forth on Schedule 3.18 the Company is not a debtor or creditor of or has any Liability or other obligation of any nature to, any holder of the Company's Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing.

**Section 3.19    Material Contracts**.  Schedule 3.19 attached hereto (which lists Contracts by each applicable subsection referenced below in this Section 3.19) contains a complete, current and correct list of all of the following Contracts (collectively the "Material Contracts") to which the Company is a party or by which any of their respective properties or assets are bound and that are in effect on the date hereof or impose any continuing Liabilities (other than confidentiality obligations) on any party thereto:

(a)      any Contract or group of related Contracts that involve or involved expenditures or receipts by the Company of more than $50,000.00 for the year ended December 31, 2021, or involve or are expected to involve more than $50,000.00 of expenditures or receipts for the year ending December 31, 2022;

(b)      any Contract with any of the Company's officers, directors, managers, employees, or Affiliates, including all non-competition, severance, employment, bonus, change of control, retention, commission, or indemnification agreements;

(c)      any Contract evidencing the granting of a loan by the Company to any third party for which amounts remain outstanding (other than the advancement of business expenses to employees in the Ordinary Course);

(d)      any Contract evidencing or relating to indebtedness relating to the borrowing of money, extension of credit or the granting of any Lien on the assets or the Equity Securities of the Company;

(e)      any Contract containing any limitation on the freedom or ability of the Company (or that following the Closing Date would purport to limit the freedom of the Company or any of its Affiliates) (A) to engage in any line of business or compete with any

11

Person or to operate at any location in the world, including non-competition, non-solicitation and standstill obligations or exclusivity rights, or (B) to own, operate, lease, sell, transfer, pledge or otherwise dispose of or encumber any asset, or to hire solicit, or consult with any Person or that would so limit the Company or its Affiliates on or after the Closing Date;

(f)     any power of attorney;

(g)     any Contract relating to the (A) acquisition or disposition of any business or entity (whether by merger, sale of stock, sale of assets or otherwise) or (B) acquisition of all or substantially all assets of any Person;

(h)     any Contract for future capital expenditures or the acquisition or construction of fixed assets requiring the payment by the Company of an amount in excess of $50,000.00 on or after the date hereof.

The Company has made available to Investor true, complete and current copies of all written Material Contracts (including any and all amendments, modifications, exhibits, annexes and schedules to such Contracts) and true, correct, and complete summaries of all non-written Contracts. Each of the Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms. There exists no material breach, default or violation on the part of the Company or, to the Knowledge of the Company, on the part of any other party thereto, under any Contract to which the Company is or was a party nor has the Company received written, or to the Knowledge of the the Company, other notice of any such breach, default or violation. the Company has not received written notice of an intention by any party to any Material Contract that provides for a continuing obligation by any party thereto on the date hereof to terminate such Contract or amend the terms thereof and (ii) the consummation of the Transactions will not affect the validity, enforceability or continuation of any Material Contract on the same terms applicable to such Material Contract as of the date hereof.  The Company has not waived any material rights under any Material Contract. To the Knowledge of the Company, no event has occurred that either entitles, or would, with notice or lapse of time or both, entitle, any party to any Contract to which the Company is or was a party to declare a breach, default or violation under, or make an indemnification claim against the Company with respect to, any such Contract or to terminate, modify or accelerate, or that does terminate, modify or accelerate, any terms of any such Contract (including any right to accelerate the maturity of any indebtedness of the Company under any such Contract).  Each of the Material Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms.

Section 3.20   **Full Disclosure**. No representation or warranty made by the Company in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

12

COAST006210

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF INVESTOR

As a material inducement to the Company to enter into this Agreement and to consummate the Transaction, Investor hereby represents and warrants to the Company as of the date hereof that:

**Section 4.1    Capacity and Authority**.   Such Investor has full legal capacity and authority to execute, deliver and perform each Transaction agreement to which such Investor is a party and to consummate the Transaction.  Each Transaction agreement to which such Investor is a party has been duly executed and delivered by such Investor and constitutes the legal, valid and binding obligations of such Investor enforceable against him in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles.

**Section 4.2    No Conflict; Consents**.    The execution, delivery and performance by Investor of each Transaction agreement to which Investor is a party does not, and the consummation of the Transaction will not, violate, conflict with or result in the breach of any term, condition or provision of, (a) any Law to which Investor is subject, (b) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to such Investor or (c) any material Contract to which Investor is a party or by which Investor is otherwise bound.  No authorization, approval or consent of, and no notice to or registration or filing with, any Person is required in connection with the execution, delivery or performance of any Transaction agreement or the consummation of the Transaction by Investor.

**Section 4.3    Disclosure of Information**.    Investor has received and reviewed information about the Company, and its current and proposed subsidiaries and affiliates and has had an opportunity to ask questions and receive answers regarding the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and affiliates and to conduct such due diligence review as it has deemed appropriate.

**Section 4.4    Investment Experience**.    Investor acknowledges that it can bear the economic risk of its investment in the Transaction, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the Transaction.

**Section 4.5    Disclosure of Information**.    Investor has received and reviewed information about the Company and its current and proposed Affiliates, and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the equity consideration pursuant to this Agreement and the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and to conduct such due diligence review as it has deemed appropriate.

**Section 4.6    Investment Experience**.    Investor acknowledges that it can bear the economic risk of its investment in the equity consideration to be received hereunder, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of owning such an investment.

13

COAST006211

**Section 4.7    Accredited Investor**.  Investor is an "accredited investor" as defined under Rule 501 promulgated under the Securities Act.  Investor understands that the Class A - Series II Units issued as the equity consideration have not been registered under the Securities Act or any state securities laws and are being transferred to Investor, in part, in reliance on the foregoing representation.

**Section 4.8    Investment Intent**.  Investor is acquiring the equity consideration hereunder for its own account, with the present intention of holding such securities for purposes of investment, and has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities Laws.

**Section 4.9    No Public Market**.  Investor understands that no public market now exists for the equity consideration to be issued hereunder and that there is no assurance that a public market will ever exist for such equity consideration.  Investor also understands that Rule 144 promulgated under the Securities Act is not presently available with respect to the sale of any of the equity consideration.

**Section 4.10    No Other Representations**.  In purchasing equity consideration, Investor is not relying on (and Investor hereby expressly disclaims) any and all representations, warranties or information (including any projections or forecasts) that may have been provided to it from the Company or any other Person, except only for the representations and warranties of the parties expressly set forth in Article 3 hereof.

**Section 4.11    Full Disclosure**. No representation or warranty made by Investor in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.


# ARTICLE 5

## POST-CLOSING COVENANTS

**Section 5.1    Further Assurances**.

(a)    At any time and from time to time after the Closing Date, at Investor's request, and without further consideration therefor, the Company will execute and deliver any and all proper deeds, assignments and such other instruments of sale, transfer, conveyance, assignment and confirmation as Investor may reasonably deem necessary in order to effect, consummate, confirm and/or evidence the Transaction.

(b)    The Company agrees to furnish or cause to be furnished, as promptly as practicable, such information and assistance relating to the business as is reasonably necessary (i) for the preparation and filing of any Tax Return or (ii) for any other claim, audit, filing or proceeding relating to Tax matters.

**Section 5.2    Uses of the Contribution Amount**.  From and after the Closing Date, the Company agrees to use the Contribution Amount exclusively for working capital and general

COAST006212

business purposes in the Ordinary Course; provided, however, the Contribution Amount may be used for other purposes with the prior written consent of Investor.

Section 5.3    **Disclosure**.  Without the prior written consent of Investor, and except as required by Law, the Company and its directors, members, managers, officers, employees and agents) shall not directly or indirectly make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of any of the terms, conditions or other aspects of the transactions contemplated herein; provided, however, that the Parties may continue such communications with employees, customers, suppliers, lenders, lessors and other particular groups as may be legally required or necessary in connection with the conduct of the Company's business in the Ordinary Course.

Section 5.4    **Intentionally omitted**

Section 5.5    **Closing of Each Contribution Agreement**.    Notwithstanding any provision hereof to the contrary, the obligations of Investor to contribute the Contribution Amount under this Agreement are conditioned upon the simultaneous closing and funding of each Contribution Agreement (defined below) by and between Investor and certain Affiliates of the Company, including Coast to Coast Title, LLC, Sol City Title, LLC d/b/a Magnolia Title, Magnolia Title Florida, LLC, under which Investor is contributing certain amounts of cash to such Affiliates of the Company in exchange for Equity Securities in such Affiliates of the Company (each a "Contribution Agreement").

Section 5.6    **Certain Waivers**.  Each Existing Class A Member, on behalf of itself and its Affiliates and each of their respective heirs, successors, assigns, descendants and beneficiaries (each, a " Releasing Party") hereby irrevocably waives, releases and discharges the Company and its Affiliates (including, after the Closing, Investor and its Affiliates) and each of their respective directors, managers, officers, employees, members, equityholders and partners (each, a " Released Party") from any and all Liabilities to such Releasing Parties of any kind or nature whatsoever, whether in the capacity as a direct or indirect equityholder, as a member, manager, officer or employee of the Company or otherwise and whether arising under any agreement or understanding (other than this Agreement) or otherwise at law or in equity, and each Existing Class A Member agrees on behalf of itself and the other Releasing Parties that none of the Existing Class A Member or such Releasing Party shall seek to recover any amounts in connection therewith or thereunder from any of the Released Parties. Notwithstanding the foregoing or anything else herein to the contrary, in no event shall the Company or any of the other Released Parties have any Liability whatsoever to any of the Existing Class A Member or the other Releasing Parties for any breaches (or matters causing or constituting breaches) of the representations, warranties, agreements or covenants of the Company or the Existing Class A Members hereunder, and, in any event, neither the Existing Class A member nor any Release Party may seek contribution or indemnification from the Company or any of the other Released Parties in respect of any payments required to be made by Existing Class A Members or the Releasing Parties pursuant to this Agreement.

15

# ARTICLE 6

## SURVIVAL; INDEMNIFICATION

**Section 6.1    Survival of Representations and Warranties**.  The representations and warranties of the Parties in this Agreement shall survive the consummation of the Transaction and shall remain in effect for a period of three (3) years after the Closing Date, provided, however, that the Fundamental Representations shall survive indefinitely and the representations and warranties set forth in Section 3.11 (Environmental) shall survive until 90 days after expiration of the applicable statute of limitations.  All covenants and agreements set forth herein shall survive the consummation of the Transaction in accordance with their respective terms.  In the event notice of any indemnifiable claim shall have been given within the applicable survival period, all representations and warranties that are the subject of such indemnifiable claim shall survive until such indemnifiable claim is finally resolved.  Indemnification obligations with respect to any Losses suffered relating to fraud or misrepresentation of a significant fact or the volitional withholding of any significant fact by any Party shall not expire.  If any representation or warranty contained in this Agreement is qualified based on materiality, including the terms "material" or any similar qualifier, such qualification shall in all respects be ignored and given no effect for purposes of determining whether any breach or inaccuracy has occurred and the amount of any related Loss.

**Section 6.2    Indemnification by the Company and the Existing Class A Members**. Subject to the terms, conditions and limitations set forth in this Article 6, the Company, the Existing Class A Members, and their respective Affiliates shall, jointly and severally, indemnify and defend Investor and its Affiliates and their respective officers, directors, managers, shareholders, members, partners, employees, lenders, agents, representatives, successors and permitted assigns (each a "Investor Indemnified Party") against, and shall hold each of them harmless from, any and all damages, losses, injuries, Liabilities, claims, demands, Proceedings, judgments, awards, settlements, assessments, deficiencies, Taxes, penalties, fines, charges, payments, costs or expenses (including reasonable investigation and legal fees) or reduction in value, whether or not involving a third-party claim (collectively, "Losses"), arising, directly or indirectly, from or in connection with:

(a)    any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of the Company or its Affiliates in this Agreement or any certificate delivered by the Company or its affiliates pursuant to this Agreement;

(b)    any breach or nonfulfillment of any covenant, agreement or obligation of the Company under this Agreement;

(c)    the operation of the business prior to Closing and any Liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the Closing (including operations);

(d)    any Tax Liability (whether incurred by the Company or Investor) as a result of the transactions contemplated by this Agreement;

16

COAST006214

(e)     any Tax Liability of the Company for tax periods up to and including Closing, including, without limitation, those Tax Liabilities that would have been or would be accrued under accrual accounting and/or any Tax Liabilities resulting from a change in the Company's method of accounting;

(f)     the Confidential Settlement Agreement and Release of All Claims and all matters relating thereto, referred to therein, or arising therefrom, including, for the avoidance of doubt, the Employment Litigation, the Proposed Starrex Transaction, the Derivative Litigation, the Stewart Litigation, and any Losses paid or otherwise incurred in the investigation, prosecution, defense, negotiation, settlement or collection of all matters relating to, referred to in, or arising out of the Confidential Settlement Agreement and Release of All Claims; and/or

(g)     any breach or nonfulfillment of any covenant, agreement or obligation of the Company or any Existing Class A Member under the Side Letter.

The Company, the Existing Class A Members, and their respective Affiliates shall not use any of the Contribution Amount to satisfy the above mentioned indemnity obligations.

**Section 6.3**     **Indemnification by Investor**.     Subject to the terms, conditions and limitations set forth in this <u>Article 6</u>, Investor shall indemnify and defend the Company and its successors and permitted assigns (each an "<u>Magnolia Indemnified Party</u>") against, and shall hold them harmless from, any Loss arising, directly or indirectly, from or in connection with:

(a)     any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of Investor in this Agreement or any certificate delivered by Investor pursuant to this Agreement; and/or

(b)     any breach or nonfulfillment of any covenant, agreement or obligation of Investor in this Agreement.

**Section 6.4**     **Limitations on Indemnification**.

(a)     In no event shall Investor, on the one hand, or the Company, on the other hand, be required to make indemnification payments hereunder for Losses that result solely from facts or circumstances which constitute a breach or inaccuracy of any representation or warranty in <u>Article 3</u>, <u>Article 4</u> or <u>Article 5</u> unless the aggregate amount of all such Losses suffered by the Investor Indemnified Parties or the Magnolia Indemnified Parties, as applicable, exceeds $10,000 (the "<u>Deductible</u>"), in which case, Investor or the Company, as the case may be, shall be liable for all such Losses in excess of the Deductible, provided, however, that the Deductible shall not apply to any claims for Losses incurred or suffered as a result of, arising out of or relating to a breach of, default in, or failure to perform, any of the Fundamental Representations and the representations and warranties set forth in <u>Section 3.16(k), Section 3.16(l)</u>, or the matters set forth on in <u>Section 6.2(f)</u> and <u>Section 6.2(g)</u>.

(b)     The limitations set forth in this <u>Section 6.4</u> shall not apply to any claim involving criminal activity, fraud, willful misconduct or an intentional misrepresentation of fact in connection with the transactions contemplated by this Agreement.

COAST006215

**Section 6.5    Treatment of Indemnification Payments**.    Each Party will treat all payments made pursuant to Article 6 as adjustments of, the equity consideration or the Contribution Amount, as the case may be, for all purposes.

**Section 6.6    Exclusive Remedy**.    Except to the extent arising from fraud or willful misconduct and except as provided in any Transaction agreement, including Section 8.14 of this Agreement, the indemnification provided by this Article 6 shall be the sole and exclusive remedy in respect of any breach of or inaccuracy in any representation, warranty, agreement or covenant contained in this Agreement.  The foregoing shall not limit the Parties' right to obtain specific performance as provided herein.  In furtherance of the foregoing, each Party hereby waives, to the fullest extent permissible under applicable Law, and agrees in any case not to assert in any action or proceeding of any kind, any and all rights, claims and causes of action it may now or hereafter have (including any such rights, claims or causes of action arising under or based upon common law or other Law) against any indemnifying Party for any matter described in the previous sentence other than claims for indemnification asserted as permitted by and in accordance with the provisions set forth in this Article 6, provided, nothing in this Section 6.6 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled, or to seek any remedy on account of any Party's fraud or willful misconduct..

**Section 6.7    Waiver of Punitive Damages**.    NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL ANY PARTY OR ITS AFFILIATES, OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE HEREUNDER AT ANY TIME FOR PUNITIVE DAMAGES (EXCEPT TO THE EXTENT PAID TO A THIRD PARTY), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND EACH PARTY HEREBY EXPRESSLY RELEASES THE OTHER PARTIES, THEIR AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND REPRESENTATIVES THEREFROM.

**Section 6.8    Other Limitations on Losses**.    Any indemnification owing pursuant to this Article 6 in respect of an indemnifiable Loss shall be reduced by any insurance proceeds, indemnification payments or contribution payments actually received in respect of such indemnifiable Loss by the Investor Indemnified Party or Magnolia Indemnified Party, as the case may be, from third parties unaffiliated with such Investor Indemnified Party or Magnolia Indemnified Party (in each case, reduced by any costs of collection and/or increases in premiums incurred by such Investor Indemnified Party or Magnolia Indemnified Party in connection with such recovery)

**Section 6.9    Indemnification Procedures**. The Party making a claim under this Article 6 is referred to as the "Indemnified Party", and the Party against whom such claims are asserted under this Article 6 is referred to as the "Indemnifying Party."

(a)    Third Party Claims.

(i)    If an Indemnified Party receives notice of the assertion or commencement of an Action made or brought by any Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement (each, a "Third Party Claim") against such Indemnified Party that

18

the Indemnified Party has determined has or would reasonably be expected to give rise to a right of indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty days after receipt of such notice of such Third Party Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

(ii)     Subject to the terms of this Section 6.9(a), upon receiving notice of a Third Party Claim, the Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party within thirty business days of its receipt of notice of the Third Party Claim, to assume the investigation and defense of such Third Party Claim at the Indemnifying Party's expense and with counsel reasonably satisfactory to the Indemnified Party; provided, that the Indemnifying Party shall not have the right to assume the investigation and defense of a Third Party Claim if (A) the Indemnifying Party or its Affiliate is also a Party to such Third Party Claim and the Indemnified Party determines in good faith that joint representation would be inappropriate, (B) upon request, the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend such Third Party Claim, (C) in the reasonable judgment of the Indemnified Party, it involves material reputational risks to the Indemnified Party or any of its Affiliates, or (D) it seeks an injunction or other equitable relief against the Indemnified Party or relates to or arises in connection with any criminal proceeding, indictment, allegation or investigation. If the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 7.06(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name of and for the Indemnified Party.

(iii)     The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it, subject to the Indemnifying Party's right to assume the control of the defense thereof in accordance with Section 6.9(a)(ii). The fees and disbursements of any such counsel shall be at the expense of the Indemnified Party; provided, that if in the written opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party or any of their Affiliates that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.

(iv)     If the Indemnifying Party elects not to compromise or defend a Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in Section 6.9(a)(ii), or (subject to the proviso to this Section 6.9(a)(iv)) fails to diligently prosecute the defense of a Third Party Claim, the Indemnified Party may, subject to Section 6.9(b), pay, compromise, and defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim; provided that if the Indemnifying Party fails to diligently pursue the defense of the Third Party Claim or

19

the Indemnified Party reasonably concludes that the Third Party Claim is not being defended to its satisfaction, the Indemnified Party can assume the defense of the Third Party Claim if the Indemnified Party gives the Indemnifying Party written demand to diligently pursue the defense and the Indemnifying Party fails to do so within ten business days after receipt of the demand, or such shorter period as may be required to respond to any deadline imposed by a Governmental Body.

(v)    The Parties shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including promptly making available records relating to such Third Party Claim in their possession or control and furnishing, without expense (other than reimbursement of actual reasonable out-of-pocket expenses) to the defending Party, management employees of the non-defending Party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)    Settlement of Third-Party Claims. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 6.9(b). If a firm offer is made to settle a Third-Party Claim without leading to Liability on the part of the Indemnified Party or its Affiliates and provides, in customary form, for the unconditional release of each Indemnified Party and their Affiliates from all Liabilities in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten business days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to settlement of such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume the defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense of a Third-Party Claim under Section 6.9(a)(iv), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)    Direct Claims.

(i)    Any Proceeding initiated by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (each, a "Direct Claim") shall be asserted by the Indemnified Party by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than sixty days after the Indemnified Party becomes aware of such Direct Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

20

COAST006218

(ii)      The Indemnifying Party shall have forty-five days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim. The Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any unprivileged accounts, documents or records in its control or possession) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such forty-five (45) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 6.10     Payments.** Once a Loss is agreed to by the Indemnifying Party or adjudicated to be payable under this Article 6, the Indemnifying Party shall satisfy its obligations within ten business days of such adjudication by wire transfer of immediately available funds. Interest on any such amount payable will accrue from and including the date of agreement of the Indemnifying Party or adjudication to but excluding the date such payment has been made at a rate per annum equal to 12%, and such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

## ARTICLE 7

## DEFINED TERMS

**Section 7.1     Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with such first Person.

"Benefit Plan" means a Pension Plan, a Welfare Plan or any other plan or program for employees relating to deferred compensation, bonus, performance compensation, severance, vacation, sick pay, incentive, insurance, health or welfare.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Agreement" means the First Amended and Restated Company Agreement of Magnolia Title Arkansas, LLC, dated December 1, 2021.

"Confidential Settlement Agreement and Release of All Claims" means that certain Confidential Settlement Agreement and Release of All Claims between John Magness ("Magness") and The Peabody Bulldog, LLC ("Peabody") ( collectively with Magness, the "Magness Parties"), and Bo and Sarah Blackburn (the "Blackburns"), #6 Metz Court ("Metz Court"), Sol City Title Managers, LLC ("Sol City Managers"), Rabbit Food, LLC ("Rabbit Food"), BS Title Team, LLC ("BS Title Team"), Pacific Waters Title, LLC ("1845 Title"), Blue Goose Title, LLC ("Noteworthy Title"), CSP Texas Joint Venture, LLC ("Key Title"), CSP Texas Joint Venture - San Antonio, LLC ("Key Title San Antonio"), Tall City Title, LLC ("Tall

21

COAST006219

City Title"), Amarillo Title, LLC ("Amarillo Title"), Joy Title LLC ("Joy Title"), Gateway City Title, LLC ("Gateway City Title"), Gateway City Title Managers, LLC ("Gateway City Managers"), Corpus Christi Title, LLC ("Corpus Christi Title"), and Corpus Christi Title Managers, LLC ("Corpus Christi Managers") ( each a "BSpoke Party," and collectively with the Blackburns, the "BSpoke Parties"), and 405 Manhattan Investments, LLC ("405 Manhattan") and Alphabet Investments, LLC ("Alphabet") ( collectively with 405 Manhattan, the "the Alphabet Parties"), and Sol City Title, LLC ("Magnolia Houston"), Coast to Coast Title, LLC ("Magnolia Dallas"), Magnolia Title Florida ("Magnolia Florida"), and Magnolia Title Arkansas, LLC ("Magnolia Arkansas") (collectively, the "Magnolia Parties"), and Britt Naponic ("Naponic"), and Starrex International Ltd. ("Starrex").

"Contract" means any agreement, contract, lease, sublease, license, sublicense, indenture, mortgage, instrument, note, guaranty, customer order, purchase order, franchise, joint venture agreement, partnership agreement or other arrangement, understanding, permission or commitment, in each case, whether written or oral.

"Control," "Controlled by," and "under common Control with" as used with respect to any Person, mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Environmental Law" means, whenever in effect, all Laws and contractual Liabilities concerning public or worker health or safety, pollution or protection of the environment.

"Equity Securities" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (howsoever designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contract which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Fundamental Representations" means the representations and warranties set forth in Sections 3.1 (Existence), 3.2 (Authorization and Power), 3.4 (No Conflict; Consents), 3.5 (Brokers), 3.6(a) (Title and Sufficiency), 3.12 (Taxes and Tax Returns), Section 3.14 (Employee Benefit Plans, 4.1 (Capacity and Authority), 4.2 (No Conflict; Consents).

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, in the case of a corporation, its certificate or articles of incorporation and the by-laws (or analogous documents), in the case of a limited liability company, its certificate of formation and operating or limited liability company agreement (or analogous documents) and in the case of a limited partnership its certificate of formation and limited partnership agreement (or analogous documents).

COAST006220

"Governmental Body" means any federal, state, municipal, local or other government department, quasi-governmental department, commission, board, bureau, agency or instrumentality, regulatory or self-regulatory authority, any tribunal, any court, or any other political or other subdivision, department or branch of any of the foregoing, in each case whether of the United States or foreign.

"Hazardous Material" means any material, substance or waste for which Liability or standards of conduct may be imposed pursuant to any Environmental Law, including petroleum.

"Intellectual Property Assets" means all intellectual property and proprietary rights throughout the world, including all: (i) patents, patent applications and inventions (whether or not patentable or reduced to practice); (ii) trademarks, service marks, logos, trade names, slogans and internet domain names, social media handles, and all registrations, applications and renewals for any of the foregoing, and all goodwill associated with the foregoing; (iii) copyrights and works of authorship, and all registrations, applications and renewals for any of the foregoing; (iv) trade secrets and other proprietary information; (v) computer software and software systems; (vi) all other intellectual, proprietary or industrial rights including rights arising under license agreements; and (vii) all rights and remedies relating thereto, including remedies against, and the right to recover damages from, present and past infringement and rights to protection of interests therein..

"Knowledge" means, as to any Person (other than the Company), the actual knowledge or awareness of such Person after due and reasonable inquiry, and with respect to the Company, the actual knowledge of any Manager, officer, executive level employee, and supervisory level employee of the Company and any Existing Class A Member and their respective Affiliates, after due and reasonable inquiry.

"Law" means any foreign or domestic law, common law, treaty, statute, ordinance, rule, regulation, enforceable requirement, binding determination, order, decree, judgment, injunction or other pronouncement having the effect of law.

"Liability" and "Liabilities" means any direct or indirect liability, indebtedness, Claim, loss, damage, deficiency, assessment, responsibility, or obligation of whatever kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, fixed or unfixed, determined or determinable, due or to become due, choate or inchoate, matured or unmatured, and whether due or to become due.

"Lien" means any lien, collateral assignment, encumbrance, mortgage, security interest, conditional or other sales agreements, pledge, hypothecations, claims, interferences, options, rights of first refusal, preemptive rights, restrictions of any nature, or other encumbrances (including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the possession, exercise, transfer or any other attribute of ownership of any asset), as applicable and, in each case, applicable with respect to such asset or property.

"Ordinary Course" means, with respect to any Person, an action taken by such Person will be deemed to have been taken in the "Ordinary Course" only if such action is recurring in nature, is consistent in all material respects with the past practices of such Person (including with respect to quantity and frequency), and is taken in the ordinary course of the normal day to day operations of such Person.

23

"Pension Plan" means an "employee pension benefit plan" as defined in Section 3(2) of ERISA.

"Permit" means any license, permit, approval, franchise, registration, certificate, variance, authorization or similar right issued by or obtained from a Governmental Body.

"Permitted Liens" means (a) non-delinquent statutory Liens arising other than by reason of default, (b) Liens of carriers, warehousemen, mechanics and materialmen incurred in the Ordinary Course for sums not yet due, (c) Liens incurred or deposits made in the Ordinary Course in connection with workers' compensation, unemployment insurance and other types of social security and (d) with respect to Real Property only, (i) Taxes which are a lien and not yet due and payable as of the Closing Date, (ii) zoning, building and other land use regulations imposed by governmental agencies having jurisdiction over the Real Property which are not violated by the current use or occupancy of the Real Property or the operation of the business thereon, (iii) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Real Property which, in each case, do not materially impair (x) the value or marketability of the parcel of Real Property to which they pertain or (y) the occupancy or use of the Real Property by the business for the purposes for which it is currently used, and (iv) landlord liens under Leases set forth on Schedule 3.10(b).

"Person" means any individual, corporation, limited liability company, partnership, joint venture, trust, business association, organization, Governmental Body or other entity.

"Proceeding" means any action, claim, complaint, charge, injunction, order, judgement, decree, arbitration, audit, hearing, investigation, litigation, suit or proceeding (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before any Governmental Body or arbitrator.

"Side Letter" means that certain letter agreement dated of even date herewith and duly executed by the Company, the Investor, and certain members of the Company regarding the Company Agreement.

"Tax" means any federal, state, local or foreign tax, assessment, governmental charge or imposition, including any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, escheat, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Body.

"Tax Return" means any federal, state, local and foreign return, report, statement or other similar document required to be filed with any Governmental Body with respect to Taxes.

"Transaction" means the transactions contemplated by this Agreement and the other Transaction agreements.

24

"Welfare Plan" means an "employee welfare benefit plan" as defined in Section 3(1) of ERISA.

## ARTICLE 8

### MISCELLANEOUS

**Section 8.1    Expenses**.  Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the Transaction, including all fees and expenses of its agents, representatives, counsel and accountants and public announcements.

**Section 8.2    Entire Agreement**.    This Agreement and the other Transaction agreements set forth the entire understanding of the Parties with respect to the Transaction. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

**Section 8.3    Amendments and Waivers**.  This Agreement may not be amended except by an instrument in writing signed by or on behalf of each of the Parties.

**Section 8.4    Assignment and Binding Effect**.  This Agreement may not be assigned by any Party without the prior written consent of the other Parties; provided that Investor may, without the prior written consent of any Party, assign any or all of its rights hereunder to (a) one or more of its Affiliates, (b) any lender for collateral purposes or (c) any future purchaser of all or substantially all of the assets of the Company; provided, further, that no such assignment shall relieve Investor of its obligations hereunder.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, heirs, personal representatives, successors and permitted assigns.

**Section 8.5    Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand, (b) when sent by electronic transmission (including facsimile and email) with written confirmation of transmission, (c) one business day following the day sent by reputable overnight courier (with written confirmation of receipt) or (d) three business days following the date sent by U.S. registered or certified mail (return receipt requested), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

COAST006223

If to the Company, to:

with required copies (which shall not constitute notice:

Magnolia Title Arkansas, LLC
14701 Saint Mary's Lane
Suite 150
Houston, Texas 77079
Attention: John Magness
Email: john.magness@magnoliatitleteam.com

York & Hinds, P.C.
1885 St. James Place
Suite 770
Houston, Texas 77056
Attention:  William York
Facsimile: 713-659-5755
Email:  wey@yorkhinds.com

If to Investor:

with required copies (which shall not constitute notice:

HMH Title Investments, LLC
c/o BNMJR, Inc.
1038 Texan Trail
Grapevine, Texas 76051
E-mail: Nelson.Mitchell@historymaker.com
Attention: CEO

Decker Jones, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, TX 76102
E-mail: afulkerson@deckerjones.com
Attention: Adam J. Fulkerson

**Section 8.6** **Governing Law**.  This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of Texas.

**Section 8.7** **Jurisdiction and Venue**.  All Proceedings arising out of or relating to this Agreement and/or the Transaction shall be heard and determined exclusively in a state or federal court in the State of Texas.  Consistent with the preceding sentence, each Party hereby expressly, irrevocably and unconditionally (a) submits to the exclusive jurisdiction of any state or federal court in State of Texas for the purpose of any Proceeding brought by any Party hereto arising out of or relating to this Agreement and/or the Transaction, (b) waives any objection to the above courts based on lack of personal jurisdiction or inconvenient forum and (c) waives its right to bring any Proceeding arising out of or relating to this Agreement and/or the Transaction in any other jurisdiction.

**Section 8.8** **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO THAT IS RELATED TO THE TRANSACTION.

COAST006224

**Section 8.9    No Third Party Beneficiaries**.   Other than those Persons entitled to indemnification pursuant to Article 6, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 8.10    No Strict Construction**.   The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 8.11    Rules of Construction**.  All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.  The words "hereof," "herein" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, the word "or" shall include both the conjunctive and disjunctive and the word "any" shall mean "one or more".  The terms "Dollars" and "$" mean United States Dollars; Wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."  Any statute defined or referred to herein or in any other Transaction agreement means such statute as from time to time amended, modified or supplemented, including by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  All accounting terms not otherwise defined in this Agreement shall have the meanings ascribed to them under GAAP.

**Section 8.12    Schedules and Exhibits**.  All Schedules and Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement and, unless otherwise defined therein, all terms used in any Schedule or Exhibit shall have the respective meanings ascribed to such terms in this Agreement.

**Section 8.13    Severability**.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof; and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 8.14    Remedies**.  In the event of any breach of this Agreement by any Party, the non-breaching Party shall, in addition to any other remedy provided herein or by law or in equity, be entitled to seek specific enforcement of the terms hereof, including appropriate injunctive relief in any court of competent jurisdiction, and no bond or other security shall be required in connection therewith.

27

COAST006225

**Section 8.15** **Counterparts**.     This Agreement may be executed in multiple counterparts, including counterparts delivered by facsimile or other electronic transmission, each of which shall be deemed an original and together shall be deemed one instrument.

*Signature page follows:*

28

COAST006226

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By: _____
    B. Nelson Mitchell, Jr., CEO


Magnolia Title Arkansas, LLC


By: _____
    John Magness, Manager


Alphabet Investments, LLC


By: _____
    Matthew Clayton Hill, Manager


Peabody Bulldog, LLC


By: _____
    John Magness, Manager


405 Manhattan Investments, LLC


By: _____
    Alyse Angelle, Manager


*Signature Page to Contribution Agreement*

COAST006227

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
   B. Nelson Mitchell, Jr., CEO

Magnolia Title Arkansas, LLC

By:_____
   John Magness, Manager

Alphabet Investments, LLC

By:_____
   Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
   John Magness, Manager

405 Manhattan Investments, LLC

By:_____
   Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
    B. Nelson Mitchell, Jr., CEO


Magnolia Title Arkansas, LLC


By:_____
    John Magness, Manager


Alphabet Investments, LLC


By: *M. Clayton Hill*_____
    Matthew Clayton Hill, Manager


Peabody Bulldog, LLC


By:_____
    John Magness, Manager


405 Manhattan Investments, LLC


By:_____
    Alyse Angelle, Manager


*Signature Page to Contribution Agreement*

COAST006229

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
    B. Nelson Mitchell, Jr., CEO

Magnolia Title Arkansas, LLC

By:_____
    John Magness, Manager

Alphabet Investments, LLC

By:_____
    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
    John Magness, Manager

405 Manhattan Investments, LLC

By:*Alyse Angelle*_____
    Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

COAST006230

## CONTRIBUTION AGREEMENT

**THIS CONTRIBUTION AGREEMENT** (this "Agreement"), dated as of September 9, 2022, is by and between HMH Title Investments, LLC, a Texas limited liability company ("Investor"), Coast to Coast Title, LLC (the "Company"), Alphabet Investments, LLC, ("Alphabet"), Peabody Bulldog, LLC, ("PB") and 405 Manhattan Investments, LLC, ("405") (Alphabet, PB and 405 are each an "Existing Class A Member" and collectively the "Existing Class A Members").

### RECITALS:

Pursuant and subject to the terms and conditions set forth in this Agreement, Investor desires to contribute or otherwise transfer, convey and assign to the Company, a contribution amount of $700,000 cash (the "Contribution Amount") and the Company desires to accept the Contribution Amount from Investor, free and clear of all Liens (other than Permitted Liens) and in consideration of the contribution of the Contribution Amount, issue to Investor Class A - Series II Units of the Company representing forty-two percent (42%) of the issued and outstanding Units of the Company (the "Transaction");

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1

### CLOSING; CONTRIBUTION

**Section 1.1    Closing**.  The closing of the Transaction (the "Closing") shall take place remotely by electronic or facsimile transmissions at 10:00 a.m. Houston, Texas time on the date hereof ("Closing Date").  At the Closing, the Parties shall deliver the documents and take the actions specified in Article 2.

**Section 1.2    Contribution**.  Subject to the terms and conditions set forth in this Agreement, Investor hereby contributes or otherwise transfers, conveys and assigns to the Company, and the Company hereby accepts from Investor, free and clear of all Liens (other than Permitted Liens), all of Investor's right, title and interest in and to the Contribution Amount, receipt of which is hereby acknowledged by Company.  In consideration of the contribution, the Company shall issue to Investor Units of Class A – Series II of the Company that will equal forty-two percent (42%) of the issued and outstanding Units of the Company, free and clear of all Liens.

### ARTICLE 2

### CLOSING

**Section 2.1    Documents to be Delivered by the Company**.  At the Closing and in consideration of the delivery of the Contribution Amount to the Company by the Investor, the

COAST006231

Company shall deliver the following to Investor, in each case, in form and substance satisfactory to Investor. Except as otherwise specified, each shall be dated as of the Closing Date.

(a)    Units.    Company shall deliver to Investor 7,240 Units of Class A – Series II Units of the Company;

(b)    Company Agreement.    The Company Agreement duly executed by the Company and each member of the Company;

(c)    Side Letter.    The Side Letter duly executed by the Company and certain members of the Company;

(d)    Secretary's Certificate.    A certificate, dated as of the Closing Date, of the secretary of the Company with respect to such Person's Governing Documents and the resolutions adopted by its governing authority authorizing such Person's execution of the Transaction agreements; and

(e)    Further Assurances.    Such further instruments and documents as the Company may reasonably request for the purpose of facilitating the consummation of the Transaction.

**Section 2.2    Documents to be Delivered by Investor**.    At the Closing, Investor shall deliver the following documents to the Company, in each case, in form and substance satisfactory to the Company. Except as otherwise specified, each shall be dated as of the Closing Date.

(a)    Delivery of the Contribution Amount.    Investor shall deliver the Contribution Amount to the Company in immediately available funds;

(b)    Secretary's Certificate.    A certificate, dated as of the Closing Date, of the secretary of Investor with respect to Investor's Governing Documents and the resolutions of its governing body authorizing Investor's execution of the Transaction agreements; and

(c)    Further Assurances.    Such further instruments and documents as Investor may reasonably request for the purpose of facilitating the consummation of the Transaction.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

As a material inducement to Investor to enter into this Agreement and to consummate the Transaction, each Existing Class A Member and the Company hereby represent and warrant to Investor, as of the date hereof that:

**Section 3.1    Existence**.    The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas and is authorized to do business in the State of Texas. The Company is treated as a corporation for United States income tax purposes. The Company has full power and authority to own, lease and operate its assets and to carry on its business as presently conducted. The Company is qualified or registered

2

to do business and is in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of its business or operations would require such qualification or registration. The Company does not directly or indirectly own or have any interest in the shares of capital stock or any other Equity Securities in any Person. There is no outstanding Contract of any kind requiring the Company to make an investment in, or to acquire Equity Securities or any other security or other interest in, any Person directly or require such registration.

**Section 3.2** **Authorization and Power**. The Company has all requisite power and authority to execute, deliver, perform and consummate the Transaction. The execution, delivery and performance by the Company of the Transaction and the consummation of the Transaction have been duly authorized by its governing authority and as otherwise may be required under its Governing Documents. No further entity action on the part of the Company is necessary to authorize the execution, delivery and performance of any Transaction agreement or the consummation of the Transaction. Each Transaction agreement to which the Company is a party has been duly executed and delivered by such Party and constitutes the legal, valid and binding obligations of such Party enforceable against it in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles. The copies of all Governing Documents of the Company, as amended to date, have been made available to Investor, are complete and correct, and no amendments thereto are pending.

**Section 3.3** **Capitalization**. All of the issued and outstanding Equity Securities in the Company consist solely of the Equity Securities, as set forth on Annex 1(a). One hundred percent (100%) of the Equity Securities are beneficially and legally owned by the holders as set forth on Annex 1(a). All of the Equity Securities of the Company set forth on Annex 1(a) and all Equity Securities in the Company being issued to Investor hereunder are duly authorized and validly issued, are fully paid and non-assessable, were not issued in violation of any preemptive rights, rights of first refusal or first offer, any Contract, or other restriction, and were or are being issued under and in accordance with the Governing Documents of the Company and in compliance with applicable federal and state Laws. There are no Contracts to which the Company, any current holder of Equity Securities in the Company, or any other Person is a party with respect to registration rights or the voting of any Equity Securities in the Company or that restrict the transfer of any such interest. There are no outstanding contractual obligations of the Company to repurchase, redeem, or otherwise acquire any Equity Securities of itself. The Company does not own or hold any Equity Securities in any other Person.

**Section 3.4** **No Conflict; Consents**. The execution, delivery and performance by the Company of each Transaction agreement to which it is a party do not, and the consummation of the Transaction will not, (a) result in the imposition of any Lien upon any of the assets of the Company or (b) violate, conflict with or result in the breach (with or without notice or the passage of time, or both) of any term, condition or provision of, (i) any material Law to which the Company or any of its assets are subject, (ii) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to the Company or any of its assets, or (iii) the Governing Documents of the Company.

COAST006233

**Section 3.5    Brokers**.  Neither the Company nor any of the Parties or any of their respective Affiliates have incurred any Liability to pay any fee or commission to any broker, finder or agent in connection with the Transaction.

**Section 3.6    Financial Statements**.  Attached to Schedule 3.6 are true, correct and complete copies of the internally prepared balance sheet and statement of income of the Company as of and for the year-to-date period ended June 30, 2022 (the financial statements contemplated by the foregoing clause are collectively referred to herein as the, "Financial Statements").  The Financial Statements (x) have been prepared in accordance with IFBS (in the case of the Interim Financials, except for the absence of notes and subject to normal and customary year-end adjustments for recurring accruals (which shall not be material either individually or in the aggregate)), as consistently applied by the Company, based upon the books and records of the Company and its subsidiaries, and (y) fairly present in all material respects the financial condition of the business of the Company as of the dates thereof and the operating results and cash flows of it business for the periods then ended. Since December 31, 2021, there has been no change in any of the accounting (or Tax accounting) policies, practices or procedures of the Company.  The Company has elected to be treated as a C Corporation for United Sates income tax purposes from and after June 30, 2022.

(a)    Title and Sufficiency.  The Company has good and valid title to, or a valid leasehold interest, in all of the business assets.

(b)    Condition.  The business assets (i) are in good operating condition and repair (ordinary wear and tear excepted), and (ii) are suitable for the purposes for which they are presently used by the business of the Company.

**Section 3.7    Compliance with Laws**.  The Company is and at all times since its formation has been, in compliance with all applicable Laws, and the Company has not received any notice, report, complaint, inquiry, claim, or other information alleging or relating to any violation of or Liability under any applicable Law relating to the Company.

**Section 3.8    Permits**.  the Company holds all Permits required to be held by it for the current and proposed conduct of its business, and the Company has been in compliance with all such Permits.  Schedule 3.8 lists all Permits held by the Company with respect to the Company's conduct of the business.

**Section 3.9    Proceedings**.  Schedule 3.9 lists all Proceedings to which the Company has been a party.  There here have been, no actions, suits, Orders, investigations, Claims or other Proceedings (including any arbitration proceedings) pending or, to the Knowledge of the Company, threatened against the Company, or pending or threatened by the Company against any third party, at law or in equity, or before or by any Governmental Bodies (including any actions, suits, Proceedings or investigations with respect to the Transaction). Except as set forth on Schedule 3.9, (a) there are no, Proceedings, Claims or Orders or, to the Company's Knowledge, investigation of any nature pending, rendered, or to the Company's Knowledge, threatened against the Company, and (b) there are no Orders outstanding against the Company.

4

**Section 3.10    Real Property**.

    (a)    The Company does not own and has never owned, any real property.

    (b)    Schedule 3.10(b) sets forth the address of any Leased Real Property, and a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease document). The Company has a good and valid leasehold interest in and to all of the Leased Real Property, free and clear of all Liens (other than Permitted Liens). With respect to each of the Leases and except as set forth in Schedule 3.10(b): (i) the possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed and there are no material disputes with respect to such Lease; (ii) no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (iii) the Company has not subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Property or any portion thereof; (iv) the Company has not collaterally assigned or granted any other security interest in such Lease or any interest therein.

    (c)    The Leased Real Property constitutes all of the real property currently leased, occupied or otherwise utilized in connection with the business as currently conducted. All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property (collectively, the "Improvements") are sufficient for the conduct of the business. To the Knowledge of the Company, there are no structural deficiencies or latent defects affecting any of the Improvements and there are no facts or conditions affecting any of the Improvements which would, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements, or any portion thereof in the operation of the business. To the Knowledge of the Company, the Leased Real Property and Improvements and the Company's use thereof conform in all material respects to the Lease and all applicable building, zoning and other Laws. All Permits necessary to the current occupancy and use of the Leased Real Property have been obtained, are in full force and effect and have not been violated. There is no pending or, to the Knowledge of the Company, threatened condemnation or other Proceedings affecting any portion of the Lease Real Property or the Company's use thereof.

    **Section 3.11    Environmental**. (a) the Company has been in compliance with all Environmental Laws, including with respect to any Permits required thereunder, (b) neither the Company nor any of its respective Affiliates has generated, transported, treated, stored, disposed of, handled, arranged for or permitted the disposal of, released or exposed any Person to any Hazardous Materials, or owned or operated any property or facility contaminated by any Hazardous Materials, in each case, so as to give rise to material Liability pursuant to any Environmental Law; (c) with respect to the business, the Real Property and the assets of the Company, the Company has not received any notice, report, or other information regarding any actual or alleged violation of or Liability under Environmental Law; and (d) except as set forth in Schedule 3.11, neither the Company nor any of their respective Affiliates has assumed, provided an indemnity with respect to or otherwise become subject to any material Liability of any other Person relating to Environmental Laws. The Company has furnished to Investor all environmental audits, assessments, reports and other documents materially bearing on

5

COAST006235

environmental, health or safety matters, which are in their possession or under their reasonable control.

      **Section 3.12**  <u>**Taxes and Tax Returns**</u>.  All Tax Returns of the Company have been timely filed with the appropriate Governmental Bodies in all jurisdictions in which such Tax Returns are required to be filed.  All such Tax Returns properly reflect the Liabilities of the Company for Taxes for the periods, property or events covered thereby.  All Taxes, including those which are called for by such Tax Returns, required to be paid, withheld or accrued by the Company or before the date hereof, including any deficiency assessments, penalties and interest assessed with respect to such Taxes, have been timely paid, withheld or accrued.  There are no Liens for Taxes (other than for current Taxes not yet due and payable) on the Assets of the Company.  The Company is not a "foreign person" within the meaning of Section 1445 of the Code.  No U.S. federal, state, local, or foreign audit, proceeding, or other examination of any Tax Return of the Company is presently in progress, nor is any such audit, proceeding, or other examination threatened or contemplated. No issue has been raised in any current or prior audit of any Tax Return of the Company that, by application of the same principles, would reasonably be expected to result in a material Tax deficiency for any subsequent Tax period. No deficiencies for any Taxes have been proposed, asserted or assessed against the Company that have not been resolved and paid in full.  No waivers of statutes of limitations have been given with respect to any Taxes of the Company and no request for any such waiver is currently pending. The Company has not requested an extension of time within which to file any Tax Return in any taxable year that has not since been filed. Company has not agreed to an extension of time with respect to a Tax assessment or deficiency or has executed any powers of attorney with respect to Tax matters that currently remain in effect. No requests for ruling or determination letters or competent authority relief with respect to the Company are currently pending with any Governmental Bodies with respect to any Taxes. The Company is not subject to any private letter ruling of the IRS or any comparable ruling of any other Governmental Bodies.  The Company (i) has never been a member of an Affiliated Group, or any similar affiliated or consolidated group for Tax purposes under state, local, or foreign Law, or (ii) has any liability for the Taxes of another Person (other than another Company Entity) pursuant to Treasury Regulation §1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract, or otherwise.  The Company is not a party to or bound by and does not have any obligations under, any Tax sharing agreement, Tax indemnification agreement or similar Contract or arrangement. The Company is not a party to any Contract or arrangement to pay, indemnify or make any payments with respect to any Tax Liabilities of any stockholder, member, manager, director, officer or other employee or contractor of the Company.  The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) use of an improper method of accounting for a taxable period ending on or prior to the Closing Date; (iii) "closing agreement" as described in Code Section 7121 (or any similar provision of state, local, or foreign Law) executed on or prior to the Closing Date; (iv) intercompany transactions or any excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local, or foreign Law); (v) installment sale or open transaction disposition made on or prior to the Closing Date; or (vi) prepaid amount received on or prior to the Closing Date.  The Company has made available to Investor true and complete copies of federal, state and local Tax Returns of each of the Company

COAST006236

Entities and their predecessors for the years ended December 31, 2019, 2020 and 2021 and true and complete copies of all examination reports and statements of deficiencies assessed against or agreed to by the Company or any predecessor with respect to Taxes. There is not currently in effect any power of attorney authorizing any Person to act on behalf of or receive information relating to, the Company with respect to any Tax matter. The Company has not received from any Governmental Body in a jurisdiction where the Company has not filed a Tax Return any (i) claim that the Company is or may be subject to taxation by that jurisdiction, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against the Company. The Company engaged in a "reportable transaction" as defined in Treas. Reg. § 1.6011-4(b). Within the past three years, the Company has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code Section 355 or Code Section 361. All of the individuals who are performing consulting or other services for the Company have been correctly classified as either "independent contractors" or "employees," as the case may be. The Company is not a party to any agreement, contract, arrangement, or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code Section 280G (or any similar provision of state, local, or foreign Law).

Section 3.13   **Employees**.  Schedule 3.13 contains a true, correct and complete (i) list of all employees of the Company as of May 1, 2022; (ii) list of the then current annual base compensation and target incentive compensation opportunity of, and a description of the fringe benefits (other than those generally available to employees) provided by the Company to any such employees, (iii) status of each employee as "exempt" or "non-exempt" under the Fair Labor Standards Act of 1938, as amended ("**FLSA**") and any applicable state law, (iv) list of the accrued but unused vacation, sick leave and personal time for all employees of the Company, (v) list of any increase, effective after December 31, 2021, in the rate of compensation of any employees if such increase exceeds 10% of the previous annual compensation of such employee, and (vi) and any payments owing or arising at or prior to the Closing from or as a result of the consummation of the Transactions, including any payments for stock appreciation or similar rights, any severance or bonus plan payment, or any similar payment, including the amount of each such payment. Except as set forth on Schedule 3.13, there are no temporary workers, leased employees, contingent workers, or any other Persons performing, and no such Person has performed, services for the Company who are not classified as an employee or former employee performing services for the Company. The Company is not delinquent in payment of or has delayed the payment to any of its employees, consultants, or independent contractors of any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees. The Company is not a party to, subject to or bound by, any collective bargaining or other agreement with a labor organization. There is no pending or, to the Knowledge of the Company, threatened, nor has there been since January 1, 2021, any, organizing effort or demand for recognition or certification or attempt to organize any of its employees or former employees.

Section 3.14   **Employee Benefit Plans**.  Schedule 3.14 lists each Benefit Plan providing benefits to any of the Company's employees which is sponsored, established, maintained, or contributed to or required to be contributed to by the Company at any time since its inception.

7

Each Benefit Plan, and the administration thereof, is in compliance, in all material respects with its terms and with all compliance, funding, reporting, disclosure and other requirements of ERISA, the Code and other Laws applicable to such Benefit Plan. The Company has made available to Investor prior to the date hereof a true and complete copy of each Benefit Plan listed or required to be listed on Schedule 3.14 and except as set forth on Schedule 3.14, the Company or any entity that is treated as a single employer with the Company under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA (an "***ERISA Affiliate***") sponsors, maintains or contributes to or has any obligation to maintain or contribute to, or has any direct or indirect liability, whether absolute or contingent, with respect to any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which the Company is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, including, without limitation, any (i) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of the Company has any present or future right to benefits. Each Benefit Plan set forth on Schedule 3.14 has been established and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other applicable Laws; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the IRS, the United States Department of Labor (the "***DOL***") or any other Governmental Body, or to the participants or beneficiaries of such Benefit Plan, have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter, opinion letter or advisory letter from the IRS with respect to such Benefit Plan's most recent remedial amendment cycle for which the IRS issued such letters, and there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or Tax under ERISA, the Code or any other applicable Law; (iv) other than routine claims for benefits, no Lien, lawsuit or complaint to or by any Person or Governmental Body has been filed against any Benefit Plan or the Company with respect to any Benefit Plan or, to the Knowledge of the Company, against any other Person and, to the Knowledge of the Company, no such Liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (v) no individual who has performed services for any Company Entity has been improperly excluded from participation in any Benefit Plan; and (vi) no Benefit Plan is under, and the Company has not received any notice of, an audit or investigation by the IRS, DOL or any other Governmental Body, and no such completed audit or investigation, if any, has resulted in the imposition of any Tax or penalty on the Company. No non-exempt "*prohibited transaction*," as defined in Section 406 of ERISA or Section 4975 of the Code, has occurred or is reasonably expected to occur with respect to any Benefit Plan set forth on Schedule 3.14. To the

8

COAST006238

Knowledge of the Company, no fiduciary of any Benefit Plan set forth on Schedule 3.14 has any liability for a breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of any such Benefit Plan. No fiduciary of any Benefit Plan has been sued by any Person alleging a breach of fiduciary duty with respect to a Benefit Plan or been the subject of an investigation by the DOL in which it was investigating an alleged or possible breach of fiduciary duty with respect to a Benefit Plan, and, to the Knowledge of the Company, no such suit or investigation is contemplated or threatened with respect to any Benefit Plan fiduciary.  Each Benefit Plan that is a "*nonqualified deferred compensation plan*" (as such term is defined in Section 409A(d)(1) of the Code) is in documentary and operational compliance in all material respects with the requirements of Section 409A of the Code and the Treasury Regulations issued thereunder. The Company does not have any obligation to indemnify, reimburse or gross up any individual with respect to any Tax that may be imposed on such individual under Section 409A of the Code.  All liabilities or expenses of the Company in respect of any Benefit Plan (including workers' compensation) which have not been paid have been properly accrued on the Company's most recent financial statements in compliance with GAAP. All contributions or premium payments required to have been made under the terms of any Benefit Plan or in accordance with applicable Law as of the date hereof have been timely made or reflected on the Company's financial statements in accordance with GAAP.  The Company does not have any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any Person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer, any temporary employee, or any employee of any professional employer organization. The Company has not been sued by any Person alleging such misclassification or been the subject of an investigation by the IRS of any other Governmental Body in which the IRS or other Governmental Body was investigating an alleged or possible misclassification, and to the Knowledge of the Company no such suit or investigation is contemplated or threatened.

    **Section 3.15   Intellectual Property Matters**.   Schedule 3.15(a) lists the material Intellectual Property Assets used or held for use in the business, including all internet domain names.  the Company owns all right, title and interest or has a right or license to use (as necessary for the operation of the business in the Ordinary Course) all of the Intellectual Property Assets.  Except as set forth on Schedule 3.15(b), the Company (i) has not granted any licenses or contractual rights relating to the Intellectual Property Assets or the use thereof or (ii) is not bound by or a party to any Contracts of any kind relating to the Intellectual Property Assets of any other Person (except for licenses to any unmodified, commercially available, off-the-shelf computer software with a replacement cost or annual license fee of less than $1,000).  To the Knowledge of the Company, the conduct of the business as it is presently being conducted, does not violate, conflict with or infringe upon the intellectual property of any other Person in any material manner.  The Company has taken commercially reasonable measures to maintain in confidence all material confidential information owned by the Company and Intellectual Property Assets that constitutes, or that the Company intends or intended to retain as, a trade secret. No such trade secret or confidential information has been disclosed by the Company to any Person other than employees, consultants or contractors of the Company who had a need to know and who used such Intellectual Property Assets in the Ordinary Course of employment or contract performance subject to a written and enforceable confidentiality agreement or obligation. There has been no unauthorized access to any such confidential information by third parties.

9

COAST006239

**Section 3.16 <u>Absence of Changes.</u>** Except as set forth on <u>Schedule 3.16</u>, since December 31, 2021, the business has been operated only in the Ordinary Course and, without limiting the foregoing, the Company has not:

(a) created or otherwise incurred any Lien except for Permitted Liens on any assets;

(b) suffered any loss exceeding $10,000 (whether or not covered by insurance), experienced any changes in the amount and scope of insurance coverage or suffered any destruction of its books and records;

(c) sold, assigned, transferred, waived, released, leased or licensed, or permitted the cancellation, loss, lapse or abandonment or other disposition of, or failed to take reasonable steps to maintain, enforce and protect, any material right or material asset (tangible or intangible) used or held for use in the business (including any right related to any asset);

(d) acquired (whether by merger, consolidation, purchase of equity interests, purchase of assets or otherwise) any business or the material assets of any Person;

(e) managed the working capital of the business (including the inventory, accounts receivable, prepaid expenses, accounts payable and accrued expenses of the business) other than in the Ordinary Course;

(f) cancelled, delayed or postponed the payment of any material Liability, the making of any capital expenditure or the replacement, repair or maintenance of any asset;

(g) made any material change in the manner in which the business extends discounts or credits to, or otherwise deals with, customers;

(h) made any material change in the manner in which the business markets its products or services;

(i) engaged in any transaction outside the Ordinary Course;

(j) discharged or satisfied any Lien or paid any material Liability, other than current liabilities paid in the Ordinary Course;

(k) declared, set aside or made any payment, dividend or distribution of cash or other property with respect to its equity interests, or purchased, redeemed or otherwise acquired any of its equity interests (including any capital stock, warrants, options or other rights to acquire its equity interests);

(l) made any material change in its cash management practices or in any method of accounting or accounting policies;

(m) incurred, assumed or guaranteed any indebtedness, except in the Ordinary Course with respect to trade payables;

10

(n)      proposed or adopted any amendments or modifications to its Governing Documents or

(o)      agreed, whether orally or in writing, to do any of the foregoing.

**Section 3.17   Liabilities**. The Company does not have any material Liabilities except Liabilities that (a) are fully and accurately disclosed on the face of the Financial Statements (rather than in the notes and schedules thereto), (b) have arisen or been incurred in the Ordinary Course since the Balance Sheet Date (none of which relate to violations of Law, a breach of Contract, or warranty Liabilities), or (c) are listed on Schedule 3.17 to this Agreement.

**Section 3.18   Affiliate Interests; Transactions with Certain Persons**.  Except as set forth on Schedule 3.18, and except for the Governing Documents, there are no Contracts or arrangements by and between the Company, on the one hand, and any holder of the Company Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing, on the other hand.  Except as set forth on Schedule 3.18 the Company is not a debtor or creditor of or has any Liability or other obligation of any nature to, any holder of the Company's Equity Securities, governing person, manager, officer or any Person related by blood or marriage to any of the foregoing.

**Section 3.19   Material Contracts**.  Schedule 3.19 attached hereto (which lists Contracts by each applicable subsection referenced below in this Section 3.19) contains a complete, current and correct list of all of the following Contracts (collectively the "Material Contracts") to which the Company is a party or by which any of their respective properties or assets are bound and that are in effect on the date hereof or impose any continuing Liabilities (other than confidentiality obligations) on any party thereto:

(a)      any Contract or group of related Contracts that involve or involved expenditures or receipts by the Company of more than $50,000.00 for the year ended December 31, 2021, or involve or are expected to involve more than $50,000.00 of expenditures or receipts for the year ending December 31, 2022;

(b)      any Contract with any of the Company's officers, directors, managers, employees, or Affiliates, including all non-competition, severance, employment, bonus, change of control, retention, commission, or indemnification agreements;

(c)      any Contract evidencing the granting of a loan by the Company to any third party for which amounts remain outstanding (other than the advancement of business expenses to employees in the Ordinary Course);

(d)      any Contract evidencing or relating to indebtedness relating to the borrowing of money, extension of credit or the granting of any Lien on the assets or the Equity Securities of the Company;

(e)      any Contract containing any limitation on the freedom or ability of the Company (or that following the Closing Date would purport to limit the freedom of the Company or any of its Affiliates) (A) to engage in any line of business or compete with any

11

Person or to operate at any location in the world, including non-competition, non-solicitation and standstill obligations or exclusivity rights, or (B) to own, operate, lease, sell, transfer, pledge or otherwise dispose of or encumber any asset, or to hire solicit, or consult with any Person or that would so limit the Company or its Affiliates on or after the Closing Date;

      (f)     any power of attorney;

      (g)     any Contract relating to the (A) acquisition or disposition of any business or entity (whether by merger, sale of stock, sale of assets or otherwise) or (B) acquisition of all or substantially all assets of any Person;

      (h)     any Contract for future capital expenditures or the acquisition or construction of fixed assets requiring the payment by the Company of an amount in excess of $50,000.00 on or after the date hereof.

The Company has made available to Investor true, complete and current copies of all written Material Contracts (including any and all amendments, modifications, exhibits, annexes and schedules to such Contracts) and true, correct, and complete summaries of all non-written Contracts. Each of the Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms. There exists no material breach, default or violation on the part of the Company or, to the Knowledge of the Company, on the part of any other party thereto, under any Contract to which the Company is or was a party nor has the Company received written, or to the Knowledge of the the Company, other notice of any such breach, default or violation. the Company has not received written notice of an intention by any party to any Material Contract that provides for a continuing obligation by any party thereto on the date hereof to terminate such Contract or amend the terms thereof and (ii) the consummation of the Transactions will not affect the validity, enforceability or continuation of any Material Contract on the same terms applicable to such Material Contract as of the date hereof. The Company has not waived any material rights under any Material Contract. To the Knowledge of the Company, no event has occurred that either entitles, or would, with notice or lapse of time or both, entitle, any party to any Contract to which the Company is or was a party to declare a breach, default or violation under, or make an indemnification claim against the Company with respect to, any such Contract or to terminate, modify or accelerate, or that does terminate, modify or accelerate, any terms of any such Contract (including any right to accelerate the maturity of any indebtedness of the Company under any such Contract). Each of the Material Contracts to which the Company is a party is in full force and effect, and is valid, binding, and enforceable in accordance with its terms.

    **Section 3.20**  <u>**Full Disclosure**</u>. No representation or warranty made by the Company in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

12

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF INVESTOR

As a material inducement to the Company to enter into this Agreement and to consummate the Transaction, Investor hereby represents and warrants to the Company as of the date hereof that:

**Section 4.1    Capacity and Authority**.  Such Investor has full legal capacity and authority to execute, deliver and perform each Transaction agreement to which such Investor is a party and to consummate the Transaction.  Each Transaction agreement to which such Investor is a party has been duly executed and delivered by such Investor and constitutes the legal, valid and binding obligations of such Investor enforceable against him in accordance with their respective terms, except as limited by bankruptcy, or insolvency Laws or Laws affecting creditors' rights generally or equitable principles.

**Section 4.2    No Conflict; Consents**.  The execution, delivery and performance by Investor of each Transaction agreement to which Investor is a party does not, and the consummation of the Transaction will not, violate, conflict with or result in the breach of any term, condition or provision of, (a) any Law to which Investor is subject, (b) any judgment, order, writ, injunction, decree or award of any Governmental Body which is applicable to such Investor or (c) any material Contract to which Investor is a party or by which Investor is otherwise bound.  No authorization, approval or consent of, and no notice to or registration or filing with, any Person is required in connection with the execution, delivery or performance of any Transaction agreement or the consummation of the Transaction by Investor.

**Section 4.3    Disclosure of Information**.  Investor has received and reviewed information about the Company, and its current and proposed subsidiaries and affiliates and has had an opportunity to ask questions and receive answers regarding the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and affiliates and to conduct such due diligence review as it has deemed appropriate.

**Section 4.4    Investment Experience**.  Investor acknowledges that it can bear the economic risk of its investment in the Transaction, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the Transaction.

**Section 4.5    Disclosure of Information**.  Investor has received and reviewed information about the Company and its current and proposed Affiliates, and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the equity consideration pursuant to this Agreement and the business, properties, prospects and financial condition of the Company and its current and proposed subsidiaries and to conduct such due diligence review as it has deemed appropriate.

**Section 4.6    Investment Experience**.  Investor acknowledges that it can bear the economic risk of its investment in the equity consideration to be received hereunder, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of owning such an investment.

13

COAST006243

**Section 4.7    Accredited Investor**.    Investor is an "accredited investor" as defined under Rule 501 promulgated under the Securities Act.  Investor understands that the Class A - Series II Units issued as the equity consideration have not been registered under the Securities Act or any state securities laws and are being transferred to Investor, in part, in reliance on the foregoing representation.

**Section 4.8    Investment Intent**.    Investor is acquiring the equity consideration hereunder for its own account, with the present intention of holding such securities for purposes of investment, and has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities Laws.

**Section 4.9    No Public Market**.  Investor understands that no public market now exists for the equity consideration to be issued hereunder and that there is no assurance that a public market will ever exist for such equity consideration.  Investor also understands that Rule 144 promulgated under the Securities Act is not presently available with respect to the sale of any of the equity consideration.

**Section 4.10    No Other Representations**.  In purchasing equity consideration, Investor is not relying on (and Investor hereby expressly disclaims) any and all representations, warranties or information (including any projections or forecasts) that may have been provided to it from the Company or any other Person, except only for the representations and warranties of the parties expressly set forth in Article 3 hereof.

**Section 4.11    Full Disclosure**. No representation or warranty made by Investor in this Agreement contains any untrue statements of a material fact or knowingly omits to state any material fact necessary in order to make the representations and warranties made herein, in light of the circumstances under which they were made, not misleading.

# ARTICLE 5

## POST-CLOSING COVENANTS

**Section 5.1    Further Assurances**.

(a)    At any time and from time to time after the Closing Date, at Investor's request, and without further consideration therefor, the Company will execute and deliver any and all proper deeds, assignments and such other instruments of sale, transfer, conveyance, assignment and confirmation as Investor may reasonably deem necessary in order to effect, consummate, confirm and/or evidence the Transaction.

(b)    The Company agrees to furnish or cause to be furnished, as promptly as practicable, such information and assistance relating to the business as is reasonably necessary (i) for the preparation and filing of any Tax Return or (ii) for any other claim, audit, filing or proceeding relating to Tax matters.

**Section 5.2    Uses of the Contribution Amount**.  From and after the Closing Date, the Company agrees to use the Contribution Amount exclusively for working capital and general

COAST006244

business purposes in the Ordinary Course; provided, however, the Contribution Amount may be used for other purposes with the prior written consent of Investor.

**Section 5.3** **Disclosure**. Without the prior written consent of Investor, and except as required by Law, the Company and its directors, members, managers, officers, employees and agents) shall not directly or indirectly make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of any of the terms, conditions or other aspects of the transactions contemplated herein; provided, however, that the Parties may continue such communications with employees, customers, suppliers, lenders, lessors and other particular groups as may be legally required or necessary in connection with the conduct of the Company's business in the Ordinary Course.

**Section 5.4** **Intentionally omitted**

**Section 5.5** **Closing of Each Contribution Agreement**.    Notwithstanding any provision hereof to the contrary, the obligations of Investor to contribute the Contribution Amount under this Agreement are conditioned upon the simultaneous closing and funding of each Contribution Agreement (defined below) by and between Investor and certain Affiliates of the Company, including Sol City Title, LLC d/b/a Magnolia Title, Magnolia Title Florida, LLC, Magnolia Title Arkansas, LLC under which Investor is contributing certain amounts of cash to such Affiliates of the Company in exchange for Equity Securities in such Affiliates of the Company (each a "Contribution Agreement").

**Section 5.6** **Certain Waivers**. Each Existing Class A Member, on behalf of itself and its Affiliates and each of their respective heirs, successors, assigns, descendants and beneficiaries (each, a " Releasing Party") hereby irrevocably waives, releases and discharges the Company and its Affiliates (including, after the Closing, Investor and its Affiliates) and each of their respective directors, managers, officers, employees, members, equityholders and partners (each, a " Released Party") from any and all Liabilities to such Releasing Parties of any kind or nature whatsoever, whether in the capacity as a direct or indirect equityholder, as a member, manager, officer or employee of the Company or otherwise and whether arising under any agreement or understanding (other than this Agreement) or otherwise at law or in equity, and each Existing Class A Member agrees on behalf of itself and the other Releasing Parties that none of the Existing Class A Member or such Releasing Party shall seek to recover any amounts in connection therewith or thereunder from any of the Released Parties. Notwithstanding the foregoing or anything else herein to the contrary, in no event shall the Company or any of the other Released Parties have any Liability whatsoever to any of the Existing Class A Member or the other Releasing Parties for any breaches (or matters causing or constituting breaches) of the representations, warranties, agreements or covenants of the Company or the Existing Class A Members hereunder, and, in any event, neither the Existing Class A member nor any Release Party may seek contribution or indemnification from the Company or any of the other Released Parties in respect of any payments required to be made by Existing Class A Members or the Releasing Parties pursuant to this Agreement.

15

## ARTICLE 6

## SURVIVAL; INDEMNIFICATION

**Section 6.1    Survival of Representations and Warranties**.  The representations and warranties of the Parties in this Agreement shall survive the consummation of the Transaction and shall remain in effect for a period of three (3) years after the Closing Date, provided, however, that the Fundamental Representations shall survive indefinitely and the representations and warranties set forth in Section 3.11 (Environmental) shall survive until 90 days after expiration of the applicable statute of limitations.  All covenants and agreements set forth herein shall survive the consummation of the Transaction in accordance with their respective terms.  In the event notice of any indemnifiable claim shall have been given within the applicable survival period, all representations and warranties that are the subject of such indemnifiable claim shall survive until such indemnifiable claim is finally resolved.  Indemnification obligations with respect to any Losses suffered relating to fraud or misrepresentation of a significant fact or the volitional withholding of any significant fact by any Party shall not expire.  If any representation or warranty contained in this Agreement is qualified based on materiality, including the terms "material" or any similar qualifier, such qualification shall in all respects be ignored and given no effect for purposes of determining whether any breach or inaccuracy has occurred and the amount of any related Loss.

**Section 6.2    Indemnification by the Company and the Existing Class A Members**. Subject to the terms, conditions and limitations set forth in this Article 6, the Company, the Existing Class A Members, and their respective Affiliates shall, jointly and severally, indemnify and defend Investor and its Affiliates and their respective officers, directors, managers, shareholders, members, partners, employees, lenders, agents, representatives, successors and permitted assigns (each a "Investor Indemnified Party") against, and shall hold each of them harmless from, any and all damages, losses, injuries, Liabilities, claims, demands, Proceedings, judgments, awards, settlements, assessments, deficiencies, Taxes, penalties, fines, charges, payments, costs or expenses (including reasonable investigation and legal fees) or reduction in value, whether or not involving a third-party claim (collectively, "Losses"), arising, directly or indirectly, from or in connection with:

(a)    any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of the Company or its Affiliates in this Agreement or any certificate delivered by the Company or its affiliates pursuant to this Agreement;

(b)    any breach or nonfulfillment of any covenant, agreement or obligation of the Company under this Agreement;

(c)    the operation of the business prior to Closing and any Liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the Closing (including operations);

(d)    any Tax Liability (whether incurred by the Company or Investor) as a result of the transactions contemplated by this Agreement;

16

(e)     any Tax Liability of the Company for tax periods up to and including Closing, including, without limitation, those Tax Liabilities that would have been or would be accrued under accrual accounting and/or any Tax Liabilities resulting from a change in the Company's method of accounting;

(f)     the Confidential Settlement Agreement and Release of All Claims and all matters relating thereto, referred to therein, or arising therefrom, including, for the avoidance of doubt, the Employment Litigation, the Proposed Starrex Transaction, the Derivative Litigation, the Stewart Litigation, and any Losses paid or otherwise incurred in the investigation, prosecution, defense, negotiation, settlement or collection of all matters relating to, referred to in, or arising out of the Confidential Settlement Agreement and Release of All Claims; and/or

(g)     any breach or nonfulfillment of any covenant, agreement or obligation of the Company or any Existing Class A Member under the Side Letter.

The Company, the Existing Class A Members, and their respective Affiliates shall not use any of the Contribution Amount to satisfy the above mentioned indemnity obligations.

**Section 6.3**    <u>**Indemnification by Investor**</u>.   Subject to the terms, conditions and limitations set forth in this <u>Article 6</u>, Investor shall indemnify and defend the Company and its successors and permitted assigns (each an "<u>Magnolia Indemnified Party</u>") against, and shall hold them harmless from, any Loss arising, directly or indirectly, from or in connection with:

(a)     any facts or circumstances which constitute a breach or inaccuracy of any representation or warranty of Investor in this Agreement or any certificate delivered by Investor pursuant to this Agreement; and/or

(b)     any breach or nonfulfillment of any covenant, agreement or obligation of Investor in this Agreement.

**Section 6.4**    <u>**Limitations on Indemnification**</u>.

(a)     In no event shall Investor, on the one hand, or the Company, on the other hand, be required to make indemnification payments hereunder for Losses that result solely from facts or circumstances which constitute a breach or inaccuracy of any representation or warranty in <u>Article 3</u>, <u>Article 4</u> or <u>Article 5</u> unless the aggregate amount of all such Losses suffered by the Investor Indemnified Parties or the Magnolia Indemnified Parties, as applicable, exceeds $10,000 (the "<u>Deductible</u>"), in which case, Investor or the Company, as the case may be, shall be liable for all such Losses in excess of the Deductible, provided, however, that the Deductible shall not apply to any claims for Losses incurred or suffered as a result of, arising out of or relating to a breach of, default in, or failure to perform, any of the Fundamental Representations and the representations and warranties set forth in <u>Section 3.16(k)</u>, <u>Section 3.16(l)</u>, or the matters set forth on in <u>Section 6.2(f)</u> and <u>Section 6.2(g)</u>.

(b)     The limitations set forth in this <u>Section 6.4</u> shall not apply to any claim involving criminal activity, fraud, willful misconduct or an intentional misrepresentation of fact in connection with the transactions contemplated by this Agreement.

17

**Section 6.5** **Treatment of Indemnification Payments**. Each Party will treat all payments made pursuant to Article 6 as adjustments of, the equity consideration or the Contribution Amount, as the case may be, for all purposes.

**Section 6.6** **Exclusive Remedy**. Except to the extent arising from fraud or willful misconduct and except as provided in any Transaction agreement, including Section 8.14 of this Agreement, the indemnification provided by this Article 6 shall be the sole and exclusive remedy in respect of any breach of or inaccuracy in any representation, warranty, agreement or covenant contained in this Agreement. The foregoing shall not limit the Parties' right to obtain specific performance as provided herein. In furtherance of the foregoing, each Party hereby waives, to the fullest extent permissible under applicable Law, and agrees in any case not to assert in any action or proceeding of any kind, any and all rights, claims and causes of action it may now or hereafter have (including any such rights, claims or causes of action arising under or based upon common law or other Law) against any indemnifying Party for any matter described in the previous sentence other than claims for indemnification asserted as permitted by and in accordance with the provisions set forth in this Article 6, provided, nothing in this Section 6.6 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled, or to seek any remedy on account of any Party's fraud or willful misconduct..

**Section 6.7** **Waiver of Punitive Damages**. NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL ANY PARTY OR ITS AFFILIATES, OR ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE HEREUNDER AT ANY TIME FOR PUNITIVE DAMAGES (EXCEPT TO THE EXTENT PAID TO A THIRD PARTY), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, AND EACH PARTY HEREBY EXPRESSLY RELEASES THE OTHER PARTIES, THEIR AFFILIATES, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND REPRESENTATIVES THEREFROM.

**Section 6.8** **Other Limitations on Losses**. Any indemnification owing pursuant to this Article 6 in respect of an indemnifiable Loss shall be reduced by any insurance proceeds, indemnification payments or contribution payments actually received in respect of such indemnifiable Loss by the Investor Indemnified Party or Magnolia Indemnified Party, as the case may be, from third parties unaffiliated with such Investor Indemnified Party or Magnolia Indemnified Party (in each case, reduced by any costs of collection and/or increases in premiums incurred by such Investor Indemnified Party or Magnolia Indemnified Party in connection with such recovery)

**Section 6.9** **Indemnification Procedures**. The Party making a claim under this Article 6 is referred to as the "Indemnified Party", and the Party against whom such claims are asserted under this Article 6 is referred to as the "Indemnifying Party."

(a)     Third Party Claims.

(i)     If an Indemnified Party receives notice of the assertion or commencement of an Action made or brought by any Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement (each, a "Third Party Claim") against such Indemnified Party that

18

COAST006248

the Indemnified Party has determined has or would reasonably be expected to give rise to a right of indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty days after receipt of such notice of such Third Party Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

(ii)    Subject to the terms of this Section 6.9(a), upon receiving notice of a Third Party Claim, the Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party within thirty business days of its receipt of notice of the Third Party Claim, to assume the investigation and defense of such Third Party Claim at the Indemnifying Party's expense and with counsel reasonably satisfactory to the Indemnified Party; provided, that the Indemnifying Party shall not have the right to assume the investigation and defense of a Third Party Claim if (A) the Indemnifying Party or its Affiliate is also a Party to such Third Party Claim and the Indemnified Party determines in good faith that joint representation would be inappropriate, (B) upon request, the Indemnifying Party fails to provide reasonable assurance to the Indemnified Party of its financial capacity to defend such Third Party Claim, (C) in the reasonable judgment of the Indemnified Party, it involves material reputational risks to the Indemnified Party or any of its Affiliates, or (D) it seeks an injunction or other equitable relief against the Indemnified Party or relates to or arises in connection with any criminal proceeding, indictment, allegation or investigation. If the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 7.06(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name of and for the Indemnified Party.

(iii)    The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it, subject to the Indemnifying Party's right to assume the control of the defense thereof in accordance with Section 6.9(a)(ii). The fees and disbursements of any such counsel shall be at the expense of the Indemnified Party; provided, that if in the written opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party or any of their Affiliates that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required.

(iv)    If the Indemnifying Party elects not to compromise or defend a Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in Section 6.9(a)(ii), or (subject to the proviso to this Section 6.9(a)(iv)) fails to diligently prosecute the defense of a Third Party Claim, the Indemnified Party may, subject to Section 6.9(b), pay, compromise, and defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim; provided that if the Indemnifying Party fails to diligently pursue the defense of the Third Party Claim or

19

COAST006249

the Indemnified Party reasonably concludes that the Third Party Claim is not being defended to its satisfaction, the Indemnified Party can assume the defense of the Third Party Claim if the Indemnified Party gives the Indemnifying Party written demand to diligently pursue the defense and the Indemnifying Party fails to do so within ten business days after receipt of the demand, or such shorter period as may be required to respond to any deadline imposed by a Governmental Body.

(v)    The Parties shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including promptly making available records relating to such Third Party Claim in their possession or control and furnishing, without expense (other than reimbursement of actual reasonable out-of-pocket expenses) to the defending Party, management employees of the non-defending Party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)    Settlement of Third-Party Claims. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 6.9(b). If a firm offer is made to settle a Third-Party Claim without leading to Liability on the part of the Indemnified Party or its Affiliates and provides, in customary form, for the unconditional release of each Indemnified Party and their Affiliates from all Liabilities in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten business days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to settlement of such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume the defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense of a Third-Party Claim under Section 6.9(a)(iv), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)    Direct Claims.

(i)    Any Proceeding initiated by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (each, a "Direct Claim") shall be asserted by the Indemnified Party by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than sixty days after the Indemnified Party becomes aware of such Direct Claim; provided that any failure to give such prompt written notice shall only relieve the Indemnifying Party of its indemnification obligations to the extent that the Indemnifying Party actually forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail and, if reasonably practicable, indicate the estimated amount of the Loss that has been or may be sustained by the Indemnified Party (such estimate not to affect the amount Losses ultimately subject to indemnification).

20

(ii)    The Indemnifying Party shall have forty-five days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim. The Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any unprivileged accounts, documents or records in its control or possession) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such forty-five (45) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 6.10    Payments.** Once a Loss is agreed to by the Indemnifying Party or adjudicated to be payable under this Article 6, the Indemnifying Party shall satisfy its obligations within ten business days of such adjudication by wire transfer of immediately available funds. Interest on any such amount payable will accrue from and including the date of agreement of the Indemnifying Party or adjudication to but excluding the date such payment has been made at a rate per annum equal to 12%, and such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

## ARTICLE 7

## DEFINED TERMS

**Section 7.1    Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with such first Person.

"Benefit Plan" means a Pension Plan, a Welfare Plan or any other plan or program for employees relating to deferred compensation, bonus, performance compensation, severance, vacation, sick pay, incentive, insurance, health or welfare.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Agreement" means the First Amended and Restated Company Agreement of Coast to Coast Title, LLC, dated December 1, 2021.

"Confidential Settlement Agreement and Release of All Claims" means that certain Confidential Settlement Agreement and Release of All Claims between John Magness ("Magness") and The Peabody Bulldog, LLC ("Peabody") ( collectively with Magness, the "Magness Parties"), and Bo and Sarah Blackburn (the "Blackburns"), #6 Metz Court ("Metz Court"), Sol City Title Managers, LLC ("Sol City Managers"), Rabbit Food, LLC ("Rabbit Food"), BS Title Team, LLC ("BS Title Team"), Pacific Waters Title, LLC ("1845 Title"), Blue Goose Title, LLC ("Noteworthy Title"), CSP Texas Joint Venture, LLC ("Key Title"), CSP Texas Joint Venture - San Antonio, LLC ("Key Title San Antonio"), Tall City Title, LLC ("Tall

21

City Title"), Amarillo Title, LLC ("Amarillo Title"), Joy Title LLC ("Joy Title"), Gateway City Title, LLC ("Gateway City Title"), Gateway City Title Managers, LLC ("Gateway City Managers"), Corpus Christi Title, LLC ("Corpus Christi Title"), and Corpus Christi Title Managers, LLC ("Corpus Christi Managers") ( each a "BSpoke Party," and collectively with the Blackburns, the "BSpoke Parties"), and 405 Manhattan Investments, LLC ("405 Manhattan") and Alphabet Investments, LLC ("Alphabet") ( collectively with 405 Manhattan, the "the Alphabet Parties"), and Sol City Title, LLC ("Magnolia Houston"), Coast to Coast Title, LLC ("Magnolia Dallas"), Magnolia Title Florida ("Magnolia Florida"), and Magnolia Title Arkansas, LLC ("Magnolia Arkansas") (collectively, the "Magnolia Parties"), and Britt Naponic ("Naponic"), and Starrex International Ltd. ("Starrex").

"Contract" means any agreement, contract, lease, sublease, license, sublicense, indenture, mortgage, instrument, note, guaranty, customer order, purchase order, franchise, joint venture agreement, partnership agreement or other arrangement, understanding, permission or commitment, in each case, whether written or oral.

"Control," "Controlled by," and "under common Control with" as used with respect to any Person, mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Environmental Law" means, whenever in effect, all Laws and contractual Liabilities concerning public or worker health or safety, pollution or protection of the environment.

"Equity Securities" means, with respect to any Person, (a) any capital stock, partnership or membership interest, unit of participation or other similar interest (howsoever designated) in such Person and (b) any option, warrant, purchase right, conversion right, exchange right or other Contract which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Fundamental Representations" means the representations and warranties set forth in Sections 3.1 (Existence), 3.2 (Authorization and Power), 3.4 (No Conflict; Consents), 3.5 (Brokers), 3.6(a) (Title and Sufficiency), 3.12 (Taxes and Tax Returns), Section 3.14 (Employee Benefit Plans, 4.1 (Capacity and Authority), 4.2 (No Conflict; Consents).

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, in the case of a corporation, its certificate or articles of incorporation and the by-laws (or analogous documents), in the case of a limited liability company, its certificate of formation and operating or limited liability company agreement (or analogous documents) and in the case of a limited partnership its certificate of formation and limited partnership agreement (or analogous documents).

22

"Governmental Body" means any federal, state, municipal, local or other government department, quasi-governmental department, commission, board, bureau, agency or instrumentality, regulatory or self-regulatory authority, any tribunal, any court, or any other political or other subdivision, department or branch of any of the foregoing, in each case whether of the United States or foreign.

"Hazardous Material" means any material, substance or waste for which Liability or standards of conduct may be imposed pursuant to any Environmental Law, including petroleum.

"Intellectual Property Assets" means all intellectual property and proprietary rights throughout the world, including all: (i) patents, patent applications and inventions (whether or not patentable or reduced to practice); (ii) trademarks, service marks, logos, trade names, slogans and internet domain names, social media handles, and all registrations, applications and renewals for any of the foregoing, and all goodwill associated with the foregoing; (iii) copyrights and works of authorship, and all registrations, applications and renewals for any of the foregoing; (iv) trade secrets and other proprietary information; (v) computer software and software systems; (vi) all other intellectual, proprietary or industrial rights including rights arising under license agreements; and (vii) all rights and remedies relating thereto, including remedies against, and the right to recover damages from, present and past infringement and rights to protection of interests therein..

"Knowledge" means, as to any Person (other than the Company), the actual knowledge or awareness of such Person after due and reasonable inquiry, and with respect to the Company, the actual knowledge of any Manager, officer, executive level employee, and supervisory level employee of the Company and any Existing Class A Member and their respective Affiliates, after due and reasonable inquiry.

"Law" means any foreign or domestic law, common law, treaty, statute, ordinance, rule, regulation, enforceable requirement, binding determination, order, decree, judgment, injunction or other pronouncement having the effect of law.

"Liability" and "Liabilities" means any direct or indirect liability, indebtedness, Claim, loss, damage, deficiency, assessment, responsibility, or obligation of whatever kind or nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, fixed or unfixed, determined or determinable, due or to become due, choate or inchoate, matured or unmatured, and whether due or to become due.

"Lien" means any lien, collateral assignment, encumbrance, mortgage, security interest, conditional or other sales agreements, pledge, hypothecations, claims, interferences, options, rights of first refusal, preemptive rights, restrictions of any nature, or other encumbrances (including any restriction on the voting of any security, any restriction on the transfer of any security or other asset, any restriction on the possession, exercise, transfer or any other attribute of ownership of any asset), as applicable and, in each case, applicable with respect to such asset or property.

"Ordinary Course" means, with respect to any Person, an action taken by such Person will be deemed to have been taken in the "Ordinary Course" only if such action is recurring in nature, is consistent in all material respects with the past practices of such Person (including with respect to quantity and frequency), and is taken in the ordinary course of the normal day to day operations of such Person.

23

COAST006253

"<u>Pension Plan</u>" means an "employee pension benefit plan" as defined in Section 3(2) of ERISA.

"<u>Permit</u>" means any license, permit, approval, franchise, registration, certificate, variance, authorization or similar right issued by or obtained from a Governmental Body.

"<u>Permitted Liens</u>" means (a) non-delinquent statutory Liens arising other than by reason of default, (b) Liens of carriers, warehousemen, mechanics and materialmen incurred in the Ordinary Course for sums not yet due, (c) Liens incurred or deposits made in the Ordinary Course in connection with workers' compensation, unemployment insurance and other types of social security and (d) with respect to Real Property only, (i) Taxes which are a lien and not yet due and payable as of the Closing Date, (ii) zoning, building and other land use regulations imposed by governmental agencies having jurisdiction over the Real Property which are not violated by the current use or occupancy of the Real Property or the operation of the business thereon, (iii) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Real Property which, in each case, do not materially impair (x) the value or marketability of the parcel of Real Property to which they pertain or (y) the occupancy or use of the Real Property by the business for the purposes for which it is currently used, and (iv) landlord liens under Leases set forth on <u>Schedule 3.10(b)</u>.

"<u>Person</u>" means any individual, corporation, limited liability company, partnership, joint venture, trust, business association, organization, Governmental Body or other entity.

"<u>Proceeding</u>" means any action, claim, complaint, charge, injunction, order, judgement, decree, arbitration, audit, hearing, investigation, litigation, suit or proceeding (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before any Governmental Body or arbitrator.

"<u>Side Letter</u>" means that certain letter agreement dated of even date herewith and duly executed by the Company, the Investor, and certain members of the Company regarding the Company Agreement.

"<u>Tax</u>" means any federal, state, local or foreign tax, assessment, governmental charge or imposition, including any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, escheat, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected by or under the authority of any Governmental Body.

"<u>Tax Return</u>" means any federal, state, local and foreign return, report, statement or other similar document required to be filed with any Governmental Body with respect to Taxes.

"<u>Transaction</u>" means the transactions contemplated by this Agreement and the other Transaction agreements.

24

COAST006254

"Welfare Plan" means an "employee welfare benefit plan" as defined in Section 3(1) of ERISA.

## ARTICLE 8

### MISCELLANEOUS

**Section 8.1**   **Expenses**.  Except as otherwise expressly provided in this Agreement, each Party shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the Transaction, including all fees and expenses of its agents, representatives, counsel and accountants and public announcements.

**Section 8.2**   **Entire Agreement**.  This Agreement and the other Transaction agreements set forth the entire understanding of the Parties with respect to the Transaction. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

**Section 8.3**   **Amendments and Waivers**.  This Agreement may not be amended except by an instrument in writing signed by or on behalf of each of the Parties.

**Section 8.4**   **Assignment and Binding Effect**.  This Agreement may not be assigned by any Party without the prior written consent of the other Parties; provided that Investor may, without the prior written consent of any Party, assign any or all of its rights hereunder to (a) one or more of its Affiliates, (b) any lender for collateral purposes or (c) any future purchaser of all or substantially all of the assets of the Company; provided, further, that no such assignment shall relieve Investor of its obligations hereunder.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective executors, heirs, personal representatives, successors and permitted assigns.

**Section 8.5**   **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand, (b) when sent by electronic transmission (including facsimile and email) with written confirmation of transmission, (c) one business day following the day sent by reputable overnight courier (with written confirmation of receipt) or (d) three business days following the date sent by U.S. registered or certified mail (return receipt requested), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

25

COAST006255

If to the Company, to:

with required copies (which shall not constitute notice:

Coast to Coast Title, LLC
14701 Saint Mary's Lane
Suite 150
Houston, Texas 77079
Attention: John Magness
Email: john.magness@magnoliatitleteam.com

York & Hinds, P.C.
1885 St. James Place
Suite 770
Houston, Texas 77056
Attention:  William York
Facsimile: 713-659-5755
Email:  wey@yorkhinds.com

If to Investor:

with required copies (which shall not constitute notice:

HMH Title Investments, LLC
c/o BNMJR, Inc.
1038 Texan Trail
Grapevine, Texas 76051
E-mail: Nelson.Mitchell@historymaker.com
Attention: CEO

Decker Jones, P.C.
801 Cherry Street, Unit #46
Burnett Plaza, Suite 2000
Fort Worth, TX 76102
E-mail: afulkerson@deckerjones.com
Attention: Adam J. Fulkerson

**Section 8.6**    **Governing Law**.  This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the State of Texas without giving effect to any choice or conflict of law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of Texas.

**Section 8.7**    **Jurisdiction and Venue**.  All Proceedings arising out of or relating to this Agreement and/or the Transaction shall be heard and determined exclusively in a state or federal court in the State of Texas.  Consistent with the preceding sentence, each Party hereby expressly, irrevocably and unconditionally (a) submits to the exclusive jurisdiction of any state or federal court in State of Texas for the purpose of any Proceeding brought by any Party hereto arising out of or relating to this Agreement and/or the Transaction, (b) waives any objection to the above courts based on lack of personal jurisdiction or inconvenient forum and (c) waives its right to bring any Proceeding arising out of or relating to this Agreement and/or the Transaction in any other jurisdiction.

**Section 8.8**    **Waiver of Jury Trial**.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO THAT IS RELATED TO THE TRANSACTION.

26

COAST006256

**Section 8.9    No Third Party Beneficiaries**.   Other than those Persons entitled to indemnification pursuant to Article 6, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 8.10    No Strict Construction**.   The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 8.11    Rules of Construction**.   All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context requires.  The words "hereof," "herein" and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, the word "or" shall include both the conjunctive and disjunctive and the word "any" shall mean "one or more".  The terms "Dollars" and "$" mean United States Dollars; Wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation."  Any statute defined or referred to herein or in any other Transaction agreement means such statute as from time to time amended, modified or supplemented, including by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  All accounting terms not otherwise defined in this Agreement shall have the meanings ascribed to them under GAAP.

**Section 8.12    Schedules and Exhibits**.   All Schedules and Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement and, unless otherwise defined therein, all terms used in any Schedule or Exhibit shall have the respective meanings ascribed to such terms in this Agreement.

**Section 8.13    Severability**.   Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof; and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 8.14    Remedies**.   In the event of any breach of this Agreement by any Party, the non-breaching Party shall, in addition to any other remedy provided herein or by law or in equity, be entitled to seek specific enforcement of the terms hereof, including appropriate injunctive relief in any court of competent jurisdiction, and no bond or other security shall be required in connection therewith.

COAST006257

**Section 8.15** <u>**Counterparts**</u>.    This Agreement may be executed in multiple counterparts, including counterparts delivered by facsimile or other electronic transmission, each of which shall be deemed an original and together shall be deemed one instrument.

*Signature page follows:*

28

COAST006258

**IN WITNESS WHEREOF**, the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
    B. Nelson Mitchell, Jr., CEO

Coast to Coast Title, LLC

By:_____
    John Magness, Manager

Alphabet Investments, LLC

By:_____
    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
    John Magness, Manager

405 Manhattan Investments, LLC

By:_____
    Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

COAST006259

**IN WITNESS WHEREOF,** the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
   B. Nelson Mitchell, Jr., CEO

Coast to Coast Title, LLC

By:_____
   John Magness, Manager

Alphabet Investments, LLC

By:_____
   Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
   John Magness, Manager

405 Manhattan Investments, LLC

By:_____
   Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

COAST006260

**IN WITNESS WHEREOF,** the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
   B. Nelson Mitchell, Jr., CEO


Coast to Coast Title, LLC


By:_____
   John Magness, Manager


Alphabet Investments, LLC


By: *M. Clayton Hill*_____
   Matthew Clayton Hill, Manager


Peabody Bulldog, LLC


By:_____
   John Magness, Manager


405 Manhattan Investments, LLC


By:_____
   Alyse Angelle, Manager


*Signature Page to Contribution Agreement*

DocuSign Envelope ID: B9E196FB-452F-4798-B7E9-31E6E5F72FAA

**IN WITNESS WHEREOF,** the Parties have executed this Contribution Agreement as of the date first above written.

HMH Title Investments, LLC

By: BNMJR, Inc., its Manager

By:_____
    B. Nelson Mitchell, Jr., CEO

Coast to Coast Title, LLC

By:_____
    John Magness, Manager

Alphabet Investments, LLC

By:_____
    Matthew Clayton Hill, Manager

Peabody Bulldog, LLC

By:_____
    John Magness, Manager

405 Manhattan Investments, LLC

By: *Alyse Angelle*_____
    Alyse Angelle, Manager

*Signature Page to Contribution Agreement*

COAST006262

September 9, 2022

HMH Title Investments, LLC
1038 Texan Trail
Grapevine, Texas 76051

<div align="center">

Re:    First Amended and Restated Company Agreement of Magnolia Title
Florida, LLC

</div>

Mr. Mitchell:

This letter agreement is between HMH Title Investments, LLC ("HMH"), Magnolia Title Florida, LLC, a Florida limited liability company (the "Company"), 405 Manhattan Investments, LLC, ("405"), Alphabet Investments, LLC, ("Alphabet") and Peabody Bulldog, LLC ("PB" and 405, Alphabet, and PB are each an "Existing Class A Member" and collectively the "Existing Class A Members") and is being entered into in connection with and is in further consideration of the investment by HMH in the Company, pursuant to the Contribution Agreement dated of even date herewith ("Contribution Agreement"), Statement of Preliminary Terms of Proposed Transactions attached hereto as Exhibit "A" and incorporated herein by reference for all purposes ("Term Sheet"), and the First Amended and Restated Company Agreement of the Company, dated as of December 1, 2021 (as amended, restated, waived or otherwise modified from time to time, the "Company Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Company Agreement.

1.    Classification of Units (Section 3.5).  Notwithstanding the terms of the Company Agreement, there are no Class A-1 Units currently issued and outstanding, and the Company will not issue any Class A-1 Units without the prior written consent of HMH. All Class A Units shall be voting common Units of the Company. Each Member shall be entitled to one vote per Class A Unit on all matters upon which the Members have the right to vote under the Company Agreement or under this letter agreement. Any references to "Series I," "Series II," "A-1," or any similar connotation shall have no significance and all Class A Units shall have the same rights and privileges (whether voting or economic). For the avoidance of doubt, all Class A Units will be voted as a single class, and all Class A-Series I Units and Class A-Series II Units shall vote as a single class of Units.

2.    Assumed Liabilities (Section 3.5).  The Existing Class A Members signing this letter agreement, agree to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses arising out of, pursuant to, or relating to the Special Contributions (as defined in the Company Agreement). For the avoidance of doubt, the Existing Class A Members hereby expressly waive and release any claims they may have against the Company for indemnity or contribution and any claims the Existing Class A Members may have or may ever incur against the Company arising out of, pursuant to, or relating to the Special Contributions.

---

COAST006263

3.     Class A-Series I and Class A-Series II Call Options (Section 3.5).  All options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option, are hereby terminated in all respects and any such options shall be of no further force and effect.  The Existing Class A Members signing this letter agreement, agree to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses arising out of, pursuant to, or relating to any options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option.  For the avoidance of doubt, the Existing Class A Members hereby expressly waive and release any claims they may have against the Company for indemnity or contribution and any claims the Existing Class A Members may have or may ever incur against the Company arising out of, pursuant to, or relating to to any options (whether call or put options) with respect to Units of the Company that are held by the Members, including the Class A-Series I Call Option and the Class A-Series II Call Option.

4.     Competition (Section 4.6).  The Existing Class A Members and each of their respective managers, governing persons, officers, representatives, and Affiliates are  not currently and will not after the date of this letter agreement: (i) compete with the Company; (ii) usurp business opportunities away from the Company' or (iii) further their own financial interests to the detriment of the Company.

5.     No Withdrawal (Section 4.7).  Notwithstanding anything to the contrary in the Company Agreement, no Member may withdraw or resign as a Member while the Member holds Units in the Company until the winding up and termination of the Company. Any purported withdrawal or resignation by a Member holding Units in the Company before the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units in the Company, such Person shall no longer be a Member. No Member is entitled to any distribution upon withdrawal, whether under § 101.205 of the Texas Business Organizations Code or otherwise.

6.     Certain Limitations on Board of Manager Activities (Section 5.5).  Notwithstanding anything contained in the Company Agreement to the contrary, the following acts shall be deemed to be an act in contradiction of the Company Agreement, and shall need the approval of a Supermajority Vote and HMH: (i) to change or reorganize the Company into any other legal form; (ii) to dissolve the Company at will; (iii) to sell, transfer, convey, assign, lease, license or otherwise dispose of substantially all of the Company's assets or properties;  (iv) to amend the Company Agreement; (v) to amend the certificate of formation or any other governing document of the Company; (vi) to merge, consolidate, or otherwise combine the Company with or into any other person or entity, or to agree to a share or interest exchange or any other transaction authorized by or subject to the provisions of Chapter Ten of the Texas Business Organizations Code or similar applicable law; (vii) to enter into any reorganization, recapitalization or other similar transaction effecting the Company or its assets or properties; (viii) to authorize any transaction, agreement, or action on behalf of the Company that is unrelated to its purpose as set forth in the Company Agreement or the Certificate or that contravenes the Company Agreement or the Term Sheet.

COAST006264

7.  <u>Management Agreement (Section 5.7)</u>.  All agreements, contracts, and obligations of the Company with BSpoke Management Group and any of its Affiliates or representatives have been satisfied, fully performed, or terminated on or before the date of this letter agreement.

8.  <u>Distributions (Section 7.4)</u>.  Notwithstanding anything contained in the Company Agreement to the contrary, and after giving effect to the terms of this letter agreement, including the indemnification by the Existing Class A Members for certain matters contained herein, all cash, securities and other assets available for Distribution, which amount shall be determined in the sole discretion of the Board of Managers, net of reserves determined by the Board of Managers, amounts for the repayment of indebtedness and expenses of the Company, shall be Distributed as follows: (i) First, to the holders of Class A Units in proportion to their relative portion of all Unreturned Capital Contributions, until each holder of Class A Units has received Distributions under this Agreement in an aggregate amount equal to the aggregate Unreturned Capital Contribution with respect to such holder's Class A Units outstanding immediately prior to such Distribution; and (ii) then to the holders of Class A Units, in proportion to the number of Class A Units held by such Members.

9.  <u>Permitted Transfers</u>.  The undersigned, constituting a Supermajority Vote, hereby consents to the Transfer from time to time by the members of HMH of their membership interests in HMH; provided that BNMJR, Inc. or its Affiliates shall at all times remain the Manager of HMH.  Furthermore, with respect to HMH, the transfer restrictions in Article 9 of the Company Agreement, including Section 9.1, shall not apply to any Transfer by HMH of all or any portion of its Units to any Affiliate of HMH.

10.  <u>Winding Up and Termination of the Company (Article 10)</u>.  Notwithstanding anything contained in the Company Agreement to the contrary, including, but not limited to Section 10.1 of the Company Agreement, any requisite vote to voluntarily wind up and/or terminate the Company shall include the affirmative vote and approval of HMH, and the Majority Vote of the Members shall not be sufficient unless such Majority Vote of the Members includes the affirmative vote and approval of HMH.

11.  <u>Tag-Along Right in Favor of HMH</u>.  Subject to the other transfer restrictions set forth in the Company Agreement, if one or more Members other than HMH (the "<u>Selling Member</u>") proposes to Transfer at least 20% of the Class A Units outstanding in any transaction or series of related transactions, then HMH (HMH, together with its permitted transferees designated herein, a "<u>Tag-Along Member</u>") may participate in such sale or transaction (a "<u>Tag-Along Sale</u>") on the terms and conditions in this Section 11.  Before any Transfer of Class A Units, the Selling Member shall deliver to the Company and each other Member a written notice (a "<u>Sale Notice</u>") of the proposed Tag-Along Sale as soon as practicable, and in no event later than two (2) days after the Selling Member enters into a definitive agreement. The Sale Notice shall reference the Tag-Along Members' rights hereunder and shall describe in reasonable detail: (i) the aggregate percentage of Class A Units the proposed transferee has offered to purchase; (ii) the name of the proposed transferee; (iii) the proposed date, time and location of the Tag-Along Sale's closing; (iv) the proposed amount of consideration for the Tag-Along Sale (both the aggregate and for each exercising Tag-Along Member), and the other material terms and conditions of the Tag-Along

COAST006265

Sale, including a description of any non-cash consideration that is sufficiently detailed to permit the consideration's valuation; and (v) a copy of the definitive agreements, and any proposed form of agreement or Member delivery for the Tag-Along Sale.  The Selling Member and each Tag-Along Member timely electing to participate in the Tag-Along Sale under this Section 11 shall have the right to Transfer in the Tag-Along Sale the amount of Class A Units equal to the product of (x) the total number of Class A Units that the proposed transferee proposes to buy as stated in the Sale Notice and (y) a fraction (A) the numerator of which is the number of Class A Units then held by the applicable Member, and (B) the denominator of which is the number of Class A Units then held by the Selling Member and all of the Tag-Along Members timely electing to participate in the Tag-Along Sale under Section 11 (such product, the "Tag-Along Portion"). Each Tag-Along Member may exercise its right to participate in a Tag-Along Sale by delivering to the Selling Member a written notice (a "Tag-Along Notice") stating its election to do so and specifying the number of Class A Units (up to its Tag-Along Portion) it will Transfer, no later than 20 days after the Tag-Along Member receives the Sale Notice (the "Tag-Along Period"). The Tag-Along Sale and right of the Selling Member to Transfer its Class A Units is subject to all the following conditions: (i) Each Member participating in the Tag-Along Sale shall receive the same form and amount of consideration to be received by the Selling Member per Unit of a given class (after deduction of such Member's proportionate share of the related expenses in accordance with Section 11, and the other terms and conditions of the Drag-Along Sale shall, except as provided in Section 11, be the same as those upon which the Selling Member sells its Units of such class below; and (ii) Each Tag-Along Member shall provide the same representations, warranties, covenants, and indemnities as the Selling Member provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, and indemnities pertaining specifically to the Selling Member, the Tag-Along Member shall make the comparable representations, warranties, covenants, and indemnities pertaining specifically to itself); provided, that all representations, warranties, covenants and indemnities shall be made by the Selling Member and each Tag-Along Member severally and not jointly and any indemnification obligation shall be pro rata based on the consideration received by the Selling Member and each Tag-Along Member (other than any indemnification obligation pertaining specifically to the representations, warranties, covenants, and indemnities of the Selling Member or a Tag-Along Member, which obligation shall be the sole obligation of such Selling Member or Tag-Along Member), in each case in an amount not to exceed the aggregate proceeds received by the Selling Member or Tag-Along Member (as applicable) in connection with the Tag-Along Sale. The requirement in the previous sentence that indemnification obligations be several and joint may be satisfied by a contribution agreement between the Selling Member and Tag-Along Members.  The fees and expenses of the Selling Member incurred in connection with a Tag-Along Sale and for the benefit of all Tag-Along Members (it being understood that costs incurred by or for a Selling Member for its sole benefit will not be considered to be for the benefit of all Tag-Along Members), to the extent not paid or reimbursed by the Company or the proposed transferee, shall be shared by the Selling Member and all the participating Tag-Along Members on a pro rata basis, based on the consideration received by each such Member; provided, that no Tag-Along Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the Tag-Along Sale. The Selling Member shall have 30 days following the expiration of the Tag-Along Period in which to consummate the Tag-Along Sale, on terms not more favorable to the Selling Member than those

COAST006266

set forth in the Tag-Along Notice (which such 30-day period may be extended for a reasonable time not to exceed 60 days to the extent reasonably necessary to obtain required approvals or consents from any governmental authority). If the Tag-Along Sale has not been consummated by the end of such period, the Selling Member may not exercise its rights under this Section 11 without again complying with Section 11 in its entirety.  If the Selling Member sells or otherwise Transfers to the proposed transferee any of its Class A Units in breach of this Section 11, then each Tag-Along Member may sell to the Selling Member, and the Selling Member undertakes to purchase from each Tag-Along Member, the number of Class A Units that such Tag-Along Member would have had the right to sell to the proposed transferee under this Section 11, for a price and upon the terms and conditions on which the proposed transferee bought such Class A Units from the Selling Member, but without indemnity being granted by any Tag-Along Member to the Selling Member; provided, that nothing contained in this Section 11 shall preclude any Member from seeking alternative remedies for a breach of this Section 11. The Selling Member shall also reimburse each Tag-Along Member for any reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred in the exercise or attempted exercise of the Tag-Along Member's rights under this Section 11.

12.     <u>Amendment (Article 12)</u>.  Notwithstanding anything contained in the Company Agreement to the contrary, including, but not limited to Section 12 of the Company Agreement, the Certificate of Formation of the Company and the Company Agreement may be amended, supplemented or restated only upon obtaining a Supermajority Vote approving such amendment and the affirmative vote and approval of HMH.  Any such amendment that does not receive the affirmative vote and approval of HMH shall be void and of no force and effect.

The Existing Class A Members have agreed to this letter agreement at the request of HMH and acknowledge and agree that this letter agreement is an inducement to HMH's decision to enter into the Contribution Agreement without requiring a substantive amendment to the Company Agreement.  The intent of this letter agreement is to shift the liability for certain existing Company obligations, liabilities, costs and expenses away from the Company and on to the Existing Class A Members.  To the extent the Existing Class A Members are required to indemnify, defend, and hold the Company, its Members (other than the Existing Class A Members), Managers, officers, representatives, HMH and its Affiliates harmless from and against any obligations, liabilities, costs or expenses set forth herein, the parties will agree to negotiate in good faith to determine the appropriate accounting and tax treatment of such indemnification payments in an effort to give effect to the substantive intent of this letter agreement.  The Existing Class A Members will not, however, receive any preferential treatment under Article 7 or any other provision of the Company Agreement over HMH for such indemnification expenses.  This letter agreement is being entered into by the parties subsequent to their execution of the Contribution Agreement, and for the avoidance of doubt, is not superseded or preempted by the Contribution Agreement, notwithstanding any language to the contrary in Section 8.2 thereof.  This letter agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Texas or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Texas.  Any dispute relating hereto shall be heard in the state or federal courts of the State of Texas, and the parties agree to jurisdiction and venue therein.  This letter agreement may

---

COAST006267

be executed in multiple counterparts which, taken together, shall constitute one and the same agreement.

* * * * *

COAST006268

Sincerely,

**Magnolia Title Florida, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006269

DocuSign Envelope ID: B9E198FB-452F-4798-B7E9-31E6E5F72FAX

Sincerely,

**Magnolia Title Florida, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: *Alyse Angelle* _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006270

Sincerely,

**Magnolia Title Florida, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: *M. Clayton Hill*
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By:_____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006271

Sincerely,

**Magnolia Title Florida, LLC**

By: _____
Name: John Magness
Title: Manager

**405 Manhattan Investments, LLC**

By: _____
Name: Alyse Angelle
Title: Manager

**Alphabet Investments, LLC**

By: _____
Name: Matthew Clayton Hill
Title: Manager

**Peabody Bulldog, LLC**

By: _____
Name: John Magness
Title: Manager

Accepted and Agreed as of
the date first written above:

**HMH Title Investments, LLC**

**By: BNMJR, Inc., its Manager**

By: _____
Name: B. Nelson Mitchell, Jr.
Title:  CEO

*[Signature Page- Side Letter]*

COAST006272

<div align="center">Exhibit "A"</div>

<div align="center">Statement of Preliminary Terms of Proposed Transactions</div>

Parties:          HMH Lifestyles, L.P. (HMH) and/or its affiliates.[1]

                  Sol City Title, LLC d/b/a Magnolia Title – Houston

                  Coast to Coast Title, LLC d/b/a Magnolia – North Texas

                  Magnolia Title Florida, LLC

                  Magnolia Title Arkansas, LLC

                  Starrex International, Ltd. and Starrex Insurance Services, Inc., a Nevada Corporation (a subsidiary of Starrex International, Ltd.) (collectively, "STX")

Transaction No. 1:      A designated affiliate of HMH will acquire the following equity interests in all Magnolias for a total consideration of $1MM cash and the completion of Transaction No. 2, below. The purchase price will be allocated as follows:

- Magnolia North Texas: $700,000; 42% ownership[2]
- Magnolia Houston $200,000; 36% ownership
- Magnolia Florida $50,000; 20% ownership
- Magnolia Arkansas $50,000; 20% ownership

The capital contributions will be used exclusively for working capital and general business purposes. The transactions contemplated in this Section will be memorialized in a contribution agreement between a designated affiliate of HMH and each Magnolia entity, as applicable. Each contribution agreement will be structured as tax free transaction under the Internal Revenue Code. Each contribution agreement will contain customary post-closing covenants. Each contribution agreement will contain obligations and restrictions in respect of the operation of the Magnolia business after closing, to help ensure that the business is sufficiently resourced and appropriately organized so as to be able to achieve the revenue targets. To this end, each contribution agreement will include adequate protections of the confidential information and trade secrets of each Magnolia entity. Each party to the contribution agreements will make customary representations and warranties that will survive for 3 years after the closing date, except for those representations and warranties of the applicable Magnolia entity related to (i) taxes, tax returns, and employee benefit matters, which shall survive until 90 days following the expiration of the applicable statute of limitations period; and (ii) certain "fundamental" representations, which shall survive indefinitely. With regard to taxes, each Magnolia entity will be responsible to pay (without use of any capital contributed by the designated affiliate of HMH in connection with the transactions described above): (i) any taxes of the applicable Magnolia entity for tax periods up to and including the date of closing, and (ii) any taxes arising by virtue or as a result of the transactions contemplated above and any tax liabilities relating to tax periods prior to closing that are not yet accrued, including, without limitation, those tax liabilities that would have been or would be accrued under accrual accounting and/or any amounts resulting from a change in the applicable Magnolia entity's method

---

[1] NTD: HMH is determining the proper parties for each transaction described herein.

[2] NTD: Are there any consent requirements to issue this equity? If so, we would like to outline any consents that have to be obtained in this Term Sheet.

COAST006273

of accounting (e.g., cash to accrual basis). Each Magnolia entity would indemnify HMH and its designated affiliates for (i) breaches of the applicable Magnolia entity's representations and warranties, (ii) the applicable Magnolia entity's covenants included as part of the contribution agreement, and (iii) liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the closing (including operations). Except in the case of fraud and taxes, such indemnification obligations for clauses (i) and (iii) above would be capped at the aggregate amount of HMH's (or its designate affiliate's) capital contribution to the applicable Magnolia entity.

- Projected closing date: August 1, 2022

Transaction No. 2:     HMH's affiliate (HMH Financial Services, Inc.) will terminate its existing Members' Agreement with Stewart Title Texas that is currently being operated under HMH Title Company, LLC and will begin transferring all existing files (to the extent such transfer would not violate fiduciary duties or otherwise breach the Members' Agreement) and new files (except files covering property in Denton County, Texas, until the applicable non-competition provisions expire) to Magnolia North Texas and Magnolia Houston, which will become preferred title vendors for HMH. Neither HMH nor its affiliates will receive any consideration, payments or distributions (other than the ownership to be received by HMH's designated affiliate described in Transaction No. 1, above) from either Magnolia North Texas or Magnolia Houston as a result of the transfer of any such files.

Magnolia North Texas and Magnolia Houston, (hereinafter referred to as the "HMH divisions"), both of which are duly licensed title agencies in good standing in the state of Texas, shall keep separate accounting records reflecting the monthly profit and loss of the HMH files.

The transactions contemplated in this Section will be memorialized in a preferred vendor relationship agreement between a designated affiliate of HMH and each Magnolia entity, as applicable. The parties agree that the preferred vendor relationship agreement will contain a mutual right to terminate the preferred vendor relationship at any time upon advance written notice, and there will be no restrictive covenants after any such termination, provided, the parties agree that such preferred vendor relationship (and the attendant termination right) may need to be revisited in connection with Transaction No. 3 set forth below.

- Projected closing date: August 15, 2022

Transaction No. 3:     Within 60 days after the completion of Transactions No. 1 and No. 2, STX shall complete the purchase of 100% ownership of the 4 Magnolias (but not later than September 15, 2022), through a series of transactions structured as tax-free reorganizations, for a total estimated consideration of US $21,000,000. All of the purchase price shall be paid by the delivery of STX common shares and warrants, allocated between the 4 Magnolias as follows:

(1)     Magnolia North Texas:
   o   Allocated to HMH (or its designated affiliate): (a) US $4,200,000 of STX stock[3], to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations[4]; and (b) 350,000 of STX warrants (the "earned warrants"), giving HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock at closing. The warrants shall be exercisable any time within three (3) years after closing and shall

---

[3] NTD: What consents are required to approve this transaction. We are assuming Board consent and shareholder consent is required. Are there any concerns with obtaining the required consents. Will either party have a remedy if the counter party is unable to obtain the requisite consents?

contain usual and customary provisions regarding exercise procedures, restrictions and mandatory conversion.[5]

o   Allocated to Remaining Members:  US $5,800,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones), but the earned warrants shall be issued at closing free and clear of any escrow requirements.

o   In addition to the earned warrants, HMH (or its designated affiliate) shall at closing be issued additional 750,000 of warrants (the "performance warrants") which shall give HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock as of the closing date and which shall be non-exercisable until the following combined revenue milestones of the HMH divisions are achieved:

   (i)    US $6,000,000 annual run rate revenue within the first 12 months after closing (the "First Expiration Date"):  250,000 warrants, to be exercised within three (3) years after closing;

   (ii)   US $8,000,000 annual run rate revenue within the first 36 months after closing (the "Second Expiration Date"):  250,000 warrants, to be exercised within four (4) years after closing;

   (iii)  US $10,000,000 annual run rate revenue within the first 48 months after closing (the "Final Expiration Date"):  250,000 warrants, to be exercised within five (5) years after closing.

   All annual run rate revenue calculations shall be based upon the average of 2 months actual revenue of the HMH divisions and will be calculated on a monthly basis beginning on the 2 month anniversary of closing.  STX covenants and agrees to adhere to a standard of good faith and fair dealing with regard to the revenues of the HMH divisions, will not divert business opportunities or revenues away from the HMH divisions, will not delay the collection of receivables, and shall not take any actions with the intent or effect of reducing or depriving the HMH divisions of revenue.

(2)   Magnolia Houston:[6]
   o   Allocated to HMH (or its designated affiliate): (a) US $2,200,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations; and (b) 150,000 of STX warrants (the "earned warrants"), giving HMH (or its designated affiliate) the right to purchase STX stock at the same per share price as the STX stock at closing.  The warrants shall be exercisable any time within 3 years after closing and shall contain usual and customary provisions regarding exercise procedures, restrictions and mandatory conversion.

   o   Allocated to Remaining Members:  US $3,800,000 of STX stock, to be issued at closing

---

[5] NTD: If these usual and customary provisions are known, let's outline them in the term sheet.  If they are not known, let's outline what they will look like.
[6] NTD: Comments 2-5 above apply to the Magnolia Houston transaction as well.

under the same provisions as the HMH stock, above.

    o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones), but the earned warrants shall be issued at closing free and clear of any escrow requirements.

(3)    Magnolia Florida:

    o   Allocated to HMH (or its designated affiliate): US $600,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date in accordance with Canadian Stock Exchange regulations.

    o   Allocated to Remaining Members:  US $2,400,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

    o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved, (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones).

(4)    Magnolia Arkansas:

    o   Allocated to HMH (or its designated affiliate): (a) US $400,000 of STX stock, to be price protected at its closing price per share within 45 days prior to the closing date, in accordance with Canadian Stock Exchange regulations.

    o   Allocated to Remaining Members:  US $1,600,000 of STX stock, to be issued at closing under the same provisions as the HMH stock, above.

    o   A portion of the STX stock to be issued at closing as consideration for the purchase price shall be placed in escrow, until certain revenue milestones are achieved, (and it is anticipated that the escrow agreements will provide for periodic releases of STX stock based upon the achievement of intermediate revenue milestones).

All shares of common stock and warrants issued by STX shall contain restrictions against free trading[7] as prescribed by the Ontario Securities Commission and the Canadian Stock Exchange and shall be subject to lock-up agreements to insure that an orderly market in maintained for the trading of STX stock in the public markets.  In this regard, all STX shares and warrants issued at closing and each person receiving STX shares and warrants at closing will be subject to the same restrictions against trading, and the lock-up agreements will be substantially similar and contain the same substantive terms and restrictions.

The transactions contemplated in this Section will be memorialized by merger agreements between STX (or a designated affiliate of STX) and each Magnolia entity, as applicable.  The mergers will be structured as tax free reorganizations under the Internal Revenue Code.  Each merger agreement will contain customary post-closing covenants.  Each merger agreement will require STX (as a condition to closing) to deliver a non-compete agreement between STX and each officer of STX that is managing a title division under which each such officer would be prohibited from competing with STX in any business that has been or is proposed to be engaged in by STX.  Each merger agreement would also contain non-solicitation provisions and

---

[7] NTD:  STX and its major shareholders need to enter into a registration rights agreement such that the shareholders would have certain registration rights and the parties would reasonably cooperate if STX or any shareholder wanted to register STX shares.

COAST006276

requirements related to confidential information and trade secrets to protect the business of STX.  Each party to the merger agreements will make customary representations and warranties that will survive for 3 years after the closing date, except for those representations and warranties of STX related to (i) taxes, tax returns, employee benefit matters, environmental, and health and safety matters which shall survive until 90 days following the expiration of the applicable statute of limitations period; and (ii) certain "fundamental" representations, which shall survive indefinitely.  With regard to taxes, STX will be responsible for (i) any taxes of STX for periods up to and including the date of closing, and (ii) any taxes arising by virtue or as a result of the transactions contemplated above and any tax liabilities relating to periods prior to closing that are not yet accrued, including, without limitation, those tax liabilities that would have been or would be accrued under accrual accounting and/or any amounts resulting from a change in STX's method of accounting  (e.g., cash to accrual basis).  STX would indemnify each Magnolia entity for (i) breaches of STX's representations and warranties, (ii) STX's covenants included as part of the merger agreement, and (iii) liabilities, actions, conditions, or occurrences existing or taking place, or related to periods prior to the closing (including operations). Except in the case of fraud and taxes, such indemnification obligations for clauses (i) and (iii) above would be capped at the aggregate amount of the consideration paid by STX to the applicable Magnolia entity.

Projected Closing Date: September 15, 2022

Other Matters:

(1)      HMH or its affiliates will be granted the right, but is under no obligation, to participate in a minimum amount of $500,000 in one or more initial equity placements that STX contemplates to complete in connection with the closing of the Magnolia transactions and other acquisitions.

(2)      STX grants to HMH and its affiliates a first and preferential right, but not obligation, to participate in all future debt or equity capital raises, subsequent to the initial capital raise described in paragraph (1) above.  Notwithstanding the foregoing, STX agrees that it will not issue any stock that has a higher voting or distribution priority than the stock being issued hereunder without affording HMH and its affiliates the right to participate in any such offering.

(3)      Nelson Mitchell has expressed an interest in becoming a director of STX.[8]  In the event the Magnolia transactions are completed into STX, STX senior management agrees to place his name on its recommended slate of directors at the next ensuing shareholder meeting following the closing.[9] Furthermore, in the event a vacancy occurs on the board of directors of STX, prior to such annual meeting, STX management agrees to recommend that Nelson Mitchell be nominated by the board to fill such vacancy.

(4)      HMH acknowledges that certain affiliates of STX own Amcap Mortgage, Ltd.  In consideration of the terms set forth in this proposal, HMH agrees to use reasonable efforts and good faith in negotiating a mortgage relationship with Amcap, assuming that, and in all respects conditioned upon, the transactions described herein closing.

Documents and timing: The Magnolia entities and the STX entities, as the case may be, will prepare the first draft of the definitive agreements and will provide a first draft to HMH at least 30 days prior to each project closing date set forth herein. The parties, however, may decide that HMH should draft and deliver the first draft of the contribution agreements relating to Transaction No. 1.  If that decision is made, legal counsel for the

---

[8] NTD:  We need confirmation that STX has D&O insurance, and we would like to review the policy.  This will be included in our initial due diligence request list.
[9] NTD:  I think STX senior management owns a controlling interest of the STX shares.  In turn, as a part of closing, I think this agreement to nominate Nelson to the board needs to be added to a voting agreement to make it legally binding.

COAST006277

Magnolia entities and legal counsel for HMH will endeavor to discuss and agree upon the structure of the contribution agreements before an initial draft is prepared such that each contribution agreement results in a tax free transaction under the Internal Revenue Code. HMH will submit an initial due diligence request list to the Magnolia entities and STX within 5 days after the signing of this proposal. The Magnolia entities and STX will use commercially reasonable efforts to respond to such due diligence request list and make the underlying responsive documents available to HMH and its representatives on or prior to the date that each initial draft of the definitive agreements are delivered to HMH.

Confidentiality: The contents of this proposal, and the fact that it has been signed, are subject to the terms of the Confidentiality and Non-Circumvention Agreement between HMH and STX dated May 20, 2022 and, unless otherwise provided under that agreement, may only be disclosed by the parties hereto to each of their respective owners, directors, governing persons, and advisers on a need to know basis.

THIS PROPOSAL SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF TEXAS. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS PROPOSAL OR THE DEFINITIVE AGREEMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS PROPOSAL AND THE DEFINITIVE AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. ANY ACTION OR PROCEEDING INVOLVING ANY DISPUTE, CLAIM OR CONTROVERSY RELATING TO OR ARISING UNDER THIS PROPOSAL, ANY DEFINITIVE AGREEMENTS, OR THE DEALINGS OF THE PARTIES SHALL BE COMMENCED AND PROSECUTED EXCLUSIVELY IN THE STATE DISTRICT COURTS LOCATED IN TARRANT COUNTY, TEXAS, OR THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS (FORT WORTH DIVISION), AND EACH OF THE PARTIES HERETO HEREBY (A) EXPRESSLY AND IRREVOCABLY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS) IN ANY SUCH ACTION OR PROCEEDING, AND (B) IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND AGREES NOT TO ASSERT ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SUCH COURTS, THAT SUCH LEGAL PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, OR THAT THE VENUE OF SUCH PROCEEDING IS IMPROPER.

This proposal may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

This proposal does not reflect any form of legally binding commitment or obligation on the part of either party or its affiliates, except with regard to confidentiality, governing law, consent to jurisdiction, and waiver of jury trial (collectively, the "Binding Provisions"). No contract, joint venture, partnership or fiduciary relationship shall be deemed to exist between the parties or any of their affiliates unless and until final definitive agreements with respect to the proposed transactions have been executed and delivered and only thereafter as and to the extent specified therein. The parties hereby acknowledge and agree that (a) the terms in this proposal do not contain all material terms to be negotiated as part of the definitive agreements or otherwise with respect to the proposed transactions; (b) no oral agreement, public or private statements or course of conduct or dealings between the parties and/or their affiliates may be introduced as evidence that there exists a joint venture or partnership or any binding contract or commitment between the parties with respect to any of the transactions contemplated hereby, other than the Binding Provisions; and (c) neither party shall be justified in relying on any provision of this proposal (other than the Binding Provisions), in connection with the transactions hereby.

In turn, this proposal is for negotiating purposes only and does not constitute a binding agreement between the parties, except for the Binding Provisions. In the event definitive agreements are not able to be completed by the projected closing dates set forth above, unless extended by mutual agreement

COAST006278

of the parties, neither party herein shall have any further duty to negotiate or discuss these matters any further, provided, however, the Binding Provisions shall survive and remain in full force and effect indefinitely.

DATE    6-17-22

JOHN MAGNESS, MANAGER OF THE MAGNOLIAS

DATE    6/17/22

MATT HILL, CEO OF STARREX INTERNATIONAL, LTD. AND STARREX INSURANCE SERVICES, INC.

DATE    6/17/22

NELSON MITCHELL, CEO OF BNMJR, INC., the general partner of HMH Lifestyles, L.P.

---

[10] Does John have the authority to enter into this transaction on behalf of the Magnolia entities without further consent of the other members.

COAST006279